# Exhibit G

## *To Plaintiffs' Complaint for Injunctive and Declaratory Relief*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


VINEYARD WIND 1, LLC,            )
                                 )   Civil Action
            Plaintiff,           )   No. 26-10156-BEM
v.                               )
                                 )
UNITED STATES DEPARTMENT         )
OF THE INTERIOR, et al.          )
                                 )
                                 )
            Defendants.          )



BEFORE THE HONORABLE BRIAN E. MURPHY
UNITED STATES DISTRICT JUDGE


MOTION HEARING


January 27, 2026


John J. Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

Counsel on behalf of Plaintiff Vineyard Wind 1 LLC:

Brooklyn Hildebrandt
Sidley Austin LLP
555 W. 5th Street
Los Angeles, CA 90013
213-896-6007
bhildebrandt@sidley.com

Jack W. Pirozzolo
Sidley Austin LLP
60 State Street
Boston, MA 02109
617-223-0300
jpirozzolo@sidley.com

Kathleen Moriarty Mueller
Peter C. Whitfield
Matthew Brewer
Sidley Austin LLP
5101 K Street NW
Washington, DC 20005
202-736-8987
kmueller@sidley.com

Counsel on behalf of Defendant United States Department of the Interior:

John Kenneth Adams
DOJ-Enrd
950 Pennsylvania Ave NW
Washington DC, DC 20530-0001
202-353-5905
john.adams3@usdoj.gov

Counsel for the Commonwealth of Massachusetts:

Nathaniel Haviland-Markowitz
Turner Smith
Massachusetts Attorney General's Office
One Ashburton Place, 20th Floor
Boston, MA 02108
347-463-7595
nathaniel.haviland-markowitz@mass.gov

(continued.)

APPEARANCES: (continued.)

Counsel for Climate Jobs Massachusetts, Massachusetts AFL-CIO, Massachusetts Building Trades:

Nicole Horberg Decter
Segal Roitman, LLP
33 Harrison Avenue
Boston, MA 02111
617-742-0208
ndecter@segalroitman.com

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Brian E. Murphy, United States District Judge for the District of Massachusetts, at the John J. Moakley United States Courthouse, One Courthouse Way, Courtroom 12, Boston, Massachusetts, on January 27, 2026 at 2:04 p.m.)

(Case called to order.)

COURTROOM CLERK:  You may be seated.  If counsel can first identify yourselves, starting with plaintiff's counsel.

MR. PIROZZOLO:  Good afternoon, Your Honor.  Jack Pirozzolo on behalf of Vineyard Wind.  And with me at counsel table is Brooklyn Hildebrandt, Kathleen Mueller, Peter Whitfield, and Matthew Brewer in the back.

THE COURT:  Good afternoon to everyone.

MR. PIROZZOLO:  Thank you, Your Honor.

MR. ADAMS:  Good afternoon, Your Honor.  I'm John Adams on behalf of federal defendants.

THE COURT:  Good afternoon.

MS. HORBERG DECTER:  Nicole Horberg Decter on behalf of the Massachusetts AFL-CIO, Massachusetts Building Trades Council and Climate Jobs Massachusetts, the amici.

THE COURT:  Good afternoon.

MR. HAVILAND-MARKOWITZ:  Good afternoon, Your Honor. Nathaniel Haviland-Markowitz with the Massachusetts Attorney General's Office on behalf of the Commonwealth of

Massachusetts, and also with me is Turner Smith.

THE COURT:  Good afternoon.  I thank you for all for being here.  I appreciate, I recognize that you may have been asked to step in at the last minute, so I just want to acknowledge I appreciate your being willing to do so.

I know as we talked about on the Zoom this was a case that needed some rather quick resolution, and that's why we ended up here quite quickly today.

I think I will give you the floor first.

MR. PIROZZOLO:  Thank you, Your Honor.  And just in terms of some procedural blocking and tackling here, the Attorney General's Office amici has asked for about five minutes, and AFL-CIO and Building Trades Council has asked for about one minute.

THE COURT:  I think we can accommodate that, yes.

MR. PIROZZOLO:  And I just want to make sure I'm answering your questions, but I have probably about 20 minutes or so of argument, but I anticipate that you'll have questions.

THE COURT:  Sure.  Take all the time that you need.

MR. PIROZZOLO:  Thank you, Your Honor.

THE COURT:  Well, let me start with a question.  A PI versus a stay, what's the difference here?

MR. PIROZZOLO:  Well, functionally it's not likely to be any different here.  So we would certainly want -- I think we've actually asked for both.

THE COURT:  You did.

MR. PIROZZOLO:  So functionally it's going to be the same thing, but I don't know really if it really makes a difference procedurally as far as --

THE COURT:  I know the factors are obviously the same. From the government's perspective, is there any difference between these two possible remedies?

MR. ADAMS:  No, Your Honor.  We would agree with that. The factors are the same, and the government will have the same defense.

THE COURT:  Okay.  Great.  Thank you.  Go ahead.

MR. PIROZZOLO:  Thank you, Your Honor.

So I want to start by saying Vineyard Wind really did not want to be here.  It's not an accident that we were the last of the projects to actually file a lawsuit.  And that's because we tried, once the order came down, we tried very, very hard to work with BOEM and BSEE.  And I know it's a bit of an alphabet soup, but BOEM is the Bureau of Ocean Energy Management, and BSEE is the Bureau of Safety and Environmental Enforcement.  And they're both defendants in this case, and our requested relief is going to go as to both.  I just want to, I want to frame that up from the beginning, Your Honor.

We tried to work with them.  We tried to work within the existing order to continue the construction of the project to get whatever information that we could with regard to

potential mitigation of the purported national security issue and there's just no engagement whatsoever. That was nearly a month before we were essentially forced -- it was about three weeks before we were forced to actually sue here.

Now, the reality here, and I don't think this is really disputed, is that without providing Vineyard Wind any notice or opportunity to be heard, the government issued this stop work order, and it suspended all ongoing activities related to the project, except for activities related to safety and ongoing power generation, which I'm going to address later in my remarks.

So this stop work order was issued at a very crucial time in the project. The project was 95 percent completed. Vineyard Wind has invested four and a half billion dollars so far. And completion of the vessel -- completion of the project requires a specialized vessel. You saw in the papers the reference to the Sea Installer. These are not vessels that you can simply contract for. It takes months and sometimes years to actually get them under contract.

The Sea Installer is only available as contracted. So Vineyard Wind is only contracted with the Sea Installer through March 31 of this year, and its commitments, financial commitments require completion of the project by the end of March of this year.

THE COURT: That's 100 percent completion? That

includes the replacing of all the blades?

MR. PIROZZOLO:  That's correct, Your Honor, that's correct.  And we have barely enough time to finish as it is, but, you know, if the order is entered, we expect that we'll be able to, weather permitting, and I can explain how the weather works here and I mentioned last week about the weather window, but under the construction schedule there's a certain amount of days that, just because of the historical weather patterns and the requirement that the vessel can't engage in construction if the seas are over a certain height, that there are going to be lost days no matter what.  We can't tell exactly what day.  We can project out in a few days in advance, as you heard on Friday, but it's part of the plan that there will be days that we cannot work.  But there are of course going to be days that we can work, and that's the 60-day window that we have in order to complete the project.  And there are 18 turbines essentially that are at issue here because 44 have been completed.

