# <u>Exhibit J</u>

*To Plaintiffs' Complaint for Injunctive and Declaratory Relief*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| RENEWABLE NORTHWEST, *et al.*, | Case No. _____ |
| *Plaintiffs*, | |
| v. | **DECLARATION OF GEOFFREY N. BLACKMAN** |
| PETER B. HEGSETH, *et al.*, | |
| *Defendants*. | |

Pursuant to 28 U.S.C. § 1746(2), I, Geoffrey N. Blackman, declare as follows:

1.    I am the founder, owner, and principal consultant of Westslope Consulting, LLC (Westslope Consulting).  My business address is 3940 West Tecumseh Road, Suite 200, Norman, OK 73072.  Westslope Consulting is a consulting firm that provides radar consulting and technical services to developers of offshore and land-based wind energy projects, commercial real estate projects, including high-rises, event venues, and stadium projects, transmission line projects, solar energy projects, and battery energy storage system projects.  Westslope Consulting works with clients at all stages of project development.  In the early stages of project planning, Westslope Consulting identifies potential radar concerns as well as other potential aviation, communications, military, and weather-related operational concerns.  In the later stages of development, Westslope Consulting supports clients in submitting projects for approval at local and federal levels, and engages with the Department of War (DoW), the Federal Aviation Administration (FAA), the National Telecommunications and Information Administration, and other agencies as needed.

1

**DECLARATION OF GEOFFREY N. BLACKMAN**

2.      I have personal knowledge of the facts stated herein and, if called to testify, could and would testify competently thereto.

3.      I received a Bachelor of Engineering with Honors in Electronic Engineering with a concentration in Microwave Engineering from the University of Leeds.

4.      I have 31 years of experience working with radar and associated tracking and display systems and am a subject matter expert on the effects of wind turbines on radar, including air traffic control radar, air defense radar, border security radar, high frequency coastal radar, weather radar, over-the-horizon drug interdiction radar, and test-range instrumentation radar.

5.      From 1995 to 2008, I provided systems engineering support to the FAA, including four years to the National Airways System Engineering Operational Support Directorate in Oklahoma City, OK during the deployment phase of the Air Route Surveillance Radar-4 (ARSR-4) system, and nine years as a senior engineer to the FAA's Airport Surveillance Radar-11 (ASR-11) Program Management Office in Washington, DC during test and evaluation and deployment phases.  This support included working with the Air Force and the Navy to evaluate and optimize radar performance, training Air Force, FAA, and Navy engineers, and researching and implementing radar improvements, such as wind turbine mitigation.

6.      During my time on the ASR-11 program, I was directed by the Senior Advisor to the Deputy Administrator of the FAA to form and lead a working group to study the potential impacts on the ASR-11 and the Very High Frequency Omnidirectional Range air navigational aid of a proposed wind energy project near Ted Stevens International Airport in Anchorage, AK, where I identified potential impacts, outlined mitigation strategies, simulated and modeled potential impacts and mitigation techniques, analyzed data, and defined, flight tested, and implemented the first wind turbine interference-specific mitigation software changes in the ASR-11 system.

2

**DECLARATION OF GEOFFREY N. BLACKMAN**

7. I served as an FAA technical advisor in support of the DoW testing at King Mountain, TX during the ARSR-4 long-range radar wind turbine interference and mitigation study, and at Travis Air Force Base (AFB) to improve radar performance over the neighboring wind resource area after the digitization of the legacy Travis AFB AN/GPN-20 and the installation of the Standard Terminal Automation Replacement System (STARS) tracking and display system.

8. I served as a technical advisor to Idaho National Laboratory for the 2008 JASON Report JSR-08-125 Wind Farms and Radar, and at wind-radar intra-agency meetings to further understand the impacts of wind turbines on radar and existing and potential mitigation techniques.

9. In 2008, I founded Westslope Consulting and for the last 18 years I have conducted mitigation studies, negotiated mitigation agreements with federal agencies, and consulted with the American Clean Power Association on wind-radar policy, processes, and technical issues.

10. I have served as a subject matter expert in over 20 FAA safety risk management panels involving radar-related hazards because of wind development.

11. I served as a subject matter expert on the Cannon AFB Alternate Analysis to identify wind turbine-radar mitigation.

12. I supported the Department of Energy's Wind Turbine Radar Interference Mitigation (WTRIM) working group to develop a series of webinars for industry during the COVID-19 pandemic.

13. I worked together with the Department of Homeland Security (DHS) to identify and site infill radar mitigation in South Texas and draft agreements to resolve border security concerns.

14. I supported the DoW, Department of Energy, DHS, and FAA Interagency Field Test and Evaluation activities.

3

**DECLARATION OF GEOFFREY N. BLACKMAN**

15. I served as Radar Working Group lead under the first Cooperative Research and Development Agreement with the United States Transportation Command and three wind developers, successfully improving Travis AFB Digital Airport Surveillance Radar performance over approximately 600 wind turbines. This work included implementing and validating a proprietary Westslope Consulting modeling method for predicting the impacts of wind energy projects; integrating two adjacent radar sites into the STARS; conducting several rounds of iterative systems optimization; conducting a third-party evaluation of wind farm mitigation; and coordinating multiple flight tests.

16. I served as the wind industry representative for the DHS radar and wind turbines interaction modeling tool.

17. I served as a technical advisor for a wind developer in negotiations of the first Memorandum of Agreement with the DoW and Navy.

18. As a result of my professional experience, I have an in-depth understanding of the planning associated with wind aeronautical studies for wind projects conducted pursuant to 14 C.F.R. Part 77, including the consultation process with the DoW's Military Aviation and Installation Assurance Siting Clearinghouse (Clearinghouse).

