# Exhibit K

*To Plaintiffs' Complaint for Injunctive and Declaratory Relief*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST, *et al.*, | Case No. _____ |
| *Plaintiffs*, | |
| v. | **DECLARATION OF HOWARD D. BELOTE** |
| PETER B. HEGSETH, *et al.*, | |
| *Defendants*. | |

Pursuant to 28 U.S.C. § 1746(2), I, Howard D. Belote, declare as follows:

1.      I am managing partner and CEO of DARE Strategies LLC ("DARE Strategies"). My business address is 139 Ocean View Drive, Tavernier, Florida 33070. DARE Strategies is a consulting firm that helps clients successfully navigate issues at the nexus of renewable energy and national defense.

2.      I have personal knowledge of the facts stated herein and, if called to testify, could and would testify competently thereto. I possess an active SECRET security clearance, and if requested, could testify at that level of classification.

3.      I received a Bachelor of Arts in Government and Foreign Affairs from the University of Virginia in 1985. I received a Master of Business Administration in Aviation from Embry-Riddle Aeronautical University in 1996, a Master of Airpower Art and Science from Air University in 1999, and a Master of Science in National Security Strategy from the National War College in 2004.

1

**DECLARATION OF HOWARD D. BELOTE**

4. I served for 24 years and 7 months in the United States Air Force, retiring as an Air Force colonel and F-16 pilot who earned two Bronze Stars during Operation Iraqi Freedom and served as commander of Nellis Air Force Base, by many measures the largest fighter base in the country. During my career, I served as Director of Staff for the 52nd Fighter Wing; Commander of the 32nd Air Operations Squadron, 3d Air Support Operations Group, and 99th Air Base Wing; and the Pentagon's principal adviser to the Chairman, Joint Chiefs of Staff, on global strategic planning issues related to weapons of mass destruction.

5. After my service in the United States Air Force, I was appointed as the first Executive Director of the Department of Defense's (DoD's) Military Aviation and Installation Assurance Siting Clearinghouse (Clearinghouse). I served in this capacity from July 2010 to June 2012.

6. As the Executive Director, I established the Clearinghouse as the DoD's centralized office to coordinate evaluation of energy and transmission projects for potential impacts on homeland defense and military testing and training, with the specific evaluations done by the military services and bases that could potentially be affected by the development. Its mission also included identifying and implementing mitigation strategies that would allow for energy development while safeguarding critical military operations and assets.

7. In this role, I was responsible for developing the governing regulations for the Clearinghouse. These regulations created a structured process enabling collaboration among local officials, industry representatives, and military leaders to assess the mission compatibility of a wide range of projects.

8. Under my leadership, the Clearinghouse reviewed 657 Federal Aviation Administration (FAA) and Bureau of Land Management (BLM) project applications and procured

2

**DECLARATION OF HOWARD D. BELOTE**

DoD approvals for more than 96% of utility-scale project reviews.  I also negotiated and finalized the first-ever Memorandum of Understanding between DoD and a wind developer.  This agreement protected military flight paths and radar approaches essential to training operations, while simultaneously promoting large-scale economic development through renewable energy.

9.      After leaving the Clearinghouse, I served as the Vice President for Federal Business at Apex Clean Energy where I generated opportunities to develop wind and solar projects for Federal customers, including the DoD; created teams to bid on renewable generation and energy surety for Army, Navy, and Air Force installations; and represented Apex on the American Council on Renewable Energy's Leadership Council and its National Defense and Security Initiative, as well as the Association of Defense Communities' Defense Energy Council.

10.      I also served as Senior Vice President of Cassidy & Associates where I developed cost-effective solutions for industry, military communities, and governmental agencies to site and permit wind and solar projects.  While there, I created a strategic consulting practice at the intersection of aviation, national security, and clean renewable energy/sustainability.  In this practice, I represented major utilities and energy developers before staff and members of the U.S. Congress; the FAA; the Departments of Defense, Energy, and Interior; and state, county, and municipal agencies and councils.

11.      Currently, I am the Managing Partner & CEO of DARE Strategies LLC where I help wind and solar developers sell renewable power to the military and other Federal entities and develop projects compatible with military training and test activities.  I also advise on Federal- and state-level energy policy.  In this role, I help clients secure Determinations of No Hazard (DNHs) from the FAA following consultation with the DoD's Clearinghouse.

