# Exhibit L

## *To Plaintiffs' Complaint for Injunctive and Declaratory Relief*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST, *et al.*, | Case No. _____ |
| *Plaintiffs*, | |
| v. | **DECLARATION OF EDWARD J. CHUPEIN** |
| PETER B. HEGSETH, *et al.*, | |
| *Defendants*. | |

Pursuant to 28 U.S.C. § 1746(2), I, Edward J. Chupein, declare as follows:

1.      I am sole proprietor of AVRO Polaris Consulting, LLC and Senior Advisor to DARE Strategies LLC ("DARE Strategies").  My business address is 500 E Lake Avenue, Baltimore, Maryland 21212. DARE Strategies is a consulting firm that helps clients successfully navigate issues at the nexus of renewable energy and national defense.

2.      I have personal knowledge of the facts stated herein and, if called to testify, could and would testify competently thereto.

3.      I received a Bachelor of Arts in Education from the West Chester University in 1983 and a Master of Arts in Political Science from the University of South Dakota in 1991.

4.      I served for 27 years and 3 months in the United States Air Force, retiring as an Air Force colonel and B-52 Electronic Warfare Officer, B-1B Weapons Systems Officer and EC-130 Navigator.  I participated in Operations Uphold Democracy, Sea Signal, Desert Fox, Desert Thunder, Joint Guard, Allied Force, Enduring Freedom, and Iraqi Freedom.  I served as commander of Detachment 1, 193d Special Operations Wing (Bollen Air-to-Ground Range), Fort

1

**DECLARATION OF EDWARD J. CHUPEIN**

Indiantown Gap, Pennsylvania, Detachment Operations Officer assigned to Joint Task Force 20 (undisclosed location), and the 5th Expeditionary Air Support Operations Squadron, Mosul, Iraq. I subsequently served as Chief, Airspace and Ranges Division, Operations Directorate, Headquarters, United States Air Force, Pentagon, Washington, DC.

5.    After my service in the United States Air Force, I was hired by the Department of the Air Force as a GS-15 to continue as Chief, Airspace and Ranges and then as Deputy Chief, Operational Training Infrastructure charged to integrate live and virtual training. I served in these capacities from February 2011 to September 2020.

6.    In 2008, as Chief, Airspace and Ranges, I supervised the Air Force analysis and response to the Shepherd's Flat Wind Farm, Oregon, the case that first revealed operational and training compatibility issues related to an evolving renewable energy infrastructure. Together with US Northern Command leadership, this involved engagement with the White House, National Security Council, and National Economic Council staff and Federal Aviation Administration (FAA), and resulted in the first Service policy office dedicated to the impacts of renewable energy development to radar and training infrastructure. As the vanguard on this issue, my office provided the template for DOD-wide policy and laid the groundwork that eventually resulted in legislation that established the DOD Military Aviation and Installation Assurance Siting Clearinghouse in 2011.

7.    In this role, I was responsible for developing and enforcing Air Force policy, guidance and oversight for Special Use Airspace, Military Training Routes, test and training ranges, and the operational elements pertaining to renewable energy development.  These instructions created a structured process enabling collaboration among local officials, industry representatives, and military leaders to assess the mission compatibility of a wide range of projects.

2

**DECLARATION OF EDWARD J. CHUPEIN**

Throughout this period, I was often directly involved in conversations between Air Force units and commands and proponent wind energy developers on especially contentious or complicated projects.

8. Under my leadership, the Air Force instituted a more rigorous, requirements-based process to develop and modify its Special Use Airspace and Military Training Routes that addresses the needs of an evolving, but smaller force structure, new tactics and new weapons systems. It was also designed to better account for the interests of the public, landowners, tribal nations, and new entrants into the National Airspace System like wind turbines and unmanned aircraft systems ("drones"), as well as the increasing efficiency demands from FAA and commercial aviation. In effect, it created a deliberative, acquisition-like process that treated airspace as a valuable and finite public resource and encouraged greater stewardship.

