# Exhibit M

*To Plaintiffs' Complaint for Injunctive and Declaratory Relief*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST, *et al.*, | Case No. _____ |
| *Plaintiffs,* | |
| v. | **DECLARATION OF BENJAMIN DOYLE** |
| PETER B. HEGSETH, *et al.*, | |
| *Defendants.* | |

Pursuant to 28 U.S.C. § 1746(2), I, Benjamin Doyle, declare as follows:

1.      I am the President and Chief Executive Officer of Capitol Airspace Group (CAG). My business address is 6350 Walker Lane, Suite 450, Alexandria, Virginia 22310. Capitol Airspace Group is an aviation consulting firm that provides analytical, strategic, and advocacy services to airports, commercial developers, and communities, specifically relating to aeronautical studies and reviews conducted by the Federal Aviation Administration (FAA) and the Department of Defense (DoD).

2.      I have personal knowledge of the facts set forth herein and, if called to testify, could, and would, testify competently thereto.

3.      Early in my career, I served as an Air Traffic Control Tower Chief in the United States Army. For over 25 years, I have focused my career on assisting clients in technical and strategic planning associated with the aeronautical study of tall structures, including wind turbines conducted by the FAA pursuant to 14 C.F.R. Part 77. These aeronautical studies include the consultation with and review by the DoD's Military Aviation and Installation Assurance Siting

1

**DECLARATION OF BENJAMIN DOYLE**

Clearinghouse (Clearinghouse) and its associated components, including in working with Mitigation Response Teams (MRT) to identify mitigations for projects with potential impacts to military readiness or national security.

4. Over the past 27 years, my staff and I have supported and advised clients on thousands of projects through the FAA's aeronautical study process. The results of these efforts have made CAG the top filer of 7460-1 filings in the country with a total number of filings in excess of 130,000.

5. Based on my professional experience, I am highly familiar with the aeronautical study process, including the coordination with the DoD, the Clearinghouse, and through the MRT process. My staff and I have extensive experience with the standard procedures and typical timelines associated with Clearinghouse consultation and review. I also have firsthand knowledge of my clients' experiences in seeking such determinations.

6. One of the services offered by CAG is pre-review and strategic planning for wind developer clients to anticipate and address potential aeronautical concerns that may arise during the formal review process. We base our analyses on long-established and well-understood regulations, orders, technical materials, aeronautical data, guidance, and past practices, providing developers with a reasonable expectation of the issues that may arise, potential mitigations, and timelines for submission based on anticipated and normal timeframes for their specific projects. CAG's studies empower our clients to predict and avoid or reduce potential impacts to DoD equities before the formal process begins and to establish project timelines, which often have many other regulatory components, based on customary timelines for similar projects.

7. As part of the FAA aeronautical review process, DoD initiates a separate review through the Clearinghouse. This includes assessing potential impacts on military readiness and

2

**DECLARATION OF BENJAMIN DOYLE**

national security; some of which may include interference with surveillance radar systems, encroachment on the navigable airspace within military training routes (MTR) and special-use military airspace. If the DoD makes a preliminary finding of potential adverse impact to military readiness (e.g. testing, training or operations), it issues a Notice of Presumed Risk (NPR) and invites the project applicant to participate in mitigation discussions with a MRT. MRTs are comprised of the various Service components (*i.e.*, Air Force, Army, Navy, NORAD, Space Force, etc.) that have identified impacts created by the project to their missions.

8.    The lead component initiates MRT discussions with the project sponsor, and all relevant DoD components to identify feasible and affordable mitigations that would address any military readiness and national security concerns.  Mitigation measures are typically based on a well-established collaborative framework employing strategies such as turbine curtailment, developer-funded radar solutions, and turbine location modifications, among other solutions.

9.    Conclusion of the MRT partnership results in either an informal "handshake agreement" between the parties or an agreement that a mitigation solution is unobtainable. The informal agreement is then forwarded by the lead component to the DoD for review. Upon completion of this review, a formal mitigation agreement outlining the terms and specific mitigation measures agreed to by the developer and the DoD component(s) is sent to the developer for signature.

10.    Once DoD has received the signed agreement from the developer, it undergoes a final review and is then executed by the Assistant Secretary of Defense for Energy, Installations, and Environment unless the voluntary funding amount is greater than $1.5M. In these cases, the approving authority is the Deputy Under Secretary of Defense for Acquisition and Sustainment.

**DECLARATION OF BENJAMIN DOYLE**

11.    A successful resolution of the MRT, such as an executed mitigation agreement, is a required component of the overall project review process, and a prerequisite to the FAA's completion of its aeronautical study which would typically result in the issuance of a determination of no hazard (DNHs) for the project.  DNHs are typically necessary for projects to secure other federal and local permits, obtain project financing and insurance, execute project agreements, and establish construction and procurement timelines.

