# Exhibit N

## *To Plaintiffs' Complaint for Injunctive and Declaratory Relief*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST, *et al.*, | Civil Action No. _____ |
| *Plaintiffs*, | |
| v. | **DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF** |
| PETER B. HEGSETH, *et al.*, | |
| *Defendants*. | |

1. Pursuant to 28 U.S.C. § 1746(2), we, Nicole Hughes, Jeffrey Clark, Marguerite Wells, Beth Soholt, Erika ("Rikki") Seguin, Eliza Donoghue, Francis Pullaro, and Simon Mahan, submit this joint declaration. Each declarant serves as the Executive Director or President of a regional or statewide clean energy organization and provides this testimony based on personal knowledge, professional experience, and information obtained through their organizations and member companies.

2. With decades of combined experience in renewable energy deployment, policy, and advocacy across the United States, we have direct visibility into the devastating impact that the Department of Defense's ("DoD") policy of complete inaction on review of wind projects is having across a broad geographic and market spectrum, including the immediate and escalating

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

1

harms that threaten significant and irreparable disruption to the industry. We offer this declaration to describe the nationwide harms being experienced by our member companies as a result of the DoD's complete and global refusal to engage, in any capacity, with wind energy developers seeking to identify and mitigate any risk their project might pose to military readiness or national security, pursuant to the process set forth in 10 U.S. Code § 183a.

## I.    DECLARANTS BACKGROUND AND EXPERIENCE

### A.    NICOLE HUGHES

3.    I, Nicole Hughes, am the Executive Director of Renewable Northwest.  I am over the age of 18 and competent to testify to the matters set forth in this Declaration. The facts stated herein are based on my personal knowledge, investigation, and information obtained in the course of my role at Renewable Northwest.

4.    Renewable Northwest is a 501(c)(3) not-for-profit organization that serves as one of the nation's most impactful renewable energy advocacy organizations, representing the interests of the Northwest. Renewable Northwest's mission is to decarbonize the Northwest region by accelerating the transition to renewable electricity. Renewable Northwest's diverse membership includes a unique and powerful coalition of renewable energy professionals, energy buyers and marketers, ratepayer advocates, and environmental NGOs. Renewable Northwest operates within a geographic region that encompasses four Northwestern states: Oregon, Washington, Idaho, and Montana.

5.    Renewable Northwest is registered as a domestic nonprofit corporation in Oregon, maintains its principal place of business in Portland, and operates within the state, including supporting wind energy projects located in Oregon. Renewable Northwest has 94 members, including 16 members that develop, own, and/or operate onshore wind projects. Among

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

2

Renewable Northwest's members are companies with wind energy projects in Oregon, including 7 projects in the state that are awaiting Determinations of No Hazard ("DNHs") and are currently stalled by DoD's freeze of its review process, one of which is in the Portland Division of the United States District Court for the District of Oregon. Its membership also includes a manufacturer of wind turbine components headquartered in Portland, Oregon.

6.    In my role as Executive Director, I act as the primary public voice for the organization and oversee all major advocacy and outreach efforts that support the renewable energy community. My responsibilities include shaping our policy recommendations, preparing public and press statements, submitting formal comments on regulatory actions that affect the industry, and representing the organization at events and forums. I carry out these duties in close partnership with Renewable Northwest's member companies, and I communicate regularly with our members to discuss legal and regulatory issues impacting the development and operation of onshore wind assets and advocate for solutions to issues that hinder onshore wind development before government entities.

7.    I am familiar with legal and regulatory issues that impact wind development, including aeronautical studies conducted by the Federal Aviation Administration ("FAA") in consultation with the Military Aviation and Installation Assurance Siting Clearinghouse ("DoD Clearinghouse") housed within DoD. In this context, I am familiar with the processes and historical timelines associated with project review and clearances, as well as the ways in which delays in securing or the inability to obtain such approvals can affect both individual project development and the wind energy industry more broadly.

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

3

**B.    JEFFREY CLARK**

8.    I am the President and CEO of Advanced Power Alliance ("APA"). I have more than 20 years of experience working to grow the American energy economy. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information provided by APA members.

