# Exhibit O

## *To Plaintiffs' Complaint for Injunctive and Declaratory Relief*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF OREGON
### PORTLAND DIVISION

| | |
|---|---|
| RENEWABLE NORTHWEST, *et al.*,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>PETER B. HEGSETH, *et al.*,<br><br>     *Defendants*. | Civil Action No. _____<br><br><br>**DECLARATION OF LAWRENCE CHRETIEN** |

Pursuant to 28 U.S.C. § 1746(2), I, Lawrence Chretien, declare as follows:

1.  I am over the age of eighteen and competent to make this declaration. I am the Executive Director of Green Energy Consumers Alliance, Inc. ("GECA"), a nonprofit organization whose mission is to empower consumers and communities to speed a just transition to a zero-carbon future.

2.  In this Declaration, I describe my background, GECA's mission and activities, and the general and project-specific harms that GECA is experiencing as a result of the Department of Defense's ("DoD") policy of inaction with respect to mitigation agreements. This policy has effectively halted the development of land-based wind projects in New England and is the subject of the present litigation.

3.  This declaration is based on my personal knowledge, professional experience, and information obtained through GECA's work and partnerships. I have personal knowledge of the facts stated herein.

1

**DECLARATION OF LAWRENCE CHRETIEN**

## I.    Relevant Background and Experience

4.    I have nearly 40 years of experience promoting clean energy, economic development, and energy affordability. For the past 26 years, I have served as Executive Director of GECA, which operates in Massachusetts and Rhode Island. GECA's primary office is located in Cambridge, Massachusetts.

5.    GECA is widely recognized for providing high-quality consumer education and clean energy programming to its members and to the general public. GECA communicates through newsletters, webinars, blog posts, podcasts, and speaking engagements.

6.    Since its founding in 1982, GECA has worked to reduce energy bills and emissions from fossil fuels through consumer-facing programs and state-level policy advocacy. In the late 1990s, GECA supported efforts to restructure the electricity system, including establishing renewable energy standards, enabling municipal aggregation of power supply, and expanding opportunities for consumers to voluntarily purchase more renewable energy than required by state standards.

7.    Over the years, GECA has advocated for amendments to strengthen renewable energy standards in both Massachusetts and Rhode Island. Today, Massachusetts's Renewable Portfolio Standard is a critical component of the Commonwealth's Clean Energy and Climate Plan. Rhode Island's Renewable Energy Standard is scheduled to make the Ocean State, by 2033, the first state in the country to be powered 100 percent by renewable energy.

8.    GECA is considered a pioneer in the field of green power marketing. Before the renewable energy certificate ("REC") system was established in New England, GECA marketed environmental attributes to consumers seeking to change the composition of the New England

**DECLARATION OF LAWRENCE CHRETIEN**

power grid. In 2002, GECA purchased the first RECs sold in New England from the Hull Wind I turbine, then the largest wind generator in the nation. Over time, GECA expanded its green power program by offering unbundled RECs to consumers in Massachusetts and Rhode Island through utility bills and tradeable certificates. In 2016, GECA pioneered what it refers to as "Green Municipal Aggregation," which enables consumers enrolled in their local community choice programs to voluntarily support more renewable energy than required by state law. Today, that program is GECA's largest. GECA purchases RECs throughout New England and directly provides voluntary RECs to 32 communities in Massachusetts and eight communities in Rhode Island.

## II.    HARM TO GECA CAUSED BY THE CHALLENGED AGENCY ACTIONS

9.    GECA has suffered and will continue to suffer immediate and ongoing harm, including programmatic, operational, financial, and mission-related harms, unless the DoD resumes its obligation to review land-based wind projects for impacts to military readiness or national security. Without such review, the Federal Aviation Administration ("FAA") is unable to complete its aeronautical studies and, where warranted, issue a Determinations of No Hazard ("DNH").

10.    DNHs are necessary for land-based wind projects to proceed and are often prerequisites to securing federal, state, and local permits, obtaining project financing and insurance, executing key project agreements, and establishing construction and procurement timelines. As a result, any land-based wind project in New England that requires a DNH is effectively halted.

