Michael Giaquinto, OSB #:246342
MORGAN LEWIS & BOCKIUS LLP
South Grand Ave., 22nd Floor
Los Angeles, CA 90071-3132
T: 213-612-7227
michael.giaquinto@morganlewis.com

Jennifer Trock (*pro hac vice to be filed)*
Douglas Hastings (*pro hac vice to be filed*)
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000
jennifer.trock@morganlewis.com
douglas.hastings@morganlewis.com

Ella Foley Gannon (*pro hac vice to be filed*)
600 Montgomery Street, Suite 2300
San Francisco, CA 94111-2725
T: 415-442-1000
ella.gannon@morganlewis.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST; ADVANCED POWER ALLIANCE; ALLIANCE FOR CLEAN ENERGY NEW YORK, INC.; CLEAN GRID ALLIANCE; GREEN ENERGY CONSUMERS ALLIANCE; INTERWEST ENERGY ALLIANCE; MAINE RENEWABLE ENERGY ASSOCIATION; RENEW NORTHEAST; and SOUTHERN RENEWABLE ENERGY ASSOCIATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> PETER B. HEGSETH., in his official capacity as Secretary of Defense; DALE R. MARKS, in his official capacity as | Case No.: 3:26-cv-01092-YY <br><br> **PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION** <br><br> **Pursuant to Fed. R. Civ. P. 65** <br> *Request for Oral Argument* |

Assistant Secretary of Defense for Energy, Installations, and Environment; U.S. DEPARTMENT OF DEFENSE; and DEPARTMENT OF DEFENSE MILITARY AVIATION AND INSTALLATION ASSURANCE SITING CLEARINGHOUSE,

*Defendants.*

2

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

LOCAL RULE 7-1 CERTIFICATION ...................................................................................... 1

MOTION............................................................................................................................ 1

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

     I.     Obstruction Review Framework ............................................................... 3

     II.    Pre-2025 DoD Review ............................................................................. 6

     III.   DoD's Review Freeze ............................................................................. 7

     IV.   The Government's Broader Campaign Against Wind............................ 10

LEGAL STANDARDS ...................................................................................................... 11

ARGUMENT.................................................................................................................... 12

     I.     Plaintiffs Have Standing ....................................................................... 12

     II.    Plaintiffs Are Likely to Succeed on the Merits...................................... 13

          A.    APA 706(2): DoD's Freeze Is a Final Agency Action That Is Arbitrary and Capricious, Contrary to Law, and Promulgated Without Observing Required Procedures. ............................... 13

              1.    DoD's freeze is a final agency action because it has important legal and practical consequences and is the consummation of the agency's policy decision. .......................... 14

              2.    DoD provided only vague and implausible justifications for its freeze, failed to consider important factors, and ignored stakeholders' reliance interests. ................................... 16

              3.    DoD's freeze was based on the Government's hostility to wind energy............................................................................. 20

              4.    DoD's freeze violates statutory and regulatory deadlines. ........... 21

              5.    DoD failed to follow the required notice-and-comment rulemaking process. ................................................................. 23

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

     B.    APA 706(1): DoD Unlawfully Withheld or Unlawfully Delayed Required Actions ...................................................................... 24

          1.    DoD unlawfully withheld agency action because it is refusing to act and missing deadlines. ......................................... 25

          2.    Alternatively, DoD is unreasonably delaying its review process.......................................................................... 26

III.    Plaintiffs Will Be Irreparably Harmed Without a Stay or Preliminary Injunction .......................................................................... 28

     A.    Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Economic Harms from DoD's Freeze......................................... 28

     B.    Plaintiffs Are Suffering and Will Suffer Irreparable Noneconomic Harm from DoD's Freeze. .......................................... 34

IV.    A Stay or Preliminary Injunction Furthers the Public Interest ............................ 34

V.    The Court Can Order Nationwide Relief................................................................ 36

CONCLUSION................................................................................................................ 37

ii

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aircraft Owners & Pilots Ass'n v. Fed. Aviation Admin.*,
  600 F.2d 965 (D.C. Cir. 1979) .................................................................................................16

*Al Otro Lado v. Exec. Off. for Immigr. Rev.*,
  138 F.4th 1102 (9th Cir.), *cert. granted sub nom. Noem v. Al Otro Lado*, 146 S. Ct.
  604 (2025)
  ...............................................................................................................................24, 25, 27

*All. for the Wild Rockies v. Pena*,
  865 F.3d 1211 (9th Cir. 2017) ................................................................................................11

*Am. Promotional Events, Inc. v. City & Cnty. of Honolulu*,
  796 F. Supp. 2d 1261 (D. Haw. 2011) ....................................................................................34

*Bennett v. Spear*,
  520 U.S. 154 (1997)................................................................................................................14

*BFI Waste Systems of North America, Inc. v. F.A.A.*,
  293 F.3d 527 (D.C. Cir. 2002) ................................................................................................15

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ............................................................................................28, 35

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)................................................................................................................20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)....................................................................................................................19

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ................................................................................................11

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ............................................................................................28, 30

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016)................................................................................................................19

*FCC v. NextWave Pers. Commc'ns Inc.*,
  537 U.S. 293 (2003)................................................................................................................21

*Gonzalez Rosario v. U.S. Citizenship & Immigr. Servs.*,
  365 F. Supp. 3d 1156 (W.D. Wash. 2018)..........................................................................24, 26

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982).............................................................................................13

*Hemp Indus. Ass'n v. Drug Enf't Admin.*,
333 F.3d 1082 (9th Cir. 2003) ...........................................................................23

*In re Pesticide Action Network N. Am., Nat. Res. Def. Council, Inc.*,
798 F.3d 809 (9th Cir. 2015) .............................................................................27

*Jajati v. U.S. Customs & Border Prot.*,
102 F. 4th 1011 (9th Cir. 2024) .........................................................................18

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)............................................................................................12

*M-J-M-A- v. Hermosillo*,
No. 6:25-CV-02011-MTK, 2026 WL 562063 (D. Or. Feb. 27, 2026) ...................15

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).............................................................................16, 17, 18, 20

*Nat'l TPS All. v. Noem*,
166 F.4th 739 (9th Cir. 2026) (Mendoza, J., concurring)......................................21

*National TPS Alliance v. Noem*,
150 F.4th 1000 (9th Cir. 2025) .....................................................................36, 37

*New York v. Trump*,
811 F. Supp. 3d 215 (D. Mass. 2025) .................................................11, 14, 15, 20

*Or. Council for Hums. v. U.S. DOGE Servs.*,
794 F. Supp. 3d 840 (D. Or. 2025) .....................................................................12

*Or. Envtl. Council v. IRS*,
No. 25-4400, 2026 WL 1631612 (D.D.C. June 6, 2026)........................................36

*Or. Nat. Desert Ass'n v. Raby*,
780 F. Supp. 3d 1085 (D. Or. 2025) ...................................................................35

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015)..............................................................................................23

*RENEW Ne. v. U.S. Dep't of Interior*,
No. 25-cv-13961-DJC, 2026 WL 1078282 (D. Mass. Apr. 21, 2026) .........11, 21, 35

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) ...........................................................................35

iv

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

*Sackett v. E.P.A.*,
566 U.S. 120 (2012)..................................................................................................14

*Santillan v. Gonzales*,
388 F. Supp. 2d 1065 (N.D. Cal. 2005) ...................................................................17

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023)..................................................................................................12

*Varniab v. Edlow*,
No. 25-cv-10602-SVK, 2026 WL 485490 (N.D. Cal. Feb. 20, 2026)...............14, 24

*Warth v. Seldin*,
422 U.S. 490 (1975)..................................................................................................12

*Washington v. Trump*,
145 F.4th 1013 (9th Cir. 2025) ................................................................................28

*Winter v. NRDC*,
555 U.S. 7 (2008)................................................................................................11, 28

STATUTES

5 U.S.C. § 551 ...................................................................................................................23

5 U.S.C. § 553 ...................................................................................................................23

5 U.S.C. § 555 ...................................................................................................................22

5 U.S.C. § 558 ...................................................................................................................22

5 U.S.C. § 705 ..............................................................................................................12, 36

5 U.S.C. § 706(1) ..............................................................................................................24

5 U.S.C. § 706(2) .........................................................................................................13, 23

10 U.S.C. § 183a .........................................................................................................5, 6, 7

49 U.S.C. § 44718 ...............................................................................................................4

49 U.S.C. § 46110 .............................................................................................................16

10  U.S.C. § 183a ....................................................................................................... passim

Pub. L. No. 111-383, 124 Stat. 4137 (2011).............................................................18, 27

Pub. L. No. 119-21, tit. VII, §§ 70512–70513, 139 Stat. 72 (2025).................................32

v

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

**REGULATIONS**

14 C.F.R. § 77.5 ........................................................................................................4

14 C.F.R. § 77.9 ........................................................................................................4

14 C.F.R. § 77.13 ......................................................................................................4

32 C.F.R. § 211 ........................................................................................................26

32 C.F.R. § 211.4 .....................................................................................................18

32 C.F.R. § 211.6 ..............................................................................................4, 5, 6 22

32 C.F.R § 211.9 ......................................................................................................19

