Jaimini Parekh
Oregon Bar No. 226337
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Phone: (206) 701-7613
Email: jparekh@earthjustice.org

*Counsel for Sierra Club*

Jolie McLaughlin
(*pro hac vice forthcoming*)
Natural Resources Defense Council
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
Phone: (312) 847-6826
Email: jmclaughlin@nrdc.org

*Counsel for Citizens Campaign for
the Environment et al.*

[Additional counsel listed below]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST; ADVANCED POWER ALLIANCE; ALLIANCE FOR CLEAN ENERGY NEW YORK, INC.; CLEAN GRID ALLIANCE; GREEN ENERGY CONSUMERS ALLIANCE; INTERWEST ENERGY ALLIANCE; MAINE RENEWABLE ENERGY ASSOCIATION; RENEW NORTHEAST; and SOUTHERN RENEWABLE ENERGY ASSOCIATION, | Case No. 3:26-cv-01092 |
| *Plaintiffs*, | |
| v. | **ENVIRONMENTAL ORGANIZATIONS' AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION** |
| PETER B. HEGSETH, in his official capacity as Secretary of Defense; DALE R. MARKS, in his official capacity as Assistant Secretary of Defense | |

for Energy, Installations, and Environment; U.S.
DEPARTMENT OF DEFENSE; and
DEPARTMENT OF DEFENSE MILITARY
AVIATION AND INSTALLATION
ASSURANCE SITING CLEARINGHOUSE,

*Defendants.*

**TABLE OF CONTENTS**

RULE 7.1 CORPORATE DISCLOSURE STATEMENT ........................................................... iv

INTRODUCTION AND INTERESTS OF *AMICI* ......................................................... 1

I.      THE DEPARTMENT'S DE FACTO BAN HAS ENORMOUS
        ENVIRONMENTAL, PUBLIC HEALTH, AND ECONOMIC CONSEQUENCES ....... 2

        A.    Wind energy is critical to meeting U.S. energy needs ............................................ 2

        B.    Wind power has enormous environmental and public health benefits ................... 4

        C.    The Department's review freeze operates as a de facto ban, with severe
              consequences for Americans ..................................................................... 6

II.     THE DEPARTMENT'S DE FACTO BAN IS UNLAWFUL ......................................... 9

        A.    The Department's de facto ban directly contravenes its statutory obligation
              to provide timely review of projects ......................................................... 9

        B.    The Department's stated reasons for freezing review of new wind energy
              projects are pretextual, in violation of the APA ................................................... 12

CONCLUSION ........................................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Blue Mountains Biodiversity Project v. Jeffries*,
　99 F.4th 438 (9th Cir. 2024) ........................................................................................ 17

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
　401 U.S. 402 (1971) ...................................................................................................... 17

*Dept. of Com. v. New York*,
　588 U.S. 752 (2019) .......................................................................................... 13, 15, 17

*Dorcas Int'l Inst. of R.I. v. USCIS*,
　No. 26-CV-132-JJM-PAS, 2026 WL 1622708 (D.R.I. June 5, 2026) ............................ 11

*FCC v. Prometheus Radio Project*,
　592 U.S. 414 (2021) ...................................................................................................... 13

*Illinois v. Trump*,
　155 F.4th 929 (7th Cir. 2025) ....................................................................................... 10

*Nat'l TPS All. v. Noem*,
　150 F.4th 1000 (9th Cir. 2025) ..................................................................................... 12

*Nat'l TPS All. v. Noem*,
　166 F.4th 739 (9th Cir. 2026) ................................................................................. 13, 17

*New York v. Trump*,
　811 F. Supp. 3d 215 (D. Mass. 2025) ............................................................................. 9

*Or. Env't Council v. IRS*,
　--- F. Supp. 3d ---, No. 25-cv-4400, 2026 WL 1631612 (D.D.C. June 6, 2026) ............... 7

*R.I. State Council of Churches v. Rollins*,
　808 F. Supp. 3d 370 (D.R.I. 2025) ............................................................................... 13

*United States v. Chem. Found.*,
　272 U.S. 1 (1926) .......................................................................................................... 17

## Statutes

10 U.S.C. § 183a ............................................................................................................... 9

10 U.S.C. § 183a(c) ....................................................................................................... 7, 10

10 U.S.C. § 183a(e) ..................................................................................................... 11, 12

10 U.S.C. § 183a(h)(11).................................................................................................. 11, 12

49 U.S.C. § 44718 ..................................................................................................... 6, 7, 9, 10

5 U.S.C. § 706(2) ................................................................................................................. 9

Pub. L. No. 111-383, § 358 (2011) ...................................................................................... 11

## Regulations

89 Fed. Reg 38950 (Apr. 8, 2024) ........................................................................................ 5

14 C.F.R. § 77.13 ................................................................................................................. 6

14 C.F.R. § 77.5 ................................................................................................................... 6

14 C.F.R. § 77.9 ................................................................................................................... 6

## Presidential Actions

E.O. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025)................................................................... 16

E.O. 14315, 90 Fed. Reg. 30821 (July 7, 2025) ................................................................. 14

## RULE 7.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel of record for *Amici Curiae* Citizens Campaign for the Environment, Clean Air Task Force, Conservation Law Foundation, Environmental Defense Fund, Environmental Protection Information Center, Natural Resources Defense Council, New York League of Conservation Voters, and Sierra Club certify that none of the *Amici* (all private, not-for-profit, non-governmental organizations) has a corporate parent, subsidiary, or affiliate, and that none issues stock to the public.

