Carra Sahler, OSB 024455
sahler@lclark.edu
Green Energy Institute
Lewis & Clark Law School
10101 S Terwilliger Blvd
Portland, OR, 97219
(503) 768-6634

Michael Burger, *pro hac vice pending*
mburger@law.columbia.edu
Sabin Center for Climate Change
Columbia Law School
435 West 116th Street
New York, NY, 10027-7297
(212) 854-2372
Attorneys for *Amici Curiae*

### UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### PORTLAND DIVISION

| | |
|---|---|
| RENEWABLE NORTHWEST; ADVANCED POWER ALLIANCE; ALLIANCE FOR CLEAN ENERGY NEW YORK, INC.; CLEAN GRID ALLIANCE; GREEN ENERGY CONSUMERS ALLIANCE; INTERWEST ENERGY ALLIANCE; MAINE RENEWABLE ENERGY ASSOCIATION; RENEW NORTHEAST; and SOUTHERN RENEWABLE ENERGY ASSOCIATION, <br><br> *Plaintiffs,* <br><br> v. <br><br> PETER B. HEGSETH, et al <br><br> *Defendants.* | Case No. 3:26-cv-01092 <br><br><br> PROPOSED BRIEF OF *AMICI CURIAE* CENTER FOR RURAL AFFAIRS, RENEW MISSOURI, CURE, IOWA ENVIRONMENTAL COUNCIL, AND DAKOTA RESOURCE COUNCIL, IN SUPPORT OF THE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION |

Dated: June 18, 2026.

/s/ Carra Sahler
/s/Michael Burger
Carra Sahler
Michael Burger, *pro hac vice forthcoming*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ………………………………………………………….. iii

RULE 7.1 CORPORATE DISCLOSURE STATEMENT …….…………………………….. iv

INTERESTS OF AMICI CURIAE…………………………………………..……..…… 1

PRELIMINARY STATEMENT………………………………………………..…… 3

ARGUMENT ……………………………………………………………………… 4

I.     The DoD's Anti-Wind Freeze Adversely Impacts the Property Rights
of Rural Landowners and Communities …………………………………………… 4

II.    The DoD's Anti-Wind Freeze Has Significant Economic Implications
for Rural Landowners …………………………………………………………… 5

III.   The DoD's Anti-Wind Freeze May Harm the Character of Rural Communities…….…… 8

CONCLUSION …………………………………………………………………… 9

CERTIFICATE OF COMPLIANCE ……………………………………………………. 11

CERTIFICATE OF SERVICE …………………………………………………………... 12

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page**

*Kaiser Aetna v. United States,*
    444 U.S. 164, 176 (1979)………………………………………………………….. 4

*Loretto v. Teleprompter Manhattan Catv Corp.,*
    458 U.S. 419, 435 (1982)………………………………………………………….. 4

*Lucas v. South Carolina Coastal Council,*
    505 U.S. 1003, 1014–19 (1992)…………………………………………………… 4

*Murr v. Wisconsin,*
    582 U.S. 383, 387 (2017) …………………………………………………………. 5

*Sackett v. Environmental Protection Agency,*
    598 U.S. 651, 670 (2023) ………………………………………………………… 4

## RULE 7.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel of record for *Amici Curiae* Center for Rural Affairs,  Renew Missouri, CURE, Iowa Environmental Council and Dakota Resource Council certify that none of the *Amici* (all private, not-for-profit, non-governmental organizations) has a corporate parent, subsidiary, or affiliate, and that none issues stock to the public.

**INTERESTS OF AMICI CURIAE**

Amici are regional and national nonprofit organizations who have an interest in protecting property rights, economic liberty, and the ability of private landowners to make productive and efficient use of their land, and who are dedicated to advancing clean energy development in rural communities. Amici and their members are directly and adversely affected when federal policies and actions restrict lawful, voluntary land uses and impede the deployment of renewable energy infrastructure, including wind energy facilities.

