# Exhibit T

*To Plaintiffs' First Amended Complaint for Injunctive and Declaratory Relief*

Michael Giaquinto, OSB #246342
MORGAN LEWIS & BOCKIUS LLP
South Grand Ave., 22nd Floor
Los Angeles, CA 90071-3132
T: 213-612-7227
michael.giaquinto@morganlewis.com

Jennifer Trock (*pro hac vice to be filed*)
Douglas Hastings (*pro hac vice to be filed*)
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000
jennifer.trock@morganlewis.com
douglas.hastings@morganlewis.com

Ella Foley Gannon (*pro hac vice to be filed*)
600 Montgomery Street, Suite 2300
San Francisco, CA 94111-2725
T: 415-442-1000
ella.gannon@morganlewis.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| RENEWABLE NORTHWEST; ADVANCED POWER ALLIANCE; ALLIANCE FOR CLEAN ENERGY NEW YORK, INC.; CLEAN GRID ALLIANCE; GREEN ENERGY CONSUMERS ALLIANCE; INTERWEST ENERGY ALLIANCE; MAINE RENEWABLE ENERGY ASSOCIATION; RENEW NORTHEAST; and SOUTHERN RENEWABLE ENERGY ASSOCIATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> PETER B. HEGSETH., in his official capacity as Secretary of Defense; DALE R. MARKS, | Case No. 3:26-cv-01092-YY <br><br> **DECLARATION OF SEAN STOCKER** <br><br> Complaint Filed: May 31, 2026 |

**DECLARATION OF SEAN STOCKER**

in his official capacity as Assistant Secretary of Defense for Energy, Installations, and Environment; U.S. DEPARTMENT OF DEFENSE; and DEPARTMENT OF DEFENSE MILITARY AVIATION AND INSTALLATION ASSURANCE SITING CLEARINGHOUSE,

*Defendants*.

Pursuant to 28 U.S.C. § 1746(2), I, Sean Stocker, declare as follows:

1.      I am the Head of Development for Apex Clean Energy Holdings, LLC ("Apex"). I am over the age of 18 and competent to testify to the matters set forth in this Declaration. The facts stated herein are based on my personal knowledge and information obtained in the course of my role at Apex.

2.      I have been employed by Apex for over six years. In my role as Head of Development, I am responsible for the development of our utility-scale electric energy projects such as wind projects, including oversight and support of permitting, development, and financing activities. I have direct knowledge of Apex's participation in the permitting, development, and financing of onshore wind energy projects, including with respect to Lariat Wind, Goldrush Apple Energy, Windswept Plain Wind, Siete Wind, Homestead Wind, and Pecos Flats Wind discussed below.

3.      Apex is a developer, owner, and operator of energy projects across the United States.  Founded in 2009 and headquartered in Charlottesville, Virginia, Apex employs around 400 full-time energy professionals.  Because Apex is a private company that does not operate as a utility, meaning that Apex lacks the power of eminent domain, Apex projects are primarily on

**DECLARATION OF SEAN STOCKER**

private land where property owners have voluntarily elected to participate in the project.  Apex has completed and commercialized over 50 projects totaling over 11 gigawatts of electricity generation across the United States.  Of these, over three dozen projects have completed construction and are fully operational.  Apex has developed, constructed, and/or operates wind projects ranging from the South (Texas and Oklahoma) to the Midwest (North Dakota, Kansas, Iowa, and Illinois), to the East Coast (Virginia, North Carolina, and Maine).

4.      Apex has active membership status with the following organizations: Interwest Energy Alliance, Clean Grid Alliance, Advanced Power Alliance, and ACE New York.

5.      Apex's wind projects provide significant public benefits.  These benefits include millions of dollars in annual rental payments to farmers and property owners that host the projects, millions of dollars in local tax revenue to localities and school districts where the projects are located, improved public infrastructure such as improved public roads and drainage systems, and hundreds of well-paying jobs during construction and operations.

6.      Apex often establishes project specific entities – either alone or with other partners – for each specific project.  These entities are subsidiaries or corporate affiliates of Apex and part of its overall portfolio of projects.

