Michael Giaquinto, OSB #:246342
MORGAN LEWIS & BOCKIUS LLP
South Grand Ave., 22nd Floor
Los Angeles, CA 90071-3132
T: 213-612-7227
michael.giaquinto@morganlewis.com

Jennifer Trock (*pro hac vice pending)*
Douglas Hastings (*pro hac vice pending*)
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000
jennifer.trock@morganlewis.com
douglas.hastings@morganlewis.com

Ella Foley Gannon (*pro hac vice pending*)
600 Montgomery Street, Suite 2300
San Francisco, CA 94111-2725
T: 415-442-1000
ella.gannon@morganlewis.com

*Attorneys for Plaintiffs (except Las Crestas Wind Energy LLC)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST; ADVANCED POWER ALLIANCE; ALLIANCE FOR CLEAN ENERGY NEW YORK, INC.; CLEAN GRID ALLIANCE; GREEN ENERGY CONSUMERS ALLIANCE; INTERWEST ENERGY ALLIANCE; MAINE RENEWABLE ENERGY ASSOCIATION; RENEW NORTHEAST; SOUTHERN RENEWABLE ENERGY ASSOCIATION; LAS CRESTAS WIND ENERGY, LLC; NOVA CLEAN ENERGY, LLC; APEX CLEAN ENERGY HOLDINGS, LLC; HORSE THIEF WIND PROJECT, LLC; NORTH HILLS WIND PROJECT, LLC; PRAIRIE PHOENIX WIND PROJECT, LLC; CRIDER VALLEY WIND ENERGY LLC; CANISTEO WIND ENERGY LLC; DEUEL HARVEST WIND ENERGY | Case No.: 3:26-cv-01092-IM<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** 1

SOUTH LLC; HAMMERHEAD WIND
ENERGY LLC; LAZBUDDIE WIND
ENERGY II LLC; THRESHER WIND LLC;
TOWNER WIND ENERGY II LLC;
TRITON WIND ENERGY LLC;
WHITETAIL WIND, LLC; RAMBLE WIND
ENERGY LLC; MEADOW LAKE II
WINDFARM, LLC; BLACKSTONE WIND
FARM II, LLC; BIG RIVER WIND, LLC;
and BLUE CANYON WINDPOWER V LLC,

*Plaintiffs*,

v.

PETER B. HEGSETH, in his official capacity
as Secretary of Defense; DALE R. MARKS,
in his official capacity as
Assistant Secretary of Defense for Energy,
Installations, and Environment; U.S.
DEPARTMENT OF DEFENSE;
DEPARTMENT OF THE AIR FORCE;
DEPARTMENT OF THE ARMY;
DEPARTMENT OF THE NAVY; and
DEPARTMENT OF DEFENSE MILITARY
AVIATION AND INSTALLATION
ASSURANCE SITING CLEARINGHOUSE,

*Defendants*.

Plaintiffs Renewable Northwest; Advanced Power Alliance; Alliance For Clean Energy

New York, Inc.; Clean Grid Alliance; Interwest Energy Alliance; Maine Renewable Energy

Association, RENEW Northeast; Southern Renewable Energy Association (collectively,

"Associational Plaintiffs"); Green Energy Consumers Alliance ("Organizational Plaintiff"); Las

Crestas Wind Energy, LLC; Apex Clean Energy Holdings, LLC; Nova Clean Energy, LLC; North

Hills Wind Project, LLC; Prairie Phoenix Wind Project, LLC; Deuel Harvest Wind Energy South

LLC; Lazbuddie Wind Energy II LLC; Thresher Wind LLC; Towner Wind Energy II LLC; Triton

2

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Wind Energy LLC; Whitetail Wind, LLC; Meadow Lake II Windfarm, LLC; Blackstone Wind Farm II, LLC; Big River Wind, LLC; Horse Thief Wind Project, LLC; Crider Valley Wind Energy LLC; Canisteo Wind Energy LLC; Hammerhead Wind Energy LLC; Ramble Wind Energy LLC; and Blue Canyon Windpower V, LLC (collectively, "Developer Plaintiffs") bring this Complaint against Defendants Peter B. Hegseth, in his official capacity as Secretary of Defense, Dale R. Marks, in his official capacity as Assistant Secretary of Defense for Energy, Installations, and Environment, the U.S. Department of Defense, the Department of the Air Force; the Department of the Army, the Department of the Navy,  and the Department of Defense Military Aviation and Installation Assurance Siting Clearinghouse (collectively, "DoD"), and allege as follows.

## NATURE OF ACTION

1. Since the first day of the current administration, the Government has waged an unprecedented campaign against wind energy, treating wind development like an adversary rather than a regulated industry.  It has engaged in sweeping efforts to block wind-energy projects through executive orders, permit freezes, sudden reversals of regulatory programs, and various other unprecedented and unlawful agency actions.

2. Paradoxically, the Government has at the same time expressed its desire to rapidly expand energy generation to meet growing demand, strengthen grid reliability, and achieve U.S. energy dominance, even though wind energy already supplies a substantial share of the nation's electricity and remains one of the few energy resources capable of deployment at the scale necessary to meet those objectives going forward.

3. The Government's actions have universally lacked substantive bases in law or fact. Instead, they have been driven by a singular goal to "not allow[] any windmills to go up,"

3

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

regardless of governing statutory and regulatory mandates.[1]

4.   Unsurprisingly, many of those actions have already been vacated or enjoined by federal courts:

a.  In December 2025, the District of Massachusetts held unlawful and vacated federal agencies' implementation of a government-wide pause on wind-energy authorizations, which had halted the issuance and processing of federal permits, approvals, leases, and related authorizations for offshore and onshore wind-energy projects pending an open-ended federal review. *New York v. Trump*, 811 F. Supp. 3d 215 (D. Mass. 2025).  The Government subsequently dismissed its appeal, leaving the district court's judgment in place. *New York v. Trump*, No. 26-1042 (1st Cir. June 11, 2026) (appeal dismissed);

b.  In January and February 2026, multiple federal courts granted preliminary injunctions barring enforcement of the Government's stop-work orders and suspension orders against all offshore wind projects under construction. *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999 (D.D.C. Jan. 12, 2026); *Empire Leaseholder LLC v. Burgum*, No. 26-cv-00004 (D.D.C. Jan. 15, 2026); *Virginia Electric & Power Co. d/b/a Dominion Energy Virginia v. Dep't of the Interior*, No. 2:25-cv-830 (E.D. Va. Jan. 16, 2026); *Vineyard Wind 1 LLC v. Dep't of the Interior*, No. 26-10156-BEM (D. Mass. Jan. 27, 2026); *Sunrise Wind LLC v. Burgum*, No. 1:26-cv-00028 (D.D.C. Feb. 2, 2026); and

c.  In April 2026, the District of Massachusetts preliminarily enjoined five other

---

[1] ROLL CALL, Remarks: Donald Trump Leads a Cabinet Meeting at the White House (Aug. 26, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-cabinet-meeting-white-house-august-26-2025/; *see also* Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 20, 2025, 9:51 AM) ("We will not approve wind or farmer destroying Solar.").

4

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

actions by federal agencies that explicitly obstructed or indefinitely delayed permitting and construction of wind and solar projects nationwide. *RENEW Northeast v. U.S. Dep't of Interior*, No. 25-CV-13961-DJC, 2026 WL 1078282 (D. Mass. Apr. 21, 2026). The Government subsequently filed a notice of appeal. *RENEW Ne. v. U.S. Dep't of the Interior*, No. 26-1565 (1st Cir. May 21, 2026) (notice of appeal filed).

5.   The Government has now identified a more surreptitious—but potentially even more damaging—tactic to block wind energy development: the Department of Defense ("DoD") has stopped fulfilling its statutory mandate to assess wind projects' impacts on military readiness, a necessary component of the Federal Aviation Administration's ("FAA") assessment of proposed commercial wind projects on the safe and efficient use of navigable airspace. The direct impact of DoD's inaction has been a total halt of all wind project development in the United States.

6.   Due to their height, all utility-scale wind energy projects are required to notify the FAA of proposed projects, and the FAA is required to review those projects to determine whether they will have a substantial adverse effect on air navigation. But, by FAA statute, the FAA can only complete this review after DoD completes its review and communicates its finding to the FAA.

7.   In conducting its review, DoD is required to promote timely solutions that both protect military readiness and operations and ensure the robust development of renewable energy sources and the increased resiliency of commercial electrical systems through mitigation measures, coordination with project developers, and the avoidance of unnecessary delays in the review process.

8.   When the FAA concludes, after receiving the necessary findings from DoD, that a proposed structure will not pose a hazard to air navigation, it issues a Determination of No Hazard ("DNH").

5

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

For utility-scale wind energy projects, obtaining a DNH is effectively a prerequisite to construction and commercial deployment. DNHs have important legal consequences because they impact a host of project-specific requirements, including compliance with state and local laws and permit requirements, project financing, insurance, power-purchase agreements, and commercial requirements. Typically, counterparties, lenders, insurers, state and local regulators, and investors will not allow projects to proceed absent a DNH. Additionally, proceeding without a DNH would present a number of serious business and other risks for project sponsors, including potential unintended impacts on airspace or military readiness—the very risks that the process is intended to identify and mitigate. In sum, DNHs typically are needed for projects to move forward.

9. DoD's necessary portion of that review typically involves one or both of two main considerations. First, because the rotation of wind turbine blades can create electromagnetic fields, turbines may have some impact on military radars. Second, the physical structure of the project itself may impact military training routes, flight patterns, military facilities (e.g., military airports).

10. Where potential military impacts are identified, they are routinely and successfully resolved through DoD's established review process using well-developed and long-standing mitigation measures that have historically allowed utility-scale wind projects and military operations to coexist—consistent with Congress's intent in establishing the DoD review framework. Those mitigation measures are most often either: (1) physical changes to the project (e.g., adjusting turbine layout or height); or (2) software or other upgrades agreed to in a mitigation agreement with the project sponsor, including reimbursement of DoD's mitigation costs (e.g., software updates to account for new turbines or hardware such as new or additional radars).

11. Since it was established in the Fiscal Year 2011 National Defense Authorization Act and until approximately August 2025, DoD's reviews proceeded in an orderly and timely manner, with

6

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

well-understood and transparent processes and timelines that allowed developers, regulators, lenders, utilities, and other market participants to reasonably rely on predictable review schedules and outcomes. Consistent with Congress's intent, that process ensured that wind developers could predictably coordinate other necessary steps—such as local permits, commercial agreements, and construction contracts—based on when the project was anticipated to receive its DNHs.

12. But beginning in August 2025, shortly after confirmation of Assistant Secretary Marks, the process ground to a halt, affecting all steps of DoD's statutorily mandated review:

    a. In August 2025, DoD stopped executing near-final mitigation agreements that were signed by the developer and awaiting countersignature from DoD. Such agreements would ordinarily be signed within 60 days, but none have been signed in over nine months.

    b. In December 2025, DoD also stopped providing draft mitigation agreements for developers' signature that it ordinarily issues after conclusion of its discussions with wind energy developers.

    c. On April 13, 2026, DoD completely froze all steps of the process by instructing the DoD staff working on the reviews to halt all of their work indefinitely. Shortly thereafter, DoD canceled all scheduled mitigation discussions with wind developers and stopped scheduling new ones, stopped sending any substantive correspondence about projects, and halted all actions towards effectuating its review duties.

    d. On May 7, 2026, DoD issued "interim guidance" that made clear that wind energy projects continue to be subject to an indefinite hold while DoD conducts "further interagency coordination." At the same time, it instructed DoD staff and armed forces branches to continue to "promptly" perform reviews for essentially all other

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

types of energy projects.  Although FAA evaluation and DoD Clearinghouse review apply to a wide variety of energy projects, not just wind projects, the current freeze and related delays are to the knowledge of Plaintiffs being applied exclusively to utility-scale wind energy projects.

13. DoD's actions (collectively, "DoD's review freeze" or "DoD's freeze") demonstrate that it has adopted a policy of refusing to perform its required obligations to review utility-scale wind projects and related FAA–DoD coordination processes for wind-energy projects (e.g. project lighting reviews), finalize mitigation agreements, or communicate its findings to the FAA.

14. As a result of DoD's review freeze, the FAA has been unable to complete its required process, effectively resulting in a nationwide freeze on new utility-scale wind energy development in the United States.

15. DoD's review freeze is unlawful and violates the Administrative Procedure Act ("APA"), the statute governing DOD's review process (10 U.S.C. § 183a), and DoD's own regulations for its review (32 C.F.R. § 211.6) in multiple ways.

16. *First*, DoD's review freeze is a final action that is arbitrary, capricious, contrary to law, and in violation of required procedures under Section 706(2) of the APA.  It is arbitrary and capricious because DoD: (1) provided no reasoned basis for it beyond vague and generalized references to unspecified "military risks" and "evolving" national security concerns; (2) failed to consider factors Congress expressly required it to analyze, including the statutory directive "to ensure that the robust development of renewable energy sources and the increased resiliency of the commercial electrical grid may move forward in the United States"; (3) failed to analyze the impacts of its policy on the reasonable reliance interests of wind energy developers and related market participants that structure investments and commercial arrangements around DoD's

8

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

longstanding review practices and timelines; and (4) departed from over a decade of consistent agency practice without adequately acknowledging or explaining that change in position. It is also arbitrary and capricious because it is based on a factor Congress did *not* authorize DoD to consider: the Government's animus towards wind energy. It is contrary to law because DoD is violating its statutory and regulatory obligations and deadlines under 10 U.S.C. § 183a and 32 C.F.R. § 211.6. And it is in violation of required procedures because DoD failed to follow the notice-and-comment process mandated by Section 553 of the APA.

17. *Second*, DoD is unlawfully withholding or unreasonably delaying performing its review duties in violation of Section 706(1) of the APA. DoD has "unlawfully withheld" action because it is categorically refusing to carry out mandatory components of its review process, including mitigation discussions, execution of mitigation agreements, and transmission of review determinations to the FAA. That refusal causes DoD to violate statutory and regulatory requirements and timelines and prevents the FAA from completing its aeronautical studies and related FAA-DoD consultation processes. And, at the very minimum, DoD has "unreasonably delayed" those actions because—despite the immediate and significant impacts on the wind industry, electricity markets, project financing and the economy—it has entirely failed to identify specific issues justifying its delay, any issues that would be caused by resuming its ordinary process, or any timeline by which it will act. The Developer Plaintiffs are each awaiting discrete agency actions required by law with respect to their projects, including completion of mitigation discussions, transmission of draft mitigation agreements, execution of mitigation agreements, and transmission of DoD determinations to the FAA.

18. Much like the Administration's other actions, DoD's review freeze is having catastrophic effects on the wind industry. For so long as DoD's policy is in place, proposed utility-scale land-

9

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

based wind projects at various stages of the planning and development process are effectively stalled, resulting in indefinite and commercially unworkable and unknown development timelines, substantial increases in project costs, major financing uncertainty, and heightened compliance risks. An unknown number of projects may *never* be able to move forward as a result of DoD's freeze, which is already affecting a least 125 utility-scale wind energy projects across 25 states, resulting in billions of dollars in sunk costs and depriving the U.S. grid of substantial new electricity generation needed to maintain grid reliability and meet rapidly growing electricity demands.

19. The inability of Associational Plaintiffs' wind developer members and Developer Plaintiffs to move forward causes ongoing daily costs and significant risks while projects are halted. Specifically, DoD's policy is: putting wind developers at risk of default under commercial contracts, interconnection agreements, equipment procurement arrangements, and labor agreements for failure to meet timelines; causing them to miss deadlines required for obtaining and maintaining state or local permits or renewing lease agreements; rendering them unable to secure necessary funding or meet financing deadlines; causing them to miss timelines for connecting to electricity grids that risks loss of interconnection queue positions or forfeiture of security deposits; and potentially rendering them ineligible for critical tax credits. There are also significant downstream impacts on Associational Plaintiffs' other members, such as suppliers of wind turbine components, construction contractors, transportation providers, and domestic manufacturers who are unable to enter into contracts to supply parts or services or effectuate delivery of parts that have already been ordered. Participants in markets for Renewable Energy Certificates ("RECs") are also damaged because the cessation of the development of utility-scale wind energy projects reduces the supply of RECs available in the market, causing harm to

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Organizational Plaintiff.

