**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | | |
|---|---|---|
| RENEWABLE NORTHWEST, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:26-CV-01092 |
| | § | |
| PETER B. HEGSETH, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**FEDERAL DEFENDANTS' COMBINED MOTION TO DISMISS AND**
**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR**
**<u>PRELIMINARY INJUNCTION</u>**

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

<u>/s/ Shawn D. Ren</u>
Shawn D. Ren, Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
999 18th St., N Terrace, Suite 600
Denver, CO 80202
Tel: (202) 598-3141
Fax: (303) 844-1350
E-mail: shawn.ren2@usdoj.gov

*Attorney for Federal Defendants*

**TABLE OF CONTENTS**

I.      BACKGROUND ..............................................................................................2

        A.      Statutory Overview .........................................................................2

        B.      Factual Background...........................................................................5

II.     STANDARD OF REVIEW ...........................................................................8

        A.      Subject-Matter Jurisdiction..............................................................8

        B.      Preliminary Injunctions ..................................................................8

III.    The Complaint Should be Dismissed for Lack of Jurisdiction.......................9

        A.      Congress Required Direct Review with the Court of Appeals...........11

        B.      Plaintiffs' Programmatic, Non-Individualized Policy Attack Falls Outside
                the Scope of APA Jurisdiction.......................................................14

        C.      Plaintiffs Have Not Identified a Final Agency Action Subject to Judicial
                Review.........................................................................................18

                1.      Plaintiffs have not identified a consummation of an agency
                        decisionmaking process..................................................19

                2.      DoW has not affected any rights or obligations nor created legal
                        consequences. ..............................................................20

        D.      Organizational Plaintiffs Bringing This Motion Lack Standing.........22

IV.     The Preliminary Injunction Motion Should be Denied.................................23

        A.      Plaintiffs Seek a Mandatory Injunction on the Merits, Not a Stay Pending
                Litigation.....................................................................................24

        B.      Plaintiffs are Unlikely to Succeed on the Merits ............................27

                1.      APA Section 706(1): DoW has not unreasonably delayed action. ........28

                2.      APA Section 706(2): DoW has not acted arbitrarily or capricious
                        or contrary to law........................................................34

        C.      Plaintiffs Have Not Demonstrated Irreparable Harm .....................41

D.    The Balance of Harms and Public Interest Weigh Against Preliminary Relief. ................................................................................................................42

V.    CONCLUSION ................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Aerosource, Inc. v. Slater,*
142 F.3d 572 (3d Cir. 1998) ................................................................................21

*Air Brake Sys., Inc. v. Mineta,*
357 F.3d 632 (6th Cir. 2004) ..............................................................................20

*Aircraft Owners & Pilot Ass'n v. FAA,*
600 F.2d 965 (D.C. Cir. 1979) ...........................................................................21

*Al Otro Lado v. EOIR,*
138 F.4th 1102 (9th Cir. 2025) ..................................................................... 29, 30

*Al Otro Lado, Inc. v. Nielsen,*
327 F. Supp. 3d 1284 (S.D. Cal. 2018) ..............................................................10

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ..............................................................................9

*Am. C.L. Union v. Clapper,*
785 F.3d 787 (2d Cir. 2015) ...............................................................................44

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
148 F.4th 648 (9th Cir. 2025) .............................................................................44

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
178 F.4th 456 (9th Cir. 2026) ....................................................................... 39, 43

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon,*
786 F. Supp. 3d 13 (D.D.C. 2025) .....................................................................17

*Awad v. Ziriax,*
670 F.3d 1111 (10th Cir. 2012) ..........................................................................26

*Backcountry Against Dumps v. Fed. Aviation Admin.,*
77 F.4th 1260 (9th Cir. 2023) ....................................................................... 3, 11

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................................19

*Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands,*
461 U.S. 273 (1983) ............................................................................................13

*Boumediene v. Bush,*
553 U.S. 723 (2008) ............................................................................................36

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
419 U.S. 281 (1974) ............................................................................................34

*Bozchalooi v. U.S. Dep't of State,*
  No. 2:25-CV-02983, 2026 WL 1042680 (E.D. Cal. Apr. 17, 2026)......................................10

*California Save Our Streams Council, Inc. v. Yeutter,*
  887 F.2d 908 (9th Cir. 1989).................................................................................................13

*Chang v. Jaddou,*
  No. 8:24-CV-01022, 2024 WL 5429724 n.6 (C.D. Cal. Nov. 25, 2024) ...............................10

*Colorado v. EPA,*
  989 F.3d 874 (10th Cir. 2021)...............................................................................................24

*Cook County v. Wolf,*
  962 F.3d 208 (7th Cir. 2020).................................................................................................24

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
  603 U.S. 799 (2024)..............................................................................................................18

*Ctr. for Biological Diversity v. Burgum,*
  No. 1:24-CV-02014, 2026 WL 180258 (D.D.C.  Jan. 23, 2026) ...........................................17

*Defense Distributed v. U.S. Dep't of State,*
  838 F.3d 451 (5th Cir. 2016).................................................................................................44

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019)..............................................................................................................40

*Dep't of Navy v. Egan,*
  484 U.S. 518 (1988)..............................................................................................................36

*Diversified Mortg. Inv'rs v. U.S. Life Ins. Co. of N.Y.,*
  544 F.2d 571 (2d Cir. 1976) ..................................................................................................26

*Dorfmann v. Boozer,*
  414 F.2d 1168 (D.C. Cir. 1969) .............................................................................................26

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021)..............................................................................................................40

*Foti v. INS,*
  375 U.S. 217 (1963).........................................................................................................11, 12

*Friends of the Clearwater v. Dombeck,*
  222 F.3d 552 (9th Cir. 2000).................................................................................................10

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
  460 F.3d 13 (D.C. Cir. 2006) ...........................................................................................20, 21

*Galvez v. Jaddou,*
  52 F.4th 821 (9th Cir. 2022)..................................................................................................42

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015)........................................................................9, 25, 27, 34

*Gen. Elec. Uranium Mgmt. Corp. v. U.S. Dep't of Energy*,
764 F.2d 896 (D.C. Cir. 1985) ................................................................................12

*Haig v. Agee*,
453 U.S. 280 (1981)........................................................................................ 43, 44

*Hemp Indus. Ass'n v. DEA*,
333 F.3d 1082 (9th Cir. 2003)................................................................................38

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013)........................................................................ 41, 42

*Holder v. Humanitarian L. Project*,
561 U.S. (2010) ............................................................................................. 43, 44

*Holistic Candlers & Consumers Ass'n v. FDA*,
664 F.3d 940 (D.C. Cir. 2012) ..............................................................................20

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025) ................................................................................24

*Indep. Equip. Dealers Ass'n v. E.P.A.*,
372 F.3d 420 (D.C. Cir. 2004) ..............................................................................14

*Indep. Min. Co. v. Babbitt*,
105 F.3d 502 (9th Cir. 1997)..................................................................................35

*Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*,
408 F.3d 638 (9th Cir. 2005)..................................................................................19

*Indus. Safety Equip. Ass'n, Inc. v. EPA*,
837 F.2d 1115 (D.C. Cir. 1988) ............................................................................21

*INS v. Chadha*,
462 U.S. 919 (1983)....................................................................................... 11, 12

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994)..................................................................................................8

*Kreis v. Sec'y of Air Force*,
866 F.2d 1508 (D.C. Cir. 1989) ....................................................................... 34, 35

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
624 F.3d 1083 (9th Cir. 2010)................................................................................22

*Leigh v. Salazar*,
No. 3:13-CV-00006, 2014 WL 4700016 (D. Nev. Sept. 22, 2014) ........................10

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ..................................................................................................15, 16, 18

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ....................................................................................24, 25, 27

*Meghrig v. KFC W., Inc.*,
   516 U.S. 479 (1996) .......................................................................................................... 24, 25

*Mexichem Specialty Resins, Inc. v. E.P.A.*,
   787 F.3d 544 (D.C. Cir. 2015) ................................................................................................41

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .......................................................................................................... 34, 36

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
   417 F.3d 1272 (D.C. Cir. 2005) ..............................................................................................10

*Nat'l Treasury Emps. Union v. Trump*,
   No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) .....................................................44

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   886 F.3d 803 (9th Cir. 2018) ...................................................................................................41

*National Parks & Conservation Ass'n v. F.A.A.*,
   998 F.2d 1523 (10th Cir. 1993) ...............................................................................................13

*Nken v. Holder*,
   556 U.S. 418, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) .........................................................42

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .......................................................................................................... 15, 16

*Nw. Ctr. for Alternatives to Pesticides*,
   552 F. Supp. 3d 1078 (D. Or. Aug. 3, 2021) .................................................................... 9, 16

*Obama v. Klayman*,
   800 F.3d 559 (D.C. Cir. 2015) ........................................................................................ 27, 28

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
   523 U.S. 726 (1998) ...............................................................................................................20

*Oregon Advoc. Ctr. v. Mink*,
   322 F.3d 1101 (9th Cir. 2003) ................................................................................................22

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*,
   901 F. Supp. 2d 54 (D.D.C. 2012) .........................................................................................24

*S. Utah Wilderness All. v. Palma*,
   707 F.3d 1143 (10th Cir. 2013) ...............................................................................................19

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
  747 F.3d 581 (9th Cir. 2014) ................................................................................ 34, 35

*San Luis Unit Food Producers v. United States,*
  709 F.3d 798 (9th Cir. 2013) ....................................................................................9

*Senate of State of Cal. v. Mosbacher,*
  968 F.2d 974 (9th Cir. 1992) ..................................................................................26

*Sierra Club v. EPA,*
  955 F.3d 56 (D.C. Cir. 2020) ............................................................................ 20, 21

*Sierra Club v. Peterson,*
  228 F.3d 559 (5th Cir. 2000) ............................................................................ 16, 17

*Sierra Forest Legacy v. Sherman,*
  646 F.3d 1161 (9th Cir. 2011) ................................................................................36

*Smith v. Pac. Props. & Dev. Corp.,*
  358 F.3d 1097 (9th Cir. 2004) ................................................................................22

*Snepp v. United States,*
  444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) ................................................44

*Starbucks Corp. v. McKinney,*
  602 U.S. 339 (2024) .......................................................................................... 26, 27

*Telecommunications Rsch. & Action Ctr. v. F.C.C.,*
  750 F.2d 70 (D.C. Cir. 1984) ............................................................................ 12, 30

*Timbisha Shoshone Tribe v. Salazar,*
  697 F.Supp.2d 1181 (E.D. Cal. 2010) ......................................................................28

*Town of Barnstable, Mass. v. F.A.A.,*
  740 F.3d 681 (D.C. Cir. 2014) ................................................................................11

*Trump v. Hawaii,*
  585 U.S. 667, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018) ............................................40

*Trump v. In"l Refugee Assistance Project,*
  582 U.S. 571 (2017) .................................................................................................8

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
  578 U.S. 590 (2016) ...............................................................................................20

*Ukiah Valley Med. Ctr. v. F.T.C.,*
  911 F.2d 261 (9th Cir. 1990) ....................................................................................9

*United States v. Orr Water Ditch Co.,*
  600 F.3d 1152 (9th Cir. 2010) ..................................................................................8

