DECLARATION OF HONORABLE DALE R. MARKS

I, Dale R. Marks, declare as follows:

**Relevant Professional Experience:**

1. (U)[1] I am Performing the Duties of (PTDO) the Deputy Under Secretary of War for Acquisition and Sustainment (DUSW(A&S)); however, I was confirmed by the U.S. Senate as the Assistant Secretary of War for Energy, Installations, and Environment (ASW(EI&E)) on June 3, 2025.

2. (U) I assumed the PTDO DUSW(A&S) role on September 22, 2025. In this position, I am responsible to the Undersecretary of War for Acquisition and Sustainment (USW(A&S)) for all matters pertaining to acquisition; contract administration; sustainment, logistics, and materiel readiness; installations and environment; operational energy; chemical, biological, and nuclear weapons; the acquisition workforce; and the defense industrial base.

3. (U) Immediately prior to assuming my current position, I served as the Executive Director of the 96th Test Wing at Eglin Air Force Base, Florida. I was responsible for all base infrastructure as well as operating and services support for the Air Force's largest installation. I directed a workforce of over 10,000 military, civilian, and contractor personnel, leading developmental testing and evaluation of advanced weapons systems. I was also responsible for the security of the installation, which was a constant target of adversaries attempting to gain access or to conduct surveillance. My team worked

---

[1] Each paragraph in this declaration is marked with letters indicating the level of classification and restrictions on dissemination applicable to that paragraph. Paragraphs marked with "U" are unclassified, and those marked with "CUI" contain controlled, unclassified information.

diligently to counter these threats, which included physical incursions and drone surveillance over flight operations.

4.  (U) Fundamentally, the Test and Evaluation (T&E) process is highly structured, strictly regulated, and designed to minimize risk before billions of dollars are spent on full-rate asset production and deployment. Like the Scientific Method, T&E has the same foundational principles: systematic, evidence-based frameworks designed to eliminate bias and find the objective truth. Similarly, T&E is also an engineering and risk-management discipline. Thus, T&E collectively shares common features with ensuring a proper, scientifically rigorous and national security-centered framework for Clearinghouse evaluations that can be developed for uniform, and agnostic, application to all developer filings.

5.  (U) Prior to my career in civil service further detailed below, I served for nearly 25 years as a combat fighter pilot (flying over 3,000 hours in A-10, F-15E, AT-38, and F-16 aircraft), ground controller, and a mission analyst for which, among other decorations, I received the Bronze Star and the Legion of Merit. My aviator and T&E experiences have given me a comprehensive understanding of radar systems, radar interference phenomenology, and their interactions with flight platforms, including unmanned aircraft systems (UASs, i.e., drones).

6.  (U) I am a distinguished graduate of the National War College with specialized training in war planning and analysis. My operational planning experience includes serving as a principal planner for major military

campaigns, including Operations Enduring Freedom and Iraqi Freedom. The relationship between planning and risk is continuous, functioning as a feedback loop throughout the Joint Planning Process (JPP).

7. (U) Thus, central to my work is a deep, applied understanding of the JPP, a structured, seven-step methodology utilized by military commanders for deliberate and crisis-action planning.[2] In addition to the application of the JPP, a significant aspect of my military career involved leading "Red Teams" for Combatant Commanders[3] and the Joint Staff. In this capacity, I was responsible for evaluating operational war plans to identify weaknesses, vulnerabilities, and risks.

8. (U) Subsequently, I served at the Department of the Air Force as the Deputy Director of Operations for the Continental U.S. North American Aerospace Defense Command (NORAD) Region (referred to as CONR) and Air Forces North (AFNORTH). My duties included operational oversight of our nation's air defense, with specific responsibility for protecting the President, the National Capital Region, and the nation from air-based threats. This role required continuous evaluation of adversary capabilities and the development of contingency plans to prevent potential attacks.

9. (CUI) During my tenure at CONR/AFNORTH, I was tasked by the U.S. Secret Service in 2016 to develop a strategy to protect the Presidential Inauguration from

---

[2] (U) The JPP framework is critically dependent on three core analytical concepts: (1) adversary intent and capabilities (i.e., understanding an adversary's most likely and most dangerous courses of action); (2) systemic vulnerabilities (i.e., identifying weaknesses in systems, processes, or plans that an adversary could exploit); and (3) risk assessment (i.e., formally evaluating the probability and severity of potential negative outcomes. Collectively, these factors inform decisions on risk acceptance or the necessity of mitigation strategies).

[3] (U) Combatant Commanders are four-star generals or admirals who exercise operational command over all U.S. military forces within their assigned geographic or functional area, directing joint forces from all service branches.

a potential drone attack. In response, my team rapidly analyzed the threat and implemented mitigation measures. This early experience underscored the urgency of addressing the rapidly evolving threats drones posed.

10. (U) In my current Senate-confirmed position as the ASW(EI&E), I apply this extensive background in process evaluation and adversary risk assessment to my present duties. As the steward of over 27 million acres of federal land with more than 500,000 facilities, the security of our national security missions and personnel is my highest priority. This same risk-based mindset extends to my work in defending our nation's critical infrastructure, a responsibility I execute in partnership with the Departments of Energy, Interior, and Transportation (DOE, DOI, and DOT respectively), among others, as well as with the Office of Golden Dome for America (GDA). In particular, I work with GDA regarding future locations of critical national defense architecture. The paramount objective of my professional responsibilities remains the prevention of attacks on the homeland and sufficient geographic bandwidth (i.e., developer siting locations are critically important) to protect it.

11. (U) While this declaration does not contain information more highly controlled than CUI (controlled, unclassified information), much of the underlying rationale for the actions I have independently taken with respect to the Clearinghouse since mid-August 2025 involve classified information that is at the "SECRET/NOFORN" or SECRET/REL USA, CAN" level.[4]

---

[4] (U) Unauthorized disclosure of SECRET information can reasonably be expected to cause serious damage to national security. Information marked "NOFORN" or "NF" or requires the permission of an appropriate official at the originating organization to release the information in any form to foreign governments, foreign nationals, foreign organizations, or non-U.S. citizens. Information marked "REL USA, CAN" requires handling under the same terms

**Overview:**

12. (U) My career spans nearly 25 years of uniformed military service and subsequent senior roles within the federal government, focusing on strategic planning, operational risk assessment, and national security. The information contained in this declaration is based entirely on my personal knowledge or information obtained through the performance of my professional duties.

13. (U) In my confirmed role as the ASW(EI&E), I am responsible for all Department of War (DoW or Department) matters relating to energy, installations, and the environment, including operational and facility energy, installation maintenance, and environmental planning. In so doing, I provide budgetary, policy, and managerial control over the Department's extensive real property assets located at over 800 installations worldwide.

