DAN RAYFIELD
Attorney General
COBY HOWELL #253434
Senior Assistant Attorney General
PATRICK T. JOHNSON #260534
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Coby.Howell@doj.oregon.gov
        Patrick.t.johnson@doj.oregon.gov

*Attorneys for Intervenor-Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST; ADVANCED POWER ALLIANCE; ALLIANCE FOR CLEAN ENERGY NEW YORK, INC.; CLEAN GRID ALLIANCE; INTERWEST ENERGY ALLIANCE; MAINE RENEWABLE ENERGY ASSOCIATION; RENEW NORTHEAST; SOUTHERN RENEWABLE ENERGY ASSOCIATION; GREEN ENERGY CONSUMERS ALLIANCE; LAS CRESTAS WIND ENERGY, LLC; APEX CLEAN ENERGY HOLDINGS, LLC; NOVA CLEAN ENERGY, LLC; NORTH HILLS WIND PROJECT, LLC; PRAIRE PHOENIX WIND PROJECT, LLC; DEUEL HARVEST WIND ENERGY SOUTH LLC; LAZBUDDIE WIND ENERGY II LLC; THRESHER WIND LLC; TOWNER WIND ENERGY II LLC; TRITON WIND ENERGY LLC; WHITETAIL WIND, LLC; MEADOW LAKE II WINDFARM, LLC; BLACKSTONE WIND FARM II, LLC; BIG RIVERWIND, LLC; HORSE THIEF WIND PROJECT, LLC; CRIDER VALLEY WIND ENERGY LLC; CANISTEO WIND | Case No. 3:26-cv-01092-IM<br><br>[PROPOSED] COMPLAINT-IN-INTERVENTION |

Page 1 -   [PROPOSED] COMPLAINT-IN-INTERVENTION
        CHH/ls8/1027710804

ENERGY LLC; HAMMERHEAD WIND
ENERGY LLC; RAMBLE WIND ENERGY
LLC; and BLUE CANYON WINDPOWER
V, LLC,

            Plaintiffs,

STATES OF OREGON, ILLINOIS, NEW
YORK, ARIZONA, CALIFORNIA,
COLORADO, CONNECTICUT,
DELAWARE, MAINE, MARYLAND,
COMMONWEALTH OF
MASSACHUSETTS, MICHIGAN,
MINNESOTA, NEVADA, NEW JERSEY,
NEW MEXICO, RHODE ISLAND,
WASHINGTON, and the DISTRICT OF
COLUMBIA,

            Intervenor-Plaintiffs,

     v.

PETER B. HEGSETH., in his official capacity
as Secretary of Defense; DALE R. MARKS,
in his official capacity as Assistant Secretary
of Defense for Energy, Installations, and
Environment; U.S. DEPARTMENT OF
DEFENSE; and DEPARTMENT OF
DEFENSE MILITARY AVIATION AND
INSTALLATION ASSURANCE SITING
CLEARINGHOUSE,

            Defendants.

The States of Oregon, Illinois, New York, Arizona, California, Colorado, Connecticut,

Delaware, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New

Mexico, Rhode Island, Washington, and the District of Columbia, collectively

Intervenor-Plaintiff States (hereafter "Plaintiff States") bring this Complaint-in-Intervention

against Defendants, Peter B. Hegseth, in his official capacity as Secretary of Defense, Dale R.

Marks, in his official capacity as Assistant Secretary of Defense for Energy, Installations, and

Environment, the U.S. Department of Defense, the Department of the Air Force, the Department

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

of the Army, the Department of the Navy, and the Military Aviation and Installation Assurance Siting Clearinghouse ("DoD Clearinghouse" and collectively, "DoD"),[1] and allege, upon information and belief, the following:

### INTRODUCTION

1.     This case challenges DoD's unlawful decision to freeze routine reviews of land-based wind energy projects across the country. DoD is required by federal law to review proposed wind projects for potential national security concerns and work with developers to address any issues. Around August 2025, however, DoD abruptly stopped moving projects through this review process.

2.     DoD's decision (hereafter the "Wind Freeze") has halted land-based wind project development throughout the United States. The Wind Freeze harms Plaintiff States and violates the Administrative Procedure Act ("APA"). These violations warrant vacatur and injunctive relief.

3.     Demand for energy is increasing across the nation. Wind project development is key to meeting this demand by creating additional supply while also increasing reliability, lowering energy costs, and reducing the harmful emissions associated with other sources of power generation. Wind is a source of clean, affordable energy and is a critical component of our nation's energy security.

4.     While wind projects can implicate national security concerns, these concerns can be mitigated through the planning process—for example, by modifying radars or structures,

---

[1] This Complaint typically uses the legal name "Department of Defense" or "DoD" but uses "Department of War" or "DoW" when directly quoting documents or communications using that term.

Page 3 -    [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

upgrading equipment, or avoiding sites that would interfere with flight paths and radars. That is why Congress provided explicit instruction to the Federal Aviation Administration ("FAA") and DoD in the Federal Aviation Act and National Defense Authorization Act to evaluate proposed wind projects in a timely manner, and, if necessary, mitigate possible adverse effects on national security. Responsible development is the aim. Congress's charge to the agencies could not be more plain: foster wind project development while mitigating any effects on national security.

5.      This process operated efficiently for over a decade, with federal agencies appropriately balancing the benefits of wind development against legitimate national security concerns. Wind developers planning to construct turbines taller than 200 feet would contact the FAA with a proposal. The FAA would provide the proposal to DoD for its input, and DoD would assess the project. If DoD identified national security concerns, it would address them with the developer through project revisions or mitigation. All of this was handled in a routine and predictable manner until the current Administration declared its war on wind energy.

6.      It is no secret that the President has set a policy objective to "try and have no windmills built in the United States."[2] At every turn, his Administration has attempted to undermine wind energy projects, even when the law requires the Administration to allow such projects to move forward. Since President Trump took office in 2025, his Administration has attempted to halt wind projects through presidential memoranda, secretarial orders, agency instruction, permit denials, sudden reversals of established policies and practices, unlawful settlements, and a host of other actions.

---

[2] Robin Bravender, *Trump Wants 'No Windmills Built in the United States'*, E&E News PM (Mar. 17, 2026), https://www.eenews.net/articles/trump-wants-no-windmills-built-in-the-united-states/.

Page 4 -   [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

7.      DoD is now dutifully playing its role in the Administration's war on wind energy. The Wind Freeze is not just bureaucratic delay, but a concerted decision by DoD to stop the wind project reviews that are necessary for the FAA to complete its own project determinations. Specifically, DoD has decided to disregard its statutory and regulatory obligations to process these reviews; negotiate mitigation agreements with developers; prepare mitigation agreements for review and signature by developers; and countersign mitigation agreements. By deciding not to engage in this process, DoD has deprived the FAA of the information it needs to issue Determinations of No Hazard for hundreds of wind projects. Consequently, those projects are unable to begin construction. The Wind Freeze is a final agency action that carries harmful consequences that can only be redressed through vacatur and injunctive relief.

8.      States have authority over electricity generation within their borders and work to ensure adequate generation resources through long-term planning. The Wind Freeze harms Plaintiff States by interfering with their ability to exercise this authority and to implement their own energy policies, including by impeding the achievement of statutory goals and mandates to generate and purchase electricity from renewable energy sources like wind and to reduce emissions of greenhouse gases.

9.      The Wind Freeze further harms Plaintiff States by constraining supply at a time when energy demand is increasing, thereby driving up electricity costs and threatening grid reliability, while simultaneously jeopardizing thousands of jobs, significant tax revenues and investments, and other economic benefits.

10.      The Wind Freeze is not only destructive as a matter of policy, but also unlawful. It is arbitrary, capricious, and contrary to law under the APA, subverting Congress's mandate to DoD to balance wind development with national security concerns. DoD's *post hoc*

Page 5 -    [PROPOSED] COMPLAINT-IN-INTERVENTION
          CHH/ls8/1027710804

rationalization of the Wind Freeze in recent court filings does not satisfy DoD's obligation under the APA to provide a reasoned explanation or to consider Plaintiff States' significant reliance interests. In addition, the Wind Freeze is causing unreasonable delay, and DoD is unlawfully withholding action within the meaning of the APA. These violations of law warrant vacatur and injunctive relief.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under federal law. 5 U.S.C. §§ 702, 706(1)–(2).

12. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

13. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are agencies of the United States Government and officers sued in their official capacities. Plaintiff the State of Oregon is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the District of Oregon.

## PARTIES[3]

**Intervenor-Plaintiffs**

14. **Intervenor-Plaintiff State of Oregon** is a sovereign state in the United States of America. Oregon is represented by Attorney General Day Rayfield, who is the chief law

---

[3] Plaintiff States use "Energy Plaintiffs" to refer to Plaintiffs named in the First Amended Complaint (ECF No. 36): Renewable Northwest; Advanced Power Alliance; Alliance for Clean Energy New York, Inc.; Clean Grid Alliance; Interwest Energy Alliance; Maine Renewable Energy Association; RENEW Northeast; Southern Renewable Energy Association; Green Energy Consumers Alliance; Las Crestas Wind Energy, LLC; Apex Clean Energy Holdings, LLC; Nova Clean Energy, LLC; North Hills Wind Project, LLC; Prairie Phoenix Wind Project, LLC; Deuel

Page 6 -    [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

enforcement officer of Oregon and is authorized to institute this action. The State is harmed by the Wind Freeze. For example, in Oregon, multiple wind projects, including but not limited to the 500-megawatt Big River Wind Project, 550-megawatt Odyssey Wind Project, and 103-megawatt Rattlesnake Road Repower Project, are being held up by the Wind Freeze. Across the State, as identified by Energy Plaintiffs, at least $1.746 billion in private investment and 4,716 jobs are at risk. In addition, Oregon has a Renewable Portfolio Standard ("RPS") requiring large investor-owned utilities to procure at least 50% renewable energy by 2040, Or. Rev. Stat. § 469A.052(1)(h), and a clean energy target requiring retail electricity providers to reduce greenhouse gas emissions by 100% from 2010–2012 levels by 2040, *id.* § 469A.410(1)(c). The Wind Freeze is impeding Oregon's implementation of those standards and targets and harming Oregon in other ways discussed at paragraphs 95-132.

15.     **Intervenor-Plaintiff State of Illinois** is a sovereign state in the United States of America. Illinois is represented by Attorney General Kwame Raoul, who is the chief law enforcement officer of Illinois. The State is harmed by the Wind Freeze. For example, multiple wind projects in Illinois, including but not limited to the 180-megawatt Ramble Wind Energy Project, 200-megawatt Goldrush Apple Energy Wind Project, 200-megawatt Windswept Plain Wind Project, 350-megawatt Spring Point Wind Project, 300-megawatt Terrace Sands Wind Project, 200-megawatt Esker Sands Wind Project, 500-megawatt The Shoals Wind Project, 100-megawatt Rail Splitter II Wind Project, and 200-megawatt Top Crop I and II Repower Project, are being held up by the Wind Freeze. Across the State, as identified by Energy

---

Harvest Wind Energy South LLC; Lazbuddie Wind Energy II LLC; Thresher Wind LLC; Towner Wind Energy II LLC; Triton Wind Energy LLC; Whitetail Wind, LLC; Meadow Lake II Windfarm, LLC; Blackstone Wind Farm II, LLC; Big River Wind, LLC; Horse Thief Wind Project, LLC; Crider Valley Wind Energy LLC; Canisteo Wind Energy LLC; Hammerhead Wind Energy LLC; Ramble Wind Energy LLC; and Blue Canyon Windpower V, LLC.

Page 7 -   [PROPOSED] COMPLAINT-IN-INTERVENTION
   CHH/ls8/1027710804

Plaintiffs, at least $4.332 billion in private investment and 10,664 jobs are at risk. In addition, Illinois has an RPS requiring procurement of renewable energy certificates/credits[4] of at least 40% of the utilities' load by 2030 and at least 50% by 2040, 20 ILCS 3855/1-75(c)(1)(B), as well as a goal of transitioning to 100% clean energy by 2050, *id.* 3855/1-5(1.5). The Wind Freeze impedes Illinois's ability to achieve those standards and targets and harms Illinois in other ways discussed at paragraphs 95-132.