And I want to add an additional fact that came up late sort of after we filed our papers, which is that the government had said that somehow Vineyard Wind isn't going to be irreparably harmed because the lenders aren't going to be doing anything.  As you may have seen in the supplemental declaration that we filed, the lenders actually have informed the project as of January 23 that they are now questioning the financial viability of the project and have reserved the right to take

the position that the order is an event of default.

So this is not speculative. This is real. And in terms of whatever standard you have for purposes of a likely irreparable harm essentially, the potential collapse of the project, you have that here on this record before the court. The reality is the project is now at a grave risk of failing to meet its construction schedule and in turn its financial obligations under both the power purchase agreements and its financing arrangements.

The government has made a lot about the fact that there are 44 turbines that are permitted to continue to spin. The record is that the current level of power production will not cure the harm. The current level of power production is insufficient to meet the project's financial obligations and its commitments, and the failure to provide a fully constructed project at the end of March, which requires it to produce 800 megawatts of power, puts the project in a position where it will be facing default under both the power purchase agreements and under its financing arrangements.

The order is illegal. It was issued in violation of the APA, the OCSLA, the Outer Continental Shelf Lands Act, and the Fifth Amendment. We've shown immediate and irreparable harm, and the balance of harms does not weigh in favor of the government. Instead, it weighs heavily in favor of an injunction.

Now, it's important, as you saw in our reply brief, that the court here is not facing these issues as the first court to be facing these issues.  So far, three other projects have gone to three separate judges, all of whom have concluded the same thing; that an injunction should issue with regard to the stop work orders.

There is no material difference between the stop work orders that those judges determined were appropriately enjoined and the stop work order that is at issue here.  And those courts properly found and they really focused -- I'm going to focus largely on the APA issues here that are raised, that the projects there showed a likelihood of success in terms of a violation of the APA, including arbitrary and capricious, and I think one court suggested that there was evidence that this is a pretext as well.

I don't think you need to decide the pretext issue here on this record.  You certainly can if you want, but I don't think it's necessary to get Vineyard Wind the relief that we're seeking here.  It's sufficient to show that the order was arbitrary and capricious; that the order was provided without notice in violation of the procedural requirements that the project is entitled to, and probably most importantly, particularly given First Circuit case law here, there was no consideration of the reliance interests of Vineyard Wind.

I think all of the reasons are sufficient for a

likelihood of success on the merits, but of all of them, I think in terms of, if you look at the line of cases in the First Circuit that we cited, you're going see that the absence of considerable reliance interests really drives the question of whether or not there's going to be a violation of APA, and I don't think it's disputed here at all that there was any consideration. Certainly the order doesn't reflect it, and administrative record doesn't reflect any consideration of the reliance interests of Vineyard Wind.

So we've provided a case table in the reply which sort of lays out the different cases, how they were decided. There were different rationales, but you can see the overall thrust of how the courts have approached the issue in terms of the balance of the various equities here.

Now, the government is I think forced into a position of saying, well, you should just not follow those. And the government is forced to say, well, this is distinguishable, right? And it really comes down to basically two points that they make as to why this is distinguishable, right?

The first has to do with the fact that they are permitting the 44 wind turbines to continue to generate power. That's one. And then the second is they claim that there really isn't a risk of catastrophic financial failure here. I'll address the second one in a moment because I don't think the record -- I think the record is overwhelming that Vineyard

Wind faces catastrophic, the collapse of the project if the stop work order is in place, and I can explain why that is in a minute.

But with regard to the question of the operation, there are two things about that. First, it doesn't affect the APA analysis, but this is still arbitrary and capricious, I think they're framing it more as a question of balance of harms that there isn't as imminent a harm. But let me tell you why that's not true and why it's just an incorrect analysis based on how the project works.

So first, as a threshold matter, the reality is the 44 turbines are simply insufficient to generate the amount of power that's required under the power purchase agreements, it requires 800. The way financing works is Vineyard Wind is committed to providing a completed project. That's the commitment. They don't do that, so commercial operation and failure to reach commercial operation date, if you look at the purchase agreement, is an event of default under those, but also with regards to the -- we submitted a declaration with regard to the financing. With regard to the financing, failure to have a completed project at the end of March exposes the project to a full default.

And so the question of the 44 turbines is just, it's irrelevant to the financial and catastrophic harm that Vineyard Wind is going to face if it can't complete the project on time.

And the project can't do that because the Sea Installer is -- we don't have a vessel to complete the project even after March.

I will say that Vineyard Wind has tried to identify whether there are other vessels that are available and has not been able to locate another vessel that could take the place of the Sea Installer. And just so you know, the Sea Installer is just sitting out there in the water waiting to work. It's just out there now, ready to work, and it can't do it. And these vessels are under tremendous demand worldwide. There are other projects worldwide. And at a certain point, the Sea Installer, it's just not going to be available to finish the project.

So with regard to the operations point as well, what's sort of puzzling about the stop work order, and this goes to the arbitrary and capricious nature of it, is as we understand it based on the record that's been developed so far, whatever the national security information is relates to issues related to operation and not construction. And the stop work order here at least is stopping the construction phase of Vineyard Wind, so there's no explanation as to the connection of those two things.

And then with regard to operations, there's no analysis whatsoever of why and how the current construction plan, so the COP, and the mitigation agreement that Vineyard Wind signed and amended in 2023, is insufficient to handle

whatever mitigation is needed for whatever this new additional information is.

If you look at the mitigation agreement, you can see that it provides, among other things, for curtailment. So if there's an issue, the blades can stop. And my understanding is that's just a matter of a couple of minutes once there's a notification that there's an issue with regard to a potential risk.

And the fundamental problem with the stop work order that we have here is there's just no explanation of any -- and I don't think there was any analysis of how the national security information ties in any way to making the mitigation agreement inadequate in any way or how it ties to the question of construction. They don't really analyze that in any way. None of that stuff is classified. They just simply didn't analyze it.

The only thing I saw in the papers, Your Honor, was a single paragraph from the acting director who said that he looked at the COP and looked at the mitigation agreement. Actually, incidentally, if you look at the declaration, it doesn't say when he did; it just says he looked at it, with no explanation as to how that should tie in any way to the decision to stop this project. And certainly there is no analysis specific, really truly specific to this project with regard to the connection of national security. Nor is there

any further explanation, there's no explanation in the administrative record at all.

So even if they could try to cure this with some affidavit, they didn't do it. They just said, I looked at it and that's it. There's no evidence that he had any expertise whatsoever. I don't think he has any expertise in national security, radar, anything. He didn't look -- there's no expert, no record here at all of anybody saying or showing if there's any particular rational basis for the decision to stop the work here under these circumstances.

So as I mentioned at the top, and I don't want to necessarily repeat myself, I think that really what fundamentally is going to sort of -- I think is sort of overwhelming here is the failure to consider the reliance interests.

THE COURT: Yes.

MR. PIROZZOLO: There just isn't, and there is no dispute and the government makes no showing that there was any actual consideration of the reliance interests.

In terms of the irreparable harm issue, as I mentioned, the way the construction works is that you have a window and you have a certain amount of time in order to build the project. The Sea Installer is there until March 31, and then it would take another year or so.