19. Developers proposing to construct structures exceeding 200 feet above ground level, or structures that would otherwise encroach into protected airspace near airports or heliports, such as land-based wind turbines, are required to submit notice to the FAA.

20. Upon receipt of notice, the FAA evaluates whether the proposed structure may impact navigable airspace, interfere with air navigation systems, or implicate military operations or readiness. As part of that review, the FAA consults with the DoW regarding any potential military impacts.

4

**DECLARATION OF GEOFFREY N. BLACKMAN**

21.     The DoW conducts its review through the Clearinghouse process. This review considers potential effects on military readiness and national security, including radar performance, electromagnetic interference, and military airspace operations. Where no concerns are identified, the DoW communicates that position to the FAA. If the DoW preliminarily identifies potential adverse impacts, it issues a Notice of Presumed Risk (NPR) and invites the project sponsor to engage in mitigation discussions with a Mitigation Response Team (MRT), comprised of relevant military components, including the Army, Air Force, Navy, North American Aerospace Defense Command (NORAD), among others, that identified the issues. In my experience, it has historically taken around 1 or 2 months from the time the DoW issues an NPR to the start of the MRT negotiation process.

22.     Through the MRT process, relevant DoW components are engaged directly, and identified military readiness and national security concerns are addressed through negotiated mitigation measures with the project sponsor. The issues most addressed involve radar interference, military training impacts, and related operational considerations, which are typically resolved under a standardized mitigation framework. Common mitigation measures include: reducing the height of, relocating, or removing wind turbines in the wind energy project; leveraging overlapping radar coverage from adjacent radar sites; a voluntary contribution to fund the optimization of radar settings, referred to as Radar Adverse-impact Mitigation (RAM) in DoW mitigation agreements involving radar sites used by NORAD; a voluntary contribution to fund for a circuit card upgrade and RAM to the ARSR-4; and wind turbine curtailment for national security events or severe weather.

23.     At the conclusion of mitigation discussions, if the parties reach consensus, they document the outcome in an informal agreement that specifies the mitigation measures the

5

DECLARATION OF GEOFFREY N. BLACKMAN

developer will implement to address impacts to military readiness and national security, and to support the DoW's issuance of a "non-objection" to the FAA for the project. Once finalized, this informal understanding is submitted to the DoW for internal review. Following that review, a draft mitigation agreement is transmitted to the developer for execution. In my professional experience, it typically takes around 4 months from the conclusion of mitigation discussions to the transmittal of the draft mitigation agreement.

24.     After execution by the developer, the agreement is returned to the DoW for final review and signature by the Assistant Secretary of Defense for Energy, Installations, and Environment. Historically, this stage has been largely procedural and of short duration, as all substantive issues are addressed during the MRT process. No new material issues are typically introduced at this point, and previously resolved matters are not revisited. In my experience this process usually takes 2 months.

25.      An executed mitigation agreement is a key component of the project timeline and a prerequisite for FAA completion of its aeronautical studies and, where applicable, issuance of a Determination of No Hazard (DNH). Such determinations are often necessary for projects to proceed, including to secure additional federal and local permits and to obtain project financing.

26.     In my experience, this process has historically been transparent and predictable, allowing me to communicate expected project timelines to my clients with a reasonable degree of certainty.

27.     However, beginning around August 2025, the process began to deviate from its prior course and no longer functioned in the ordinary manner. Since that time, no client has been able to secure a Determination of No Hazard (DNH) from the FAA due to breakdowns at various stages of the process:

6

**DECLARATION OF GEOFFREY N. BLACKMAN**

a. **DoW countersignature:** The DoW has not returned countersigned agreements for any project since August 2025. Westslope Consulting is aware of six (6) total projects for its clients in this category.

b. **Draft agreements sent to developer:** The DoW has not provided an agreement or amendment for execution by the project sponsor for any project that has concluded MRT negotiations since December 2025.  Westslope Consulting is aware of thirteen (13) projects for its clients in this category. Of these projects, one (1) has been pending for 9 months, two (2) have been pending for 8 months, two (2) have been pending for 7 months, three (3) have been pending for 4 months, three (3) have been pending for 3 months, and two (2) have been pending for 2 months.

c. **MRT negotiations:** MRT negotiations, particularly those involving customary military training route mitigations, have proceeded significantly more slowly than in prior periods. As of mid-April 2026, Westslope Consulting has been informed by MRTs that, without explanation, all negotiations, including those previously scheduled, have been canceled until further notice. Westslope Consulting is aware of sixteen (16) projects for its clients in this category.

d. **Projects awaiting preliminary determinations:** DoD is not conducting preliminary reviews to determine whether wind energy projects need to participate in MRT discussions or can be cleared by DoD without convening a MRT. Westslope Consulting is aware of six (6) projects for its clients in this category. Of these projects, one (1) has been pending for 8 months, one (1) for 4 months, and four (4) for 3 months.

7

**DECLARATION OF GEOFFREY N. BLACKMAN**

28.     In general, these delays do not appear to be attributable to project-specific concerns or newly identified risks, but instead reflect a broader posture by the DoW. Historically, new or evolving concerns were identified through the NPR and, in some cases, during the MRT process on a project-specific basis. By contrast, the current circumstances appear to reflect a more generalized disengagement and departure from established practice, notwithstanding project sponsors' continued efforts to advance projects and engage with the DoW.

29.     My clients make long-term business decisions based on a fair, consistent, predictable, and timely aeronautical review process, including the ability to obtain an airspace determination from the FAA following completion of the DoW review process.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on 05/31/2026.

Geoffrey N. Blackman

8

**DECLARATION OF GEOFFREY N. BLACKMAN**