**DECLARATION OF HOWARD D. BELOTE**

12.    Prior to initiating the FAA process, developers engage my company to conduct a pre-review of the proposed project. Using available data and industry experience, I am able to anticipate potential issues that must be addressed to avoid impacts to airspace and military readiness and to secure favorable DoD and FAA outcomes. Based on this pre-review and the nature of the issues identified, we are also able to predict the expected timelines for completion of the DoD and FAA review process. These pre-review assessments are critical to project planning and are relied upon by developers in making investment and construction decisions.

13.    During my career I have successfully collaborated on more than 60 Memoranda of Understanding between DoD and wind developers, facilitating the construction of at least 40 projects comprising 12.4 GW of wind power while protecting critical military capabilities, including the two largest single-phase wind projects in the US.  Overall, I have supported and advised on more than 115 projects through the DoD process.

14.    Based on my professional experience, I am highly familiar with the process of securing a DNH from the FAA, including the standard procedures and typical timelines associated with the DoD consultation and review process.  I also have firsthand knowledge of my clients' experiences in attempting to secure DoD review and concurrences.  Developers proposing structures that are taller than 200 feet above ground level or that would intrude into protected airspace near airports or heliports, such as land-based wind turbines, must provide notice to the FAA.  In practice, developers do not proceed with construction of a land-based wind project absent a DNH from the FAA.

15.    When such notice is filed, the FAA evaluates whether the proposed structure could affect navigable airspace, disrupt air navigation systems, or implicate military operations or

4

**DECLARATION OF HOWARD D. BELOTE**

readiness. As part of that evaluation, the FAA seeks DoD's assessment of potential military impacts.

16. DoD conducts its review through the Clearinghouse. This review includes assessing potential impacts to military readiness and national security, which includes assessing radar and electromagnetic and military airspace impacts. If DoD identifies no concerns, it informs FAA accordingly. If DoD makes a preliminary finding of potential adverse impact, it issues a Notice of Presumed Risk (NPR) to both the developer and the Governor of the affected state and invites the project applicant to participate in mitigation discussions with a Mitigation Response Team (MRT), which is comprised of the various components (*i.e.*, Army, Air Force, Navy, NORAD, etc.) that identified issues with the project.

17. Through the MRT process, relevant DoD entities are consulted, and any military readiness and national security concerns are addressed through agreed-upon mitigation measures with the project sponsor. Most mitigations involve electromagnetic impacts on radars or test facilities or obstructions in low-level military training airspace, which are routinely agreed upon by the project sponsor based on a well-established framework for mitigation and timeline to complete the DoD process. Typical mitigations include voluntary payments to optimize affected radars' software and repositioning or removing turbines to provide additional space for low-level aircraft to maneuver.

18. Upon conclusion of the MRT discussions, if the parties reach consensus, they prepare an informal agreement that sets forth the mitigation measures the developer will implement to address impacts to military readiness and national security and to enable DoD to issue a "non-objection" to the FAA for the project. At the end of these discussions, the informal agreement is

5

**DECLARATION OF HOWARD D. BELOTE**

submitted to DoD for internal review. After such review, a draft mitigation agreement is sent to the developer for signature.

19.    After the developer executes the agreement, it is returned to DoD for final processing and signature by a deputy assistant secretary of the affected military Service and the Assistant Secretary of Defense for Energy, Installations, and Environment (EI&E).  Historically, this step was routine and short-duration because all material issues had been previously identified and resolved through the MRT discussions.  There are typically no new substantive issues at this stage, nor are previously resolved matters revisited.

20.    An executed mitigation agreement is a core required component of each project timeline, and a prerequisite to the FAA's ability to complete its aeronautical studies and, where warranted, issue DNHs for the project.  DNHs are often necessary for projects to move forward and are often needed to secure other federal and local permits, obtain project financing and insurance, execute project agreements, and establish construction and procurement timelines.

21.    In my experience, since the inception of the DoD/Clearinghouse process the advancement of a project from the issuance of an NPR through final execution by the DoD has occurred within a predictable timeframe, typically nine to fourteen months from the date the applicant files with FAA.  More specifically,

> a. It would take approximately 2 months from the developer's signature of a mitigation agreement to receive the countersigned version back from DoD and for DoD to transmit its findings to FAA to continue the process. Historically, once a mitigation agreement was executed by a developer, the remaining DoD review and countersignature process was limited and predictable, since substantive issues had already been identified and resolved.  While further review would confirm the

**DECLARATION OF HOWARD D. BELOTE**

agreement reflected the agreed-upon terms, of the 60+ agreements I have handled for clients, no agreements at this stage have been reopened for further review.