9. After retiring from civil service in 2020, I joined DARE Strategies LLC as a Senior Advisor on compatible siting and matters of military airspace, where I consulted with unit and major command training officers and airspace managers, as well as radar specialists at North American Aerospace Defense Command (NORAD) to address adverse impacts to test activities, training and readiness. By doing so I aid clients in risk management decisions and help secure Determinations of No Hazard (DNHs) from the FAA following consultation with the affected Service and DoD's Clearinghouse.

10. During my career I have successfully guided numerous airspace modifications and acquisitions through Air Force, DOD, FAA and NEPA processes. I successfully petitioned and collaborated with the Air Force Secretariat to rewrite Air Force policy regarding compatible siting of renewable energy projects to shift it from an encroachment management philosophy to one more focused on operational requirements, readiness and mission sustainment. This served to better

3

involve unit-level rated aviators and airspace managers in direct and transparent discussions with wind energy developers; and in the absence of much needed metrics, it helped give voice to units faced with cumulative effects that truly represented a significant impact to combat readiness and national security.

11.    Based on my professional experience, I am highly familiar with the process of securing a DNH from the FAA, including the standard procedures and typical timelines associated with the DoD consultation and review process.  I also have firsthand knowledge of my clients' experiences in attempting to complete the DoD process.

12.    Developers proposing structures that are taller than 200 feet above ground level or that would intrude into protected airspace near airports or heliports, such as land-based wind turbines, must provide notice to the FAA.  In practice, developers do not proceed with construction of a land-based wind project absent a DNH from the FAA.

13.    When such notice is filed, the FAA evaluates whether the proposed structure could affect navigable airspace, disrupt air navigation systems, or implicate military operations or readiness.  As part of that evaluation, the FAA seeks DoD's assessment of potential military impacts.

14.    DoD conducts its review through the Clearinghouse. This review includes assessing potential impacts to military readiness and national security, which includes assessing radar and electromagnetic and military airspace impacts. If DoD identifies no concerns, it informs FAA accordingly. If DoD makes a preliminary finding of potential adverse impact, it issues a Notice of Presumed Risk (NPR) and invites the project applicant to participate in mitigation discussions with a Mitigation Response Team (MRT), which is comprised of the various components (*i.e.*, Army, Air Force, Navy, NORAD, etc.) that identified issues with the project.

4

**DECLARATION OF EDWARD J. CHUPEIN**

15.    Through the MRT process, relevant DoD entities are consulted, and any military readiness and national security concerns are addressed through agreed upon mitigation measures with the project sponsor.  Most mitigations involve electromagnetic impacts on radars or test facilities or obstructions in low-level military training airspace, which are routinely agreed upon by the project sponsor based on a well-established framework for mitigation.  Typical mitigations include voluntary payments to optimize affected radars' software and repositioning or removing turbines to provide additional space for low-level aircraft to maneuver.

16.    Upon conclusion of the MRT discussions, if the parties reach consensus, they prepare an informal agreement that sets forth the mitigation measures the developer will implement to address impacts to military readiness and national security and to enable DoD to issue a "non-objection" to the FAA for the project.  At the end of these discussions, the informal agreement is submitted to DoD for internal review. After such review, a draft mitigation agreement is sent to the developer for signature.

17.    After the developer executes the agreement, it is returned to DoD for final processing and signature by the Assistant Secretary of Defense for Energy, Installations, and Environment.  Historically, this step was routine and short-duration because all material issues had been previously identified and resolved through the MRT discussions.  There are typically no new substantive issues at this stage, nor are previously resolved matters revisited.

18.    An executed mitigation agreement is a core required component of each project timeline, and a prerequisite to the FAA's ability to complete its aeronautical studies and, where warranted, issue DNHs for the project.  DNHs are often necessary for projects to move forward and are often needed to: secure other federal and local permits, obtain project financing and insurance, execute project agreements, and establish construction and procurement timelines.