12.    CAG has direct experience completing 82 mitigation agreements through the Clearinghouse review process.

13.    Based on personal experience and the experience of my staff, this process has historically proceeded along a transparent and predictable timeline. More specifically,

    a. Once a developer filed notice with the FAA, it would take an average of 2-3 months for DoD to issue an NPR, or to inform the FAA that it has no concerns regarding impacts to military readiness or national security.

    b. Once DoD issued an NPR it would take an average of 1-2 months for DoD to form the appropriate MRT.

    c. Once the MRT was formed to reach an informal agreement of mitigation measures through the MRT process, it would take an average of seven (7) to thirty (30) days for NORAD-related issues; sixty (60) to 90 days for Air Force related impacts (*e.g.*, MTRs, Military Operations Areas (MOAs), Inter-Continental Ballistic Missile (ICBM) impacts, weapons and flight testing ranges), and sixty (60) to 120 days for Navy-related impacts (*e.g.*, MTRs, MOAs, weapons testing ranges).  Mitigation of impacts were often discussed simultaneously and collaboratively.

4

**DECLARATION OF BENJAMIN DOYLE**

d.  By the conclusion of the MRT process, if the parties found a mutually agreeable, affordable and feasible solution, the relevant DoD component(s), would have concluded that the mitigation measures outlined in the agreement would overcome any potential unacceptable risk to national security. The mitigation agreements follow standard terms in a template developed by DoD that would typically take an average of ninety (90) to 120 days for the DoD to transmit a draft to the project sponsor for signature.

e.  From the date in which the project sponsor executed the agreement and returned it to the DoD, it would take approximately 60 days to receive the countersigned version back from DoD and for DoD to transmit its findings to the FAA. Historically, once a mitigation agreement was executed by a developer, the remaining DoD review and countersignature process was limited and predictable, since substantive issues had already been identified and resolved via the MRT discussions and "handshake" agreement.

14.  Over the last several months, CAG observed changes occurring in the DoD's handling of these cases resulting in significant delays and, ultimately, the total cessation of review of wind projects by the DoD. Projects under review at various stages of the process have been impacted as summarized below (specific to CAG clients):

a.  DoD has not produced countersigned agreements (including amendments) for any project since August 2025. These agreements remain unsigned by DoD, even though DoD has already agreed upon mitigation, provided a draft mitigation agreement to the project sponsor, and the project sponsor has returned the signed agreement. CAG is aware of fifteen (15) of its clients' projects that fall into this

5

**DECLARATION OF BENJAMIN DOYLE**

category. Of these, four (4) transmitted signed agreements back to the DoD for final signatures and execution over 270 days ago; two (2) transmitted signed agreements for final DoD signatures and execution over 180 days ago; five (5) transmitted agreements for final DoD signatures and execution over 120 days ago; two (2) transmitted draft agreements for final DoD signatures and execution over 90 days ago; and two (2) have awaited DoD signature for less than 90 days.

b. DoD has not sent a draft agreement for signature to the project sponsor of any project that has completed an MRT since December 2025.  CAG is aware of nineteen (19) projects for its clients in this category. Of these projects, one (1) project has been awaiting an agreement for over 24 months; two (2) projects have been awaiting an agreement for 12 - 24 months; six (6) projects have been awaiting an agreement for 6 - 12 months; ten (10) projects have been awaiting an agreement for 4 - 6 months.

c. DoD has also halted execution of amendments to existing mitigation agreements. Mitigation agreements include provisions for the project sponsor to make minor project modifications though amendments.  The DoD signature requirements for amendments vary across agreements, with some allowing a delegated official to issue certain approvals. The amendment execution process has been halted in the same manner as the new agreement process and none have been produced since the DoD signature stoppage in August 2025.

d. MRT engagement, particularly with respect to customary MTR mitigations, has been significantly slower than usual. In mid-April 2026, CAG was informed by the Air Force, Navy, and NORAD that all MRTs, without explanation, and all

6

**DECLARATION OF BENJAMIN DOYLE**

engagement (including previously scheduled meetings) have been canceled until further notice. CAG is aware of eleven (11) projects for its clients in this category.

e. The last successful MRT led by the Air Force, and related to MTR impacts, that led to a signed Mitigation Agreement concluded in August 2024.

f. Capitol Airspace previously conducted weekly engagements with the SAF contractor team from January 2019 through January 2024 to review project status and next steps. These collaborative meetings were cancelled by the Director, Air Force Community Partnerships and Mission Sustainment in September 2024.

15. In general, these delays do not appear to be tied to any project specific concern, but rather a general position by DoD to delay or avoid reviewing wind projects.

16. DoD's decisions to not sign mitigation agreements, to cancel MRT's and to discontinue communications with industry effectively put a halt to the issuance of FAA determinations. Wind projects that are unable to obtain an FAA DNH are, in the vast majority of cases, unable to obtain or secure related permits, approvals, and commercial agreements (including financing) necessary to begin construction.

17. In addition, we understand that the May 7 DoD Interim Guidance creates additional conditions and indefinite review for wind energy projects, while other projects are able to move with priority.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on 05/31/2026

Digitally signed by Benjamin M. Doyle
DN: cn=Benjamin M. Doyle, o=Capitol Airspace Group, LLC, ou=President, email=ben.doyle@capitolairspace.com, c=US
Date: 2026.05.31 15:35:58 -04'00'

7

**DECLARATION OF BENJAMIN DOYLE**