9.    For more than 20 years, APA has promoted the development of advanced utility-scale power generation, infrastructure, and energy storage to drive American energy expansion across the central and southeastern United States. Our advocacy covers eleven states—including key wind energy states including Texas, Oklahoma, Kansas, Nebraska, Missouri and beyond—representing the nation's most active regions for the development of wind, solar, and natural gas power generation; energy storage; transmission and infrastructure development; and the deployment of advanced technologies like green hydrogen and small modular nuclear reactors. APA represents a diverse and wide-ranging coalition of power generation developers, energy storage companies, major corporate energy buyers, power equipment manufacturers, landowners, rural communities and school districts, and suppliers across the energy value chain. Our members are responsible for billions of dollars in investment and hundreds of thousands of jobs in the regions we serve.

10.    A significant share of APA's membership is active in onshore wind development. APA has 67 members, including 32 members that develop, own, and operate onshore wind projects.

11.    As President and CEO, I oversee APA's legal, political, regulatory, and legislative experts who are fighting for equitable and technology-neutral regulatory, tax, and siting policies. I represent our members before decision-makers to ensure that permitting, interconnection,

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

4

market design, and transmission policies treat all technologies including renewable power generation, energy storage, and advanced energy projects fairly and efficiently. I also work directly with members to identify barriers to fair and equitable energy markets so that APA can help guard against policies that jeopardize continued private investment, consumer affordability, system reliability, competition and innovation, or access to energy markets.

12.     I am familiar with how FAA aeronautical reviews are conducted in coordination with the DoD Clearinghouse, the timing associated with obtaining determinations, and DoD's role in early-stage project evaluation and siting decisions. I can speak to how imperative DoD's timely action on mitigation agreements is to wind energy development throughout our region, as well as the harms our members are experiencing as a direct result of DoD's policy of inaction.

### C.     MARGUERITE WELLS

13.     I, Marguerite Wells, am the Executive Director of Alliance for Clean Energy New York, Inc. ("ACE NY"). I have over 15 years of experience in the clean energy industry, including grid-scale, land-based and offshore wind energy, and have held this position since April 2024. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information provided by ACE NY member companies.

14.     ACE NY is a 501(c)(3) not-for-profit organization that serves as the premier multi-technology clean energy industry organization for the State of New York. ACE NY's mission is to promote the use of clean electricity technologies and energy efficiency in the State of New York, increase energy diversity and security, boost economic development, improve public health, reduce energy costs, and reduce air pollution. ACE NY's diverse membership includes companies engaged in the development, construction, and operation of land-based wind

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

5

and solar power; offshore wind power facilities; energy efficiency contracting; manufacturing of clean energy equipment; and consulting to or supporting the clean energy industry. ACE NY's membership also includes environmental and labor organizations interested in the advancement of the clean energy industry in the State of New York.

15. Onshore wind development represents a substantial portion of our member-companies' respective portfolios. ACE NY has 119 members, including 24 members that develop, own, and/or operate onshore wind projects.

16. As Executive Director, I am the spokesperson for the organization and primarily responsible for ensuring ACE NY's effective advocacy and outreach operations on behalf of the renewable energy industry. I set the organization's legislative agenda and policy goals. I advocate for wind and solar energy industries with the New York State Legislature, state executive agencies, the New York State Energy Research and Development Authority ("NYSERDA"), and the New York Independent System Operator ("NYISO") by developing and delivering various policy positions, issuing media statements, responding on behalf of industry to public comment periods for relevant regulations, and conducting various speaking engagements to advance this industry. This work is done in consultation with ACE NY member companies. I also work to inform the State of New York. This includes tracking, researching, and analyzing proposed policies that will affect the development of wind and solar facilities.

17. Through my experience and in conversations with members, I understand how the FAA and DoD interagency process generally operates, including typical review timelines and its significance in early-stage project planning and siting decisions. I further understand that uncertainty as to the availability or delay in obtaining these approvals can disrupt development schedules and negatively impact financing and investment decisions.

**DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF**

**D.    BETH SOHOLT**

18.    I, Beth Soholt, am the Executive Director for the Clean Grid Alliance ("CGA"). I have over 20 years of experience in the energy industry. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information provided by CGA members.

19.    CGA is a 501(c)(3) nonprofit (Clean Grid Alliance) and associated 501(c)(6) trade organization (Clean Grid Association) dedicated to advancing clean energy development and grid modernization in the Midwest. CGA provides a unified voice for approximately 80 members, advocating for policies and regulations that support the growth of renewable energy and strengthen the regional energy market. By engaging directly with policymakers, regulators, and industry stakeholders, CGA and its members support an industry responsible for over $450 million in annual economic benefits and hundreds of thousands of jobs across the Midwest. CGA covers the nine Upper Midwest States of the Midcontinent Independent System Operator ("MISO") footprint, including: Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, and Wisconsin.