11.    DoD's inaction is therefore reducing and destabilizing the supply of RECs available in the New England market by preventing new land-based wind generation from coming online on

3

DECLARATION OF LAWRENCE CHRETIEN

predictable timelines. This disruption constrains the supply of eligible RECs and undermines the stability of the market on which GECA's programs rely.

12. RECs represent the environmental attributes of one megawatt hour of renewable electricity generation. GECA's voluntary green power programs—including its largest clean energy program, Green Municipal Aggregation—require GECA to procure sufficient quantities of eligible New England RECs in adequate volume, at reasonable cost, and on predictable timelines, and to ensure their timely retirement to meet program requirements and deliver the verifiable environmental benefits promised to participating communities.

13. GECA and/or its customers retire the RECs that GECA procures—meaning the RECs are permanently removed from circulation through the applicable tracking system—so that the environmental attributes associated with the underlying renewable electricity generation are claimed only once and cannot be resold or double-counted. Because REC retirement is the mechanism through which GECA delivers the verifiable environmental benefits its programs promise, GECA's credibility and effectiveness depend on its ability to procure RECs and ensure their retirement in accordance with its program commitments, and to maintain a stable supply at reasonable prices to preserve affordability and support program growth.

14. Since 1999, GECA has purchased RECs from New England-based generators and sold them to individual consumers and to municipal aggregations in Massachusetts and Rhode Island. GECA's current throughput is approximately 300,000 RECs per year, the vast majority of which are sold to municipal aggregations (32 communities in Massachusetts and eight communities in Rhode Island). These sales generate approximately $12 million in gross revenue and approximately $1 million in gross margin annually. This earned income is, by far, GECA's largest funding source.

15. GECA uses proceeds from REC sales to support its other innovative and popular

4

**DECLARATION OF LAWRENCE CHRETIEN**

programs to educate and assist energy consumers. Because REC sales provide GECA's largest source of earned income, reductions in REC sales volume or increases in REC procurement costs directly threaten GECA's ability to sustain and expand its broader portfolio of consumer-facing programs.

16.    GECA's participation in the REC market has also raised its profile in Massachusetts and Rhode Island, which is an important intangible benefit and strengthens GECA's ability to reach and serve communities in those states. GECA seeks to sell more RECs to more customers, and at lower prices, but can only do so if more renewable energy projects are developed in New England. In GECA's experience, consumers and communities strongly prefer to support wind and solar power generated as close as possible to their homes and businesses.

17.    RECs are generated only when eligible renewable electricity is produced. Accordingly, the REC supply in the New England market depends directly on renewable projects

5

being permitted, built, and operating on schedule. DoD Inactions are slowing and preventing new renewable generation from coming online, including land based wind projects.

18.    Those delays and disruptions constrain the supply of eligible RECs and increase price volatility in the New England REC market. As a result, GECA must pay more for RECs, faces greater difficulty securing sufficient volumes, and faces increased risk of being unable to ensure timely REC retirement in accordance with its program commitments.

19.    These impacts, in turn, directly and substantially harm GECA. First, constrained REC supply and higher REC prices increase GECA's program costs and force GECA to divert limited organizational resources away from other mission-critical work to sustain existing commitments. Second, constrained supply and procurement uncertainty impose significant operational burdens, requiring GECA to devote additional staff time and organizational resources to securing RECs, negotiating procurement arrangements, and revising program materials and communications to avoid disruptions to GECA's REC retirement obligations. Third, these constraints create a real risk that GECA will be forced to contract its programs because GECA cannot sustainably procure sufficient RECs and ensure their timely retirement to maintain affordability and support growth. Fourth, by reducing REC supply, the challenged actions undermine GECA's ability to achieve its organizational mission: GECA exists to accelerate a just transition to a zero-carbon world by supporting verifiable renewable electricity.

20.    When DoD inaction delays or prevents renewable projects and thereby reduces REC supply, GECA is deprived of the essential tool it uses to deliver meaningful, credible environmental results through its programs. In these ways, DoD's inaction impairs GECA's core operations, effectiveness, and reputation. These harms are ongoing and will continue

6

**DECLARATION OF LAWRENCE CHRETIEN**

absent injunctive relief, and they constitute immediate and irreparable injuries that cannot be adequately remedied through monetary damages after the fact.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on: May 31, 2026.

By: _____

Lawrence Chretien

7

**DECLARATION OF LAWRENCE CHRETIEN**