78 Fed. Reg. 73088 (Dec. 5, 2013) ........................................................................23

**OTHER AUTHORITIES**

Am. Clean Power Ass'n, *Clean Power Annual Market Report 2025* (2025),
    https://cleanpower.org/resources/market-report-2025 ..........................................36

Benjamin Storrow, Kelsey Tamborrino & Jessie Blaeser, *"Windmills Are a Disgrace":*
    *Inside Trump's War Against a Growing US Industry*, Politico (Dec. 11, 2025),
    https://www.politico.com/news/2025/12/11/how-the-wind-industry-misread-trump-
    00666895..............................................................................................................20

Dep't of Def. Instr. 4180.02, *DoD Military Aviation and Installation Assurance Siting*
    *Clearinghouse* (June 15, 2023) ...................................................................4, 5, 6, 19

Dinah Voyles Pulver, *Trump assails 'windmills' and wind energy as junk: 'They're*
    *losers'*, USA Today (Jan. 9, 2026),
    https://www.usatoday.com/story/news/nation/2026/01/09/trump-assails-windmills-
    and-wind-energy-as-junk-theyre-losers/88108694007/.........................................20

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

**TABLE OF ABBREVIATIONS**

| Abbreviation | Term |
|---|---|
| ACP | American Clean Power Association |
| Clearinghouse | Military Aviation and Installation Assurance Siting Clearinghouse |
| DoD | Department of Defense |
| DNH | Determination of No Hazard |
| EPC | Engineering Procurement and Construction |
| FAA | Federal Aviation Administration |
| GECA | Green Energy Consumers Alliance |
| May 7 Memorandum | May 7, 2026 Interim Guidance Regarding Compliance with Established Military Aviation and Installation Assurances Siting Clearinghouse Procedures |
| Member Organization Plaintiffs | Plaintiffs Renewable Northwest Advanced Power Alliance, Alliance for Clean Energy New York, Inc., Clean Grid Alliance, Interwest Energy Alliance, Maine Renewable Energy Association, Renew Northeast, and Southern Renewable Energy Association |
| MRT | Mitigation Response Team |
| NPR | Notice of Presumed Risk |
| PPA | Power Purchase Agreement |
| REC | Renewable Energy Credit |

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

## LOCAL RULE 7-1 CERTIFICATION

Pursuant to LR 7-1, undersigned counsel for the Plaintiffs made a good-faith effort to confer with counsel for the Defendants by telephone conference on June 10, 2026 but were unable to resolve the disputed matters in this motion.

## PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION

Pursuant to FRCP 65 and LR 65 and 7, Plaintiffs respectfully move for a stay or preliminary injunction against implementation of Defendants' unlawful policy freezing their statutorily mandated review duties for wind energy projects. Preliminary relief is needed to avoid ongoing irreparable harm while this litigation is pending. This motion is supported by the following memorandum of law, the attached declarations, and the pleadings and papers on file in this case.

## INTRODUCTION

Congress entrusted Defendants (collectively, "DoD") with a pivotal role in the review of certain energy projects—to determine if they could adversely affect military readiness or operations, and if so, to propose solutions to mitigate such impacts. For years, the process functioned as Congress intended: timely review happened, mitigation measures were developed and agreed upon when necessary, and projects moved forward in a predictable and efficient manner.

That changed over the last year when DoD departed from its longstanding practice and began unlawfully refusing to perform its obligations for utility-scale wind projects. The result has been an effective freeze on utility-scale land-based wind projects requiring DoD review, jeopardizing the industry as well as projects critical to the U.S. energy supply, electric grid reliability, economic growth, and energy objectives.

Plaintiffs are likely to succeed on the merits of their case. But a favorable merits ruling months from now will not be enough. By the time the litigation concludes, projects will have been

1

PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION

canceled, financing commitments will have expired, development opportunities will have disappeared, and opportunities to qualify for tax credits will be lost. Over 100 projects across 25 states are already being impacted, resulting in billions of dollars in sunk costs. Those injuries cannot be fully remedied after final judgment.

DoD's review freeze did not occur in isolation. It is the latest in a series of actions the Government has taken to impede wind energy development, including a presidential memorandum that suspended issuance and processing of all federal authorizations for wind energy development, stop-work orders directed at specific wind energy projects under construction, and a series of regulatory measures designed to impede, delay, or halt wind energy development. Federal courts have found all these actions unlawful and have vacated, stayed, or preliminarily enjoined them. DoD's review freeze suffers from the same fundamental defects. Indeed, if allowed to remain in place, it would permit the Government to accomplish indirectly what courts have prohibited it from accomplishing directly: halting wind energy development through administrative action that is unsupported by reasoned decision-making and in contravention of law.

Plaintiffs are likely to succeed on the merits for multiple reasons. DoD's freeze is arbitrary and capricious because DoD: (1) failed to provide a reasoned explanation for its abrupt policy change; (2) failed to consider factors Congress directed it to consider; (3) failed to account for substantial reliance interest created by its longstanding review process; and (4) instead based its decision on a factor Congress did *not* authorize it to consider—its goal of stopping wind energy development. The freeze also violates both statutory and regulatory deadlines governing DoD's review process, effectively repeals DoD's own regulations establishing review timelines without following notice-and-comment procedures, and causes DoD to unlawfully withhold or unreasonably delay its mandatory duties.

2

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

The remaining preliminary injunction factors likewise favor injunctive relief. Wind energy developers are experiencing extensive irreparable harm every day that DoD's review freeze continues, including: potential project cancellations; breaches of contracts with power purchasers triggering liquidated damages; defaults under construction, equipment or other commercial contracts; inability to procure, store, or install turbine components; loss of financing; loss of transmission and interconnection opportunities; loss of tax credits and tax-credit eligibility; and substantial unrecoverable carrying and sunk costs. The public interest is similarly harmed by the loss of new electricity generation, diminished grid reliability and resilience, increased costs to consumers, diminished environmental benefits, the loss of jobs and economic activity associated with utility-scale wind energy development, and diminished progress toward national and state energy objectives.

In contrast, the Government has no legitimate interest in continuing its unlawful policy. An injunction would not limit DoD's ability to consider military readiness and operational concerns. It would merely require DoD to resume the review process that Congress established and that DoD has successfully administered for years.

Plaintiffs therefore respectfully request that the Court issue a nationwide stay or preliminarily enjoin DoD's review freeze, require DoD to resume processing wind project reviews in the ordinary course, and direct DoD to provide status reports every 30 days on its progress in conducting its statutorily mandated reviews.

## **BACKGROUND**

### I.    **Obstruction Review Framework**

The statutory and regulatory framework for DoD's review of proposed wind projects stems from the FAA's mandate to review proposed construction of certain structures for their impacts on the safety in air commerce, the efficient use and preservation of navigable airspace, and the "the

3

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

interests of national security *as determined by the Secretary of Defense.*" 49 U.S.C. § 44718(a)(3) (emphasis added). Developers proposing any structure over 200 feet above ground level, which includes utility-scale wind turbines, must notify the FAA of the proposed construction. 49 U.S.C. § 44718(a); 14 C.F.R. §§ 77.5, 77.9, 77.13.

Once notified, the FAA conducts an aeronautical review of the proposed project based on well-established criteria. Because the FAA must consider DoD's assessment of impacts to military operation and readiness, the FAA does not complete its aeronautical review until DoD has transmitted its findings. *See* 49 U.S.C. § 44718(b). Upon completion of its aeronautical study and receipt of DoD's inputs, the FAA will, where warranted, issue DNHs for the project. *Id.*

DNHs are, as a practical matter, necessary to satisfy a host of project-specific requirements, including compliance with state and local laws and permit requirements, project financing, insurance, PPAs, and commercial requirements. Typically, counterparties, lenders, insurers, state and local regulators, and investors will not allow projects to proceed absent DNHs. For all of these reasons, successful completion of the FAA process is project-critical, and projects are unlikely to move forward in the absence of DNHs.

DoD's review process is overseen by the Clearinghouse. 10 U.S.C. § 183a; Dep't of Def. Instr. 4180.02, *DoD Military Aviation and Installation Assurance Siting Clearinghouse* ¶3.2(c)(4) (June 15, 2023). At the core of DoD's review are its obligations to: (1) identify adverse impacts on military readiness and operations; (2) timely communicate its findings to both developers and the FAA; and (3) where impacts have been identified, work with developers to identify feasible mitigation measures that may allow the project to proceed. *See* 10 U.S.C. § 183a; 32 C.F.R. § 211.6.

4

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

The impacts and the necessary mitigations are both well-understood. Most involve potential interference with radar due to spinning turbine blades or physical impacts of the project to military facilities (e.g., military training routes). Common mitigations may include adjustments to turbines or project layouts or through funding of radar improvements.

DoD's review process is dictated by statute, regulations, and DoD's own instructional documents.

*First*, DoD must conduct a preliminary review. By statute, DoD must complete this review within 75 days. 10 U.S.C. § 183a(c)(1). By regulation, however, DoD has agreed to a quicker deadline: DoD's regulations require that the preliminary review be completed within thirty days. 32 C.F.R. § 211.6(a)(3). Through the preliminary review, DoD determines whether the project has a potential to create an adverse impact on military operations and readiness. *Id.* If the preliminary review finds that the project will not have material impacts on military readiness or operations, it will notify the FAA of its preliminary findings. If, on the other hand, the preliminary review identifies potential impacts, it will issue an NPR identifying the issues and inviting developers to engage in mitigation discussions. 10 U.S.C. § 183a(c)(2)(A); 32 C.F.R. § 211.6(a).