## INTRODUCTION AND INTERESTS OF *AMICI*[1]

Over one hundred utility-scale wind energy projects are currently under development to meet America's energy needs with clean and affordable power. Yet the Department of Defense has stopped reviewing these projects for impacts on military operations, preventing them from obtaining federal clearance to proceed. The Department has therefore enacted a de facto ban on new wind energy—despite having no legal authority to do so.

What is more, the evidence shows that the Department's stated justifications for freezing its review are not genuine. While the Administration has moved swiftly to accelerate energy production from fossil fuels, President Trump has repeatedly stated that he does not intend to allow any new wind turbines to be built. Those statements have coincided with a series of federal actions aimed at blocking new wind development, including orders instructing wind developers to stop work, presidential directives prohibiting agencies from issuing permits for wind projects, and payouts for energy companies to abandon wind projects altogether.

*Amici* are regional and national nonprofit organizations dedicated to safeguarding the environment and communities from pollution, including through an affordable clean energy transition. *Amici* submit this brief in support of Plaintiffs' request for preliminary relief because of the enormous public interests at stake. If the Department does not resume its reviews promptly, more than 30,000 megawatts of low-cost, clean-energy capacity will be jeopardized. Americans' utility bills will get more expensive. Increased air pollution will make people sicker. And communities will be exposed to more harms from extreme weather driven by climate change. The resulting emissions alone would impose billions of dollars in economic and

---

[1] *Amici* affirm that no counsel for a party authored this brief in whole or in part, and no person other than *Amici* or their counsel made any monetary contributions intended to fund the preparation or submission of the brief. *Cf.* Fed. R. App. P. 29(a)(4)(E).

ENVIRONMENTAL ORGANIZATIONS' AMICUS BRIEF IN SUPPORT OF PLAINTIFFS'    1
MOTION FOR STAY OR PRELIMINARY INJUNCTION

healthcare costs on society in the next several years. The Court should stop the significant, irreparable harm the Department's action is causing Plaintiffs, the environment, and the public who rely on and benefit from wind power.

I.   THE DEPARTMENT'S DE FACTO BAN HAS ENORMOUS ENVIRONMENTAL, PUBLIC HEALTH, AND ECONOMIC CONSEQUENCES

A.   Wind energy is critical to meeting U.S. energy needs

Wind power accounts for 10% of the nation's total electricity generation, with many states relying more heavily on it.[2] In Iowa, Kansas, and South Dakota, wind comprises more than half the current electricity mix,[3] while six other states generate more than 25% of their in-state electricity from wind.[4] In 2024, Texas generated enough wind energy to power all of New England.[5] Planned wind projects are expected to supply 14% of new generating capacity in 2026, with New Mexico, Texas, Illinois, and Wyoming providing almost 60% of that growth.[6]

As U.S. wind power capacity has expanded, costs have dramatically decreased. The vast majority of new onshore wind plants now offer cheaper power than fossil fuel sources.[7] The expansion of wind power has also created significant employment opportunities. In 2022, the

---

[2] Ember, *US Electricity 2025 Special Report* 12, 18-19 (Mar. 12, 2025), https://perma.cc/XR6P-SQVS.

[3] Climate Central, *State Share of Electricity from Solar and Wind in 2024* (Mar. 12, 2025), https://www.climatecentral.org/graphic/solar-and-wind-2025?graphicSet=State+Share+of+Electricity+from+Solar+and+Wind+in+2024&location=IA&lang=en (select state from location menu).

[4] Climate Central, *A Decade of Growth for U.S. Solar and Wind* (Mar. 12, 2025), https://perma.cc/2YJD-SSGM (compiling U.S. Energy Information Administration data).

[5] *Compare* Climate Central, *supra* note 3 (Texas generated over 124,000 gigawatt-hours from wind), *with* ISO New England, *New England's Electricity Use*, https://perma.cc/9PDQ-DQ6S (New England used about 117,000 gigawatt-hours).

[6] U.S. Energy Info. Admin. (EIA), *New U.S. Electric Generating Capacity Expected to Reach a Record High in 2026* (Feb. 20, 2026), https://perma.cc/W7F5-VSUH.

[7] *See* Int'l Energy Agency, *Renewables 2023: Analysis and Forecast to 2028*, at 9 (rev. Jan. 2024), https://perma.cc/FU75-K3AJ (estimating that 96% of newly installed, utility-scale onshore wind capacity had lower generation costs than new coal and natural gas plants).

ENVIRONMENTAL ORGANIZATIONS' AMICUS BRIEF IN SUPPORT OF PLAINTIFFS'       2
MOTION FOR STAY OR PRELIMINARY INJUNCTION

wind energy sector employed around 125,500 people,[8] and could support up to 600,000 jobs by 2050.[9]

Wind is a highly reliable energy source. Fossil-fuel-fired power plants can shut down abruptly, which requires operators to maintain large quantities of expensive reserves. Although wind energy is weather dependent, wind changes are often more predictable and gradual, allowing wind plants to use reserves that are slower-acting and less costly.[10] When wind turbines are spread across large areas or paired with storage, their combined output becomes more constant.[11] Wind energy can also deliver more reliable electricity to Americans during extreme weather events—which are likely to increase in frequency and severity due to climate change[12]—when fossil fuel sources experience more outages. For example, during a June 2023 record heatwave in Texas, wind and solar provided an average of 30% of the state's electric grid needs during peak demand hours, keeping electricity prices relatively low despite outages of gas and coal plants.[13] And wind energy has proven crucial to reliability during winter storms.[14] Producing more affordable energy from wind will also be critical to meet rising electricity demand, due to natural gas plants' rising costs and manufacturing bottlenecks.[15]

---

[8] E2, *Clean Jobs America 2023*, at 9 (2023), https://perma.cc/P376-MFD4.