The Center for Rural Affairs is a nonprofit organization that works to support rural communities in Nebraska, Iowa, Minnesota, and South Dakota. The Center for Rural Affairs' mission is to cultivate strong communities rooted in social and economic justice, environmental stewardship, and opportunity for all.

Renew Missouri is a nonprofit organization committed to clean energy advocacy throughout the state of Missouri. Renew Missouri works directly with rural landowners and community leaders to educate on the benefits of clean energy and advance the deployment of renewables in rural communities. Renew Missouri also works with rural electric cooperative member-owners to help transform their utilities into a force for economic development.

Clean Up the River Environment (CURE) is a nonprofit organization dedicated to improving the well-being of rural communities, the quality of air, land, and water, as well as the climate for future generations. CURE protects and restores resilient communities and landscapes by harnessing the power of people who care about them. In Minnesota and neighboring states, CURE works in energy with a focus on rural energy democracy. CURE's members are largely rural residents and member-owners of rural electric cooperatives that support clean energy development in their communities and on their land.

The Iowa Environmental Council (IEC) is an alliance of nearly 100 organizations, over 500 individual members, and an at-large board of farmers, business owners, and conservationists. IEC works to build a safe, healthy environment and sustainable future for Iowa. Our members care about air and water quality across the state, and they hike, recreate, and enjoy the outdoors in Iowa and beyond. IEC's work focuses on clean water, clean air, conservation, and clean energy, including the promotion of policies, programs, and actions that result in the development of clean energy and clean energy jobs.

The Dakota Resource Council (DRC) is a nonprofit organization that works to promote sustainable use of North Dakota's natural resources and family-owned and operated agriculture by building member-led local groups that empower people to influence the decision-making processes that affect their lives and communities. DRC organizes farmers, ranchers, landowners, and community members to advance renewable energy, defend family farms and ranches, and promote community-led solutions to environmental and economic challenges.

Amici have a strong interest in rural land development because responsible land use decisions shape economic sustainability, community stability, environmental stewardship, and generational continuity.

Amici submit this brief to assist the Court by explaining how federal restrictions on wind energy development affect private landowners and rural communities by constraining land use choices, eliminating income opportunities, and harming rural character. The implications of the federal actions at issue in this litigation extend beyond the immediate parties and bear directly on

Proposed Brief of Amici Curiae                2

rural landowners' ability to use their land profitably and in their own best interests.[1] Amici have an interest in this case, as the wind projects involved span across states amici advocate in.

## PRELIMINARY STATEMENT

Plaintiffs challenge the Department of Defense's ("DoD") categorical and deliberate failure to fulfill its statutorily mandated duty to assess the impacts of proposed commercial wind energy projects on military readiness (the "Anti-Wind Freeze"). Plaintiffs correctly contend that the DoD's refusal to perform this duty constitutes an "arbitrary and capricious" action in violation of the Administrative Procedure Act, 5 U.S.C. §§ 500–596, 701–706; contravenes the statute governing DoD's review of wind energy projects, 10 U.S.C. § 183a; and violates DoD's own implementing regulations, 32 C.F.R. § 211.6. Beyond its legal deficiencies, the DoD's Anti-Wind Freeze directly burdens private property —and rural landowners and communities, in particular —by effectively preventing the development of wind energy facilities on private land, limiting lawful land use choices, foreclosing significant economic opportunities for landowners and local governments, and constraining rural development. Plaintiffs' Br. at 36.

Wind energy projects located on private lands, like many other energy developments, are often subject to federal review requirements. *See* 10 U.S.C. § 183(a); *See also* 32 C.F.R. § 211.6. Here, the DoD's Anti-Wind Freeze categorically and unjustifiably disadvantages rural wind facilities. Though FAA evaluation and DoD Clearinghouse review apply to a wide range of energy projects, the DoD has suspended only its review of wind energy projects. As a result, the

---

[1] Amici affirm that no counsel for a party authored this brief in whole or in part, and no person other than Amici or their counsel made any monetary contributions intended to fund the preparation or submission of the brief. Fed. R. App. P. §29(a)(4)(E).