7.      Apex makes long-term business decisions on project viability in reliance on a fair, consistent, and timely completion of the aeronautical study process to obtain Determinations of No Hazard ("DNHs") from the Federal Aviation Administration ("FAA"). The FAA must coordinate with the DoD, which has a Mitigation Response Team ("MRT") that reviews projects for issues concerning military readiness or national security.  This step is a core component of each project timeline, and to the FAA's ability to complete its aeronautical studies and, where warranted, issue DNHs for the project.  DNHs are required to allow the project to move forward,

**DECLARATION OF SEAN STOCKER**

including for project financing, insurance, and often for local and state permitting.  Without DNHs, Apex is unable to finance or construct these projects.

8.      Apex expends significant human and financial resources in identifying and mitigating potential aeronautical concerns for proposed energy generation sites.  Apex works with experienced third-party aeronautical technical consultants to pre-identify likely concerns, often adjusting site and turbine locations to assess and address site and project viability several months or years before formal submission to the FAA to begin the review process.  As a result, it has a reasonable understanding and expectation that once the formal review is completed, the project will receive a DNH.

9.      Between 2014 and 2025, Apex submitted over fifty projects for aeronautical review under Part 77, which involved mitigation discussions with the DoD.

10.      Since August 2025, DoD has not issued a final clearance on a mitigation agreement for an Apex project and has subsequently refused to clear projects that do not require mitigation agreements. DoD inaction has prevented the FAA from completing its aeronautical studies, and where warranted, issuing DNHs.  DoD inaction has materially disrupted project timelines and created waterfall project impacts.

11.      As a result of DoD inaction, Apex has experienced significant consequences including: over $133,000,000 in project costs incurred to date that are now at risk, risk of defaulting under commercial transactions, inability to comply with state and local permits, inability to obtain financing to construct Apex's projects, and inability to commence construction of wind energy projects.

**DECLARATION OF SEAN STOCKER**

12.     As of June 1, 2026, Apex has three land-based wind energy projects, representing approximately $38,000,000 in total investment to date, for which mitigation agreements have been executed by Apex and are awaiting countersignature by DoD.

13.     For each of these projects, following MRT review, relevant DoD components, including the Air Force and NORAD, in coordination with the Clearinghouse, have determined that, with agreed mitigation measures, the projects do not pose an unacceptable risk to national security, meaning that the project does not interfere with the efficient use of navigable airspace for DoD activities, or impair military readiness.

14.     Following conclusion of the MRT review process and negotiation of agreed-upon mitigation measures, the Clearinghouse presented mitigation agreements to Apex for signature. These agreements outline the required mitigation measures to address potential project impacts to radar systems, military readiness, or national security.  These agreements are substantially similar to mitigation agreements previously issued for comparable projects.

15.     The agreements awaiting countersignature relate to the following projects:

a.  Lariat Wind, developed by Apex through its subsidiary Lariat Project, LLC, received a draft mitigation agreement from the Clearinghouse on August 14, 2025, which Apex signed and returned for countersignature on August 15, 2025.  The mitigation measures related to possible radar interference and were routine.  The agreement has been pending for over nine months.

b.  Goldrush Apple Energy, developed by Apex through its subsidiary Goldrush Apple Energy, LLC, received a draft mitigation from the Clearinghouse on August 1, 2025, which Apex signed and returned for countersignature on August 6, 2025.  The mitigation measures related to possible radar

**DECLARATION OF SEAN STOCKER**

interference and were routine.  The agreement has been pending for over nine months.

    c.  Windswept Plain Wind, developed by Apex through its subsidiary Windswept Plain Wind, LLC, received a draft mitigation agreement from the Clearinghouse on December 15, 2025, which Apex signed and returned for countersignature on December 18, 2025.  The mitigation measures related to possible radar interference and were routine.  The agreement has been pending for over five months.

16.    Apex has taken the following steps to follow up with DoD in an attempt to obtain status and receive the countersigned agreement: multiple phone calls, emails, and requests for meetings with DoD asking for DoD's signature and/or a status update on the mitigation agreements.  Apex has also met with members of Congress and other government officials encouraging them to contact DoD on the project's behalf.

17.    As a result of DoD inaction, DoD has not transmitted its non-objection to the FAA for the above referenced projects, the FAA has not completed its aeronautical studies, and DNHs have not been issued for these projects.