20. The dramatic irreparable harm to the wind energy industry in turn has significant negative impacts on consumers, State governments, and the U.S. economy. It increases electricity prices at a time when Americans are already struggling with affordability. It impacts long-term energy security and grid reliability at a time of rising energy demand driven by artificial intelligence and data centers, electrification, domestic manufacturing growth, and supply shocks from ongoing military conflicts abroad. It eliminates high-paying jobs, undermines domestic manufacturing and supply-chain investment, and reduces economic activity. And it hinders state governments' ability to meet renewable electricity standards and targets, denies them of anticipated property, sales, and income tax revenues, impairs grid planning and resource adequacy efforts, and wastes public investments made in support of energy infrastructure, transmission development, workforce training, and economic development.

21. Congress has established through multiple statutes that developing additional electricity sources is an important national priority, and wind energy is an affordable form of clean energy that can be quickly deployed on public and private lands with existing technology. By deciding instead to deliberately stifle wind energy, DoD's actions run counter to those goals and Congress's explicit instructions for it to consider renewable energy development needs through a mitigation-based, project-specific review process rather than through indefinite delay or categorical obstruction.

22. Plaintiffs therefore respectfully ask the Court to: (1) vacate or set aside DoD's unlawful policy freezing its review process; (2) retain jurisdiction over this matter and order DoD to provide status reports on its progress in completing its review for wind energy projects; and (3) order DoD to take action by certain dates with respect to projects stalled at particular stages of its review; and

11

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(4) order DoD to take particular actions required by law with respect to Developer Plaintiffs' projects.

**PARTIES**

23.  Plaintiff Renewable Northwest is a 501(c)(3) not-for-profit organization with its principal place of business in Portland, Oregon.  Its mission is to decarbonize the Northwest region by accelerating the transition to renewable electricity.  Renewable Northwest's diverse membership includes coalition of renewable energy professionals, energy buyers and marketers, ratepayer advocates, and environmental organizations, and it operates within a geographic region that encompasses four Northwestern states: Oregon, Washington, Idaho, and Montana.

24. Plaintiff Advanced Power Alliance ("Advanced Power") is an industry trade association with its principal place of business in Austin, Texas.  Advanced Power promotes the development of the advanced energy technologies that deliver clean, reliable, affordable power, including wind, solar, and energy storage, for American consumers, businesses, and manufacturers.  Advance Power represents a coalition of clean energy developers, energy storage companies, major corporate energy buyers, manufacturers, landowners, rural communities and school districts, and suppliers across the energy value chain.  Advanced Power's advocacy covers eleven states, including Texas, Oklahoma, Kansas, Nebraska, and Missouri.

25. Plaintiff Alliance for Clean Energy—New York ("ACE NY") is a 501(c)(3) not-for-profit organization with its principal place of business in Albany, New York.  It serves as the premier multi-technology clean energy industry organization for the State of New York.  Its mission is to promote the use of clean electricity technologies and energy efficiency in New York, increase energy diversity and security, boost economic development, improve public health, reduce energy costs, and reduce air pollution.  ACE NY's diverse membership includes companies engaged in

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

the development, construction, and operation of land-based wind and solar power; offshore wind power facilities; energy efficiency contracting; manufacturing clean energy equipment; and consulting to or supporting the clean energy industry. ACE NY's membership also includes environmental and labor organizations interested in the advancement of the clean energy industry in the State of New York.

26. Plaintiff Clean Grid Alliance ("CGA") is a 501(c)(3) nonprofit and associated 501(c)(6) trade organization with its principal place of business in Minneapolis, Minnesota. CGA is dedicated to advancing clean energy development and grid modernization in the Midwest. CGA provides a unified voice for its members, advocating for policies and regulations that support the growth of renewable energy and strengthen the regional energy market. By engaging directly with policymakers, regulators, and industry stakeholders, CGA helps ensure that its members' interests are represented while promoting the business case for clean energy. CGA covers the nine Upper Midwest States of the Midcontinent Independent System Operator footprint: Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, and Wisconsin.

27. Plaintiff Green Energy Consumers Alliance ("GECA") is a non-profit organization based in Cambridge, Massachusetts, and Providence, Rhode Island. Its mission is to empower consumers and communities to speed a just transition to a zero-carbon world, and it achieves this mission through green energy education, programming, and climate advocacy funded through the sale of RECs to consumer and municipal aggregations in Massachusetts and Rhode Island. DoD's actions challenged in this lawsuit reduce the amount of wind energy being added to the grid, constraining REC supply, and therefore harming GECA's ability to earn revenue from the sale of RECs and fund its other activities.

28. Plaintiff Interwest Energy Alliance ("Interwest") is a non-profit trade association with its

13

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

principal place of business in Albuquerque, New Mexico.  Interwest brings the nation's leading companies in the renewable energy industry together with the West's advocacy community to expand deployment of a reliable, cost-effective, and diverse portfolio of renewable energy resources.  Interwest works across New Mexico, Colorado, Wyoming, Utah, Nevada, and Arizona. Its membership brings together the leading developers and manufacturers of utility-scale renewable energy in the Intermountain West with environmental advocacy organizations, promoting the deployment of reliable, cost-effective, and diverse renewable energy resources.

29. Plaintiff Maine Renewable Energy Association ("MREA") is a not-for-profit trade association with its principal place of business in Augusta, Maine.  MREA represents renewable energy producers, suppliers of goods and services to those producers, and other supporters of the renewable energy industry in Maine. Its members include companies engaged in the development, ownership, and operation of renewable energy projects, including utility-scale onshore wind projects.  MREA advocates on behalf of the renewable energy industry before the Maine Legislature, the Maine Public Utilities Commission, and other governmental and regulatory bodies and works to support the responsible development of renewable energy resources throughout the State of Maine.

30. Plaintiff RENEW Northeast is a not-for-profit association with its principal place of business in Cambridge, Massachusetts.  It aims to unite renewable energy companies and environmental advocates seeking to promote the use of sustainable energy technologies across New England, including in Massachusetts.  RENEW Northeast's members include companies and organizations involved in developing and advocating for renewable energy projects, including onshore and offshore wind developers and solar developers.

31. Plaintiff Southern Renewable Energy Association ("SREA") is a trade association with its

14

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

principal place of business in Little Rock, Arkansas.  SREA promotes responsible use and development of wind energy, solar energy, energy storage and transmission solutions by advocating for legislation that support renewable energy deployment, promoting regulations that shape utility plans to expand clean energy access in the Southeast, and collaborating with organizations across the region to push for reforms in transmission planning, transparency, and oversight to strengthen the grid and integrate more renewable energy.  SREA's geographic region covers seven Southeastern states: Alabama, Arkansas, Georgia, Kentucky, Louisiana, Mississippi, and Tennessee.

32. Plaintiff Horse Thief Wind Project, LLC is a Delaware limited liability company that is the sponsor of the Horse Thief Wind Project, an up to 650 MW proposed wind project in Finney, Gray, Hodgeman, and Ford Counties, Kansas. Horse Thief Wind Project, LLC is awaiting transmission of a draft Mitigation Agreement from DoD for signature.

33. Plaintiff North Hills Wind Project, LLC is a Delaware limited liability company that is the sponsor of the North Hills Wind Project, a 183 MW land-based wind energy project located in Howard County, Iowa. North Hills Wind Project, LLC is awaiting DoD countersignature of its Mitigation Agreement.

34. Plaintiff Prairie Phoenix Wind Project, LLC is a Delaware limited liability company that is the sponsor of the Prairie Phoenix Wind Repower Project. The project is repowering a wind energy generating facility in Limestone and McLennan Counties, Texas. Prairie Phoenix Wind Project, LLC is awaiting DoD countersignature of its Mitigation Agreement.

35. Plaintiff Crider Valley Wind Energy LLC is a Delaware limited liability company that is the sponsor of the Crider Valley Wind Energy Project, a 450 MW land-based wind energy project near Bickleton, Washington. Crider Valley Wind Energy LLC is awaiting transmission of a draft

15

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Mitigation Agreement from DoD for signature.

36. Plaintiff Canisteo Wind Energy LLC is a Delaware limited liability company that is the sponsor of the Canisteo Wind Energy Project, a 290 MW land-based wind energy project located near Greenwood, New York. Canisteo Wind Energy LLC is awaiting transmission of a draft Mitigation Agreement from DoD for signature.

37. Plaintiff Deuel Harvest Wind Energy South LLC is a Delaware limited liability company that is the sponsor of the Deuel Harvest Wind Energy South Project, a 250 MW land-based wind energy project located near Brandt, South Dakota. Deuel Harvest Wind Energy South LLC is awaiting DoD countersignature of its Mitigation Agreement.

38. Plaintiff Hammerhead Wind Energy LLC is a Delaware limited liability company that is the sponsor of the Hammerhead Wind Energy Project, a 1,500 MW land-based wind energy project located near Hugoton, Kansas. Hammerhead Wind Energy LLC is awaiting transmission of a draft Mitigation Agreement from DoD for signature.

39. Plaintiff Lazbuddie Wind Energy II LLC is a Delaware limited liability company that is the sponsor of the Lazbuddie Wind Energy II Project, a 300 MW land-based wind energy project located near Friona, Texas. Lazbuddie Wind Energy II LLC is awaiting DoD countersignature of its Mitigation Agreement.

40. Plaintiff Thresher Wind LLC is a Delaware limited liability company that is the sponsor of the Thresher Wind Project, a 1.2 GW land-based wind energy project located near Plains, Texas. Thresher Wind LLC is awaiting DoD countersignature of its Mitigation Agreement.

41. Plaintiff Towner Wind Energy II LLC is a Delaware limited liability company that is the sponsor of the Towner Wind Energy II Project, a 500 MW land-based wind energy project located near Lamar, Colorado. Towner Wind Energy II LLC is awaiting DoD countersignature of its

16

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Mitigation Agreement.

42. Plaintiff Triton Wind Energy LLC is a Delaware limited liability company that is the sponsor of the Triton Wind Energy Project, a 1,500 MW land-based wind energy project located in Finney, Haskell, and Gray Counties, Kansas. Triton Wind Energy LLC is awaiting DoD countersignature of its Mitigation Agreement.

43. Plaintiff Whitetail Wind, LLC is a Minnesota limited liability company that is the sponsor of the Whitetail Wind Project, a 67 MW land-based wind energy project located in Grant County, Wisconsin. Whitetail Wind, LLC is awaiting DoD countersignature of its Mitigation Agreement.

44. Plaintiff Ramble Wind Energy LLC is a Delaware limited liability company that is the sponsor of the Ramble Wind Energy Project, a 180 MW land-based wind energy project located near Bloomington, Illinois. Ramble Wind Energy LLC is awaiting transmission of a draft Mitigation Agreement from DoD for signature.

45. Plaintiff Las Crestas Wind Energy, LLC is a Delaware limited liability company that is the sponsor of the Las Crestas Wind Project, a 400-800 MW land-based wind energy project located in Zapata and Hogg Counties, Texas. Las Crestas Wind Energy, LLC is awaiting DoD countersignature of its Mitigation Agreement.

46. Plaintiff Nova Clean Energy, LLC is a Delaware limited liability company that is the sponsor of the Pecos County Phase II Wind Project, a 193.8 MW land-based wind energy project located in Pecos County, Texas. Nova Clean Energy, LLC is awaiting DoD countersignature of its Mitigation Agreement.

47. Plaintiff Meadow Lake II Windfarm, LLC is a Delaware limited liability company that is the sponsor of the Meadow Lake II Repower Project, a XX MW land-based wind energy project located in XX. Meadow Lake II Windfarm, LLC is awaiting DoD countersignature of its

17

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Mitigation Agreement.

48. Plaintiff Blackstone Wind Farm II, LLC is a Delaware limited liability company that is the sponsor of the Top Crop I and II Wind Project, a 200 MW land-based wind project in LaSalle and Grundy Counties, Illinois. Blackstone Wind Farm II, LLC is awaiting DoD countersignature of its Mitigation Agreement.

49. Plaintiff Big River Wind, LLC is a Delaware limited liability company that is the sponsor of the Big River Wind Project, a 500 MW land-based wind energy project in Gilliam County, Oregon. Big River Wind, LLC is awaiting DoD countersignature of its Mitigation Agreement.

50. Plaintiff Blue Canyon Windpower V, LLC is a Delaware limited liability company that is the sponsor of the Blue Canyon Windpower V Project, a XX MW land-based wind energy project located in XX, XX. Blue Canyon Windpower V, LLC is awaiting transmission of a draft Mitigation Agreement from DoD for signature.

51. Plaintiff Apex Clean Energy Holdings, LLC is a Delaware limited liability company that is the sponsor of the following projects:

   a. Lariat Wind, developed by Apex through its subsidiary Lariat Project, LLC, a 800 MW land-based wind project located in Bailey and Parmer Counties, Texas. Lariat Wind is awaiting DoD countersignature of its Mitigation Agreement.

   b. Goldrush Apple Energy, developed by Apex through its subsidiary Goldrush Apple Energy, LLC, a 200 MW land-based wind project located in Peoria County, Illinois. Goldrush Apple Energy is awaiting DoD countersignature of its Mitigation Agreement.

   c. Windswept Plain Wind, developed by Apex through its subsidiary Windswept Plain Wind, LLC, a 200 MW wind project located in Shelby County, Illinois.

18

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Windswept Plain Wind is awaiting DoD countersignature of its Mitigation Agreement.

d.  Siete Wind, developed by Apex through its subsidiary Siete Wind, LLC, a 375 MW land-based wind project located in Texas. Siete Wind is awaiting transmission of a draft Mitigation Agreement from DoD for signature.

e.  Homestead Wind, developed by Apex through its subsidiary Homestead Wind, LLC, a 255 MW land-based wind project located in Williams County, North Dakota. Homestead Wind is awaiting transmission of a draft Mitigation Agreement from DoD for signature.

f.  Pecos Flats Wind, developed by Apex through its subsidiary Pecos Flats Wind, LLC, a 1,500 MW land-based wind project located in Pecos County, Texas. Pecos Flats Wind is awaiting transmission of a draft Mitigation Agreement from DoD for signature.

52. Defendant DoD is an executive department of the United States Government, headquartered at the Pentagon in Arlington County, Virginia.  DoD is responsible for, among other things, coordinating and supervising the U.S. armed forces.  It is charged with conducting reviews of national security and military readiness concerns as part of aeronautical studies for wind energy projects.

53.    Defendant Department of the Air Force is a military department within DoD organized under Title 10 of the United States Code. Through its components and personnel participating in the Clearinghouse review process, the Department of the Air Force evaluates proposed wind-energy projects for impacts on military operations, readiness, radar systems, military airspace, and related Air Force missions. The Department of the Air Force participates in mitigation discussions,

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

review determinations, and implementation of the challenged actions at issue in this case.

54.     Defendant Department of the Army is a military department within DoD organized under Title 10 of the United States Code. Through its components and personnel participating in the Clearinghouse review process, the Department of the Army evaluates proposed wind-energy projects for impacts on military operations, readiness, radar systems, military airspace, and related Army missions. The Department of the Army participates in mitigation discussions, review determinations, and implementation of the challenged actions at issue in this case.

55.     Defendant Department of the Navy is a military department within DoD organized under Title 10 of the United States Code. Through its components and personnel participating in the Clearinghouse review process, the Department of the Navy evaluates proposed wind-energy projects for impacts on military operations, readiness, radar systems, military airspace, and related Navy and Marine Corps missions. The Department of the Navy participates in mitigation discussions, review determinations, and implementation of the challenged actions at issue in this case.

56.     Defendant Peter B. Hegseth is the Secretary of Defense and is DoD's senior official.  He is named in his official capacity.  Mr. Hegseth maintains an office at the Pentagon in Arlington, VA.

57. Defendant Dale R. Marks is the Assistant Secretary of Defense for Energy, Installations, and Environment and is named in his official capacity.  He maintains an office at the Pentagon in Arlington, VA.  As relevant here, he is responsible for leading the Department of Defense mission compatibility evaluation process for proposed energy projects and maintaining and overseeing the Department of Defense Military Aviation and Installation Assurance Clearinghouse.  Defendant the Department of Defense Military Aviation and Installation Assurance Clearinghouse

20

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

coordinates DoD's review of projects filed with the FAA for airspace review under 49 U.S.C. § 44718. The Clearinghouse is responsible for coordinating the mission compatibility evaluation among DoD and other governmental components and process that seeks to minimize or mitigate adverse impacts on military operations and readiness for proposed wind projects, with the goal of protecting national security and military missions, while promoting national objectives for clean energy by supporting development of compatible energy projects. Its main office is located at the Pentagon in Arlington, Virginia.