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981) ..........................................................................8, 26, 27

*Vaz v. Neal*,
    33 F.4th 1131 (9th Cir. 2022) ...................................................................30

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
    900 F.3d 250 (6th Cir. 2018) ...................................................................27

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
    5 F.4th 997 (9th Cir. 2021) ................................................................ 15, 16

*Winter v. NRDC*,
    555 U.S. 7 (2008) ...........................................................................passim

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ..................................................................41

*Yazzie v. Hobbs*,
    977 F.3d 964 (9th Cir. 2020) ...................................................................27

**Statutes**

10 U.S.C. § 183a........................................................................... 30, 39

10 U.S.C. § 183a(a) .............................................................................3

10 U.S.C. § 183a(b).............................................................................3

10 U.S.C. § 183a(b)(1).........................................................................3

10 U.S.C. § 183a(c)(1) ..................................................................... 4, 33

10 U.S.C. § 183a(c)(1)(A)-(B)................................................................4

10 U.S.C. § 183a(c)(2)(A).....................................................................4

10 U.S.C. § 183a(h)(11) ......................................................................3

49 U.S.C. § 106(a) .............................................................................2

49 U.S.C. § 44718 .............................................................................3

49 U.S.C. § 44718(a) ..........................................................................2

49 U.S.C. § 44718(b)(1)........................................................................2

49 U.S.C. § 44718(b)(1)(B) ............................................................... 3, 13

49 U.S.C. § 44718(f) ...................................................................... 1, 13

49 U.S.C. § 44718(f)(1) ................................................................... 3, 44

49 U.S.C. § 46110(a)...................................................................... 11, 14

5 U.S.C. § 553(a)(1) .................................................................................................................39

5 U.S.C. § 553(b)(4)(A) ...........................................................................................................39

5 U.S.C. § 702.........................................................................................................................14

5 U.S.C. § 704...........................................................................................................................9

5 U.S.C. § 705.........................................................................................................................24

5 U.S.C. § 706.........................................................................................................................27

5 U.S.C. § 706(1) ....................................................................................................................28

Pub. L. 116-92, 133 Stat. 1198 (2019).....................................................................................37

## Regulations

14 C.F.R. § 77.31 ............................................................................................................ 2, 3, 19

14 C.F.R. § 77.31(c)-(d)...........................................................................................................5

14 C.F.R. § 77.9(a)....................................................................................................................2

32 C.F.R. § 211.5(a)..................................................................................................................5

32 C.F.R. § 211.5(b)..................................................................................................................5

32 C.F.R. § 211.6 ....................................................................................................................37

32 C.F.R. § 211.6(a)(3) ...................................................................................................... 4, 37

32 C.F.R. § 211.6(a)(3)(i)-(ii)....................................................................................................4

32 C.F.R. § 211.6(a)(3)(iii)(B)...................................................................................................4

32 C.F.R. § 211.6(a)(4)..............................................................................................................4

32 C.F.R. § 211.6(b) ........................................................................................................... 4, 32

32 C.F.R. § 211.6(b)(1)..............................................................................................................5

32 C.F.R. § 211.6(c)(1)-(3)........................................................................................................5

C.F.R. § 211.6(b)(2)..................................................................................................................5

## Other Authorities

90 Fed. Reg. 43893 (Sep. 5, 2025) ...........................................................................................2

**INTRODUCTION**

The Military Aviation and Installation Siting Clearinghouse, a component within the Department of War, was established by Congress in 2011 for one discrete goal of paramount importance: to evaluate proposed energy and infrastructure projects and ensure they do not present an unacceptable risk to the national security of the United States.  49 U.S.C. § 44718(f). This case centers on the Clearinghouse's ability to do its job—specifically, whether national security interests must take a back seat when they inconvenience the development interests of the energy industry.  The answer should doubtlessly be "no."

In light of emergent, modern-day national security threats, the Department of War has found a need to reassess its existing Clearinghouse review process, including its risk assessment and mitigation strategies.  A practical result of that reassessment has been delay in the development or signing of wind-energy mitigation agreements while the Clearinghouse attempts to cure deficiencies in its current process.  Plaintiffs challenge the resulting delay, asserting that the inaction has been deleterious to the Developer Plaintiffs' bottom line.  They bring claims under the Administrative Procedure Act ("APA"), alleging that the Department of War has acted arbitrarily and capriciously and that the delay is unreasonable. As a remedy— both a preliminary and permanent one—Plaintiffs seek programmatic relief in the form of a broad, mandatory injunction compelling action on any and all applications, including on specific timelines and regardless of case-specific circumstances, and with judicial oversight of the Department's implementation of its program.

Plaintiffs' case should be dismissed and their request for preliminary relief denied. As set forth below, the Court lacks jurisdiction over Plaintiffs' admittedly programmatic

challenge. As to the request for preliminary injunctive relief, Plaintiffs have failed to meet their burden as to jurisdiction, the merits, or the equities. As explained at great length in the attached declaration from the Honorable Dale R. Marks, the Department's reassessment of its Clearinghouse process is necessary to safeguarding national security interests in an ever-evolving global landscape and its shifting threat paradigm.

## I.    BACKGROUND

### A.    STATUTORY OVERVIEW

The Federal Aviation Administration ("FAA") is an agency within the Department of Transportation. 49 U.S.C. § 106(a). Federal law directs that when the Secretary of Transportation determines the construction of a structure "may result in an obstruction of the navigable airspace, an interference with air or space navigation facilities and equipment or the navigable airspace, or, after consultation with the Secretary of [War],[1] an adverse impact on military operations and readiness, the Secretary of Transportation shall conduct an aeronautical study to decide the extent of any adverse impact on the safe and efficient use of the airspace, facilities, or equipment."[2] 49 U.S.C. § 44718(b)(1). That process ultimately culminates in FAA's issuance, based on the results of the aeronautical study, of a Determination of Hazard or Determination of No Hazard for the proposed project. *See* 14 C.F.R. § 77.31. The applicable statutes and regulations do not impose any deadlines on this

---

[1] On September 5, 2025, President Trump established that the Department of Defense "should once again be known as the Department of War and the Secretary should be known as the Secretary of War." Exec. Order No. 14347, 90 Fed. Reg. 43893 (Sep. 5, 2025). While statutory references to the Department of Defense and Secretary of Defense subsist, Federal Defendants use the titles interchangeably for purposes of this litigation.

[2] As Plaintiffs note, "commercial wind turbines exceed 200 feet above ground level." Dkt. No. 36 ¶ 72. By regulation, such construction proposals require notice to the FAA. 14 C.F.R. § 77.9(a); *see* 49 U.S.C. § 44718(a).

ultimate determination. *See id.*; 49 U.S.C. § 44718. Interested parties, such as local municipalities and insurers, use this determination to inform their own decisionmaking, but the determination itself carries no legal effect. *See Backcountry Against Dumps v. Fed. Aviation Admin.*, 77 F.4th 1260, 1265 (9th Cir. 2023).

As one component of FAA's aeronautical study, FAA "shall" include a finding by the Secretary of War on whether the project "would result in an unacceptable risk to the national security of the United States."[3] 49 U.S.C. § 44718(f)(1); *see id.* § 44718(b)(1)(B). Accordingly, the Department of War ("DoW") is tasked with reviewing energy project applications "filed with the Secretary of Transportation pursuant to section 44718 of title 49 and received by the Department of [War] from the Secretary of Transportation." 10 U.S.C. § 183a(b)(1). To facilitate review, Congress directed that the Secretary of War "shall establish a Military Aviation and Installation Assurance Siting Clearinghouse" (hereinafter, the "Clearinghouse"). *See id.* § 183a(a). The Clearinghouse "shall coordinate Department of [War] review" of such applications, including considering "the acceptability" of energy project proposals, "provid[ing] procedures to ensure affected local military installations are consulted," and "such other functions as the Secretary of [War] assigns." *Id.* § 183a(b).

---

[3] The term "unacceptable risk to the national security of the United States" means a showing that the project could:

(A) endanger safety in air commerce directly related to the activities of the Department of [War];

(B) interfere with the efficient use of the navigable airspace directly related to the activities of the Department of [War]; or

(C) significantly impair or degrade the capability of the Department of [War] to conduct training, research, development, testing, and evaluation, and operations or to maintain military readiness.

10 U.S.C. § 183a(h)(11).

Once having received an energy project application from the Secretary of Transportation, the Clearinghouse "shall conduct a preliminary review of such application" within 75 days. *Id.* § 183a(c)(1). The preliminary review "shall assess" the likely extent of the project's impacts on military operations and readiness and identify any feasible actions which may satisfactorily mitigate those impacts and allow development. *Id.* § 183a(c)(1)(A)–(B). The preliminary review is to result in "one of three actions." 32 C.F.R. § 211.6(a)(3). First, if the Clearinghouse determines the proposed project will not have an adverse impact, or, second, there is an adverse impact that is "sufficiently attenuated that it does not require mitigation," the Clearinghouse "shall notify the Secretary of Transportation of such determination." *Id.* § 211.6(a)(3)(i)–(ii). Third, if the Clearinghouse determines the proposed project may have an adverse impact (more than "sufficiently attenuated"), the Clearinghouse, in addition to notifying the Secretary of Transportation, "shall issue to the applicant a notice of presumed risk that describes the concerns identified by the Department in the preliminary review and requests a discussion of possible mitigation actions." 10 U.S.C. § 183a(c)(2)(A); *see also* 32 C.F.R. § 211.6(a)(3)(iii)(A). If the applicant intends to engage in mitigation discussions, it must agree to do so within five days of being informed of the adverse impact determination. 32 C.F.R. § 211.6(a)(4).

In the case of mitigation discussions, the Clearinghouse will "[d]esignate one or more Do[W] Components to engage in [mitigation] discussions." *See id.* § 211.6(a)(3)(iii)(B). It "shall [also] invite the Administrator of the Federal Aviation Administration and the Secretary of Homeland Security to participate in such discussions," and "may also invite other Federal agencies to participate[.]" *Id.* § 211.6(b). By regulation, these discussions should, unless

otherwise agreed, take place within 90 days from "initial notification to the applicant."[4]  *Id.*

§ 211.6(b)(1).    After the discussion period, the designated components notify the

Clearinghouse whether the parties reached an agreement, and the Clearinghouse shall review

and determine whether the project, as proposed (including any agreed modifications), "would

result in an unacceptable risk to the national security of the United States."    32 C.F.R.

§ 211.6(b)(2).  The Clearinghouse then makes its recommendation to the senior official,[5] who

in turn makes his/her recommendation to the senior officer,[6] who then conveys his/her own

final determination to the Secretary of Transportation.  *Id.* § 211.6(c)(1)–(3).  Finally, based on

the conclusions of the aeronautical study, the FAA will issue a hazard/no hazard

determination.  *See* 14 C.F.R. § 77.31(c)-(d).  The applicable statutes and regulations do not

impose any deadlines for DoW's internal recommendations, nor the recommendation to the

Secretary of Transportation.