14. (U) As part of my present duties as the ASW(EI&E) and as described in Department of Defense Instruction (DoDI) 4180.02, *DoD Military Aviation and Installation Assurance Siting Clearinghouse*, I am the Secretary's delegated manager of the Military Aviation and Installation Assurance Clearinghouse (Clearinghouse). As such, I am familiar with the Clearinghouse processes for evaluating projects referred by the Federal Aviation Administration (FAA) and those referred by Department of the Interior (DOI), acting through the Bureau of Land Management and the Bureau of Ocean Energy Management (BOEM); as well as, where appropriate, negotiating, and executing

---

as "NF" or "NOFORN," except that properly security-cleared Canadian officials, with a need to know (NTK), may be provided the information independent of approval by an official at the originating organization. Importantly, simply having a clearance does not grant a NTK.

mitigation agreements to address effects on military operations and national security. Additionally, in my confirmed position, I am the signatory for Clearinghouse mitigation agreements where any voluntary contribution (i.e., developer provided funds to offset DoW costs) is $1.5 million or less.

15. (U) DoW's role in evaluating the national security implications of proposed energy projects differs based on which agency <u>DoW is supporting, FAA or BOEM</u>. *Importantly, DoW is not an approval authority for projects* submitted by either.

16. (U) Importantly, my understanding of these duties and desire to ensure process integrity and scientific rigor is informed by my prior professional experiences, to include combat operations, military planning (i.e., threat assessment expertise), red-teaming (i.e., adversarial simulation), Joint Planning Process (JPP) application, Test and Evaluation (T&E) process oversight, and Department of Homeland Security (DHS) leadership that cultivated my expertise in risk and vulnerability analysis. Notably, I was also personally involved with drafting the original Clearinghouse framework (Public Law 111-383; 10 U.S.C. § 183a) 15 years ago.

17. (CUI) The law developed in response to a significant vulnerability in our nation's defense posture that resulted in a midair collision. The root causes of this unnecessary tragedy included wind farm interference with a NORAD radar and lack of interagency coordination. While the paramount objective of the Clearinghouse was, and continues to be, formalizing a process for "minimizing or mitigating any adverse impacts on military operations and readiness" arising from

development of energy projects, the issue of radar interference persists today and is heightened by advanced drone technology.

18. (U) Given my early involvement in the process, the methodology development, and my professional experiences in the interim, I am acutely aware of how the generational, global threat paradigm shift in the last 24-months (when drone incursions over military facilities began) is absent from, and must be reflected in, the Clearinghouse's internal, analytical methodology for national security evaluations.

**Clearinghouse Preliminary Review Process:**

19. (U) The Clearinghouse evaluation process begins when an energy developer files a Notice of Proposed Construction or Alteration, for proposed projects, and the FAA assigns an Aeronautical Study Number (ASN). Once assigned, the FAA tracks the ASN through its OEAAA system, which analytically screens proposed projects for impacts, to military airfields, military training routes, airspace, and radar systems.

20. (U) If the OEAAA identifies a project that may implicate DoW equities, the FAA forwards the Clearinghouse a copy of the developer's Part 77 application for a determination regarding whether the project will adversely impact DoW operations. Broadly, an adverse impact on military operations and readiness is "any adverse impact…including flight operations research, development, testing, and evaluation and training, that is demonstrable and is likely to impair or degrade the ability of the armed forces to perform their warfighting missions" (32 C.F.R. § 211.3).

21. (U) The Clearinghouse provides the FAA application to the Military Departments (MILDEPs) and the DoW Components it believes may have an interest in reviewing the project, and these DoW entities, by regulation, have 20 days (within the statutory 75-day preliminary review timeframe), to provide any comments back to the Clearinghouse. Based on this feedback, the Clearinghouse makes one of three potential adverse impact determinations: (1) the project will have an adverse impact on military operations and readiness; (2) the project will not have an adverse impact; or (3) the project's adverse impacts are sufficiently attenuated that they do not require mitigation.

22. (U) Within 70 days of FAA notification through OEAAA, the Department's internal Clearinghouse instruction, DoDI 4180.02, requires concurrence of the Military Department's Deputy Assistant Secretary that a proposed project will adversely impact military operations and that a mitigation response team (MRT) should be established. Importantly, the concurrence is a necessary step because mitigation response teams rely on Military Departments and Component resourcing and personnel; the coordination of which is often time-consuming given the inter-related and occasionally, competing concerns.

23. (U) The interim processing milestones (i.e., 20 days for Military Department feedback and 70 days for Military Department leader concurrence) are designed to permit the Clearinghouse to have the remaining 5 days out of the 75-day, statutory period for administrative purposes. Thus, the numerous procedural steps addressed in the statute, regulation, and Department's implementing Instruction (DoDI) are integrated into the whole of the 75-day, statutory period.

24. (U) Notably, and in support of this fact, in 2019 Congress realized DoW needed more time for its preliminary reviews. It expanded the original, 60-day period for preliminary reviews to 75 days in the Fiscal Year 2020 National Defense Authorization Act (Public Law 116-92, section 311). Moreover, Congress "encourage[d] the Clearinghouse to consider future military requirements when reviewing and approving any energy projects to ensure that such projects are consistent with the National Defense Strategy" (Senate Report 1160-48, p. 140). The newly released 2026 National Defense Strategy fundamentally shifts how the United States approaches the threat of unmanned systems, elevating homeland air defense and counter-drone missions to core organizing principles.

25. (U) The congressionally mandated extension (15 days, a 25% increase overall [60 to 75 days]) came in a year when the Department only executed seven mitigation agreements and six years after DoW promulgated the Part 211 regulations. The Clearinghouse's workload has grown exponentially since then. From 2020 forward, the number of mitigation agreements executed per year increased by 400% or more. Given the sheer volume of FAA applications in recent years, DoW has historically exceeded the 75-day requirement.

26. (CUI) Moreover, to the best of DoW's knowledge, no developer has ever contacted the Clearinghouse to allege the Department failed to render a preliminary review within 30 days. In sum, it has been long understood that the 30-day period is one of several components of the statutory 75-day standard, not a reduced processing period in lieu of the 75-day, statutory standard.

27. (U) According to Clearinghouse records, the DoW has signed 185 wind energy

mitigation agreements since 2012. In an average year, the DoW executes 13 mitigation agreements, but in recent years, this number has hovered around 30. Over the 13-year period (2012-2025), it took, on average, 491 days from the point of OEAAA project notification to full execution of mitigation agreements.

28. (U) If adverse impacts are found, the Clearinghouse issues a Notice of Presumed Risk (NPR) to the applicant describing the concerns identified by the Military Departments and/or DoW Components and requests a discussion with the developer regarding possible mitigation measures. Ultimately, when the Clearinghouse issues a developer an Notice of Presumed Risk, the national security evaluation process results in one of two outcomes: (1) a mitigation agreement and FAA Determination of No Hazard subject to the conditions of the mitigation agreement; or (2) a DoW determination that the project is unmitigable and presents an "unacceptable risk to the national security of the United States".