16.     **Intervenor-Plaintiff State of New York** is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief legal officer of New York. The State is harmed by the Wind Freeze. For example, multiple wind projects in New York, including but not limited to the 290-megawatt Canisteo Wind Energy Project and the 162-megawatt Maple Harvest Wind Project, are being held up by the Wind Freeze. Across the State, as identified by Energy Plaintiffs, at least $445 million in private investment and 806 jobs are at risk. In addition, New York has a Clean Energy Standard requiring electric utilities to procure at least 70% renewable energy by 2030, N.Y. Pub. Serv. Law § 66-p(2), and a statutory goal of reducing greenhouse gas emissions to 40% below 1990 levels by 2030 and to 85% below 1990 levels by 2050, N.Y. Env't Conserv. Law § 75-0107(1). The Wind Freeze is impeding New York's implementation of those standards and targets and harming New York in other ways discussed at paragraphs 95-132.

17.     **Intervenor-Plaintiff State of Arizona** is a sovereign state in the United States of America. Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona. The State is harmed by the Wind Freeze. For example, in

---

[4] Renewable energy certificates/credits are market-based instruments that represent the environmental attributes associated with electricity generated by renewable resources, including wind resources.

Page 8 -   [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

Arizona, at least 1 project, the 400-megawatt Black Ridge Renewable Power Project, is being held up by the Wind Freeze. Across the State, as identified by Energy Plaintiffs, at least $304 million in private investment and 739 jobs are at risk. In addition, the Arizona State Land Department has granted the Black Ridge project a right-of-way over 7,869 acres of State Trust Land. Rents due under the right-of-way agreement are expected to generate over $100 million in revenue to Arizona's K-12 public education fund over the term of the agreement. The Wind Freeze is harming Arizona in other ways discussed at paragraphs 95-132.

18.    **Intervenor-Plaintiff State of California** is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California. The State is harmed by the Wind Freeze. For example, in California, at least 1 onshore wind project with a total capacity of 30 megawatts is being held up by the Wind Freeze, threatening private investment and an average of 65 construction jobs in California. This project entails, among other things, removing old turbines and replacing them with more energy-efficient turbines that are expected to triple the annual energy production. If the Wind Freeze is not lifted, this existing project will be shut down by the site owner, which would lead to the loss of 30 megawatts of capacity, enough to support 2,500 homes. In addition, California has an RPS requiring electric utilities to procure at least 60% renewable energy by 2030, Cal. Pub. Util. Code § 399.11, and targeting 100% clean energy by 2045, *id.* § 454.53, and a statutory goal of achieving net-zero greenhouse gas emissions by 2045, Cal. Health & Safety Code § 38562.2. The Wind Freeze is impeding California's implementation of those standards and targets and harming California in other ways discussed at paragraphs 95-132.

19.    **Intervenor-Plaintiff State of Colorado** is a sovereign state in the United States of America. Colorado is represented by Attorney General Phil Weiser, who is the chief legal

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

representative of Colorado. The State is harmed by the Wind Freeze. Colorado has Clean Energy Targets requiring large electric utilities to reduce emissions by 80% of 2005 levels by 2030 and to provide customers with energy generated from 100% clean energy resources by 2050, Colo. Rev. Stat. § 40-2-125.5(3), and a statutory goal of reducing greenhouse gas emissions to 50% below 2005 levels by 2030 and to 100% below 2005 levels by 2050, *id.* § 25-7-102(2)(g)(I). Colorado relies on wind energy to decrease greenhouse gas emissions from the power sector to meet its legislated reduction goals. In 2024, utility-scale wind energy comprised 30% of Colorado's net electricity generation and 67% of all renewable electricity generation in state. By 2030, Colorado utilities plan to add 6,054 megawatts of wind generation capacity; these projects represent 40% of the generation capacity to be brought online in Colorado during that period. The Wind Freeze is impeding Colorado's implementation of its standards and targets and interfering with expected generation. For example, multiple wind projects in Colorado, including but not limited to the 500-megawatt Towner Wind Energy II Project, are being held up by the Wind Freeze. Across the State, as identified by Energy Plaintiffs, at least $2.687 billion in private investment and 7,124 jobs are at risk. The Wind Freeze is harming Colorado in other ways discussed at paragraphs 95-132.

20.    **Intervenor-Plaintiff State of Connecticut** is a sovereign state in the United States of America. Connecticut is represented by Attorney General William Tong, who is the chief law enforcement officer of Connecticut. The State is harmed by the Wind Freeze. For example, Connecticut purchases electricity generated in States where the Wind Freeze is currently holding up development, and is actively reviewing bids as part of an ongoing request for proposals that includes bids from onshore wind in Maine. The Wind Freeze may impact this or future procurements. Onshore wind diversifies the regional system's generation mix, which

Page 10 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

can improve reliability for Connecticut ratepayers. In addition, Connecticut has an RPS requiring electric utilities to procure 37% renewable energy by 2030, Conn. Gen. Stat. §§ 16-243q, 16-245a(a)(25), and statutory goals of reducing greenhouse gas emissions to 45% below 2001 levels by 2030; and to at least 65% below 2001 levels by 2040, including to a level of 0% from electricity supplied to electric customers in the State; and achieving economy-wide net-zero greenhouse gas emissions by 2050, *id.* § 22a-200a(a). The Wind Freeze is impeding Connecticut's implementation of those standards and targets and harming Connecticut in other ways discussed at paragraphs 95-132.

21.    **Intervenor-Plaintiff State of Delaware** is a sovereign state in the United States of America. Delaware is represented by Attorney General Kathleen Jennings, who is the chief law enforcement officer of Delaware. The State is harmed by the Wind Freeze. For example, Delaware purchases electricity generated in States where the Wind Freeze is currently holding up development. In addition, Delaware has an RPS requiring electric utilities to procure 40% renewable energy by 2035, Del. Code Ann. tit. 26, § 354, and a statutory goal of reducing greenhouse gas emissions to 50% below 2005 levels by 2030 and achieving net-zero greenhouse gas emissions by 2050, *id.* tit. 7, § 10003. The Wind Freeze is impeding Delaware's implementation of those standards and targets and harming Delaware in other ways discussed at paragraphs 95-132.

22.    **Intervenor-Plaintiff State of Maine** is a sovereign state in the United States of America. Maine is represented by Attorney General Aaron M. Frey, who is the chief law enforcement officer of Maine. The State is harmed by the Wind Freeze. For example, in Maine, at least 1 project, the 350-megawatt Number Nine Wind Project, is being held up by the Wind Freeze. Across the State, as identified by Energy Plaintiffs, at least $112 million of private

Page 11 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

investment and 296 jobs are at risk. In addition, Maine has an RPS requiring electric utilities to procure 80% renewable energy by 2030 and 90% renewable energy by 2040, Me. Rev. Stat. Ann. tit. 35-A, § 3210(1-A), and a statutory target of reducing greenhouse gas emissions to 45% below 1990 levels by 2030 and achieving net-zero greenhouse gas emissions by 2045, *id.* tit. 38, § 576-A. The Wind Freeze is impeding Maine's implementation of those standards and targets and harming Maine in other ways discussed at paragraphs 95-132.

23.    **Intervenor-Plaintiff State of Maryland** is a sovereign state in the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief law enforcement officer of Maryland. The State is harmed by the Wind Freeze. Maryland is served by the regional transmission organization PJM Interconnection, which receives energy from projects currently subject to the Wind Freeze. Prohibiting these resources from coming online will result in higher electricity prices and limit generation capacity within the PJM region, harming Maryland. Maryland also has adopted a statutory target of reducing greenhouse gas emissions to 60% below 2006 levels by 2031 and achieving net-zero greenhouse gas emissions by 2045, Md. Code Ann. Env't §§ 2-1204.1–.2, and a renewable portfolio standard (RPS) requiring electric utilities to procure 50% renewable energy by 2030, Md. Code. Ann. Pub. Util. § 7-703. The RPS requires electricity suppliers to purchase renewable energy certificates (RECs), which are market-based instruments that represent the environmental attributes associated with a given unit of electricity generated by a renewable resource. See Md. Pub. Util. § 7-701. RECs from onshore wind projects that are located anywhere within PJM or that are located adjacent to PJM and which supply electricity to the PJM region can be used to meet the RPS requirements. Id. § 7-701(m). If eligible projects are unable to generate electricity, fewer RECs will be available for purchase in Maryland. As a result, Maryland and its residents

Page 12 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

will pay more for those RECs, which will likely increase energy prices and interfere with the State's ability to ensure compliance with its RPS.

24.     **Intervenor-Plaintiff Commonwealth of Massachusetts** is a sovereign state in the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts. The Commonwealth is harmed by the Wind Freeze. For example, Massachusetts purchases electricity generated in States where the Wind Freeze is currently holding up development, including New York and Maine. In addition, Massachusetts has an RPS requiring electric utilities to procure an increasing percentage of renewable energy annually, Mass. Gen. Laws ch. 25A, § 11F(a), and a statutory target of reducing greenhouse gas emissions to 50% below 1990 levels by 2030 and achieving net-zero greenhouse gas emissions by 2050, *id.* ch. 21N, §§ 3–4. The Wind Freeze is impeding Massachusetts's implementation of those standards and targets and harming Massachusetts in other ways discussed at paragraphs 95-132.

25.     **Intervenor-Plaintiff the State of Michigan** is a sovereign state in the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan. The State of Michigan is harmed by the Wind Freeze. For example, multiple wind projects in Michigan, including but not limited to the 200-megawatt Bay (a/k/a Pinconning) Wind Project and the 200-megawatt Tupper Lake Wind Project, are being held up by the Wind Freeze. Across the State, as identified by Energy Plaintiffs, at least $507 million in private investment and 1,168 jobs are at risk. In addition, 2023 Mich. Pub. Act 235 ("PA 235") requires that electric utilities operating in the State provide 15% of electricity sales from renewable energy each year through 2029, increasing to 50% of electricity sales for 2030, and then 60% in 2035 and thereafter. Mich. Comp. Laws § 460.1028(28)(1). PA 235

Page 13 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

further requires that each utility supply 80% of electricity sales from 2035 through 2039, and 100% of electricity sales from 2040 and thereafter, from renewable energy, nuclear, or natural gas with carbon capture and sequestration. Mich. Comp. Laws § 460.1051(51)(1). Michigan also maintains a target of reducing greenhouse gas emissions by 52% of 2005 levels by 2030 and achieving carbon neutrality by 2050. *See*, Mich. Exec. Dir. No. 2020-10, § 1 (Sept. 23, 2020). The Wind Freeze is impeding Michigan's implementation of those standards and targets and harming Michigan in other ways discussed at paragraphs 95-132.

26.    **Intervenor-Plaintiff State of Minnesota** is a sovereign state in the United States of America. Minnesota is represented by Attorney General Keith Ellison, who is the chief law enforcement officer of Minnesota. The State is harmed by the Wind Freeze. For example, Minnesota purchases electricity generated in States where the Wind Freeze is currently holding up development. In addition, Minnesota has an RPS requiring electric utilities to procure 80% clean electricity by 2030 and 100% clean electricity by 2040, Minn. Stat. § 216B.1691(2g), and a statutory target of reducing greenhouse gas emissions to 50% below 2005 levels by 2030 and achieving net-zero greenhouse gas emissions by 2050, *id.* § 216H.02(1)(a). The Wind Freeze is impeding Minnesota's implementation of those standards and targets and harming Minnesota in other ways discussed at paragraphs 95-132.

27.    **Intervenor-Plaintiff State of Nevada,** represented by and through Attorney General Aaron D. Ford, is a sovereign state within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. §§ 228.110 and 228.170. The State is harmed by the Wind Freeze. For example, Nevada purchases electricity generated in States where the Wind Freeze is currently holding up development. In addition, Nevada has an RPS requiring electric utilities to

Page 14 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

procure 50% clean energy by 2030 and 100% carbon-free energy by 2050, 2019 Nev. Stat. 6; Nev. Rev. Stat. § 704.7821(1)(l), and a statutory target of reducing greenhouse gas emissions to 45% below 2005 levels by 2030 and achieving net-zero greenhouse gas emissions by 2050, Nev. Rev. Stat. § 445B.380. The Wind Freeze is impeding Nevada's implementation of those standards and targets and harming Nevada in other ways discussed at paragraphs 95-132.