I want to address in terms of the -- sorry, I said

there were two.  One was operations.  And the second is this idea that somehow the blade failure back in 2024 shows that this really isn't going to be irreparable harm to the project because there was a blade failure and the project survived.  It wasn't entirely clear to me what the government's argument was along those lines, but I infer from that they're suggesting, well, Vineyard Wind is crying wolf here because they went through a crisis before, and, you know, they can survive it just as easily.  I think that's the thrust of the argument.

That situation was completely different.  Among other things, the period of time under the power purchase agreement had already been extended, and there wasn't any kind of imminent deadline for issuing of the power in the power purchase agreements.  The financing arrangements were I think nine months off.  But most importantly, and I think this is truly fundamental in terms of the difference between this order and what happened in 2024, is that when the blade fell, there was an immediate response to figure out what happened, and then Vineyard Wind was able to create a plan to come to the agencies and say, here is the plan to complete construction.  If you can show a plan and a timeline for completing construction, then you're in a position to have the financing arrangements work out.

Here, with respect to both the Sea Installer and the financing arrangements, the stop work order here is for 90 days

minimum.  It's essentially an indefinite stop work order, and it doesn't provide any guidance in terms of how there could be any plan in order to mitigate.  They say there's going to be mitigation, but there's absolutely no plan, and so the project simply can't go to its lenders.  What lender is going to say, okay, we're going to lend you money but I don't know when the project is going to be completed, I don't know whether you're going to ever be able to complete the project?

And the same with the Sea Installer.  It's not like it's inexpensive to keep the Sea Installer around.  It costs something in the order of $200,000 to $500,000 a day.  And Vineyard Wind is an entity; and yes, it has money, but it doesn't have infinite money.  And you can't be in a position to simply say, okay, we're just going to keep you on in the hopes that someday, somehow, several months later, okay, now Sea Installer, you can do your work.  It puts the project completely at risk because Vineyard Wind, as the entity -- and really the focus here is on the entity, the LLC -- the entity itself simply would not be in a position to have an indefinite amount of money spent on a ship that is just sitting around.

I do have a picture of the Sea Installer if the court is interested.

THE COURT:  I'd like to see that.  Let me ask you a question that I've been struggling with a little bit, which is, when I'm looking at irreparable harm, and I looked at the other

cases, the three other cases you talked about, is irreparable harm the death knell of the smallest legal entity?

So let's say Vineyard Wind is owned -- I'm not saying that this is the case, but Vineyard Wind is owned by Apple, but it's separately incorporated so that the five-billion-dollar loss that we'd be looking at, four-and-a-half-billion-dollar loss that we'd be looking at here would wipe out the LLC but potentially not the larger entity.

How do I deal with -- I mean, you could have incorporated each individual turbine as an LLC and then say that since one turbine is not online, it's the death knell of Turbine 6 LLC, would that still be irreparable harm?  And how am I supposed to think about those things?

MR. PIROZZOLO:  You do need to look at the juridical entity, so the answer is yes.  So I think the answer to your question is yes.  So the entity that you looked at in terms of assets, liabilities, in terms of the ability to survive, and I think the case law is quite clear on this, that you look at that entity and you make the judgment as to whether or not there's going to be a collapse of that entity.

Now, it just so happens there's all kinds of terrible collateral other effects of the collapse of the project here, but in terms of what you're supposed to focus on, the order runs against Vineyard Wind LLC.

THE COURT:  Right.

MR. PIROZZOLO: The construction, the COP is with Vineyard Wind LLC. And so the issue is what effect does it have on Vineyard Wind LLC. That's really the appropriate focus of the court's inquiry. May I approach?

THE COURT: Of course, yeah. Mr. Adams has seen this before?

MR. PIROZZOLO: Yes, I have provided him a copy. Marked as Exhibit 1, Your Honor?

(Exhibit 1 admitted into evidence.)

THE COURT: Sure. Thank you.

MR. PIROZZOLO: So just for the record, we're marking a photograph of the Sea Installer that you can see. Just to describe what you're looking at, the Sea Installer is the massive vessel with the crane, and you can see on the right-hand side of the photo essentially the constructed tower coming out of the water, sort of like a concrete post. Do you see that?

THE COURT: Yes.

MR. PIROZZOLO: Just for scale, to the left is a service boat. That gives you a sense of how large this vessel truly is. The turbines go hundreds of feet in the air. This is not a day sail that you can rent in Hyannis. This is a specialized vessel. I believe that there are maybe fewer than ten in the world that can do this work.

THE COURT: Is that vessel floating on the water?

MR. PIROZZOLO: I believe it's anchored, fastened to the -- not fastened but it has footers that go to the floor of the seabed.

THE COURT: All right. Thanks.

MR. PIROZZOLO: It jacks up.

THE COURT: It does, okay. Thanks.

MR. PIROZZOLO: And then the last, two more points before I'll sit down, Your Honor, unless you have further questions for me?

THE COURT: No. Go ahead.

MR. PIROZZOLO: So I do want to focus, because the government is so focused heavily on the *Winter* case, and we think the *Winter* case actually helps us, it doesn't hurt us. Because if you read the *Winter* case, it's clear that the Supreme Court said you do conduct the same balancing test, the test is the same, and national security doesn't overwhelm every other consideration.

But I think the most germane part of *Winter* is if you look at the actual development of the record that existed in that case, you saw several Naval, I guess they were officers, who submitted affidavits with regard to, it had to do with essentially training exercises under water, multiple rounds, a highly, highly developed factual record here, and even then it was a close call. But in this case, by contrast, we have nothing. We have an acting director who saw a report

designated secret, not even top secret, SCI, and made a decision to just stop everything without any development.

There's no evidence that the Department of War actually evaluated any of this, made the recommendation. There's just no evidence of any of that. I don't know whether that happened or didn't happen, but we can only deal with the record before us, and the court can only deal with the record in evaluating the APA issue where the record gets presented, and there's nothing of the sort here.

I mentioned at the beginning that this case is not just against BOEM but also against BSEE. I want to explain why that matters. So the way the construction works, and this relates to the installation of the blades, is there's two phases: return to installation and return to service.

And in the construction, as part of the construction, what happens is there's a blade, there are various specifications for the blade, so testing, making sure the blade meets the specifications basically. And so what happens is the project submits to BSEE the specifications, and then if BSEE has any questions, they ask the questions. And then once they don't have any more questions, then the blades first can be installed. That's what they call RTI. And then they can be put into service. That's RTS. Okay?

On average over the last three months before this order, the RTI process took two days. The RTS process took

less than a day on average. Since December 23, there's been nothing. There have been a series of what we call blade packages that have been presented to BSEE and it's been silent.

It is of great concern in connection with whatever order this court were to issue that it takes into account the requirement that BSEE treat those blade packages in the ordinary course. There's a course of dealing so we know how long and we know the types of things that are at issue with BSEE. We have some concern that even if the stop work order on BOEM is enjoined that the government would countermand that by having BSEE simply not provide the information back to the project so the blades can be installed.

THE COURT: What happened to the other three cases? What happened in the other three cases?

MR. PIROZZOLO: It wasn't an issue because those are earlier in development. Those are --

THE COURT: They don't need it.

MR. PIROZZOLO: They didn't need that.

THE COURT: Okay.

MR. PIROZZOLO: I think, unless the court has any further questions for me, I think that's all I have.

THE COURT: Great. Thank you. I'll give you a chance again at the end.

Mr. Adams, do you want to speak now, or do you want to give the amici a chance to speak and speak after that?