b.  After MRT discussions were concluded and the parties reached an informal agreement on the mitigation measures required, it would take on average 3-4 months for DoD to review the agreement and to transmit the agreement to the project sponsor for review signature.  The agreement was a reflection that relevant DoD components, including NORAD and relevant offices within the military Services' Secretariats, Headquarters staffs, and Major Commands, had determined that the projects do not pose an unacceptable risk to national security with the agreed mitigation measures. The anticipated mitigation agreements were standard, template agreements consistent with those previously approved by DoD. Historically, the anticipated period from completion of MRT discussions to transmission of a draft mitigation agreement to the project applicant took four months.

c.  Once the MRT was formed, to reach an informal agreement of mitigation measures through the MRT discussions, it would take on average 1 month for NORAD-related issues and 2-3 months for Air Force related impacts (*e.g.*, military training routes).  These impacts were often discussed simultaneously.

d.  Once DoD issued an NPR it would take on average 1-2 months for DoD to convene the necessary MRTs.

e.  Once a developer filed a notice with the FAA, DoD would take on average two to three months to either issue an NPR or to inform the FAA that it has no concerns

7

**DECLARATION OF HOWARD D. BELOTE**

regarding impacts to military readiness or national security. When NPRs were issued, it generally took 1-2 months to schedule an MRT teleconference.

22.    MRTs generally occur early in a wind project's years-long development process, sometimes long before turbine height, turbine arrangement within a defined project footprint, or the shape of the project footprint are finalized. Consequently, project sponsors often have to tweak project design after DNHs are issued. When such changes are made, MRT participants have to amend their submissions to FAA and reconvene MRT discussions with DoD to amend executed mitigation agreements underlying FAA's original DNH. Historically, amendments were treated as straightforward administrative updates that followed clearly defined and predictable stages of review, proceeding as follows.

   a.  The amendment process commences when the project sponsor notifies FAA that it needs to alter the project design. This requires termination of the original aeronautical study numbers (ASNs) filed with the FAA and filing of new ASNs at the desired locations and heights.

   b.  As with the initial filings, DoD is automatically notified of the changes due to its role within the FAA's Obstruction Evaluation/Airport Airspace Analysis (OEAAA) process, and developers can simply wait for the Clearinghouse to contact them. My practice, however, has always been to proactively contact the Clearinghouse and members of the original MRT to jumpstart the amendment process. Notably, unlike projects that are being reviewed by the Clearinghouse for the first time, this proactive outreach precludes the issuance of a new NPR because a risk has already been identified; of course, the Clearinghouse may choose to issue

**DECLARATION OF HOWARD D. BELOTE**

an updated NPR to maintain a clear paper trail.  I have worked on amendments both with and without new NPRs.

c. Once amendment discussions commence, contractors working for the Clearinghouse and Service Secretariats review the new layout for compliance with the parameters established in the original agreement, prepare a new table of ASNs and a new map, then draft an amendment to remove and replace the old table and map with the updated ASNs. The level of staff review depends on the parameters and timing of the refiled ASNs; amendments initiated within 12 months of receiving DNHs that do not increase the number or height of turbines need only be approved and executed by the GS-15 project officer from the affected Service, while all other amendments must be approved and executed by the SES-level signatories of the original agreement -- the deputy assistant secretary of the relevant Service and Assistant Secretary of Defense for EI&E -- or their successors.

d. In practice, the typical amendment process has taken considerably less time than the original MRT because the military impacts are already well understood and documented, and the signatories need only confirm those impacts have not increased.  GS-15-level amendments have been executed in as little as 2 to 4 weeks, whereas SES-level amendments have averaged roughly 3-4 months for drafting, staff and Office of the General Counsel review, and signature by the developer, deputy assistant secretary of the relevant Service, and Assistant Secretary of Defense for EI&E.

23. Beginning around August 2025, this established process ceased to function in its ordinary manner.  Even where mitigation has been agreed upon and DoD career staff have

9

**DECLARATION OF HOWARD D. BELOTE**

concluded that projects do not pose an unacceptable risk as mitigated, agreements and amendments are no longer advancing.  In many cases, draft agreements are not being provided to developers, and where developers have executed agreements or amendments, DoD has not completed countersignature.  These delays are open-ended and have not been accompanied by project-specific feedback or identified deficiencies.