5

**DECLARATION OF EDWARD J. CHUPEIN**

19.     In my experience, since the inception of the DoD/Clearinghouse process the advancement of a project from the issuance of an NPR through final execution by the DoD has occurred within a predictable timeframe, typically nine to fourteen months from the date the applicant files with FAA.  More specifically:

a.   It would take approximately 2 months from the developer's signature of a mitigation agreement to receive the countersigned version back from DoD and for DoD to transmit its findings to FAA to continue the process. Historically, once a mitigation agreement was executed by a developer, the remaining DoD review and countersignature process was limited and predictable, since substantive issues had already been identified and resolved.  While further review would confirm the agreement reflected the agreed upon terms, of the 60+ agreements I have handled for clients, no agreements at this stage have been reopened for further review.

b.   After MRT discussions were concluded and the parties reached an informal agreement on the mitigation measures required, it would take on average 3-4 months for DoD to review the agreement and to transmit the agreement to the project sponsor for review signature.  The agreement was a reflection that relevant DoD components, including NORAD and relevant offices within the military Services' Secretariats, Headquarters staffs, and Major Commands, had determined that the projects do not pose an unacceptable risk to national security with the agreed mitigation measures. The anticipated mitigation agreements were e standard, template agreements consistent with those previously approved by DoD. Historically, the anticipated period from completion of MRT discussions to

**DECLARATION OF EDWARD J. CHUPEIN**

transmission of a draft mitigation agreement to the project applicant took four months.

c. Once the MRT was formed, to reach an informal agreement of mitigation measures through the MRT negotiations, it would take on average of 1 month for NORAD-related issues and 2-3 months for Air Force related impacts (*e.g.*, military training routes). These impacts were often discussed simultaneously.

20. Beginning around August 2025, this established process ceased to function in its ordinary manner. Even where mitigation has been agreed upon and DoD career staff have concluded that projects do not pose an unacceptable risk as mitigated, agreements are no longer advancing. In many cases, draft agreements are not being provided to developers, and where developers have executed agreements, DoD has not completed countersignature. These delays are open-ended and have not been accompanied by project-specific feedback or identified deficiencies.

21. Projects sponsored by clients of DARE Strategies have been impacted at various stages, as summarized below:

a. **DOD counter signature:** DoD has not returned countersigned agreements for any project since August 18, 2025. DARE Strategies is aware of 8 total projects for its clients in this category. Of these, two projects transmitted executed mitigation agreements for countersignature in August 2025, one project transmitted an executed mitigation agreement for countersignature in September 2025, and five projects transmitted executed mitigation agreements for countersignature in December 2025.

7

**DECLARATION OF EDWARD J. CHUPEIN**

b. **Draft agreements sent to developer:** DoD has not presented an agreement for signature by the project sponsor for any project that has concluded MRT negotiations since December 17, 2025. DARE Strategies is aware of 8 projects for its clients in this category. Of these projects, 1 project has been pending for 8months, 2 projects have been pending for 5 months, 2 projects have been pending for 4 months, 2 projects have been pending for 3 months, and 1 project has been terminated by the developer.

c. **MRT negotiations:** MRT negotiations, particularly with respect to customary military training route mitigations, have been significantly slower than usual. As of mid-April 2026, DARE Strategies has been informed by MRT conveners that, without explanation, all negotiations (including previously scheduled negotiations) have been canceled until further notice. DARE Strategies is aware of at least 21 projects for its clients in this category.

d. **Projects awaiting preliminary determinations:** DoD is not conducting preliminary reviews to determine whether wind energy projects need to participate in MRT discussions or can be cleared by DoD without convening a MRT. DARE Strategies is aware of three (3) projects for its clients in this category. Of these projects, one (1) has been pending for 5 months and two (2) for 6 weeks.

22. In general, these delays do not appear to be tied to any project-specific concern or newly identified risks, but rather an ambiguous and to date unsupported position by DoD. Historically, new and evolving concerns have been identified by the NPR and, in some cases, during the MRT process on a project-specific basis. By contrast, the current situation seems to

8

reflect a broader practice of disengagement and deviation from historic norms, despite project sponsors' best efforts to move projects forward and engage with DoD.

23.    My clients make long-term business decisions based on a fair, consistent, predictable, and timely aeronautical review process, which includes the ability to obtain an airspace determination from the FAA, following the DoD process.

24.    Prior to these delays, I was able to reliably advise my clients on the timelines needed to secure DoD non-objections, based on a transparent and predictable timeline.  This is no longer the case.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on 5/31/2026.

*/s/ Edward J. Chupein*

Edward J. Chupein

9

**DECLARATION OF EDWARD J. CHUPEIN**