20.    Onshore wind development is a substantial portion of our member-companies' respective portfolios. CGA has approximately 80 members, including at least 25 members that develop, own, and/or operate onshore wind projects.

21.    As Executive Director, I lead the organization in advancing clean energy and modernizing the electric grid throughout the Midwest. I am responsible for guiding CGA's strategic initiatives, including programs that help members navigate evolving market conditions, regulatory changes, and emerging technology opportunities. I work closely with industry partners, stakeholders, and regional leaders to foster collaboration, share best practices, and drive initiatives that strengthen

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

7

the clean energy sector. In addition, I ensure members have access to timely information on industry developments, market trends, and initiatives that impact renewable energy deployment, enabling them to make informed decisions and pursue growth opportunities.

22.     Wind energy development is subject to a range of regulatory requirements, including FAA aeronautical reviews conducted in coordination with the DoD Clearinghouse. I have experience with how this interagency review process is administered, the timelines under which determinations are generally made, and the significance of those determinations in assessing project siting and conducting early-stage due diligence. In my experience, delays in obtaining or an inability to obtain the necessary clearances can introduce meaningful uncertainty into project schedules and adversely affect financing decisions and overall project development.

E.     **RIKKI SEGUIN**

23.     I Rikki Seguin, am the Executive Director of Interwest Energy Alliance ("Interwest").  I am over the age of 18 and competent to testify to the matters set forth in this Declaration. The facts stated herein are based on my personal knowledge and information obtained in the course of my role at Interwest.

24.     Interwest is a non-profit trade association that brings the nation's leading companies in the renewable energy industry together with the West's advocacy community to expand deployment of a reliable, cost-effective, and diverse portfolio of renewable energy, storage, and transmission resources. Interwest works across New Mexico, Colorado, Wyoming, Utah, Nevada, and Arizona. Interwest promotes the deployment of reliable, cost-effective, and diverse renewable energy, storage and transmission resources. Interwest's priorities include facilitating the development of utility-based onshore wind assets.

**DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF**

25.    Interwest has 55 members. At least 20 of Interwest's members engage in onshore wind development activities.

26.    As Executive Director, I manage a multidisciplinary team of policy and technical experts engaged in advocacy efforts within regulatory and legislative forums to facilitate large-scale development of wind, solar, storage, and transmission resources. I work with our member organizations to understand the issues facing the renewable energy industry and to build consensus across a diverse set of Interwest members to advance our organization's six-state strategic agenda. I am deeply involved in development of strategy and implementation of each facet of Interwest's work, including permitting and market reform efforts, such as promoting the development of Regional Transmission Organizations ("RTOs") in the West, and regulatory proceedings and stakeholder forums that facilitate renewable energy development. In addition, I speak to policymakers, media, and industry groups about the economic and environmental benefits of renewable energy and transmission expansion in the interior West.

27.    I have experience with the legal and regulatory requirements affecting wind energy development, including aeronautical reviews carried out by the FAA in coordination with the DoD Clearinghouse. I am familiar with the interagency review process, typical approval timelines, and the role these determinations play in early-stage project due diligence and siting feasibility. I also understand how delays or the inability to obtain required clearances can create significant schedule risk, affect project financing and development decisions, and deal potentially fatal blows to projects hanging in the balance.

F.    **ELIZA DONOGHUE**

28.    I, Eliza Donoghue, am the Executive Director of the Maine Renewable Energy Association ("MREA"). I am of the age of majority, am competent to make this declaration, and

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

make this declaration based on my personal knowledge, investigation, and review of information provided by MREA members.

29.     The Maine Renewable Energy Association (MREA) is a not-for-profit association of renewable energy producers, suppliers of goods and services to those producers, and other supporters of this industry. Our power producer members sustainably manufacture electricity from solar, wind, hydro, and biomass. MREA represents the renewable power industry at the State Legislature and before the Maine Public Utilities Commission. MREA leads the local and statewide policy debate on renewable energy generation in Maine and works to ensure its efforts are united with those of its member companies.

30.      Onshore wind development is a substantial portion of our member-companies' respective portfolios. MREA has 73 members, including 11 members that develop, own, and/or operate onshore wind projects.