*Second*, for those projects that receive an NPR, DoD's regulations require that it invite the developer to participate in an MRT to discuss project impacts and mitigation options. 32 C.F.R. § 211.6(a)-(b); *see also* DoDI 4180.02 at 3.2(c)(7). Through this process, relevant DoD components and governmental agencies are consulted, and issues are addressed through mutually agreed-upon mitigation measures that provide "feasible and affordable actions" with the goal of protecting national security and military operations while "promoting national objectives for clean energy." DoDI 4180.02 at 1.2(a)(1). By regulation, the MRT discussions may not last more than 90 days, unless extended in writing by mutual agreement. 32 C.F.R. § 211.6(b)(1).

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

*Third*, after successful mitigation discussions, DoD's regulations require the Clearinghouse to prepare a mitigation agreement for review and signature by the developer. Mitigations are often accomplished through mitigation agreements, which are prepared by the Clearinghouse in draft form and provided to the developer for review, and if acceptable, for signature. 32 C.F.R. § 211.6(b); DoDI 4180.02 at 3.2(c)(8).

*Fourth*, the signed mitigation agreement is returned to the Clearinghouse for countersignature. At this stage, there are typically no new substantive issues or revisiting of issues already resolved at the MRT level. ECF.1-11 ¶19; ECF.1-13 ¶10.

Upon countersignature, the Clearinghouse notifies the FAA of its non-objection and the FAA can then complete its aeronautical study and, where warranted, issue DNHs for the project. *See* ECF.1-10 ¶25; ECF.1-11 ¶20; ECF.1-12 ¶18; ECF.1-13 ¶11.

## II.    Pre-2025 DoD Review

For years, DoD implemented Congress's statutory framework through a predictable process that identified project-specific concerns, came to agreement on mitigations, and enabled projects to proceed while protecting military readiness. DoD also followed the statutory requirements directing it to develop tools to inform developers ahead of time whether their project was likely to require mitigation and the approximate time frame that it would take to finalize a mitigation agreement. *See* 10 U.S.C. § 183a(d)(4). This allowed developers to engage experienced airspace and military compatibility consultants and anticipate with a high degree of accuracy potential issues to be addressed to avoid impacts to airspace and military readiness and to reliably anticipate the time and cost necessary to address unavoidable impacts. ECF.1-13 ¶6; ECF.1-11 ¶¶12-14.

Prior to 2025, DoD was able to complete its review within the following predictable timelines:

6

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

*Preliminary Review*: The Clearinghouse would typically complete its preliminary review and either transmit initial findings of no adverse impacts to the FAA or issue NPRs within 75 days. ECF.1-11 ¶21.

*MRT Discussions*: When an NPR was issued, DoD would promptly convene an MRT, engage in discussions with the developer on impacts and mitigation, and reach an agreement on the necessary mitigation measures. Depending on the nature of the impacts, this process would typically take between one and four months. *Id.*

*Receipt of Draft Mitigation Agreement for Signature*: After agreement on the mitigations, DoD would typically provide a draft agreement within about three to four months, which allowed the various DoD components and the Clearinghouse to review the proposed mitigations before sending back to the developer for signature. *Id.*

*Countersignature*: DoD would typically countersign a mitigation agreement and notify the FAA of its non-objection within 60 days of receipt of the developer-executed mitigation agreement. *Id.*

Developers reasonably relied on those consistent timeframes to plan their developments, as timing is critical for entering into agreements to supply power, sequencing construction steps, qualifying for tax credits, and contracting for supply of parts and labor. *See* Ex.L ¶¶6, 7; Ex.N ¶¶7, 8; Ex.O ¶¶7-9; Ex. C ¶8; Ex.A ¶8.

### III.    DoD's Review Freeze

Beginning in 2025, however, DoD fundamentally altered that process. Following the confirmation of Assistant Secretary Marks, DoD began slowing and then broadly suspending critical stages of review, resulting in industry-wide delays affecting wind-energy projects across the country. ECF.1-10 ¶¶27-28; ECF.1-11 ¶23; ECF.1-12 ¶¶20, 22; ECF.1-13 ¶¶14-15.

7

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

The change occurred incrementally and systematically. In August 2025, DoD ceased countersigning mitigation agreements that had already been agreed upon through the MRT process and executed by developers. ECF.1-10 ¶27(a); ECF.1-11 ¶24(a); ECF.1-12 ¶21(a); ECF.1-13. ¶14(a). In December 2025, the Clearinghouse stopped providing draft mitigation agreements to developers for signature even where MRT discussions had concluded and the parties had reached agreement on mitigation measures. ECF.1-10 ¶27(b); ECF.1-11 ¶24(b); ECF.1-12 ¶21(b); ECF.1-13 ¶14(b). At the same time, projects actively engaged in the MRT process experienced increasing delays, including in April 2026 cancellation of essentially all meetings and the complete absence of substantive feedback regarding next steps. ECF.1-10 ¶27(c); ECF.1-11 ¶24(c); ECF.1-12 ¶21(c); ECF.1-13 ¶14(d).

On April 13, 2026, the Clearinghouse was directed to halt all review activities for wind projects pending further guidance. *See* ECF.1-11 ¶26.

Also in April, the Clearinghouse began sending form letter communications to developers with projects under review, stating only that evolving risks and ongoing interagency coordination required further review. Those communications provided no timeline for agency action, no explanation of what additional information was being evaluated, and no identification of project-specific deficiencies.

Less than a month later, on May 7, 2026, DoD issued interim guidance requiring additional layers of interagency coordination before wind energy—and only wind energy—projects could advance through the Clearinghouse process. ECF.1-1. By singling out projects with Doppler-related effects, the guidance exempted all energy projects other than wind, while effectively freezing the review and approval process for wind projects. ECF.1-13 ¶17; ECF.1-11 ¶27.

8

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

Although DoD invoked evolving national security concerns, it identified no change in circumstances, no impacts on military readiness or operations, no project-specific issues, and no evidence that the mitigation measures historically employed by DoD had become ineffective. While nominally preserving the statutory requirement that the Clearinghouse complete a preliminary review within seventy-five days, it established no deadlines for subsequent stages of review and did not incorporate the regulatory and other timelines that have historically governed the Clearinghouse process.

Instead, DoD has ceased performing its obligations for wind-energy projects. It is not completing its preliminary reviews, convening, or advancing mitigation discussions, providing draft mitigation agreements, or countersigning agreements that have already been executed by developers. Instead, DoD has unilaterally and indefinitely suspended the MRT process, in clear contravention of its mandatory duties. Nor has DoD identified project-specific adverse impacts from wind-energy projects that require additional mitigation or otherwise explained why previously approved mitigation frameworks are no longer sufficient.

As a result, wind energy projects have become stranded at every stage of the Clearinghouse process. Some projects await only DoD countersignature on developer-signed mitigation agreements. Ex.B ¶¶ 12,15; Ex.J ¶9; Ex.K ¶10; Ex. L ¶¶9-13; Ex.N ¶15; Ex.O ¶9; Ex.C ¶¶12-13; Ex.A ¶17; Ex.X ¶11-14; Ex.W ¶11-15; Ex.Y ¶11-14; Ex.T ¶12-15; Ex.R ¶12-16; Ex.U ¶14-18; Ex.F ¶9; Ex.G ¶9. Others have completed MRT discussions and await draft agreements from DoD. Ex.I ¶9; Ex.N ¶¶21-24; Ex.S ¶12-16; Ex.Q ¶11-21; Ex.P ¶10; Ex.V ¶11; Ex. A ¶¶23, 27. Still others remain stalled within the MRT process itself, notwithstanding regulatory expectations that mitigation discussions be completed within ninety days absent a written extension agreed to by the developer. Ex.B ¶¶ 19-20; Ex.E ¶8. Additional projects remain pending at the preliminary-review

9

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

stage, awaiting NPRs or non-objection determinations well beyond the timelines contemplated by statute and regulation for such review.  Ex.A ¶25-27; Ex.H ¶10; Ex.M ¶16; Ex.D ¶11.

Developers have made multiple and repeated attempts to move the process forward and get answers from DoD—all of which have gone unanswered.  Ex.J ¶17; Ex.K ¶17; Ex.E  ¶17; Ex.N ¶¶20, 27; Ex.O  ¶13; Ex.C ¶18; Ex.T ¶17; Ex.Q ¶23; Ex.X ¶16; Ex.W ¶18; Ex.Y ¶16; Ex.R ¶18; Ex.U ¶20; Ex.P ¶12.

On March 9, 2026, ACP requested that DoD explain both its refusal to execute agreed-upon mitigation agreements and the legal basis for its changed approach.  ECF.1-2.  In an April 8, 2026 response, DoD cited evolving military risks and the need for expanded interagency coordination, but it provided no project-specific rationale, identified no deficiencies in existing mitigation measures, and offered no timetable for resuming the review process.  ECF.1-3.