[9] U.S. Dep't of Energy, *Wind Vision: A New Era for Wind Power in the United States* 139 (Apr. 2015), https://perma.cc/D55X-TDLB.

[10] Am. Clean Power, *Wind Power Facts*, https://perma.cc/7CTB-RUAN (last visited June 16, 2026).

[11] *Id.*; EIA, *Electricity Explained, Energy Storage for Electricity Generation*, https://perma.cc/F2T7-FAF9 (last visited June 16, 2026).

[12] NASA, *Extreme Weather and Climate Change*, https://perma.cc/5CPX-Z73X (last updated Oct. 23, 2024).

[13] Am. Clean Power, *Clean Energy Keeps Texas Grid Resilient During Heatwave* (July 2023), https://perma.cc/CCD4-JN5M.

[14] *See, e.g.*, FERC et al., *Inquiry into Bulk-Power System Operations During December 2022 Winter Storm Elliott* 17 (Oct. 2023), https://tinyurl.com/2rrx7kvj (showing percentage of unplanned natural gas outages were twice as high as wind); Niskanen Center, *Winter Storm Fern Shows the Value of Transmission and Diverse Generation* 1-4 (Mar. 25, 2026), https://perma.cc/7E6H-HCEU.

[15] *See* Wood Mackenzie, *News Release: Gas Turbine Prices Soar 195% as Market Faces Supply-Demand Crisis* (Apr. 1, 2026), https://perma.cc/E7SH-HLRX.

ENVIRONMENTAL ORGANIZATIONS' AMICUS BRIEF IN SUPPORT OF PLAINTIFFS'     3
MOTION FOR STAY OR PRELIMINARY INJUNCTION

### B.    Wind power has enormous environmental and public health benefits

Wind energy offers enormous health, environmental, and climate benefits by reducing the need for high-polluting, fossil-fuel-fired facilities.

The substantial health harms of fossil fuel energy are well documented. Extracting and burning fossil fuels produces harmful air pollutants, including sulfur dioxide, nitrogen oxides, particulate matter, carbon monoxide, and mercury.[16] Fine particulate matter pollution from burning fossil fuels causes an estimated 350,000 premature deaths in the United States every year.[17] Emissions of sulfur dioxide and nitrogen oxides are precursors to secondary pollutants like ground-level ozone and fine particulate matter that can cause respiratory airway inflammation, exacerbate asthma, and reduce lung function.[18] These health harms fall predominantly on low-income communities and communities of color, which commonly neighbor fossil fuel facilities[19] and are disproportionately susceptible to harms from pollution because of cumulative environmental and social burdens.[20]

Meeting electricity demand with wind energy significantly reduces those health harms. For example, one peer-reviewed study documented that, in 2022, wind and solar generation led to 1,200 to 1,600 fewer premature deaths nationwide.[21] Another study found that between 2011

---

[16] Savannah Bertrand, *Fact Sheet: Climate, Environmental, and Health Impacts of Fossil Fuels*, Env't & Energy Study Inst. (Dec. 17, 2021), https://perma.cc/6MFM-4Q7B.

[17] Anna Miller, *Fossil Fuel Air Pollution Responsible for 1 in 5 Deaths Worldwide*, Harvard T.H. Chan School of Pub. Health (Feb. 9, 2021), https://perma.cc/ARH6-SBVE.

[18] U.S. EPA, *Sulfur Dioxide Basics*, https://perma.cc/22RS-ZVHP; U.S. EPA, *Basic Information about $NO_2$*, https://perma.cc/3JGT-ZDET.

[19] *E.g.*, Paul Mohai et al., *Racial and Socioeconomic Disparities in Residential Proximity to Polluting Industrial Facilities*, 99 Am. J. Pub. Health S649, S654 (2009), https://tinyurl.com/4tc32a2f.

[20] *See, e.g.*, Kevin P. Josey et al., *Air Pollution and Mortality at the Intersection of Race and Social Class*, 388 N. Engl. J. Med. 1396, 1396, 1401 (2023), https://tinyurl.com/2eaevfjh.

[21] Dev Millstein et al., *Climate and Air Quality Benefits of Wind and Solar Generation in the United States from 2019 to 2022*, 1 Cell Reps. Sustainability 100105, at 1, 6 (2024), https://tinyurl.com/y6pn754r.

ENVIRONMENTAL ORGANIZATIONS' AMICUS BRIEF IN SUPPORT OF PLAINTIFFS'    4
MOTION FOR STAY OR PRELIMINARY INJUNCTION

and 2017—at generation levels far below current totals—U.S. wind power created $2 billion in health benefits from improved air quality and avoided 231 premature deaths.[22]

Wind energy also avoids the extensive environmental destruction caused by fossil fuel extraction and production. Fossil fuel extraction destroys and fragments wildlife habitat; causes air, water, and other pollution impacts; and spreads invasive species.[23] Mountaintop mining for coal, for instance, degrades water quality and releases pollutants with toxic effects on birds, fish, and aquatic organisms, causing steep declines in biodiversity and destroying stream ecosystems.[24] Fossil-fuel-fired power plants are the largest industrial source of toxic water pollution in the nation.[25] Wastewater from fossil fuel plants impacts water quality in receiving waters, harms wildlife in the surrounding environments, and poses human health threats to nearby communities.[26] Coal combustion also produces coal ash—a waste product that contains toxic metals[27]—which is stored in landfills and surface impoundments where toxins can contaminate groundwater[28] or spill into nearby streams and rivers.[29]

---

[22] Minghao Qiu et al., *Impacts of Wind Power on Air Quality, Premature Mortality, and Exposure Disparities in the United States*, 8 Science Advances 48 (2022), https://tinyurl.com/mvsefebm.