Proposed Brief of Amici Curiae                    3

DoD has failed to issue Determinations of No Hazard ("DNHs") and enter into mitigation agreements, both of which often function as de facto prerequisites to project development.

Moreover, the Anti-Wind Freeze places a broad, federal limit on the development of wind energy facilities on private land and thereby limits rural landowners' voluntary and economically beneficial uses of their property. This unnecessary and arbitrary restraint on land-use autonomy, in turn, adversely impacts the economies and character of rural communities. Amici respectfully urge the Court to consider these concerns when evaluating the merits of the Complaint, the harms caused by the Anti-Wind freeze challenged by the plaintiffs, and the public interest in enjoining them.

## ARGUMENT

I.    **The DoD's Anti-Wind Freeze Adversely Impacts the Property Rights of Rural Landowners**

Private property ownership has long been understood to encompass a suite of rights, including the authority to engage in lawful uses of land, to exclude others, and to derive economic benefit from one's property. See *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014–19 (1992); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982); *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979). Where federal actions functionally prohibit lawful uses of land, thus narrowing the traditional bundle of property rights and limiting contractual freedom, courts should carefully scrutinize such restrictions to ensure they have a rational basis, are not arbitrary and capricious, and conform to the protections afforded by required administrative procedures.

In *Sackett v. Environmental Protection Agency*, a majority of the United States Supreme Court, concerned about the "staggering array of landowners" at risk of the Army Corps' and

Proposed Brief of Amici Curiae                4

EPA's regulatory reach over wetlands, asked, "What are landowners to do if they want to build on their property?" 598 U.S. 651, 670 (2023). The same question pertains here. The Anti-Wind Freeze has effectively destroyed rural landowners' ability to lease their private property for wind energy development. Rural landowners thus have been and are unable to derive the consistent economic benefits of participating as lessors to wind energy development projects because such projects are being delayed and/or terminated due to the DoD's failure to carry out its statutorily mandated duty to review them. Plaintiffs' Br. at 36.

In *Murr v. Wisconsin*, the U.S. Supreme Court affirmed that the government does not hold "unfettered authority to shape and define property rights and reasonable investment-backed expectations, leaving landowners without recourse against unreasonable regulations." 582 U.S. 383, 396 (2017) (internal quotation marks omitted). Here, the DoD's arbitrary Anti-Wind Freeze is a paradigmatic example of such "unfettered authority," resulting in financial instability for rural landowners and their families, an inability to preserve the desired use of their property for future generations, and downstream effects on their communities. And, as plaintiffs persuasively demonstrate in their brief, it does so without adequate procedures or a fulsome, rational explanation. Plaintiffs Br. at 16-20.

## II.    The Anti-Wind Freeze Has Significant Economic Implications for Rural Landowners and Communities

Federal agencies may, of course, regulate land use in pursuit of legitimate legislative objectives. However, agency actions that broadly eliminate lawful income opportunities for property owners raise, at a minimum, questions of fairness that demand conformance with substantive and procedural requirements imposed by federal law. Here, the Anti-Wind Freeze imposes additional barriers and financial risks on wind energy development that substantially

Proposed Brief of Amici Curiae                5

disincentivize and hinder the financing, siting, permitting, and construction of new facilities. As noted by plaintiffs, Charles River Associates estimate that the Anti-Wind Freeze has already resulted in the delay of approximately 29.6 GW of land-based wind capacity. Strunk Decl. ¶¶ 26 & Table 1. These delays have resulted in approximately $2.0 billion in economic harm in the form of carrying costs, higher financing costs, and delayed or lost project revenues. Strunk Decl. ¶¶ 40–42 & Tables 2–3. These delays are estimated to result in over $5.0 billion in economic harm during a one-year inaction period. *Id.*

Given that large-scale wind is frequently sited in rural areas with abundant land resources, this barrier imposes very real repercussions on rural landowners — who are precluded from benefiting from significant and sustainable economic opportunities, including land lease payments and indirect benefits from increased state and local tax revenue. These estimated 106 projects span across 21 different states, impacting communities and landowners across the nation. Strunk Decl. ¶16 & Table 1.