18.    DoD inaction halts project progress by preventing completion of the DoD review process.

19.    In addition, DoD inaction is causing significant and ongoing harm across Apex's project portfolio.  This inaction has effectively halted progress on a substantial portion of Apex's project portfolio, creating significant uncertainty, financial exposure, and jeopardized project viability, including the project-specific impacts, below:

**DECLARATION OF SEAN STOCKER**

a. For example, to date, Apex has invested over $11 million in the Lariat Wind Project, including expenditures for land acquisition, environmental and wildlife studies, engineering and technical analysis, interconnection studies, regulatory permitting at the state, local, and federal levels, and consulting and professional services, in reasonable reliance on a timely and predictable federal permitting process.

b. Apex has executed a Purchase and Sale Agreement for the Lariat Wind Project. Under the terms of that agreement, Apex must provide DNHs for Lariat Wind as a requirement for closing the transaction. If Apex is unable to obtain DNHs and is unable to close the transaction, Apex will be prevented from receiving millions of dollars in closing payments that it would otherwise be entitled to under the Purchase and Sale Agreement.

c. The Lariat Wind Project is being purchased by a utility that plans to construct and operate the project as a replacement to one of its retiring power plants. The Lariat Wind Project has already been included in state and regional regulatory filings and included in grid reliability and supply forecasts by both transmission operators and the utility; however, the project cannot be constructed without DNHs.

d. As another example, to date, Apex has invested over $20.1 million in the Goldrush Apple Energy Project, including expenditures for land acquisition, environmental and wildlife studies, engineering and technical analysis, interconnection studies, regulatory permitting at the state, local, and federal

**DECLARATION OF SEAN STOCKER**

levels, and consulting and professional services, in reasonable reliance on a timely and predictable federal permitting process.

e.  The Goldrush Apple Energy Project is a wind project in Illinois.  Apex has constructed three wind projects in Illinois in the last three years and for each project, the hosting county in Illinois required DNHs either to obtain necessary county permits or to commence construction.  In Apex's experience, requiring DNHs is standard practice in Illinois.  Therefore, Goldrush Apple Energy will not be able to satisfy county requirements to commence construction without DNHs.

f.  Furthermore, in Apex's experience, DNHs are required by financial parties to finance the construction of a wind project.  Therefore, Apex will not be able to finance – and therefore construct – the Goldrush Apple Energy project without DNHs.

g.  Also, Goldrush Apple Energy has entered into an agreement to provide electricity with the Illinois Power Authority ("IPA").  Under the terms of the agreement with the IPA, if the Goldrush Apple Energy project is not constructed, Apex is in breach of the agreement and forfeits the $3 million financial security it provided to the IPA.

h.  As another example, Apex has invested over $6.9 million in the Windswept Plain Wind Project, including expenditures for land acquisition, environmental and wildlife studies, engineering and technical analysis, interconnection studies, regulatory permitting at the state, local, and federal

**DECLARATION OF SEAN STOCKER**

levels, and consulting and professional services, in reasonable reliance on a timely and predictable federal permitting process.

    i.   The Windswept Plain Wind Project is a wind project in Illinois. Apex has constructed three wind projects in Illinois in the last three years and for each project, the hosting county in Illinois required DNHs either to obtain necessary county permits or to commence construction. In Apex's experience, requiring DNHs is standard practice in Illinois. Therefore, Windswept Plain Wind will not be able to satisfy county requirements to commence construction without DNHs.

    j.   Furthermore, in Apex's experience, DNHs are required by financial parties to finance the construction of a wind project. Therefore, Apex will not be able to finance – and therefore construct – the Windswept Plain Wind project without DNHs.

20.    Apex has engaged in substantial outreach to DoD to determine status and request return of the countersigned agreements. Despite this outreach, DoD has not signed these mitigation agreements.

21.    As of June 1, 2026, Apex has three wind energy projects, representing over $95 million dollars in total investment, which have completed mitigation and deconfliction negotiations, have reached an informal agreement with DoD, and are waiting for the Clearinghouse to transmit a mitigation agreement for Apex's signature.

22.    For each of these projects, following MRT review, relevant DoD components, including the Air Force, and NORAD, in coordination with the Clearinghouse, have determined that, with agreed mitigation measures, the projects do not pose an unacceptable risk to national

**DECLARATION OF SEAN STOCKER**

security, meaning that the project does not interfere with the efficient use of navigable airspace for DoD activities, or impair military readiness.