## JURISDICTION AND VENUE

58. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 because this Action arises under the APA, 5 U.S.C. §§ 551 *et seq.*

59. This Court has personal jurisdiction over Defendants, United States Department of Defense, Department of Defense Military Aviation and Installation Assurance Siting Clearinghouse, Secretary Hegseth, and Assistant Secretary Marks, in their official capacities as each is an agency, department, or official of the United States Government.

60. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Plaintiff Renewable Northwest is registered as a domestic nonprofit corporation in Oregon, maintains its principal place of business in Portland, and operates within the state, including supporting wind energy projects located in Oregon. Renewable Northwest's members include companies with wind energy projects in Oregon, including seven projects in the state that are under development and are currently stalled by DoD's review freeze. Its membership also includes manufacturers of wind turbine components that are located within the state and provide parts and services to wind energy projects in the state.

61. Divisional venue is proper in the Portland Division under LR 3-2(a) because

21

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Renewable Northwest has its headquarters in Portland. Renewable Northwest also has member companies and wind energy projects that are located in the counties for which the Portland Division handles matters, including at least one project currently stalled under DoD review and a company that manufactures parts for wind turbines.

## OBSTRUCTION REVIEW FRAMEWORK

62.     The statutory and regulatory framework for DoD's review of proposed wind projects stems from the FAA's mandate to review proposed construction of certain structures for their impacts on the safety in air commerce, the efficient use and preservation of navigable airspace and "the interest of national security *as determined by the Secretary of the Defense.*" 49 U.S.C. § 44718 (emphasis added). For the FAA to complete its review under Section 44718, DoD must transmit its findings to the FAA. 49 U.S.C. § 44718(b)(1)(B).

63.      DoD is required by separate statute, codified in 10 U.S.C. § 183a, to review energy projects (including wind-energy projects), identify and work with developers to mitigate impacts, and communicate those findings to the FAA. The DoD process is administered by DoD's Military Aviation and Installation Assurance Siting Clearinghouse (the "Clearinghouse"). 10 U.S.C. §183a.

64.     DoD reviews begin after an applicant submits a valid notice of proposed construction to the FAA, which the FAA then refers to DoD for review through the Clearinghouse process, and concludes with DoD communicating its findings back to the FAA. 10 U.S.C. §183a(c).

65.     The DoD statutory framework does not give DoD authority to regulate local land-use outside of its jurisdiction (e.g., military bases). The entire review framework is based on cooperation with developers to identify and mitigate risks—indeed, Congress specifically directed DoD to pursue feasible and affordable mitigations through a project-specific mitigation-based

22

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

review process so the project can proceed rather than through categorical prohibitions or indefinite delay. 10 U.S.C. § 183a(c)(1)(B).

66.    The review regime includes procedural requirements that are intended to promote prompt, coordinated, predictable, and timely evaluations of aviation safety and military readiness impacts to give developers certainty required to plan complex projects. These procedures outline express timelines for key stages of DoD's review process including deadlines for the Clearinghouse's preliminary review and mitigation coordination periods. DoD instructs it components to provide "timely assessments to meet Federal or State siting requirements and timelines." Dep't of Def. Instr. 4180.02, DoD Military Aviation and Installation Assurance Siting Clearinghouse    at    3.2b(2)(b)    (June    15,    2023),    *available    at* https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/418002p.pdf ("Clearinghouse DoDI").

67.    The review process also requires that projects be evaluated under well-established criteria and customary timelines upon which project developers rely as part of the complex project planning involved with wind project development.

**A.  FAA Framework**

68.    The FAA is responsible for ensuring the efficient use of the navigable airspace, which includes airspace used by the military. 49 U.S.C. § 40103(a); 49 USC § 40102(a)(32). As part of that responsibility, in 1958, Congress directed the FAA to promulgate regulations requiring developers of certain proposed construction to notify the FAA of their project so that the FAA could conduct an aeronautical study to determine whether the proposed construction would have an adverse impact on air navigation, equipment, or facilities and navigable airspace. *See* Federal Aviation Act of 1958, Pub. L. No. 85-726, § 1101, 72 Stat. 731, 797 (codified as amended at 49 U.S.C. § 44718); 14 C.F.R. pt. 77.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

69.    While the FAA's review of wind projects has always informally included input from DoD on any impacts to military airspace and facilities, in 2011, the FAA statutory framework was amended to formally require DoD review of projects for "adverse impacts on military operations and readiness" (including identification of feasible and affordable mitigations on such impacts). Codified in 2017, 49 U.S.C. § 44718 requires the FAA to include DoD's finding in its airspace determinations. *Id.* § 44718(b)(1)(B).

70.    Concurrent with the 2011 amendments to the FAA statute, Congress enacted legislation specifying the requirements for DoD review and directing DoD to work cooperatively with project developers to identify feasible and affordable mitigation measures where possible. Ike Skelton National Defense Authorization Act ("NDAA") for Fiscal Year 2011, Pub. L. No. 111-383, § 358, 124 Stat. 4137, 4198-202 (2011) (codified as amended at 10 U.S.C. § 183a).

71.    Pursuant to its statutory mandate in 49 U.S.C. § 44718, the FAA promulgated 14 C.F.R. Part 77 to establish: (a) notification requirements for proposed construction or alteration of existing structures; (b) the standards used to determine obstructions; (c) the process for aeronautical studies of obstructions to determine their effects; and (d) the process to petition the FAA for discretionary review of determinations, revisions and extensions of determinations. 14 C.F.R. pt. 77.

72.    Part 77 notification is required at least 45 days in advance for any proposed construction (or alteration) for structures more than 200 feet above ground level, as well as other structures that meet certain enumerated requirements in 14 C.F.R. § 77.9. *See* 14 C.F.R. §§ 77.7(b), 77.9(a)–(d). Because commercial wind turbines exceed 200 feet above ground level, developers are required to notify the FAA of the proposed project, including the exact height and location of the turbines. *Id.* § 77.9(a).

73.    The FAA conducts its studies based on prescribed and established regulations and

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

orders related to obstruction evaluation, including those in Part 77 and FAA Order JO 7400.2R, Procedures for Handling Airspace Matters (Feb. 20, 2025) ("FAA Order 7400.2R"). *See* 14 C.F.R. pt 77, subpt. C; FAA Order 7400.2R ¶ 5-1-1.

74.    Each turbine, building, and structure requires notice to the FAA, and is assigned an Aeronautical Study Number ("ASN") unique to the particular turbine or structure point.  ASNs are specific to the height and location of the structure.  Changes in height or location (even by as little as one foot in height or changes in latitude/longitude by one second or more) typically require project sponsors to re-file the project and obtain new ASNs.  FAA Order 7400.2R ¶ 6-1-2.

75.    To complete its Part 77 review, the FAA requires that DoD provide either its "non-objection" or "notice of unacceptable risk" to the FAA for the FAA to complete its review.  *See* 49 U.S.C. § 44718(b).

76.    At the conclusion of the review, the FAA issues a determination with its findings.  If the aeronautical study concludes that the proposed construction would exceed an obstruction standard and would have a substantial aeronautical impact, it will issue a Determination of Hazard. 14 C.F.R. § 77.31(c).

77.    The FAA will issue a DNH if the study concludes that the proposed project will exceed an obstruction standard but would not have a substantial aeronautical impact on air navigation.  14 C.F.R. § 77.35(c).  Because of their height, all utility-scale wind turbines exceed obstruction standards.    DNHs may include conditions (e.g., lighting requirements), limitations, or supplemental notice requirements. *Id.*

78.    DNHs are valid for a period of 18 months unless a project begins substantial construction. *Id.* § 77.33(b).

79.    Wind developers may apply for a one-time, 18-month, extension of their DNH, which

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

must be re-reviewed pursuant to the process and standards of the original DNH, and requires the FAA to issue a new DNH. *Id.* § 77.3(c).

80.     Once construction commences, the DNHs become permanent and the FAA takes the necessary steps to implement whatever changes are necessary to ensure airspace is protected (e.g., changes to air traffic procedures, notices to airmen, etc.).

## B. DoD Framework

### (i)  DoD Statutory Framework

81.     In 2011, Congress formalized DoD review of proposed wind projects requiring FAA notice under 49 U.S.C. § 44718 for adverse impacts on military operations and readiness through the enactment of the Ike Skelton National Defense Act.  NDAA for Fiscal Year 2011 § 358, 124 Stat. at 4198.

82.     Section 358 of the Ike Skelton National Defense Authorization Act stated that the objective of the DoD review was to "ensure that the robust development of renewable energy sources and the increased resiliency of the commercial electric grid may move forward in the United States, while minimizing or mitigating any adverse impacts on military operations and readiness." *Id.*

83.     The National Defense Authorization Act for Fiscal Year 2018 ("2018 NDAA") replaced Section 358 and codified the underlying authority at 10 U.S.C § 183a (as amended, "Section 183a").  See NDAA for Fiscal Year 2018, Pub. L. No. 115-91, § 311(a), 131 Stat. 1343 (2017).

84.     The legislation established the framework for the Clearinghouse and directed DoD to, among other things, develop, in coordination with other departments and agencies, an integrated review process to "*ensure timely notification and consideration of energy projects*" filed with the FAA that may have an adverse impact on military operations and readiness, and establish

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

procedures for DoD's coordinated consideration of those impacts. 10 U.S.C. § 183a(c)(5)(emphasis added).

85.     Under Section 183a, DoD's review must determine whether a project would have an "adverse impact on military operations and readiness," which is defined as an "adverse impact upon military operations and readiness, including flight operations, research, development, testing, and evaluation, and training, that is demonstrable and is likely to impair or degrade the ability of the armed forces to perform their warfighting missions." 10 U.S.C. § 183a(h)(1).

86.     Only if a project would result in an "unacceptable risk to the national security" of the United States may DoD object to a project, and only *after* giving full consideration to mitigation actions identified by Section 183a. *Id*. § 183a(e)(1)(A).

87.     The term "unacceptable risk to the national security of the United States" is expressly defined in the context of 183a reviews to mean:

the construction, alteration, establishment, or expansion, or the proposed construction, alteration, establishment, or expansion, of a structure or sanitary landfill, that the Secretary of Defense can demonstrate would—(A) endanger safety in air commerce directly related to the activities of the Department of Defense; (B) interfere with the efficient use of the navigable airspace directly related to the activities of the Department of Defense; or (C) significantly impair or degrade the capability of the Department of Defense to conduct training, research, development, testing, and evaluation, and operations or to maintain military readiness.

*Id*. § 183a(h)(11).

88.     DoD is authorized to accept voluntary contributions of funds from project sponsors to offset cost of measures undertaken by DoD to mitigate any adverse impacts on military operations and readiness. *Id*. § 183a(f).

89.     Within 75 days of receiving the application from the FAA, the Clearinghouse must complete its preliminary project review of adverse impacts and, where such impacts are identified, DoD must also identify feasible and affordable mitigation alternatives that could be taken to

27

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

mitigate the risk.  *Id*. § 183a(c).

90.    In addition to project-specific mitigations, Section 183a directs DoD to specifically identify feasible long-term actions to mitigate adverse impacts to wind-energy projects, including: research and development investment priorities, modifications to military operations to accommodate energy projects, upgrades and modifications to existing DoD systems and procedures, acquisition of new systems, and modifications to projects.  *Id.* § 183a(d)(2)(F).

91.    Where DoD's preliminary review of a proposed project shows that impacts are not identified or do not require mitigation, DoD must communicate its non-objection to the FAA.  *Id*. § 183a(c)(8).

92.    If the Clearinghouse's preliminary review finds that the proposed project would have an adverse impact on military operations and readiness, it is required to issue the applicant a notice of presumed risk ("NPR").  *Id*. § 183a(c)(2)(A).  An NPR is a preliminary assessment only and does not constitute a formal objection or determination that the project presents an unacceptable risk to national security.  Rather, the NPR process is intended to facilitate discussions regarding feasible and affordable mitigation measures that may resolve any identified concerns and allow the project to proceed.  *Id.* § 183a(c)(1)(B).

93.    When the Clearinghouse issues the NPR to the applicant, it is also required to notify the Governor of the State in which the project is located of the determination.  *Id*. § 183a(c)(3). DoD must ensure that the Governor has at least 30 days to review and provide comments.  *Id.*

94.    To fulfill its obligations to conduct a timely preliminary review, the statute also mandates that DoD engage in a broader strategy that involves, among other requirements, identification of distinct geographic areas of concern (with public comment) where DoD can demonstrate projects could have an adverse impact on military operations and readiness, including

28

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

categorization of the nature of such impact.  Section 183a(d).

95.     DoD is required to publish online the geographic areas where projects could have an adverse impact on military operations or readiness.  10 U.S.C. § 183a(d)(4).  This ensures that project sponsors can reasonably predict where its projects may pose DoD-related concerns.

**(ii)     DoD Regulations**

96.     In 2013, DoD promulgated 32 C.F.R. Part 211 ("Part 211"), to prescribe procedures for the Clearinghouse pursuant to Section 358.  Like the enabling legislation, Part 211 also recognizes the objective of ensuring the "robust development of renewable energy" may move forward, while minimizing and mitigation adverse impacts on military operations and readiness.  32 C.F.R. § 211.4.

97.     Part 211 provides that upon receipt of a Part 77 notice from the FAA for review, the Clearinghouse must distribute the notice to DoD components who must provide comments and recommendations to the Clearinghouse within 20 days of receiving the application.  Pursuant to the regulations, the Clearinghouse must then evaluate the comments received and make an initial determination on the project within 30 days of receipt of the application.  32 C.F.R. § 211.6.

98.     Within this 30 day timeline, the Clearinghouse is required to take one of three actions: (1) determine that the project has no adverse impact on military operations and readiness and notify the FAA of its determination, (2) determine that the project has an adverse impact, but the impact is sufficiently attenuated that it does not require mitigation and notify the FAA of its determination, or (3) determine that the proposed project may have an adverse impact and *immediately* notify the applicant (and the FAA) of its preliminary findings and offer to engage with the applicant to discuss mitigation options.  *Id.* § 211.6(a)(3)(emphasis added).  These regulatory timelines are consistent with and operate within the broader 75-day statutory preliminary review period

29
**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

established under 10 U.S.C. § 183(a)(c)(1).

99.     If the applicant agrees to enter into mitigation discussions, designated DoD components are required to engage in those discussions to mitigate the identified impacts.  The Clearinghouse must notify and invite the FAA and Department of Homeland Security to participate and may invite other federal agencies to participate.  32 C.F.R. §§ 211.6(b).

100.    Mitigation discussions "shall not extend more than 90 days" beyond the initial notification unless mutually agreed by the parties in writing.  *Id.*

101.    With the codification of Section 183a in 2017, the authorizing legislation included a savings clause, which stated, in relevant part: "Notwithstanding the amendments made by [this legislation], any rule or regulation promulgated to carry out [Section 358], that is in effect on the day before the date of the enactment of this Act [Dec. 12, 2017] shall continue in effect and apply to the extent such rule or regulation is consistent with the authority under [Section 183a] . . . until such rule or regulation is otherwise amended or repealed."  NDAA for Fiscal Year 2018 § 311(c), 131 Stat. at 1348.

102.    Part 211 has not been amended since its promulgation in 2013 and remains binding on DoD to the extent it is consistent with Section 183a.  As a result, the vast majority of Part 211— including applicable timelines—remains binding on DoD.

**(iii) DoD Instructions**

103.    In addition to the procedures codified at 32 C.F.R. Part 211, DoD issued the Clearinghouse DoDI, which prescribes internal procedures and policies for reviewing applications received from the FAA.

104.    The Clearinghouse is responsible for coordinating the mission compatibility evaluation process that seeks to minimize or mitigate adverse impacts on military operations and readiness

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

from proposed wind projects, with the goal of protecting national security and military missions while promoting national objectives for clean energy by supporting development of compatible energy projects. Clearinghouse DoDI § 1.2.a.

105. The Clearinghouse serves as DoD's single focal point for all DoD components and U.S. Government interagency coordination and review, as well as coordination with state governments. *Id*. § 3.1.