### B.    FACTUAL BACKGROUND

Within this FAA process, DoW's role "is lengthy and requires significant intra-agency

[] as well as interagency coordination."  Ex. 1 ¶ 69 (Declaration of Honorable Dale R. Marks)

(hereinafter, "Marks Decl.").  The evaluation of "energy development proposals, particularly

wind turbines, is inherently complex and time-consuming because it involves balancing two

critical, and sometimes competing, interests: (1) developing energy sources, (2) while ensuring

---

[4] As a practical matter, mitigation discussions almost always exceeded 90 days, and historically has averaged 512 days between mitigation response team establishment and the first draft of the mitigation agreement. Extensions were seldom, if ever, reduced to writing, as the sides have taken an informal approach.  Marks Decl. ¶ 32.

[5] By designation, the "senior official" is the Under Secretary of Defense for Acquisition, Technology, and Logistics.  32 C.F.R. § 211.5(b).

[6] By designation, the "senior officer" is the Deputy Secretary of Defense.  32 C.F.R. § 211.5(a).

military operations and readiness are not degraded or impaired to the extent an unacceptable risk to national security is created." *Id.*   Notably, once a project has received a Determination of No Hazard, that determination "will persist in perpetuity" absent any changes to the design itself requiring a new application, including in the face of evolving adversarial threats and technology, or even shifting priorities. *Id.* ¶ 67.  "[T]his framework means [DoW and FAA] have one opportunity to get the advisory assessment correct[.]" *Id.*  It is thus paramount to get it right the first time.

Given recent developments and internal assessment, DoW concluded that the Clearinghouse's current methodology and process no longer satisfy its statutory duty to identify and mitigate relevant risks "[g]iven the materially changed threat environment." *Id.* ¶ 101.  Among other things, recent geopolitical warfare has "shattered many long-held military doctrines and rewrote the rules of engagement." *Id.* ¶ 40.  There has been a proliferation of "highly resilient, asymmetric arsenals," including specifically by way of low-cost, unmanned, and remotely-operated systems which can be deployed in devastating manner from the interior of the target country. *Id.* ¶ 46.  In the context of wind energy, large commercial-sized wind farms create effects which only exacerbate the potency of this emergent threat. *Infra* Part IV.B.1.

Given these concerns, DoW in August 2025 began re-evaluating "the Clearinghouse's internal, analytical methodology for assessing national security risks in light of the dramatic threat paradigm shift." Marks Decl. ¶ 68.  DoW has not executed any mitigation agreements during this re-evaluation. *Id.* ¶ 96.  During this time, the preliminary review phase of the Clearinghouse process remained ongoing, save for the federal government shutdown from

October 1, 2025 to November 12, 2025, and "a brief period consisting of 16 business days" between mid-April to early-May 2026, during which there had been some "administrative confusion" as to agency directive. *Id.* ¶¶ 88, 97. That period, however, ended when DoW issued the May 7 Memorandum clarifying that the Clearinghouse should proceed with the preliminary review of energy project applications, including issuing notices of presumed risk. *See* Dkt. No. 36-3 at 4.

Currently, DoW remains in the process of re-assessing its internal analytical methodology, including "evaluat[ing] the intersection of emerging threats and adverse operational and readiness impacts of OEAAA and BOEM applicant project types," "explor[ing] new mitigation options as they become technologically available," and ensuring inter-agency coordination "in continued [mitigation] discussions for all existing OEAAA applications for which the FAA has not issued a Determination of No Hazard[.]" Dkt. No. 36-3 at 3–4. As stated in letters to project applicants, further review of potential mitigation and mitigation agreements is being conducted "efficiently" and "as soon as feasible" as DoW takes the requisite steps to develop strategies "sufficient to address modern military risks." *See* Dkt. No. 36-11 at 2–3. Since Fall 2025, DoW has had "53 internal and external meetings, including 20 engagements with Congress and key federal partners" in furtherance of crafting an effective solution. Marks Decl. ¶ 94.

On May 31, 2026, a coalition of Plaintiffs brought suit against Federal Defendants, asserting the Clearinghouse's inaction within the FAA's review process is unlawfully holding up a number of prospective wind projects across the interior of the United States. On the heels of their original complaint, Plaintiffs filed a motion for preliminary injunctive relief. Dkt.

No. 14. They later amended their complaint to add the project developers themselves as additional plaintiffs. And while none of the substantive claims appear to have changed, the relief demanded is now far more expansive.[7] *Compare* Dkt. No. 36 at 79–81 *with* Dkt. No. 1 at 70–71. Because the Developer Plaintiffs were added after the motion for preliminary injunctive relief, they are not a part of the motion which is brought by Organizational Plaintiffs only.

## II.    STANDARD OF REVIEW

### A.    SUBJECT-MATTER JURISDICTION

"Federal courts are courts of limited jurisdiction," possessing "only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Pursuant to Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss based on a court's lack of subject-matter jurisdiction. The burden of demonstrating subject-matter jurisdiction lies with the party asserting jurisdiction. *E.g.*, *United States v. Orr Water Ditch Co.*, 600 F.3d 1152, 1157 (9th Cir. 2010).

### B.    PRELIMINARY INJUNCTIONS

A preliminary injunction is an "extraordinary" equitable remedy "never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). Its purpose "is merely to preserve the relative positions of the parties until" a determination on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). It serves "not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. In"l Refugee Assistance Project*, 582

---

[7] While the original complaint asked for relief with projects generally, Plaintiffs' amended complaints seek comprehensive relief specific to individual developers. *See* Dkt. No. 36 at 80–81.

U.S. 571, 580 (2017) (cleaned up).  Generally, "[a] plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  As the Ninth Circuit observes, the first of these factors—likelihood of success on the merits—is "a threshold inquiry" and "the most important," and absent such a showing a court need not consider the remaining three factors.[8]  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).  As set forth below, however, Plaintiffs in this case seek a mandatory injunction which is "particularly disfavored" and subject to a "doubly demanding" standard which requires that "the law and facts *clearly* compel" a ruling in favor of the moving party.  *Id.* at  740.

## III.    THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF JURISDICTION[9]

Plaintiffs bring claims under the APA alleging that delays in the development and signing of mitigation agreements concomitant with DoW's reassessment of its existing

---

[8] The Ninth Circuit has previously reasoned, under a "sliding scale" approach, that a movant needs less than a likelihood of success on the merits, but rather merely "serious questions going to the merits," when all other elements are strongly in his favor.  *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Federal Defendants maintain that such analysis is inconsistent with and should not survive *Winter*, which unmistakably instructs that a plaintiff "must establish that he is *likely* to succeed on the merits."  555 U.S. at 20 (emphasis added).

[9] The Ninth Circuit has held that the requirements for agency action to be reviewable under the APA are jurisdictional.  *See, e.g.*, *San Luis Unit Food Producers v. United States*, 709 F.3d 798, 801 (9th Cir. 2013) (no final agency action "and therefore [the plaintiffs] have not established subjectmatter jurisdiction under the APA"); *Ukiah Valley Med. Ctr. v. F.T.C.*, 911 F.2d 261, 266 (9th Cir. 1990) (final agency action "is a jurisdictional requirement imposed by statute").  This interpretation adheres to the statutory text, which provides that only "final agency action" is "subject to judicial review."  5 U.S.C. § 704.  This Court has followed this reasoning. *See, e.g.*, *Nw. Ctr. for Alternatives to Pesticides*, 552 F. Supp. 3d 1078, 1082 (D. Or. Aug. 3, 2021) ("[T]his Court concludes that Plaintiffs do not challenge final agency action within the meaning of the APA.  Accordingly, this Court does not have jurisdiction.").  To be sure, to the extent the Court finds that any arguments presented in Federal Defendants' motion to dismiss are not jurisdictional defects but rather more aptly construed as legal insufficiency of the APA causes of action, Federal Defendants move in the alternative that Plaintiffs' APA claims must be dismissed under Rule 12(b)(6) for failure to state a claim.

Clearinghouse's review process is unlawful. Specifically, they argue that a "policy" of halting progression of DoW's review process is arbitrary and capricious under Section 706(2) of the APA, and that delay of DoW's review process is unreasonable under Section 706(1).

As an initial matter, Section 706(2) and Section 706(1) are fundamentally different; the former is directed at allegedly unlawful *action*, and the latter at allegedly unlawful *inaction*. *See*, *e.g.*, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1280 (D.C. Cir. 2005) (observing the "oppose action/compel action dichotomy" and explaining that "a different burden" applies to each). This point is intuitive: a complained-of wrong cannot simultaneously be both an act and a failure to act. When a plaintiff pleads both, but is at core challenging an agency's alleged failure to act, that action "is more appropriately channeled through Section 706(1)." *Al Otro Lado, Inc. v. Nielsen*, 327 F.Supp.3d 1284, 1309 (S.D. Cal. 2018); *see*, *e.g.*, *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) ("An action to compel an agency to [act], however, is not a challenge to a final agency decision, but rather an action arising under 5 U.S.C. § 706(1)"); *Leigh v. Salazar*, No. 3:13-CV-00006, 2014 WL 4700016, at *4 (D. Nev. Sept. 22, 2014) (recognizing the dichotomy and construing a Section 706(2) claim regarding an agency's alleged failure to act as in fact a Section 706(1) claim); *Bozchalooi v. U.S. Dep't of State*, No. 2:25-CV-02983, 2026 WL 1042680, at *3 (E.D. Cal. Apr. 17, 2026) (same); *Chang v. Jaddou*, No. 8:24-CV-01022, 2024 WL 5429724, at *8 n.6 (C.D. Cal. Nov. 25, 2024) (same). Plaintiffs' allegations, and relief sought, confirm this assessment where their central thesis is that DoW is "refusing to" move review forward, and the relief sought repeatedly seeks to compel DoW to "take action" and demands DoW "resum[e]" the review process. *See generally* Dkt. No. 36.

10

From the outset, this case should be dismissed for lack of subject-matter jurisdiction. By statute, Plaintiffs' claims must be brought directly to a federal court of appeals under the Federal Aviation Act's direct circuit review provision. The claims additionally fail to satisfy the jurisdictional requirements for bringing an APA action under Section 706(2) or Section 706(1).

### A.     CONGRESS REQUIRED DIRECT REVIEW WITH THE COURT OF APPEALS

Properly construed as a challenge to compel agency action, the operative complaint should be dismissed because Plaintiffs filed suit in the wrong court. The Federal Aviation Act provides that challenges to FAA actions, including FAA hazard determinations under 49 U.S.C. § 44718, are reviewable in the first instance only in the courts of appeals. 49 U.S.C. § 46110(a); *see, e.g.*, *Backcountry Against Dumps*, 77 F.4th at 1267 (entertaining direct review of no hazard determination); *Town of Barnstable, Mass. v. F.A.A.*, 740 F.3d 681, 691 (D.C. Cir. 2014) ("any challenge to the no hazard determinations must be brought in the court of appeals"). The Federal Aviation Act's direct circuit review provision applies here for two reasons.

First, while the statute discusses review of "an order issued by" the FAA, *id.*, courts have interpreted similar provisions to include "all determinations made during and incident to the administrative proceeding[.]" *Foti v. INS*, 375 U.S. 217, 229 (1963). In *INS v. Chadha*, 462 U.S. 919 (1983), the relevant immigration statute provided that the courts of appeals "shall be the sole and exclusive procedure for the judicial review of all final orders of deportation[.]" *Id.* at 937. The Supreme Court explained that appellate jurisdiction extended to "all matters on

11

which the validity of the final order is contingent, rather than only those determinations actually made." *Id.* at 938.