29. (U) At the point of Notice of Presumed Risk issuance, the Clearinghouse is required to inform the Secretary of Transportation and the Secretary of Homeland Security (32 C.F.R. § 211.6(a)(3)(iii)). Additionally, the governor of the state in which the project is located is similarly notified and offered the ability to provide comments for inclusion in the final determination that will be sent to the Secretary of Transportation.

30. (CUI) The OEAAA portal through which the DoW interacts with the FAA is a DOT process; however, the comprehensive Clearinghouse review (discussed further below) revealed that the Department was not consistently notifying DHS of a Notice of Presumed Risk, nor inviting DHS to participate in mitigation

response team discussions with the developers as required. Given the classified national security concerns arising from Twenty-First Century threats, it is critical to properly engage with DHS.

**The Clearinghouse Mitigation Response Team Process:**

31. (U) In response to a Notice of Presumed Risk determination, the Clearinghouse assembles a mitigation response team made up of representatives from impacted DoW entities. While it may also invite other Federal agencies to participate, DoW must invite DHS and FAA. The mitigation response team generally is led by the Component/Military Department with the greatest equities in a given project. The mitigation response team oversees a detailed analysis to determine if the risks posed by the proposed project can be mitigated and works with the developer to explore potential options to minimize the adverse impacts (32 C.F.R. § 211.6(b)).

32. (CUI) By regulation, extensions of mitigation response team discussions requiring more than 90 days are to be agreed to in writing (32 C.F.R. § 211.6(b)(1)); however, to the best of DoW's knowledge, no developer has sought a written extension or complained about continuing discussions beyond this regulatory goal until litigation seemed imminent. When I arrived, the projects pending action averaged 512 days between mitigation response team establishment and the first draft of the mitigation agreement available (the temporarily and strategically paused portion of the Clearinghouse process), and I was not made aware of any formalized extension requests.

33. (U) Mitigable impacts generally culminate in a mitigation agreement signed between the developer and DoW. Mitigation measures may include site

modification; turbine curtailment; Radar Adverse impact-Management (RAM) measures (i.e., radar blinding); developer operational restrictions; hardware upgrades; and/or DoW area avoidance or acceptance of incremental degradation (32 CFR § 211.9). If the mitigation measures entail modification to the proposed project, the developer notifies the Secretary of Transportation once an agreement is executed and amends its application accordingly (32 CFR § 211.6(b)(1)). The FAA then issues a Determination of No Hazard subject to the agreement's mitigation measures.

34. (U) When mutually agreeable mitigation options are not feasible or do not resolve the conflict between the project and adverse impacts on military operations and readiness, the Clearinghouse reviews the mitigation response team analysis and recommendations and determines if the proposed project, as it may have been modified during mitigation discussions, would result in an "unacceptable risk to the national security of the United States" (32 C.F.R. § 211.6(b)(1)).

35. (U) An "unacceptable risk to the national security of the United States," means the construction or the proposed construction, alteration, establishment, or expansion, of a structure that the Secretary of War can demonstrate would: (1) endanger safety in air commerce directly related to the activities of the DoW; (2) interfere with the efficient use of the navigable airspace directly related to the activities of the DoW; or (3) *significantly impair or degrade the capability of the DoW to conduct* training, research, development, testing, and evaluation, and *operations or to maintain military readiness* (emphasis added) (10 U.S.C. § 183a(h)(11) and 32

C.F.R. § 211.3).

36. (U) Importantly, the Department cannot discharge its statutory duty by relying on mitigation measures if it lacks confidence that those measures are responsive to the actual risks presented. Given known wind turbine effects on radar operations and the once in a generation military paradigm shift underway, DoW concluded that a comprehensive review of the Clearinghouse was required.

**DoW's Internal, Analytical Methodology:**

37. (CUI) Critically, and as further described below, DoW's internal, analytical methodology by which it informs its Mitigation Response Teams (MRTs) is not part of the process established by statute, regulation, or Department of Defense Instruction (DoDI) for obvious reasons. *In the defense and national security realm, protecting how the DoW thinks and analyzes is often just as critical as protecting the raw data itself.* There are several clear, strategic reasons why the military must classify its internal, analytical methodologies for determining national security threats, including prevention of adversarial reverse-engineering, protection of "sources and methods," denial of spoofing and information operations, and maintenance of decisional advantage.

38. (CUI) Fundamentally, and in its own right, methodology is a weapon system. In modern conflict, the cognitive framework used to process information is a primary battleground. Classifying the analytical methodology ensures that our cognitive processes remain secure, our detection thresholds remain unpredictable, and our decision-makers maintain the advantage. For these reasons, DoW is not, and never has been, required to codify how it conducts its project specific

analysis or how it informs the mitigation response teams, which will negotiate with developers on its behalf. Fundamentally, the Department needs to be flexible, to account for evolving threats, and to tailor mitigation measures to individual projects.

39. (U) The Department's statutory evaluation process must be driven by national security concerns (which are almost always classified) as known at the time a determination regarding a project is rendered (i.e., a mitigation agreement is offered or a finding of an "unacceptable risk to the national security of the United States" is made). With this perspective in mind, and within weeks of being confirmed, I ascertained critical program elements were lacking as required by statute, regulation, and policy. For example, the Clearinghouse had not evolved in the 15 years since I was last involved and critical interagency partners responsible for homeland defense had not been included in the mitigation response team process as required by regulation.

40. (U) These deficiencies were especially troubling given developments in weaponry and strategy originating in combat; specifically, Ukraine's "Operation Spiderweb" that took place the same week I was confirmed in June of 2025. Given my expertise in risk and vulnerability analysis regarding radar, as well as application of the Joint Planning Process (JPP), Operation Spiderweb shattered many long-held military doctrines and rewrote the rules of engagement. It is through this lens that DoW assessed changes in the global threat picture over the last 24 months, which informed the strategic steps DoW has taken since mid-August of 2025.

**Generational Shift in National Security Risks to the Homeland:**

41. (CUI) Congress passed the Clearinghouse statute (10 U.S.C. § 183a) at the height of the Global War on Terror (2011), and the Department's regulations, which remain unchanged, closely followed in time (2013). Prior to the fall of 2025, the Department evaluated FAA applications through the lens of flight safety, training impacts within or adjacent to military training areas, and low-level routes. This narrow focus represents only a narrow portion of the section 183a definition of "unacceptable risks to the national security of the United States". Fundamentally, avoidance of midair collision was the driving factor. As world events in the second quarter century (2025 and beyond) demonstrate, there is a threat paradigm shift taking place that arguably exceeds 9/11.

42. (CUI) Modern conflicts, especially in Ukraine and the Strait of Hormuz, fundamentally and permanently altered modern belligerency in five distinct ways: (1) extreme cost-asymmetry; (2) the death of "strategic depth"; (3) AI-guided precision at the tactical edge; (4) exploiting the enemy's commercial infrastructure; and (5) functional strategic neutralization.