28.    **Intervenor-Plaintiff State of New Jersey** is a sovereign state in the United States of America. New Jersey is represented by Attorney General Jennifer Davenport, who is the chief law enforcement officer of New Jersey. The State is harmed by the Wind Freeze. For example, New Jersey is served by the regional transmission organization PJM Interconnection, which receives energy from projects currently subject to the Wind Freeze. Thus, New Jersey and its residents are harmed by higher electricity prices resulting from reduced energy generation within the PJM regional grid. Electricity prices for New Jersey customers have already increased by approximately 20 percent within the past year following PJM's latest capacity auctions. In addition, New Jersey has an RPS requiring electric utilities to procure 50% renewable energy by 2030, N.J. Stat. Ann. § 48:3-87(d)(2), a policy goal of achieving 100% clean energy by 2035, N.J. Exec. Order. No. 315, § 1 (Feb. 15, 2023), and a target of reducing greenhouse gas emissions to 50% below 2006 levels by 2030 and to 80% below 2006 levels by 2050, N.J. Stat. Ann. §§ 26:2C-39 to -40; N.J. Exec. Order No. 274 § 1 (Nov. 10, 2021). The Wind Freeze is impeding New Jersey's implementation of those standards and targets. Thus, the Wind Freeze is raising the cost of electricity for New Jersey customers, including the State of New Jersey, both by restricting the supply of energy and driving up prices in the PJM regional market, and by restricting the supply of renewable energy certificates/credits and driving up the

Page 15 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

price of compliance with the RPS. The Wind Freeze is also harming New Jersey in other ways discussed at paragraphs 95-132.

29.     **Intervenor-Plaintiff State of New Mexico** is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico. The State is harmed by the Wind Freeze. For example, multiple wind projects in New Mexico, including but not limited to the 1,000-megawatt Silver Oak Energy Project and the 400-megawatt Silver Stallion Project, are being held up by the Wind Freeze. Across the State, as identified by Energy Plaintiffs, at least $1.994 billion in private investment and 4,710 jobs are at risk. In addition, New Mexico has an RPS requiring investor-owned electric utilities to procure 50% renewable energy by 2030 and 100% zero-carbon electricity by 2045, N.M. Stat. Ann. § 62-16-4(A), as well as a target of reducing greenhouse gas emissions to 45% below 2005 levels by 2030, N.M. Exec. Order. No. 2019-0003, § 1 (Jan. 29, 2019). The Wind Freeze is impeding New Mexico's implementation of those standards and targets and harming New Mexico in other ways discussed at paragraphs 95-132.

30.     **Intervenor-Plaintiff State of Rhode Island** is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island. The State is harmed by the Wind Freeze. For example, Rhode Island purchases electricity generated in States where the Wind Freeze is currently holding up development. In addition, Rhode Island has a Renewable Energy Standard requiring electric utilities to procure 100% renewable energy by 2033, 39 R.I. Gen. Laws § 39-26-4(a); *see also* R.I. Exec. Order. No. 20-01, § 1 (Jan. 17, 2020), as well as a statutory target of reducing greenhouse gas emissions to 45% below 1990 levels by 2030 and achieving

Page 16 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

net-zero greenhouse gas emissions by 2050, 42 R.I. Gen. Laws § 42-6.2-9. The Wind Freeze is impeding Rhode Island's implementation of those standards and targets and harming Rhode Island in other ways discussed at paragraphs 95-132.

31.    **Intervenor-Plaintiff State of Washington** is a sovereign state in the United States of America. Washington is represented by Attorney General Nicholas W. Brown, who is the chief law enforcement officer of Washington. The State is harmed by the Wind Freeze. For example, multiple wind projects in Washington, including but not limited to the 450-megawatt Crider Valley Wind Energy Project, 200-megawatt Riverside Wind Project, 300-megawatt Springboard Wind Project, 300-megawatt Great Bend Wind Project, and 378-megawatt Cloudwalker Wind Project, are being held up by the Wind Freeze. Across the State, as identified by Energy Plaintiffs, at least $2.066 billion in private investment and 4,532 jobs are at risk. In addition, Washington has a Renewable Energy Standard requiring electric utilities to procure 100% greenhouse gas-neutral energy by 2030 and 100% carbon-free energy by 2045, Wash. Rev. Code § 19.405.010(2), as well as a statutory target of reducing greenhouse gas emissions to 45% of 1990 levels by 2030 and to 95% of 1990 levels by 2050, *id.* § 70A.45.020(1)(a). The Wind Freeze is impeding Washington's implementation of those standards and targets and harming Washington in other ways discussed at paragraphs 95-132.

32.    **Intervenor-Plaintiff the District of Columbia** is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District of Columbia is represented by Attorney General Brian L. Schwalb, who is the chief law enforcement officer of the District of Columbia. The District of Columbia is harmed by the Wind Freeze. For example, the District of Columbia purchases electricity

Page 17 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

generated in States where the Wind Freeze is currently holding up development. In addition, the

District of Columbia has an RPS requiring electric utilities to procure 87% renewable energy by

2030 and 100% renewable energy by 2032, D.C. Code § 34-1432(c), as well as a statutory target

of reducing greenhouse gas emissions to 60% below 2006 levels by 2030 and achieving carbon

neutrality by 2045, *id.* § 8-151.09d(a). The Wind Freeze is impeding the District of Columbia's

implementation of those standards and targets and harming the District of Columbia in other

ways discussed at paragraphs 95-132.

**Defendants**

33.    **Defendant Peter B. Hegseth** is the Secretary of Defense and the U.S. Department

of Defense's highest ranking official. The Assistant Secretary of Defense for Energy,

Installations, and Environment reports to the Secretary of Defense. Secretary Hegseth is sued in

his official capacity.

34.    **Defendant Dale Marks** is the Assistant Secretary of Defense for Energy,

Installations, and Environment in the U.S. Department of Defense. The Assistant Secretary of

Defense for Energy, Installations, and Environment oversees matters relating to energy,

installations, and the environment, including operational and facility energy, installation,

maintenance, and environmental planning, and he carries out varied functions subject to the

authority, direction, and control of the Secretary of Defense. Assistant Secretary Marks is

responsible for maintaining and overseeing the DoD Clearinghouse. Assistant Secretary Marks

is sued in his official capacity.

35.    **Defendant U.S. Department of Defense** is a cabinet agency within the Executive

Branch of the United States government and is an agency within the meaning of 5 U.S.C.

§ 552(f). The U.S. Department of Defense is responsible for, among other things, coordinating

Page 18 - [PROPOSED] COMPLAINT-IN-INTERVENTION

CHH/ls8/1027710804

and supervising the U.S. armed forces. The U.S. Department of Defense is charged with conducting reviews of national security and military readiness concerns as part of aeronautical findings for wind energy projects. 49 U.S.C. § 44718(e)–(f); 10 U.S.C. § 183a.

36. **Defendant Department of the Air Force** is a military department within the U.S. Department of Defense. Through participation in the DoD Clearinghouse review process, the Department of the Air Force evaluates proposed wind projects for impacts on military operations, readiness, radar systems, military airspace, and related Air Force missions. The Department of the Air Force participates in mitigation discussions, review determinations, and implementation of the Wind Freeze.

37. **Defendant Department of the Army** is a military department within the U.S. Department of Defense. Through participation in the DoD Clearinghouse review process, the Department of the Army evaluates proposed wind projects for impacts on military operations, readiness, radar systems, military airspace, and related Army missions. The Department of the Army participates in mitigation discussions, review determinations, and implementation of the Wind Freeze.

38. **Defendant Department of the Navy** is a military department within the U.S. Department of Defense. Through participation in the DoD Clearinghouse review process, the Department of the Navy evaluates proposed wind projects for impacts on military operations, readiness, radar systems, military airspace, and related Navy and Marine Corps missions. The Department of the Navy participates in mitigation discussions, review determinations, and implementation of the Wind Freeze.

39. **Defendant Department of Defense Military Aviation and Installation Assurance Siting Clearinghouse** coordinates the U.S. Department of Defense's review of

Page 19 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

projects filed with the FAA for airspace review under 49 U.S.C. § 44718. The DoD

Clearinghouse is responsible for coordinating the review of energy project applications among

DoD and other governmental components, with the goal of protecting national security and

military missions while promoting the development of compatible renewable energy projects.

10 U.S.C. § 183a.

40.    Collectively, Defendants Secretary Hegseth, Assistant Secretary Marks, the U.S.

Department of Defense, the Department of the Air Force, the Department of the Army, the

Department of the Navy, and the DoD Clearinghouse are referred to as "DoD Defendants" or

"DoD."

## LEGAL FRAMEWORK

41.    DoD's legal obligation to conduct national security findings related to wind

projects arises from interlocking statutory and regulatory frameworks under both the Federal

Aviation Act, 49 U.S.C. §§ 40101 *et seq*., and the National Defense Authorization Act,

10 U.S.C. § 183a.

**FAA Framework**

42.    The United States government has exclusive sovereignty over U.S. airspace.

49 U.S.C. § 40103. The FAA is authorized to determine whether the proposed construction or

alteration of a project will present a hazard to air navigation. *Id.* § 44718. Section 44718 states

that the FAA "[b]y regulation . . . shall require a person to give adequate public notice [of] . . .

the proposed construction, alteration, establishment, or expansion, of a structure or sanitary

landfill when the notice will promote . . . (1) safety in air commerce; (2) the efficient use and

preservation of the navigable airspace and of airport traffic capacity at public-use airports; or

(3) the interests of national security, as determined by the Secretary of Defense." *Id.* § 44718(a).

Page 20 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

43.     Pursuant to this statutory authority, the FAA promulgated regulations under 14 C.F.R. Part 77 ("Part 77") to administer the review process mandated by Section 44718. Part 77 requires developers of applicable projects, including construction projects 200 feet or more above ground level, to submit a "Notice of Proposed Construction or Alteration," FAA Form 7460-1. 14 C.F.R. §§ 77.7, 77.9(a). As all utility-scale wind turbines exceed 200 feet in height, all utility-scale projects require this notice. Developers must submit notice by the date the application for a construction permit is filed, or 45 days before the start date of the proposed construction, whichever is earlier. *Id.* § 77.7(b).

44.     After receiving notice, the FAA must conduct an "aeronautical study" to decide whether the proposed structure obstructs the navigable airspace, interferes with air navigation, or has an "adverse impact on military operations and readiness"—the latter decided in "consultation" with DoD. 49 U.S.C. § 44718(b)(1), (f). As part of this study, DoD "shall— (1) make a finding on whether the construction . . . included in the study would result in an unacceptable risk to the national security of the United States; and (2) transmit the finding to the Secretary of Transportation for inclusion in the report required under subsection (b)(2)." *Id.* § 44718(f).

45.     Upon completing the study, the FAA "shall issue a report" that discloses the "extent of (A) adverse impact on [navigable airspace]; and (B) unacceptable risk to the national security of the United States, as determined by the Secretary of Defense under subsection (f)." *Id.* § 44718(b)(2).

46.     The FAA must then make a public determination stating whether the proposed construction would pose a hazard to air navigation. 14 C.F.R. § 77.31(a). The project receives

Page 21 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
    CHH/ls8/1027710804

either a "Determination of Hazard to Air Navigation" or a "Determination of No Hazard to Air Navigation." 14 C.F.R. § 77.31(c)–(e).

**DoD Framework**

47.    In 2011, Congress identified a need to create a single entity to establish and oversee DoD's review of applications filed with the FAA under 49 U.S.C. § 44718. The solution, included in the National Defense Authorization Act for that year, was to direct the Secretary of Defense to designate a senior official to serve as a "clearinghouse" for these reviews. Pub. L. No. 111-383, 124 Stat. 4137 (2011). In establishing this new role, Congress set forth DoD's objective to "ensure that the *robust development of renewable energy sources* and the *increased resiliency of the commercial electrical grid* may move forward in the United States, while minimizing or mitigating any adverse impacts on military operations and readiness." *Id.* § 358(a) (emphasis added).

48.    Then, in 2017, Congress further formalized this process and established the DoD Clearinghouse. The National Defense Authorization Act for Fiscal Year 2018 replaced Section 358 and codified the underlying authority at 10 U.S.C. § 183a. Pub. L. No. 115-91, § 311(a), 131 Stat. 1283, 1343 (2017). The DoD Clearinghouse's function remained the same: to coordinate DoD review of Section 44718 applications. 10 U.S.C. § 183a(a)(2).

49.    In codifying the DoD Clearinghouse under Section 183a, Congress again emphasized the importance of timely application review. It mandated that the DoD Clearinghouse "shall accelerate" the development of tools to assess applications filed under Section 44718 and "shall develop" an "integrated review process to ensure timely notification and consideration" of applications. *Id.* § 183a(b)(2), (c)(5).