MR. ADAMS: Your Honor, we'd appreciate it if the amici go first so the government has a chance to respond to whatever argument they make.

THE COURT: Sure.

MR. HAVILAND-MARKOWITZ: Can you hear me all right?

THE COURT: Okay.

MR. HAVILAND-MARKOWITZ: Good afternoon, Your Honor. The Commonwealth of Massachusetts would like to emphasize two points in support of Vineyard Wind's motion.

First, BOEM's order has caused Massachusetts to incur significant harm, and if it is not enjoined, additional significant harm will accrue, and that relates directly to the public interest inquiry related to Vineyard Wind's motion.

Second, BOEM's order did not consider at all the serious reliance interests that the Commonwealth of Massachusetts has engendered, and for that reason, Vineyard Wind is likely to succeed on the merits.

So I want to start first with one of the categories of harm that faces Massachusetts. BOEM's order hampers Massachusetts' ability to provide reliable, affordable energy to its hospitals, schools, residents and businesses. The winter period like the one that we're in right now is the period that is the most intensive for the grid. It requires the highest level of demand, and energy supply sources are usually most constrained. That means energy prices are also at

their highest.

THE COURT: Can I consider the damage to Massachusetts when deciding if Vineyard Wind has demonstrated irreparable harm?

MR. HAVILAND-MARKOWITZ: Yes. I believe the case *Department of Homeland Security v. Regents of University of California,* 591 U.S. 1, indicates that third party harms can be considered and reliance interests can also be considered in the APA analysis.

THE COURT: Thank you.

MR. HAVILAND-MARKOWITZ: So going back to this period we're in, this winter with this crazy storm, it's when energy prices are high, the grid is constrained, and often wind energy resources have their highest capacity factor in winter, meaning they can generate the most electricity during this period.

Currently there are a portion of the blades online, but there's a portion that are not. And the remaining blades, if they were to come online, would be able to power approximately 150,000 homes in the Commonwealth of Massachusetts. That's a significant and critical amount of energy.

I also want to note that there's no new comparable energy generation that could come online to take the place of Vineyard Wind. So that is all to say that BOEM's order jeopardizes Massachusetts' sovereign obligation to provide

reliable, affordable energy to its residents and ratepayers.

Next I want to talk about the economic damage that's brought by BOEM's order.  Massachusetts has been working in partnership with Vineyard Wind for nearly a decade to develop this project.  And one of the features of that partnership are the power purchase agreements, long-term contracts that are signed by Massachusetts electricity distribution companies and Vineyard Wind.  Those contracts provide for a stable price for both energy and renewable energy credits.  However, those prices are not available right now because BOEM's order prohibits Vineyard Wind from meeting its commercial operation date and the power purchase agreement price becoming active.

That means that the electricity that is currently being generated by Vineyard Wind is being sold and purchased on the wholesale open market, and those prices are much, much higher than the stable price that would have been guaranteed by the power purchase agreement.  We've estimated that that's going to cost ratepayers in Massachusetts $11 million for energy costs between January and March of this year and 13 million to purchase renewal energy credits over that same period.

I also want to note that Massachusetts has invested or committed over $418 million into the development of the offshore wind industry, and that also includes thousands of jobs and millions of labor income that are associated with the

Vineyard Wind project that are threatened by BOEM's order.

As further explained in our brief, the order also causes harm to other state interests, including our ability to meet clean energy and climate statutory obligations as well as to protect our residents from climate harms and public health harms.

The last point I want to touch on are the reliance interests. The public -- the harms that I've just been describing also serve as the basis for our reliance interests. First Circuit and U.S. Supreme Court case law clearly establish that where a federal agency did not consider serious reliance interests, they acted arbitrarily and capriciously.

BOEM's order does not make any reference to Massachusetts' dependence on Vineyard Wind for energy supply, its ability to decrease ratepayer bills or its ability to prevent the harms associated with climate change and the public health impacts of other emitting energy resources.

In closing, we ask the court to please grant the preliminary injunction and other remedies requested by Vineyard Wind. Thank you.

THE COURT: Thank you.

MS. HORBERG DECTER: Good afternoon, Your Honor. Can you hear me?

THE COURT: I can. Good afternoon.

MS. HORBERG DECTER: Wonderful. I'm here on behalf of

500,000 workers represented by the Massachusetts AFL-CIO's affiliates and particularly 75,000 construction workers represented by the Massachusetts Building Trades Council.  I'm also here on behalf of Climate Jobs Massachusetts, a Massachusetts coalition of unions and community groups focused on building an American workforce to support the offshore wind industry and renewable energy generally.

Our position is very simple, and it goes both to irreparable harm that will be suffered if the order is not enjoined and the public interest in this case.  Vineyard Wind is the first industrial-scale wind project in the United States.  The Southeastern Massachusetts Building Trades Council reached a historic deal with Vineyard Wind, guaranteeing good jobs for Massachusetts construction workers beginning in 2021 and continuing through the end of the project.  That promise will not be met if this stop work order is not enjoined.

Vineyard Wind has generated thousands of unionized construction jobs, and over 200 unionized workers whose skilled construction work has been a boon to the project are still needed to complete this job.  Thousands of hours are estimated as needed to complete those 18 windmills and make this wind farm fully functional.

These workers' ability to continue their work remains in limbo.  Many of these workers have committed years of their lives not just to the work but to the training and

certifications required to perform this work. They've planned on careers in offshore wind, and their livelihoods are frankly in jeopardy.

The failure to immediately employ these workers has consequences for the success of this project, as these workers will be forced to move on. These are not workers who can wait for a month and see if the work returns. These are workers who live paycheck to paycheck. They have families. They have mortgages. They have lives. They have already waited over six weeks. It's too long. They cannot wait another day, 90 days or 180 days for a return to work.

And it's important to note that there isn't new work that can be offered in offshore wind in Massachusetts. Vineyard Wind is the only offshore wind project in construction for the foreseeable future. The only work that they can do to continue their livelihoods, continue what they began is on this project. If this project does not continue immediately, they will, frankly, even if it's restarted, there's no guaranty these workers will be able to come back to work, they will need to find work elsewhere. Their services will be retained elsewhere. That would mean that Vineyard Wind, through its contractors, would need to train and certify a whole new wave of workers. That would only further delay and complicate this project.

This project requires significant attention to detail,

but more than that, it requires the exceptional skill of these trades workers who have already spent years on the job and know this work well. They've made it efficient. They can get it done in the next three months.

Finally, I just want to highlight plaintiff counsel's statement about the installation vessel and the urgency of bringing construction back online. In my experience working on wind projects in New England on behalf of the unionized trades, I can tell you that the average wait time for a new vessel is approximately two years and that they are in very high demand around the world. And so even a year may be a generous estimate of when this could come back online. Thank you very much.

THE COURT: Thank you. Mr. Adams, I'm going to turn to you in one second. I'm going to ask Mr. Pirozzolo one quick question if that's all right.

Whether or not the government considered reliance interests, it's something that you've made strongly in your papers, you made strongly here, how do I know?

MR. PIROZZOLO: Well, that's part of the problem, is that you don't know. So in a case like this, you have to look at the administrative record. There is no meaningful administrative record. And so the inquiry is have they documented consideration of the reliance interests. If they didn't, there's nothing for you to -- there's no reliance

interests that can support the order. So does that answer your question?