24.    Projects sponsored by clients of DARE Strategies have been impacted at various stages, as summarized below:

a. **DoD counter signature:** DoD has not returned countersigned agreements for any project since August 18, 2025.  DARE Strategies is aware of 8 total projects for its clients in this category.  Of these, two projects transmitted executed mitigation agreements for countersignature in August 2025, one project transmitted an executed mitigation agreement for countersignature in September 2025, and five projects transmitted executed mitigation agreements for countersignature in December 2025.

b. **Draft agreements sent to developer:**  DoD has not presented an agreement for signature by the project sponsor for any project that has concluded MRT discussions since December 17, 2025.  DARE Strategies is aware of 8 projects for its clients in this category.  Of these projects, 1 project has been pending for 8 months, 2 projects have been pending for 5 months, 2 projects have been pending for 4 months, 2 projects have been pending for 3 months, and 1 project has been terminated by the developer.

c. **MRT discussions:** MRT discussions, particularly with respect to customary military training route mitigations, have been significantly slower than usual.  As

10

**DECLARATION OF HOWARD D. BELOTE**

of mid-April 2026, DARE Strategies has been informed by MRT conveners that, without explanation, all discussions (including previously scheduled discussions) have been canceled until further notice.  DARE Strategies is aware of at least 21 projects for its clients in this category.

d. **Projects awaiting preliminary determinations:** DoD is not conducting preliminary reviews to determine whether wind energy projects need to participate in MRT discussions or can be cleared by DoD without convening a MRT. DARE Strategies is aware of three (3) projects for its clients in this category. Of these projects, one (1) has been pending for 5 months and two (2) for 6 weeks.

25.    In general, these delays do not appear to be tied to any project-specific concern or newly identified risks, but rather ambiguous and to date unsupported positions by DoD. Historically, new and evolving concerns have been identified by the NPR and, in some cases, during the MRT process on a project-specific basis.  By contrast, the current situation seems to reflect a broader practice of disengagement and deviation from historic norms, despite project sponsors' best efforts to move projects forward and engage with DoD.

26.    On May 12, 2026 I was informed by ToniAnn Fisher, the Director of Encroachment Risk Management and Community Partnerships for the Air Force Secretariat, that on or about April 13, 2026 the Clearinghouse and its counterparts in the military Services had been directed by Deputy Assistant Secretary of War for Energy Resilience and Optimization Rebecca Isacowitz to stop all efforts to review and process wind projects until further notice.

27.    On May 26, 2026, I learned that on May 7, 2026, Robert E. Thompson, Performing the Duties of the Assistant Secretary of War for Energy, Installations, and Environment, had published "Interim Guidance Regarding Compliance with Established Military Aviation and

11

**DECLARATION OF HOWARD D. BELOTE**

Installation Assurance Siting Clearinghouse Procedures" and transmitted it to the affected assistant secretaries of the Military Services and directors of the Defense Agencies. In paragraph 8, the document appears to justify recent delays in Clearinghouse processes, claiming that "the Department has been evaluating its Part 211 interagency coordination compliance" and "has determined that further interagency coordination, especially with respect to the Department of Homeland Security (DHS)" is warranted and ongoing. Having been responsible for specifically including DHS in the original draft of Title 32 C.F.R Part 211, I find the implication that DHS has not been properly consulted to be erroneous and misleading. DHS has been involved in Clearinghouse deliberations through the Wind Turbine Radar Interference Mitigation Working Group and the Long-Range Radar Joint Program Office at HQ Air Combat Command, Langley AFB, VA, for more than a decade. In my experience, DHS has always been aware of the expert analysis conducted by NORAD and the Air Force's 84th Radar Evaluation Squadron and has deferred to those analyses rather than participate in individual MRT discussions. Mr. Thompson's suggestion that DHS may not be aware of "potential threats to critical infrastructure and the homeland based on the advancement of adversarial capabilities and the evolving global threat picture" is not credible and should not be used to excuse lengthy Clearinghouse delays.

28.    My clients make long-term business decisions based on a fair, consistent, predictable, and timely aeronautical review process, which includes the ability to obtain an airspace determination from the FAA, following the DoD process and well-established historic timelines.

29.    Prior to these delays, I was able to reliably advise my clients on the timelines needed to secure DoD non-objections, based on a transparent and predictable timeline. This is no longer the case.

12

**DECLARATION OF HOWARD D. BELOTE**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on 5/31/2026.

*/s/ Howard D. Belote*

Howard D. Belote

13

**DECLARATION OF HOWARD D. BELOTE**