31.     As Executive Director of MREA, I oversee strategic planning and advocacy efforts for the renewable energy sector in Maine. I am responsible for leading statewide renewable energy advocacy efforts before the Maine Legislature, regulatory agencies, and other public stakeholders as well as MREA's daily operations, communications, and strategic initiatives. In fulfilling this role, I coordinate closely with member companies on energy policy, permitting, regulatory matters, and emerging barriers to project advancement.

32.     I am familiar with the vital role the DoD Clearinghouse review process plays in evaluating proposed land-based wind energy projects, as well as how that process generally operates. Through my work with MREA members, I have seen firsthand the impact that regulatory uncertainty in this area can have on project development. In my experience, unanticipated and unpredictable

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

10

obstacles in the DoD Clearinghouse review process can significantly disrupt the development pipeline and put project viability at risk.

### G.    FRANCIS PULLARO

33.    I, Francis Pullaro, am the President of RENEW Northeast. I have over 23 years in the energy industry. I have held this position since 2011. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information provided by RENEW Northeast member companies.

34.    RENEW Northeast is a 501(c)(6) not-for-profit organization that brings together renewable energy companies, environmental advocates, and communities to expand sustainable energy across New England, including in Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. We champion the use of the region's abundant renewable resources—including offshore and land-based wind, solar, small hydropower, and energy storage—and emphasize the importance of transmission investments to deliver this clean power.

35.    A large segment of RENEW's membership is engaged in onshore wind development. RENEW has 35 members, including 13 members that develop, own, and/or operate onshore wind projects.

36.    As President, I am responsible for the day-to-day administration and management of RENEW's operations and for carrying out the organization's activities consistent with its mission and governing documents. I act pursuant to, and subject at all times to, the direction, authority, and oversight of RENEW's Board of Directors. The Board of Directors is RENEW's governing body and exercises exclusive authority over the organization's strategic direction, policy positions, and significant organizational actions, including the approval of major initiatives, expenditures, and commitments. The Board acts collectively and only through duly

**DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF**

convened meetings or other formal action authorized by RENEW's bylaws. RENEW does not adopt positions or undertake material actions except as authorized by the Board of Directors, and all such decisions are made through a vote of the full Board.

37. In my work, I have become familiar with the regulatory processes governing wind energy development, including FAA aeronautical reviews coordinated through the DoD Clearinghouse. I understand how the interagency review process functions, the timing of approvals, and the importance of these determinations in assessing project feasibility and siting early in development. I also recognize that delays or an inability to obtain necessary clearances can create substantial schedule risk and adversely affect financing and development decisions

**H. SIMON MAHAN**

38. I, Simon Mahan, am the Executive Director of the Southern Renewable Energy Association ("SREA"). I have over a decade of local, state, and federal legislative and regulatory experience. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information provided by SREA members.

39. SREA is an industry-led initiative dedicated to fostering the responsible use and development of renewable energy sources, specifically wind energy, solar energy, energy storage, and transmission solutions, in the Southern United States. Our vision is to establish renewable energy as a primary energy source across the South, ensuring that these sustainable options play a significant role in powering communities and businesses. To achieve this, our mission focuses on promoting the responsible adoption and growth of renewable energy technologies, ensuring they are developed in a way that benefits both the environment and local economies. SREA operates within a geographic region that encompasses seven Southeastern states: Alabama, Arkansas, Georgia, Kentucky,

**DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF**

12

Louisiana, Mississippi, and Tennessee. Through advocacy, education, and collaboration, we aim to advance the renewable energy landscape in these areas, empowering individuals, businesses, and policymakers to embrace cleaner energy solutions for a more sustainable future.

40.     Onshore wind development is a substantial portion of our member-companies' respective portfolios. SREA has 40 members, including 19 members that develop, own, and/or operate onshore wind projects.

41.     As Executive Director of SREA, I engage in utility-scale wind energy and solar power advocacy, electric utility regulatory engagement, and legislative advocacy at the state and federal levels, throughout the South. In this capacity, I oversee SREA's participation in public utility proceedings, provide technical comments on integrated resource planning and transmission development, and intervene in regulatory dockets to ensure renewable energy interests are fairly represented. I also serve as SREA's public voice in policymaking circles, collaborating with utilities, state regulators, and other stakeholders to push for grid reforms, regional planning, and policies that reduce permitting friction and support the growth of renewable generation in the region. I coordinate SREA's strategic direction by engaging member companies (which include developers, investors, and energy consumers) to align advocacy goals with their technology and business priorities.