The practical effect of these actions has been to indefinitely suspend new wind projects. The resulting uncertainty and delay has disrupted project development schedules, increased project cost, jeopardized tax-credit eligibility, delayed financing and procurement decisions, and placed numerous projects in jeopardy.  As discussed below, those consequences extend beyond individual developers and affect electric-generation planning, investment decisions, and broader energy-sector interests nationwide.

## IV.    The Government's Broader Campaign Against Wind

DoD's review freeze is just the latest component of a concerted effort by the Government to stop wind-energy development.  Since the start of the new administration, the Government also has (1) issued a memorandum directing all federal agencies to indefinitely suspend the issuance of any approvals related to wind-energy development nationwide, pending government-wide "comprehensive assessment and review" of permitting practices; (2) promulgated a series of coordinated agency actions that imposed open-ended delays on, and otherwise disadvantaged both

10

wind and solar development; and (3) issued stop-work orders to five offshore wind projects already under construction based on purported national security concerns.

Each of those actions has been vacated, stayed, or preliminarily enjoined by federal courts. In so holding, courts emphasized that the Government's actions suffered from many of the same flaws as its actions here: they were not premised on any identified project-specific concerns or shortcomings in the existing review framework, constituted an abrupt departure from settled practice without reasoned explanation or attention to reliance interests, and imposed open-ended freezes with no end date. *See, e.g.*, *New York v. Trump*, 811 F. Supp. 3d 215, 232-45 (D. Mass. 2025) (vacating presidential memorandum); *RENEW Ne. v. U.S. Dep't of Interior*, No. 25-cv-13961-DJC, 2026 WL 1078282, at *8–33 (D. Mass. Apr. 21, 2026) (vacating actions delaying or disfavoring wind energy). And as is true here, courts in the stop work order cases emphasized that the Government had failed to demonstrate any concrete national security risk warranting project suspensions and noted that any genuine national security concerns could be addressed through ordinary mitigation processes. *See* ECF.1-4, 1-5, 1-6, 1-7, 1-8.

## **LEGAL STANDARDS**

A party is entitled to a preliminary injunction when it shows that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm unless preliminary relief is granted; (3) the balance of the equities favors a preliminary injunction; and (4) a preliminary injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Where, as here, the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The Ninth Circuit also has a "sliding scale" approach under which "a lesser showing than likelihood of success on the merits" is sufficient if the other factors are strongly in the party's favor. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).

11

A party is entitled to a stay "postpon[ing] the effective date of an agency action or . . . preserv[ing] status or rights pending conclusion of review proceedings," under Section 705 of the APA where "necessary to prevent irreparable injury." 5 U.S.C. § 705. "[T]he factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." *Or. Council for Hums. v. U.S. DOGE Servs.*, 794 F. Supp. 3d 840, 858 (D. Or. 2025).

Plaintiffs are entitled to a stay or a preliminary injunction under any of these standards.

## ARGUMENT

### I.    Plaintiffs Have Standing

To establish Article III standing, "a plaintiff must show (i) an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). Organizational plaintiffs can demonstrate standing by: (1) showing associational standing; or (2) by showing that the organizational plaintiffs have standing to sue on their own. *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

The Member Organization Plaintiffs have associational standing to sue on behalf of their members. A plaintiff organization demonstrates associational standing where: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). These criteria are met here. First, as explained in further detail below, the Member Organization Plaintiffs' members are suffering concrete harm from DoD's freeze because their projects are delayed, and that harm would be redressed by setting aside DoD's policy. *See* Section III, *supra*. Second, each of the Member

12

Organization Plaintiffs exists to further the use of wind energy and the development of wind energy projects—aims that would be furthered by setting aside DoD's unlawful freeze. *See* ECF.1-14 ¶¶4, 9, 14, 19, 24, 29, 34, 39. Third, because DoD's policy is a broad one and the Member Organization Plaintiffs seek programmatic relief, individual participation by each of their members is not necessary.

GECA, for its part, has standing to sue on its own behalf because it has suffered concrete and particular injuries to its organizational interests. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982) (explaining that the court "conduct[s] the same inquiry as in the case of an individual" to assess organizational standing). GECA relies on RECs generated by renewable-energy projects to advance its programs and provide benefits to participating communities, and it promotes a zero-carbon energy environment. ECF.1-15 ¶12. Because DoD's freeze halts the development of wind-energy projects, it reduces the number of RECs available, *id*. ¶¶18, 19, and impedes the advancement of zero-carbon energy.

## II.    Plaintiffs Are Likely to Succeed on the Merits

### A.    APA 706(2): DoD's Freeze Is a Final Agency Action That Is Arbitrary and Capricious, Contrary to Law, and Promulgated Without Observing Required Procedures.

Plaintiffs are likely to succeed on their claims that DoD's freeze must be set aside under Section 706(2) of the APA because DoD failed to account for required considerations and wind developers' reliance interests, based the freeze on an impermissible policy against wind energy, ignored statutory and regulatory timelines, and amended DoD's current regulations without following required procedures. 5 U.S.C. § 706(2)(A), (D).

13

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

       ***1.    DoD's freeze is a final agency action because it has important legal and practical consequences and is the consummation of the agency's policy decision.***

An agency action is "final" if it (1) "mark[s] the consummation of the agency's decision-making process" and (2) determines "right and obligations" or creates "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). DoD's freeze satisfies both prongs.

With respect to the first *Bennett* prong, DoD's freeze is the "consummation" of DoD's process because it is currently in effect and does not depend on further agency action. While DoD retains the power to lift its freeze at any time, "the mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal." *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012). Similar attempts by agencies to place a "pause" or an "indefinite hold" on an ongoing review process have repeatedly been recognized as final agency actions. *Varniab v. Edlow*, No. 25-cv-10602-SVK, 2026 WL 485490 at *8, 17  (N.D. Cal. Feb. 20, 2026) (indefinite hold on initial asylum determinations while agency "develop[ed] a new process for imposing additional requirements" was final agency action). Particularly relevant here, the District of Massachusetts concluded in *New York v. Trump* that agencies' implementation of a presidential memorandum placing an indefinite pause on all wind-energy permits, leases, and other authorizations was final action notwithstanding the agencies' characterization of the pause as "temporary." 811 F. Supp. 3d at 233. The court emphasized that the pause "altered the legal status quo" by replacing the agencies' prior practice of processing wind development applications in the ordinary course with a blanket suspension on decision-making. *Id.* at 234 (citation omitted). While the agencies argued that the pause would eventually end following a "comprehensive assessment," the court noted that the memorandum represented the agencies' "final word" unless and until some future decision was made. *Id.*

14

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

The same is true here. DoD's freeze alters the longstanding status quo under which the Clearinghouse reviewed wind projects and developed mitigation measures in the ordinary course. *See* pp.6-7, *infra*. In its place, DoD adopted a policy under which those projects no longer proceed through the ordinary review and mitigation process. Although DoD has suggested that the freeze may someday end after unspecified interagency review regarding vague purported national security concerns, it has provided no timeline or criteria for ending the freeze nor has it established a process through which affected parties may obtain review in the interim. The DoD freeze, like the pause in *New York v. Trump,* constitutes the agency's operative and definitive position governing wind-project reviews today.

DoD's implementation of its policy through unwritten communications and an informal "guidance" document does not undermine its finality. *See M-J-M-A- v. Hermosillo*, No. 6:25-CV-02011-MTK, 2026 WL 562063, at \*18 (D. Or. Feb. 27, 2026) ("[That] a practice is not committed to writing is not dispositive; both logic and law require unwritten policies to be reviewable."). Indeed, despite DoD's characterization of the May 7 Memorandum as "interim," it illustrates that DoD already had a final policy in place and chose to continue that policy. *See* ECF.1-1. The May 7 Memorandum confirmed that DoD had already placed additional coordination requirements specifically on wind-energy projects, established no deadlines for completion of those requirements, and determined that reviews would not proceed through the established review and mitigation framework and timelines on which developers had long relied. *Id.*

Turning to *Bennett's* second prong, DoD's freeze has concrete and significant "legal consequences" because it prevents wind-energy projects from receiving DNHs from the FAA. The lack of DNHs "can hinder the project sponsor in acquiring insurance, securing financing or obtaining approval from state or local authorities," *BFI Waste Systems of North America, Inc. v.*

15

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

*F.A.A.*, 293 F.3d 527, 530 (D.C. Cir. 2002), and wind-energy projects effectively cannot move forward with construction and commercial operation without them. For that reason, courts have long recognized that DNHs are reviewable "final orders" under 49 U.S.C. § 46110. *See, e.g.*, *Aircraft Owners & Pilots Ass'n v. Fed. Aviation Admin.*, 600 F.2d 965, 967 n. 2 (D.C. Cir. 1979).

Those same legal and practical consequences are already flowing directly from DoD's review freeze. By halting the review process and preventing wind projects from obtaining DNHs functionally necessary to advance, DoD's review freeze prevents projects from moving forward. As described in further detail in Section III, *infra*, that results in numerous immediate impacts for wind developers, including significant daily carrying costs, violation of PPA terms that could result in termination or liquidated damages, violation or of or need to cancel equipment and service contracts, inability to qualify for critical tax credits, and risk of cancellation of projects.