[23] Shaye Wolf et al., *Scientists' Warning on Fossil Fuels*, 5 Oxford Open Climate Change (2025), https://tinyurl.com/4jcdfnye.

[24] *See* U.S. EPA, *The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields* (Mar. 2011), https://perma.cc/83P9-WX66; Marie Simonin et al., *Consistent Declines in Aquatic Biodiversity Across Diverse Domains of Life in Rivers Impacted by Surface Coal Mining*, 31 Ecological Applications (June 17, 2021), https://tinyurl.com/4ncve4jm.

[25] U.S. EPA, *Environmental Assessment for the Proposed Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category* 3-14 (Apr. 2013), https://downloads.regulations.gov/EPA-HQ-OLEM-2019-0173-0197/attachment_9.pdf.

[26] *Id.* at 1-1; U.S. EPA, *Environmental Assessment for Final Supplemental Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category* 2, 5 (Apr. 2024), https://perma.cc/XC79-8XPF; *see also* Nat'l Wildlife Fed., *Protecting Wildlife From Toxic Discharges* (Jan. 6, 2016), https://perma.cc/22RT-TNZ9.

[27] Michael Hendryx et al., *Impacts of Coal Use on Health*, 41 Ann. Rev. of Pub. Health 397, 404 (Jan. 8, 2020), https://doi.org/10.1146/annurev-publhealth-040119-094104.

[28] 89 Fed. Reg 38950, 38951 (May 8, 2024); U.S. EPA, *Frequent Questions About the 2015 Coal Ash Disposal Rule* (last updated Sept. 8, 2025), https://perma.cc/6PLC-QV4X.

[29] *See, e.g.*, U.S. EPA, *EPA Response to Kingston TVA Coal Ash Spill* (last updated May 28, 2025), https://perma.cc/L5P8-PWLK.

ENVIRONMENTAL ORGANIZATIONS' AMICUS BRIEF IN SUPPORT OF PLAINTIFFS'    5
MOTION FOR STAY OR PRELIMINARY INJUNCTION

Unlike fossil-fuel-fired generation, wind turbines generate electricity without climate-warming greenhouse gas emissions. Developing wind energy is therefore critical to combating climate change, which is driving rising temperatures, intensifying and increasing the frequency of extreme weather, including heat waves, wildfires, floods, and droughts, and accelerating sea level rise.[30] These changes threaten public health and our water sources, food systems, infrastructure, and economic systems, and pose severe risks to wildlife—disrupting migration patterns, degrading habitats, and pushing species towards extinction.[31] Given wind energy's substantial climate benefits, every credible national and international climate mitigation scenario, including those developed by the Intergovernmental Panel on Climate Change,[32] the International Energy Agency,[33] and the U.S. Department of Energy,[34] identifies wind power as essential to avoid the worst consequences of climate change.

### C.    The Department's review freeze operates as a de facto ban, with severe consequences for Americans

The Department's review freeze operates as a de facto ban on new wind development, with enormous and widespread harms to the public and the environment.

Under federal law, every utility-scale wind energy project in the United States must notify the Federal Aviation Administration (FAA) of proposed construction. *See* 49 U.S.C. § 44718(b); 14 C.F.R. §§ 77.5, 77.9, 77.13. Projects are unlikely to move forward until they have received an FAA determination of "no hazard," *see* Pls.' Prelim. Inj. Mot. 15-16, which cannot

---

[30] *See* U.S. Global Change Rsch. Program, *Fifth National Climate Assessment* 1-5 to 1-7, 1-16 (2023), https://perma.cc/J7V7-FRYB.

[31] *See id.* at 1-23 to 1-28, 1-31 to 1-33.

[32] *See* Intergovernmental Panel on Climate Change, *Climate Change 2022: Mitigation of Climate Change* 37, 57 (2022), https://perma.cc/SLM9-SPPG.

[33] Int'l Energy Agency, *Net Zero by 2050: A Roadmap for the Global Energy Sector* 3 (rev. 2021), https://perma.cc/LJJ2-7FZA.

[34] U.S. Dep't of Energy, *Wind Vision: A New Era for Wind Power in the United States* 181 (2015), https://perma.cc/5UTR-3LR3.

be issued until the FAA has received the Department's required findings regarding impacts on military operations and readiness, *see* 49 U.S.C. § 44718(b)(1)(B); 10 U.S.C. § 183a(c). The Department previously reviewed projects in a timely manner. *See* Pls.' Prelim. Inj. Mot. 6-7. Now, in a sudden reversal of past practice, the Department is refusing to conduct these reviews or transmit its findings to the FAA, suspending the entire federal clearance process. *See id.* at 7-10. The result is a blanket moratorium on new wind projects in the United States that have not yet received an FAA "no hazard" determination.

The practical effect of this de facto ban is sweeping. More than 100 planned onshore wind projects across the country, representing around 30,000 megawatts (MW) of electricity capacity, are already being impacted by this policy. *Id.* at 2; Ex. A, Declaration of Amanda Levin (Levin Decl.) ¶¶ 12, 30. Another 16,000 MW of planned onshore wind projects will likely be affected if the de facto ban remains in place. *Id.* These projects would produce an estimated 144 terawatt-hours (TWh) of electricity annually by 2031, *id.* ¶ 37 (tbl.3), which is enough electricity to power roughly 14 million homes, or 10% of U.S. households, for an entire year.[35] The Department's moratorium not only delays these projects but jeopardizes their viability and the enormous energy benefits they will produce.