Many rural property owners rely on voluntary lease agreements with wind energy developers to generate necessary supplemental income, given the volatile and often decreasing profitability of the farming business due to excessive operational costs, low commodity prices, and market instability. Across the nation, private landowners receive approximately $3 billion annually in land lease payments for the development of wind, solar, and battery energy storage facilities.[2] And according to the latest Department of Energy Report, in 2022, wind energy projects alone provided an estimated $935 million in land lease payments to rural landowners.[3]

---

[2] The estimate of $3 billion represents the U.S. total annual land lease payments paid by developers of wind, solar and battery storage facilities through the third fiscal quarter of 2025. *See* Clean Power State by State, The American Clean Power Association, https://cleanpower.org/facts/state-fact-sheets/ (last visited June 12, 2026).

[3] Local Economics, United States Department of Energy, https://www.energy.gov/cmei/systems/windexchange/local-economics (last visited June 15, 2026).

The revenues from wind farm leasing provide financial stability and diversify household income during times of economic uncertainty. This supplemental income allows farming families to maintain their property, avoid relocation, secure generational ownership of the land, honor the agricultural legacy of their land, and plan for retirement with greater confidence.

These projects also provide consistent income for rural businesses that provide services associated with wind development. For example, rural construction workers are employed in both the installation and decommissioning processes, and rural businesses service wind farms during the years they are in operation. These projects are associated with 29,127 direct construction jobs. Strunk Decl. ¶18. Denying rural landowners and workers access to these lease payments and employment opportunities may force many to delay necessary investments, scale back production, or forego conservation initiatives that provide long-term benefits to both their land and surrounding communities.

These individual financial losses also ripple outward, affecting the broader economic health of rural communities. According to the American Clean Power Association, on average, state and local governments receive approximately $2.8 billion annually in tax revenue from renewable energy development.[4] In 2022 alone, the wind industry paid an estimated $1 billion in state and local taxes, making up one-third of this estimate.[5] The increased tax revenue provides funding to finance critical municipal services, including investing in the public school, transportation and health sectors in rural communities. In addition, wind development may spur indirect economic activity, allowing landowners to spend more on local goods and services.

---

[4] The estimate of $2.8 billion represents the U.S. total annual paid by developers in property, state and local taxes through the third fiscal quarter of 2025. *See* Clean Power State by State, The American Clean Power Association, https://cleanpower.org/facts/state-fact-sheets/ (last visited June 12, 2026).

[5] Local Economics, United States Department of Energy, https://www.energy.gov/cmei/systems/windexchange/local-economics (last visited June 15, 2026).

Proposed Brief of Amici Curiae                    7

When federal restrictions impede wind development, this broader economic activity will be curtailed, reducing business revenues and diminishing the benefits to the community.

In short, the challenged Anti-Wind Freeze not only deprives rural landowners of lawfully earned, supplemental income but also imposes new costs and weakens the overall economic resilience of the communities in which wind energy generation facilities would otherwise be sited.

**III.    The Anti-Wind Freeze May Harm the Character of Rural Communities**

Rural landowners, in choosing how to use their land, have traditionally played a pivotal role in shaping the character of their communities. Here, the Anti-Wind Freeze unjustifiably restricts and disincentivizes lawful income-generating wind land uses.

In creating impediments to development, the Anti-Wind Freeze perpetuates the misconception that wind development is incompatible with rural character. This is untrue. Supplemental income from lawful wind development often enables farming families to retain property during periods of economic hardship, retirement, or other life transitions — thus allowing families to keep their land within the household across generations. Moreover, wind development actually preserves the agrarian character of rural communities for the next generation of farmers.[6] Many wind facilities are fully compatible with continued agricultural use, which reinforces the economic benefits without disrupting historical land practices.