23.    The mitigation agreements for these projects are expected to be consistent with standard agreements previously issued for Apex's comparable projects.  These agreements outline the required mitigation measures to address potential project impacts to radar systems, military readiness, or national security.

24.    The following projects have concluded negotiations and are awaiting mitigation agreements for signature:

a.  Siete Wind, developed by Apex through its subsidiary Siete Wind, LLC, concluded negotiations with DoD and an informal understanding was reached on December 17, 2025.  The mitigation measures related to airspace and were routine.  The project has been waiting for the agreement for signature for over five months.

b.  Homestead Wind, developed by Apex through its subsidiary Homestead Wind, LLC, concluded negotiations with DoD and an informal understanding was reached on February 3, 2026.  The mitigation measures related to possible radar interference and were routine.  The project has been waiting for the agreement for signature for over four months.

c.  Pecos Flats Wind, developed by Apex through its subsidiary Pecos Flats Wind, LLC, concluded negotiations with DoD and an informal understanding was reached on December 11, 2025.  The mitigation measures related to possible radar interference and were routine.  The project has been waiting for the agreement for signature for over five months.

**DECLARATION OF SEAN STOCKER**

25.    DoD inaction halts project progress by preventing completion of the DoD review process.

26.    In addition, DoD inaction is causing significant and ongoing harm across Apex's project portfolio.  Inaction has effectively halted progress on a substantial portion of Apex's project portfolio, creating significant uncertainty, financial exposure, and jeopardized project viability, including the project-specific impacts, below:

a.  For example, to date, Apex has invested over $56,970,000 in the Siete Wind Project, including expenditures for land acquisition, environmental and wildlife studies, engineering and technical analysis, interconnection studies, regulatory permitting at the state, local, and federal levels, and consulting and professional services, in reasonable reliance on a timely and predictable federal permitting process.

b.  As another example, to date, Apex has invested over $28,377,000 in the Homestead Wind Project, including expenditures for land acquisition, environmental and wildlife studies, engineering and technical analysis, interconnection studies, regulatory permitting at the state, local, and federal levels, and consulting and professional services, in reasonable reliance on a timely and predictable federal permitting process.

c.  The Homestead Wind Project is a wind project in North Dakota that requires approval from the North Dakota Public Service Commission.  The Public Service Commission requires DNHs before either approving a wind project or before allowing construction to commence on a wind project.  Therefore,

**DECLARATION OF SEAN STOCKER**

without DNHs, Apex will not be able to construct the Homestead Wind Project.

d. Furthermore, in Apex's experience, DNHs are required by financial parties to finance the construction of a wind project.  Therefore, Apex will not be able to finance – and therefore construct – the Homestead Wind project without DNHs.

e. As another example, Apex has invested over $9,800,000 in the Pecos Flats Wind Project, including expenditures for land acquisition, environmental and wildlife studies, engineering and technical analysis, interconnection studies, regulatory permitting at the state, local, and federal levels, and consulting and professional services, in reasonable reliance on a timely and predictable federal permitting process.

27. Apex has engaged in substantial outreach to DoD to determine status and request draft agreements for review and signature.  Project-specific outreach has included the following:

a. On April 2, 2025, Apex representatives traveled to Arlington, Virginia and met in person with DoD officials to discuss Apex projects that required mitigation agreements, including the Siete Wind Project.

b. Throughout 2025 and into 2026, Apex and its consultants reached out to DoD staff regarding the status of each of these mitigation agreements; to date, the DoD has not presented Apex with a mitigation agreement for signature for any of these projects.

28. The impacts and losses described in this Declaration are not fully recoverable nor are they solely economic.  They directly diminish the value and viability of Apex's business. If

**DECLARATION OF SEAN STOCKER**

Apex is forced to cancel projects as a result of DoD inaction, the resulting economic, reputational, and business losses could irreparably harm the company.  Accordingly, Apex faces an imminent threat of irreparable harm in the absence of immediate and timely relief.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: 06/10/2026

By: /s/ _____

Sean Stocker
Head of Development
Apex Clean Energy Holdings, LLC
8665 Hudson Blvd North, Suite 200
Lake Elmo, MN 55042

**DECLARATION OF SEAN STOCKER**