106. Upon receipt of an application from the FAA of proposed construction subject to DoD review, the Clearinghouse is required to conduct a preliminary review of the project to assess whether the project will have an adverse impact on military operations and readiness. *Id*. § 3.1.e. Relevant DoD components conducting the review (e.g., the U.S. Air Force, U.S. Army, U.S. Navy, North American Aerospace Defense Command ("NORAD"), etc.) are required to assess the project impacts and provide "timely" assessments to meet federal or state siting requirements and timelines. *Id*. § 3.1.e.

107. If issues are identified during the preliminary review, the Clearinghouse must, among other actions, issue the NPR, request that the developer to participate in a Mitigation Response Team ("MRT"), notify the Governor of the State in which the project is located of the impact, and conduct mitigation discussions with the developer and the relevant DoD components that identified the issues in the NPR. *Id*. § 3.1.e.

108. Through the MRT process, relevant DoD and governmental agencies are consulted, and issues are addressed through mutually agreed-upon mitigation measures that provide "feasible and affordable actions" with the goal of protecting national security and military operations, while "promoting national objectives for clean energy by supporting development of compatible energy projects or energy-related projects." *Id*. § 1.2.a.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

109.    Where issues are identified, DoD is required to consider, *at a minimum*, mitigation measures set forth in 32 C.F.R. § 211.9, which include: "(a) modifications to military operations, (b) modifications to radars or other items of military equipment, (c) modifications to military test and evaluation activities, military training routes, military training procedures, or training sites and ranges, (d) upgrades or modifications to existing systems or procedures, [and] (e) the acquisition of new systems by the DoD and other agencies of the Federal Government." Clearinghouse DoDI § 3.2(c)(5).

110.    DoD components may also recommend that the applicant consider mitigations set forth in 32 C.F.R. § 211.9 including: (a) modifying the proposed project's structure or project configuration; (b) relocating the project; (c) limiting operating hours or days of operation; (d) providing a voluntary contribution of funds towards DoD mitigation measures; and (e) other feasible and affordable mitigations. Clearinghouse DoDI § 3.2(c)(6).

111.    Mitigation agreements may be discussed and modified through the MRT process. Mitigation agreements may be entered into by the Assistant Secretary of Defense for Energy, Installations, and Environment ("ASD(EI&E)") under the authority, direction, and control of the Under Secretary of Defense for Acquisition and Sustainment. *Id*. §§ 2.2, 3.2.c(7), 3.2.d.

## FACTUAL BACKGROUND

112.    The DoD review process depends on clear and well-established criteria and timelines, which are necessary to fulfill Congress's statutory objective to facilitate wind energy development, while protecting military readiness and operations. Ex. J (Blackman Decl. at ¶¶ 26, 29); Ex. K (Belote Decl. at ¶¶ 12, 21); Ex. L (Chupein Decl. at ¶ 19); Ex. M (Doyle Decl. at ¶¶ 6, 13).

113.    Utility-scale wind development projects often require years of complex planning and coordination across numerous regulatory, commercial and technical requirements, including local

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

and state-required siting and construction permits and approval processes, federal permitting reviews, including the FAA obstruction evaluations and DNH determinations, environmental and wildlife reviews, interconnection studies, turbine procurements, financing arrangements, engineering and construction contracts, and power-purchase agreements.

114.    Because FAA DNHs are time limited, timely and predictable DoD review is critical to project development.  Developers rely on this predictability in planning their projects.  Ex. J (Blackman Decl. at ¶¶ 26, 29); Ex. K (Belote Decl. at ¶¶ 28-29); Ex. L (Chupein Decl. at ¶¶ 23-24); Ex. M (Doyle Decl. ¶ 6).

115.    DNHs are frequently prerequisites for obtaining state and local permits, securing financing, satisfying contractual milestones, and maintaining interconnection queue positions and equipment procurement schedules.  Ex. J (Blackman Decl. at ¶ 25); Ex. K (Belote Decl. at ¶¶ 14, 20); Ex. L (Chupein Decl. at ¶¶ 12, 18); Ex. M (Doyle Decl. at ¶ 11).  For project development, developers must be able to reasonably predict both the issues likely to arise during DoD review and the expected timelines for resolutions.

116.    The FAA and DoD review processes rely on well-established and known airspace and military readiness considerations (e.g., air traffic procedures, airport climb gradients, locations of radars, etc.), including the geographic and other procedures published by the FAA and DoD, including those published under Section 183a(d)(4).

117.    Before beginning the process by notifying the FAA of the proposed project, developers typically engage experienced airspace and military compatibility consultants to conduct a pre-review.  Using available data and experience, consultants and developers are able to anticipate with a high degree of accuracy potential issues that must be addressed to avoid impacts to airspace and military readiness and to determine whether a project is likely to trigger an NPR, require MRT

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

review or necessitate particular mitigation measures.  Consultants are also generally able to estimate the likely timeline for completion of the process—again with a high degree of accuracy. These pre-development analyses are critical to project planning and are routinely relied upon by developers, investors, lenders, utilities, manufacturers and state and local permitting authorities. Ex. K (Belote Decl. at ¶ 12); Ex. M (Doyle Decl. at ¶ 6).

118.    In general, projects requiring mitigation fall into three primary categories: (1) radar impact, including impacts to military or national security radar systems such as NORAD systems; (2) military airspace impacts, including impacts to military training routes, military airports, or aviation operations; and (3) technical or operational impacts, including cybersecurity or communications-related concerns.  Some projects may involve multiple categories of impacts requiring layered mitigation measures.  Ex. J (Blackman Decl. at ¶ 22); Ex. K (Belote Decl. at ¶ 17, 20); Ex. L (Chupein Decl. at ¶ 15); Ex. M (Doyle Decl. at ¶ 8).

119.    During the MRT process, DoD has historically regularly and proactively communicated with developers throughout the process, including through regular calls and weekly meetings.  *See, e.g.*, Ex. M (Doyle Decl. at ¶ 14.f).

120.    The vast majority of impacts associated with wind projects involve predictable and well-understood electromagnetic impacts on radars or obstructions in low-level military training airspace.  Typical mitigation measures include voluntary developer funding for radar software upgrades or optimization, hardware solutions (*i.e.*, new or additional radars) or adjustments to turbine placement, height, numbers, or layout.  Both the issues and mitigations are typically standard and well-established.[2]  Ex. J (Blackman Decl. at ¶ 22); Ex. K (Belote Decl. at ¶ 17, 20);

---

[2] A 2024 report to Congress by a consortium of federal agencies that included DoD stated that "the development and use of radar interference mitigation techniques, and collaboration both among federal agencies and between the federal government and the wind industry have enabled federal radar agencies to continue to perform their missions without significant impacts." Wind Turbine Radar Interference Mitigation Working

34

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Ex. L (Chupein Decl. at ¶ 15); Ex. M (Doyle Decl. at ¶ 8).

121.    Following successful mitigation discussions, the parties reach an informal agreement on the mitigations.  Mitigations are typically accomplished through mitigation agreements, which are prepared by the MRT in draft form to the applicant for signature.  Ex. J (Blackman Decl. at ¶ 23); Ex. K (Belote Decl. at ¶ 18); Ex. L (Chupein Decl. at ¶ 16); Ex. M (Doyle Decl. at ¶ 9).

122.    Upon execution by the project sponsor, the mitigation agreement is then returned to the Clearinghouse for countersignature by the ASD(EI&E).  At this stage, there are typically no new substantive issues nor revisiting of issues already resolved at the MRT level.  Upon countersignature, the Clearinghouse notifies the FAA of its non-objection and the FAA can then complete its aeronautical study and, where warranted, issue DNHs for the project.  Ex. J (Blackman Decl. at ¶ 24); Ex. K (Belote Decl. at ¶ 19); Ex. L (Chupein Decl. at ¶ 17); Ex. M (Doyle Decl. at ¶ 10).

123.    It is not uncommon for mitigation agreements to require amendments, often based on minor adjustments to the number, location, or heights of turbines within a project that may require filing of a new ASN.   While most minor changes do not require new mitigations, they typically require amendments to the mitigation agreements to reflect the adjustments.  Ex. K (Belote Decl. at ¶ 22); Ex. M (Doyle Decl. at ¶ 14(c)).

A.  Pre-2025 DoD Review.

124.    Based on long-established DoD practice, prior to August 2025, DoD conducted an efficient and expedient review process based on well-understood criteria and timelines.  Ex. J (Blackman Decl. at ¶ 22); Ex. K (Belote Decl. at ¶ 17); Ex. L (Chupein Decl. at ¶ 15); Ex. M

---

Group, U.S. Department of Energy, *Update on the Efforts of the Wind Turbine Radar Interference Working Group* at ii (2024), https://www.energy.gov/sites/default/files/2024-02/EXEC-2022-004484%20-%20Report%20to%20Congress%20as%20of%20December%2014%202023%2028229.pdf

35

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(Doyle Decl. at ¶ 13).

125. Project sponsors reasonably relied on the efficiency and predictability of the DoD review process in developing timelines for project financing, procurement, commercial commitments, construction, and approvals. Ex. J (Blackman Decl. at ¶¶ 26, 29); Ex. K (Belote Decl. at ¶¶ 28-29); Ex. L (Chupein Decl. at ¶¶ 23-24).

### 1. Initial Review

126. Prior to 2025, the Clearinghouse typically completed its preliminary review and issued an NPR (or non-objection) within 75 days.

### 2. MRT Discussions

127. If the outcome of DoD's preliminary review was an NPR, DoD would then proceed to promptly schedule MRT discussions, consistent with the timeframes established in Part 211. The overall timing to complete the MRT would depend on the number and nature of impacts and mitigations required and generally proceeded within expected timeframes.

128. Mitigation discussions were facilitated and expedited by the fact that the Clearinghouse could rely on its broad experience handling similar projects. Mitigation would often involve the same or similar options, such as compensating DoD for updating the software on its ground-based radars to account for the location of wind turbines or adjusting factors about the wind project such as turbines' height or project layout. Ex. J (Blackman Decl. at ¶ 22); Ex. K (Belote Decl. at ¶ 17, 20); Ex. L (Chupein Decl. at ¶ 15); Ex. M (Doyle Decl. at ¶ 8).

129. Mitigation discussions through the MRT would typically take between one and four months, depending on the number and types of impacts identified. At the conclusion of mitigation discussions, the parties would reach an informal "handshake" agreement on the mitigation measures and the contents of the mitigation agreement. Ex. K (Belote Decl. at ¶ 21(c)); Ex. L

36

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(Chupein Decl. at ¶ 19(c)); Ex. M (Doyle Decl. at ¶ 13(c)).

### 3. Issuance of Draft Mitigation Agreements

130.     After an informal "handshake agreement" was reached, DoD would then prepare a draft mitigation agreement where required.  DoD would typically provide a draft agreement within about three to four months.  This timeline allowed the various DoD components and the Clearinghouse time to review the proposed mitigations before sending back to the developer for signature.  Ex. K (Belote Decl. at ¶ 21(b)); Ex. L (Chupein Decl. at ¶ 19(b)); Ex. M (Doyle Decl. at ¶ 13(d)).

131.     DoD typically would prepare its mitigation agreements based on standard, template agreements that it would then tailor to the project-specific mitigations.  Mitigation agreements would typically be substantially similar to those previously approved by DoD for other projects with similar issues.  Ex. J (Blackman Decl. at ¶ 22); Ex. K (Belote Decl. at ¶ 21(b)); Ex. L (Chupein Decl. at ¶ 19(b)); Ex. M (Doyle Decl. at ¶¶ 8, 13(d)).

### 4. Final Execution of Mitigation Agreements

132.     Once a mitigation agreement was executed by a developer, DoD typically would transmit a countersignature quickly because substantive issues had already been identified and resolved through the MRT process.

133.     It would typically take 60 days for a project sponsor to receive a countersigned mitigation agreement back from DoD and for DoD to transmit its non-objection and findings to the FAA.  Ex. J (Blackman Decl. at ¶ 24); Ex. K (Belote Decl. at ¶ 21(a)); Ex. L (Chupein Decl. at ¶ 19(a)); Ex. M (Doyle Decl. at ¶13(e)).

134.     Because substantive issues have been addressed at this stage in the process, this process was limited and predictable.  Ex. J (Blackman Decl. at ¶ 24); Ex. K (Belote Decl. at ¶ 21(a)); Ex.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

L (Chupein Decl. at ¶ 19(a)); Ex. M (Doyle Decl. at ¶13(c)).

### B. DoD's Current Freeze

135.    Shortly after Assistant Secretary Marks' confirmation in the summer of 2025, DoD radically changed the Clearinghouse review practices for wind projects in ways that, through delay and intentional inaction, effectively stopped approval of all wind projects in violation of its statutory obligations.  Ex. J (Blackman Decl. at ¶ 27); Ex. K (Belote Decl. at ¶ 23); Ex. L (Chupein Decl. at ¶ 20); Ex. M (Doyle Decl. at ¶14).

136.    DoD's freeze has been broadly-applied across the industry; it is not project-specific. Ex. J (Blackman Decl. at ¶ 28); Ex. L (Chupein Decl. at ¶ 22); Ex. M (Doyle Decl. at ¶15).

137.    DoD has applied the same freeze to routine amendments to existing mitigation agreements, the majority of which are non-substantive and require no new mitigations.  Ex. K (Belote Decl. at ¶ 22); Ex. M (Doyle Decl. at ¶ 14(c)).

138.    Without executed mitigation agreements, the FAA has been unable to complete its aeronautical review process for these projects.  Ex. J (Blackman Decl. at ¶ 25); Ex. K (Belote Decl. at ¶ 15); Ex. L (Chupein Decl. at ¶ 18); Ex. M (Doyle Decl. at ¶11).

139.    In August 2025, DoD stopped countersigning mitigation agreements that had been authored by DoD after completion of the MRT discussions and had been executed by the applicant. Ex. J (Blackman Decl. at ¶ 27(a)); Ex. K (Belote Decl. at ¶ 24(a)); Ex. L (Chupein Decl. at ¶ 21(a)); Ex. M (Doyle Decl. at ¶14(a)).

140.    In December 2025, DoD stopped providing draft mitigation agreements for signature by the project sponsor after MRT discussions concluded and an informal agreement was reached on the material mitigation terms.  Ex. J (Blackman Decl. at ¶ 27(b)); Ex. K (Belote Decl. at ¶ 24(b)); Ex. L (Chupein Decl. at ¶ 21(b)); Ex. M (Doyle Decl. at ¶14(b)).

141.    In addition, projects in the midst of MRT discussions experienced unexplained delays

38

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

and stoppages, including widespread cancellation of all MRT meetings in April 2026. Ex. J (Blackman Decl. at ¶ 27(c)); Ex. K (Belote Decl. at ¶ 24(c)); Ex. L (Chupein Decl. at ¶ 21(c)); Ex. M (Doyle Decl. at ¶14(d)).

142.    The Clearinghouse stopped all review until further notice on April 13, 2026, at the direction of a representative of the Office of the Secretary of Defense. Ex. K (Belote Decl. at ¶ 26).

143.    On May 7, 2026, DoD issued a memorandum characterized as "interim guidance" to various DoD components explaining that certain energy projects would be subject to "further interagency coordination" to "ensure a comprehensive national security review is conducted in a manner sufficient to address modern advancements in consideration of their scope, duration, and level of risk recent presented to DoW operations and readiness."[3]  Ex. A (*Interim Guidance Regarding Compliance with Established Military Aviation and Installation Assurances Siting Clearinghouse Procedures* ("May 7, 2026 Memorandum") at 1-2. But the DoD Memorandum exempted oil and gas energy projects and any project that does not "create an impactful doppler effect" from that additional review. *Id.* at 2. The only type of energy project that DoD has identified to date as having a potentially "impactful" doppler effect is wind energy, as a result of the spinning blades on turbines. Ex. M (Doyle Decl. at ¶ 17).