Second, courts have held such jurisdiction-channeling provisions to include allegations of inaction or delay. For instance, in *Telecommunications Rsch. & Action Ctr. v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"), the relevant statute vested exclusive jurisdiction in the court of appeals "over review of final FCC orders." *Id.* at 75. Yet there was no final FCC order in *TRAC*, but rather a claim "of unreasonable [FCC] delay" in issuing such order. *Id.* The D.C. Circuit explained that, despite the lack of a final order, the exclusive jurisdiction necessarily includes "resolv[ing] claims of unreasonable delay[.]" *Id.* at 76. These rulings are harmonious with, and reinforced by, the general rule of thumb that any ambiguity between district court and appellate court jurisdiction be resolved in favor of the latter. *See, e.g.*, *Gen. Elec. Uranium Mgmt. Corp. v. U.S. Dep't of Energy*, 764 F.2d 896, 903 (D.C. Cir. 1985) (explaining that this "policy favoring exclusive jurisdiction in the court of appeals" promotes judicial economy by "avoid[ing] duplicative review and the attendant delay and expenses involved").

Here, Plaintiffs challenge, at heart, the alleged inaction in the FAA process from which they hope a favorable Determinations of No Hazard will flow. In so doing, they direct their attack on one specific component of review which, while tasked within DoW, is entirely subsumed within the FAA's overarching process. Had the FAA issued a final determination, and that decision was challenged, DoW's finding as to national security risk would surely fall within "all matters on which the validity of the final order is contingent," *Chadha*, 462 U.S. at 938, and within "all determinations made during and incident to the administrative proceeding," *Foti*, 375 U.S. at 229.

12

Analogous case law is instructive.  In *California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908 (9th Cir. 1989), the Ninth Circuit considered a statute which vested exclusive jurisdiction with the courts of appeals.  Therein, the Federal Energy Regulatory Commission made a licensing determination based on conditions solicited from the Forest Service as part of the process.  *See id.* at 910.  The Ninth Circuit rejected the plaintiffs' district court suit against the Forest Service as an attempt, "through careful pleading, to avoid the strict jurisdictional limits imposed by Congress."  *Id.* at 911.  Likewise, in *National Parks & Conservation Ass'n v. F.A.A.*, 998 F.2d 1523 (10th Cir. 1993), the plaintiffs challenged certain Bureau of Land Management determinations required as part of the FAA's review process, which "was initiated by the provisions of the FAA Act."  *Id.* at 1528.  The Tenth Circuit explained that it had exclusive jurisdiction over the BLM actions "[g]iven the statutory scheme in which the actions of the BLM arose."  *Id.* at 1529.

The same result follows here where a determination from the Secretary of War is but one step in the FAA's review process.  *See* 49 U.S.C. § 44718(b)(1)(B); (f) .  Plaintiffs could (and should) have brought this case in a court of appeals alleging FAA delay in issuing a final determination of hazard/no hazard, in which case judicial review of that challenge would extend to any alleged delay by DoW in making the national security risk determination.  The fact that jurisdiction would be proper in the federal courts of appeals means it is necessarily improper here; after all, exclusive jurisdiction is just that: exclusive.  And a litigant cannot "circumvent[] by artful pleading" the remedial scheme prescribed by Congress.  *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 285 (1983) (internal quotation marks omitted); *see also Yeutter*, 887 F.2d at 912 ("[W]e do not believe that the jurisdictional remedy

13

prescribed by Congress hangs on the ingenuity of the complaint.").  Here, Plaintiffs ultimately seek resolution of the FAA's process.  While Plaintiffs frame this case as challenging one step specific to DoW, it nonetheless arises within the umbrella of the FAA's review and process. In sum, because DoW's review arises within, and was initiated by, the FAA's statutory scheme, the Federal Aviation Act's exclusive jurisdiction provision requires this case to be heard, if at all, by a federal court of appeals.  49 U.S.C. § 46110(a).

### B.    PLAINTIFFS' PROGRAMMATIC, NON-INDIVIDUALIZED POLICY ATTACK FALLS OUTSIDE THE SCOPE OF APA JURISDICTION

In addition to the jurisdiction-channeling provision of the Federal Aviation Act, the Court lacks jurisdiction because Plaintiffs seek a broad, programmatic change.

Plaintiffs seek mandamus relief "requir[ing] DoD to conduct its review for all wind-energy projects in accordance with law," Dkt. No. 14 at 46.  Not only so, but the extent of their requested relief is breathtaking, asking for, inter alia, judicial oversight of the entire Clearinghouse program, deadlines for any and every step of the review process regardless of circumstance, and reports to the court on the status of all pending reviews.  *See* Dkt. No. 36 at 78–81.  They also specifically request orders to "take action" on projects owned or developed by Developer Plaintiffs.  *Id.* at 80-81.  But this is an impermissible programmatic challenge that does not challenge a "discrete" agency action as is required for APA jurisdiction under either Section 706(1) or Section 706(2).  Under the APA, "[a] person suffering legal wrong because of agency action . . . is entitled to judicial review thereof."  5 U.S.C. § 702.  But courts "have long recognized that the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004) (cleaned up).  Rather,

14

an agency action is one that is "circumscribed" and "discrete," such as an "agency rule, order, license, sanction [or] relief." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) ("*SUWA*") (alteration in original) (quoting 5 U.S.C. § 551(13)).  A plaintiff "must direct its attack against some *particular* 'agency action' that causes it harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  As the Ninth Circuit instructs, "[t]his limitation on judicial review precludes 'broad programmatic attack[s],' whether couched as a challenge to an agency's action or 'failure to act.'" *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1010 (9th Cir. 2021) (alteration in original) (quoting *SUWA*, 542 U.S. at 64–65).   As such, a suit under Section 706(1) must seek to compel, and a suit under Section 706(2) must challenge, a "discrete" action, which here would mean a specific wind application.

In *Lujan*, an environmental organization attempted to seek APA judicial review to what they called the Bureau of Land Management's "land withdrawal review program," which was comprised of many "individual classification terminations and withdrawal revocations."  497 U.S. at 881.  The Supreme Court, rejecting this maneuver, explained that such review was better suited for "the offices of the [agency] or the halls of Congress, where programmatic improvements are normally made."  *Id.* at 891.  While a "case-by-case approach" (i.e., challenging each termination or revocation) may be "understandably frustrating to an organization such as respondent," case-by-case "is the traditional, and remains the normal, mode of operation of the courts."  *Id.* at 894.  As reinforced in *SUWA*, "[t]he limitation to discrete agency action precludes" a "broad programmatic attack."  542 U.S. at 64.  By bringing an across-the-board challenge to all wind projects, they do not seek to compel or challenge any "discrete" action under the APA but rather a conglomerate of actions—the very essence

15

of a programmatic challenge. The Ninth Circuit and the courts therein have recognized this black-letter prohibition against APA programmatic challenges, *see Whitewater*, 5 F.4th at 1010, as has this very Court, *see Nw. Ctr. for Alternatives to Pesticides v. DHS*, 552 F. Supp. 3d 1078, 1088–89 (D. Or. 2021) (Immergut, J.) ("Plaintiffs effectively bring a broad programmatic challenge . . . [s]uch challenges are impermissible under the APA and infringe upon the separation of powers inherent in our constitutional system.").

Plaintiffs here bring a challenge that is quintessentially programmatic, alleging injuries for "[o]ver 100 projects across 25 states." Dkt. No. 14 at 11. In so doing, they attempt to capture projects "at every stage of the Clearinghouse process." *Id.* at 18 (citing exhibits). The Court need not take Federal Defendants' word that Plaintiffs seek programmatic relief; Plaintiffs admit as much. *See* Dkt. No. 14 at 22 ("Member Organization Plaintiffs seek programmatic relief"). While they challenge an alleged "freeze of all steps of its review process for wind-energy projects," *id.* at 31, the critical defect is that their "whole" is comprised of many discrete component parts; it is those parts, i.e., the alleged delay of a particular wind application, which would meet the "discrete" requirement to be justiciable agency action. *See, e.g.*, *Lujan*, 497 U.S. at 881, 894; *SUWA*, 542 U.S. at 64.

In one particularly analogous case, various environmental groups challenged the U.S. Forest Service's policy of adopting "even-aged timber management," a particular technique in how trees are cut. *Sierra Club v. Peterson*, 228 F.3d 559, 562 (5th Cir. 2000). In so doing, the plaintiffs cited twelve alleged examples of projects but made clear that those examples were just that—examples—and not the "extent of their challenge," which was extrapolated to the entire program. *Id.* at 563. The Fifth Circuit rejected this effort as "precisely the type of

16

programmatic challenge that the Supreme court struck down in *Lujan*," and observed that a plaintiff cannot "challenge an entire program by simply identifying specific allegedly-improper final agency actions within that program[.]"  *Id.* at 566-67.  So too here, where Plaintiffs attempt to compel action as to an entire program—the Clearinghouse's entire process of reviewing wind-energy projects—by identifying some specific applications.

This "bundling" of parts, including to levy a challenge far greater than the sum of those parts, is forbidden by the APA.  *See, e.g., Ctr. for Biological Diversity v. Burgum*, No. 1:24-CV-02014, 2026 WL 180258, at *11 (D.D.C.  Jan. 23, 2026) (plaintiff "jumbles together a boatload of individual agency actions," which "is exactly the move that *Lujan*—and the APA—forbids"); *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, 786 F. Supp. 3d 13, 23 (D.D.C. 2025) (a plaintiff cannot "bundl[e] together a collection of discrete actions, present[] them as facets of a single event, and then challeng[e] that event instead of the individual actions").  Indeed, while "bundling" is categorically improper, it is particularly ill-suited in this case.  Despite that Plaintiffs challenge a general "freeze," their pleadings acknowledge that the various underlying applications are in different stages in the review process.  *See* Dkt. No. 14 at 18 (citing various wind energy projects which are "at every stage of the Clearinghouse process").  Indeed, Plaintiffs' own supporting materials concede that each project is inherently fact-specific, involving different designs, proposals, timeframes, and geographic regions which all present unique security risks and require individualized assessments.  *See* Dkt. No. 1-14 at 19–20 ("each individual wind project follows a unique sequence of development," and "the timing, magnitude, and form of impacts may vary across projects").  The "action" Plaintiffs seek to compel in this case would not be a discrete "action," but rather different actions from project

17

to project.[10]  The APA's requirement for "discrete" agency action functions as a feature, not a bug, to ensure that a legal challenge pertains to a particular project so the project is duly considered on its own circumstances.  Again, while Plaintiffs would prefer to avoid a "case-by-case approach" which may be "understandably frustrating," it is nonetheless the statutorily required mode of operation.  *Lujan*, 497 U.S. at 894.  As such, there is no jurisdiction over Plaintiffs' admittedly "programmatic" APA suit, *see* Dkt. No. 14 at 22, which must be dismissed.