43. (CUI) On June 1, 2025, the Security Service of Ukraine (SBU) executed Operation Spiderweb (Ukrainian: *Pavutyna),* a highly coordinated covert drone strike that targeted five Russian airbases deep (approximately 2,500 miles) inside Russian territory. The SBU smuggled first-person view (FPV) drones directly into Russia by concealing them inside modified shipping containers mounted on the back of commercial flatbed trucks. The attack by $600 to $1,000, off-the-shelf

drones powered by a free, open-source autopilot software used by hobbyists successfully targeted Russia's long-range aviation assets causing overwhelming damage to their fleet.








44. (CUI) By remotely launching from smuggled "Trojan Horse" containers, the strike not only proved that cheap drones can easily bypass outer air defenses, but also that the greatest vulnerability is no longer the skies above (i.e., threats can come from commercial highway traffic deep within a nation's borders).

45. (U) Inflicting an estimated $7 billion in losses, Operation Spiderweb also proved that no target is out of reach, regardless of geographic distance and that a smaller nation or rouge actor does not need to achieve air or naval superiority to inflict severe damage on larger power. A reality also being witnessed in the Strait of Hormuz with the Islamic Revolutionary Guard Corps Navy's "mosquito fleet," which consists of hundreds of low-cost, fast inshore attack craft, remote-

controlled one-way explosive speedboats, and Shahed-class, kamikaze one-way attack drones.

46. (CUI) Now, highly resilient, asymmetric arsenals can inflict severe tactical blows to a nation's defenses (i.e., hobbyist drones costing hundreds of dollars can destroy a $300 million strategic bomber). By systematically targeting Russia's nuclear-capable aircraft on the ground, Ukraine achieved functional strategic neutralization—disrupting Russia's ability to launch cruise missile salvos without ever having to engage their fighter jets in the air.

47. (U) For centuries, massive nations like Russia relied on their vast geography as a natural defense, stationing critical nuclear triad assets deep in the interior. Prior to this operation, FPV drones were viewed primarily as tactical, short-range weapons for the muddy trenches of the front line. Operation Spiderweb's drones, trained on historical museum pieces and open-source data of Russian aircraft, elevated FPV UASs to a strategic-strike weapon. Instead of relying on jammable global positioning systems (GPS), Ukraine employed onboard AI and cutting-edge, but easily accessible computing. Simply stated, Operation Spiderweb proved that for hundreds of dollars no target is out of reach.

48. (CUI) Even prior to Operation Spiderweb, military facilities across the globe, including those within the homeland have experienced drone incursions. Given this recent and dramatic change in drone-based adversarial capabilities emerging over the past 24 months, global militaries, including the U.S., are taking the time to widely study and adapt to this profound paradigm shift in modern warfare. Not surprisingly, much of this analysis and doctrinal evaluation is taking place at the classified level.

**CUI-level Wind Farm Radar Interference:**

49. (U) It is widely understood that wind energy projects (i.e., wind farms) interfere with FAA and military radar systems. Wind farm towers are large enough objects to obstruct radar signals, and their spinning turbine blades rotate fast enough to generate a false signal due to their Doppler effect. The Doppler effect[5] is the change in frequency or wavelength of a wave in relation to an observer who is moving relative to the wave source.

50. (U) Air Surveillance Radars (such as the FAA's ASR-9 and ASR-11 systems or military FPS-117 arrays) are designed to locate, track, and monitor aircraft in real-time. Large conductive and highly reflective vertical planes (such as large wind turbine towers and blades) introduce significant physical and electromagnetic problems for these radar systems (e.g., physical blockage, reflective clutter, and Doppler contamination).



51. (U) Because metal is highly conductive, it behaves like a near-perfect mirror to

---

[5] (U) This effect was first proposed by Austrian physicist Christian Doppler in 1842 and is a fundamental concept across physics, acoustics, and radar technology. All waves (sound, light, and radio waves) travel through space at a constant speed through a given medium unless or until they experience interference.

radio-frequency (RF) electromagnetic waves, disrupting radar operations in several distinct ways: (1) multipath and ghost targets; (2) target masking and shadowing; (3) receiver saturation and blindness; and (4) clutter and Doppler desensitization. Multipath propagation occurs when a transmitted radar signal splits and travels along multiple different paths to reach the receiver antenna. Instead of receiving a single, clean, direct "line-of-sight" signal, the receiver is hit by the direct signal followed by one or more delayed, bounced signals that reflected off the wind turbines. Receiving a delayed return signal, the radar calculates a target is farther away than it actually is, or places it in a completely different direction, thereby displaying a fake aircraft where none exists (i.e., a ghost target).

52.  (U) While the turbine's blades may vary in size, most modern terrestrial wind turbines have blades over 170 feet long.  General Electric's Haliade-X, one of the largest for offshore applications, has 351-foot blades, making them larger than a football field. The wind turbine's large conductive surfaces absorb or cleanly reflect the radar energy away from the sky behind them, creating a blind spot (radar shadow) directly behind the reflective plane, masking legitimate aircraft. Moreover, the massive Radar Cross Section



(RCS)[6] of a flat conductive plane returns an incredibly high-power echo directly to the radar receiver (e.g., bar graph entitled *Signal to Notice (SNR) Comparison* below para. 38).

53. (U) An object with a high RCS reflects a very large amount of the radar's transmitted electromagnetic energy back to the radar receiver, making it appear highly visible, bright, and easy to detect on a radar screen. The strong signal created by wind turbines saturates the receiver's high-sensitivity amplifiers, leaving it temporarily "blind" to low RCS objects (i.e., small aircraft, especially drones). Moving conductive planes (like spinning wind turbine blades) shift the frequency of the returned signal via the Doppler effect. When that happens, the radar's Moving Target Indicator filter is tricked into treating the stationary/local area as a moving target, overwhelming the air traffic controller with false alerts.

---

[6] (U) An RCS is a measure of how detectable an object is by radar. It is not a physical measurement of an object's actual geometric surface area; rather, it is an electromagnetic size.



54. (U) As such, wind turbines are the classic example of objects that generate severe

Doppler effects based on their varying blade speeds (i.e., hubs that rotate slowly

and blade tips that can exceed speeds of 150 to 200 mph[7]), continuous

acceleration and deceleration based on wind speed, directional changes to best

capture the wind, and "flash" phenomenon.



When a blade rotates to a position perfectly perpendicular to the radar beam, it

---

[7] The speed differential demonstrates the physics principle of tangential speed vs. angular velocity. When a rigid body (like a wind turbine, vinyl record, or merry-go-round) rotates around a fixed center, every point on that object shares the exact same angular velocity, meaning every part of the object takes the same amount of time to complete one full 360º rotation. Unlike angular velocity, tangential speed, which is the actual linear speed you would measure if you were moving in a straight line at that exact moment—changes depending on your distance from the center. Taken together these concepts explain why if you stand in the middle of a playground merry-go-round, you barely feel any motion. However, when clinging to the outer edge, you feel like you are flying because you are moving at a much higher linear speed than you would be based on being at the center of the merry-go-round.

suddenly presents a massive surface area, sending a brief, intense burst of energy

(a "Doppler flash") back to the receiver (the vertical red lines seen in the diagram

below).