Page 22 - [PROPOSED] COMPLAINT-IN-INTERVENTION
    CHH/ls8/1027710804

50.     To ensure timely and cooperative processing, Congress requires the DoD Clearinghouse to conduct a "preliminary review" of applications within 75 days of receipt from the FAA. *Id.* § 183a(c)(1). A preliminary review is a "preliminary assessment only" and "does not represent a formal objection[.]" *Id.* § 183a(c)(2)(C). If a preliminary review indicates the development will have an "adverse impact on military operations and readiness," the DoD Clearinghouse must issue a "notice of presumed risk" to the applicant describing its concerns and work with the applicant to mitigate them. *Id.* § 183a(c)(2).

51.     When the DoD Clearinghouse issues a notice of presumed risk to an applicant, it must also provide the "same notice" to the Governor of the State in which the prospective project sits. *Id.* § 183a(c)(3). The DoD Clearinghouse must provide the applicable Governor at least 30 days to review and provide comments. *Id.* The DoD Clearinghouse also must provide the Governor with detailed information and other information necessary to ensure that the Governor can fully understand the nature of the presumed risk. *Id.* DoD must then consider the Governor's comments and include any comments with the DoD finding provided to the FAA. *Id.*

52.     Pursuant to Section 183a, DoD promulgated regulations further prescribing procedures for the DoD Clearinghouse's review. 32 C.F.R. Part 211 ("Part 211"). These regulations set forth a strict cadence of activity to ensure that the DoD Clearinghouse completes its preliminary review within the 75-day period established under 10 U.S.C. § 183a(c)(1).

53.     Upon receipt of a Part 77 application from the FAA, the DoD Clearinghouse must distribute the application to DoD components[5] implicated by the application. The DoD

---

[5] Part 211 defines "DoD Components" as "[t]he Office of the Secretary of Defense, the Military Departments, the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense

Page 23 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

components have 20 days to provide comments and recommendations to the DoD Clearinghouse. 32 C.F.R. § 211.6(a)(2). Within 30 days of receipt of the Part 77 application, the DoD Clearinghouse must evaluate the DoD components' comments and recommendations and make a preliminary determination. *Id.* § 211.6(a)(3).

54.     DoD also must establish a website that includes publicly accessible information about each application that DoD is currently considering and the stage of review for that application and that indicates how the public may provide comments to DoD. 32 C.F.R. § 211.12.

55.     The DoD Clearinghouse can make one of three preliminary determinations: (i) that the project "will not have an adverse impact on military operations and readiness;" (ii) that the project will have an adverse impact, but the impact is "sufficiently attenuated" such that it does not require mitigation; or (iii) that the proposed project may have an adverse impact that is not sufficiently attenuated under (ii). *Id.* § 211.6(a)(3)(i)–(iii). In all instances, the DoD Clearinghouse must notify the FAA of its determination. In the event the DoD Clearinghouse determines that a proposed project may have an adverse impact under (iii), it must "immediately" notify the applicant of its preliminary findings and offer to engage with the applicant to discuss mitigation options. *Id.* § 211.6(a)(3)(iii)(A). It must also "immediately" designate DoD components to engage in mitigation discussions, notify the FAA of any obstruction standard that would be exceeded, and notify the FAA and Department of Homeland Security that the DoD Clearinghouse offered to engage in mitigation discussions. *Id.* § 211.6(a)(3)(iii)(B)–(D).

---

Agencies, the DoD Field Activities, and all other organizational entities in the Department of Defense (hereafter referred to collectively as the "DoD Components")." 32 C.F.R. § 211.2(a).

Page 24 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

56.     Once it receives the DoD Clearinghouse's notification of preliminary findings, the applicant has five days to agree to begin mitigation discussions. *Id.* § 211.6(a)(4). If the applicant agrees to discuss mitigation, the designated DoD components are required to engage in discussions to mitigate the identified impacts. *Id.* § 211.6(b). The DoD Clearinghouse must notify and invite the FAA and Department of Homeland Security to participate and may invite other federal agencies to participate. *Id.* These mitigation discussions "shall not extend more than 90 days beyond the initial notification to the applicant," unless both parties agree in writing to an extension of time. *Id.* § 211.6(b)(1).

57.     If the applicant and the designated DoD components cannot successfully negotiate mitigation measures, or if the applicant does not agree to enter mitigation discussions, then the DoD Clearinghouse must determine whether the project would result in an "unacceptable risk to the national security of the United States," which is explicitly defined by 10 U.S.C. § 183a(h)(11). [6] 32 C.F.R. § 211.6(b)(2), (c). If the Under Secretary of Defense for Acquisition, Technology, and Logistics and the Deputy Secretary of Defense concur with the recommendation of the DoD Clearinghouse that a project creates an unacceptable risk, the Deputy Secretary of Defense must convey that determination to the FAA. *Id.* § 211.6(b)(2). DoD must also submit its unacceptable risk finding to Congress within 30 days of such finding. 10 U.S.C. § 183a(e)(2). The report must explain the project's impact on military operations, the

---

[6] Section 183a defines "unacceptable risk to the national security of the United States" as the construction or proposed construction or alteration of a structure, "that the Secretary of Defense can demonstrate would—(A) endanger safety in air commerce directly related to the activities of [DoD]; (B) interfere with the efficient use of the navigable airspace directly related to the activities of [DoD]; or (C) significantly impair or degrade the capability of [DoD] to conduct training, research, development, testing, and evaluation, and operations or to maintain military readiness." 10 U.S.C. § 183a(h)(11). *See also* 32 C.F.R. § 211.3 ("unacceptable risk to the national security of the United States" similarly defined).

Page 25 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
        CHH/ls8/1027710804

mitigation options considered, and why the mitigation options were not feasible or did not resolve the conflict. *Id.* On information and belief, no such report has been submitted to Congress. The DOD Clearinghouse must seek an extension of time from the Secretary of Transportation if more time is required to consider an application. 32 C.F.R. § 211.6(d).

58.     If, on the other hand, the applicants and DoD successfully engage in mitigation discussions and reach mitigation agreements, the FAA can proceed with its review and reach a Determination of No Hazard.  Upon receipt of the Determination of No Hazard, wind projects may proceed to construction, leading to commercial operations and electricity generation that serve the States and their citizens.

## FACTUAL ALLEGATIONS

**The Trump Administration's War on Wind Energy**

59.     In January 2025, President Trump was inaugurated. Since that time—and despite President Trump's declaration of an energy emergency—he and his Administration have taken a series of actions to hinder the development of wind energy in the United States.

60.     For example, on January 20, 2025—the first day of his second term—President Trump issued a presidential memorandum that categorically and indefinitely halted all federal approvals necessary for the development of offshore and onshore wind energy. *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 29, 2025) ("Wind Memo").

61.     The Wind Memo prohibited various federal agencies from issuing "new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind

Page 26 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

projects" until "the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices."[7] *Id.* at 8364.

62.    Meanwhile, President Trump has regularly emphasized the need for expedited domestic energy development—*but not wind energy.* He has taken numerous actions to streamline and expedite reviews for other energy sources, while the Wind Memo used those same reviews to delay and block wind energy development. *See, e.g.*, Exec. Order No. 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 29, 2025) (declaring a "National Energy Emergency" to shore up the "inadequate energy supply" by facilitating the development of "a reliable, diversified, and affordable supply of energy"); Exec. Order No. 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025) ("encourag[ing] energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf, in order to meet the needs of our citizens and solidify the United States as a global energy leader long into the future"); Exec. Order No. 14262, *Strengthening the Reliability and Security of the National Electric Grid*, 90 Fed. Reg. 15521 (Apr. 14, 2025) (ordering certain energy-generation resources to remain online); Exec. Order No. 14270, *Zero-Based Regulatory Budgeting to Unleash American Energy*, 90 Fed. Reg. 15643 (Apr. 15, 2025) (ordering agencies to sunset regulations governing environmental reviews that impact energy development); *see also* Exec. Order No. 14153, *Unleashing Alaska's Extraordinary Resource Potential*, 90 Fed. Reg. 8347 (Jan. 29, 2025) (announcing policy to "expedite the permitting and leasing of energy and natural resource projects in Alaska"); Exec. Order. No. 14261, *Reinvigorating America's Beautiful Clean Coal Industry*, 90 Fed. Reg. 15517 (Apr. 14, 2025) (ordering the Secretary of

---

[7] The District of Massachusetts has since found that the agency actions taken in response to the Wind Memo are arbitrary and capricious and contrary to law, *New York v. Trump*, 811 F. Supp. 3d 215 (D. Mass. 2025), and the federal government has chosen not to appeal this determination.

CHH/ls8/1027710804

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

the Interior, *inter alia*, to "identify[] opportunities to provide for expedited environmental reviews" of coal mining); Exec. Order No. 14285, *Unleashing America's Offshore Critical Minerals and Resources*, 90 Fed. Reg. 17735 (Apr. 24, 2025) (directing the Secretary of the Interior to "establish an expedited process for reviewing and approving permits for prospecting and granting leases for exploration, development, and production of seabed mineral resources within the United States Outer Continental Shelf").

63.    President Trump has repeatedly stated that his Administration's policy is to stop the construction of "windmills," by which he means wind energy projects (the projects use wind turbines, not windmills, to generate electricity). Early in his second term, he stated that "[w]e are going to have a policy where no windmills are being built."[8] And President Trump recently confirmed that his Administration is following through on this policy: "I can proudly say . . . that we have not approved one windmill since I've been in office. And we're going to keep it that way. My goal is to not let any windmill be built."[9]

**DoD Mitigation Process Prior to the Wind Freeze**

64.    Until recently, proposed wind projects followed a routine, predictable mitigation process with the DoD Clearinghouse.

65.    DoD Defendants' mitigation process typically proceeded under well-established timeframes, from negotiation, to informal agreement, then to formal agreement, in accordance with the statutory and regulatory requirements outlined above. According to wind developers,

---

[8] Bloomberg, *Trump Says He Wants No Wind Farms Built During Presidency* (Jan. 7, 2025), https://www.energyconnects.com/news/renewables/2025/january/trump-says-he-wants-no-wind-turbines-built-during-administration/.

[9] Tamara Keith, *Trump Takes Aim at Windmills Despite Increasing Energy Costs*, NPR (Mar. 24, 2026), https://www.npr.org/2026/03/24/nx-s1-5684158/trump-takes-aim-at-windmills-despite-increasing-energy-costs.

Page 28 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

prior to the Wind Freeze, DoD Defendants actively engaged in the process, holding regular calls and meetings. Their initial review would usually take 75 days, resulting in a notice of presumed risk or non-objection. If DoD issued a notice of presumed risk, DoD would engage in prompt discussions with the developer to identify acceptable mitigation options and reach an informal "handshake agreement." This process would take between one and four months, depending on the level of mitigation required. Three to four months later, DoD Defendants would provide a draft agreement to the developer for signature. Once the developer signed the agreement, DoD Defendants typically countersigned agreements and issued determinations to the FAA within 60 days.

66.    The potential for wind turbines to interfere with radar systems, military airspace, and military technology and operations is not new. The military and the wind industry have been collaborating on this topic for almost 20 years. There are multiple software- and hardware-based mitigation options available, depending on the specific concern and potentially impacted radar system. The types of issues that arise during the DoD mitigation process are known, easily anticipated, and quickly resolved given the large number of similar existing projects from which mitigation practices can be drawn.

67.    According to Energy Plaintiffs, mitigation issues typically fall into three categories: (1) impacts to radar systems, such as those used for military or national security purposes; (2) impacts to military airspace, such as training routes, military airports, or aviation operations; and (3) technical or operational impacts, such as impacts on cybersecurity or communications.

68.    Because the mitigation process had become so routine, wind developers were reportedly able to accurately identify the potential issues that were likely to be flagged by DoD

Page 29 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

Defendants for mitigation. This predictable process was an important part of project planning, providing the consistency necessary to make investment and construction decisions.

69.    Mitigation agreements typically consisted of a template, with only the company name and project-specific details differing from agreement to agreement. Typical measures in mitigation agreements included: funding from developers for radar software upgrades or new hardware, such as additional radars; physical changes to the project design, such as changes to turbine placement and height; provisions for any party to amend the agreement; and allowance for the North American Aerospace Defense Command ("NORAD") to request temporary curtailment of operations for discrete national security or defense purposes.

70.    The consistent implementation of the DoD Clearinghouse process resulted in dozens of mitigation agreements for wind energy projects located in Plaintiff States' jurisdictions.[10] The existence of those agreements allowed wind projects to reach commercial operation and generate electricity to serve the States and their citizens, while protecting national security interests in accordance with governing law.

71.    These mitigation agreements were formerly available on the DoD Clearinghouse website. The website was recently disabled without explanation. The website no longer provides the public with information about past mitigation agreements and does not list applications currently under consideration.