THE COURT: It does. I'm going to give Mr. Adams a chance to answer it, too. How am I supposed to judge on a very limited record before me whether or not the government considered reliance interests at all?

MR. ADAMS: Your Honor, what you have before you is the suspension order that allows Vineyard Wind to continue operating at 75 percent capacity, and that is some indication that reliance interests were considered. The suspension order in this case, unlike the other cases, has more case specific facts, specifically as it relates to operations.

Counsel is correct that there's no final administrative record. We're at a preliminary stage right now. But that's one indication that BOEM did consider reliance interests here.

THE COURT: All right. Thank you. The floor is yours.

MR. ADAMS: Thank you, Your Honor.

THE COURT: Well, let me start with the two questions that I'm struggling most with on your side. So I suspect you are going to do this anyway, but obviously I have three other district court judges who have looked at similar cases. I've reviewed what they did, looked at the briefing. I understand there are some distinctions, but I'm interested in hearing

where you see those distinctions are.

And then the second thing that I've struggled with is, if the national security interest is with operation, and that I don't think is contested on your part, how am I not supposed to conclude that allowing the continued operation or prohibiting construction isn't arbitrary?

MR. ADAMS: I'll start with the first question.

THE COURT: Sure.

MR. ADAMS: The distinction is irreparable harm. I'll spend most of my argument on irreparable harm. But in short, the other wind projects weren't able to reach even past zero power. They were not operating. Here, Vineyard Wind is 95 percent constructed and operating at 75 percent power. And with operations of that 75 percent power, Vineyard Wind is collecting revenue unlike the other wind projects.

THE COURT: Right.

MR. ADAMS: That is the easiest distinction for Your Honor, and that goes to irreparable harm.

With respect to operations and construction, the answer about whether it's arbitrary and capricious lies within the classified information that Your Honor has for ex-parte, in-camera review, and this court can make its own determination based on those classified materials about whether the order was arbitrary or capricious. We can talk about the face of the order when I get to the merits arguments.

THE COURT: Sure.

MR. ADAMS: If I could, Your Honor, I would like to start with the balance of the harms because as Vineyard Wind's counsel just stated, they rely on *Winter v. NRDC* and so do we. We think that *Winter v. NRDC* supports the government here because that case, like here, the analysis turned on the balance of the harms, given the significant national security risks at issue.

And let me begin by stating that as this court is balancing the interests, the significant national security risks that the government has put forward to Your Honor for ex-parte, in-camera review versus all the other interests from Vineyard Wind and third parties before the court, this court must first start with the premise as stated in *Winter* that national security is paramount.

I'm just going to quote some Supreme Court jurisprudence about this. As the Supreme Court stated in *Haig v. Agee*, it is obvious and unarguable that no governmental interest is more compelling than the security of the nation. The justices' opinions, for example in *Hamdi v. Rumsfeld*, explain that national security is the primary responsibility and purpose of the federal government. Courts thus recognize that protecting the national security is a government interest of the highest order.

This case, like *Winter*, involves complex, subtle and

professional decisions by the Department of War. This court must give great deference to the professional judgment of military authorities, as it's seen in the classified information because, as a Supreme Court has emphasized, judges do not begin their day with briefings that may describe security risks to the nation and its people, unlike individuals within the executive branch, including the declarant, the Honorable Dale Marks. Simply put, courts do not second-guess expert agency judgments on potential risks to national security.

Here, as explained in the suspension order issued by BOEM, there was new national security information that was brought to light that caused it to suspend activities while BOEM analyzed that information as it related to extant mitigation measures that were already in the project.

Your Honor, I want to emphasize one thing. It is undisputed that the Vineyard Wind project does pose a national security risk. The dispute is whether the mitigation measures currently in place are enough to be able to mitigate those national security risks. But as the suspension order emphasized in November 2025, the Department of War came forward after a different assessment based on new information about a rapid evolution of adversarial technology that presents new risks to the homeland and its people.

Mr. Giacona further explains in his declaration that

suspension is necessary now because further mitigation measures, if they exist, would be necessary to put in place before the project reaches full operational status. The mitigation measures could also be more effectively put into the project while it's under construction rather than trying to unwind the knot.

This court has the classified information, including the classified declaration of the Honorable Dale Marks it should consider. And as this court is reviewing that information and balancing that information that details the significant national security risks against the other interests from Vineyard Wind and third parties before this court, I would make a few observations for this court to consider.

First, the fact that BOEM is allowing Vineyard Wind to continue at current level operations is significant. Vineyard Wind is 95 percent complete and is operating at about 75 percent capacity, and BOEM is allowing Vineyard Wind to continue its operations for the time being.

Second, Vineyard Wind's alleged harm is all economic.

And third, Vineyard Wind has not satisfied its burden to show that its economic harm is irreparable, and I'll explain why. Before I do so, I just want to pause for one moment and emphasize, just as in *Winter*, this court could resolve the motion and deny it based on the balance of harms.

*Winter* makes clear that even if plaintiff has suffered

irreparable harm, the balance of harms could still outweigh that irreparable harm, and *Winter* itself didn't even reach the merits of the plaintiff's claims in that case.  So this court can deny the motion based on the significant national security risk under this court's review.

Turning to irreparable harm, let me provide an answer to Your Honor's questions to the Commonwealth.  I disagree that this court can look at third-party harm as it relates to irreparable harm.  I'm not familiar, I don't have the case that counsel provided to the court.  I would suspect that the third-party considerations relate to the public interest, which the government doesn't contend that it's appropriately before the court.

But let me just read to you what *Winter* says about the standard here.  "A plaintiff seeking a preliminary injunction must establish that he is likely to suffer irreparable harm in the absence of preliminary relief."  It doesn't say "third party's irreparable harm."  So the government disagrees with the Commonwealth on that point.

THE COURT:  What about the point that I asked Vineyard Wind about, if it is going to be devastating for the legal structure, right, if Vineyard Wind was 44 turbines with 18 more getting built under one LLC, it was an LLC per turbine, one turbine.  What do I do with the fact that there might be smaller legal entities owned by larger legal entities when

assessing whether or not it's irreparable harm?

MR. ADAMS:  Your Honor, I'll just go to the standard for irreparable harm here, and this is something that I'm going to emphasize in the irreparable harm argument that Vineyard Wind makes.  Financial losses do not constitute irreparable harm unless the potential economic loss is so great as to threaten the existence of the movant's business.

So to answer your question, Your Honor, it's all about existential threat.  So if there was this web of interconnecting LLCs and the plaintiff in that particular circumstance wasn't able to show that there was existential threat to the business as a whole, then the plaintiff hasn't satisfied its heavy burden to show that there was irreparable harm.  I'm not familiar with Vineyard Wind's corporate structure.  I don't think that's in the record right here.

THE COURT:  It's not.

MR. ADAMS:  But going to the actual standard, Vineyard Wind makes five arguments in support of its contention that it's suffering irreparable harm.  Only one of those arguments relates to satisfying the standard of existential threat, and that argument relates to lenders.

Vineyard Wind contends, and this is at its opening brief at page 24, that it faces existential threat because its, quote, "lenders will have the ability," end quote, to declare an event of default, accelerate repayment of a loan and

foreclose on the project.

In support of that statement, Vineyard Wind puts forward just three paragraphs from its declarations.  That's paragraph four from Mr. Moeller's declaration, paragraph seven from Mr. Hortiguela's declaration and paragraph 11 from his same declaration.