42.     I am familiar with the role the DoD Clearinghouse review process plays in evaluating proposed land-based wind energy projects. Based on my work with SREA members, I understand that developers rely on timely and predictable outcomes from this process when evaluating project locations, negotiating commercial arrangements, and advancing projects through development milestones. Where DoD-related reviews are delayed, unresolved, or result in restrictions on a proposed project, those issues can create substantial business uncertainty, complicate financing and contracting efforts, and jeopardize a project's ability to move forward.

**DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF**

## II.    BENEFITS OF WIND ENERGY DEVELOPMENT

43.    Onshore wind energy is the fourth largest source of electricity generation capacity in the United States. It is the largest source of renewable electricity generation, providing over 10% of the country's electricity. This is enough wind power to serve the equivalent of more than 46 million American homes.

44.    ECONOMIC BENEFITS: Onshore wind development has delivered over $350 billion in investment across all operational and planned capacity. Onshore wind development employs over 380,000 Americans across all 50 states from direct, indirect, and induced jobs. At the end of fourth quarter of 2025, there were 29 gigawatts ("GW ") of onshore wind capacity in the clean power pipeline, representing nearly $50 billion in capital investment.

45.    ENERGY SECURITY: Wind energy is a significant contributor to America's energy independence and security. As demand surges due to expanding AI data centers, renewed domestic manufacturing, building and transportation electrification, and continued economic growth, land-based wind will play an essential role in meeting near-term and long-term energy needs. Due to its rapid deployment timelines, modular buildout capabilities, and declining levelized costs, wind energy will play a vital role in producing the 1,000 terawatts (TW) of new electricity needed by 2035 to meet growing demand.

46.    ENVIRONMENTAL BENEFITS: Wind energy is among the cleanest and least environmentally harmful sources of electricity available today. Because wind energy generates electricity without producing greenhouse gases or other harmful pollutants, it avoids the air quality hazards associated with other energy sources. Emissions avoided by the operational fleet of land-based wind projects generate health benefits with an economic value of between $2.6

billion to $4.2 billion per annum at a 2.5% and 2% discount rate, respectively. Its minimal water usage not only conserves freshwater, especially in arid regions and areas experiencing drought, but also prevents the thermal and chemical impacts on rivers, lakes, and marine ecosystems that result from water withdrawals and discharges associated with other forms of power production. Wind energy generates virtually no solid or hazardous waste. Together, these factors make wind a clean, low-impact energy source that can provide reliable electricity while protecting environmental and public health.

47.     BENEFITS TO LOCAL COMMUNITIES AND LANDOWNERS: Wind energy development delivers substantial and sustained economic benefits to communities and local governments across the country. Utility-scale wind projects attract billions of dollars in regional capital investment, with individual projects often representing hundreds of millions of dollars in upfront spending that supports local contractors, suppliers, and infrastructure. Wind development also supports significant job creation, including hundreds of well-paying construction jobs during buildout and a stable base of long-term operations and maintenance positions. Landowners who host turbines receive reliable lease payments, creating a steady supplemental income stream that helps sustain family farms and ranches through commodity price fluctuations while allowing farming and grazing to continue with minimal disruption. These projects generate millions of dollars annually in property tax revenues, providing critical, long-term funding for county budgets, school districts, and essential public services. Indeed, onshore wind projects delivered nearly $2.7 billion in state and local tax payments and land-lease payments last year alone. Taken together, these benefits drive broader economic development, diversifying local economies, strengthening public finances, and delivering durable financial value to communities across the country.

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

48.    CONCLUSION: In sum, wind energy has become a cornerstone of the country's energy system, delivering both reliable, affordable, clean electricity and meaningful economic value across all fifty states.

## III.    DISCUSSION OF HARMS

### A.    MEMBER-DEVELOPERS ARE DIRECTLY IMPACTED BY DOD'S POLICY OF INACTION

49.    Our members that develop onshore wind projects make long-term business decisions in reliance on fair, consistent, and timely completion of the regulatory process, including the aeronautical study process performed by the FAA.

50.    As part of this process, the FAA is required to coordinate with the DoD, which reviews projects for issues concerning military readiness or national security. This step is a core component of each project timeline and is essential to the FAA's ability to complete its aeronautical studies and, where warranted, issue DNHs for onshore wind projects. DNHs are often necessary for such projects to move forward and are often prerequisites to securing other federal and local permits, obtaining project financing and insurance, executing project agreements, and establishing construction and procurement timelines.