### 2. *DoD provided only vague and implausible justifications for its freeze, failed to consider important factors, and ignored stakeholders' reliance interests.*

The APA's "arbitrary and capricious" standard requires that an agency examine the relevant information before it and articulate a basis for its action, including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). DoD has failed to do so in multiple respects.

*First*, DoD has failed to provide a reasoned explanation for its freeze. Before implementing the policy, it offered no explanation at all—written or otherwise. Rather, it simply stopped executing final mitigation agreements starting in August 2025 then progressively slowed the remaining DoD review process until staff were directed to stop all components of the review process on April 13, 2026. ECF.1-11 ¶26. The sparse justifications that the DoD has since provided fare no better. They consist mainly of generalized "national security concerns"

16

untethered to any identified change in circumstances, particularized project concerns, or evidence of problems with implementation of well-established mitigation measures.

For example, in an April 8, 2026 letter to ACP DoD, offered only a few generalized explanations for the freeze, none of which provides the reason basis the APA requires. The letter's primary explanation was the need for a "comprehensive national security review" involving "further interagency coordination." ECF.1-3. It did not identify any specific national security concern, any changed circumstances necessitating the freeze or any explanation as to how halting wind development would address those concerns. As one court found in rejecting a similar conclusory explanation, an agency may not rely on "repeated, conclusory appeals to national security concerns" but instead "must explain and justify their actions in order to permit meaningful checks on executive power." *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1080 (N.D. Cal. 2005).

The letter's remaining explanations are equally deficient. For example, DoD's letter posits an implausible reason for delay—that "the Government was shut down from October 1, 2025, to November 12, 2025." ECF.1-3. But DoD stopped executing final mitigation agreements in August 2025, two months *before* the shutdown, *see supra* p.16, has not issued any since, and has frozen additional steps of the process for more than six months after it ended. Such explanations are precisely the sort of unconvincing justifications that cannot sustain agency action under *State Farm*.

DoD's May 7 Memorandum is equally devoid of reasoned decision-making. *See* ECF.1-1. For the most part, it repeated purported concerns with unspecified "national security considerations." *Id.* at 1. The only specific concern it mentioned—without any explanation of changed circumstances—was "impactful doppler interference," an issue that is unique to wind-

17

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

energy projects. *Id.* at 3. Indeed, Doppler-interference is one of the most common issues that has been successfully addressed through the DoD review process since its inception.

*Second*, DoD failed to consider an important aspect of the issue. *State Farm*, 463 U.S. at 43. Congress directed that, in its review process, DoD must balance military operations and readiness considerations with the need to foster renewable energy development: "[i]t shall be an objective of the Department of Defense to ensure that the robust development of renewable energy sources and the increased resiliency of the commercial electrical grid may move forward. . . while minimizing or mitigating any adverse impacts on military operations and readiness." Pub. L. No. 111-383, 124 Stat. 4137 (2011). DoD in turn incorporated that directive into its own regulations, which likewise recognize a DoD objective of ensuring that renewable energy development and grid resiliency move forward while adverse military impacts are minimized or mitigated. 32 C.F.R. § 211.4. Yet, there is no indication that DoD either considered those congressionally mandated interests or the corresponding objectives reflected in its own regulations when it adopted its freeze.

DoD did not consider the impacts of its freeze on wind-energy development, evaluate its consequences on grid resiliency, or explain why a total halt was preferable to the mitigation approach that Congress contemplated and that DoD successfully implemented for years. By entirely disregarding these factors that Congress required it to consider, DoD failed to consider an important aspect of the problem in contravention of the APA. *See Jajati v. U.S. Customs & Border Prot.*, 102 F. 4th 1011, 1018 (9th Cir. 2024) (finding action arbitrary and capricious where the agency failed to consider mandatory regulatory criteria).

DoD likewise failed to consider other mitigation options despite the instructions in its own regulations that it "shall" consider whether there are "feasible and affordable actions that may be

18

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

taken to mitigate adverse impacts of projects on military operations and readiness." 32 C.F.R. § 211.9(a); DoDI 4180.02 at 3.2(c)(5). DoD's regulations further instruct it to analyze the specifically enumerated mitigation options. 32 C.F.R § 211.9. Yet, DoD did not consider whether any of these mitigations were feasible and affordable, let alone whether their implementation would avoid unacceptable national security risks while allowing wind projects to move forward.

*Third*, DoD failed to acknowledge or account for the substantial reliance interests created by its longstanding review process. While an agency can change its policy, it must "be cognizant that longstanding policies may have engendered serious reliance interests," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016), and must "determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 32 (2020). DoD has failed to consider wind developers' substantial reliance interests in its prior review process, criteria, and timelines. Those reliance interests are particularly strong given that Congress directed DoD to develop a "comprehensive strategy" for assessing the impacts of wind and other energy projects, including "identify[ing] distinct geographic areas" where projects are likely to have impacts on military operations or readiness and "specifically identify[ing] feasible and affordable long-term actions that may be taken to mitigate adverse impacts of projects." 10 U.S.C. § 183a. In response, DoD established a review process that enabled developers to assess whether a project was likely to require mitigation and to reliably predict the timing of the DoD review, and developers structured project planning, financing, contracting, permitting, and construction schedules around that process. *See* pp.5-6, *supra*. DoD's freeze has now upended these reasonable expectations. *Id.* Yet, DoD never even acknowledged them—much less analyzed their significance, compared them against competing

19

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

policy interests, considered alternatives, or explained why they were outweighed by the asserted basis for the freeze.

For all of those reasons, Plaintiffs are likely to succeed on their claim that DoD's freeze is arbitrary and capricious.

### 3. DoD's freeze was based on the Government's hostility to wind energy.

An agency action is also arbitrary and capricious when the agency has "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. A rule that is based on such impermissible considerations cannot be saved by the recitation of an alternative rationale when the "stated rationale [is] pretextual" or "contrived." *Dep't of Com. v. New York*, 588 U.S. 752, 773–74, 785 (2019).

Here, there is abundant evidence that DoD's stated bases for its freeze are mere pretext for the Government's desire to stop wind energy development. That motivation can be seen in statements made by the President indicating that he plans to "not approve[] one windmill"[1] during his time in office and his repeated disparagement of wind energy projects as a "disgrace" and a "junkyard of steel."[2] It can also be seen in the consistent pattern of anti-wind actions the Government has taken—first in the presidential memorandum freezing permitting (vacated in *New York v. Trump*), then in its stop work orders halting construction on offshore wind projects (preliminarily enjoined in five separate district court decisions), and again in the actions taken by multiple agencies to discourage or slow down wind and solar development (preliminarily enjoined

---

[1] Dinah Voyles Pulver, *Trump assails 'windmills' and wind energy as junk: 'They're losers'*, USA Today (Jan. 9, 2026), https://www.usatoday.com/story/news/nation/2026/01/09/trump-assails-windmills-and-wind-energy-as-junk-theyre-losers/88108694007/.

[2] *Id.*; Benjamin Storrow, Kelsey Tamborrino & Jessie Blaeser, *"Windmills Are a Disgrace": Inside Trump's War Against a Growing US Industry*, Politico (Dec. 11, 2025), https://www.politico.com/news/2025/12/11/how-the-wind-industry-misread-trump-00666895.

20

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

in *RENEW Northeast*). After courts repeatedly blocked those efforts, the Government has moved on to a stealthier strategy of effectuating the same objectives.

When the Government decisionmakers "repeatedly broadcast their impermissible reasons for making a decision," courts need not ignore those statements. *Nat'l TPS All. v. Noem*, 166 F.4th 739, 769 (9th Cir. 2026) (Mendoza, J., concurring). To the contrary, it is imperative that courts "believe them the first time." *Id.* The Government has made its position clear: it seeks to stop further wind energy development and has repeatedly attempted to achieve that objective through agency action. Such considerations are plainly outside of what Congress authorized DoD to consider in its review process—which asks DoD to assess project-specific concerns while ensuring robust development of renewable energy sources. *See* 10 U.S.C. § 183a. Unsurprisingly, DoD has not explicitly invoked its disfavor for wind energy to support its decision in any formal communication. But where, as here, an agency offers only vague and unsupported justifications while simultaneously implementing a policy that aligns with repeatedly expressed opposition to wind energy, the court may consider whether the agency is in fact relying on factors that Congress did not authorize it to consider. Because DoD appears to have abandoned the project-specific review and mitigation framework designated by Congress in favor of policy objectives Congress did not authorize it to consider, Plaintiffs are likely to demonstrate that DoD's conduct is arbitrary and capricious.

### 4. *DoD's freeze violates statutory and regulatory deadlines.*

Under the APA, any action that is "not in accordance with law,"—"which means, of course, *any* law"—must be set aside. *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003).

21

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

DoD's freeze must be set aside because it effectively directs DoD components to violate multiple statutory and regulatory deadlines.[3]

To begin with, DoD's freeze of all steps of its review process for wind-energy projects violates the requirement under 10 U.S.C. § 183a for DoD to "conduct a preliminary review" of applications for energy projects "not later than 75 days" after receiving an application from the FAA. DoD's halt of all steps of the process that it implemented on April 13, 2026 inherently contemplated that DoD would violate that deadline. DoD's May 7 Memorandum stated that it would follow that deadline "effective immediately," implicitly recognizing that DoD had not been complying with that deadline prior to May 7 (and without acknowledging the 30-day deadline set forth in Part 211 of its regulations). ECF.1-1. And despite that statement, Plaintiffs are currently unaware of any projects for which DoD has completed preliminary review since it issued the May 7 Memorandum.