If these projects are further delayed or canceled, the resulting disruption will be felt throughout the country. First, it will reduce future energy generation capacity, which will increase electricity prices. *See Or. Env't Council v. IRS*, --- F. Supp. 3d ---, No. 25-cv-4400, 2026 WL 1631612, at *12 (D.D.C. June 6, 2026) (finding evidence that IRS notice affecting ability of wind and solar projects to qualify for federal tax credits would cause project delays and

---

[35] *See* EIA, *Table 5a: 2024 Average Monthly Bill- Residential*, https://tinyurl.com/yspvk749. The average U.S. household consumes 863 kWh/month or 10,356 kWh/year, with 143,144,185 residential electricity customers (households) receiving service as of the end of 2024.

ENVIRONMENTAL ORGANIZATIONS' AMICUS BRIEF IN SUPPORT OF PLAINTIFFS'              7
MOTION FOR STAY OR PRELIMINARY INJUNCTION

cancellations, increasing electricity prices). This will exacerbate the affordability crisis that is already pushing up Americans' energy bills and driving many households deeper into debt.[36]

Second, further delay or loss of the stalled projects will increase pollution, causing significant public health and environmental harms. When grid operators dispatch electricity, renewable energy resources like wind, which has no fuel costs, are routinely used ahead of fossil-fuel sources.[37] As new renewable energy resources come online, they replace or reduce the dispatch of more expensive fossil-fuel generation.[38] The Department's de facto ban will therefore require grid operators to meet electricity demand by relying more heavily on fossil-fuel-fired sources. Even in the near term, the Department's freeze is projected to result in an additional 235,000 tons of sulfur dioxide emissions and 316,000 tons of nitrogen oxide emissions from running more fossil-fuel-fired generation. Levin Decl. ¶ 39 (tbl.4) (cumulative projections through 2031). This will result in measurable public health harms and costs, including up to 4,900 additional premature deaths and 7,500 extra emergency room visits and hospital admissions through 2031, with a total estimated public health cost of between $46-$63 billion from increased incidences of asthma, cardiovascular disease, respiratory illness, premature mortality, and other health problems. *Id.* ¶¶ 41-44, 51 (tbl.5), 53 (tbl.6).

Greenhouse gas emissions from fossil fuel plants will also increase, exacerbating climate-change harms already affecting communities and ecosystems across the country. Further delays in wind projects currently under development are expected to result in roughly 414 million

---

[36] EIA, *Table 5.3. Average Price of Electricity to Ultimate Customers: Total by End-use Section, 2016 - March 2026*, Electric Power Monthly, https://perma.cc/6ZHV-7CT8 (showing average residential electricity costs increased from 15 cents per kWh in beginning of 2024 to 18 cents in March 2026); Julie Margetta Morgan et al., *Fueling Debt: How Rising Utility Costs Are Overwhelming American Families*, The Century Foundation (Nov. 17, 2025), https://tinyurl.com/mu4nm4tc.
[37] U.S. EPA, *Power Sector Evolution* (last updated June 10, 2026), https://perma.cc/85TS-PN3Q.
[38] *Id.*

ENVIRONMENTAL ORGANIZATIONS' AMICUS BRIEF IN SUPPORT OF PLAINTIFFS'                    8
MOTION FOR STAY OR PRELIMINARY INJUNCTION

metric tons of additional carbon dioxide emissions, just through 2031, *id.* ¶ 13—roughly equivalent to the annual emissions of 96 million gas-powered cars.[39] These emissions will contribute to more severe heatwaves, wildfires, and other natural disasters caused by climate change, resulting in billions of dollars of economic damages. Levin Decl. ¶¶ 47-50.

The Department's de facto ban has myriad other environmental effects, including increased water pollution and contamination of soil and groundwater that will threaten wildlife and ecosystems. If the ban persists, these environmental harms, along with the economic and health impacts to Americans, will only intensify as more wind projects become indefinitely delayed or canceled.

## II.    THE DEPARTMENT'S DE FACTO BAN IS UNLAWFUL

### A.    The Department's de facto ban directly contravenes its statutory obligation to provide timely review of projects

Nothing in 49 U.S.C. § 44718 or 10 U.S.C. § 183a gives the Department a sweeping power to effectively ban wind energy projects. Because the Department's de facto ban exceeds its authority and is contrary to its statutory obligation to provide timely project review, it violates the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706(2)(A), (C).

Under the APA, a reviewing court must set aside an agency action that is "not in accordance with law," *id.* § 706(2)(A), or "in excess of statutory . . . authority," *id.* § 706(2)(C).[40] Whether the Department's action is contrary to law or exceeds its authority are questions of statutory interpretation. *See Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010); *Frontier*

---

[39] U.S. EPA, *Greenhouse Gas Equivalencies Calculator*, https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator#results (showing 414 million metric tons of $CO_2$ as equivalent to 96,567,678 gas-powered vehicles).

[40] *See New York v. Trump*, 811 F. Supp. 3d 215, 241 (D. Mass. 2025) (noting that there is no "practical difference" between these two provisions of the APA "in the context of an agency action allegedly contrary to statutory requirements").

ENVIRONMENTAL ORGANIZATIONS' AMICUS BRIEF IN SUPPORT OF PLAINTIFFS'                    9
MOTION FOR STAY OR PRELIMINARY INJUNCTION

*Airlines, Inc. v. Dep't of Homeland Sec.*, 173 F.4th 1158, 1165 (10th Cir. 2026). Even in national security contexts, the Department is not "entitled to deference on the meaning of a statute." *See Illinois v. Trump*, 155 F.4th 929, 938 (7th Cir. 2025) (affording no deference to President on "what constitutes a 'rebellion'" when federalizing the National Guard).