---

[6] *See* Karen Maguire, Sophia Tanner & Justin B. Winikoff, *Agricultural Land Near Solar and Wind Projects Usually Remained in Agriculture After Development*, U.S. Dep't of Agric., Econ. Rsch. Serv. (Sept. 12, 2024), https://www.ers.usda.gov/amber-waves/2024/september/agricultural-land-near-solar-and-wind-projects-usually-remained-in-agriculture-after-development.

Proposed Brief of Amici Curiae                    8

Wind turbines generally occupy a limited physical footprint, allowing crops, grazing, and normal farm operations to continue beneath and around them.[7] These dual-use practices allow for continued agricultural production or land regeneration during the operational life of the renewable installations. At the end of their operational life, wind facilities can be removed, with land restored to its prior condition. This reversibility preserves the long-term character and identity of agricultural communities.

When wind opportunities are foreclosed, however, rural landowners face increased pressure to sell portions of their land to meet financial obligations. The loss of family-held lands, in turn, has profound consequences for rural communities. Open spaces and historic homesteads that contribute to local identity may be replaced by suburban sprawl development, roads, strip malls or commercial structures incompatible with agrarian landscapes.[8] The financial pressures on rural landowners and workers induced by these arbitrary, capricious and unexplained restriction on private land use opportunities, can thereby translate into lasting economic, social, and infrastructural challenges for entire communities.

**CONCLUSION**

Amici respectfully urge the Court to consider these property rights, economic, and community character concerns when evaluating the federal Anti-Wind Freeze challenged by the plaintiffs and, for the foregoing reasons, grant the motion.

---

[7] *See generally* Iowa State Univ. Coll. of Agric. & Life Scis., *Iowa State University Research Finds Wind Farms Positively Impact Crops* (Mar. 5, 2018), https://www.cals.iastate.edu/news/2018/iowa-state-university-research-finds-wind-farms-positively-impact-crops.

[8] Between 2001 and 2016, 11 million acres of farmland and ranchland were irreversibly converted to urban and highly developed land use (4.1 million acres) or low-density residential land use (nearly 7 million acres). *Farms Under Threat: The State of the States (2020)*, American Farmland Trust, https://farmlandinfo.org/publications/farms-under-threat-the-state-of-the-states/. (last visited June 12, 2026).

Proposed Brief of Amici Curiae                    9

Dated: June 18, 2026

Respectfully submitted,

/s/ Carra Sahler
Carra Sahler
Director and Staff Attorney
Green Energy Institute
Lewis & Clark Law School
(503) 768-6634 (office)
(971) 213-9480 (cell)
sahler@lclark.edu

/s/ Michael Burger
Michael Burger*
Sabin Center for Climate Change Law,
Columbia Law School
435 West 116th Street
New York, NY 10027
(212) 854-2372
mburger@law.columbia.edu

*Counsel for amici curie Center for Rural Affairs, Renew Missouri, CURE, Iowa Environmental Council, and Dakota Resource Council*

*Admission pro hac vice forthcoming*

Proposed Brief of Amici Curiae                    10

## CERTIFICATE OF COMPLIANCE

*Amici* certify that they have both used the Federal Rules of Appellate Procedure (Fed. R. App. P. 29(a)(5) and 32 (a)(7)(B)) and Local Rule 7-2(b) for reference and have, accordingly, limited their brief to no more than 35 pages and fewer than 11,000 words.

Dated: June 18, 2026

/s/ Michael Burger
MICHAEL BURGER

Proposed Brief of Amici Curiae                11

## CERTIFICATE OF SERVICE

I, Carra Sahler, hereby certify that on this 18th day of June 2026, this *Amici Curiae* Brief was filed with the Clerk of the Court via the Court's electronic filing system, which will provide electronic mail notice to all counsel of record.

Dated: June 18, 2026

/s/ Carra Sahler
CARRA SAHLER