144.    The May 7 DoD Memorandum makes clear that DoD review of wind projects continues to be subject to indefinite delay, while DoD will continue to review all other types of energy projects "promptly." Ex. A (May 7, 2026 Memorandum). In other words, DoD's own internal guidance confirms that Defendants have imposed additional review barriers and

---

[3] The Department of Defense is also known as the Department of War, abbreviated as DoW. This Complaint typically uses the legal name "Department of Defense" or "DoD," but uses "DoW" when directly quoting documents or communications using that term.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

procedural delays specifically targeting utility-scale wind energy projects. *See id.*

145. The May 7 Memorandum also confirms that the outlined additional procedures are not tied to any individualized finding regarding a specific project's mitigation measures or operation impacts but instead reflect a broader categorical shutdown of wind project reviews untethered to the timelines established by Congress and DoD's own implementing regulations. Notably, the memorandum provides no project-specific findings, technical analysis, or evidentiary support demonstrating that previously approved mitigation measures are no longer effective or that existing statutory and regulatory procedures are insufficient to address any newly identified operational risks. Indeed, the memorandum's reference to "doppler effects" is nothing new but rather an issue that DoD has routinely mitigated. *See* ¶¶ 10, 96-98, *supra*.

146. While the DoD Memorandum directed DoD components to comply with the 75-day statutory requirement for conducting preliminary reviews "effective immediately", it did not provide any deadlines or time frame for any other step of the process. Nor did it direct DoD to comply with the 20- or 30-day timing requirements under its own regulations.

147. While other energy projects subject to DoD review are proceeding through the process, wind projects are not. DoD is not conducting its initial review and issuing NPRs, or—for projects that do not have an adverse DoD impact—issuing non-objections to the FAA to complete its process. It is not scheduling mitigation discussions or working on active discussions. Draft mitigation agreements are not being provided to developers, and where developers have executed mitigation agreements, DoD is not countersigning. DoD is no longer even notifying project sponsors if their project does not need to participate in the MRT process at all because their project poses *no risk* to national security or military readiness.

148. Historically, if DoD had new or emergent concerns, it would communicate them

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

promptly and specifically to wind energy developers. But DoD's current posture has not been accompanied by any project-specific feedback, identification of new discovered adverse impacts requiring mitigation, or descriptions of deficiencies.

149. Indeed, the only correspondence DoD has provided to developers since fully implementing its new policy is a set of form letters sent to project developers starting on April 9, 2026. *See, e.g.*, Ex. I (April 9, 2026 letter from DoD to Pecos County Phase 2). But those letters neither provided any substantive information regarding project-specific issues nor gave any timeline for DoD's process going forward. Instead, they stated vaguely that "during review of your application and others" DoD "determined that further interagency coordination is required to ensure the comprehensive national security review is conducted in a manner consistent with evolving risks." *Id.* The only further explanation the letters provided for that additional "coordination" was that DoD was "taking steps to ensure [its] formal review of proposed projects is sufficient to address modern military risks." *Id.*

150. Because DoD has halted its required actions at each step of its review process, Associational Plaintiffs' members and Developer Plaintiffs have projects that are now stuck at one or more of the following four stages:

### 1. *Projects Awaiting Countersignature*

151. Associational Plaintiffs' members currently have multiple land-based wind projects with mitigation agreements that are only awaiting countersignature by DoD. For each of these projects, the Clearinghouse provided mitigation agreements to the project sponsor reflecting the agreed-upon mitigation measures discussed during the MRT process, and the project sponsor signed the mitigation agreements. Ex. J (Blackman Decl. at ¶ 27(a)); Ex. K (Belote Decl. at ¶ 24(a)); Ex. M (Doyle Decl. at ¶14(a)).

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

152. Developer Plaintiffs Las Crestas Wind Energy, LLC; Apex Clean Energy Holdings, LLC (through its subsidiaries Lariat Project, LLC, Goldrush Apple Energy, LLC, and Windswept Plain Wind LLC); Nova Clean Energy, LLC; North Hills Wind Project, LLC; Prairie Phoenix Wind Project, LLC;  Deuel Harvest Wind Energy South LLC; Lazbuddie Wind Energy II LLC; Thresher Wind LLC; Towner Wind Energy II LLC; Triton Wind Energy LLC; Whitetail Wind, LLC; Meadow Lake II Windfarm, LLC; Blackstone Wind Farm II, LLC; and Big River Wind, LLC are developing one or more wind projects that are awaiting DoD countersignature of their mitigation agreements. *See* Ex. U (King Decl. at ¶ 9); Ex. T (Stocker Decl. at ¶¶ 12, 15); Ex. S (Condo Decl. at ¶ 13); Ex. Q (Davis Decl. at ¶ 9); Ex. R (Davis Decl. at ¶ 10); Ex. Y (Litchfield Decl. at ¶¶ 12-15); Ex. CC (Cure Decl. at ¶¶ 11-14); Ex. BB (Cure Decl. at ¶¶ 11-16); Ex. W (Miner Decl. at ¶¶ 12-16); Ex. DD (Cure Decl. at ¶¶ 11-14); Ex. Z (Litchfield Decl. at ¶¶ 14-18); Ex. GG (LoTurco Decl. at ¶¶ 9-11); Ex. II (LoTurco Decl. at ¶¶ 9-11); Ex. HH (LoTurco Decl. at ¶¶ 9-10).

153. Each of these projects have completed MRT review, and the relevant DoD components (including the Air Force and NORAD), in coordination with the Clearinghouse, have determined that the project's adverse impacts to military readiness and operation can be fully mitigated.

154. Despite that determination, DoD's freeze is precluding these projects from moving forward and preventing FAA from completing its own review process.

155. Nearly all of these agreements are substantially similar in form, with standard project-specific mitigations agreed upon and issued and countersigned for comparable issues under longstanding Clearinghouse practices

156. These projects have now been awaiting countersignature for up to nine months—over four times as long as the historical 60-day timeframe for execution prior to August 2025.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

157.    Project sponsors have invested hundreds of millions of dollars in project development costs in these projects, including costs associated with land acquisition, environmental and wildlife studies, engineering and technical analysis, interconnection studies, permitting costs, financing costs, and consulting and professional services.  All of those investments—which were incurred in reasonable reliance on a timely and predictable permitting process—are put at risk by DoD's freeze.

### 2. *Post-MRT-discussion Projects*

158.    Associational Plaintiffs' members have multiple land-based wind projects that have completed mitigation discussions.  These projects have reached an informal agreement with DoD and are waiting for the Clearinghouse to transmit a mitigation agreement to the project sponsor for signature.  Ex. J (Blackman Decl. at ¶ 27(b)); Ex. K (Belote Decl. at ¶ 24(b)); Ex. M (Doyle Decl. at ¶14(b)).

159.    Developer Plaintiffs Apex Clean Energy Holdings, LLC (through its subsidiaries Siete Wind, LLC, Homestead Wind, LLC, and Pecos Flats Wind, LLC); Horse Thief Wind Project, LLC; Crider Valley Wind Energy LLC; Canisteo Wind Energy LLC; and Blue Canyon Windpower V, LLC are developing one or more wind projects that are awaiting transmission of a draft mitigation agreement from DoD for signature, following conclusion of MRT discussions. *See* Ex. T (Stocker Decl. at ¶¶ 21, 24); Ex. P (Davis Decl. at ¶ 9); Ex. X (Miner Decl. at ¶ 13); Ex. V (Kaplan Decl. at ¶ 21); Ex. JJ (LoTurco Decl. at ¶ 8).

160.    For each of these projects, MRT has determined, with agreed mitigation measures, the project's adverse impacts to military readiness and operation can be fully mitigated.

161.    Based on the issues addressed through the Clearinghouse process and historical practices, it is anticipated that the mitigation agreements for these projects would be consistent

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

with existing standard agreements previously issued by DoD for comparable impacts and mitigations previously approved through the MRT process.

162.    Project sponsors have invested hundreds of millions of dollars in project development costs in these projects, including costs associated with land acquisition, environmental and wildlife studies, engineering and technical analysis, interconnection studies, permitting costs, financing costs, and consulting and professional services, among other costs associated with development of these projects.    These costs were incurred in reasonable reliance on a timely and predictable permitting process, and those investments are put at risk by DoD's delay and refusal to advance projects to final agreement execution.

### 3.    Projects in the MRT Discussion Process

163.    Associational Plaintiffs' members have multiple land-based wind projects that are stuck in the MRT process.    These projects are being held up indefinitely, without substantive explanation as to project-specific concerns, while awaiting either scheduling of MRT review, further MRT evaluation, or further discussions.    And some have received repeated requests for information from DoD without actual engagement in the project.    All have now been put on hold and DoD is no longer taking any actions to address any project-related issues.    Ex. J (Blackman Decl. at ¶ 27(c)); Ex. K (Belote Decl. at ¶ 24(c)); Ex. M (Doyle Decl. at ¶14(d)).

164.    Developer plaintiffs Hammerhead Wind Energy LLC and Ramble Wind Energy LLC have projects for which the MRT process is currently frozen.    Ex. AA (Cure Decl. at ¶ 11); Ex. EE (Amended Kaplan Decl. at ¶ 11).

165.    These delays are a significant departure from DoD's prior conduct and from the timelines in Part 211 to complete MRTs within 90 days absent mutual agreement in writing to

44

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

extend the MRTs.  DoD regulations do not grant it the ability to unilaterally extend such deadlines. *See* 32 C.F.R. § 211.6.

166.    Projects remaining in MRT review for extended periods of time without resolution prevent project sponsors from advancing to mitigation agreement drafting, jeopardizing the future of those projects and putting the developers' significant investments at risk while also threatening their ability to satisfy commercial, financing, permitting, interconnection, and tax-credit related deadlines.

### 4. *Projects Undergoing Preliminary Review*

167.    Associational Plaintiffs' members have multiple land-based wind projects that are awaiting preliminary reviews from the Clearinghouse—either in the form of a non-objection to the FAA or an NPR to begin the MRT process.  Ex. J (Blackman Decl. at ¶ 27(d)).

168.    Some of these projects have been waiting well beyond the 30 days required by Part 211 and the 75 days required by statute.  *Id.*

169.    On information and belief, Associational Plaintiffs' members have multiple land-based wind projects that have received NPRs but have not yet started the MRT process—well beyond customary timeframes for doing so.

170.    Project developers invest significant time and resources in projects before they get to the formal preliminary review phase in reasonable reliance on the predictability and efficiency of DoD's review process.  As with projects stuck in the other stages, DoD's delay threatens the viability of the projects stuck in initial review by preventing them from obtaining necessary FAA determinations and advancing to the construction of their projects.

## C.  Engagement with DoD by Wind Energy Developers

171.    Project sponsors have taken proactive and repeated steps to move their projects along in the DoD review process.  They have followed up with DoD to obtain status information and

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

receive countersigned documents through phone calls, emails, and requests for meetings with DoD to discuss the status of project review.

172. None of these efforts have been successful in prompting DoD to engage in its statutorily-mandated review process.

173. After learning about DoD's extreme delays from its members, the American Clean Power Association ("ACP") sent a letter to DoD on March 9, 2026 seeking information on the delays and asking DoD to clarify its position regarding its review process going forward. Ex. B (March 9, 2026 Letter from ACP to Dale R. Marks). ACP specifically asked DoD to clarify: (1) "the basis for the apparent departure from DoW's prior longstanding practice of promptly concluding agreements and transmitting findings to the FAA"; and (2) "if DoW does not intend to execute mitigation agreements for certain projects or categories of projects, please identify the legal and factual basis for that position." *Id.*

174. On April 8, 2026, DoD sent a response letter to ACP signed by Robert E. Thompson, PTDO Assistant Secretary of War. Ex. C (April 8, 2026 Letter from Robert E. Thompson to ACP). The letter did not indicate any timeline by which DoD would resume finalizing mitigation agreements or otherwise timely performing its review duties. Nor did the letter identify any project-specific deficiencies, newly discovered operational concerns, or failures of existing mitigation measures. Much like the letters that DoD sent to individual developers a few weeks later, *see* ¶ 127, *supra*, the only explanation that DoD provided for halting the review process was that it was "taking steps to ensure the Department's formal review of proposed projects is sufficient to address modern military risks." *Id.* It also referenced the government shutdown that ended on November 12, 2025, almost five months prior to its letter. *Id.*

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## D. Impacts on the Wind Energy Industry

175.    Utility-scale wind energy projects in the United States are capital-intensive infrastructure developments that rely on precise coordination of permitting, equipment procurement, interconnection, financing, construction, and commercial operations.  These projects are typically financed through a combination of debt and equity, with repayment structures and investment assumptions dependent on timely construction and commercial operation.  As a result, project timelines are a critical component of overall financial viability.

176.    Because of the scale of investment and the structure of project financing, any delay in project development materially increases project costs and risks.  As costs increase and timelines slip, the economic assumptions underlying project agreements deteriorate.  In some circumstances, those delays can result in project cancellation, stranded investments, loss of anticipated energy generation, and reduced availability of new electricity resources needed to meet consumer demand and grid reliability needs.

177.    Utility-scale wind energy projects typically rely on long-term Power Purchase Agreements ("PPAs") that establish fixed prices for the sale of electricity over extended periods of time.[4]  When delays and cost increases render these fixed-price agreements uneconomic, developers may be forced to seek renegotiation or termination.  The loss, impairment, or destabilization of a PPA can have cascading financial consequences because PPAs generally serve as the principal source of contracted revenue supporting project financing and lender requirements.

---

[4] Inst. for Hum. Rts. & Bus., *What Are Renewable Power Purchasing Agreements?* (Jan. 27, 2023), https://www.ihrb.org/resources/what-are-renewable-power-purchasing-agreements.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

178. Wind energy projects also face elevated financing risk premiums due to their scale and complexity. When delays cause the loss of contracted revenue, projects may breach financing covenants, require additional equity infusions, or face technical default.

179. In light of all of those considerations, wind energy projects carefully plan out the timing of their projects, and completing a project on time is critical to its success. Prior to August 2025, developers reasonably relied upon the established timelines and historical practices governing DoD review. But DoD's policy is upending that reliance and causing significant harms to wind developers.

180. Because of the complexity of wind projects, the specific harms of DoD's delay vary from company to company and project to project. But all wind projects across the country without DNHs are likely to experience at least one or more of the categorical harms described below:

### 1. Impacts on Power Purchase Agreements

181. PPAs typically establish a fixed schedule for various steps in the development process, up to and including the start of commercial operation. These agreements also frequently provide that the buyer has the right to collect liquidated damages or termination of the agreement if the developer fails to meet those deadlines. Ex. N (Decl. of Hughes *et. al.* at ¶ 60).

182. DoD's freeze is already threatening to cause some land-based wind energy projects without DNHs to miss their contractual PPA deadlines. So, without relief from this Court, wind developers will be subject to their customers seeking damages or PPA termination. And if a PPA is terminated, it often results in cancellation of a project and enormous losses of the sunk costs that wind developers have invested in the project. *Id.*

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## 2. Impacts on Financing

183.    Many land-based wind projects rely on third-party financing to provide the capital necessary for development and construction costs.  DoD's delay affects projects' ability to obtain financing because lenders are typically unwilling to bear the risk of development-stage ongoing and indefinite regulatory uncertainty and therefore typically will not provide funding unless and until DNHs are obtained. *Id.* at ¶ 61.

184.    As a result, DoD's policy prevents projects that need financing from proceeding to initial project activities such as environmental studies, land acquisition, equipment procurement, construction planning, and preliminary engineering.  And for projects that are able to conduct initial activities without any immediate external financing, it places those projects at risk of particularly significant sunk-cost losses if projects are ultimately unable to proceed to construction or commercial operation.  *Id.*

## 3. Impacts on Ordering and Receiving Components and Equipment

185.    While DoD's review freeze is in effect, many projects cannot execute contracts to purchase necessary components and equipment or finalize procurement schedules with manufacturers and suppliers.  This in turn will likely engender supply chain bottlenecks and could make it difficult for developers to obtain equipment and parts if DoD's indefinite pause is lifted.  That is a particular issue for wind energy because many turbine components and associated parts typically need to be tailored to project-specific requirements, making it difficult to obtain them if timing is not predictable.  *Id.* at ¶¶ 62 & 63.

186.    Because large wind turbine components such as blades, nacelles, and tower sections are very difficult to store, delays also force developers to cancel or defer deliveries of parts that

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

are already scheduled.  That can cause developers to incur penalties or damages under contracts, need to re-negotiate agreements, or in some cases be forced to abandon a project altogether.  *Id.*

187.    Wind turbine components created according to the specifications of particular projects are often difficult to reallocate to other buyers, so delays also significantly harm manufacturers of wind turbine components and related suppliers to the extent they have already manufactured parts and are unable to deliver them on the anticipated project schedule.  *Id.*

### 4.  *Labor Contract Issues*

188.    DoD's freeze will also significantly interfere with coordination of labor and construction activities for wind energy development.  Construction of wind projects depends on a highly skilled and specialized labor force and is sensitive to weather and constraints on the availability of contractors and their crews.  Construction activities are therefore scheduled months or years in advance according to carefully coordinated timelines, and DoD's delays will cause projects to miss those windows.  *Id.* at ¶ 64.