### C. PLAINTIFFS HAVE NOT IDENTIFIED A FINAL AGENCY ACTION SUBJECT TO JUDICIAL REVIEW

Perhaps recognizing the programmatic nature of their case, Plaintiffs attempt to manufacture a challengeable final agency action, which they call a "freeze."  But they have not identified any final agency action reviewable under the APA.

The APA, and the Supreme Court interpreting the APA, instruct that where "review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'"  *Lujan*, 497 U.S. at 882 (quoting 5 U.S.C. § 704); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (explaining that unless review is pursuant to another statute, APA judicial review "is available only for 'final agency action'").  An agency action is final only if it (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is an action "by which rights or obligations have been determined, or from

---

[10] For instance, the "action" in one project might be final signature, versus another might be starting mitigation discussions.  Thus, the "discrete" agency action that Plaintiffs seek in this case not only fails to be singular in quantity, but indeed in type.

which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted). Here, Plaintiffs' alleged "freeze" satisfies neither requirement.

> **1.    Plaintiffs have not identified a consummation of an agency decisionmaking process.**

For an agency action to be final, "it must not be of a merely tentative or interlocutory nature." *Id.* at 178. Here, DoW is undertaking a review of its methodology for assessing the national security risks of wind-energy projects. Thus, both legally and practically, it is the initiation of a decisionmaking process—not the culmination of one. *See Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646–47 (9th Cir. 2005) (holding that a decision, even if it has "immediate financial impact," is not final agency action when it "serves only to initiate the proceedings" (cleaned up)). DoW's re-assessment is part of the decisionmaking process, which will fully play out in due course; indeed, the "final" agency action in the application process is FAA's issuance of a determination of hazard/no hazard. 14 C.F.R. § 77.31. DoW's role within this process, then, is necessarily an "interim decision of the agency as part of the process of deciding whether to grant" an application, which is not final agency action. *See, e.g.*, *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1159 (10th Cir. 2013).

It also is unclear what agency "action" Plaintiffs tie to the delay, which began in August 2025 and remains ongoing. Plaintiffs seem to point to "DoD's April 13, 2026 communication to the Clearinghouse and its May 7, 2026 memorandum." Dkt. No. 36 at 65. But as explained, the April 13, 2026 communication was due to administrative confusion and rescinded by the May 7 Memorandum. Marks Decl. ¶ 97. Thus, to the extent the April 13, 2026 communication ever constituted an agency action, it is moot. As for the May 7 Memorandum, it merely clarified that the Clearinghouse was to resume preliminary review of energy project

applications and issue notices of presumed risk.  Dkt. No. 36-3.  It certainly did not "consummate" the reassessment which has been underway since August 2025.

### 2.    DoW has not affected any rights or obligations nor created legal consequences.

Even if the Court concludes DoW has consummated a decision with respect to ongoing review, there have been no legal consequences. The Supreme Court directs that the appropriate inquiry is whether there are "direct and appreciable legal consequences."  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016).  Plaintiffs allege that they will suffer a litany of consequences, all because DoW's ongoing review "prevents projects from moving forward."  Dkt. No. 14 at 25.  They submit that delay affects matters such as project financing, insurance, and third-party contracts.  *Id.* at 24–25.  But such consequences, even if materialized, are practical implications from the ongoing review; the consequences are neither "direct" nor "legal" (as would be the case had DoW instead, for example, denied or cancelled the applications).  Here, no final decisions have been made.  DoW has "impose[d] no obligations, prohibitions, or restrictions," *Sierra Club v. EPA*, 955 F.3d 56, 64 (D.C. Cir. 2020) (finding no final agency action), nor "compel[led] action by [ ]either the recipient [ ]or the agency," *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (same). When agency action does not "command anyone to do anything or to refrain from doing anything," it is not final agency action under the APA.  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 22 (D.C. Cir. 2006) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).  The fact that a wind project applicant might have lined up vendors or financing based on its own expectations as to the pace of bureaucracy does not make DoW legally responsible for such decisions.  *See, e.g., Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645

(6th Cir. 2004) (the fact that an agency action might have even "devastating effect[s] on the [plaintiff]'s business . . . does not make the agency's action final"); *Aerosource, Inc. v. Slater*, 142 F.3d 572, 581 (3d Cir. 1998) ("severe adverse impact" on business was insufficient for final agency action); *Indus. Safety Equip. Ass'n, Inc. v. EPA*, 837 F.2d 1115, 1121 (D.C. Cir. 1988) (no final agency action where economic harm "is indirect and arises from the reactions and choices of [the] industry"). While Plaintiffs cite a case stating that an FAA's ultimate Determination of No Hazard is a reviewable final order, *see* Dkt. No. 14 at 25 (citing *Aircraft Owners & Pilot Ass'n v. FAA*, 600 F.2d 965, 967 n.2 (D.C. Cir. 1979)), that reasoning has no bearing here where Plaintiffs do not attack the FAA's ultimate decision but rather a delay in an intermediary determination antecedent to that ultimate decision. Here, DoW's ongoing review of its methodology does not impose any direct legal consequences with respect to any application, which all remain in pending status and will be reviewed in due course.

If anything, this analysis illustrates precisely why Section 706(1), and not Section 706(2), is the applicable vehicle for Plaintiffs' claims, as this case is at heart a challenge to agency inaction. By its terms, agency inaction is just that—inaction—and it "imposes no obligations, prohibitions, or restrictions," *Sierra Club*, 955 F.3d at 64, nor "command[s] anyone to do anything or to refrain from doing anything," *Fund for Animals*, 460 F.3d at 22. An attempt to artfully recast an agency's delay, or failure to act, as a paradoxical "agency action of taking inaction," cannot change that there are no "direct" legal consequences required to be final agency action.

### D.  ORGANIZATIONAL PLAINTIFFS BRINGING THIS MOTION LACK STANDING

For the above reasons, if this case were to proceed, it must do so under Section 706(1) as individual challenges to specific wind energy applications.  As such, not only do Organizational Plaintiffs lack standing and therefore must be dismissed, but this motion, brought only by Organizational Plaintiffs, must be denied.

 To sue on its members' behalf, an association must show: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *E.g.*, *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003).  Here, because the challenged delays must proceed by individual applications, *supra* Part III.B, they require the participation of the project developers.  Alternatively, to sue on their own behalf, Organizational Plaintiffs must demonstrate "(1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [conduct] in question." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004).  As to the second prong, an organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).  Plaintiffs have not shown that these elements have been met for any of the Organizational Plaintiffs, and indeed only offer one plaintiff, GECA, as an organization purportedly with standing to sue on its own behalf.  *See* Dkt. No. 14 at 22.  On the "diversion of its resources" inquiry, Plaintiffs argue DoW's delay "reduces the number of RECs [Renewable Energy Certificates] available" to GECA.  *Id.* (citing

22

Dkt. No. 1-15). But they wholly fail to show, nor is it intuitive, that DoW delays in this case have meaningfully altered the REC market, including the supply of RECs, such that it is attributable to any diversion of GECA resources.

Plaintiffs' own conduct in this litigation reveals their doubt as to the Organizational Plaintiffs' standing; after all, this case was initially brought by the Organizational Plaintiffs only, and, without adding any new claims, was subsequently amended to name the Developer Plaintiffs. *Compare* Dkt. No. 1 (original complaint) *with* Dkt. No. 36 (amended complaint). As an initial matter, amendment to include the developers themselves does not save the day. While the developers are the correct plaintiffs to challenge their respective applications, as explained, each suit must separately seek to compel or challenge a discrete agency action, and Developer Plaintiffs cannot have all of their fact-specific claims heard as one programmatic challenge. *See supra* Part III.B. But setting aside that jurisdictional defect, the Organizational Plaintiffs must be dismissed for lack of standing. As previously explained *supra* note 7, the present motion for preliminary injunctive relief was brought by the Organizational Plaintiffs only, before Developer Plaintiffs joined this suit. Therefore, even if the Court were to find that Developer Plaintiffs may bring this action, this preliminary injunction motion nevertheless must also be denied for the independent reason that it was exclusively brought by Organizational Plaintiffs, who must be dismissed for lack of standing.

## IV.     THE PRELIMINARY INJUNCTION MOTION SHOULD BE DENIED

In light of the foregoing, dismissal of this suit is proper and the Court need not consider the pending motion for a stay or preliminary injunctive relief. But should the Court reach Plaintiffs' motion, the motion should be denied. Plaintiffs have not met their burden for the

23

mandatory injunctive relief they seek; Plaintiffs are unlikely to succeed on the merits; Plaintiffs have pled, but failed to show, that they will suffer irreparable harm; and the balance of harms does not favor a preliminary injunction given the implications for national security and military readiness.

### A.    PLAINTIFFS SEEK A MANDATORY INJUNCTION ON THE MERITS, NOT A STAY PENDING LITIGATION.

Whether seeking a preliminary injunction or a stay under 5 U.S.C. § 705, Plaintiffs' request is the same and is governed by the same analysis.[11] "A preliminary injunction can take two forms." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009). A preliminary injunction is ordinarily a prohibitory injunction, which "prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Id.* (cleaned up). In contrast, far rarer is a mandatory injunction, which "orders a responsible party to 'take action.'" *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996). While the standard for any preliminary relief is already high, "a mandatory injunction goes well beyond simply maintaining the status quo pendente lite and is *particularly disfavored*." *Marlyn Nutraceuticals*, 571 F.3d at 879 (emphasis added); *see Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 901 F. Supp. 2d 54, 56 n.1 (D.D.C. 2012) (explaining that courts

---

[11] Plaintiffs present their motion as seeking a "stay or preliminary injunction." Dkt. No. 14. The "stay" they seek is not a stay of proceedings, but a stay under 5 U.S.C. § 705 which permits a reviewing court to "postpone the effective date of an agency action" in order to "preserve status or rights pending conclusion of the review proceedings." The "stay" here is functionally duplicative of the preliminary injunction, as courts have interpreted the analysis is identical. *See, e.g., Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972 (9th Cir. 2025) (concluding the two analyses are "the same"); *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020) (same); *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (same). Plaintiffs do not appear to argue otherwise, and their entire motion proceeds under an analysis of the traditional preliminary injunction factors. Thus, the arguments herein, while predominantly focused on preliminary injunctive relief, are directed with equal force against the granting of a stay under 5 U.S.C. § 705.

"proceed with extreme caution when the injunction would alter the status quo"). For such requests, a likelihood or substantial likelihood of success will not suffice; the facts and law must *clearly* favor the moving party. *E.g.*, *Garcia*, 786 F.3d at 740.

This heightened, "doubly demanding" standard applies paradigmatically to the nature and facts of this case. *Id.* In simple terms, Plaintiffs allege that DoW is not timely processing wind-energy applications and seek relief for those applications to be processed expeditiously. With this Motion, Plaintiffs do not ask to preserve the status quo, which "means the last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals*, 571 F.3d at 879 (cleaned up). Again, Plaintiffs demand, inter alia, judicial oversight of the entire Clearinghouse program, deadlines for any and every step of the review process regardless of circumstance, and reports to the court on the status of all pending reviews. *See* Dkt. No. 36 at 78–81. They specifically request orders to "take action" on projects owned or developed by Developer Plaintiffs. *Id.* at 79–80. That relief is not seeking to merely maintain the status quo.[12] Plaintiffs' complaint is unmistakable that they seek a mandatory injunction "order[ing] a responsible party to 'take action,'" *Meghrig*, 516 U.S. at 484, as evident in their claims for relief. *See*, *e.g.*, Dkt. No. 36 at 80–81 (repeatedly requesting the Court order Federal Defendants to "take action"). Plaintiffs therefore seek a mandatory injunction, for which they must show that they are "clearly" entitled to relief. *Garcia*, 786 F.3d at 740.