**Dynamic radar cross section and Doppler measurements of a utility-scale wind turbine**

55. (CUI) The diagrams below further summarize these effects. The takeaway of

what a radar operator actually sees when a wind farm is introduced into the

airspace is simple: when the turbines are operating, the radar effectively goes

blind, changing a successful detection into a catastrophic operational failure (such

as the incident that led to the creation of the Clearinghouse in 2011). Therefore,

the physical presence of these turbines creates an unacceptable and unmitigated

blind spot in our radar defense, negatively impacting national security.



         **Scenario A:**                                    **Scenario B:**

This view represents normal, optimal conditions. The radar environment is clear. The system functions exactly as intended, achieving a confirmed lock-on and tracking the target seamlessly.

This is the exact same airspace, but with wind farm interference introduced. As you can see, the real target becomes completely fragmented and lost. It is buried underneath a massive field of what engineers call "clutter"—false targets generated by the rotating turbine blades.



The diagram above depicts the mechanical reality of wind turbine interference that results in blinding. Radar relies on sending out a signal and listening for it to bounce back off an object. Aircraft—especially low-altitude drones or small planes—return a relatively weak, small signal. Wind turbines, as discussed above, are massive, metallic structures with rapidly spinning blades. As shown here, when the radar beam hits the wind farm, the turbines create massive, chaotic reflections. This situation creates an immediate "blind zone" or "clutter mask" directly over and behind the wind farm. Any low-altitude target flying through this zone is completely masked. The radar energy bouncing off the turbines is so overwhelming that the weaker signal from the actual aircraft cannot pierce through it to return to the receiver.



Objective data regarding signal strength scientifically proves this phenomenon. For a radar system to display a target to an operator, that target's signal must cross the red "Detection Threshold" running horizontally across the chart. The middle bar depicts a clear target signal that easily crosses the detection threshold and is detected. In contrast, the green bar on the far left represents the signal strength emanating from the wind farm turbines. It is massive and dwarfs the real target. Because the turbine returns are so overwhelming, they artificially raise the background noise environment.

As a result, the real target signal (the third bar on the right) is pushed entirely below the detection threshold. It is not that the aircraft isn't there; it is that the signal strength of the wind farm has effectively drowned it out, rendering it invisible to the radar system. The interference caused by these wind farms is not a minor technical glitch. It degrades radar capability through four specific, compounding mechanisms:

## CRITICAL FINDINGS FOR RADAR DEGRADATION

**1. SIGNAL MASKING (BLINDING) -** Overpowering returns make real targets invisible.

**2. TARGET FRAGMENTATION -** Real target position appears broken and unstable.

**3. OPERATOR OVERLOAD -** Sorting false targets from real targets is mentally exhausting.

**4. SYSTEM SATURATION -** Excessive data overwhelms radar processors.

The overpowering returns from the turbines physically blind the radar (i.e., signal masking), making real targets invisible as shown below. Even if a signal briefly breaks through, the constantly moving blades cause the target's position to appear broken, unstable, and impossible to track reliably, (i.e., target fragmentation), creating risk and vulnerabilities. A radar operator is forced to manually sort through hundreds of blinking, false turbine targets to try and find one real threat. This operator overload is cognitively exhausting, introducing severe risks for human error. The bottom line is that the sheer volume of raw data generated by a massive wind farm can completely overwhelm the radar processor's hardware capabilities, causing system saturation.



PHYSICAL INTERFERENCE MECHANISM: HOW TURBINES CREATE BLIND SPOTS

56. (CUI) To overcome this adverse radar phenomenology, DoW historically sought mitigation measures from wind energy developers that included an $80,000 voluntary contribution as permitted by 10 U.S.C. § 183a. These funds covered the Department's equipment, personnel, and travel costs associated with installing Radar Adverse-impact Management (RAM) measures on impacted radar systems—most notably Airport Surveillance Radars (ASRs), such as the ASR-4, ASR-8, ASR-9, and ASR-11 that are operationally used by NORAD for national defense in addition to their civil air traffic control functions.

57. (CUI) Because the radar's processing sees the massive turbine arrays as a swarm of fast-moving targets, air traffic control operators must use "geo-censoring maps" or amplitude thresholds to blank out or desensitize the radar returns over the wind farm to prevent their screens from being flooded with thousands of false targets. Unfortunately, those filters cannot differentiate between turbines and low RCS objects.

58. (CUI) Unfortunately, this means RAM techniques partially blind these radars by filtering much of the electromagnetic interference caused by the wind turbines, making them less effective as shown in the diagrams above. The national security concern is that any low-RCS drone or missile flying through this "blinded" sector could be entirely filtered from radar view as summarized below.



59. (CUI) Therefore, a proposed structure, whether considered independently or in combination with surrounding infrastructure, terrain, and commercial activity, may create or intensify vulnerabilities by degrading surveillance, limiting maneuver or operational flexibility, reducing warning time, complicating detection or response, constraining testing or training, creating concealment opportunities, or otherwise interfering with the Department's ability to protect critical assets and missions. When such risks are implicated, the Department's statutory obligation is not satisfied by identifying mitigation in name only.

60. (CUI) Given the scope of these concrete risks, especially in light of what Ukraine and Iran have recently achieved, DoW needs to be assured that potential national security risks have proper mitigation measures in place to close the gap and to prevent an attack on the homeland from occurring. Therefore, the Department, informed by proper internal, analytical methodology grounded in realistic modern

risks, must determine whether proposed mitigation measures are actually sufficient to reduce the national-security risk to an acceptable level before entering into a mitigation agreement.

**Classified National Security Risks Posed by Wind Farms:**

61. (CUI) Pursuant to Executive Order ("EO") 13526, Section l.3(c), 75 Fed. Reg. 707 (Jan. 2010), the USW(A&S) delegated me, the original classification authority (OCA)[8] over the matters involving DoW's review of wind-energy projects referred to the Clearinghouse. This delegation means within the Office of the USW(A&S) that I am responsible for the protection of and authorized to assess DoW information relating to wind energy projects, up to and including TOP SECRET information. I confirm that the information upon which the DoW temporarily and strategically paused Clearinghouse mitigation agreement executions to evaluate DoW's internal, analytical assessment of national security concerns related to wind farm interference remains currently and properly classified as SECRET REL USA, CAN (i.e., specific to the United States and Canada) or SECRET[9] and dissemination outside of these channels could reasonably be expected to cause serious damage to national security.

62. (CUI) The map below represents data from the U.S. Wind Turbine Database, a publicly available dataset jointly developed by the U.S. Geological Survey, Lawrence Berkeley National Laboratory, and the American Clean Power

---

[8] (CUI) As part of my official duties, it is my responsibility to ensure that any determination as to the release or withholding of any such documents or information are proper and do not jeopardize national security. Under the EO, classified information may only be provided to individuals who: (l) have a properly adjudicated security clearance; (2) have signed a non-disclosure agreement; and (3) have a "need to know" (NTK) the information as assessed by an appropriate Executive Branch official.