---

[10] Copies of previously executed mitigation agreements are available on the Wayback Machine. *See* Clearinghouse Mitigation Agreement Map, available at https://web.archive.org/web/20260214155448/https://www.dodclearinghouse.osd.mil/Project-Review/-Formal-Review/Mitigation-Agreements/).

Page 30 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

**The DoD Wind Freeze**

72.    Around August 2025, DoD Defendants implemented a new decision—the Wind Freeze—that categorically halted all work related to the review process for land-based wind energy projects. DoD has ceased countersigning mitigation agreements and transmitting non-objections to the FAA; ceased providing mitigation agreements for signature following informal agreements on mitigation; and significantly delayed and/or stopped engaging in mitigation negotiations with developers.

73.    As described by the *New York Times*, the Wind Freeze is "the latest escalation in President Trump's efforts to stop wind power, a technology he detests," and it "is blocking more than 150 onshore wind farms across the United States by delaying military reviews that were once considered routine."[11]

74.    Hundreds of projects across the country, including projects in Plaintiff States, are now frozen in various stages of the DoD Clearinghouse review process. In many cases, developers have already invested hundreds of millions of dollars in these wind projects. Without DoD action, these wind projects are unable to move forward, jeopardizing reliability of the electrical grid, jobs, and climate and economic benefits that would otherwise accrue to Plaintiff States.

75.    The wind industry has identified four categories of affected wind projects.

76.    The first category encompasses projects for which mitigation negotiation is complete, where the project developer has signed a formal mitigation agreement and is waiting for countersignature by a DoD representative. DoD has already conducted a thorough review of

---

[11] Brad Plumer, *More Than 150 Wind Projects Stall as Pentagon Delays Reviews*, N.Y. Times (May 4, 2026), https://www.nytimes.com/2026/05/04/climate/wind-power-delays-trump-pentagon.html.

Page 31 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

these projects and determined that any potential adverse impacts can be fully mitigated. Some of these projects have been waiting for countersignature for almost a year, since August 2025.

77. The second category consists of projects that have reportedly completed mitigation discussions, have reached an informal agreement with DoD, and are waiting only for DoD to submit a mitigation agreement to the developer for signature. DoD has already determined that any adverse impacts stemming from these projects can be fully mitigated. Upon belief, the mitigation measures in many of these projects are expected to draw from existing standard agreements used for previous projects.

78. The third category of projects includes those that were in the middle of the mitigation negotiation process when DoD Defendants halted communications without explanation and without project-specific concerns. DoD's failure to engage with developers prevents the negotiation of mitigation agreements, jeopardizing existing investments and threatening developers' ability to meet deadlines related to financing, permitting, interconnection, and tax credits.

79. Finally, projects in the fourth category have not been able to engage at all in the mitigation negotiation process. DoD may have sent developers notices of presumed risk but failed to further engage with developers, or DoD has failed to conduct its preliminary review that would result in a non-objection or a notice of presumed risk to begin the mitigation negotiation process. The developers of these projects invested significant resources before the preliminary review.

80. DoD's refusal to act on mitigation agreements or otherwise proceed with the Clearinghouse process is not project-, company-, or state-specific, but has applied broadly to wind projects across the United States.

Page 32 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

81.     DoD's refusal is a reversal of its longstanding policy, practice, and procedure for implementing the DoD Clearinghouse mitigation process and is contrary to DoD's statutory duties.

82.     Moreover, aside from *post hoc* rationalizations expressed for the first time in this lawsuit (ECF Nos. 90, 90-1), DoD has not explained its failure to proceed with the review process. Plaintiff States, congressional representatives, industry representatives, and project developers have reached out to DoD Defendants through letters, phone calls, and emails seeking to discuss the status of the halted mitigation process and/or individual project reviews, but DoD Defendants have consistently refused to engage. DoD has also not sought an extension for time to consider applications from the Secretary of Transportation under § 211.6(d).

83.     DoD confirmed the existence of the Wind Freeze in a May 7, 2026 memorandum by Assistant Secretary Marks and, more explicitly, in a July 6, 2026 declaration by Assistant Secretary Marks submitted in this lawsuit (ECF No. 90-1).

84.     On May 7, 2026, the Office of Assistant Secretary Marks issued an internal memorandum to various DoD components explaining that certain energy projects would be subject to "further interagency coordination" to "ensure a comprehensive national security review is conducted in a manner sufficient to address modern advancements in consideration of their scope, duration, and level of risk recent[ly] presented to DoW operations and readiness." Interim Guidance Regarding Compliance with Established Military Aviation and Installation Assurances Siting Clearinghouse Procedures ("Marks Memorandum") at 1–2. But the Marks Memorandum specifically *exempted oil and gas energy projects from this additional review*, as well as any project that does not "create an impactful doppler effect." *Id.* at 2. This last provision was designed to single out wind energy projects, the only type of energy project that

Page 33 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

DoD has identified as having a potentially "impactful" doppler effect. The Marks Memorandum does not acknowledge that adverse impacts from the doppler effect have been successfully mitigated through the Clearinghouse process for years.

85.    The Marks Memorandum makes clear that DoD Defendants' review of individual *wind projects* continues to be subject to indefinite delay, while DoD will continue to review *all other types of energy projects* "promptly." The Marks Memorandum also shows that DoD Defendants are imposing unjustified additional review barriers and procedural delays to specifically and purposefully obstruct utility-scale wind energy projects.

86.    The Marks Memorandum also confirms that the outlined additional procedures reflect a broad shutdown of wind project reviews, disregarding the timelines established by Congress and DoD's own implementing regulations. These additional procedures are not tied to any individual project's mitigation measures or operational impacts.

87.    Notably, the Marks Memorandum does not identify any new operational risks and does not provide project-specific findings, technical analysis, or evidentiary support demonstrating that previously approved mitigation measures are no longer effective or that existing statutory or regulatory procedures are insufficient.

88.    To illustrate, Illinois-based wind projects that are now halted by DoD's Wind Freeze have the same conflicts as projects that have already been successfully mitigated. In 2023, DoD executed a mitigation agreement for the City of Roses wind project located near Pana, Illinois, which DoD had identified as conflicting with NORAD operation of the Springfield Illinois Airport Surveillance Radar 11. In a letter received on March 10, 2026, DoD notified the Governor of Illinois that the proposed Shoals Renewables wind energy project near Nokomis, Illinois, would also have an adverse impact on NORAD's use of the Springfield

Page 34 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

Airport Surveillance Radar. The proposed Shoals Renewables wind energy project is geographically close to the City of Roses wind farm, with City of Roses located in Christian County and Shoals Renewables located in neighboring Montgomery County, Illinois. But the letter received in March 2026 did not identify any project-specific information indicating that potential interference from the proposed Shoals Renewables wind project was materially different from the risks to the same radar system from the City of Roses project that were successfully mitigated in 2023.

89.    On July 6, 2026, in the context of this litigation, Assistant Secretary Marks filed a declaration ("Marks Declaration") that explicitly confirms the existence of the Wind Freeze, stating "[c]onsistent with my direction as the signatory authority, DoW executed the last mitigation agreement on August 18, 2025." *See* Decl. of Assistant Secretary Marks ¶ 96, ECF No. 90-1 ("Marks Decl."). The Marks Declaration further provides that "Th[is] decision meant DoW refrained from executing further agreements and drafting new ones (beginning around December)." *Id.*

90.    The Marks Declaration attributes DoD's policy of not executing or drafting new mitigation agreements to a purported "internal, analytical methodology review" of the review process itself. *Id.* The Marks Declaration, however, is a classic *post hoc* rationalization of an unlawful practice, which does not satisfy the APA's reasoned explanation requirement.

91.    The Marks Declaration also alleges that there is a "generational, global threat paradigm shift" presented by risks from drones that have been developing over the past 24 months. The declaration provides information that DoD previously failed to provide in violation of its statutory obligations. For example, on March 10, 2026, the Governor of Illinois received notice of DoD's preliminary assessment that four wind projects in Illinois would have

Page 35 - [PROPOSED] COMPLAINT-IN-INTERVENTION

an adverse impact on military operations and readiness due to interference with NORAD radar operations. On May 21, 2026, the Governor of Illinois responded to this notice and requested that DoD provide information regarding the risks identified in the notice, as required by law. On June 14, 2026, a DoD representative responded that DoD had determined that additional interagency coordination was necessary for a comprehensive review of "modern advancements" and that "this review and project level analysis is progressing." The response concluded that, until such time as this work is complete, "DoW does not have the detailed information you requested." This response, which was provided less than one month before the Marks Declaration and did not contain any of the now publicly-disclosed information in the Marks Declaration related to purported concerns about drones, failed to provide the Governor with the information necessary to ensure that he could fully understand the nature of the presumed risk.

92.     The Marks Declarations' statements on the emerging threat paradigm related to drones is also incongruous with concurrent efforts by the Trump Administration to expedite the rapid expansion of drone use for commercial purposes, as well as the Administration's apparent position that the United States' airspace is presumptively open to drone use.[12]

**The Consequences of DoD's Wind Freeze**

93.     DoD Defendants' ongoing refusal to move projects forward flouts Congress's repeated directives promoting renewable energy development, Congress's express instruction

---

[12] *See, e.g.,* FAA and Transportation Security Administration's joint Notice of Proposed Rulemaking, Normalizing Unmanned Aircraft Systems Beyond Visual Line of Sight Operations, 90 Fed. Reg. 38212 (Aug. 7, 2025) (Docket No. FAA-2025-1908) (proposing regulations to expedite drone operations beyond visual line of sight throughout national airspace); FAA Notice of Proposed Rulemaking, Designation-Restrict the Operation of Unmanned Aircraft in Close Proximity to a Fixed Site Facility, 91 Fed. Reg. 24650 (May 6, 2026) (proposing to limit airspace closure eligibility to power-generation facilities with nameplate capacity of 500 megawatts or greater); Exec. Order No. 14307 Unleashing American Drone Dominance, 90 Fed. Reg. 24727 (June 11, 2025).

Page 36 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

that DoD Defendants' review process accommodate renewable energy projects through mitigation where feasible, and Congress's repeated enactment of incentives designed to facilitate continued deployment of utility-scale wind energy projects. For example:

- Section 358(a) of the National Defense Authorization Act for Fiscal Year 2011 states: "OBJECTIVE.—It shall be an objective of the Department of Defense to ensure that the robust development of renewable energy sources and the increased resiliency of the commercial electrical grid may move forward in the United States, while minimizing or mitigating any adverse impacts on military operations and readiness."

- 10 U.S.C. § 2911(g) provides that "[i]t shall be the goal of the Department of Defense" to "produce or procure not less than 25 percent of the total quantity of facility energy it consumes . . . from renewable energy sources."

- The Energy Policy Act of 2005 requires all federal agencies to increase their renewable energy consumption to at least 7.5% of total electricity use. Pub. L. No. 109-59, § 203(a)(3), 119 Stat. 594, 652 (2005).

94.    As discussed further below, DoD's Wind Freeze will also prevent Plaintiff States from meeting their own statutory obligations and enforcing their own clean energy policies.

## **HARMS TO PLAINTIFF STATES**

95.    The Wind Freeze constitutes a nationwide ban on land-based wind development in the Plaintiff States. By blocking the reviews necessary to construct new wind energy facilities and even to repower and expand existing facilities, the Wind Freeze is blocking wind projects that are urgently needed to meet rising demand for electricity, maintain the reliability of the electric grid, and decrease the price of electricity at a time of major energy affordability concerns.

Page 37 -  [PROPOSED] COMPLAINT-IN-INTERVENTION

96.    Energy Plaintiffs have already identified at least 106 land-based wind projects with a total capacity of more than 29,597 megawatts that are currently blocked by the Wind Freeze. *See* ECF No. 14-28, Decl. of Kurt Strunk ¶ 19 ("Strunk Decl.").

97.    Many projects affected by the Wind Freeze are located in Plaintiff States, including projects in Oregon, Illinois, New York, Arizona, California, Colorado, Maine, Michigan, New Mexico, and Washington. Some of these projects would have supplied electricity to other states, including Plaintiff States served by PJM, ISO-NE, and other regional grid operators in which frozen projects are located.