Your Honor, paragraphs four and seven are conclusory allegations with no factual support.  They simply assert that Vineyard Wind will suffer irreparable harm because it faces existential threat.  There's no factual basis to support those conclusory allegations.  Paragraph 11 candidly does add a little bit more substance, but it's still not sufficient to be able to satisfy the standard that the plaintiff is likely to suffer irreparable harm.

The Supreme Court has expressly rejected in *Winter* that the mere possibility of suffering irreparable harm satisfies the standard.  It must be likely that the event will pass for the plaintiff to satisfy the burden.  And to do so Mr. Hortiguela says at paragraph 11 that if the project is not timely completed by March 31, 2026, the contractual maturity date due under the credit agreement and with no vessel secured to complete the project in the foreseeable future, then its lenders will have the ability to declare an event of default, accelerate repayment of the construction loan and foreclose on the project.  Such an event would threaten Vineyard Wind's

ability to survive.

As the federal defendants pointed out in their opposition brief, just because someone, a third party has the ability to do something doesn't make it likely that it's going to happen.  We also pointed to the fact that in July 2024 Vineyard Wind wasn't operating for, as I understand, about six months.  And at that point the lenders made no contention that they would default or foreclose on the loan.

Counsel for Vineyard Wind just made a factual distinction saying that July 2024 was a year and a half away; we're closer to the completion date, therefore this factual scenario is much different.  Your Honor, I would submit that's a factual distinction without a difference.

The whole thesis of the irreparable harm argument from Vineyard Wind is that there are cascading effects that if there's one blip at one moment in time to be able to complete the construction, then those cascading effects will thwart the whole project to be able to reach its maturity date to be able to provide full power.  Under that thesis the argument would run that back in July 2024 when there was a six-month suspension, that would have way more effect on the ability to meet the March 2026 date to come to full power than what we're at right now, which is, I think the 34th day of a suspension order.  So the fact that the lenders apparently didn't take any action while Vineyard Wind was suspended for about six months

in 2024 militates against finding that it's credible now.

In the reply brief, Vineyard Wind adds one more paragraph to support its argument that it has satisfied the irreparable harm standard for existential harm to its business. That is paragraph four of Mr. Moeller's supplemental declaration. Mr. Moeller informs the court that the lenders submitted a letter to Vineyard Wind after the federal government made its observation that the plaintiffs haven't carried their burden to satisfy irreparable harm for the standard and that the letter came Friday last week on the day when the hearing was originally supposed to come. Tellingly, Your Honor, Vineyard Wind has not provided this court with that letter which basically its irreparable harm hinges on; nor has Vineyard Wind provided this court with the credit agreement.

But in any event, if we take Mr. Moeller's supplemental declaration at face value, the letter as I understand it raised questions about the financial viability of the Vineyard Wind project in light of the suspension order, which, Your Honor, lenders raise questions every single hour of every single day about the financial viability of the things they invest in. That's what lenders do. That does not make it more likely that the lenders would suddenly declare a default and foreclose on this project that's been ten years in the making.

Second, the lenders make a reservation of rights to be

able to declare a default or foreclose on a project. But again, that doesn't move the needle from the mere possibility of the injury happening to making it more likely that the injury would happen. Parties reserve rights every hour of every day to be able to do something. That doesn't mean that they're likely to happen.

Your Honor, outside of that one argument in support of existential threat, Vineyard Wind makes four additional arguments to support its contention that it has irreparable harm. None of those arguments importantly relate to the existential threat that Vineyard Wind claims.

I'll start with the power purchase agreement that we heard just now. Importantly, Vineyard Wind does not argue that it faces an existential threat if it's not able to come to full power by March 2026. Instead, Vineyard Wind claims, quote, "It could be exposed to the potential declaration of default," end quote, if it doesn't generate enough power to satisfy the PPAs. That's at the opening brief at page 23.

Again, Vineyard Wind relies on the declaration of Mr. Hortiguela at paragraph 12, but as the federal defendants pointed out in their papers, the fact that something could happen does not mean it's likely to happen. Again, this goes back to what *Winter* expressly rejected as relates to irreparable harm, that the mere possibility of something to happen is insufficient to satisfy the standard and obtain the

extraordinary relief of an injunction.

Moreover, Your Honor, I would submit, aside from Vineyard Wind failing to carry its burden, that it's unlikely to happen. We just heard a passionate argument from the Commonwealth about how important this project is. It's been ten years in the making. It supports hospitals and schools and all these other projects. Given the fact that the Commonwealth so vigorously supports this project, it is unlikely that if Vineyard Wind happens to miss full power at March 2026 that the utilities would suddenly pull the rug out from Vineyard Wind with whatever consequences might come of that.

The fact that Vineyard Wind is currently operating at 70 percent and is constructed at 95 percent makes that event unlikely. Moreover, Vineyard Wind submitted a declaration from Ms. Mahoney who is the Commissioner on the Massachusetts Department of Energy Resources. Same argument, Your Honor. The fact that you have these important state officials and the Commonwealth of Massachusetts vigorously supporting this project makes it highly unlikely that just because Vineyard Wind is unable to reach full power in March 2026 that the utilities would suddenly declare default rather than take a more measured or sensible approach such as renegotiate the PPAs or allow a little bit of a grace period to happen while the suspension order plays out.

Your Honor, Vineyard Wind makes three more arguments

in support of its irreparable harm arguments.  The next two I'll talk about I think collapse within the argument of the PPA that I just described because it's all about being able to reach full power by March 2026.

I'll be begin with the replacement blades.  Vineyard Wind maintains it needs to be able to set up these replacement blades right now, again to reach full power by March 2026.  But for the reasons I just stated, that doesn't mean that it's suffering irreparable harm if it's not able to replace the replacement blades at this point in time.  It's also unclear why, aside from being able to satisfy the PPA in reaching full power in March 2026, that the inability to replace a part of a construction project would suddenly cause a company irreparable harm.

Construction companies all the time have to replace projects because of defaulting projects or whatever.  That doesn't mean the construction company is suffering irreparable harm.  I think again, it just relates to being able to satisfy a construction timeline that is tightly sequenced as Vineyard Wind contends.

Nevertheless, the more important principle, Your Honor, for the replacement blades is that the expert agency here, BSEE, has already considered the issue, and this court must defer to the technical and scientific expertise of an expert agency.

Here is what Mr. Stevens had to say in his declaration. Mr. Stevens is part of BSEE, and the government submitted his declaration in support of our opposition brief. He says, "BSEE technical personnel determined that there should be no structural issues associated with the tower and nacelle-only configuration if they were installed correctly. Further, BSEE technical personnel noted that the towers were routinely left in this configuration by the project over the last year and five months with no reported adverse impacts to safety." It's unclear why now is different than the year and a half, about the year and a half that Vineyard Wind had left these blades or the wind turbines in the same condition.

And then, Your Honor, I would just emphasize, as we state in our papers, an agency is entitled to deference with regard to factual questions involving scientific matters in its own area of expertise.

The fourth argument that Vineyard Wind makes in support of its claim of irreparable harm is the construction delays. Again, Your Honor, I think that just goes to the PPAs that I addressed.