51.    Members developing wind projects expend significant human and financial resources in identifying and mitigating potential aeronautical concerns, including working with experienced technical consultants in advance to identify likely concerns and assess site and project viability (often several months) before formal submission to the FAA to begin the review process. As a result, project sponsors have a reasonable understanding and expectation of the timing associated with completing aeronautical studies.

**DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF**

52.     Our members' projects remain mired in all four stages of the DoD "Mitigation Response Team" (MRT) negotiation process: (i) the countersignature stage, (ii) the draft agreement production stage, (iii) the consultation and collaboration stage, and (iv) the preliminary review stage. This, in turn, has prevented the FAA from completing its aeronautical studies, and where warranted, issuing project-specific DNHs.

### i.     Projects Awaiting Counter-Signature.

53.     Members are reporting that DoD is not countersigning mitigation agreements that DoD has drafted and transmitted for land-based wind energy projects. This is occurring even though the relevant DoD components have agreed, following formal review and consultation with the project sponsor, that these projects do not pose an unacceptable risk to national security, as mitigated.

### ii.     Projects Awaiting Draft Agreement.

54.     Members are reporting that DoD is not producing draft mitigation agreements for land-based wind energy projects. This is occurring even though DoD's formal consultation with the project sponsor has concluded and the relevant DoD components, in coordination with the Clearinghouse, have informally agreed that the project will not pose an unacceptable risk to national security, as mitigated.

### iii.     Projects Stymied in the MRT Negotiation Process.

55.     Members are reporting that DoD is not engaging in MRT discussions regarding land-based wind energy projects to discuss potential project impacts and mitigation options. Projects remain indefinitely stalled at the formal review and consultation stage despite member developers' willingness to engage in mitigation and deconfliction efforts.

**DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF**

17

iv.     **DoD's Refusal to Clear Projects that Have No Potential to Impact National Security or Military Readiness.**

56.     Members are reporting that DoD is no longer pre-screening wind energy projects to determine whether they need to be routed for formal MRT consultation, discussion, and review. Member projects remain pending at this preliminary review stage, even where they have no potential to impact military operations and readiness and therefore do not need to engage in mitigation discussions with DoD.

v.     **DOD's Stonewalling Amounts to a Federal Wind Energy Ban.**

57.     DoD's refusal to engage with members on wind energy related mitigation agreements effectively amounts to a federal ban on the issuance of FAA DNHs for all wind energy projects and has the practical impact of blocking land-based wind energy development across the nation. For the reasons discussed below, DoD's policy of inaction creates immediate, concrete economic and reputational harm for our members that will persist indefinitely absent relief from this court.

**B.     THE DOD POLICY OF INACTION IS CAUSING AGGREGATE HARM TO WIND ENERGY DEVELOPMENT NATIONWIDE**

58.     Wind energy project development is a complex, sequential process that cannot advance without strict adherence to tactical development schedules. Even minimal delays in the issuance of federal permits—including a DNH—can jeopardize a wind project's commercial viability. As such, DoD's policy of sector-wide inaction places the wind energy industry at risk of immediate, irreversible economic harm, and potentially even collapse.

59.     The harms inflicted upon members by DoD's policy of inaction are complex in scope and nature. Wind developers differ in financial structure, portfolio size, access to capital, risk tolerance, and development or business strategy, and each individual wind project follows a

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

18

unique sequence of development. As such, while all wind projects across the country are, due to DoD's policy of inaction, likely to experience at least one or more of the permitting roadblocks described below. While the timing, magnitude, and form of impacts may vary across projects, the delay can be fatal to our members' projects and collectively, result in cascading and irreparable effects across the industry including cancelled or deferred projects, workforce reductions, supply-chain disruptions, and loss of business opportunities that are uniquely dependent on timely regulatory actions.

60.    *Inability to Meet Power Purchase Agreement Deadlines*: Wind energy developers commonly enter into Power Purchase Agreements ("PPAs") with a prospective "buyer" or "offtaker" during early project development. PPAs typically establish a fixed schedule of development milestones, including deadlines for procurement of long-lead supply chain components, completion of permitting, securing financing, execution of interconnection agreements, and commercial operations. These agreements frequently provide that, if the developer fails to meet specified milestones, the buyer has the right to collect liquidated damages and/or terminate the agreement. Without immediate relief from this court, DoD's policy of inaction will cause companies developing land-based wind energy projects to miss contractual PPA deadlines, resulting in contractual damages or PPA termination.