DoD is also violating several of its own regulatory deadlines. By directing DoD to complete preliminary review "within 75 days" while saying nothing about the 30-day regulatory review requirement, DoD's May 7 Memorandum effectively supersedes the agency's own regulations without formal amendment. The memorandum likewise says nothing about DoD's deadline in 32 C.F.R. § 211.6 to conclude mitigation discussions within 90 days absent a written agreement between DoD and the developer extending the period. DoD is also violating that deadline given that mitigation discussions have been pending for longer than 90 days for many wind projects without mutual agreements on extensions. ECF.1-11. Because DoD's policy has

---

[3] DoD's freeze is also inconsistent requirements for timely action under the APA itself. *See* 5 U.S.C. §§ 555 (b), 558(c)

22

the effect of directing DoD components to miss those deadlines, Plaintiffs are likely to show that it must be set aside.

### 5. *DoD failed to follow the required notice-and-comment rulemaking process.*

Finally, DoD's policy was promulgated "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), because DoD failed to use the notice-and-comment rulemaking process. Section 553 of the APA requires agencies that promulgate legislative rules to use at least notice-and-comment rulemaking procedures. Legislative rules are those that "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003). And courts "need not accept the agency characterization" of whether it has promulgated a legislative rule "at face value." *Id.*

Here, DoD's review freeze is an across-the-board policy that alters legal rights, obligations, and procedures governing wind-project review. Indeed, DoD's new policy directly conflicts with DoD's own regulations in Part 211—including its 30-day requirement for making an initial determination—and requirement to complete MRT discussions within 90 days absent a written agreement to extend—a telltale sign of a legislative rule requiring notice and comment rather than nonbinding guidance. *See Hemp Indus. Ass'n*, 333 F.3d at 1087. Since Part 211 was promulgated using notice-and-comment procedures, *see* 78 Fed. Reg. 73088, (Dec. 5, 2013), it can only be repealed or modified through that same process. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (noting that Section 551 of the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance"). Yet, DoD has made no attempt to repeal its 30-day deadline for performing its preliminary review through a

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

notice-and-comment rule, instead attempting to handwave it away through unwritten internal communications and one informal memorandum.

By failing to provide for notice and comment, DoD deprived wind developers and other interested stakeholders of their procedural rights to provide comments to DoD that it would have then needed to consider before finalizing its new policy. Plaintiffs are likely to show that DoD's review freeze should be set aside for that reason too.

### B.  APA 706(1): DoD Unlawfully Withheld or Unlawfully Delayed Required Actions

Plaintiffs are also likely to prevail on their claim under Section 706(1) of the APA, which authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." The Ninth Circuit has recognized an important distinction between those two grounds— "if an agency withholds a required action, it violates § 706(1) regardless of its reason for doing so," while it if it "delays a required action, it violates § 706(1) only if the delay is unreasonabl[e]," which "is a fact-intensive inquiry analyzed under the so-called *TRAC* factors." *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1121 (9th Cir.), *cert. granted sub nom. Noem v. Al Otro Lado*, 146 S. Ct. 604 (2025). An agency "withholds" a required action when it "refuses to accept, in any form, a request that it take a required action." *Id.* For example, Ninth Circuit courts have recognized that an agency has unlawfully withheld processing applications where it "admit[ed] that . . . final adjudication of the applications is on hold" and "failed to explain when and by what criteria a decision will be made to lift the hold." *Varniab*, 2026 WL 485490 at *16. Agencies also unlawfully withhold actions when they ignore clear statutory or regulatory deadlines. *See Gonzalez Rosario v. U.S. Citizenship & Immigr. Servs.*, 365 F. Supp. 3d 1156, 1161 (W.D. Wash. 2018).

24

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

### 1.    *DoD unlawfully withheld agency action because it is refusing to act and missing deadlines.*

DoD's freeze amounts to a clear "unlawful withholding" because DoD is "refusing" to move its review process forward. As of the DoD's April 13 directive, all steps of DoD's review process were frozen entirely, with no indication of when they might resume. ECF.1-11 ¶26. And while DoD's May 7 Memorandum suggested that DoD may now comply with one component of that process—conducting preliminary reviews within 75 days—that is hardly material when DoD is not letting applications proceed any further. ECF.1-3 at 3. The clearest examples of how DoD's current freeze amounts to a refusal to process are projects that have already gone through the full review/mitigation process, have agreed-upon mitigation agreements, and are awaiting only countersignature from DoD. DoD has refused to sign pending agreements since August 2025 and is providing no indication about what point in the future it may do so (or even whether it ever intends to do so). ECF.1-10 ¶27(a). DoD's failure to act here is analogous to a hypothetical the Ninth Circuit posited in *Al Otro Lado* to illustrate unlawful withholding of an agency action, in which a post office tells someone that it will not mail their package today but might do so in the future if they keep coming back. 138 F.4th at 1122. Just like the post office in that hypothetical, DoD is refusing to act now and is offering only the possibility that it might act in the future without providing any timetable or criteria that would result in lifting the freeze. That is unlawful withholding of agency action.

Projects awaiting countersignature provide a particularly stark example, but the same problem exists throughout the review process. DoD is not merely declining to execute final mitigation agreements. It has ceased taking actions to advance review on projects that have completed mitigation discussions and are awaiting a draft mitigation agreement, projects that are in the midst of mitigation discussions, and projects that have received an NPR but have not yet

25

scheduled mitigation discussions. *See* pp.7-10, *supra*. At each stage, projects have reached a standstill because DoD has stopped performing the next step in the review process. The breadth of that paralysis underscores that DoD is not exercising discretion or only proceeding more slowly than usual; it is straightforwardly withholding action that governing statutes and regulations require it to take.

DoD is also unlawfully withholding of required action because it is missing statutory and regulatory deadlines. An agency that misses deadlines unlawfully withholds actions, even where those deadlines are ones it initially set. *See Gonzalez Rosario*, 365 F. Supp. 3d at 1161. DoD is violating its own 90 deadline under 32 C.F.R. § 211.6 to complete its preliminary review in 30 days and its deadline to conclude mitigation discussions within 90 days absent a mutual agreement in writing for an extension. *See* pp.22-23, *supra*. It has also been violating the statutory deadline to complete preliminary review in 75 days under 10 U.S.C. § 183a, and, while it has recently indicated that it plans to comply with that one particular deadline going forward, *see* ECF.1-3, Plaintiffs have not to date seen any evidence that it is doing so.

Each of DoD's refusals to act reinforce each other—by failing to execute any mitigation agreements, by halting multiple other steps of its review process, and by missing statutory and regulatory deadlines, DoD has made a clear choice to withhold action it is required to take.

### 2. *Alternatively, DoD is unreasonably delaying its review process.*

Even if DoD is not considered to be withholding its actions, it is in all events unreasonably delaying them. The Ninth Circuit assesses whether agency actions are "unreasonably delayed" based on six "*TRAC* factors" first articulated by the D.C. Circuit: "(1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute,

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *In re Pesticide Action Network N. Am., Nat. Res. Def. Council, Inc.*, 798 F.3d 809, 813 (9th Cir. 2015). Assessment of those factors involves a "fact-intensive inquiry" that does not depend on the passage of any particular period of time. *Al Otro Lado*, 138 F.4th at 1122.

Analyzing those factors here demonstrates that DoD's freeze resulted in an unreasonable delay. DoD's delay is unsupportable under a "rule of reason" because it has violated multiple statutory and regulatory deadlines and is grossly outside of its historical practices even for steps in the review process that do not have explicit deadlines. DoD has not articulated any compelling competing priorities or other need for the delay. Nor has it identified any "concrete timetable" by which it plans to act on applications in the future. *Pesticide Action Network*, 798 F.3d at 814. DoD's freeze is having significant deleterious impacts on not only the wind energy industry, but also the nation's economy, grid reliability and resiliency, and energy security. *See* pp.35-36, *infra*. And there are strong indications that DoD's freeze is driven by an unreasonable, unfounded, and generalized predisposition against wind energy.

When considering all of those factors together, particularly in the context of a review program designed to ensure "robust development of renewable energy sources," Pub. L. No. 111-383, 124 Stat. 4137 (2011), Plaintiffs are likely to show that DoD has unreasonably delayed required action.

27

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

**III.    Plaintiffs Will Be Irreparably Harmed Without a Stay or Preliminary Injunction**

Plaintiffs can readily demonstrate that irreparable injury is likely absent preliminary relief. *Winter*, 555 U.S. at 22.  The relevant question is not the magnitude of the injury, but whether the threatened harm is concrete, imminent, and incapable of adequate remediation after final judgment. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

This standard is easily satisfied here.  Because Defendants are federal agencies and officials, Plaintiffs cannot recover money damages for the injuries caused by DoD's freeze. *See Washington v. Trump*, 145 F.4th 1013, 1036–37 (9th Cir. 2025).  This means that, in this context, both economic harm, and "intangible injuries" can be considered irreparable. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).  And those harms are not speculative.  They are occurring now.  As is described below, DoD's freeze is causing projects to incur significant unrecoverable costs, jeopardizing financing and contractual commitments, threatening eligibility for tax incentives, preventing construction, interconnection, and commercial operation of the project, and in some cases, placing projects at risk of cancellation.  Plaintiffs are therefore suffering multiple forms of irreparable harm that warrant immediate injunctive relief.