Congress gave the Department authority to object to specific projects in limited circumstances. The Department's de facto ban far exceeds that limited role. As relevant here, the Department has authority under section 44718 of title 49 to "make" a national security "finding," as "part of an aeronautical study" conducted by the FAA, to determine whether a project that may interfere with navigable airspace "would result in an unacceptable risk to the national security of the United States." 49 U.S.C. § 44718(f). This section confers no additional authority on the Department.

Section 183a of title 10 establishes the Military Aviation and Installation Assurance Siting Clearinghouse and more comprehensively describes the Department's project review process. Under this statute, once the Clearinghouse receives an application for an "energy project" from the FAA, it must conduct a preliminary review within 75 days, reaching one of two potential outcomes. 10 U.S.C. § 183a(c). The Department either (1) determines the project has no adverse impacts on military operations or readiness and conveys that finding to the FAA, or (2) determines the project will adversely impact military operations, in which case the Department issues a "notice of presumed risk" to the developer and requests "a discussion of possible mitigation actions." *Id.* The statute dictates that the Clearinghouse's preliminary review "shall" "identify any feasible and affordable" mitigation options that may allow the project "to proceed." *Id.* § 183a(c)(1)(B). From there, the statute presumes any adverse impacts can be mitigated.

The statute dictates that the Department "may not object to an energy project" under the FAA's review except when the Department "determines, *after giving full consideration to mitigation actions* identified pursuant to this section, that such project, in isolation or cumulatively with other projects, would result in an unacceptable risk to the national security of the United States." *Id.* § 183a(e)(1)(A) (emphasis added). The statute defines "unacceptable risk to the national security of the United States" to mean circumstances where the Department "can demonstrate" a project "would" endanger, impair, or interfere with certain Department activities. *See id.* § 183a(h)(11). The Department's limited authority to object to energy projects only when it "can demonstrate" that a specific project "would" impact military operations and readiness in particularized ways, *id.*, is a far cry from the Department's refusal to review all proposed wind projects based on unspecified and unsupported references to "evolving," "modern military risks," Compl. Ex. C at 1-2. *See Dorcas Int'l Inst. of R.I. v. USCIS*, No. 26-CV-132-JJM-PAS, 2026 WL 1622708, at *41 (D.R.I. June 5, 2026) (finding blanket freeze on immigrant benefit adjudications "'fundamentally inconsistent'" with underlying statute and regulations, and noting agency did not identify any law giving it authority "to indefinitely withhold adjudications of benefit requests").

Reading either statute to allow the Department to indefinitely pause review of wind projects would also contravene Congress's intent "to ensure that the robust development of renewable energy sources and the increased resiliency of the commercial electrical grid may move forward in the United States . . . ." Pub. L. No. 111-383, § 358 (2011). Congress evinced this intent by not only cabining the Department's authority to object to energy projects, but also including a 75-day deadline for the Department to complete its preliminary review. *See* 10 U.S.C. § 183a. If Congress had intended to give the Department broad discretion to freeze all

domestic wind energy "at will, it is difficult to imagine why it would have enacted [the statutes] in the form that it did." *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1022 (9th Cir. 2025). The statutes' "structural and temporal limitations protect . . . the important reliance interests" of project developers and communities anticipating new energy sources, "and the Government must adhere to these statutory constraints." *Id.* at 1021.

Finally, section 183a places the burden of identifying an unacceptable national security risk on the Department. 10 U.S.C. § 183a(h)(11). The Department has not offered any factual findings demonstrating a single project, much less the hundred-plus projects currently in limbo, "would result" in such a risk. *Id.* § 183a(e)*.* And its statutory burden here is substantive. Within 30 days of making a finding of unacceptable risk, the Department must report that finding to Congress with "an explanation of the operational impact that led to the finding, a discussion of the mitigation options considered, and an explanation of why the mitigation options were not feasible or did not resolve the conflict." *Id.* § 183a(e)(2)(A). The Department's blanket inaction and lack of specificity defy the detailed justifications the statute requires.

### B.    The Department's stated reasons for freezing review of new wind energy projects are pretextual, in violation of the APA

The Department's review freeze is not the product of reasoned decisionmaking. Instead, the agency's stated rationales—namely the need for a "comprehensive review" to address undefined "risks," Compl. Ex. C—are pretextual, offered to obscure the real, and illegitimate, objective of stopping new wind development because of President Trump's deeply rooted animus toward the industry. Although the Department's policy suffers from numerous other fatal defects, the failure to provide a genuine justification for its action alone makes the policy arbitrary and capricious under the APA.

The APA requires agency action to be "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), which includes "disclos[ing] the basis" for the action, *Dept. of Com. v. New York*, 588 U.S. 752, 780 (2019) (cleaned up). This "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions," that "can be scrutinized by courts and the interested public." *Id.* at 785. An agency subverts this requirement when its rationales are "founded on implausible and illegitimate justifications." *See Nat'l TPS All. v. Noem*, 166 F.4th 739, 771 (9th Cir. 2026) (Mendoza, J., concurring). Accordingly, courts have consistently set aside actions where evidence indicates the agency's rationale was "contrived," *New York*, 588 U.S. at 784, "pretextual," *R.I. State Council of Churches v. Rollins*, 808 F. Supp. 3d 370, 384 (D.R.I. 2025), or "a cloak for improper motive," *Nat'l TPS All.*, 166 F.4th at 771 (Mendoza, J., concurring).