189.    Missing construction windows affects compliance with multiple contracts throughout the supply chain, including contracts with turbine installation crews and other specialized subcontractors.  Those contracts may subject wind project developers to delay damages, increased mobilization costs, cancellation fee damages, and termination rights, which can in turn affect their compliance with PPA deadlines.  *Id.*

### 5.  *Interconnection Issues*

190.    DoD's freeze also significantly impacts wind developers' ability to interconnect with power grids.   Interconnection is a complicated, resource-intensive, and highly regulated process that can take years to complete, so energy sources are typically placed in a queue behind other energy projects.  DoD's delay risks causing projects to miss particular critical interconnection

50

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

milestones, which may result in loss of queue position, withdrawal from the queue or substantial additional delay while other projects proceed ahead in the interconnection process. Such delays would compound the impact of DoD's delay on affected projects and reduce the timely addition of necessary new generation resources to the electric grid. *Id.* at ¶ 65

191. Interconnection agreements also typically include a substantial security deposit—often in the tens of millions of dollars—to cover the utility's costs for network upgrade, and that security deposit is typically forfeited if the project cannot achieve a particular Commercial Operation Date ("COD"). DoD's delays risk postponing developer's projects past the required COD, triggering the loss of that security deposit or other contractual penalties. *Id.*

### 6. *Tax Credit Eligibility*

192. DoD's freeze also has potentially massive impacts on wind developers' eligibility for federal tax credits under the framework established by One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025). Many utility-scale wind projects currently in development were financed, structured, and contracted based on the expectation that they would qualify for Many utility-scale wind projects currently in development were financed, structured, and contracted based on the expectation that they would qualify for production tax credits ("PTCs") or investment tax credits ("ITCs"), which are often essential to project financing and commercial viability. Those anticipated credits are frequently embedded directly into project financing assumptions, tax-equity structures, PPAs, construction contracts, turbine supply agreements, and overall project valuation. *Id.* at ¶ 66.

193. Eligibility for those tax credits is subject to strict timing requirements. Generally, projects must begin construction on or before July 4, 2026, and then must achieve placed-in-service status within four calendar years after the end of the year in which construction began.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Accordingly, projects beginning construction in 2025 generally must achieve placed-in-service status by December 31, 2029, while projects beginning construction on or before July 4, 2026 generally must achieve placed-in-service status by December 31, 2030.  Projects that do not begin construction on or before July 4, 2026 become subject to a substantially accelerated placed-in-service deadline of December 31, 2027.

194.    DoD's freeze threatens multiple categories of projects financed and developed under that framework and in reliance on those statutory deadlines.  Some projects have already begun construction for tax-credit purposes but now risk being unable to complete construction and achieve placed-in-service status before the applicable continuity-safe-harbor deadline because they cannot obtain final FAA DNHs that may be necessary to proceed into major onsite construction activity.  Other projects may be unable to satisfy applicable begin-construction requirements before the July 4, 2026 deadline because DoD's freeze prevents them from proceeding into qualifying construction activity and broader construction mobilization.  Projects unable to begin construction before July 4, 2026, may become subject to the accelerated December 31, 2027 placed-in-service deadline, which is likely functionally unworkable if the freeze DoD's review process continues.

195.    The resulting harms are immediate and potentially irreversible.  DoD's freeze disrupts carefully coordinated construction schedules involving financing commitments, tax-equity closings, turbine deliveries, contractor availability, interconnection work, and seasonal construction windows.  Once those schedules are disrupted, projects may lose critical financing, procurement windows, labor availability, and commercial arrangements, resulting in substantial additional delays or cancellation altogether.  For projects financed and structured in reliance on anticipated tax-credit eligibility, the loss of tax-credit eligibility may materially impair project

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

economics, undermine financing structures, or render projects economically unfinanceable altogether.

### 7. Carrying Costs

196.    Finally, DoD's policy inherently extends the time for which wind projects must incur ongoing carrying costs with no financial returns.  Those costs are significant and include the costs of leases or other holding interests in land, the cost of equipment that cannot be used and must be kept idle or stored, and the costs of labor or employees that are paid on a recurring or salaried basis.  *Id.* at ¶ 67.

197.    Those carrying costs are incurred on an annual, monthly, or even daily basis, so each additional period of delay further increases unrecoverable project costs and financial exposure for wind developers, even if their projects are ultimately still able to come online in the future.

## E.  Impacts on U.S. Energy Security, Jobs, and the Economy

198.    DoD's complete halt of wind projects is extremely consequential given the increasing national demand for new energy generation capacity, including renewable resources needed to support grid stability, economic growth, electrification, and large-scale industrial and technological demand.

199.    Wind power constitutes a substantial and growing component of the U.S. energy system.  Utility-scale wind energy is the largest source of renewable electricity in the United States, supplying approximately 10% of the nation's electricity and supporting over 161 gigawatts of installed capacity in 2025.[5]  Wind energy infrastructure is sufficient to power the equivalent of

---

[5] U.S. Energy Info. Admin., *Wind and Solar Generated a Record 17% of U.S. Electricity in 2025* (Mar. 20, 2026), https://www.eia.gov/todayinenergy/detail.php?id=67367; Am. Clean Power Ass'n, *Wind Power Facts*, https://cleanpower.org/facts/wind-power/ (last visited May 1, 2026).

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

more than 46 million American homes and represents a substantial portion of planned energy investment nationwide.[6]

200. The clean power sector has driven more than $743 billion in investment across the United States, and wind energy remains essential to future capacity additions, grid reliability and resilience, and economic growth.[7] The wind industry supports approximately 383,000 American jobs, including about 20,000 manufacturing positions across hundreds of facilities, and contributes roughly $2 billion annually in state and local tax and land-lease payments.[8]

201. Wind energy generates electricity without any direct carbon emissions, while also generating virtually no solid or hazardous waste, making it one of the most environmentally friendly methods of producing electricity.

202. As electricity demand rises—driven in part by exponential expansion of data centers and electricity demand for artificial intelligence—wind energy will need to provide a growing share of new generating capacity.

203. Congress has also repeatedly chosen to promote wind energy and other renewable energy sources through various statutes. As particularly relevant here, Congress specifically provided in the legislation authorizing DoD's review process that:

> OBJECTIVE.—It shall be an objective of the Department of Defense to **ensure that the robust development of renewable energy sources and the increased resiliency of the commercial electrical grid** may move forward in the United States, while minimizing or mitigating any adverse impacts on military operations and readiness.

---

[6] *Id*.

[7] Am. Clean Power Ass'n, *Clean Power Facts and Statistics*, https://cleanpower.org/facts/ (last visited May 1, 2026).

[8] *See* Am. Clean Power Ass'n, *Clean Power Annual Market Report 2024* (2024), https://cleanpower.org/resources/market-report-2024; Am. Clean Power Ass'n, *Clean Power Annual Market Report 2025* (Apr. 28, 2025), https://cleanpower.org/resources/market-report-2025.

54

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Pub. L. No. 111–383, 124 Stat. 4137 (2011) (emphasis added).

204.    Congress has also created numerous other incentives for wind energy development and programs directing the Government to use renewable energy including:

a.  10 U.S.C. § 2911(g), which provides that "[i]t shall be the goal of the Department of Defense" too "produce or procure not less than 25 percent of the total quantity of facility energy it consumes . . . from renewable energy sources."

b.  The Energy Policy Act of 2005, which also requires all federal agencies to increase their renewable energy consumption to at least 7.5% of total electricity use.  Pub. L. No. 109-59, 119 Stat. 594 (2005).

c.  Establishment and repeated revisions to and expansion of tax credits and investment tax credits for wind energy, starting with the 1992 Energy Policy Act and most recently updated in both the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022) and the One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025).

205.    DoD's current refusal to move projects forwards therefore flies in the face of Congress's repeated directives promoting renewable energy development, Congress's express instruction that DoD's review process accommodate renewable energy projects through mitigation where feasible, and Congress's repeated enactment of incentives designed to facilitate continued deployment of utility-scale wind energy projects.

206.    The current delays are already having notable substantial economic, employment, energy reliability, and environmental impacts that will only worsen the longer DoD's indefinite delay of reviews continues.  As ongoing delay causes additional canceled or deferred projects, the resulting loss of planned generating capacity will harm energy security by placing additional strain

55

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

on existing infrastructure and reducing the ability of the U.S. electric grid to respond to price shocks, extreme weather events, supply disruptions, and other reliability challenges.

207.    It also will have significant impacts in terms of lost jobs, reduced investment, and reduced economic activity that will spill over and have impacts beyond the wind industry.  It will affect the ability of both federal and state governments to meet their environmental goals, including rapidly increasing renewable portfolio standards in many states.  And by halting the development of wind projects, it creates downstream volatility in the availability and pricing of RECs, jeopardizing organizations such as GECA that rely on RECs for their revenue stream.  This deprives GECA and similarly situated organizations of the ability to carry out its mission and also harms GECA's reputation in the industry.  Ex. O (Chretien Decl. at ¶¶ 11-20).

## F.  The Government's Other Wind Energy Actions

208.    DoD's actions are just the latest attempt by the Government to stop wind energy development.  Starting in early 2025, the Government has tried—and failed—to implement multiple strategies including a permitting moratorium, stop work orders directed at individual offshore wind projects, and multiple agency policies that would disfavor or otherwise indefinitely hinder wind development in search of any mechanism that could be used to effectively halt the wind energy development pipeline.

209.    None of those efforts have survived judicial scrutiny.  Federal courts have repeatedly and consistently concluded that the Administration's attempts to suspend, delay or otherwise abdicate statutorily prescribed permitting obligations in order to "stop wind" are unlawful under the APA and preliminarily enjoined or vacated those actions.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

### 1. New York v. Trump

210.    The Government's first broad scale attack on wind energy was its January 20, 2025, Wind Presidential Memorandum ("Wind PM"), which directed all federal agencies to indefinitely suspend the issuance of any approvals and authorizations related to wind-energy development, nationwide, pending a specious government-wide "comprehensive assessment and review" of permitting practices.

211.    States and wind energy plaintiffs challenged agency implementation of that order in *New York*, 811 F. Supp. 3d at 227.

212.    The U.S. District Court for the District of Massachusetts held that the indefinite, government-wide suspension of wind-energy permitting constituted an unlawful final agency action that caused immediate legal and economic harms to developers, investors, utilities, and states dependent on renewable-energy deployment. *Id.* at 232-45.

213.    Specifically, the court found that defendants' actions were arbitrary and capricious, emphasizing that the Wind PM itself failed to identify any specific defects in existing permitting processes that might justify a nationwide suspension of all permitting activities across ten distinct statutory and regulatory regimes. *Id.* The court also noted that defendants abruptly, and unlawfully, deviated from decades of agency permitting policy and practice without providing any reasoned explanation for the change in position or consideration of reliance interests. *Id.* 231 n.7 (detailing the relevant statutes and regulations).

214.    The court likewise found that the Wind PM was contrary to law because it constituted an indefinite halt of application processing with no end date. It explained that the APA imposes "a general but nondiscretionary duty upon an administrative agency to pass upon a matter presented to it 'within a reasonable time.'" *Id.* at 241. This provision precludes an agency from

57

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

"declin[ing] to adjudicate applications altogether, for an unspecified time, pending the completion of a wide-ranging assessment with no anticipated end date." *Id.* at 242.

### 2. *RENEW Northeast v. DOI*

215. In the summer and fall of 2025, the Government renewed its efforts to stymie renewable energy development, this time expanding their attacks to cover both wind and solar development.

216. Specifically, multiple federal agencies issued a coordinated series of actions that each operated to delay, disfavor, or otherwise stymie wind and solar development:

a. In July 2025, DOI issued a memorandum ("Review Procedures Memo") requiring DOI's highest officials to assume all permitting-related responsibilities pertaining to renewable energy development, responsibilities historically managed by field and regional offices. By precluding DOI staff from taking any form of administrative action that might allow for wind and solar development to advance, it effectively ground to a halt permitting for wind and solar projects requiring DOI review nationwide.

b. On July 18, 2025, the Fish and Wildlife Service announced that wind and solar projects could no longer use the Information for Planning and Consultation ("IPaC") website. Federal agencies use IPaC to, among other things, determine whether Endangered Species Act Section 7 consultation is required and to process Clean Water Act permits. So, without access to IPaC, developers and agencies could not complete the environmental analyses necessary to secure federal, state, and local approvals ("Wind and Solar IPaC Ban").

c. On August 1, 2025, DOI Secretary Burgum issued an order ("DOI Land and Water Order") requiring DOI staff evaluating energy projects on federal lands and waters to consider whether alternative projects could produce the same or more energy on less land. That order treated projects with higher capacity densities—such as nuclear, gas, or coal

58

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

generation—as inherently "more appropriate" uses of federal lands and waters, while effectively disadvantaging wind and solar projects because those technologies generally require substantially larger land or water areas to generate equivalent amounts of electricity and while failing to fully assess the comparative environmental impacts of different energy projects.

d. On September 18, 2025, the Army Corps of Engineers issued a memorandum ("Corps Memo") that directed Corps staff to assess whether proposed energy projects make "efficient" use of lands and waters subject to Corps permitting jurisdiction based on "capacity density" metrics such as megawatts generated per acre. Much like the DOI Land and Water Order, the Corps Memo effectively predetermined that wind and solar projects are categorically unsuitable for Corps authorization when compared to higher-density forms of energy that generate more energy over a smaller area. As a result, the Corps Memo effectively predetermined that renewable-energy projects were categorically disfavored for Corps authorization based on their lower capacity-density characteristics rather than any project-specific environmental or statutory considerations.

e. Finally, on May 1, 2025, then-Acting DOI Solicitor, Gregory Zerzan, issued an opinion ("Zerzan M-Opinion") interpreting Outer Continental Shelf Lands Act to require the Bureau of Ocean Energy Management ("BOEM") to deny or reconsider offshore wind construction and operations plans whenever a project would interfere, even minimally, with other asserted "reasonable uses" of the Outer Continental Shelf, such as commercial fishing.

217. All of these actions were challenged in *RENEW Northeast v. Department of the Interior*, a suit filed in the District Court for the District of Massachusetts by regional renewable-

59

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

energy trade organizations against the DOI, Bureau of Land Management,  BOEM, U.S. Fish and Wildlife Service ("USFWS"), Bureau of Safety and Environmental Enforcement, and the Army Corps of Engineers.  No. 25-cv-13961-DJC, 2026 WL 1078282 (D. Mass. April 21, 2026).

218.    On April 21, 2026, the District Court for the District of Massachusetts entered an order granting the plaintiffs' motion to preliminary enjoin all challenged actions.  *Id.*

219.    In assessing the likelihood of success on the merits, the court held that the DOI "Review Procedures Memo" functioned as an unlawful de facto moratorium because it indefinitely delayed agency action on renewable-energy projects without any clear timeline or standards governing review.  *Id.* at *18.  The court rejected the argument that the memo would not be ripe for review until decisions on individual project applications were issued, finding that the plaintiffs could assert claims based on the permitting delays resulting from the review process itself.  *Id.* at *11. The court also concluded that it was a final agency action, explaining that had important legal consequences because "a suspension on agency authorizations prevents plaintiffs from moving forward with their proposed activities, such that they are trapped without recourse due to the indefinite postponement of agency action." *Id.* at *18 (cleaned up).  Finally, the court concluded that the DOI memo was likely arbitrary because DOI provided virtually no substantive explanation beyond generalized references to executive orders and presidential memoranda and failed to acknowledge its departure from longstanding permitting practice or the substantial reliance interests at stake.  *Id.* at *19.