---

[12] To the extent Plaintiffs argue the "status quo" should be the agency's practice of timely reviewing applications, such an argument would fly flatly in the face of the Supreme Court's instruction that an order for a party to "take action" is a mandatory injunction. *Meghrig*, 516 U.S. at 484. The distinction between ordering action versus inaction is determinative; here, both legally and intuitively, the relief Plaintiffs seek is action, not inaction.

Further, an abrupt expeditious processing of wind-energy applications would not preserve the parties' positions until the merits; it would grant Plaintiffs the very relief they seek on the merits. *Compare* Dkt. No. 14 at 46 (PI Motion) (asking the Court to "require DoD to conduct its review for all wind-energy projects in accordance with law") *with* Dkt. No. 36 at 78 (Amended Complaint) ("The Court should order DoD to immediately resume processing wind-energy applications expeditiously and within a reasonable time in compliance with its statutory and regulatory deadlines . . ."). The purpose of preliminary injunctive relief, however, "is merely to preserve the relative positions of the parties until" a determination on the merits. *Camenisch*, 451 U.S. at 395. Here, the injunction would afford "judgment on the merits in the guise of preliminary relief," which is "highly inappropriate." *Senate of State of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992); *see also Diversified Mortg. Inv'rs v. U.S. Life Ins. Co. of N.Y.*, 544 F.2d 571, 576 (2d Cir. 1976) (explaining that a preliminary injunction "should not grant relief properly awarded only in a final judgment"); *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969) (per curiam) ("[A] preliminary injunction should not work to give a party essentially the full relief he seeks on the merits."). As put by one Circuit, "There are three types of disfavored injunctions: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012). Plaintiffs seek an injunction that accomplishes all three.

At baseline, "[a] preliminary injunction is an extraordinary equitable remedy[.]" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (cleaned up). As such, it is an exercise of judicial discretion and "never awarded as of right"—that is, even when all applicable burdens

have been met. *Id.* (cleaned up). Such relief must be, inter alia, "appropriate" and "suitable" for the case at hand. *Id.* at 347. The fact that the "preliminary" relief requested in this case is the very same relief sought on the merits is reason alone for the Court to decline the request. Plaintiffs' requested injunction undermines the very purpose of preliminary relief: "to preserve the relative positions of the parties until" a determination on the merits. *Camenisch*, 451 U.S. at 395. A litigant should not be able to obtain, at the outset of a case, the very relief ultimately sought, including by sidestepping the central tenet of APA litigation: that the reviewing court shall make its rulings based on the full administrative record. *See* 5 U.S.C. § 706.

### B.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

Plaintiffs' preliminary injunction motion fails because Plaintiffs are not likely to succeed on the merits of their case. As previously outlined, Plaintiffs seek to compel Federal Defendants to take affirmative action, seeking a mandatory injunction which is "particularly disfavored." *Marlyn Nutraceuticals*, 571 F.3d at 879 (citation omitted). As such, Plaintiffs must show they are "clearly" entitled to relief. *Garcia*, 786 F.3d at 740.

Subsumed in this likelihood-of-success inquiry is the subject-matter jurisdiction inquiry, as a plaintiff who cannot demonstrate jurisdiction cannot demonstrate success on the merits. *See, e.g., Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (per curiam) (holding that to obtain a preliminary injunction, the plaintiffs "must make a clear showing of" jurisdiction (citation omitted)); *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (explaining that in the preliminary injunction context, "the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction"); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018) (same);

*Timbisha Shoshone Tribe v. Salazar*, 697 F.Supp.2d 1181 (E.D. Cal. 2010) (given the "serious questions as to the Court's subject matter jurisdiction over Plaintiffs' claims, Plaintiffs fail to establish the likelihood of success on the merits of their claims"). This result is necessarily so, as "the affirmative burden of showing a likelihood of success on the merits necessarily includes a likelihood of the court's *reaching* the merits." *Klayman*, 800 F.3d at 565 (cleaned up). As provided *supra* Part III, this Court lacks subject-matter jurisdiction because Plaintiffs' claims, as pled, are not subject to APA review. Even if the Court declines to dismiss this case due to uncertainty as to jurisdiction, that same uncertainty instructs that the preliminary injunctive relief should be denied as Plaintiffs have failed to make a "clear" (or even likely) showing of jurisdiction.

Even should the Court reach the merits of Plaintiffs' complaint, however, they are unlikely to succeed on either the Section 706(1) or Section 706(2) claim.

### 1. APA Section 706(1): DoW has not unreasonably delayed action.

For APA Section 706(1), Federal Defendants do not dispute that this case, setting aside the jurisdictional defects, would present a situation contemplated by Section 706(1).[13] This claim thus should not be considered, as pled in the complaint.

But if this claim were considered on the merits, Plaintiffs argue that agency action has been unlawfully withheld or, "[a]lternatively," unreasonably delayed. Dkt. No. 14 at 35. As an initial matter, only the latter claim would be applicable here. Section 706(1) addresses agency action "unlawfully withheld" or "unreasonably delayed." 5 U.S.C. § 706(1). In contrast

---

[13] As explained *supra* Part III.B, such projects must be challenged on an individual basis and on their own facts and record, by individual developers who are not even part of this motion, to be "discrete" agency action rather than the type of programmatic attack forbidden by the APA.

to a delay, an agency "withholds" a required action when it outright "refuses to accept, in any form, a request that it take a required action." *Al Otro Lado v. EOIR*, 138 F.4th 1102, 1122 (9th Cir. 2025) (rev'd and remanded on other grounds). On this record, there is no indication that DoW has done so, and in fact DoW is "diligently striving" to develop an analytically sound methodology "as expeditiously as possible" so it can resume issuing full determinations to the FAA. Marks Decl. ¶ 101. Plaintiffs' reliance on the post office analogy in *Al Otro Lado* to argue that there has been an "unlawful withholding" is unpersuasive. That analogy says that if the post office keeps telling a customer it will not mail a package but might change its mind in the future, that "is not mere delay[.]" 138 F.4th at 1122. In that hypothetical, the post office is not merely saying it will take delayed action; the post office is saying it currently will not, and *may not ever*, take action. As the Ninth Circuit explains in *Al Otro Lado*, when "one expects that, with the passage of time (maybe even an unreasonable amount of time), the action eventually will be completed," that is a delay. When one can wait out a delay "[w]ith patience," or "even with superhuman patience," it does not amount to withholding. *Id.* Here, that is precisely the case; unlike the post office analogy, DoW is not saying it may not ever take action; indeed, the Clearinghouse has unwaveringly committed to resuming the review process "as expeditiously as possible," while recognizing the need to re-assess risks and potential mitigation. Marks Decl. ¶ 101. Here, the delay is only measured in months,[14] and DoW has never indicated it will never act (and indeed has steadfastly maintained the contrary).

---

[14] Indeed, it has historically taken 491 days from FAA notification to full execution of mitigation agreements. Marks Decl. ¶ 27.

Nothing on this record supports the extreme finding that there has been an outright withholding.

As to unreasonable delay, Federal Defendants do not resist Plaintiffs' framing that the so-called *TRAC* factors govern the analysis of the reasonableness of any delay. As Plaintiffs recognize, a delay itself is not alone unlawful; the delay must be "unreasonable," which is a "fact-intensive inquiry" under the *TRAC* factors. *Al Otro Lado*, 138 F.4th at 1121. Those factors are:

> (1) the time agencies take to make decisions must be governed by a "rule of reason[";]
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
>
> (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*Vaz v. Neal*, 33 F.4th 1131, 1137 (9th Cir. 2022) (quoting *TRAC*, 750 F.2d at 79–80).

Here, the delay is not unreasonable, as set forth in precise detail. Congress created the Clearinghouse at the height of the global War on Terror. *See* 10 U.S.C. § 183a; Marks Decl. ¶ 41. From the Clearinghouse's inception in 2011 until Fall 2025, DoW "through the lens of flight safety, training impacts within or adjacent to military training areas, and low-level

routes." Marks Decl. ¶ 41. Historically, the main concern was "avoidance of midair collision." *Id.* First, "[i]t is widely understood that wind energy projects (i.e., wind farms) interfere with FAA radar and military radar systems," *id.* ¶ 49, including in a myriad of compounding ways. *See id.* ¶¶ 49–60 (explaining the phenomenon in depth). When wind turbines are operating, "the radar effectively goes blind, changing a successful detection into a catastrophic operational failure[.]" *Id.* ¶ 55. "To overcome this adverse radar phenomenology," DoW historically sought $80,000 as a mitigation measure from wind energy developers, which went toward installing Radar Adverse-Impact Management (RAM) measures on impacted radar systems. *Id.* ¶ 56. This RAM technique would "partially blind [surveillance] radars by filtering much of the electromagnetic interference caused by the wind turbines[.]" *Id.* ¶ 58. This "filtering" technique essentially hid wind farms from radar view by masking their effects. *Id.*

As explained in great detail by the Honorable Marks, recent events revealed "a threat paradigm shift taking place that arguably exceeds 9/11," and "doing things as we have always done is an insufficient and potentially dangerous answer[.]" *Id.* ¶¶ 41, 64. A particularly rapidly evolving threat is the use of "unmanned aircraft systems (UASs, i.e., drones)," which wreck devastation from the interior of the target country. *Id.* ¶¶ 5, 44, 46. In June 2025, Ukraine executed Operation Spiderweb, a highly-coordinated covert drone strike which successfully "caus[ed] "overwhelming damage to [Russia's aviation] fleet," despite these fleets being located "deep (approximately 2,500 miles) inside Russian territory." *Id.* ¶ 43. Through the smuggling of cheap "off-the-shelf drones powered by a free, open-source autopilot software" deep into a country's interior and "bypass[ing] outer air defenses," *id.* ¶¶ 43–44, Operation Spiderweb showed that "air or naval superiority" is no longer determinative. *Id.* ¶ 45. Similar

31

tactics are also being seen in the Strait of Hormuz, where the Islamic Revolutionary Guard Corps' Navy has deployed hundreds of low-cost, fast inshore attack crafts, including unmanned explosive speedboats and "Shahed-class kamikaze one-way attack drones." *Id.* Domestically, in the last two years the United States has documented multiple incidents of military base incursions by unidentified drones in restricted airspace, as well as a thwarted plot involving drones targeting the White House during a recent event. *Id.* ¶¶ 73–79. These tactics have been eye-opening, and the lesson taken is clear: "[n]ow, highly resilient, asymmetric arsenals can inflict severe tactical blows to a nation's defenses." *Id.* ¶ 46.