[9] The marking of NOFORN means the material is sensitive intelligence information that may not be released in any form to foreign governments, foreign nationals, or non-U.S. citizens.

Association. As of June 2026, there were 77,379 wind turbines installed in the United States, representing 1,814 projects. This number is an increase of 1,652 turbines over the previous quarter, meaning about 20 wind turbines were installed per day.  Importantly, there is typically a one-quarter lag between when a turbine becomes operational and when it appears in the public dataset, and the database is only updated quarterly. Therefore, the actual number of turbines and projects is likely higher than as depicted below.



63. (U) While no single state or federal entity is charged with overall regulatory oversight of the 1,814 projects (yellow dots above), statutorily, DoW is charged with ensuring FAA applicant proposals do not significantly impair or degrade the capability of the Department to conduct training, research, development, testing, and evaluation, and operations or to maintain military readiness (10 U.S.C. § 183a(h)(11)).

64. (CUI) More recently, TOP SECRET[10] concerns have emerged. Given the context described above, doing things as we have always done is an insufficient and potentially dangerous answer, especially given the fact that most of the information upon which I used in independently making the strategic decision to

[10] TOP SECRET information is the highest classification level where unauthorized disclosure could reasonably be expected to cause "exceptionally grave damage" to national security.

temporarily pause further execution of mitigation agreements remains classified.

**DoW Clearinghouse Determinations Essentially Persist in Perpetuity:**

65. (U) The Clearinghouse is the official "single point of contact" for DoW to consolidate the concerns of developers, DoW, and the FAA as well as to seek mitigation of any adverse project impacts where possible. DoW promulgated its Mission Compatibility Evaluation Process in 2013. These regulations governing Clearinghouse processes are contained in 32 Code of Federal Regulations (C.F.R.) Part 211.

66. (U) Pursuant to 10 U.S.C. § 183a, DoW evaluates FAA applications against an "unacceptable risk to the national security of the United States" standard. Importantly, current law governing the Clearinghouse process related to FAA evaluations (49 U.S.C. § 44718) does not contemplate the DoW's ability to re-evaluate an initial Mission Compatibility Evaluation, nor do the existing mitigation agreement templates provide a mechanism to address changes in the nature of adversarial threats, technology, or DoW equities after execution.

67. (U) Similarly, the FAA lacks a mechanism to change a Determination of No Hazard (DNH), except in cases where new aeronautical facts require a new application (e.g., a developer seeks to change the placement or height of a structure penetrating navigable airspace) or where a written objection seeking a discretionary review is received within 30 days of a determination. Collectively, this framework means both agencies have one opportunity to get the advisory assessment correct because the ultimate decision will essentially persist in perpetuity.

68. (U) Thus, the national security determinations currently before the Clearinghouse are paramount. For that to happen, the first step is uniformly applying a rigorous, scientifically based, analytical methodology. It is for these reasons DoW strategically initiated a temporary pause in signing further mitigation agreements until the Department had the opportunity to evaluate the Clearinghouse's internal, analytical methodology for assessing national security risks in light of the dramatic threat paradigm shift.

**Ensuring N&NC[11] Operations and Homeland Defense is Properly Emphasized:**

69. (U) The Clearinghouse process is lengthy and requires significant intra-agency coordination, as well as interagency coordination. DoW's role in evaluating energy development proposals, particularly wind turbines, is inherently complex and time-consuming because it involves balancing two critical, and sometimes competing, interests: (1) developing energy sources while (2) ensuring military operations and readiness are not degraded or impaired to the extent an "unacceptable risk to national security" is created. Energy projects, such as wind turbines and related electric power transmission infrastructure (as discussed above) have the inherent potential to adversely impact or impair military testing, training, and operations.

70. (U) Importantly, the FAA only refers projects (including those beyond wind energy) to the Department when its Obstructions Evaluation and Airport Airspace Analysis (OEAAA) screening algorithm indicates a proposal may have adverse impacts of DoW operations. Statutorily from there, DoW is charged with

---

[11] NORAD and U.S. Northern Command (USNORTHCOM) are collectively referred to as N&NC.

ensuring the proposal does not rise to the level of creating an "unacceptable risk to national security".

71. (U) This legal standard by which DoW evaluates proposals remains unchanged. The strategic and temporary pause in mitigation agreement executions is grounded in ensuring the Clearinghouse employs a scientifically-sound, internal, analytical methodology that properly emphasizes operations vital to homeland defense, especially those of N&NC.

72. (CUI) By optimizing mitigation measures for *operations* (a component of the 183a definition that has been present since initial passage in 2011), DoW automatically continues to protect the flight safety (i.e., *training* and *readiness*) component of the unacceptable risk definition that had been emphasized during the immediate post-9/11 era. The critical difference between now and 2001 is that DoW is leaning forward to ensure *operations* are adequately considered and sufficiently protected from unacceptable risk and that the U.S. stays ahead of the ever-changing threat environment in order to stave off another national tragedy. This effort is particularly timely as the U.S. has experienced several recent and significant incursions, including a close call within the last month that cannot be discounted.

**Homeland Drone Incursions Over the Past 24-Months:**

73. (U) Over 17 consecutive nights in December of 2023, a sophisticated swarm of drones repeatedly breached the highly restricted airspace over Joint Base Langley-Eustis in Hampton, Virginia—home to some of the U.S. military's most advanced stealth fighter jets, the F-22 Raptors. These drones exhibited highly

coordinated flight paths and advanced technology. These breaches were not isolated incidents; in the ensuing 24 months, there have been subsequent military base incursions.

74. (U) In November and December 2024, New Jersey became the epicenter of drone activity that gripped the Northeast. The Army confirmed 11 distinct drone incursions over a sensitive military research and weapons manufacturing facility, leading the FAA to issue strict flight bans over that airspace. At Naval Weapons Station Earle, the Navy officials confirmed at least two instances of unidentified drones entering the base's restricted airspace. Joint Base McGuire-Dix-Lakehurst similarly experienced a series of persistent drone flights near a federal correctional facility located on the base.

75. (U) The region around Edwards Air Force Base and the adjacent classified Air Force Plant 42 has been subjected to a highly concerning, persistent wave of unauthorized drone incursions beginning in August of 2024. These California incursions fit into a broader, documented surge of foreign intelligence operations targeting remote U.S. military installations in the West, which also included the arrest of a Chinese national flying a camera drone over Vandenberg Space Force Base in late 2024.

76. (U) The current Commander of both NORAD and USNORTHCOM (N&NC) is U.S. Air Force General Gregory Guillot. USNORTHCOM was established on October 1, 2002, following the September 11 terrorist attacks, specifically to coordinate homeland defense and to support domestic authorities. NORAD, is a bi-national (United States and Canada) military organization tasked with

safeguarding continental airspace and maritime approaches that was established in 1958.