98.    By blocking these wind projects, the Wind Freeze harms Plaintiff States in at least four ways. *First*, the Wind Freeze undermines Plaintiff States' sovereign interests in implementing their own laws, including by interfering with the achievement of statutory goals and mandates to generate and purchase electricity from renewable energy sources and to reduce emissions of greenhouse gases. *Second*, the Wind Freeze harms Plaintiff States and their residents, as ratepayers, by increasing the cost of electricity and jeopardizing grid reliability. *Third*, the Wind Freeze harms Plaintiff States by jeopardizing investments, jobs, tax revenues, and other economic benefits from wind development. And *fourth*, the Wind Freeze harms Plaintiff States by interfering with their ongoing efforts to ameliorate the acute and long-term public health and environmental harms caused by pollution from fossil fuel-fired energy sources.

**The Wind Freeze Undermines Plaintiff States' Sovereign Interest in Implementing Their Own Laws and Policies**

99.    "States have an interest, as sovereigns, in exercising the power to create and enforce a legal code." *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989)

Page 38 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

(quotation marks omitted). That sovereign interest includes the authority to plan for reliable and affordable energy. *See Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*, 461 U.S. 190, 205 (1983). To that end, courts have repeatedly acknowledged the States' "traditional responsibility in the field of regulating electrical utilities," which includes "determining questions of need, reliability, cost and other related state concerns." *Id.*; *see also Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 185 (D.C. Cir. 2022) (recognizing States' interest "in protecting their citizens and electric ratepayers").

100.    Over the years, Plaintiff States have adopted laws and policies to advance the deployment of renewable energy and to reduce emissions of conventional air pollutants that harm human health and greenhouse gases that cause and contribute to climate change. Most Plaintiff States have adopted RPSs, Clean Energy Standards, or other renewable energy mandates that require electricity suppliers to procure specified percentages of renewable energy certificates/credits.[13]

101.    The Wind Freeze undermines Plaintiff States' sovereign interests in implementing these laws and policies by making it harder to meet Plaintiff States' clean energy targets.

102.    For example, Oregon passed legislation in 2021 mandating clean energy targets for retail electricity providers. ORS House Bill 2021. These electricity providers subsequently submitted plans to State agencies that relied on the continued development of land-based wind

---

[13] N.Y. Pub. Serv. Law § 66-p(2) (70% by 2030); Mass. Gen. Laws ch. 25A, § 11F(a) (annually increasing percentage); Wash. Rev. Code § 19.405.010(2) (100% by 2045); Conn. Gen. Stat. § 16-245a(a)(25) (33% by 2030); Del. Code Ann. tit. 26, § 354(a) (40% by 2035); 20 ILCS 3855/1-75(c)(1)(B) (40% by 2030, 50% by 2040); Me. Rev. Stat. Ann. tit. 35-A, § 3210(1A)(A) (80% by 2030); Minn. Stat. § 216B.1691(2g) (2025) (100% by 2040); Md. Code. Ann., Pub. Util. § 7-703(b)(25) (50% by 2030); 39 R.I. Gen. Laws § 39-26-4 (100% by 2033); N.J. Stat. Ann. § 48:3-87 (50% by 2030); D.C. Code Ann. § 34-1432 (100% by 2032); Cal. Pub. Util. Code § 454.53 (100% by 2045); N.M. Stat. Ann. § 62-16-4(A)(3), (6) (40% by 2025, 100% by 2045); Or. Rev. Stat. § 469A.410(1)(c) (100% by 2040); 2023 Mich. Pub. Acts 235 (50% renewable by 2030 and 100% clean by 2040).

Page 39 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

energy facilities. Because of the Wind Freeze, these plans will need to be changed. This uncertainty makes it more difficult for Oregon to meet its clean energy targets. It will also require State agencies to perform additional work and expend resources to evaluate new plans.

103.    Illinois, like many of the Plaintiff States, has an RPS. Under Illinois law, the Illinois Power Agency must attempt to procure cost-effective renewable energy resources equal to 40% of each relevant Illinois electric utility's load by 2030, climbing to 50% of each utility's load by 2040. *See* 20 ILCS 3855/1-75. To comply with the Illinois RPS, the Illinois Power Agency "shall endeavor to procure 45% from new and repowered wind and hydropower projects." 20 ILCS 3855/1-75(c)(1)(C)(i), as amended by P.A. 103-1066, (effective Feb 20, 2025). Because RPS compliance cannot incentivize the development of new dams, hydropower is not expected to play a significant role in achieving the RPS. Wind projects, however, are expected to play a key role in RPS compliance. If DoD's Wind Freeze continues to prevent the development of new wind projects, Illinois is unlikely to be able to satisfy its statutory obligations or fully implement its own clean energy policies.

104.    Meeting the Illinois RPS is important to maintain a stable, reliable, cost-effective, and clean power supply in Illinois. Maintaining a robust local wind industry is vital for Illinois to meet its RPS goals. Illinois currently has a robust wind industry, with at least 8,479 megawatts of generation capacity from wind projects as of June 2026. In 2024, 13.46% of all electricity generated in Illinois was from wind projects, with over 24.91 million megawatt hours generated. To meet its statutory commitments, the Illinois Power Agency periodically conducts procurements for new wind farms. One such procurement yielded a successful bid for a 300-megawatt utility-scale wind farm from Apex Clean Energy. This wind farm, Prosperity Wind, is operates in Galesville, Illinois, a rural farming community. It will produce enough

Page 40 - [PROPOSED] COMPLAINT-IN-INTERVENTION

power for 99,000 homes and will consist of up to 50 turbines. Other recent Illinois procurements have yielded successful bids for utility-scale wind farms that ranged in capacity from 200 megawatts to 450 megawatts. Illinois will lose the ability to procure wind energy options if the DoD's Wind Freeze continues.

105.    Local laws in Illinois sometimes require that a wind project receive a Determination of No Hazard from the FAA—which as described above, requires DoD review— before finalizing the local permitting process. For example, Pattern Energy Group LP reports it has multiple wind projects in Illinois that need a Determination of No Hazard in order to secure needed local county permits, including: Spring Point (Cumberland and Shelby Counties); Half Moon (Mercer County); Terrance Sands (Mason County); Esker Sands (Mason County); and The Shoals (Montgomery County). *See* Cumberland Cnty., Ill., Amended Cumberland County Wind Energy Conversion System (WECS) Ordinance 25-08, at § G(a) (July 8, 2025); Mason Cnty., Ill., Commercial Wind Energy Facility Siting Ordinance, at § IV(B)(5) (Mar. 12, 2024); Zoning Resolution of Mercer County, Illinois, Chapter III, Article XIX, at § 19.17 (Dec. 2018); Montgomery Cnty., Ill., Ordinance Regulating the Siting of Wind Energy Conversion Systems, at § VII(E)(a) (9th Rev., Mar. 10, 2026); Shelby Cnty., Ill., Zoning Ordinance No. 23-06-"O", Article II, at § 16(E)(2)(d) (Oct. 12, 2023). Apex Clean Energy Holdings, LLC, also reports that, in its experience constructing wind projects in Illinois over the last three years, Determinations of No Hazard are required at the local level to obtain county permits or to commence construction.

106.    The Wind Freeze will also make it harder for many Plaintiff States to achieve statutory mandates for reducing greenhouse gas emissions. For example, the New York State Legislature has enacted greenhouse gas-reduction targets of 40% from 1990 levels by 2030 and

Page 41 - [PROPOSED] COMPLAINT-IN-INTERVENTION
    CHH/ls8/1027710804

85% from 1990 levels by 2050. N.Y. Env't Conserv. Law § 75-0107. Impeding the development of wind projects will delay the transition from fossil fuel-fired power plants, which generate large quantities of greenhouse gas emissions, to low-emitting energy sources. As a result, it will be more difficult for New York to achieve its statutory targets.

107.    Illinois likewise is committed to clean energy initiatives that provide for a healthy environment for Illinois residents. In the last decade, Illinois enacted major clean energy legislation, including the Future Energy Jobs Act of 2017, Climate and Equitable Jobs Act (CEJA) of 2021, and Clean and Reliable Grid Affordability Act (CRGA) of 2025. In addition to Illinois's clean energy standards and targets described above, Illinois law requires all electricity generating units to reduce carbon dioxide and co-pollutant emissions to zero by 2045 on a progressive retirement or emission reduction schedule that begins taking effect in 2030. *See* 415 ILCS 5/9.15. Illinois law directs the State to transition to the use of 100% clean energy by 2050. 20 ILCS 3855/1-5(1.5). With electricity demand projected to rise sharply, new wind projects are an essential source of clean energy generation to meet that demand while complying with state laws. Without bringing new wind projects online, Illinois is unlikely to be able to satisfy these Illinois statutory obligations or otherwise fully implement its own clean energy policies.

108.    In 2004, Colorado became the first state with a voter-approved RPS. The Colorado legislature subsequently adopted greenhouse gas-reduction targets that seek to reduce emissions to 100% below 2005 levels by 2050. Colorado energy producers use wind energy to meet the state's greenhouse gas emission-reduction goals. In 2024, wind power accounted for 29% of the State's total energy generation and 67% of renewable generation in Colorado. After more than doubling its use of wind energy from 2014, according to the U.S. Energy Information Administration, Colorado ranked seventh nationwide for installed wind generating capacity as

Page 42 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

of 2024. Continued installation of wind energy is essential for Colorado to achieve its goal for 100% net reduction in statewide greenhouse gas pollution by 2050, as set forth in Colo. Rev. Stat. § 25-7-102.

109.    New Jersey is committed to reducing greenhouse gas emissions and increasing investment in clean energy to preserve a healthy environment for its residents. For instance, New Jersey's Global Warming Response Act requires the State to achieve 80% reductions from 2006 greenhouse gas emissions by 2050. 2007 N.J. Laws ch. 112 § 2; N.J. Stat. Ann. § 26:2C-38. In addition, New Jersey has set a goal of achieving 100% clean energy by 2035. N.J. Exec. Order No. 315 (Feb. 15, 2023). New Jersey's RPS plays a significant role in the State's strategy to meet its clean energy and climate goals. The RPS requires electricity suppliers to purchase renewable energy certificates/credits. *See* N.J. Stat. Ann. § 48:3-87. Electricity produced from wind energy is defined as renewable energy under New Jersey law, and renewable energy certificates/credits from wind projects that are located anywhere within or that supply electricity to the PJM region can be used to meet the RPS requirements, including from projects that are subject to the Wind Freeze. *Id.* §§ 48:3-51, 14:8-2.5(b)(3), 14:8-2.7(b). If projects subject to the Wind Freeze within the PJM service area are unable to generate electricity, fewer renewable energy certificates/credits will be available for purchase in New Jersey. As a result, New Jersey and its residents will pay more for those renewable energy certificates/credits, which will likely increase energy prices and interfere with the State's ability to ensure compliance with its RPS.

110.    Other states within the PJM service area rely on the timely development of new generation resources across the regional grid to maintain reliability, meet growing electricity demand, and moderate wholesale electricity prices. The Wind Freeze is delaying the addition of

Page 43 - [PROPOSED] COMPLAINT-IN-INTERVENTION

significant new generating capacity, exacerbating existing supply-demand imbalances as older generation retires and electricity demand continues to increase. Because PJM operates a single regional wholesale market, constrained renewable development in one part of the footprint can increase energy and capacity costs, reduce resource diversity, and heighten reliability risks for consumers and utilities throughout the region. Delays in renewable generation also threaten the ability of many PJM states to satisfy their RPS requirements, which depend on the continued availability of qualifying renewable energy resources to meet statutory clean energy targets. *See* D.C. Code § 34-1432 (requiring electricity suppliers to obtain not less than 100% of retail electricity sales from Tier 1 renewable sources beginning in 2032); N.J. Stat. Ann. § 48:3-87(d)(2) (requiring electric utilities to procure 50% renewable energy by 2030). The continued deployment of land-based wind is therefore critical to ensuring that PJM states have access to a sufficient, diverse, and cost-effective generation mix capable of supporting both grid reliability and long-term energy affordability.

**The Wind Freeze Harms Plaintiff States and Their Residents, as Ratepayers, by Increasing Electricity Costs and Threatening Grid Reliability**

111.    The Wind Freeze will drive up the cost of electricity and threaten grid reliability by constraining supply during a period of growing demand for electricity.

112.    For example, according to New York's 2025 State Energy Plan, demand for electricity, including from new large loads associated with economic development and the operation of data centers, could increase 8% by 2030 alone, with growth accelerating to 24% by 2040 and 42% by 2050.