Finally, Vineyard Wind contends it's suffering significant financial losses. Vineyard Wind does not argue that those financial losses that it catalogs, the 2.3 million dollars a day, will inflict existential threat to the harm. It's just arguing that it's losing a large amount, which Your

Honor, I would submit with a multi-billion-dollar valued company that those amounts are single-digit percentages and don't satisfy the irreparable harm standard for economic harms, which, again, is that the business is facing an existential threat in the absence of injunctive relief.

Turning to the merits, Your Honor, unless the court has any questions on authority, I'm going to turn right to arbitrary and capriciousness, which is what we heard from counsel today.

Under the arbitrary and capriciousness standard, a court asks not whether it agrees with the agency decision but rather only whether the agency was reasonable and reasonably explained. That's well established in the administrative law, and that comes right from the *Seven County* decision that the Supreme Court issued last year. Review under the APA's arbitrary and capriciousness standard is highly deferential, and especially so when it involves marked areas of technical or scientific matters within the agency's area of expertise.

Your Honor, this court may not substitute its own judgment for that of the agency and must uphold a decision, even one that has less than ideal clarity in the record, if the reasoning can be reasonably discerned from that record. And this goes to Your Honor's point earlier about how do I know that BSSE or BOEM hasn't considered reliance interests.

Well, in the face of the order, given the

circumstances of classified information, it is reasonable and reasonably explained.  BOEM explained there's new information, the nature of the risk that the agency is taking action to mitigate, to investigate the mitigation measures as it relates to the new information from November 2025.  It gave project specific information as it related to allowing Vineyard Wind to continue operations at 75 percent capacity, and it also cited its legal authority to be able to issue the suspension order, which is 30 CFR Section 585.417(b).  The order on its face is reasonable and reasonably explained.

There is no APA deficiency just because an administrative record is brief.  There's no such thing as unlawful conciseness.  In fact, I think the court and parties appreciate when things are brief.  The court just has to take a look at the suspension order and determine whether it is reasonable and reasonably explained.  And moreover, Your Honor, given the circumstances involving the classified information, BOEM was hampered in its ability to explain even further, BOEM sensibly didn't expose our national security vulnerabilities or risks for the world to see.

In addition, Your Honor, this court may consider the ex-parte review of the full administrative record including the classified declaration of the Honorable Dale Marks to make its arbitrary and capriciousness assessment.  If Your Honor doesn't have any questions about due process, I will --

THE COURT: No.

MR. ADAMS: Your Honor, I'm just going to end on one thing that we saw in Vineyard Wind's papers, which is allegations of pretext. As this court knows, and even Vineyard Wind cited the correct standard, it is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action. That's *Department of Homeland Security v. Regents*.

And notwithstanding that foundational principle, Vineyard Wind introduces extra record evidence about policymakers' decisions or judgments on offshore wind projects. Those decisions or those statements are not properly considered for this court's review of the administrative record.

Nevertheless, Your Honor, in *Department of Commerce v. New York*, the Supreme Court was clear that a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by the administration's priorities. The citation for that is 558 U.S. 752-781 from the decision in 2019.

All that is to say, Your Honor, is both things can be true. Our senior government officials may think that offshore wind energy is inefficient and is not a good policy for this nation to be invested in. And the offshore wind projects, specifically Vineyard Wind, create national security risks. While Vineyard Wind selectively draws quotes from senior

government officials, it omits important information that directly supports our senior government officials' thinking as it relates to national security risks posed by offshore wind projects.

Here is what Secretary Burgum had to say last month that was omitted from Vineyard Wind's papers. "The prime duty of the United States government is to protect the American people. Today's actions addressing emerging national security risks," referring to the December 22nd orders, "including the rapid evolution of relevant adversary technologies and the vulnerabilities created by large-scale offshore wind projects with proximity near our East Coast population centers. The Trump administration will always, always prioritize the security of the American people."

Your Honor, you have the classified information for ex-parte, in-camera review, and the government submits that that information, including all the arguments we made and the fact that Vineyard Wind has not satisfied its heavy burden to show irreparable harm warrants denial of the motion.

THE COURT: Thank you, Mr. Adams. I will take a ten-minute recess and come back and rule from the bench.

COURTROOM CLERK: All rise.

(Recess, 3:07 p.m. - 3:23 p.m.)

THE COURT: Give me just a minute, please.

First I want to thank all of you for both a very

helpful oral argument and very thorough briefing in a very short time period.  It makes my job a lot easier when you all do an extraordinary job at yours.  So I want to start with thanking you all for that.

I came into today knowing that an opinion from the bench would be what would be best, given the urgency of the parties' issues here, but I don't often do this, so I'm going to attempt to articulate my opinion as clearly as possible.  At the end of it I'll give you an opportunity to ask any follow-up questions you might have.

So in this case, plaintiffs moved for a preliminary injunction.  They're asking for a preliminary injunction.  I'm granting the motion insofar as it is an order to stay the stop work section under section 705 of the APA.  I am granting the stay rather than an injunction because I believe that it is sufficient and because it is a less drastic remedy.

I will explain my reasoning, but in advance, I will say that I have reviewed the arguments and the evidence submitted by both parties, including the declarations attached to the parties' filings, as well as the classified information the government provided to explain the reason for the stop work order.

The Bureau of Ocean and Energy Management, BOEM, issued a stop work order on December 22, 2025, directing Vineyard Wind to, quote, "suspend all activities related to the

Vineyard Wind 1 project for the next 90 days for reasons of national security."

The order excepted activities, quote, "necessary for the current level of power generation," which Vineyard Wind states is approximately 572 megawatts out of approximately 800 megawatts it would be able to produce if fully completed, about 70 percent, and those, quote, "necessary to respond to emergency situations and/or to prevent impacts to health, safety, and the environment."

While only producing 70 percent of its goal power, the project is substantially nearly 95 percent complete.  The remaining work is the installation of a relatively small number of turbines, I believe it was 18, and the replacement of some blades that had manufacturing defects.

It is undisputed that during the permitting process Vineyard Wind worked extensively with a variety of federal agencies, including the Department of Defense, NORAD, and other branches of the military to ensure that the project would not interfere with any military concerns and to address and mitigate those concerns.  In issuing this order, BOEM relied on a classified security assessment provided to the Bureau by the Department of War or Defense in November of 2025.

The court is limited in its ability to describe the classified information that was shared on an ex-parte, in-camera basis.  However I have reviewed these documents

carefully, and their contents have informed my analysis of the relevant factors.

And to clarify here, my decision here does not rely in any way on any statements made by officials outside the purported intention of the order itself, meaning there was some discussion about what other people in the executive branch may have said.  I have not considered those statements in any way.

A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, and that the balance of equities tips in his favor, and that an injunction is in the public interest. The same factors govern when a court should grant a stay of agency action under 705 of the APA.

Likelihood of success on the merits is the most important factor.  On the first factor, the likelihood of success on the merits, the court finds that the plaintiff has demonstrated it is likely to succeed in showing that the order was arbitrary and capricious under section 706(2) of the APA. The arbitrary and capricious standard requires that an agency action be reasonable and reasonably explained, as both parties stated in their argument.

As the Supreme Court explained in *Ohio v. EPA*, 603 U.S. 279, 2024, a court may not substitute its own judgment for that of the agency but must ensure, quote, "that the agency has

offered a satisfactory explanation for its action, including a rational connection between the facts found and the choices made." Furthermore, when an agency's "new policy rests upon factual findings that contradict those which underlie its prior policy or when its prior policy has engendered serious reliance interests," close quote, the failure to consider such factors is arbitrary and capricious. That's citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 2009.