61.    *Inability to Meet Financing Deadlines and Secure Financing*: Most land-based wind projects rely, at least in part, on debt to advance project development and project financing contracts generally rely heavily on predictable and certain timelines for construction, development and operation. So long as DoD's policy of inaction is in place, wind developers will not be able to start operation and revenue generation which can result in additional finance costs such as higher interest rates.  Further, DoD's policy will make critical loans inaccessible to our

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

19

member-developers. Lenders generally underwrite land-based wind energy projects on a standalone basis and are unwilling to bear the risk of development-stage permitting uncertainty. Consequently, lenders typically will not provide development or construction loans unless and until all material permits—i.e., those necessary for construction and operation—have been secured, and lenders consider FAA DNHs to be material permits. As such, DoD's policy of inaction will prevent member projects that use debt to finance initial project activities (such as environmental studies, land acquisition, and preliminary engineering) from progressing through even the earliest phases of development, and could place projects that are able to advance to later stages of development without loans at risk of significant and unrecoverable sunk-cost losses.

62.    *Inability to Place New Supply Chain Orders*: DoD's policy of inaction will introduce supply chain bottlenecks and could make it difficult for developers to place equipment orders. Turbine and transmission equipment manufacturing require substantial upfront investment, long-lead procurement, and tightly scheduled production slots. Once project components enter production, they are often tailored to project-specific requirements and therefore difficult to reallocate to other buyers. If a project is delayed or does not proceed due to permitting uncertainty, manufacturers face the risk of inefficient production sequencing or stranded inventory. In a global supply chain that is already constrained by elevated demand and limited manufacturing capacity, especially for products like Generation Step-Up Transformers, these risks may lead manufacturers to impose stringent preconditions to the execution of supply chain agreements, including requiring evidence of permit issuance. Consequently, DoD's policy of inaction creates a material barrier to supply chain procurement for member-developers and has a significant economic impact on the manufacturing sector.

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

20

63.    *Inability to Accept Delivery of Equipment Ordered*: To the extent a wind developer was able to enter into supply chain agreements before securing federal permits, it may be unable to take delivery of project components so long as the DoD refuses to engage in the legally mandated review of wind projects. Wind turbine components—particularly blades, nacelles, and tower sections—are not designed for indefinite warehousing and cannot be readily stored due to their large size, specialized handling requirements, and the high cost of appropriate storage facilities. As a result, permitting bans that indefinitely postpone construction, like the one effectively created by DoD's inaction here, can force developers to defer or cancel scheduled deliveries, renegotiate supply timelines, or, in some cases, abandon the project altogether. As such, DoD's policy of inaction exposes member developers to contractual penalties under their supply chain agreements, PPA delay and associated penalties, and other economic losses.

64.    *Labor Contract Penalties and Losses*: DoD's inaction will also disrupt the coordination of labor and construction activities across wind energy nationwide. Wind project construction depends on tightly sequenced deployment of specialized labor and installation equipment, including transportation routing, crane mobilization, foundation work, turbine installation, and electrical interconnection activities. These activities are typically scheduled months in advance and are highly sensitive to weather, seasonal constraints, and contractor availability. As a result, delays can cause projects to miss critical construction windows, particularly in areas with limited seasonal access or environmental restrictions. These disruptions cascade through the construction chain, affecting balance-of-plant contractors, turbine installation crews, and specialized subcontractors. In many cases, such delays make it difficult or impossible to achieve the commercial operation date set forth in the PPA, thereby triggering

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

21

delay damages, exposing the developer to termination rights, and increasing the risk of broader contractual liability.

65.    *Interconnection Delay, Re-Study Requirements, Loss of Sunk Development Costs, and Forfeiture of Security Funds*: DoD's policy of inaction is undermining members' interconnection rights. Interconnection is a highly structured, resource intensive process that generally takes at least four years to complete. Projects are evaluated for interconnection on a queued basis, meaning each project's impact on capacity-constrained transmission systems is evaluated in a defined order and in relation to earlier-queued projects. Consequently, failure to meet applicable development milestones can have cascading consequences, potentially resulting in re-studies, loss of queue position, withdrawal from the queue, movement into a later study cycle, or an increased allocation of network upgrade costs. Once an interconnection agreement is signed, it typically specifies a commercial operation date ("COD") and requires the interconnection customer to post substantial security—often in the tens of millions of dollars—to cover the utility's costs for network upgrades needed to accommodate the new generation. Failure to achieve COD by the specified deadline can result in forfeiture of these security funds, creating significant financial exposure for project developers. As such, the unexpected delays associated with DoD's policy of inaction cause members' interconnection related harm by eroding the value of prior study work and deposits, triggering contractual penalties or forfeitures under study agreements, and forcing projects into less favorable queue positions or abandonment.

66.    *Loss of Tax Credit Eligibility and Equity Investment Commitments*: DoD's inaction threatens to materially impair our members' projects' ability to secure federal tax credits and associated equity investment. Wind projects frequently rely on the availability of production

tax credits ("PTCs") or investment tax credits ("ITCs") as a core component of their long-term revenue and return profile. To qualify for these credits, wind projects must meet certain development deadlines. Where permitting delays jeopardize the project's ability to satisfy timing-based requirements necessary to generate the anticipated tax credits, tax equity investors may delay commitments, reprice the value of tax attributes, or decline to proceed altogether. As a result, delays not only disrupt financing expectations but can also materially impair or entirely foreclose the project's ability to achieve its projected return profile, potentially rendering the project non-viable.

67.    *Carrying Costs*: Finally, DoD's policy of inaction forces wind energy developers to incur substantial and unrecoverable carrying costs while indefinitely putting the ability to generate revenue out of reach. Among other things, developers must continue paying for leases, easements, rights-of-way, and other property interests necessary to preserve project sites and transmission access. They may also bear the costs associated with maintaining, securing, storing, and preserving specialized turbines, components, and construction equipment that cannot be deployed while the freeze remains in effect. In addition, developers frequently must continue paying salaried employees, contractors, consultants, and other personnel, even where project development remains stalled. These expenses are immediate, ongoing financial obligations that accrue continuously, often daily or monthly. As delays continue, financing expenses, interest obligations, and exposure to contractual penalties likewise increase, compounding the unrecoverable economic harm caused by the freeze.

## IV.    CONCLUSION

68.    DoD's policy of inaction on wind projects poses an existential threat to the wind energy industry across the nation by effectively halting all new development activity. The longer

**DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF**

23

this policy is in place, the more severe these impacts will become, as delay continues to compound across development timelines, contractual obligations, financing arrangements, and supply chain commitments.

69.    At the project level, even short delays in the issuance of federal authorizations, including DNHs, can materially affect a project's ability to move forward on its planned schedule and can create significant commercial risk. Some projects may be able to temporarily absorb the daily costs associated with short-term delays, but these pressures are not sustainable indefinitely and materially increase the risk of project suspension or cancellation. If cancellation occurs, the project will incur substantial unrecoverable development costs, including, in most cases, expenditures on early-stage activities such as engineering, interconnection studies, and permitting, as well as potentially significant later-stage costs such as supply chain commitments.

70.    At the company level, in aggregate, project-specific losses may be too large for a developer's broader portfolio to absorb, which creates financial distress and could ultimately lead to insolvency. In addition, repeated delays and failed transactions can damage developers' business reputations in capital markets and with key counterparties, making it more difficult to secure financing, equipment, and offtake agreements for future projects.

71.    At the sector level, DoD's policy of inaction is directly eroding market confidence in the land-based wind sector in the United States. Over time, the uncertainty DoD has cultivated threatens to divert future investment to more predictable regulatory environments and discourage new market entry. If left unaddressed, the cumulative effects will destroy the nation's wind energy industry and desiccate the domestic supply chain that depends on its continued growth and stability.

DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

24

72.    In sum, the wind energy sector in the United States needs immediate relief. If this court enters an order directing DoD to (a) countersign and transmit a finding of non-objection to the FAA, (b) finalize mitigation agreements, (c) timely complete the MRT review process, and (d) resume notifying those projects that pose no potential risk to national security or military readiness that they can advance without engaging in the MRT process, our members will be able to save projects that are currently stalled in the project pipeline and preserve the sector's future viability.

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge and belief.

Executed on:

By: _____

Nicole Hughes

By: _____

Jeffrey Clark

By: _____

Marguerite Wells

**DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF**

By: _____

Beth Soholt


By: _____

Erika ("Rikki") Seguin


By: _____

Eliza Donoghue


By: _____

Francis Pullaro


By: _____

Simon Mahan


**DECLARATION OF NICOLE HUGHES, JEFFREY CLARK, MARGUERITE WELLS, BETH SOHOLT, ERIKA ("RIKI") SEGUIN, ELIZA DONOGHUE, FRANCIS PULLARO, AND SIMON MAHAN IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF**

26