> **A.    Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Economic Harms from DoD's Freeze.**

DoD's freeze has resulted, and will continue to result, in the delay, impairment, and possible cancellation of hundreds of wind projects, including projects owned or developed by Plaintiffs' members.  Many of these projects represent investment of hundreds of millions dollars and depend on tightly coordinated development schedules, financing arrangements, procurement commitments, contractual milestones, and tax-credit deadlines.  Once those opportunities are lost, the resulting harms are unrecoverable.

Wind energy project development requires strict adherence to development schedules, and

28

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

even small delays can jeopardize a wind project's commercial viability.  DoD's freeze places at risk billions of dollars that have been invested in these projects to date.  Overall, these delays are causing substantial and continuing losses for wind-project developers, including Plaintiffs' members.  These losses stem from multiple sources and are not speculative.  Economic analysis performed by Charles River Associates conservatively estimates that the current delays have already caused approximately $2.0 billion in economic harm across affected projects through increased carrying costs, higher financing costs, delayed or lost project revenues, and the potential loss of tax-credit value.  If DoD's inaction continues for one year, those harms are conservatively projected to exceed $6.5 billion.  Those losses continue to accrue each day and will only increase as projects remain unable to advance through the permitting process.  Ex.AA ¶¶40-42 & Tables 2-3.

The cumulative effect of these harms is project cancellation.  Utility-scale wind projects require the alignment of financing, equipment procurement, transmission access, interconnection rights, permits, land rights, tax-credit eligibility, and commercial arrangements.  As delays compound, projects can become uneconomic and may be abandoned altogether.  Indeed, multiple developers have already indicated that continued delay threatens the viability of their projects.  Once a project is cancelled, the lost opportunity to develop that project cannot be restored through a later agency decision or monetary relief.

***Project Financing***.  Many developers finance at least some portion of their projects.  These project financing contracts generally rely heavily on predictable and certain timelines for construction.  As such, DoD's freeze, which makes construction timelines unpredictable, is making it difficult for developers to obtain financing.  ECF.1-14 ¶61.  Specifically, lenders are often unwilling to bear the risk of development-stage financing given ongoing and indefinite regulatory

29

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

uncertainty and therefore almost never provide funding unless and until DNHs are obtained. *Id*. Every day that a project cannot obtain financing also leads to other costs. Failure to obtain financing is preventing some developers from proceeding to initial project activities such as environmental studies, land acquisition, EPC planning, and preliminary engineering. *Id*. For those that have obtained financing, the delay has put their agreements in jeopardy and/or is leading to interest and other costs under the contracts. Ex.D ¶13; Ex.E ¶ 11.

*Project Planning and Costs*. Developers spend years planning projects and invest significant amounts of capital in planning and development. Ex.A ¶20; Ex.N ¶11; Ex.P ¶16. Projects that are cancelled as a result of DoD's freeze therefore result in massive sunk costs. Ex.J ¶13 ($83 Million); Ex.K ¶16 ($50 Million); Ex.A ¶30 (47.5 million); Ex.W ¶22 ($35 million); Ex.U ¶24 ($22 million).

*Carrying Costs*. Projects also incur several types of carrying costs that add up each day the DoD's freeze continues, with no financial returns to offset them—these include the costs of holding interests in land or equipment that cannot be used because of the DoD freeze and must be kept idle or stored, and the costs of labor or employees that are paid on a recurring or salaried basis. Ex.R ¶21(d); Ex.S ¶17(e); Ex.O ¶17(a); Ex.T ¶20(d). These costs are incurred on an annual, monthly, or even daily basis and would be unrecoverable even if Plaintiffs prevail.

*Impacts on EPC mobilization*. Further, DoD's freeze is resulting in developers bearing higher costs to obtain the materials necessary to construct projects. Wind turbine and transmission equipment availability is limited (and often designed with a specific project in mind) and acquiring them requires lead times in excess of 12–18 months. Delays in federal review force developers to relinquish manufacturing slots and vessel charters to ship the equipment. ECF.1-14 ¶¶62, 63. Any additional delay continues exposing these projects to increased prices. Ex.K ¶15; Ex.Q ¶26; Ex.P

30

¶15.  Developers are also exposed to penalties for having to cancel charters that cannot be used. ECF.1-14 ¶¶62, 63.  Wind turbine components are not designed for indefinite warehousing and cannot be readily stored due to their large size, specialized handling requirements, and the high cost of appropriate storage facilities.  *Id*.

**Power Purchase Agreements, Interconnection Agreements, and Local Permits**. Projects are suffering substantial harm to their contractual relationships as a result of the freeze.   Ex.S ¶17(d); Ex.T ¶20(c); Ex.O ¶17; Ex.A ¶¶23.  In addition to EPC inputs, developers enter into a series of time-sensitive agreements well before the project is under construction.  Ex.BB ¶15. DoD's freeze causes developers to be at risk of failing to meet PPA development and operational milestones, which in turn puts them at risk of liquidated damages, termination rights, or other contractual remedies. *Id*. ¶60; Ex.J ¶15; Ex.K ¶ 13; Ex.Q ¶26(e).

The freeze is also jeopardizing developers' interconnection rights, which are necessary for projects to deliver electricity to the grid, require developers to meet critical milestones, and often take years to get through the queue to complete.  ECF.1-14 ¶65.  Delays caused by DoD's freeze are preventing projects from meeting those milestones, placing them at risk of losing their queue position or experiencing substantial additional delay while non-wind-energy projects proceed ahead in the interconnection process.  Ex.L ¶17; Ex.J ¶13; Ex.K ¶15; Ex.A ¶13; Ex.B ¶ 7; Ex.T ¶20(b); Ex.U ¶23(d); Ex.W ¶ 21(c); Ex.X ¶19(d); Ex.Q ¶26(b).  For those projects that already have an interconnection agreement, developers are in danger of achieving operational milestones, putting projects at risk of contractual penalties, as well as the potential loss of a security deposit that is usually tens of millions of dollars.  ECF.1-14 ¶65.  As the freeze continues, developers face a growing risk of suffering unrecoverable losses.  Ex.B ¶¶ 18, 22; Ex.I ¶11; Ex.K ¶16.

Developers also often need permits and agreements from state and local governments that

31

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

have their own requirements—often including receipt of DNHs, deadlines, performance benchmarks, and expiration dates. DoD's freeze is currently putting developers at imminent risk of failing to meet those deadlines and benchmarks. Ex.A ¶¶17(b), 23(a)-(b), 27(a)-(b); Ex. N ¶¶ 11, 19, 26.

*Tax Consequences*. Additionally, delays threaten to eliminate the ability of wind developers to use substantial tax credits they are entitled to under the One Big Beautiful Bill Act. Wind projects often rely and are structured on tax credits that require meeting development deadlines. Ex.Z ¶¶47, 61-63, 69. Because of the delays caused by DoD's freeze, many projects are at risk of losing eligibility for the credits. *Id*. ¶55. This is reducing the projects' projected rate of return, undermining financing assumptions, disrupting tax-equity structures and impairing debt-sizing and could make them economically nonviable. *Id*. ¶¶56-75.

Specifically, to be eligible, developers must (1) begin construction by July 4, 2026 to preserve eligibility and (2) achieve commercial operation within four years from starting construction (by the end of 2030 at the latest) to retain full tax-credit eligibility. *Id*. ¶¶18-19, 29; *see* Pub. L. No. 119-21, tit. VII, §§ 70512–70513, 139 Stat. 72, 252–73 (2025). Wind projects are multi-year infrastructure projects that require significant financing, procurement, contracting, construction, and commissioning activities before becoming operational. Ex.Z ¶42. These processes cannot move forward while DoD's freeze is in effect, and without preliminary relief, many projects will not be able to meet the construction deadline or the operation deadline to be eligible for the tax credits. *Id*. ¶¶18, 28, 33, 35, 36, 40-41, 46-49. Further, loss of the tax credits has a negative ripple effect on the entire process because much of the proposed financing and economic planning for a project assumes that the project would qualify for these tax credits. *Id*. ¶¶13, 70-72. Indeed, some projects have already begun construction for tax-credit purposes but

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

now risk being unable to complete construction and achieve placed-in-service status before the applicable continuity-safe-harbor deadline because they cannot obtain final FAA DNHs that may be necessary to proceed into major onsite construction activity. *Id*. ¶¶12, 28, 30, 33-35.

   ***Irreparable Economic Harm Due to Decreased Supply of RECs***. GECA, an organization whose mission is pursuing a zero-carbon future, is also being irreparably harmed by DoD's freeze. To carry out its mission, GECA needs to be able to purchase RECs "in adequate volume, at reasonable cost, and on predictable timelines." ECF.1-15 ¶¶12,13. The delay in wind energy production from DoD's freeze reduces the supply of RECs that GECA can purchase and provide to consumers and communities. *Id*. ¶18. That reduction in supply is increasing the costs of RECs, which in turn will require GECA to divert resources or contract out other programs. *Id*. ¶19.

***

   The myriad economic harms that developers are experiencing will only intensify as DoD's freeze continues. Ex.AA ¶¶34-35. For example, many PPAs and interconnection agreements permit counterparties to terminate the agreements if a developer fails to satisfy contractual milestones or achieve commercial operation by specified deadlines. Likewise, permits, easements and other project approvals and agreements often contain expiration dates or conditions that become increasingly difficult to satisfy as delays mount. As projects fall further behind schedule, the risk that developers will lose critical contractual rights, interconnections positions, permits and financing commitments increases substantially.

   At some point, DoD's freeze will render certain projects economically or practically infeasible, resulting in outright cancellation. The cancellation of a utility-scale wind project does not merely postpone development; it strands years of planning and investment and eliminates opportunities that cannot be later recreated. The resulting losses—amounting to billions of dollars

33

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

across affected projects—cannot be recovered even if Plaintiffs prevail on the merits. These are quintessential irreparable harms warranting preliminary relief.

      **B.      Plaintiffs Are Suffering and Will Suffer Irreparable Noneconomic Harm from DoD's freeze.**

Plaintiffs are also suffering significant intangible harms. Courts routinely recognize that "[h]arm to business goodwill and reputation is unquantifiable and considered irreparable." *Am. Promotional Events, Inc. v. City & Cnty. of Honolulu*, 796 F. Supp. 2d 1261, 1283 (D. Haw. 2011). DoD's freeze is causing precisely those types of injuries. Since the DoD freeze, developers have faced increased skepticism from investors, lenders and other counterparties regarding the viability and timing of wind-energy projects. As a result, some developers have had difficulty obtaining financing and maintaining commercial relationships. These harms flow not from any project-specific determination but from the uncertainty and delay caused by DoD's continued refusal to carry out its mandated review process. Ex.D ¶15; Ex.E ¶18; Ex.B ¶ 24. Absent preliminary relief, the reputational harm will certainly continue until the regulatory status quo is restored.

GECA faces ongoing intangible injury. The freeze has reduced the supply of RECs available to support its programs, threatening its ability to maintain and expand its presence in the communities. ECF.1-15 ¶16. The freeze also impairs GECA's efforts to advance the transition to zero-carbon fuels by preventing the development of new wind generation resources central to that objective. *Id*. ¶19.

In sum, DoD's freeze is leading to tremendous current and ongoing economic and intangible harm to Plaintiffs. Those harms are already occurring but will only get worse and more severe absent preliminary injunctive relief.

**IV.    A Stay or Preliminary Injunction Furthers the Public Interest**

Finally, a stay or preliminary injunction serves the public interest. The relief Plaintiffs

34

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

seek is narrow. It would require only that DoD resumes performing the review responsibilities Congress assigned to it and that the agency provide periodic status reports regarding its compliance. Such relief would restore the status quo that existed prior to DoD's unlawful policy change and bring the agency back into compliance with the law. It would not take away DoD's statutory obligations to consider and mitigate military impacts—it would only require that it do so. Courts have repeatedly recognized that the public has a strong interest in ensuring that federal agencies comply with statutory requirements and follow their own regulations. *See, e.g.*, *Azar*, 911 F.3d at 581; *Or. Nat. Desert Ass'n v. Raby*, 780 F. Supp. 3d 1085, 1107 (D. Or. 2025).

DoD has no countervailing interest in perpetuating its unlawful practice. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Undoubtedly, DoD has an important responsibility to protect military readiness and operations. But Plaintiffs do not seek an order preventing DoD from considering those concerns. To the contrary, Plaintiffs seek only to require DoD to resume the very review and mitigation process Congress established to protect such interests. Congress has already determined that military readiness concerns should be addressed through project-specific review and mitigation—not through an indefinite blanket policy. Requiring DoD to return to that framework therefore advances, rather than impairs, public interest.

The public also has a substantial interest in the continued development of reliable domestic energy resources. Wind projects affected by DoD's freeze alone represent approximately 29.6 GW of planned generation capacity across 106 projects—enough to power millions of American homes. Ex.AA ¶15. New wind-energy projects, which operate without any direct carbon emissions or generation of virtually any solid or hazardous waste, contribute to grid reliability, stabilize consumer electricity prices, and help meet growing electricity demands, all factors that are critically important to the public. *RENEW Ne.*, 2026 WL 1078282, at *31 (D. Mass. Apr. 21,

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

2026) (recognizing the "public's vital interest in maintaining a reliable, affordable, and resilient power grid"); *see also Or. Envtl. Council v. IRS*, No. 25-4400, 2026 WL 1631612, at *12-14 (D.D.C. June 6, 2026) (explaining that the "natural economic consequence" of an IRS Notice designed to limit access to renewable energy tax credits "is less clean electricity generation capacity and higher electricity prices."). Wind energy is especially important at a time of rising energy costs and concerns about energy stability and security raised by global conflicts, including the conflict with Iran. New wind-energy projects diversify the power grid and contribute to its stability. Ex. BB ¶ 37. Yet, absent a preliminary injunction, DoD's freeze is stalling and placing in jeopardy a tremendous amount of wind development that would generate capacity and strengthen grid resiliency.

The public also has an interest in the continuation of the substantial and sustained economic benefits wind energy development delivers. This includes billions of dollars in private capital investment that supports local contractors, suppliers, and infrastructure. ECF.1-14 ¶14. The projects also generate billions of dollars annually in property tax revenues.[4] And wind energy creates hundreds of thousands of jobs, including thousands of manufacturing jobs.[5]

DoD's freeze significantly blunts these economic gains from new wind projects, and vacating DoD's unlawful policy would help restore them.

## V. The Court Can Order Nationwide Relief

A nationwide stay under Section 705 of the APA is appropriate when needed to afford complete relief to the parties. *National TPS Alliance v. Noem*, 150 F.4th 1000, 1028-30 (9th Cir. 2025) (holding that "a postponement . . . effective nationwide, is the only remedy that provides

---

[4] See Am. Clean Power Ass'n, *Clean Power Annual Market Report 2025* (2025),
https://cleanpower.org/resources/market-report-2025.
[5] *Id.*

36

complete relief to the parties before the court"). Nationwide relief is particularly appropriate where an organizational plaintiff seeks relief from a single policy on behalf of a membership base that is dispersed across the country. *Id.* That is precisely the case here—there are hundreds of ongoing wind-development projects across the country that are each affected by DoD's freeze. The "workable solution" for affording them complete relief is to stay DoD's freeze nationwide, which will then simply require DoD to conduct its review for all wind-energy projects in accordance with law.

### CONCLUSION

The Court should grant Plaintiffs' motion and stay or preliminarily enjoin DoD from continuing to apply its unlawful review freeze and related policies and practices. To ensure DoD is resuming its ordinary (and required) review process, the Court should order DoD to provide status reports every 30 days summarizing each of the actions it has taken to review wind energy projects, including the steps taken to address: (1) projects with a mitigation agreement executed by the developer that are awaiting countersignature by DoD; (2) projects that have completed the MRT process but have not yet received a draft mitigation agreement from DoD; (3) projects that were in the middle of the MRT process; (4) projects that have received an NPR and are awaiting initial MRT meetings; and (5) projects that are awaiting completion of a preliminary review and issuance of an NPR determination or non-objection transmittals to the FAA.[6]

---

[6] Plaintiffs believe the ordinary schedule for briefing motions under LR 7 is appropriate here but respectfully request that a hearing be scheduled as soon as practicable after briefing concludes.

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

Dated:  June 11, 2026

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**


_s/       Michael Giaquinto_
Michael Giaquinto, OSB#: 246342
MORGAN, LEWIS & BOCKIUS LLP
300 South Grand Ave., 22nd Floor
Los Angeles, CA 90071-3132
T: 213-612-7227
michael.giaquinto@morganlewis.com

Jennifer Trock (pro hac vice to be filed)
Douglas Hastings (pro hac vice to be filed)
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000
jennifer.trock@morganlewis.com
douglas.hastings@morganlewis.com

Ella Foley Gannon (pro hac vice to be filed)
600 Montgomery Street
Suite 2300
T: 415-442-1000
San Francisco, CA 94111-2725
ella.gannon@morganlewis.com

_Attorneys for Plaintiffs_

38

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

## <u>LOCAL RULE 7-2 (b) CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,955 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, table of abbreviations, signature block, exhibits, and any certificates of counsel.

39

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

## CERTIFICATE OF SERVICE

The undersigned certifies that, on June 11, 2026, a copy of the foregoing was caused to be served upon the following individuals via first-class mail:

Peter B. Hegseth
Secretary of Defense
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

Dale R. Marks
Assistant Secretary of Defense for Energy, Installations, and Environment
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

Department of Defense Military Aviation and Installation Assurance Siting Clearinghouse
3400 Defense Pentagon, Room 5C646
Washington, DC 20301-3400

Scott E. Bradford
U.S. Attorney for the District of Oregon
Attn: Civil Process Clerk
1000 SW Third Avenue, Suite 600
Portland, OR 97204

Todd Blanche
U.S. Attorney General (Acting)
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

_s/ Michael B. Giaquinto_

Michael B. Giaquinto

40

**PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**