Here, the evidence leaves no doubt that the Department's vague justifications for its review freeze are pretext, disguising an improper motive to stop new wind development. *See* Compl. Ex. F at 44 (transcript of preliminary injunction hearing in *Revolution Wind, LLC v. Burgum*, No. 25-cv-02999, finding that "stated national security reason" for Interior Department's offshore wind stop work orders "may have been pretextual"). President Trump has been open about his disdain for wind energy, persistently lamenting the "ugly" aesthetics of wind turbines at least since he unsuccessfully challenged an offshore wind development near his Scottish golf course more than a decade ago.[41] Since taking office, President Trump has translated his personal campaign against wind energy into an official one, repeatedly sharing his

---

[41] Kevin Keane & Aimee Stanton, *How Trump's loathing for wind turbines started with a Scottish court battle*, BBC (July 29, 2025), https://perma.cc/FP92-SGBK; The Scottish Parliament, *Official Report, Economy, Energy and Tourism Committee* 1328-29 (Apr. 25, 2012), https://tinyurl.com/m4hm3djc; Newsweek, *Trump Rants About Windmills And Solar Energy, Calls Them "Ugly"* (Aug. 27, 2025), https://www.youtube.com/shorts/erzNqFQ8CTQ.

"goal to not let any windmills be built" and proudly touting that his Administration has "not approved one windmill since I've been in office, and we're going to keep it that way."[42]

To carry out this agenda, the Administration has waged a coordinated, unrelenting campaign against wind energy. Presidential directives have ordered federal agencies to stop approving new wind energy leases or permits[43] and to "eliminate" any preferential treatment for new wind facilities.[44] Federal agencies have imposed numerous obstacles designed to delay or obstruct wind projects, including ordering wind developers to stop working on projects,[45] subjecting wind permits and consultations to additional layers of review,[46] prioritizing energy projects with higher "capacity densities" over wind and solar,[47] restricting access to federal databases,[48] and withdrawing federal funds.[49] After courts enjoined several of these unlawful actions, the Administration took the unprecedented step of using taxpayer dollars to pay several wind developers to forfeit their leases, in exchange for commitments not to develop new offshore wind projects in the country.[50] While its tactics have varied, the Administration's efforts have all

---

[42] White House, *President Trump Participates in a Meeting with Oil and Gas Executives* (Jan. 9, 2026), https://www.youtube.com/watch?v=iaE8lw8_x30 (59:54 to 1:00:52); *see also* Edith Olmsted, *Trump Goes on Bizarre Rant about Windmills Driving Whales Crazy*, The New Republic (July 28, 2025), https://perma.cc/HD8T-BBMX; Donald J. Trump (@realDonaldTrump), TruthSocial (Aug. 20, 2025, 9:51 AM), https://tinyurl.com/4xvavrsb.

[43] Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8363 (Jan. 29, 2025).

[44] Exec. Order 14315, 90 Fed. Reg. 30821, 30821 (July 7, 2025).

[45] U.S. Dep't of Interior, Director's Order (Aug. 22, 2025), https://perma.cc/Z223-CJ7K.

[46] U.S. Dep't of Interior, Memorandum, Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities (July 15, 2025), https://tinyurl.com/4vnrt32p.

[47] U.S. Dep't of Interior, Press Release, *Secretary Burgum Announces Order to Rein In Environmentally Damaging Wind and Solar Projects* (Aug. 1, 2025), https://perma.cc/7PCF-C47N; Army Corps of Eng'rs, News Release, *Army Corps of Engineers begins implementing policy to increase America's energy generation efficiency* (Sept. 22, 2025), https://tinyurl.com/f27njc3h.

[48] *See supra* note 45.

[49] Dep't of Transp., *Trump's Transportation Secretary Sean P. Duffy Terminates and Withdraws $679 Million from Doomed Offshore Wind Projects* (Aug. 29, 2025), https://perma.cc/ZDB4-EA86.

[50] U.S. Dep't of Interior, *Interior and TotalEnergies Agree to End Offshore Wind Projects, Lowering Costs for American Families* (Mar. 23, 2026), https://perma.cc/S66P-SYY8; Brad Plumer, *Trump Administration to Pay $765 Million to Cancel 4 More Wind Projects*, N.Y. Times (June 17, 2026), https://tinyurl.com/5axshr3b.

---

ENVIRONMENTAL ORGANIZATIONS' AMICUS BRIEF IN SUPPORT OF PLAINTIFFS'     14
MOTION FOR STAY OR PRELIMINARY INJUNCTION

served the President's goal to prevent the development of an energy resource he personally dislikes.

The Department's policy is no exception. It is not coincidental that after President Trump declared he will "not let any windmill be built," the Department of Defense determined that "further interagency coordination" is needed before it can process any new wind projects waiting for federal clearance, or sign finalized mitigation agreements. And it is telling that the Department did not officially recognize the review freeze until *after* wind developers had contacted the Department in March 2026 to understand the reasons for the delays. Pls.' Prelim. Mot. Br. 9-10. The timing of the Department's review freeze, augmented by the Administration's other efforts to halt wind development and the President's clear wind energy animus, intimate hidden motives. This Court is "not required to exhibit a naiveté from which ordinary citizens are free." *New York*, 588 U.S. at 785 (cleaned up).

The "mismatch" between the evidence and the Department's rationale also strongly indicates that its stated reasons are contrived. *See id*. at 784-85. For example, the Department cites "evolving risks" to military activities as the reason why comprehensive review of wind projects is needed. Compl. Ex. C at 2. Yet projects that ought to present similar purported "risks," including oil and gas infrastructure, meteorological evaluation towers, transmission lines, and other energy projects, will continue to be "promptly processed" by the Department. *Id.* Ex. A at 2. Although the Department attempts to distinguish these projects as lacking an "impactful doppler effect," *id.*, potential radar interference from wind turbines is not a new or emerging issue. The Department has successfully worked with other agencies and the wind

industry on strategies to mitigate potential risks from radar interference for 15 years.[51] A 2024 Department of Energy report concluded that these efforts, along with new technologies, have "enabled federal radar agencies to continue to perform their missions without significant impacts, and have also enabled significant wind energy deployments throughout the United States."[52] The evidence therefore fails to support the Department's claim that doppler-related risks warrant a complete freeze of the entire review process, further confirming that the Department's reasoning is pretextual.

The Department's indefinite pause is also inconsistent with the Administration's own "energy emergency" declaration and related fast-tracking of other energy projects. The President's emergency declaration directs agencies to "expedite the completion" of new energy infrastructure projects.[53] As detailed above, new wind projects provide critical sources of domestic energy. Yet far from expediting review of these projects, the Department has done the opposite. It has imposed an indefinite halt on its military readiness review for wind energy, with no timeline for resuming it. Meanwhile, the Administration has expedited approvals for new fossil-fuel development. Just this month, the Interior Secretary announced that new coal projects that previously took "years" to approve have been "approved in less than one month under the emergency procedures" implemented by the Trump Administration.[54] The Administration's ability to fast-track approvals for favored energy projects based on the emergency declaration,

---

[51] U.S. Dep't of Energy, *Mitigating Wind Turbine Radar Interference*, https://perma.cc/6J9W-CG4R (last accessed on June 17, 2026) (stating that, since 2011, DOE's Integrated Energy Systems Office has worked with federal agencies, wind industry, radar providers, and other stakeholders to develop mitigation measures to support existing radars near wind turbines and encourage development of next-generation radars resistant to wind turbine interference).

[52] U.S. Dep't of Energy, *Update on the Efforts of the Wind Turbine Radar Interference Working Group*, at ii (Feb. 2024), https://perma.cc/2C78-VL3E.

[53] Exec. Order 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025).

[54] White House, *President Trump Makes an Announcement on Beautiful, Clean Coal* (June 4, 2026), https://www.youtube.com/watch?v=eafk0lNExQE (19:58 to 20:06).

ENVIRONMENTAL ORGANIZATIONS' AMICUS BRIEF IN SUPPORT OF PLAINTIFFS'     16
MOTION FOR STAY OR PRELIMINARY INJUNCTION

while imposing an indefinite freeze on a statutorily mandated process for reviewing new wind projects, strongly suggests its asserted reasons for delay are not genuine.

Because the Court is "presented . . . with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process," *New York*, 588 U.S. at 785, the Department may not invoke the presumption of regularity to shield its ulterior motives. While agency decisions are generally afforded a presumption of regularity, *see Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 445 (9th Cir. 2024), courts may consider evidence pertinent to "the mental processes of administrative decisionmakers" where there is a "strong showing of bad faith or improper behavior," *New York*, 588 U.S. at 781 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)); *see also United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926) ("clear evidence" that an official has not "properly discharged their official duties" may rebut the usual presumption of regularity). As discussed above, there is clear evidence that the Department's representation that it is halting wind projects for national security reasons is in bad faith. The Court should not "pretend to be blind to what the American public can easily observe for themselves." *Nat'l TPS All.*, 166 F.4th at 782 (Mendoza, J., concurring).

## CONCLUSION

The Court should grant Plaintiffs' request for a stay or preliminary injunction against the Department's unlawful policy.

Dated: June 18, 2026                                  Respectfully submitted,

                                                       /s/ Jaimini Parekh
Jolie McLaughlin                                       Jaimini Parekh
(*pro hac vice forthcoming*)                           Oregon Bar No. 226337
Natural Resources Defense Council                      Earthjustice
20 North Wacker Drive, Suite 1600                      810 Third Avenue, Suite 610

Chicago, IL 60606
Phone: (312) 847-6826
Email: jmclaughlin@nrdc.org

Natasha Brunstein
(*pro hac vice forthcoming*)
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
Phone: (212) 727-2700
Email: nbrunstein@nrdc.org

Julia K. Forgie
(*pro hac vice forthcoming*)
Natural Resources Defense Council
1314 Second Street
Santa Monica, CA 90401
Phone: (301) 434-2300
Email: jforgie@nrdc.org

*Counsel for Citizens Campaign for
the Environment, Conservation
Law Foundation, Environmental
Protection Information Center,
Natural Resources Defense
Council, and New York League of
Conservation Voters*

Francis W. Sturges, Jr.
(*pro hac vice forthcoming*)
Danielle C. Fidler
(*pro hac vice forthcoming*)
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 624-0234
fsturges@catf.us
dfidler@catf.us

*Counsel for Clean Air Task Force*

Seattle, WA 98104
Phone: (206) 701-7613
Email: jparekh@earthjustice.org

Amanda Lineberry
(*pro hac vice pending*)
Earthjustice
1250 I Street NW
Washington, DC 20001
Phone: (202) 797-5257
Email: alineberry@earthjustice.org

Joshua A. Berman
(*pro hac vice forthcoming*)
Sierra Club
50 F Street NW, 8th Floor
Washington, DC 20001
Phone: (202) 650-6062
Email: josh.berman@sierraclub.org

*Counsel for Sierra Club*

Phelps Turner
(*pro hac vice forthcoming*)
Environmental Defense Fund
257 Park Avenue South
New York, NY 10010
Phone: (212) 624-8846
Email: pturner@edf.org

*Counsel for Environmental Defense
Fund*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 5,498 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/    *Jaimini Parekh*

## CERTIFICATE OF SERVICE

I, Jaimini Parekh, certify that this document was filed through the CM/ECF system on June 18, 2026, and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).

/s/    *Jaimini Parekh*