220.    The court also found that the plaintiffs were likely to succeed on their challenge to the Wind and Solar IPaC Ban.  *Id.* at *22.  The court held that the restriction was a final agency action because it imposed immediate, practical consequences by cutting off access to a core permitting tool.  *Id.* And it found the ban likely arbitrary and capricious because USFWS offered no rational

60

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

explanation for singling out renewable-energy developers or distinguishing them from other regulated entities that retained access to the system. *Id.*

221. The court likewise found plaintiffs likely to prevail on their challenges to both DOI's "Land Order" and the related Corps Memo directing agencies to prioritize "capacity density" in evaluating energy projects. *Id.* at *23-27. The court explained that these orders "provide firm guidance to enforcement officials about how to handle permitting decisions," and thus constitute final agency action. *Id.* at *23. With respect to the DOI Land Order, the court concluded that plaintiffs were likely to succeed on their argument that the directives were contrary to law because they conflicted with governing statutes, including the OCSLA and the Federal Land Policy and Management Act, both of which require agencies to balance competing uses rather than elevate a single metric into a controlling criterion. *Id.* at *23-26. With respect to the Corps Memo, the court further concluded that it was likely arbitrary and capricious because it failed to "adequately explain why the Corps must prioritize processing Clean Water Act and Rivers and Harbor Act permit applications for high-capacity density projects." *Id*. at *26-27. The court further recognized that these ""capacity density"" frameworks effectively disadvantaged renewable-energy projects, particularly wind and solar projects, relative to higher-density energy sources. *Id.*

222. Finally, the court held that the Zerzan M-Opinion was also a final agency action that was contrary to law. *Id.* at *27. First the court found that it was reviewable, under the APA, because it provides "firm" and "authoritative" guidance to enforcement officials about permitting activity under § 8(p)(1) of OCSLA, requiring DOI to "prevent all [more than de minimus] interference with fishing or other reasonable uses of the OCS" and "to re-evaluate all agency action taken under the withdrawn Anderson M-Opinion." *Id.* at *28 (cleaned up). The court then found that the Zerzan M-Opinion was likely arbitrary and capricious because "it fails to account for

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

serious reliance interests that offshore developers had in DOI's prior, predictable permitting procedures." *Id*. (cleaned up).

### 3. Stop Work Order Litigation

223.    In December 2025, the BOEM issued stop work orders to five offshore wind energy developments that were under construction directing them to "stop all ongoing activities" for 90 days.  Ex. D (Transcript of Preliminary Injunction Oral Ruling at 4-5, *Empire Leaseholder LLC v. Burgum*, No. 1:26-cv-00004 (D.D.C. Jan. 15, 2026)).  BOEM purported to base those orders on asserted national security concerns tied to classified information it had recently received from DoD.  *See id* at 5.

224.    All five stop work orders were challenged, and the federal district courts in all five granted emergency relief preventing enforcement of the stop work orders, including through a stay in one case and preliminary injunctive relief in the others.  *Id.*; Ex. E (Transcript of Motion Hearing at 52, *Virginia Electric & Power Co. v. U.S. Dep't of the Interior*, No. 2:25-cv-830 (E.D. Va. Jan. 16, 2026)); Ex. F (Transcript of Preliminary Injunction Hearing at 46, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL (D.D.C. Jan. 12, 2026)); Ex. G (Transcript of Motion Hearing at 57, *Vineyard Wind 1, LLC v. U.S. Dep't of the Interior*, No. 26-10156-BEM (D. Mass. Jan. 27, 2026)); Ex. H (Transcript of Preliminary Injunction Hearing at 64*, Sunrise Wind, LLC v. Burgum,* No. 1:26-cv-00028-RCL (D.D.C. Feb. 2, 2026)).

225.    In granting emergency relief, the district courts universally found that BOEM had failed to satisfactorily explain why the completion of the projects would present national security concerns.  For example, the Eastern District of Virginia emphasized that those concerns were not "particularized" to the projects at issue, Ex. E (*Dominion Wind* transcript), and the District Court for the District of Columbia indicated that the "stated national security reason[s] may have been

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

pretextual." Ex. F (*Revolution Wind* transcript). Courts also noted that ordinary mitigation processes should have been able to address any national security concerns. *See id.*

226. The district courts also found that the impacts to wind energy developers of the delays were immediate and severe. Among other things, the courts found that the delays could lead to cancellation of the projects, which could lead to billions of dollars of sunk costs on top of the millions of dollars per day caused by the delays. *See, e.g., id.*

227. And the courts found that the balance of the equities weighed in favor of emergency relief because wind energy development has important public benefits that outweighed the minimal burden identified by the Government. For example, the District of Massachusetts emphasized the significant impacts of the projects on jobs, energy generation, and economic investment, which it found outweighed the security concerns that were susceptible to being addressed through mitigation. Ex. G (*Vineyard Wind* transcript).

228. Together, *New York v. Trump*, *RENEW Northeast*, and the stop work order cases show a consistent pattern of the Government using unlawful means to target wind energy development. In all of those cases, the court found that the challenged measures were attempts to restructure renewable-energy permitting without statutory authority, reasoned explanation, or regard for the reliance interests built around the existing regulatory framework.

229. Of particular import here, these decisions emphasize that agencies cannot indefinitely abdicate their permitting responsibilities by imposing open-ended review processes, suspending ordinary permitting functions, or layering extra-statutory criteria onto existing regulatory schemes in a manner that effectively prevents applications from moving forward.

230. Those cases also universally found that wind energy provides important economic, environmental, and employment benefits, and that delays in wind energy development cause

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

significant public harm.  Several of those decisions are particularly relevant here because the courts rejected attempts to justify halting wind-energy development based on generalized and unsupported national security assertions untethered to project-specific analysis or established mitigation processes.

## COUNT I

### APA 706(2): DoD's Review Freeze is
### Arbitrary, Capricious, Contrary to Law, and Failed to Follow Required Procedures

231.    Plaintiffs incorporate paragraphs 1 through 205 as if fully set forth herein.

232.    Under Section 706(2) of the APA, final agency action must be set aside when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or promulgated "without observance of procedure required by law."  *See* 5 U.S.C. § 706(2)(A), (D).

233.    DoD's freeze of its review of wind energy projects must be set aside under Section 706(2) because is violates those standards in multiple ways.

### A.  DoD's Review Freeze is a Final Agency Action

234.    Final agency actions are reviewable under Section 706(2) of the APA.  An action is "final" if it (1) "marks the consummation of the agency's decision-making process" and (2) determines "right and obligations" or creates "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

235.    The DoD freeze has effectively stopped performance of all of DoD's duties to review wind energy projects.

236.    That policy is a final agency action under *Bennett*.  It has concrete and significant legal consequences because it prevents wind energy projects from receiving a DNH from the FAA and, without that sign-off, wind energy projects typically cannot move forward with construction and commercial operation.  And it is sufficiently "final" because there is no indication that DoD is

64

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

further developing or refining that policy—to the contrary, DoD's April 13, 2026 communication to the Clearinghouse and its May 7, 2026 memorandum together demonstrate that DoD is indefinitely halting its wind energy reviews (while continuing to review other types of projects in the ordinary course).

237.    Similar agency policies and actions that indefinitely "pause" or otherwise result from decisions not to act on an ongoing required review process have repeatedly been recognized as final agency actions. *See Doe v. Trump*, No. 1:25-CV-13946-JEK, 2026 WL 1170971, at *6 (D. Mass. Apr. 30, 2026); *Behdin, et al. v. Edlow*, No. 26-cv-00566-SVK, 2026 WL 1031079 (N.D. Cal. April 16, 2026); *Varniab v. Edlow*, No. 25-cv-10602-SVK, 2026 WL 485490 (N.D. Cal. Feb. 20, 2026).

238.    Agency policies and practices remain reviewable under the APA even where they are implemented through informal directives, internal guidance, or unwritten agency practice rather than formal regulations. "Both logic and law require unwritten policies to be reviewable" because "any ruling to the contrary would allow agencies to avoid review by simply not putting their decisions in writing." *M-J-M-A- v. Hermosillo*, No. 6:25-CV-02011-MTK, 2026 WL 562063, at *18 (D. Or. Feb. 27, 2026).

### B. DoD Did Not Articulate a Reasoned Basis for its Policy.

239.    The "arbitrary and capricious" standard requires that an agency examine the relevant information before it and articulate a basis for its action, including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

240.    DoD has not provided any plausible explanation—let alone a reasoned basis—for its inaction in its review of wind energy projects. Despite its recent communications to wind energy

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

developers that it is not processing any applications, it has provided no official explanation for that policy whatsoever.

241.    The closest thing to an explanation that DoD has provided is its boilerplate assertion in a letter to the American Clean Power Association that it was reviewing projects to assess their "compatibility with the national security of the United States."  Ex. C (April 8, 2026 Letter from Robert E. Thompson to ACP).  That vague statement, without more, is not a "reasoned basis" for a policy indefinitely freezing its statutorily required review process.  It is certainly not the type of project-specific analysis that DoD is directed by 10 U.S.C. § 183a and its own regulations to perform.

242.    DoD's brief reference to the 2025 government shutdown does not help it either.  Arguing that the government shutdown in fall 2025 is causing an across-the-board halt in DoD's review process "is so implausible that it could not be ascribed to a difference in view." *State Farm*, 463 U.S. at 43.  Indeed, DoD started the process by shutting down all final sign offs in August 2025, *several months before the shutdown*, and then halted all steps of its review process—long after the shutdown was resolved in November 2025.

243.    That lack of any reasoned basis for DoD's actions is sufficient by itself to render DoD's actions arbitrary and capricious.

### C. DoD's Policy Was Based on Impermissible Factors.

244.    An agency action is also arbitrary and capricious where the agency has "relied on factors which Congress has not intended it to consider." *Id.*

245.    A rule that is based on impermissible considerations cannot be saved by the mere recitation of an alternative rationale when the "stated rationale [is] pretextual" or "contrived." *Dep't of Com. v. New York*, 588 U.S. 752, 773–74 (2019).  Courts have considered a rationale to

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

be pretextual where it is concealing political purposes or animus. *See Am. Fed'n of State Cnty. & Mun. Emps., AFL-CIO v. U.S. Off. of Mgmt. & Budget*, 807 F. Supp. 1004, 1034 (N.D. Cal. 2025) (invaliding agency action that was "intended for the purpose of political retribution").

246. There is abundant evidence that DoD's policy is part of the Government's overarching goal of preventing wind energy development.

247. The President has repeatedly disparaged wind energy projects, referring to them as a "scam" and a "junkyard of steel."[9] He has also repeatedly stated that he intends to "not approve[] one windmill" during his time in office.[10]

248. The actions taken by agencies across the Government in *New York v. Trump*, *RENEW Northeast* and the stop work order casecs—each of which have now been vacated or preliminarily enjoyed—are each consistent with that animus towards wind energy.

249. DoD is now following suit, effectuating the Government's broader policy of impeding or preventing wind energy development. That targeting of wind energy is clearly demonstrated by DoD's May 7 memorandum which, without reasoned explanation, treats wind energy differently from all other energy technologies.

250. DoD's vague and conclusory references to "national security" and the government shutdown as explanations for its delay only underscore that its articulated bases for its action are pretextual. That is a quintessential example of an agency relying on a "factor[] which Congress has not intended it to consider" in exercising its authority—and therefore acting arbitrarily and

---

[9] Benjamin Storrow, Kelsey Tamborrino & Jessie Blaeser, *'Windmills are a disgrace': Inside Trump's war against a growing US industry*, Politico (Dec. 11, 2025), https://www.politico.com/news/2025/12/11/how-the-wind-industry-misread-trump-00666895.

[10] Tamara Keith, *Trump Takes Aim at Windmills Despite Increasing Energy Costs*, NPR (Mar. 24, 2026), https://www.npr.org/2026/03/24/nx-s1-5684158/trump-takes-aim-at-windmills-despite-increasing-energy-costs; Dinah Voyles Pulver, *Trump assails 'windmills' and wind energy as junk: 'They're losers'*, USA Today (Jan. 9, 2026), https://www.usatoday.com/story/news/nation/2026/01/09/trump-assails-windmills-and-wind-energy-as-junk-theyre-losers/88108694007/.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

capriciously under *State Farm*, 463 U.S. at 43.

### D. DoD Failed to Consider Important Factors Congress Directed it to Analyze

251.    Agency action is also arbitrary and capricious where the agency "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

252.    Here, the impacts of DoD's policy on the development of wind energy were undoubtedly an "important aspect of the problem" because Congress explicitly directed DoD to consider it.  The authorizing legislation for DoD's review process specified that "it shall be the policy of the Department of Defense to ensure that the ***robust development of renewable energy sources and the increased resiliency of the commercial electrical grid*** may move forward in the United States, while minimizing or mitigating any adverse impacts on military operations and readiness."  Pub. L. No. 111-383, 124 Stat. 4137 (2011) (emphasis added).

253.    DoD in turn incorporated that directive in 32 CFR § 211.4, which provides that "it is an objective of the Department of Defense to ensure that the robust development of renewable energy sources and the increased resiliency of the commercial electrical grid may move forward in the United States, while minimizing or mitigating any adverse impacts on military operations and readiness."

254.    The explicit direction is in line with other Congressional directives for the Government to prioritize developing wind and other renewable energy, including Congress's guidance in 10 U.S.C. § 2911(g) that "[i]t shall be the goal of the Department of Defense" to "produce or procure not less than 25 percent of the total quantity of facility energy it consumes . . . from renewable energy sources."

255.    Yet, DoD did not consider the impacts of its delay on ongoing wind energy development.  There is no indication that it considered, for example, that its delays would stymie

wind projects' ability to meet deadlines in PPAs, tax-credit frameworks, financing commitments, interconnection requirements, leases, or state and local permitting requirements and thereby threaten the viability of projects. It likewise did not consider other impacts on wind development, including supply chain bottlenecks, manufacturing delays, and interference with labor agreements and other contracts. And it in turn did not analyze the impacts of those issues on the overall prospects of developing wind energy resources in the United States, including the "resiliency of the commercial electric grid" and the renewable-energy development and clean-energy targets adopted by the federal government and numerous state governments.

256.    By failing to give any weight to those considerations—or analyze them at all—DoD acted arbitrarily and capriciously in adopting a policy of indefinite delay for processing wind energy projects in the Clearinghouse review process that represented a dramatic departure from its longstanding policy and practice of expeditiously conducting its review process.

### E. DoD Changed Its Policy Without Considering Reliance Interests or Alternatives.

257.    Although an agency can change its policies, an agency that departs from its previous policy must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (internal quotation omitted). It must assess the strength of those reliance interests and "weigh them against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1895 (2020).

258.    If an agency chooses to change its policy in spite of serious reliance interests it has created, it must provide a "reasoned explanation" for doing so, including an analysis of other alternatives. *Id.* And even in the absence of reliance interests, an agency must at least acknowledge in its action that it is departing from its prior policy. *F.C.C. v. Fox Television*

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

*Stations, Inc.*, 556 U.S. 502, 515 (2009).

259.    Prior to 2025, DoD consistently adhered to well-understood criteria and timelines, which generally followed the statutory and regulatory timelines for its review process.  And for steps of the Clearinghouse review process without explicit statutory or regulatory deadlines, DoD processed applications in an expeditious manner, consistent with well established timeframes.

260.    Wind energy developers have made significant investments in planning new wind projects in reasonable reliance on DoD's prior policy of expeditiously performing its review.

261.    Wind energy developers had particularly good reason to rely on DoD's prior policy: Congress directed DoD to develop a "comprehensive strategy" for assessing the impacts of wind and other energy projects, including "identify[ing] distinct geographic areas" where projects are likely to have impacts on military operations or readiness and "specifically identify[ing] feasible and affordable long-term actions that may be taken to mitigate adverse impacts of projects."  10 U.S.C. § 183a(f).  DoD had taken steps to implement that comprehensive strategy so, prior to the freeze, project developers could be reasonably certain ahead of time whether their project was likely to require mitigation and the approximate time frame that it would take to finalize a mitigation agreement.

262.    Yet, starting in August 2025, DoD abruptly adopted a policy of indefinite delay, a dramatic change from its prior policy of expeditiously processing applications.

263.    In doing so, it did not give any consideration to the effect of its new policy on those reasonable reliance interests, much less "weigh them against competing policy concerns" or consider alternatives to its indefinite freeze of its review.  *Regents*, 140 S. Ct. at 1895.

264.    Indeed, DoD has not acknowledged its change in policy, as its May 7 memorandum explicitly disclaimed that it had changed any policy.  Ex. A (May 7, 2026 Memorandum).  That

70

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

failure to recognize its own change is sufficient by itself to render DoD's new policy arbitrary and capricious. *Fox Television Stations*, 556 U.S. at 515.

### F. DoD's Freeze Violates Statutory and Regulatory Timing Requirements.

265. Agency actions that are contrary to relevant statutes and regulations are easily set aside under Section 706(2) as contrary to law. *See Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 609 (2013). 5 U.S.C. § 555 (b) also requires that 'within a reasonable time, each agency shall proceed to conclude a matter presented to it,' and 5 U.S.C. § 558(c) similarly requires that agencies act on an 'application . . . for a license' (a term that is defined broadly in 5 U.S.C. § 551(8)) 'within a reasonable time.

266. DoD's policy of indefinitely freezing its review process is contrary to law because it directs DoD to violate statutory and regulatory obligations.

267. To begin with, DoD is violating Section 183a by failing to conduct a preliminary review within the 75-day deadline after it receives those applications from the FAA.

268. While DoD's May 7, 2026 memorandum says that DoD will begin complying with the 75-day deadline for preliminary reviews "effective immediately," that implicitly recognizes that DoD had not been complying with that deadline prior to May 7. And Plaintiffs are currently unaware of any projects for which DoD has completed preliminary review (including, where warranted, an NPR) since the May 7 memorandum.

269. DoD is also violating its own regulatory deadlines, including:

   a. its deadline to make complete its preliminary review within 30 days, 32 C.F.R. § 211.6; and

   b. its deadline to conclude mitigation discussions within 90 days absent a mutually agreeing in writing upon an extension, *id.*

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

270.    Notably, despite its direction to complete preliminary reviews "within 75 days", DoD's May 7 memorandum says nothing about complying with DoD's shorter 30-day requirement in Section 211.6.  That amounts to an effective instruction to DoD components that they do *not* need to follow that deadline.

### G. DoD Failed to Follow Required Notice-and-Comment Rulemaking Procedures.

271.    Under Section 553 of the APA, when an agency promulgates a legislative rule, it must use at least notice-and-comment rulemaking procedures.  Legislative rules are those that "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress."  *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003).  And courts "need not accept the agency characterization" of whether it has promulgated a legislative rule "at face value."  *Id.*

272.    Here, DoD's review freeze is an across-the-board policy that changes the existing legal framework for its review for all wind developers going forward.  As such, it is a quintessential legislative rule, but DoD never provided the notice-and-comment process that the APA requires.

273.    Indeed, DoD's new policy directly conflicts with DoD's own regulations in Section 211.6—including its 30-day requirement for making an initial determination and the 20-day requirement for providing initial comments—a telltale sign of a legislative rule requiring notice-and-comment.  *See Hemp Indus. Ass'n*, 333 F.3d at 1087.  Since Section 211.6 was passed using notice-and-comment procedures, *see* 78 Fed. Reg. 73088, (Dec. 5, 2013), it can only be repealed or modified through that same process.  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (noting that Section 551 of the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance").

274.    DoD's failure to provide for notice-and-comment deprived wind developers and other

72

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

interested stakeholders of their procedural rights to provide comments to DoD that it would have then needed to consider before finalizing its new policy. Its review freeze should be set aside for that reason too.

*  *  *  *  *

275. Therefore, consistent with Section 706(2) of the APA, the Court should set aside or vacate DoD's policy of halting its review process.

276. The Court should also retain jurisdiction after vacating or setting aside DOD's policy and require status reports every 30 days so that it can monitor whether DoD has resumed its review for wind energy projects. At a minimum, those status reports should identify: (a) projects with mitigation agreements executed by developers that are awaiting countersignature by DoD; (b) projects that have completed the MRT process but have not yet received draft mitigation agreements from DoD; (c) projects that are in the middle of the MRT process; ((d) projects with an NPR but awaiting MRT discussion; and (e) projects that are awaiting preliminary review determinations (e.g., issuance of an NPR or non-objection). The status reports should also identify the average and project-specific durations of review at each stage of the process and any projects for which review remains paused or delayed beyond applicable statutory or regulatory timelines, including an explanation for such delay. Such continuing jurisdiction and reporting requirements are necessary to ensure Defendants resume and continue complying with their statutory and regulatory obligations regarding wind energy review.

<strong><u>COUNT II</u></strong>

<strong><em>APA 706(1): DoD Has Unlawfully Withheld or Unreasonably Delayed<br>Its Review</em></strong>

277. Plaintiffs incorporate paragraphs 1 through 251 as if fully set forth herein.

278. Section 706(1) of the APA authorizes a reviewing court to "compel agency action

73

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

unlawfully withheld or unreasonably delayed."

### a. DoD Unlawfully Withheld Required Action.

279.    Agency actions "unlawfully withheld" "when an agency refuses to accept, in any form, a request that it take a required action." *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1120–21 (9th Cir. 2025), *cert. granted*, *Noem v. Al Otro Lado*, No. 25-5 (2025).

280.    For example, an agency has unlawfully withheld an action where it has "admit[ed] that … final adjudication of the applications is on hold" and "failed to explain when and by what criteria a decision will be made to lift the hold." *Varniab*, 2026 WL 485490 at *15.

281.    Agency actions are also unlawfully withheld when the agency violates binding deadlines, including deadlines under its own regulations. *See Gonzalez Rosario v. U.S. Citizenship & Immigr. Servs.*, 365 F. Supp. 3d 1156, 1161 (W.D. Wash. 2018) (compelling agency to adhere to 30-day deadline under its regulations).

282.    Here, DoD has unlawfully withheld required action by refusing to move its review process forward.  It started withholding finalization of approval in August 2025, entirely "refusing to accept" requests for action on mitigation agreements that are signed by the developer and awaiting final action by DoD.

283.    On April 13, 2026, DoD imposed a blanket freeze on all steps of its review process. That is an even more obvious unlawful withholding of action—it has placed all review activities "on hold" and "failed to explain when and by what criteria a decision will be made to lift the hold." *Varniab*, 2026 WL 485490 at *15.

284.    DoD's review freeze is also a clear unlawful withholding of agency action because it is causing it to miss several statutory and regulatory deadlines:

    a. *First*, DoD is violating the deadlines in Section 183a because it is allowing more

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

than 75 days to pass after it receives wind energy applications from the FAA without conducting a preliminary review of those applications. While DoD's May 7 memorandum indicated that DoD would comply with the 75-day deadline going forward, Plaintiffs are not aware of any evidence that it is doing so.

b. *Second*, DoD is violating several of its own regulatory deadlines in Part 211.

    i. The Clearinghouse is failing to complete its preliminary review and issue NPRs or non-objections within 30 days. *See id.*

    ii. And, when DoD has issued an NPR and the developer has agreed to engage in mitigation discussions, it has failed to conclude those MRT discussions within 90 days without mutually agreeing in writing to an extension. *Id.*

Tellingly, DoD made *no* indication that it intended to follow those regulatory deadlines in its May 7 memorandum.

285.     To be sure, DoD's freeze is also an unlawful withholding of several of DoD's actions that are non-discretionary but lack an explicit statutory deadline because DoD has made clear that it has no intention of performing them on any timetable. For example, DoD's current policy has also frozen the processing of review for projects for which MRT discussions have concluded but for which no draft mitigation agreement has been provided. DoD has made clear that it will not move forward with review for those projects *at all*, a quintessential example of an agency "unlawfully withholding" an action.

286.     DoD is unlawfully withholding statutorily required action on each of the Developer Plaintiffs' projects. Specifically, DoD is:

a. refusing to countersign developer-signed mitigation agreements for Developer Plaintiffs Las Crestas Wind Energy, LLC; Apex Clean Energy Holdings, LLC

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(through its subsidiaries Lariat Project, LLC, Goldrush Apple Energy, LLC, and Windswept Plain Wind LLC); Nova Clean Energy, LLC; North Hills Wind Project, LLC; Prairie Phoenix Wind Project, LLC;  Deuel Harvest Wind Energy South LLC; Lazbuddie Wind Energy II LLC; Thresher Wind LLC; Towner Wind Energy II LLC; Triton Wind Energy LLC; Whitetail Wind, LLC; Meadow Lake II Windfarm, LLC; Blackstone Wind Farm II, LLC; and Big River Wind, LLC;

b.  refusing to transmit draft mitigation agreements for Developer Apex Clean Energy Holdings, LLC (through its subsidiaries Siete Wind, LLC, Homestead Wind, LLC, and Pecos Flats Wind, LLC); Horse Thief Wind Project, LLC; Crider Valley Wind Energy LLC; Canisteo Wind Energy LLC; and Blue Canyon Windpower V, LLC; and

c.  freezing the MRT process for Hammerhead Wind Energy LLC and Ramble Wind Energy LLC.

## b.  Alternatively, DoD Unreasonably Delayed Those Actions.

287.    At the very minimum, it is clear that DoD is unreasonably delaying its review process. The Ninth Circuit has assessed whether agency actions are "unreasonably delayed" based on the "*TRAC* factors" first articulated by the D.C. Circuit:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re Pesticide Action Network N. Am., Nat. Res. Def. Council, Inc.*, 798 F.3d 809, 813 (9th Cir. 2015).

288.    The *TRAC* factors demonstrate that the delays in DoD's review are not justified in the context of the statutory and regulatory review framework and are unsupported by the boilerplate justifications DoD has articulated for the delay:

a.   First, DoD's delay is unsupportable under a "rule of reason" when it has violated multiple statutory and regulatory deadlines.  DoD's delays are also grossly outside of its historical practices even for steps in the review process that do not have explicit deadlines, such as the time period between a project proponent's signature of a mitigation agreement and DoD's counter signature, which has consistently been less than sixty days.

b.   Second, DoD has not articulated any compelling competing priorities or other need for the delay.   Its vague reference to "national security" in a letter to the American Clean Power Association. Ex. C (April 8, 2026 Letter from Robert E. Thompson to ACP), does not move the needle.  *See Doe v. Risch*, 398 F. Supp. 3d 647, 658 (N.D. Cal. 2019) ("[T]he mere invocation of national security is not enough to render agency delay reasonable per se.")

c.   Third, DoD has not identified any "concrete timetable" by which it plans to act on applications in the future; instead, its reference to an undefined further "review" process is simply a "roadmap for further delay." *Pesticide Action Network*, 798 F.3d at 814.

d.   Fourth, DoD's freeze is having significant deleterious impacts on not only the wind energy industry, but the nation's economy, grid reliability, and energy security.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Those impacts are heightened at a time at which electricity costs are historically high, driven in part by increased demand from AI and data centers.

e. Fifth, there are strong indications that DoD's intentional freeze of its wind project review process is driven not by legitimate concerns with national security but by a generalized predisposition against wind energy. The DoD delays are just one in a long line of anti-wind actions taken by the Administration, several of which have already been struck down or enjoined by courts. *See* ¶¶ 183-205, *supra*. Particularly when combined with statements by the President indicating that "we will not approve wind,"[11] those actions demonstrate that DoD's policy is driven primarily by concerns other than national security.

289. Therefore, consistent with Section 706(1) of the APA, the Court should declare that DoD has unlawfully withheld or unreasonably delayed action at each step of its review process, including: (1) countersigning final mitigation agreements; (2) drafting mitigation agreements; (3) participating in the MRT discussion process; and (4) performing its preliminary reviews.

290. The Court should order DoD to immediately resume processing wind-energy applications expeditiously and within a reasonable time in compliance with its statutory and regulatory deadlines and consistent with longstanding historical practices prior to DoD's review freeze.

291. The Court should further order DoD to take the specific steps with respect to particular categories of applications described in the requested relief, including promptly resuming review, completing mitigation discussions, transmitting draft mitigation agreements, executing final

---

[11] Spencer Kimball, *Trump Says U.S. Will Not Approve Solar or Wind Power Projects*, CNBC (Aug. 20, 2025), https://www.cnbc.com/2025/08/20/trump-says-us-will-not-approve-solar-or-wind-power-projects.html.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

mitigation agreements, issuing required determinations, and transmitting non-objections to the FAA in accordance with Defendants' statutory and regulatory obligations.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter judgment for Plaintiffs;

B. Vacate or set aside DoD's unlawful policy freezing its review for wind energy projects;

C. Order DoD to provide a status report every 30 days summarizing each of the actions it has taken to effectuate its duty to review wind energy projects, including the steps taken to address:

  i. Projects with a mitigation agreement executed by the developer that are awaiting countersignature by DoD;

  ii. Projects that have completed the MRT process but have not yet received a draft mitigation agreement from DoD;

  iii. Projects that were in the middle of the MRT process;

  iv. Projects that have received an NPR and are awaiting initial MRT meetings; and

  v. Projects that are awaiting completion of a preliminary review and issuance of an NPR determination or non-objection transmittals to the FAA;

D. Declare that DoD has unlawfully withheld and/or unreasonably delayed each of its required review duties for wind projects;

E. Order DoD to take action on all projects with a mitigation agreement executed by the developer that are awaiting countersignature by DoD within 30 days.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

F.  Order DoD to take action with respect to all projects that have completed the MRT process but have not yet received a draft mitigation agreement from DoD within 60 days;

G.  Order DoD to resume the MRT process for all projects with pending MRT discussions or pending requests for initial MRT meetings, and conduct that process as expeditiously as possible;

H.  For all projects for which the preliminary review does not result in an NPR and therefore does not require MRT review, order DoD to communicate its non-objection or clearance determination to the FAA within 30 days pursuant to 32 C.F.R. § 211.6;

I.  Order DoD to conduct its preliminary review and make a determination as to whether to issue an NPR within 15 days or the required deadline under 10 U.S.C. § 183a and 32 § C.F.R. § 211.6, whichever is later;

J.  Declare that DoD has unlawfully withheld and/or unreasonably delayed agency action required by law with respect to the Developer Plaintiffs' projects.

K.  Order DoD to take action within 30 days with respect to countersignatures for projects owned or developed by Developer Plaintiffs Las Crestas Wind Energy, LLC; Apex Clean Energy Holdings, LLC (through its subsidiaries Lariat Project, LLC, Goldrush Apple Energy, LLC, and Windswept Plain Wind LLC); Nova Clean Energy, LLC; North Hills Wind Project, LLC; Prairie Phoenix Wind Project, LLC; Deuel Harvest Wind Energy South LLC; Lazbuddie Wind Energy II LLC; Thresher Wind LLC; Towner Wind Energy II LLC; Triton Wind Energy LLC; Whitetail Wind, LLC; Meadow Lake II Windfarm, LLC; Blackstone Wind Farm II, LLC; and Big River Wind, LLC;

L.  Order DoD to take action with 60 days with respect to draft agreements for projects owned or developed by Developer Plaintiffs Apex Clean Energy Holdings, LLC (through its

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

subsidiaries Siete Wind, LLC, Homestead Wind, LLC, and Pecos Flats Wind, LLC); Horse Thief Wind Project, LLC; Crider Valley Wind Energy LLC; Canisteo Wind Energy LLC; and Blue Canyon Windpower V, LLC;

M.  Order DoD to resume the MRT process for Hammerhead Wind Energy LLC and Ramble Wind Energy LLC;

N.  Order DoD to provide the notice to state governors required by 10 U.S.C. § 183a(b)(3) within 30 days;

O.  Award Plaintiffs their litigation costs and reasonable attorney's fees; and

P.  Order such other relief as the Court may deem just and proper.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Dated:  June 22, 2026

Respectfully submitted,
MORGAN, LEWIS & BOCKIUS LLP

_____
Michael Giaquinto, OSB#: 246342
MORGAN LEWIS & BOCKIUS LLP
South Grand Ave., 22nd Floor
Los Angeles, CA 90071-3132
T: 213-612-7227
michael.giaquinto@morganlewis.com

Jennifer Trock (pro hac vice to be filed)
Douglas Hastings (pro hac vice to be filed)
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000
jennifer.trock@morganlewis.com
douglas.hastings@morganlewis.com

Ella Foley Gannon (pro hac vice to be filed)
600 Montgomery Street
Suite 2300
T: 415-442-1000
San Francisco, CA 94111-2725
ella.gannon@morganlewis.com

*Attorneys for Plaintiffs (except Las Crestas Wind Energy LLC)*

Darin Sands
OSB No. 106624
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480
dsands@bradleybernstein.com

Richard W. Smith (pro hac vice to be filed)
Kathleen Mueller (pro hac vice to be filed)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
T: 202-736-8000

82

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

rwsmith@sidley.com
kmueller@sidley.com

*Attorneys for Plaintiff Las Crestas Wind Energy,*
*LLC*

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**