While the RAM mitigation technique had been considered sufficient until recent years, that was back when "avoidance of midair collision" was considered the main threat. *Id.* ¶ 41. But the "filtering" RAM implements as a mitigation feature is now a bug: the RAM technique decreases radar sensitivity, creating a "blinded sector" wherein "any low-RCS drone or missile flying through . . . could be entirely filtered from radar view[.]" *Id.* ¶ 58. DoW's old analytical methodology, which had focused on "flight safety," is no longer tenable in modern times, when "the greatest vulnerability is no longer the skies above[.]" *Id.* ¶¶ 44, 72. This "dramatic change in drone-based adversarial capabilities emerging over the past 24 months" has necessitated "global militaries, including the U.S., [to] tak[e] time to widely study and adapt to this profound paradigm shift in modern warfare."[15] *Id.* ¶ 48. This analysis is, of course, taking place at the classified level. *Id.* ¶¶ 38–39, 48.

---

[15] Reinforcingly, the Clearinghouse also recognized that as a matter of procedure, it had not been consistently notifying DHS of presumed risks and inviting them to participate in mitigation discussions as required. Marks Decl. ¶ 30; *see* 32 C.F.R. § 211.6(b). This coordination gap is also currently being addressed in the reassessment. Marks Decl. ¶ 95.

Applying the *TRAC* factors, the first factor, "rule of reason," is here the national security of the United States, for which DoW believes the Clearinghouse's current internal analytical methodology does not adequately account. As discussed, emergent modern threats present new national security challenges that the old mitigation solutions not only fail to account for, but potentially exacerbate. Thus, the reasoned justification for the delay favors Federal Defendants. The second factor is neutral, as Congress has not set forth any deadlines for when MRT review must conclude, nor when mitigation agreements must be exchanged or signed. Congress did provide that preliminary review shall take place within 75 days, *see* 10 U.S.C. § 183a(c)(1), but that step is not affected by DoW's reassessment and thus there is no controversy. Marks Decl. ¶ 97. The third and fifth factors favor Federal Defendants, as Plaintiffs' interests at issue are quintessentially economic, *see, e.g.*, Dkt. No. 14 at 37–43 (Plaintiffs complaining of their harms), and considerations of health and welfare favor Federal Defendants as the very purpose of the delay is to ensure "proper mitigation measures in place . . . to prevent an attack on the homeland[.]" Marks Decl. ¶ 60. In the same ilk, the fourth factor also favors Federal Defendants as expediting Clearinghouse review before DoW has adequately synthesized an effective solution to newly-identified risks could potentially jeopardize national security, including public safety, which certainly takes priority over the developers' bottom lines. Finally, on the sixth factor, the record does not reflect any impropriety here. *See id.* ¶ 101. Indeed, DoW continued to sign mitigation agreements through August 2025.[16] *Id.* ¶ 80. And the reassessment of the mitigation process was made

---

[16] The fact that the Honorable Marks was signing mitigation agreements immediately upon taking office shows, if anything, that he was not merely brought in to obstruct wind development.

33

independently," i.e., not mandated by higher directive, and based in science and national security. *See* Marks Decl. ¶¶ 64, 71. The sixth factor favors Federal Defendants.

In sum, Plaintiffs fail to show a likelihood of success, much less a clear likelihood, on either of their APA claims, particularly against the "unusually deferential" standard of APA review applicable in this case. *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989). As such, the inquiry may end here and Plaintiffs' motion should be denied. *See Garcia*, 786 F.3d at 740.

### 2. APA Section 706(2): DoW has not acted arbitrarily or capricious or contrary to law.

Even construing Plaintiffs' complaint to challenge a reviewable final agency action under Section 706(2), DoW has not acted arbitrarily or capriciously. Arbitrary-and-capricious review is "highly deferential." *E.g.*, *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). The court's review is "narrow," and it cannot "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Reversal is only appropriate where "there has been a clear error of judgment." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (citation omitted).

By Plaintiffs' account, DoW's explanation of its ongoing review has been lacking and unsatisfactory; while they acknowledge DoW has offered explanation to project proponents, they argue that "generalized explanations" cannot satisfy the APA. Dkt. No. 14 at 26. But the reassessment is not arbitrary and capricious for the same reasons it is not unreasonable under Section 706(1), as explained in the Marks Declaration outlining the national security risks presented by emergent modern-day developments. *See supra* Part IV.B.1. DoW has

consistently appraised Plaintiffs of these issues; as their own briefing concedes, Plaintiffs were informed that review of their applications had been slowed for national security concerns. *See* Dkt. No. 14 at 26. As their own exhibit shows, Plaintiffs were informed that "further interagency coordination is required" in light of "evolving risks to the activities of DoW," and comprehensive review was necessary to tackle "modern military risks." Dkt. No. 36-11 at 2. DoW explicitly indicated that the risk pertained to wind energy projects' "potential to adversely impact or impair military testing, training, and operations." *Id.* And as Plaintiffs admit, DoW's May 7 memorandum discussed concerns with "national security considerations" and indeed specifically mentioned "impactful doppler interference" as an "area[] of emerging concern."[17] Dkt. No. 36-3 at 2. 4. Plaintiffs conclusorily dismiss DoW's concerns as "one of the most common issues that has been successfully addressed through the DoD review process since its inception." Dkt. No. 14 at 18. But as explained, that dismissiveness is misguided, as past outdated mitigation efforts are not only ineffective against modern-day emergent threats but may exacerbate their potency.

At baseline, ordinary arbitrary-and-capricious review is already "highly deferential." *E.g.*, *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 601. But on matters of "military judgment requiring military expertise," that deference is supercharged into an "unusually deferential" application of that standard. *Kreis*, 866 F.2d at 1514–15; *see Winter*, 555 U.S. at 24 ("We give great deference to the professional judgment of military authorities concerning the

---

[17] The Honorable Marks' declaration is evidently not a "post hoc agency rationalization, which only applies "where an agency has provided a particular justification for a determination at the time the determination is made, but provides a different justification for that same determination when it is later reviewed by another body." *Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 512 (9th Cir. 1997). Here, it expounds upon the very same justification consistently proffered by DoW.

relative importance of a particular military interest." (cleaned up)).  Given the highly sensitive, technical, and complex national security judgments at play here, this case is quintessentially one where a court should defer to the expertise of the Clearinghouse.  *See*, *e.g.*, *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011) (per curiam) (observing it is "reasonable" to defer to the government on issues within its "unique expertise, in fields such as national security or the internal functioning of the military"); *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Boumediene v. Bush*, 553 U.S. 723, 797 (2008) ("[N]either the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people.").

In support of their arbitrary-and-capricious claim, Plaintiffs argue DoW "failed to consider . . . the need to foster renewable energy development" and, similarly, that DoW failed to account for their reliance interests.  Dkt. No. 14 at 27–28.  But their saying so does not make it true.  Indeed, in the cited letter, DoW explicitly recognized Plaintiffs' interest in "developing energy sources."  Dkt. No. 36-11.  DoW informed the developer that the "competing" interests of military operations and readiness in this circumstance necessitated a further comprehensive review to assess evolving risks.  *Id.*  In other words, DoW acknowledged the relevant interests and determined that one took priority over the other; such a choice does not mean DoW "entirely failed to consider" the importance of energy development, or did not consider Plaintiffs' reliance interests in their projects.  *State Farm*, 463 U.S. at 43.  Plaintiffs' priorities are understandably focused on predictability, industry, and, overwhelmingly, dollars and cents, *see* Dkt. No. 14 at 37–43, but DoW must balance those

36

priorities to ensure the protection of the homeland against modern emergent threats.  The fact that DoW's decisionmaking has hampered Plaintiffs' interests does not mean DoW did not consider them.

Plaintiffs also argue that DoW acted arbitrarily in failing to meet "statutory and regulatory deadlines" and therefore its action is "not in accordance with law."  *Id.* at 30.  The critical problem with this argument is that failure to meet deadlines is the very essence of a delay claim under Section 706(1), not a claim challenging agency action under Section 706(2).  To highlight how this is so, consider the agency "action" that forms the basis of Plaintiffs' Section 706(2) claim.  To support their argument that this case involves "action," not "inaction," they point to the "action" of the May 7 Memorandum.  *See, e.g., id.* at 31.  But the May 7 Memorandum says nothing contrary to law at all; it references the need to evaluate emergent threats, directs the continued timely preliminary review of energy applications, and references continued mitigation discussions.  *See* Dkt. No. 36-3.  The document also does not direct DoW to violate any deadlines in the Clearinghouse process.[18]  Indeed, Plaintiffs' attempt

---

[18] To be sure, Plaintiffs seem to argue that while the statute provides 75 days for the Clearinghouse to conduct a preliminary review, the agency's own regulations self-impose 30 days for the entire process.  This is not so, as the 30-day period is an interim regulatory milestone to ensure the Clearinghouse timely begins its "evaluat[ion] [of] all comments and recommendations received," i.e., with adequate time to meet the statutory 75-day period.  32 C.F.R. § 211.6(a)(3).  This point is confirmed by statutory, regulatory, and industry context.  *See* Marks Decl. ¶ 23 ("[T]he numerous procedural steps addressed in the statute, regulation, and Department's implementing Instruction (DoDI) are integrated into the whole of the 75-day, statutory period.").

The 30-day interim regulatory milestone at 32 C.F.R. § 211.6 was established in December 2013, back when the full period for preliminary review was 60 days.  But in the Fiscal Year 2020 National Defense Authorization Act, Congress realized DoW needed more time to conduct its preliminary reviews and amended the 60-day period to 75 days.  Pub. L. 116-92, 133 Stat. 1198, 1303 (2019).  Had DoW's internal regulations self-imposed 30 days for the entire process, DoW would have simply relaxed its regulations—not obtain more time from Congress (which would have been useless without changing its self-imposed deadline).  Moreover, the Clearinghouse DoDI cited by Plaintiffs confirm this understanding, instructing 70 days—i.e., enough cushion before the statutory 75 days—for DoW to file a notice of presumed risk with FAA.  *See* Dep't of Def. Instr. 4180.02, DoD Military Aviation and Installation Assurance Siting Clearinghouse at 3.2b(2)(c) (June 15,
(continue)

to frame this case as one of "agency action" is precisely what dooms it, as setting aside a memorandum which does not direct the agency to do anything unlawful would provide no relief. If Plaintiffs' aim is for mitigation discussions to progress, or for mitigation agreements to be signed, it must be via an order compelling agency action under Section 706(1). Had the May 7 Memorandum directed DoW to *refrain* from taking those steps, Plaintiffs' argument might hold water. But the May 7 Memorandum does no such thing; as such, it cannot be contrary to law.

Plaintiffs' argument that DoW failed to engage in notice-and-comment rulemaking fares no better. This argument is odd; again, this case at core is one of agency inaction, i.e., delay, so there is no agency action for which to seek notice-and-comment rulemaking. While Plaintiffs argue "legislative rules" must go through notice-and-comment rulemaking, Dkt. No. 14 at 32, a delay in agency action is of course not a rule at all, much less legislative. Legislative rules "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003). The reassessment of DoW's internal methodology and concomitant delay does not hold a single one of these characteristics. At most, even if conceptualizing any delay as a rule at all, it would at most constitute an "interpretive rule[], general statement of policy, or rule[] of agency

2023), available at https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/418002p.pdf; *see also* Marks Decl. ¶ 22. Practically, the 75-day statutory requirement is already operationally difficult; a 30-day timeline would be operationally impracticable, as the Clearinghouse could have less than 10 days to review all comments and recommendations received from Components (which the Components must send within 20 days). Industry expectations confirm this discussion, as "[t]o the best of DoW's knowledge, no developer has contacted the Clearinghouse to allege the Department failed to render a preliminary review within 30 days." Marks Decl. ¶ 26. In light of longstanding interpretations and practices of the statutory and regulatory scheme, "it has long been understood that the 30-day period is one of several components of the statutory 75-day standard, not a reduced processing period in lieu of the 75-day, statutory standard." *Id.* ¶ 26.

organization, procedure, or practice," which does not require notice-and-comment. 5 U.S.C. § 553(b)(4)(A). Not only so, but even legislative rules are exempt from notice-and-comment rulemaking where they involve "a military or foreign affairs function of the United States," which would comfortably apply here. 5 U.S.C. § 553(a)(1).

Finally, Plaintiffs attempt to turn what should be legal argument into political argument, arguing that DoW is driven by "hostility to wind energy," including based on statements by President Trump and actions by other agencies in offshore wind projects. Dkt. No. 14 at 29–30. As an initial matter, this case concerns exclusively onshore wind projects, and the factual and legal issues in the offshore cases are entirely inapposite here.[19] More crucially, the law forbids this mud fight, as the Ninth Circuit explained just weeks ago that the relevant inquiry in this context must look to the action itself. In *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 178 F.4th 456, 464 (9th Cir. 2026), the plaintiffs argued that judicial review of the Administration's actions should be colored by its "hostil[ity] to federal labor unions and their First Amendment activities." The Ninth Circuit rejected this approach, instructing that the court would not "read the [action] in the worst possible light," particularly considering the "measure of deference in the national security context." *Id.* at 467. Rather, the appropriate inquiry is whether the action itself, on its face, has "a legitimate grounding in national security concerns, quite apart from any" signs of animus. *Id.* And because the executive order at issue "disclose[d] no retaliatory animus on its face," that argument was unavailing. *Id.* The Supreme Court has held the same, looking to the executive action itself to "discern a relationship to

---

[19] Not only are the offshore cases just that—offshore—but none of them involve the Clearinghouse and FAA review process at issue here under 10 U.S.C. § 183a.

legitimate state interests." *Trump v. Hawaii*, 585 U.S. 667, 706, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018) (citation omitted) (rejecting the proposition that a presidential proclamation, which was facially neutral as to religion, was spurred by religious animus); *see also Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) ("[A] court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons . . . [r]elatedly, a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."). In *Hawaii*, the Supreme Court noted that its finding was "particularly" warranted given the context involved sensitive and weighty interests of national security. 585 U.S. at 708. Here, Plaintiffs concede that "Do[W] has not explicitly invoked its disfavor for wind energy to support its decision in any formal communication." Dkt. No. 14 at 30. Under controlling law, that admission is dispositive; the merits, should the Court reach them, must turn on whether the delay is supported by the record itself.

In light of the applicable law and record available at this early stage, the Clearinghouse's delay in review while formulating a solution is comfortably "reasonable and reasonably explained" under the APA. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Ultimately, Plaintiffs do not appear to dispute, nor could they, that the analytical methodology itself used to assess national risks is sensitive, *classified*, and not defined by statute nor regulation but rather left to the internal evaluation of DoW. *See* Marks Decl. ¶ 37–39. They also do not appear to dispute, nor could they, that this analytical methodology must be dynamic and re-assessed as necessary. Plaintiffs' position in this litigation, then, is essentially this: that DoW has no choice but to unceasingly review and sign off on projects which implicate newly

40

identified emergent risks to national security, even prior to having developed a solution to those risks and as DoW is actively working to do so.  It is far from arbitrary and capricious to temporarily check a car into the mechanic's shop when its check-engine light comes on; indeed, if anything were arbitrary and capricious, it would be to drive that car business-as-usual while the issue persisted, which is precisely what Plaintiffs demand.  Plaintiffs' Section 706(2) claim, even if construed as a jurisdictionally proper challenge to final agency action (which it should not, *see supra* Part III) is unlikely, much less clear, to succeed on the merits.

### C.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

Plaintiffs' motion also fails under the irreparable harm prong.  Those seeking a preliminary injunction must demonstrate that irreparable harm "is likely in the absence of an injunction."  *Winter*, 555 U.S. at 22.  The Ninth Circuit has since been steadfast in interpreting *Winter* to instruct that a mere possibility of irreparable harm "cannot support an injunction." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018); *see Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).  Here, Plaintiffs allege irreparable harm and refer to declarations in support that they have suffered financial loss; however, the bar is not so low.  When asserting economic loss, "the barrier to proving irreparable injury is higher still, for it is well settled that economic loss does not, in and of itself, constitute irreparable harm."  *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up).  Financial injury is irreparable "only where the loss threatens the very existence of the movant's business."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  Plaintiffs have not made such a showing here.

The irreparable harm analysis also highlights why Plaintiffs' case is jurisdictionally impermissible. First, Plaintiffs "seek programmatic relief," i.e., universal relief, despite that they do not allege, much less show, that each and every pending wind project is currently suffering irreparable harm. This tactic of alleging irreparable harm to specific projects to obtain industry-wide preliminary relief highlights why this programmatic challenge cannot maintain. Second, the types of harms Plaintiffs allege almost exclusively pertain to the developers themselves. *See* Dkt. No. 14 at 37–43. But this motion was brought by the Organizational Plaintiffs who could only be suffering these harms if suing on behalf of their members, which Organizational Plaintiffs do not have standing to do in light of the need for member participation given the individualized basis under which these claims must proceed. *See supra* Part III.D. Finally, as to reputational harm, any such harm would be suffered by the Developer Plaintiffs, who are not part of this motion. Additionally, such harm must be likely, and cannot be "grounded in platitudes rather than evidence." *Herb Reed Enters.*, 736 F.3d at 1250. Plaintiffs cite three declarations—one paragraph from each—to support their claim of reputational harm. Dkt. No. 14 at 43 (citing Exhibits B, D, and E). Each of those paragraphs are conclusory and speculative, as opposed to backed by evidence. *See* Dkt. No. 14-3 ¶ 24; Dkt. No. 14-5 ¶ 15; Dkt. No. 14-6 ¶ 18. Indeed, the declarations are each copy-and-pastes of each other, aside from the company name. *See id.*

**D.    THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH AGAINST PRELIMINARY RELIEF.**

Finally, the balance of the equities and public interest "merge when the Government is the party opposing the injunction." *Galvez v. Jaddou*, 52 F.4th 821, 831 (9th Cir. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)). These

considerations greatly tip in favor of Federal Defendants here where there is a strong public interest in ensuring the adequate protection of military and national security interests in the light of emergent risks.

When the Executive Branch finds a course of action is essential to national security, the public interest is compelling; indeed, "[i]t is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (cleaned up); *see also Am. Fed'n of Gov't Emps.,* 178 F.4th at 462 ("[T]he government's interest in ensuring the nation's security is 'an urgent objective of the highest order.'" (quoting *Holder v. Humanitarian L. Project*, 561 U.S. at 1, 28 (2010))). Take *Winter*, 555 U.S. 7, where environmental groups asserted that the Navy's use of MFA sonar caused serious injuries to marine animals. The Supreme Court reversed the lower courts' holdings as to the equities and public interest, instead holding that they "tip *strongly* in favor of the Navy." *Id.* at 26 (emphasis added). The Supreme Court recognized that in light of the significant "public interest in national defense," courts should "defer to military officials' "specific, predictive judgments" about how injunctive relief could impede military effectiveness. *Id.* at 24, 27. In *Winter*, it was "[not] a close question" that the public interest favored the Government and "plainly outweigh[ed] the interests advanced by the plaintiffs." *Id.* at 26.

So too in this case, where any temporary delay for a specific project that may result in irreparable harm is the product of the Clearinghouse's need to reassess the adequacy of its current mitigation processes. Just as it was against the public interest in *Winter* to "forc[e] the Navy to deploy an inadequately trained antisubmarine force," thereby "jeopardiz[ing] the safety of the fleet," 555 U.S. at 26, here it is against the public interest to force the

Clearinghouse to quickly cobble together a methodology, or rely on a prior one, that potentially fails to adequately consider emergent national security risks. Such an order could needlessly "jeopardize[] the safety" of citizens and servicemembers, *id.*, including by potentially overlooking critical exposures which open the door to "unacceptable risk to the national security of the United States." 49 U.S.C. § 44718(f)(1).

Furthermore, not only have Plaintiffs failed to show irreparable harm, but Federal Defendants would suffer irreparable harm if an injunction were to issue. As the Supreme Court has recognized, damage to activities "vital to our national security" can inflict "irreparable harm." *Snepp v. United States*, 444 U.S. 507, 509, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025) (finding that the government suffers irreparable harm when an injunction "ties the government's hand in the national security context") (quoting *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025)).

In sum, given that national security interests are of "the highest order," *Holder*, 561 U.S. at 28), and which "no governmental interest is more compelling than," *Haig*, 453 U.S. at 307, the third and fourth preliminary injunction factors strongly favor Federal Defendants. Indeed, courts have found that where the balance-of-equity and public interest favors weigh heavily in favor of the Government and against a preliminary injunction, there is no need to consider the other factors at all. *See, e.g., Am. C.L. Union v. Clapper*, 785 F.3d 787, 826 (2d Cir. 2015) (declining to order preliminary injunction in light of national security interests even where success on merits was certain); *Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 458 (5th

Cir. 2016) (affirming denial of preliminary injunction on balance-of-equities and public interest factors alone).

## V.    CONCLUSION

In bringing this admittedly programmatic attack, Plaintiffs have failed to show there is jurisdiction for this Court to entertain those claims.  Even if their claims did not fail as a matter of law, Plaintiffs have not met their burden to show a "clear" entitlement to the mandatory, preliminary relief they seek—the same relief sought on the merits.  The equities also favor Federal Defendants given the national security interests at stake.  Particularly on this record, and at this stage, the Court should decline to order such extraordinary and ill-fitting relief.  For the foregoing reasons, Federal Defendants respectfully request that the Court grant their motion and dismiss Plaintiffs' claims in their entirety or, in the alternative, deny the motion for preliminary injunction.

Dated: July 6, 2026                                    Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

*/s/ Shawn D. Ren*
Shawn D. Ren, Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
999 18th St., N Terrace, Suite 600
Denver, CO 80202
Tel: (202) 598-3141
Fax: (303) 844-1350
E-mail: shawn.ren2@usdoj.gov

45

*Attorney for Federal Defendants*

46

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

This brief complies with the applicable 14,000-word limitation as requested by Federal Defendants and granted ordered by the Court (see Dkt. Nos. 84, 87) because it contains 13,998 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature blocks, exhibits and any certificates of counsel.

_/s/ Shawn D. Ren_
Shawn D. Ren
Trial Attorney