77. (U) On February 13, 2025, in testimony before the Senate Armed Services Committee, General Guillot stated "there were 350 detections reported last year [2024] on military installations, and that was 350 over a total of hundred different installations of all types and levels of security".[12] These military installation drone incursions continue. Beginning on March 9, 2026, Barksdale AFB, one of two bases for our nation's B-52 bombers, experienced a highly sophisticated, week-long campaign of unauthorized drone incursions, occurring across multiple days and varying in volume and flight duration. A "Shelter in Place" order was briefly issued on the morning of March 9th. To effectively counter this evolving threat, the Department has mobilized a coordinated, multi-organizational effort. However, military installations are not the only facilities being targeted. Over the last several years, other federal facilities, critical civilian infrastructure, and our national borders have faced an unprecedented wave of drone incursions. In 2024 alone, federal authorities logged over 13,000 drone incursions at U.S. power generation sites.[13]

78. (CUI) As the United States dramatically scales up its orbital launch cadence, the targeting of hundreds of national security, scientific, and commercial launch facilities by drones has emerged as a significant threat. Spaceports like Cape

---

[12] *Posture of USNORTHCOM and USSOUTHCOM Hearing*, 119th Cong. (2025) (statement of Gen. Gregory M. Guillot), p. 36.

[13] *Surveillance, Sabotage, and Strikes: Industry Perspectives on How Drone Warfare Abroad Is Transforming Threats at Home: Hearing Before the Subcomm. on Transportation and Maritime Security of the H. Comm. on Homeland Security*, 119th Cong. (2025) (written statement of Tom Walker, Founder & CEO, DroneUp), p. 5.

Canaveral Space Force Station and Vandenberg Space Force Base are highly sensitive, complex RF environments. Launch vehicles, satellites, ground control networks, and telemetry tracking antennas rely on flawless, uninterrupted radio frequencies. UAS flights over active ranges present severe operational, physical, and espionage hazards that can delay or completely compromise critical space missions. Additionally, launch delays have serious economic impacts as well. For example, 15 years ago, NASA estimated its direct cost of scrubbing a Space Shuttle launch was approximately $1.2 million per day.

79. (U) Even the White House grounds are not immune. Based on a tip from a suspect's mother, federal law enforcement thwarted a highly sophisticated, multi-phase terror plot involving drones targeting the Ultimate Fighting Championship (UFC) Freedom 250 event on June 14, 2026. The plan was to fly explosive-laden drones to strike buildings surrounding the White House event. The resulting explosions were intended to trigger a chaotic, mass evacuation that would funnel people into the crosshairs of waiting snipers. This situation is a chilling proof-of-concept for how easily accessible, consumer drone technology can be weaponized for terrorism.

**Executed Mitigation Agreements & Initial Clearinghouse Observations:**

80. (CUI) With the exception of the UFC event, I assumed my current position in June of 2025 within this context. Being new to the post, I took some time to refamiliarize myself with the Clearinghouse. In my first 45 days, I executed 60 percent of the wind energy mitigation agreements signed by the Department during calendar year 2025; some were signed prior to my arrival. During this

same period, my Deputy, Mr. Robert E. Thompson, signed an additional 20 percent of the total agreements executed that year.

81. (CUI) Through that work, I became familiar with the timing, complexity, and operational significance of these matters. For the projects I reviewed during that period, the average time from initiation to completion was approximately 673 days, including an average of 512 days between establishment of the mitigation response team and circulation of the first draft mitigation agreement (i.e., the phase of the process currently strategically and temporarily paused). In other words, the evaluations that pre-dated my arrival had taken months to years, and mitigation response team discussions were rarely complete within 90 days of the issuance of a Notice of Presumed Risk.

82. (CUI) I also observed that requests to extend internal timelines had not been consistently memorialized in writing. These observations confirmed that the Clearinghouse process is not only consequential, resource-intensive, and central to the Department's discharge of its national-security responsibilities, but also in need of a comprehensive review.

83. (CUI) The threat paradigm shifting developments described above present clear national-security implications for the Department's review of Obstructions Evaluation and Airport Airspace Analysis applications. If DoW assesses projects using outdated or incomplete assumptions, then the resulting mitigation agreements may fail to address the actual risk. In that circumstance, approval of such agreements would not meaningfully protect national security and would be inconsistent with the Department's statutory responsibilities.

84. (CUI) Based on those considerations, DoW concluded that the first step in the comprehensive Clearinghouse review needed to assess whether the existing internal, analytical methodology and related coordination practices remained sufficient in light of the modern threat paradigms. DoW's concern was not limited to any single project. Rather, it was that the Department's underlying framework for evaluating national-security risk and accepting mitigation required prompt review to ensure that the Clearinghouse was not relying on assumptions that no longer provide an adequate basis for decision.

85. (CUI) For that reason, DoW strategically initiated a temporary pause in the execution of additional mitigation agreements while the Department conducted that assessment. This was not a determination that every pending project posed an unacceptable risk, nor was it a complete or permanent cessation of Clearinghouse operations (most aspects of the process continued business as usual). It was, however, necessary as the Department should not continue to execute mitigation agreements, unless it has a sound basis to conclude that the risks have been correctly identified and that the mitigation measures are sufficient to protect national security.

86. (CUI) Moreover, the DoW cannot engage in productive, good faith mitigation response team discussions until it has validated its internal, analytical methodology, trained its mitigation response team participants regarding any updates necessitated by the changing threat paradigm, and provided those individuals with an awareness of sufficiently protective mitigation measures that can be discussed with developers.

**Critical Importance of Interagency Coordination:**

87. (CUI) In the words of General Guetlein, the Golden Dome for America Program Manager, N&NC "are tasked with defending critical defense infrastructure in the homeland from attack to preserve U.S. force projection capability and mitigate risks to vital transportation, energy, and manufacturing hubs". The mission of this key Clearinghouse participant depends on coordination across the federal government, especially with the Department of Homeland Security. Therefore, the importance of this procedural step (DHS consultation) cannot be overstated, especially since there is no single agency managing the 1,814 wind farms (the yellow dots pictured on the map above) nationally from cradle to grave.

88. (U) Government shutdowns occurring since my confirmation and conflict with Iran have limited proper coordination with DHS, a fact DoW made developers aware of in the letters sent in April and May 2026. In particular, the whole of the Government was shut down from October 1, 2025, to November 12, 2025, which resulted in Clearinghouse personnel furloughs and delays in OEAAA applicant processing. More challenging from an interagency perspective is the fact that DHS experienced three operational lapses totaling 123 days; the last of which ended on April 30, 2026 (44 business days ago). From a DoW perspective, the conflict with Iran, beginning with Operations Epic Fury and Roaring Lion in February, have consumed a considerable amount of the Department's focus as well.

**Comprehensive Review of DoW's Internal, Analytical Methodology & Clearinghouse Processes:**

89. (CUI) In conducting the required assessment, the Department has consulted with relevant DoW components and appropriate federal partners possessing expertise in homeland defense, threat analysis, operational risk, critical infrastructure, and emerging capabilities as well as engaged in several lines of efforts to improve the effectiveness of Clearinghouse reviews. That consultation was necessary not only to ensure that the process reflects current threat information, but also to ensure that any mitigation accepted by DoW is calibrated to present national-security realities rather than to assumptions that may no longer be sufficient.

90. (CUI) Therefore, the first step DoW undertook in the systematic Clearinghouse review during the fall of 2025 was to seek USNORTHCOM's (i.e., a Combatant Commander's) assessment to see if the national security concerns discussed above were shared. Given N&NC's missions and their dependence on FAA radars for defense purposes, the Command routinely coordinates with the Military Departments to identify and quantify the degree to which a proposed developer's project interferes with military operations and readiness and to ascertain if mitigation measures can be adopted or implemented to reduce identified concerns.

91. (CUI) When a Combatant Commander conducts a risk assessment, that four-star general officer uses the Joint Risk Analysis Methodology (JRAM). JRAM is the authoritative risk framework established in Chairman of the Joint Chiefs of Staff Manual (CJCSM) 3105.01B, *Joint Risk Analysis Methodology*. This important methodology provides a standardized lexicon and structured process to appraise, manage, and communicate risk across the Joint Force. This model relies on a

structured, four-pillar (problem framing, risk assessment [qualitative and quantitative], risk [i.e., military] judgment, and risk management) framework designed to turn complex, strategic, and operational uncertainties into actionable decisions. The model defines military risk into standardized levels based on the likelihood of mission failure or resource shortfalls.

92. (U) The strategic discipline imposed by the JRAM enables everyone from a theater commander to Congress to understand the stakes of any given situation. The result of a JRAM analysis is to make one of four risk determinations by weighing probabilities and consequences as shown on the diagram below.



93. (CUI) DoW then validated General Guillot's JRAM findings related to wind energy development through the Defense Threat Reduction Agency's (DTRA's) Mission Assurance process. DTRA serves as the Department's Center of Excellence for Mission Assurance Assessments. Within this role, DTRA utilizes

a highly structured, comprehensive, and multi-disciplinary analytical process to evaluate the resilience of defense critical assets and other critical infrastructure. Rather than merely checking compliance with policy, DTRA's analytical process is designed to identify vulnerabilities in systems, networks, and physical architecture that could be exploited by adversaries (particularly below the threshold of armed conflict) or disrupted by natural and accidental hazards. Commanders utilize the assessment results to bridge the gap between abstract strategic risks and the current realities.

94. (CUI) With two Departmentally recognized sources (a four-star Combatant Commander applying JRAM and the DoW's Center of Excellence for Mission Assurance) for systematically assessing risk validating the concerns that prompted the inquiry into the soundness of the Clearinghouse's internal, analytical methodology, DoW further consulted with Departmental experts (e.g., the Air Force Research Laboratory and the Golden Dome for America) and other federal partners (e.g., DHS, DOI, and DOE among others) over the ensuing months. Since the fall of 2025, we have had 53 internal and external meetings, including 20 engagements with Congress and key federal partners, in addition to numerous phone calls among the parties.

95. (CUI) During this programmatic review of the Clearinghouse, we also became concerned that certain aspects of the Department's implementation practices warranted further examination to ensure full consistency with governing procedures, including documentation and coordination (e.g., DHS involvement) practices. That concern reinforced the team's judgment that DoW should proceed

carefully before executing further mitigation agreements, especially given the agreements essentially persist in perpetuity, and the FAA only refers projects (including those beyond wind energy) to the Department when its OEAAA screening algorithm indicates a proposal may have adverse impacts of DoW operations.

96. (CUI) Consistent with my direction as the signatory authority, DoW executed the last mitigation agreement on August 18, 2025. The decision meant DoW refrained from executing further agreements and drafting new ones (beginning around December) pending the outcome of the internal, analytical methodology review and its impact on identifying sufficiently effective mitigation measures.

97. (CUI) Notwithstanding the temporary and strategic pause with respect to those aspects of the Clearinghouse process, the other phases of evaluation continued until the Spring of 2026. Over a brief period consisting of 16 business days (from on or about April 15, 2026, to on or about May 7, 2026) there was some degree of administrative confusion regarding my intent, which resulted in limited stoppage of Clearinghouse workflow. It was for this reason the Department issued interim guidance on May 7, 2026. However, since May 11, 2026, the Clearinghouse issued the FAA a finding of no concern for approximately 1,000 structures.

98. (CUI) Since the driving national security concern is radar interference and self-imposed, partial blindness as a mitigation measure, the May 7, 2026, interim guidance made it clear that the applications affected by the strategic, interim pause included *any* project that had the potential to create a significant Doppler effect. Therefore, wind energy development was not exclusively singled out.

99. (CUI) Since the temporary mitigation agreement execution pause was initiated, not only has the Department engaged in a rigorous, structured review of its internal, analytical methodology, but it has also undertaken several lines of effort to implement and incorporate any changes that may come of this ongoing analysis.

100. (CUI) Broadly these lines of effort touch on the following areas: improving communications (including with developers and others); identifying and securing federal partner participation (DHS, DOE, DOI, and FAA), especially since there is no oversight entity responsible for wind farms for the whole of government; clarifying guidance (i.e., 7 May 2026 interim guidance memo); reviewing effectiveness of mitigation measures and seeking others better suited to address changes in the threat paradigm; reviewing and updating post-determination documentation (e.g., mitigation agreement templates and reports) as necessary; training personnel, including DoW mitigation response team participants, regarding any changes resulting from the internal, analytical methodology; resuming developer discussions as required; and making any necessary updates brought to light by the previous lines of effort.

101. (CUI) In sum, DoW initiated the temporary mitigation agreement execution pause for strategic national security reasons. We concluded that the Department needed to review both its analytical methodology and aspects of its implementation practices before continuing to approve agreements. Given the materially changed threat environment and DoW's statutory duty to prevent unacceptable risks to national security, it would have been inconsistent with the

Department's statutory obligations to continue executing mitigation agreements without first confirming that DoW's internal, analytical methodology remained capable of identifying relevant risks and ensuring that those risks were adequately mitigated. That said, DoW has been diligently striving to complete its post-paradigm shift review of projects awaiting a determination as expeditiously as possible without sacrificing homeland safety and national security for administrative speed.

102. (U) I swear under penalty of perjury that the preceding information is true and accurate to the best of my knowledge.

MARKS.DALE.R.1080786405
Digitally signed by MARKS.DALE.R.1080786405
Date: 2026.07.05 16:04:03 -04'00'

HON Dale R. Marks
Assistant Secretary of War for Energy, Installations, and Environment
Performing the Duties of Deputy Under Secretary of War for Acquisition and Sustainment