113.    Illinois is anticipating significant load growth in the coming years, primarily related to data centers and other residential and commercial customers. According to Illinois's

Page 44 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

2025 Resource Adequacy Study, both of Illinois's regional transmission organizations (PJM and MISO) are projected to face capacity shortfalls over the coming decade unless additional new capacity resources, like wind projects, are developed.[14] PJM's resource adequacy target increases by approximately 20% between 2025 and 2030, while MISO's target grows by around 10% over the same period. New sources of electricity are required to meet these evolving needs, while simultaneously maintaining a cost-effective power supply and healthy environment for Illinois residents.

114. New Jersey and its residents have already experienced significant electricity price increases over the past year as a result of the increase in large loads, such as data centers, and the loss of new generation from planned wind projects within the PJM service area. These dynamics have tightened regional supply and demand, prompting unprecedented capacity prices: the PJM capacity market clearing price jumped from $28.92 in the 2024/2025 Delivery Year Base Residual Auction ("BRA") to $269.92 in the 2025/2026 BRA, $329.17 in the 2026/2027 BRA, and $333.44 in the 2027/2028 BRA. This price increase will cost New Jersey ratepayers close to $4 billion. In addition, the capacity market price increases have caused the State's own electricity contracts to increase significantly with respect to consumption following the 2025 BRA. The frozen, planned-for wind projects located in PJM would improve reliability and reduce pricing constraints within the PJM service area.

115. Minnesota is similarly anticipating load growth from onshoring of manufacturing, electrification, and data center development. Based on recent regulatory filings, Minnesota is

---

[14] *2025 Resource Adequacy Study*, Illinois Environmental Protection Agency, Illinois Power Agency, Illinois Commerce Commission, at pg. iv., (Dec. 15, 2025), https://ipa.illinois.gov/content/dam/soi/en/web/ipa/documents/20251215-illinois-ra-study-2025-final.pdf.

Page 45 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

anticipating 2.5 to 6.9 GW of new load from electrification and data centers. This load growth is projected over the next ten years but some of it is already showing up in the near term in filed or recently approved resource plans which are proposing to serve this demand, at least partially, with new wind resources.

116.    Meeting growing electricity demand with fossil fuel-fired generation will take longer and be more expensive than meeting electricity demand with the wind projects that are being blocked by the Wind Freeze. In many of the Plaintiff States, wind energy is one of the most cost-effective electricity resources to construct and operate. Unlike fossil fuel-dependent generation, wind projects lock in predictable costs over the life of their contracts (typically 10-25 years), insulating ratepayers from fuel price volatility and supply disruptions. Fossil fuel-fired facilities take longer to build and are often more expensive than renewable energy facilities. The cost of building a new combined cycle gas turbine has increased substantially in recent years due to turbine shortages and long delivery times, and the cost of electricity from gas-fired power plants is forecasted to rise steeply in the near term. Further, the supply of equipment (e.g., gas turbines) that would support new fossil fuel-based energy generation is currently experiencing major backlogs that impose practical constraints on construction of new fossil fuel-fired power plants.

117.    Because fossil fuel-fired facilities take longer to build and are more expensive than wind energy facilities, the Wind Freeze, which blocks the development of wind energy projects, creates a risk of capacity shortfalls in the near future.

118.    In New York, for example, the 2025 State Energy Plan warns that delays in obtaining permits for renewable energy projects are already affecting the State's energy needs. The plan found that, without near-term renewable energy additions, a significant buildout of

Page 46 - [PROPOSED] COMPLAINT-IN-INTERVENTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

additional gas generation would be needed by 2030—an expensive undertaking that may now be impracticable given the supply chain backlogs for gas turbines.

119. By preventing the development of wind energy, the Wind Freeze will increase reliance on more volatile and capital-intensive alternatives, increasing electricity prices and directly harming the States and their residents, both of which purchase electricity as ratepayers. And the Wind Freeze will further harm the States by forcing State entities to expend significant time and resources re-analyzing their energy plans to meet growing demand and secure grid reliability.

**The Wind Freeze Harms the States and Their Residents by Jeopardizing Investments, Jobs, Tax Revenues, and Other Economic Benefits**

120. The Wind Freeze also harms Plaintiff States by jeopardizing planned investments in wind energy facilities, as well as anticipated jobs, critical tax revenues, and other economic benefits expected to result from the development of onshore wind energy.

121. The Wind Freeze threatens billions of dollars in anticipated investment in Plaintiff States, including, as identified by Energy Plaintiffs, at least: $304 million in Arizona; $2.687 billion in Colorado; $4.332 billion in Illinois; $112 million in Maine; $507 million in Michigan; $1.994 billion in New Mexico; $445 million in New York; $1.177 billion in Oregon; and $2.066 billion in Washington. *See* Strunk Decl. ¶ 19.

122. The Wind Freeze further threatens to destroy the value of existing investments, including investments by Plaintiff States. Plaintiff States themselves have already invested billions of dollars in wind energy infrastructure, research and development, job-training programs, and supply chains. These investments are at risk of becoming stranded or severely diminished in value because of the Wind Freeze.

Page 47 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

123.     The Wind Freeze also jeopardizes significant employment opportunities within the States. Blocking planned wind projects will deprive Plaintiff States of thousands of jobs, including, as identified by Energy Plaintiffs, at least: 739 jobs in Arizona; 7,124 jobs in Colorado; 10,664 jobs in Illinois; 296 jobs in Maine; 1,168 jobs in Michigan; 4,710 jobs in New Mexico; 806 jobs in New York; 4,716 jobs in Oregon; and 4,532 jobs in Washington. *See* Strunk Decl. ¶ 19.

124.     The Wind Freeze likewise jeopardizes large sources of state revenue. In Arizona, for example, the State Land Department earns revenues by granting rights-of-way over certain State-owned lands to renewable energy projects. These State Land Trust revenues are an important source of funding for Arizona's K-12 public education system and its three State universities. Wind energy projects like Black Ridge that are currently being developed on State-owned land in Arizona are expected to provide tens of millions of dollars to Arizona's public education system. But the Wind Freeze has ground the permitting process to a complete standstill, threatening the viability of wind projects in Arizona and any revenue they are expected to produce.

125.     Other States similarly stand to lose billions of dollars in financial investments and tax revenue from renewable energy projects due to the Wind Freeze. For example, Colorado wind projects generated more than $10 million in state and local tax dollars and $18 million in lease payments to Colorado residents in 2022. These revenue streams are now at risk due to DoD's actions.

126.     Finally, the Wind Freeze jeopardizes other economic benefits these projects provide, including electricity bill credits and direct payments to host communities through local taxes, community benefit agreements, and host community agreements.

Page 48 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

**The Wind Freeze Harms the States and Their Residents by Interfering with State Efforts to Protect Public Health and the Environment**

127.    The Wind Freeze harms human health and the environment in Plaintiff States by impeding the States' transition to clean energy. Specifically, by reducing the amount of new generation from wind energy, the Wind Freeze perpetuates the States' reliance on fossil fuel-fired power plants that emit large quantities of harmful conventional air pollutants, including fine particulate matter, nitrogen oxides, volatile organic compounds, and other hazardous air pollutants.

128.    Fossil fuel pollution causes approximately 107,000 premature deaths each year in the United States. *See* Med. Soc'y Consortium on Climate & Health et al., *The Costs of Inaction: The Economic Burden of Fossil Fuels and Climate Change on Health in the United States* 5 (May 20, 2021), https://perma.cc/VS6U-YJFQ.

129.    This pollution imposes healthcare costs on the States. In the United States, health costs due to fossil fuel pollution currently exceed $820 billion each year. *Id.*

130.    The wind projects that the Wind Freeze is blocking are expected to alleviate healthcare costs to the States by reducing reliance on, and emissions from, fossil fuel-fired power plants. But this will not occur if the Wind Freeze remains in place.

131.    By slowing the clean energy transition, the Wind Freeze will also cause an increase in greenhouse gas emissions, which cause and contribute to climate change and its devastating impacts, such as sea-level rise, property and ecosystem loss, flooding, drought, and extreme weather events.

132.    By impeding the deployment of wind energy facilities and by stalling the transition from fossil fuels to clean sources of electricity, such as wind energy, the Wind Freeze

Page 49 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

will make it harder for States to reduce and avoid these harmful emissions.

## CLAIMS FOR RELIEF

### Count I
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)–(D)

**Arbitrary and Capricious, Not in Accordance with Law, In Excess of Statutory Authority, and Without Observance of Procedure**

133.    Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

134.    Defendant DoD, including Defendant DoD Clearinghouse, is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

135.    The Wind Freeze is a "final agency action for which there is no other adequate remedy in a court of law," within the meaning of the APA. *Id.* § 704; *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 591 (D.C. Cir. 2019).

136.    The Wind Freeze is the consummation of DoD's decision-making process concerning wind energy development in the United States. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 247 (D.C. Cir. 2014). The Wind Freeze reflects DoD's "final word" on the topic, *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 868 (9th Cir. 2022), consistent with the Administration's policy to halt wind energy development in the United States.

137.    The Wind Freeze is an action by which rights or obligations have been determined and from which legal consequences will flow. *Bennett*, 520 U.S. at 177–78; *Nat'l Mining Ass'n*, 758 F.3d at 247.

138.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious," or "not in accordance with law," 5 U.S.C.

Page 50 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

§ 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D).

139.    The Wind Freeze, which indefinitely halts all national security findings required by 49 U.S.C. § 44718, violates 5 U.S.C. § 706(2) in several ways.

140.    First, the Wind Freeze is arbitrary and capricious within the meaning of the APA. 5 U.S.C. § 706(2)(A).

141.    An agency action is arbitrary or capricious when it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation and quotation marks omitted).

142.    Additionally, agencies must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

143.    Further, when an agency changes its existing policy, it must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). An agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* An "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino*

Page 51 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

*Motorcars, LLC v. Navarro,* 579 U.S. 211, 222 (2016) (internal citation and quotation marks omitted).

144.   Agencies also must provide a more detailed justification "when [their] prior policy has engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515.

145.   Here, DoD Defendants have not provided a reasoned basis for the Wind Freeze, and the *post hoc* rationalizations they have offered in recent court filings do not satisfy their legal obligations under the APA. For months, DoD Defendants have stonewalled stakeholders and Plaintiff States, refusing to provide information on the status or timing of the DOD Clearinghouse's national security findings, and they have never provided the genuine justifications required under the law.

146.   The Wind Freeze marks a stark departure from the federal government's longstanding policy of encouraging wind energy development. DoD Defendants have also failed to provide any factual findings or explanation regarding their departure from their past policy or the findings that underlay their prior policy, much less provide "a more detailed justification" to explain any such conflicting findings. Further, in carrying out the Wind Freeze, DoD Defendants have failed to take Plaintiff States' numerous reliance interests into account. As such, DoD's Wind Freeze is arbitrary and capricious.

147.   Second, DoD's Wind Freeze is contrary to law. 5 U.S.C. § 706(2)(A).

148.   DOD has a statutory obligation to transmit a national security finding to the Secretary of Transportation so that the FAA can make a hazard determination. 49 U.S.C. § 44718(b), (f). Pursuant to 49 U.S.C. § 44718, an applicant seeking to build a structure that is more than 200 feet above ground level must notify the Secretary of Transportation. *Id.*

Page 52 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

§ 44718(a); 14 C.F.R. §§ 77.5, 77.9. The Secretary of Transportation, through the FAA, "shall" conduct a study and provide a report disclosing the extent of adverse impacts on the safe and efficient use of navigable airspace that will result from the proposed project. 49 U.S.C. § 44718(b). That report "shall" also include unacceptable risks to national security as determined by the Secretary of Defense. *Id.* § 44718(b)(1)(B), (f). The Secretary of Defense, through the DoD Clearinghouse, "shall" make a finding as to whether the proposed project would "result in an unacceptable risk to the national security of the United States" and transmit that finding to the Secretary of Transportation so that the Secretary of Transportation can make a hazard determination. *Id.* § 44718(f); *see also* 10 U.S.C. § 183a (DoD Clearinghouse); 14 C.F.R. § 77.31 (hazard determinations).

149.    DoD regulations also set forth a strict timeline for the DoD Clearinghouse's review of Section 44718 applications. 32 C.F.R. § 211.6. DoD components that have an interest in a proposed project have "no later than 20 days" to provide comments and recommendations to the Clearinghouse. *Id.* § 211.6(a)(2). The DoD Clearinghouse has 30 days after receiving the application from the Secretary of Transportation to make a finding as to whether the proposed project has an adverse impact and whether the adverse impact requires mitigation. *Id.* § 211.6(a)(1)(3). Mitigation discussions, if required, "shall not extend more than 90 days beyond the initial notification to the applicant" of the adverse impact determination. *Id.* § 211.6(b)(1). The DOD Clearinghouse must seek an extension of time from the Secretary of Transportation if more time is required to consider an application. *Id.* § 211.6(d). No extension of time has been sought with respect to any wind project.

150.    5 U.S.C. § 555 (b) also requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it," and 5 U.S.C. § 558(c) similarly requires that

Page 53 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

agencies act on an "application . . . for a license" (a term that is defined broadly in 5 U.S.C. § 551(8)) "within a reasonable time."

151.    The Wind Freeze violates these statutory and regulatory authorities and therefore is contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A).

152.    Third, the Wind Freeze exceeds DoD statutory authority in violation of 5 U.S.C. § 706(2)(C).

153.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt*, 338 U.S. 632, 644 (1950)).

154.    An agency thus may not take any action that exceeds the scope of its statutory authority.

155.    DoD Defendants have no statutory authority to freeze their issuance of national security findings. Congress specifically directed DoD Defendants, particularly the DoD Clearinghouse, to make these findings in accordance with specific timeframes. Yet the Wind Freeze ignores Congress's clear instruction. DoD Defendants have no authority to issue a policy that deviates from statutory and regulatory timeframes, let alone one that halts the findings altogether.

156.    Fourth, the Wind Freeze is without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

157.    The Wind Freeze revised DoD's regulations for processing a national security finding. When issuing such legislative rules, federal agencies are required to follow the notice-and-comment process set forth in the APA. The agency must first publish a "[g]eneral

Page 54 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

notice of proposed rule making" in the Federal Register, *id.* § 553(b), that describes "either the terms or substance of the proposed rule or a description of the subjects and issues involved," *id.* § 553(b)(3). The agency must further provide "interested persons" an "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c).

158.    No such procedure accompanied the Wind Freeze. The policy has not been made public for notice and comment. And interested parties have had no opportunity to participate.

159.    DoD's failure to articulate a satisfactory explanation and make a reasoned decision is also agency action "without observance of procedure" in violation of 5 U.S.C. § 706(2)(D).

160.    For all these reasons, the Wind Freeze violates 5 U.S.C § 706(2) and should be vacated.

**Count II**
**Administrative Procedure Act, 5 U.S.C. § 706(1)**
**Unlawful Withholding and Unreasonable Delay of Agency Action**

161.    Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

162.    The APA authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). Relief is warranted under this provision where an agency completely fails to take, or unreasonably delays in taking, "a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted); *see id.* at 63 n.1.

163.    By statute, DoD's national security finding is a discrete agency action that DoD

Page 55 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

Defendants are required to take. The Secretary of Defense, through the DoD Clearinghouse, "shall" make a finding as to whether the proposed project would "result in an unacceptable risk to the national security of the United States" and transmit that finding to the Secretary of Transportation so that the Secretary of Transportation can make a hazard determination. 49 U.S.C. § 44718(f); *see also* 10 U.S.C. § 183a (codifying the DoD Clearinghouse); 14 C.F.R. § 77.31 (hazard determinations).

164.    In addition, if the DoD Clearinghouse issues a notice of presumed risk, it "shall provide the same notice to the governor of the State in which the project is located and request that the governor provide the DoD Clearinghouse any comments the governor believes of relevance to the application." 10 U.S.C. § 183a(c)(3). The DoD Clearinghouse also "shall ensure that a governor has at least 30 days after the date on which the governor receives the notice of presumed risk to provide any such comments and shall provide detailed information and other information necessary to ensure that the governor can fully understand the nature of the presumed risk." *Id.* In addition, the "Secretary of Defense shall consider the comments of the governor in the Secretary's evaluation of whether the project presents an unacceptable risk to the national security of the United States and shall include the comments with the finding provided to the Secretary of Transportation pursuant to section 44718(f) of title 49." *Id.*

165.    These are mandatory, discrete statutory duties that the DoD Clearinghouse and Secretary of Defense must perform. Upon information and belief, the Clearinghouse and the Secretary of Defense have unlawfully withheld these mandatory duties in violation of 5 U.S.C. § 706(1).

166.    DoD Defendants have also unreasonably delayed agency action.

CHH/ls8/1027710804

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

167.     DoD regulations set forth a strict timeline for the DoD Clearinghouse's review of Section 44718 applications. 32 C.F.R. § 211.6. DoD components that have an interest in the proposed project have "no later than 20 days" to provide comments and recommendations to the Clearinghouse. *Id.* § 211.6(a)(2). The DoD Clearinghouse has 30 days after receiving the application from the Secretary of Transportation to make a finding as to whether the proposed project has an adverse impact and whether the adverse impact requires mitigation. *Id.* § 211.6(a)(1)(3). Mitigation discussions, if required, "shall not extend more than 90 days beyond the initial notification to the applicant" of the adverse impact determination. *Id.* § 211.6(b)(1). DoD must seek an extension of time from the Secretary of Transportation if more time is required to consider an application. *Id.* § 211.6(d).

168.     DoD has not transmitted to the Secretary of Transportation national security findings for hundreds of onshore wind projects across the country. The length of delay varies by project, but all exceed DoD's historical processing times and the statutory and regulatory timeframes. This amounts to unreasonable delay.

169.     Because DoD failed to timely transmit to the Secretary of Transportation a national security finding as required under 49 U.S.C. § 44718(f), it engaged in unlawful withholding and unreasonable delay of agency action within the meaning of 5 U.S.C. § 706(1).

170.     For the foregoing reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to declaratory relief and a preliminary and permanent injunction compelling Defendants to undertake the activities of the DoD Clearinghouse that Defendants have unlawfully withheld and unreasonably delayed.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States request that this Court:

1.      Enter judgment for Plaintiff States against DoD Defendants;

2.      Vacate or set aside DoD's Wind Freeze policy;

3.      Declare that DoD Defendants have unlawfully withheld or unreasonably delayed agency action;

4.      Enjoin Defendants (1) from continuing to implement the Wind Freeze and (2) from failing to comply with the DoD Clearinghouse's review of Section 44718 applications set forth in 32 C.F.R. § 211.6.

5.      Order DoD to provide copies of notices of presumed risk for all projects pending with the Clearinghouse to Plaintiff State Governors as required by 10 U.S.C. § 183a(b)(3) within 30 days of the Court's order;

6.      Award Plaintiff States their litigation costs and reasonable attorneys' fees; and

7.      Order such other relief as the Court may deem just and proper.


Dated: July 16, 2026                              Respectfully submitted,

                                                  **DAN RAYFIELD**
                                                  Attorney General of Oregon

                                                  By:  */s/ Coby Howell*
                                                  COBY HOWELL #253434
                                                  *Senior Assistant Attorney General*
                                                  PATRICK T. JOHNSON #260534
                                                  *Assistant Attorney General*
                                                  100 SW Market Street
                                                  Portland, OR 97201
                                                  Tel (971) 673-1880
                                                  Fax (971) 673-5000
                                                  Coby.Howell@doj.oregon.gov
                                                  Patrick.t.johnson@doj.oregon.gov

                                                  *Counsel for the State of Oregon*


Page 58 -  [PROPOSED] COMPLAINT-IN-INTERVENTION
       CHH/ls8/1027710804

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Joanna Brinkman*
CARA HENDRICKSON
*Executive Deputy Attorney General*
JOANNA BRINKMAN
*Complex Litigation Counsel*
CAITLIN KELLY
MOLLY MAUCK
ALICE RIECHERS
*Assistant Attorneys General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov
Joanna.Brinkman@ilag.gov
Caitlin.Kelly@ilag.gov
Molly.Mauck@ilag.gov
Alice Riechers@ilag.gov

*Counsel for the State of Illinois*

**KRISTIN K. MAYES**
Attorney General of Arizona

By: */s/ Mary M. Curtin*
MARY M. CURTIN (SBN 031973)
*Senior Litigation Counsel*
ANDY McCOY (SBN 039783)
*Assistant Attorney General*
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-3333
Mary.Curtin@azag.gov
Andy.McCoy@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Matthew Eisenson*
MONICA WAGNER
*Deputy Bureau Chief*
MATTHEW EISENSON
*Assistant Attorney General*
LIBBY DIMENSTEIN
*Special Assistant Attorney General*
Environmental Protection Bureau
28 Liberty Street
New York, NY 10005
(212) 416-6351
Monica.Wagner@ag.ny.gov

*Counsel for the State of New York*

**ROB BONTA**
Attorney General of California

VANESSA C. MORRISON
Supervising Deputy Attorney General

By: */s/ Rafael J. Hurtado*
RAFAEL J. HURTADO
BRIAN CALAVAN
*Deputy Attorneys General*
600 West Broadway, Suite 1800
San Diego, CA 92101
Tel: (619) 321-5780
Fax: (916) 732-7920
Rafael.Hurtado@doj.ca.gov

*Counsel for the State of California*

Page 59 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ Carrie*
*Noteboom*
CARRIE NOTEBOOM (Colo. #52910)
*Assistant Deputy Attorney General*
JESSICA L. LOWREY (Colo. #45158)
*First Assistant Attorney General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Carrie.Noteboom@coag.gov
Jessica.Lowrey@coag.gov

*Counsel for the State of Colorado*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: /s/ *Vanessa L. Kassab*
IAN R. LISTON
*Director of Impact Litigation*
RALPH K. DURSTEIN III
VANESSA L. KASSAB
*Deputy Attorneys General*
ROBIN L. JACOBS
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Jill Lacedonia*
Jill Lacedonia
*Assistant Attorney General*
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Jill.Lacedonia@ct.gov
860-808-5250

*Counsel for the State of Connecticut*

**AARON M. FREY**
Attorney General of Maine

By: */s/ Caleb Elwell*
CALEB E. ELWELL
*Assistant Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, Maine 04333
(207) 626-8545
Caleb.Elwell@Maine.gov

*Counsel for the State of Maine*

Page 60 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Steven J. Goldstein*
Steven J. Goldstein
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6414
sgoldstein@oag.maryland.gov

*Counsel for the State of Maryland*


**DANA NESSEL**
Attorney General of Michigan

By: */s/ Lucas Wollenzien*
Lucas Wollenzien
Michael Moody
Neil Giovanatti
*Assistant Attorneys General*
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909
(517) 335-7627
WollenzienL@michigan.gov
Moodym2@michigan.gov
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: /s/ *Turner Smith*
Turner Smith
*Deputy Chief & Assistant Attorney General*
Nathaniel Haviland-Markowitz
*Assistant Attorney General*
Jon Whitney
*Special Assistant Attorney General*
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 727-2200
Turner.Smith@mass.gov

*Counsel for the Commonwealth of Massachusetts*


**KEITH ELLISON**
Attorney General of Minnesota

By: */s/ Cat Rios-Keating*
Cat Rios-Keating
*Special Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
651-300-7302
Catherine.Rios-Keating@ag.state.mn.us

*Counsel for the State of Minnesota*


Page 61 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804

**AARON D. FORD**
Attorney General of Nevada

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*


**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Rachel Manning*
JESSICA PALMER
*Assistant Attorney General*
RACHEL MANNING
*Deputy Attorney General*
New Jersey Division of Law
25 Market Street, P.O.
Box 093
Trenton, NJ 08625-0093
609-376-2740
Jessica.Palmer@law.njoag.gov
Rachel.Manning@law.njoag.gov

*Counsel for the State of New Jersey*


**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Thomas Silva*
Thomas Silva
*Honors Attorney*
408 Galisteo Street
Santa Fe, New Mexico 87501
Tel. (505) 681-4894
TSilva@nmdoj.gov

*Counsel for the State of New Mexico*


**PETER F. NERONHA**
Attorney General of Rhode Island

By: /s/ Rachel Rebello
RACHEL REBELLO
*Special Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2063
rrebello@riag.ri.gov

*Counsel for the State of Rhode Island*


**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Yuriy Korol*
YURIY KOROL
*Assistant Attorney General*
Washington Attorney General's Office
Environmental Protection Division
800 5th Ave Ste. 2000 TB-14
Seattle, WA 98104-3188
(206) 717-0096
Yuriy.Korol@atg.wa.gov

*Counsel for the State of Washington*


**BRIAN L. SCHWALB**
Attorney General for the District of
Columbia

*/s/ Lauren Cullum*
LAUREN CULLUM
*Special Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 6th Street, N.W., 10th Floor
Washington, D.C. 20001
lauren.cullum@dc.gov

*Counsel for the District of Columbia*


Page 62 - [PROPOSED] COMPLAINT-IN-INTERVENTION
CHH/ls8/1027710804