Of note here, mitigation has been a part of the project from the outset, and the failure to consider any possible mitigation when such efforts have been successful in the past is likely arbitrary and capricious. The court finds that the record, including the classified information provided to the court, fails to adequately explain or justify the decision to halt construction.

To even begin construction, Vineyard Wind engaged in a multiyear, multiagency approval process under the Outer Continental Shelf Lands Act, which included identifying national security concerns and agreeing to various mitigation efforts. The agency has failed to explain how the purportedly new classified information undermines BOEM's prior conclusions or renders the mitigation measures inadequate.

While the government states that it has concerns that Vineyard Winds will not be able to mitigate the national security concerns or will ignore those concerns if Vineyard

Wind is allowed to continue construction, such speculative concerns are belied by the undisputed evidence that Vineyard Wind has complied with all of the litigation measures requested.

Further, the record before the court indicates that Vineyard Wind continues to try and work with the government to address the government's concern. In addition, as Judge Walker of the Eastern District of Virginia noted in *Virginia Electric & Power Company v. U.S. Department of the Interior*, at docket 2:25-CV-830, on January 16, 2026, quote, "the risks the government is concerned about appear to attend to the operation of the project, not its construction," close quote. However, the order at issue here, like the one in *Virginia Electric*, bars construction of the remaining turbines but permits the continued operation of the 44 already-constructed turbines. This can hardly be characterized as a, quote, "rational connection" between the facts found and the choice made." The government has made no attempt to explain this disconnect, despite its being raised hardly two weeks ago in a directly comparable case.

To be clear, if the government's concern is the operation of these facilities allowing the ongoing operation of the 44 turbines while prohibiting the repair of the existing turbines and the completion of the 18 additional turbines is irrational, the government has not attempted to explain why

national security interests would be triggered by a completion of the remaining small number of turbines but not implicated by the operation of the existing turbines.

Because the government has failed to provide a reasoned explanation both for its change of position and for why a complete stop in construction is required, the court finds that the December 22 stop work order is likely arbitrary and capricious under the Administrative Procedure Act.  Having concluded that the stop work order was likely arbitrary and capricious, the court will not engage at this time with plaintiff's other arguments concerning whether the government's order was unlawful on other grounds.

On the second factor, the court finds that Vineyard Wind has demonstrated it faces irreparable harm should the order continue to apply.  And to be clear here, under the irreparable harm factor, I am only considering the irreparable harm to Vineyard Wind in the analysis, not irreparable harm to any third parties, including the State of Massachusetts, as the Supreme Court instructed me to in *Winter*.

While economic loss alone does not generally constitute irreparable harm, it can where, quote, "the potential economic loss is so great as to threaten the existence of the movant's business."  That is cited in *NACM, New England v. The National Association of Credit Management*, a First Circuit case at 927 F.3d 1 from 2019.

Here, Vineyard Wind has demonstrated that it has already suffered losses of approximately $2 million a day, which would total approximately $180 million in losses over the 90-day stop work order contemplated by the order.

Further, Vineyard Wind has demonstrated that if the stop work order is not stayed, it will lose access to a specialized ship necessary to complete the project and would not be able to contract another specialized ship within the foreseeable future.

Finally, Vineyard Wind has demonstrated that stopping construction now risks defaulting on approximately $2 billion in loans. While the government has described the risk as merely speculative, as the D.C. circuit put it in 2016, quote, "Damocles's sword does not actually have to fall before the court will issue an injunction," and that is citing *The League of Women Voters v. Newby,* 838 F.3d 1, a D.C. Circuit decision from 2016.

Regardless, Vineyard Wind has provided evidence that its lenders have questioned Vineyard Wind's financial viability in light of the stop order such that the court can and does conclude that the risk of default is more than hypothetical.

In sum, the evidence shows that the potential economic loss here cannot be remedied after the fact by award of damages because there is sufficient risk to the very existence of Vineyard Wind's business.

The final two factors, weighing the balance of equities and determining whether a preliminary injunction would be in the public interest, merge here because the government is the party opposing the preliminary injunction. Quote, "To begin with, the plaintiffs' likelihood of success on the merits lightens defendants' stated interests." That is citing *Devitri v. Cronen*, 289 F. Supp. 3d 287, a District of Massachusetts case from 2018. And the government's reliance on the invocation of national security does not end the inquiry as the government seems to suggest. The Supreme Court made clear in *Winter* that, quote, "military interests do not always trump other considerations."

The court gives deference to the government's determination of national security concerns. However, as stated earlier, even taking the government's assertions at face value does not explain or justify its actions with respect to this construction project. It is worth noting that the classified assessment was completed in November of 2025, and yet the government did not issue a stop work order until December 22, 2025, undermining any claim that this new assessment presented an emergency in need of immediate addressing.

Thus, the court finds based on the government's own contentions that the issuance of relief will not substantially impede the government's interests. Accordingly, the

government's interest in the relief not issuing cannot outweigh Vineyard Wind's, where Vineyard Wind is likely to suffer irreparable harm absent preliminary relief.

Moreover, Vineyard Wind and the amici have provided evidence that the public stands to benefit in other ways from this project's completion, including as a result of economic investment, jobs and the availability of new energy.

Moreover, to the extent that the government requires further mitigation of any operations-related security concerns, Vineyard Wind has adequately demonstrated that the government can address its national security concerns through the normal channels without an order that shuts down nearly the entire project. And I am quoting the *Virginia Electric & Power* transcript there as well.

Ultimately, the balance of equities and the public interest favors preserving what the status quo was before the stop work order issued. It is worth noting that I am not the first to rule on a motion like this in a case involving a stop work order on a wind energy project based on the same set of classified materials. Courts in three other cases, the District of Columbia in the *Matter of Empire Leaseholder v. Douglas Burgum*, and the matters of *Rhode Island v. Department of Interior*, and *Revolution Wind v. Burgum,* and the Eastern District of Virginia in the matter of *Virginia Electric v. U.S. Department of the Interior*, have all granted the same or

substantially the same preliminary relief sought and granted in the instant case.

Accordingly, all four factors weigh in Vineyard Wind's favor. The government's December 22, 2025 stop work order as to the Vineyard Wind project is hereby stayed until further order of the court.

The BSEE order that you had sought I am declining to issue at this time. I have not had evidence presented to me that BSEE delays are likely in the situation where the stop work order is stayed. Should that arise, you are welcome to return to the court, and we will address you in very short order. I hesitate to issue an injunction against BSEE without some showing that BSEE would change its behavior in the absence of the stop work order.

Finally, I order the parties to file a joint status report by Friday of this week with a proposed schedule for the remainder of the case. I recognize this has great expediency to all the parties and will accommodate you on a very rapid schedule. I would instruct you to meet with each other and come up with a schedule that works if you can. If you cannot agree, submit duelling schedules and I'll decide.

Is there anything I could clarify from the government's perspective?

MR. ADAMS: No, Your Honor.

THE COURT: Is there anything I could clarify from the

plaintiff's perspective?

MR. PIROZZOLO: No, Your Honor. Thank you.

THE COURT: All right. I thank you all for your work. I appreciate the great diligence you clearly put into this.

(Adjourned, 3:40 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 28th day of January, 2026.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter