Michael Giaquinto, OSB No. 246342
MORGAN LEWIS & BOCKIUS LLP
300 South Grand Ave., 22nd Floor
Los Angeles, CA  90071-3132
T: 213-612-7227
michael.giaquinto@morganlewis.com

Jennifer Trock (*pro hac vice*)
Douglas Hastings (*pro hac vice*)
1111 Pennsylvania Ave., NW
Washington, D.C.  20004
T: 202-739-3000
jennifer.trock@morganlewis.com
douglas.hastings@morganlewis.com

Ella Foley Gannon (*pro hac vice*)
600 Montgomery Street, Suite 2300
San Francisco, CA  94111-2725
T: 415-442-1000
ella.gannon@morganlewis.com

*Attorneys for Plaintiffs (except Las Crestas Wind Energy, LLC)*

Darin Sands, OSB No. 106624
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR  97209
T: +1 503-734-2480
dsands@bradleybernstein.com

Richard W. Smith (*pro hac vice*)
Kathleen Mueller (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C.  20005
T: 202-736-8000
rwsmith@sidley.com
kmueller@sidley.com

*Attorneys for Plaintiff Las Crestas Wind Energy, LLC*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### PORTLAND DIVISION

| | |
|---|---|
| RENEWABLE NORTHWEST, *et al.*,<br><br>　　　　　　　　　*Plaintiffs*,<br><br>　　v.<br><br>PETER B. HEGSETH, *et al.*,<br><br>　　　　　　　　　*Defendants.* | Case No.: 3:26-cv-01092-IM<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**<br><br>**Pursuant to Fed. R. Civ. P. 65**<br>*Request for Oral Argument* |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

    I.     Plaintiffs Seek a Prohibitory Stay or Preliminary Injunction That Preserves
        the Status Quo. ....................................................................................................... 3

    II.    Plaintiffs Are Likely to Succeed on the Merits......................................................... 6

        A.    Plaintiffs Challenge Reviewable Agency Conduct. .................................... 6

        B.    Plaintiffs Are Likely to Succeed on Their 706(2) Claim. ........................... 6

               1.    DoD did not provide a reasoned basis for its decision.................... 6

               2.    DoD failed to consider statutorily required factors and
                    ignored wind developers' reliance interests.................................. 11

               3.    DoD's freeze is unlawful because it prohibits compliance
                    with statutory and regulatory deadlines. ...................................... 12

               4.    DoD changed its regulations without notice-and-comment
                    rulemaking. .................................................................................. 14

               5.    DoD was motivated by impermissible bias. ................................. 15

        C.    Plaintiffs Are Likely to Succeed on Their 706(1) Claim. ......................... 18

               1.    DoD has unlawfully withheld statutorily required agency
                     actions. ........................................................................................ 18

               2.    Alternatively, DoD has unreasonably delayed required
                    actions. ........................................................................................ 22

    III.   Plaintiffs Have Demonstrated Irreparable Harm. ................................................. 22

    IV.   The Balance of Equities and Public Interest Favor Preliminary Relief. .............. 24

CONCLUSION................................................................................................................... 27

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR
PRELIMINARY INJUNCTION**

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A&M Records, Inc. v. Napster, Inc.*,
284 F.3d 1091 (9th Cir. 2002) ...............................................................................................5

*Al Otro Lado v. Executive Office for Immigration Review*,
138 F.4th 1102 (9th Cir. 2025) .......................................................................................19, 21

*Alaska Urological Inst. v. U.S. Small Bus. Admin.*,
619 B.R. 689 (D. Alaska 2020)...............................................................................................7

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ..............................................................................................23

*American Federation of Government Employees, AFL-CIO v. Trump*,
178 F.4th 456 (9th Cir. 2026) ...............................................................................................18

*Arizona Dream Act Coalition v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ................................................................................................4

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ...........................................................................................5, 6

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
780 F. Supp. 3d 897 (N.D. Cal. 2025) ....................................................................................8

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)..........................................................................................................17, 18

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)..............................................................................................................7, 12

*Diversified Mortg. Invs. v. U.S. Life Ins. Co. of N.Y.*,
544 F.2d 571 (2d Cir. 1976)....................................................................................................5

*Doe v. Trump*,
No. 1:25-cv-13946-JEK, 2026 WL 1170971 (D. Mass. Apr. 30, 2026) ...............................22

*Dorfmann v. Boozer*,
414 F.2d 1168 (D.C. Cir. 1969).............................................................................................5

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ................................................................................................23

ii

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR
PRELIMINARY INJUNCTION**

*Easterday Dairy, LLC v. Fall Line Cap., LLC,*
No. 2:22-CV-01000-HL, 2022 WL 17104572 (D. Or. Nov. 22, 2022)...................................23

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,*
82 F.4th 664 (9th Cir. 2023) ...........................................................................................3, 4

*In re Pesticide Action Network N. Am.,*
798 F.3d 809 (9th Cir. 2015) ................................................................................................22

*Indep. Guard Ass'n of Nev., Local No. 1 v. O'Leary,*
57 F.3d 766 (9th Cir. 1995) ..................................................................................................15

*Invenergy Renewables, LLC v. United States,*
422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ..........................................................................26

*Kirwa v. U.S. Department of Defense,*
285 F. Supp. 3d 257 (D.D.C. 2018) .......................................................................................26

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983)..........................................................................................................11, 16, 18

*New York v. Trump,*
811 F. Supp. 3d 215 (D. Mass. 2025) ..............................................................................13, 16

*Perez v. Mortg. Bankers Ass'n,*
575 U.S. 92 (2015)................................................................................................................15

*RENEW Ne. v. U.S. Dep't of Interior,*
No. 25-cv-13961, 2026 WL 1078282 (D. Mass. Apr. 21, 2026)................................13, 16, 27

*Revolution Wind, LLC v. Burgum,*
No. 1:25-cv-02999 (D.D.C. Jan. 12, 2026).........................................................................10

*Senate of Cal. v. Mosbacher,*
968 F.2d 974 (9th Cir. 1992) .................................................................................................5

*State v. U.S. Dep't of Interior,*
363 F. Supp. 3d 45 (D.D.C. 2019) .......................................................................................17

*Sunrise Wind, LLC v. Burgum,*
No. 1:26-cv-00028 (D.D.C. Feb. 2, 2026)...........................................................................11

*Tang v. Chertoff,*
493 F. Supp. 2d 148 (D. Mass. 2007) ..................................................................................21

*Telecommunications Research and Action Center v. F.C.C.,*
750 F.2d 70 (D.C. Cir. 1984).................................................................................................22

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR
PRELIMINARY INJUNCTION**

*Thomas v. Cnty. of L.A.*,
   978 F.2d 504 (9th Cir. 1993) .................................................................................5

*Trump v. Hawaii*,
   585 U.S. 667 (2018)............................................................................................18

*Tummino v. Hamburg*,
   936 F. Supp. 2d 162 (E.D.N.Y. 2013) ................................................................17

*Twinco, Inc. v. U.S. Small Bus. Admin.*,
   No. CV-24-5061-BHS, 2026 WL 322876 (W.D. Wash. Feb. 6, 2026)...................7

*Va. Elec. & Power Co. v. U.S. Dep't of the Interior*,
   No. 2:25-cv-830 (E.D. Va. Jan. 16, 2026) ...........................................................11

*Vineyard Wind 1, LLC v. U.S. Dep't of the Interior*,
   No. 26-10156 (D. Mass. Jan. 27, 2026) ...............................................................11

*Washington v. Trump*,
   145 F.4th 1013 (9th Cir. 2025), *cert. denied*, No. 25-364, 2026 WL 1871300 (U.S.
   June 30, 2026)......................................................................................................23

*Washington v. U.S. Department of Transportation*,
   792 F. Supp. 3d 1147 (W.D. Wash. 2025)............................................................24

*Winter v. NRDC*,
   555 U.S. 7 (2008)................................................................................................11

*Woods Petroleum Corp. v. U.S. Dep't of Interior*,
   18 F.3d 854 (10th Cir. 1994) ..............................................................................17

**STATUTES**

5 U.S.C. § 553(a) .......................................................................................................15

5 U.S.C. § 706(1) ................................................................................................. passim

5 U.S.C. § 706(2) ................................................................................................. passim

10 U.S.C. § 183a................................................................................................. passim

Pub. L. No. 111-383, 124 Stat. 4137 (2011)..........................................................12, 26

**REGULATIONS**

32 C.F.R. § 211.4......................................................................................................12

32 C.F.R. § 211.6..............................................................................................14, 15, 21

iv

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR
PRELIMINARY INJUNCTION**

**TABLE OF ABBREVIATIONS**

| Abbreviation | Term |
|---|---|
| ACP | American Clean Power Association |
| Clearinghouse | Military Aviation and Installation Assurance Siting Clearinghouse |
| DoD | Department of Defense |
| DNH | Determination of No Hazard |
| EPC | Engineering Procurement and Construction |
| FAA | Federal Aviation Administration |
| GECA | Green Energy Consumers Alliance |
| May 7 Memorandum | May 7, 2026 Interim Guidance Regarding Compliance with Established Military Aviation and Installation Assurances Siting Clearinghouse Procedures |
| Member Organization Plaintiffs | Plaintiffs Renewable Northwest Advanced Power Alliance, Alliance for Clean Energy New York, Inc., Clean Grid Alliance, Interwest Energy Alliance, Maine Renewable Energy Association, RENEW Northeast, and Southern Renewable Energy Association |
| MRT | Mitigation Response Team |
| NPR | Notice of Presumed Risk |
| PPA | Power Purchase Agreement |
| REC | Renewable Energy Credit |

v

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

## **INTRODUCTION**

This case is not about whether DoD may consider national security concerns when reviewing wind-energy projects. Congress required DoD to do exactly that in 10 U.S.C. § 183a. It is about whether DoD may abandon without legally sufficient justification the statutory review process Congress established for evaluating those concerns. The answer is that it cannot.

Beginning in August 2025, DoD adopted an across-the-board policy suspending the Clearinghouse review process for wind-energy projects. DoD did not disclose that policy to affected developers until April and May 2026, despite repeated requests for information from Congress, the wind industry, and other stakeholders. Even then, the agency offered only generalized references to "national security," "military risks," and "interagency coordination," never explaining why those concerns necessitated abandoning the project-specific review and mitigation process Congress established. Faced with that void, Defendants rely principally on a declaration crafted for this litigation by Assistant Secretary Hon. Dale R. Marks. That declaration is classic post-hoc rationalization that cannot supply the agency's reasoning. But even if considered, it does not justify DoD's action. At most, it asserts that there are additional military and technological developments for the Clearinghouse to evaluate. It does not explain why those developments required the Clearinghouse to stop evaluating wind-energy projects through the statutory process Congress prescribed.

The APA required DoD to justify its extraordinary decision to abandon its statutory review process. It required DoD to explain why its policy change was necessary, to consider the factors Congress directed it to weigh, to account for the substantial reliance interests created by its longstanding review process, and to comply with the statutory and regulatory framework governing that process. DoD did none of those things. Instead, it violated mandatory deadlines,

1

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR
PRELIMINARY INJUNCTION**

effectively amended its regulations without notice-and-comment rulemaking, and ultimately based its decision on considerations outside the factors Congress authorized it to consider. Plaintiffs are therefore likely to succeed on the merits.

Plaintiffs do not ask the Court to second-guess DoD's substantive military judgments, dictate the outcome of any project-specific review, or require approval of any wind-energy project. They ask only for a return to the status quo that existed before August 2025 in which DoD performed the individual review Congress required under Section 183a.

Such relief is necessary because Plaintiffs are suffering immediate and irreparable harm. The practical effect of DoD's suspension is that wind-energy projects cannot obtain FAA DNHs that are necessary for financing, permitting, contractual performance, construction, and tax-credit eligibility. Defendants' suggestion that those harms are merely "economic" ignores that the freeze is disrupting wind developers' operations, contractual obligations, business relationships, and project timelines in ways that cannot be remedied after final judgment. The government is immune from damages, and by the time the Court enters final judgment, many projects may have passed the point at which they can be built.

Finally, the public interest and balance of the equities weigh heavily in Plaintiffs' favor. Defendants generically point to "national security," but Plaintiffs' requested relief would not prevent DoD from addressing any national security concern. It would simply restore the statutory review process through which Congress directed DoD to evaluate those concerns. On the other side, DoD's freeze is disrupting utilities that are relying on planned generation, hindering U.S. energy security, increasing costs to consumers, and harming both local economies and the national economy. Plaintiffs therefore respectfully request that the Court stay or preliminarily enjoin DoD's review freeze, require DoD to resume processing wind project reviews in the ordinary

2

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

course, and direct DoD to provide status reports every thirty days on its progress in conducting the reviews Congress required.

<div align="center"><u>**ARGUMENT**</u></div>

**I.    Plaintiffs Seek a Prohibitory Stay or Preliminary Injunction That Preserves the Status Quo.**

Plaintiffs seek a standard prohibitory injunction that restores the last uncontested status quo pending resolution of this case. Defendants' contention that the requested relief is a "mandatory" preliminary injunction subject to a heightened standard is incorrect. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684-85 (9th Cir. 2023).

The relevant status quo is straightforward. Before August 2025, DoD reviewed wind-energy projects under the process Congress established in Section 183a. That longstanding practice is confirmed by declarants with decades of firsthand Clearinghouse experience, including the Clearinghouse's founding Executive Director. Ex. A (Belote Decl. ¶ 6); Ex. D (Doyle Decl. ¶ 3). Plaintiffs ask only that the Court prohibit DoD from continuing to implement its subsequent policy suspending the review process during this litigation. *See* ECF No. 14 at 37. Enjoining that policy restores the parties to the relationship that existed before DoD adopted the challenged policy; it does not alter it.

Defendants argue that the injunction is mandatory because, if the freeze is enjoined, DoD would be required to "take action." ECF No. 90 at 24 ("DoD Br."). But that conflates the consequence of restoring the status quo with the character of the injunction. The Ninth Circuit has repeatedly held that an injunction restoring the status quo pending litigation remains prohibitory even when existing law or the parties' prior relationship requires the defendant to take affirmative steps after the challenged policy is enjoined.

<div align="right">3</div>

<div align="center">**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**</div>

Two Ninth Circuit precedents illustrate the point. In *Fellowship of Christian Athletes*, the school district argued that restoring recognition to a student organization would require affirmative action. 82 F.4th at 684-85. The Ninth Circuit nevertheless found the injunction prohibitory because it restored the status quo that existed before the school district changed its challenged policy. *Id*. Similarly, in *Arizona Dream Act Coalition*, Arizona argued that an injunction would require it to issue driver's licenses and was therefore mandatory. 757 F.3d 1053, 1058-61 (9th Cir. 2014). Again, based on an evaluation of the status quo when the controversy arose, the Ninth Circuit found that the injunction was prohibitory as it merely restored the legal relationship that existed before Arizona adopted its new policy; the action that Arizona would need to take (processing certain license applications) was necessitated by independent state law not the injunction. *Id.* at 1061.

The same reasoning controls here. DoD does not meaningfully dispute that the parties' legally relevant relationship before this controversy arose was one in which DoD processed wind-energy projects under Section 183a. DoD's freeze—not Plaintiffs' requested injunction—alters the status quo. Restoring that status quo by enjoining DoD's freeze is prohibitory relief. *Fellowship of Christian Athletes*, 82 F.4th at 684-85; *Ariz. Dream Act Coal.*, 757 F.3d at 1061. To the extent DoD must thereafter resume performing statutory duties, that obligation arises from the statutes and regulations Congress already enacted, not from the injunction itself. *Ariz. Dream Act Coal.*, 757 F.3d at 1061.

Additionally, contrary to Defendants' assertion, Plaintiffs' request for periodic status reports does not transform the injunction into a mandatory one. That relief would not require DoD to act on any particular application under a particular schedule; it would merely require it to provide the court with aggregated information regarding the status of the Clearinghouse

4

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

processing. District courts possess broad authority to supervise compliance with their injunctions, and modest reporting requirements are routinely upheld when they facilitate enforcement of otherwise proper injunctive relief. *See Thomas v. Cnty. of L.A.*, 978 F.2d 504, 510 (9th Cir. 1993); *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1099 (9th Cir. 2002).

Nor would the requested injunction afford Plaintiffs all the relief they seek on the merits. Plaintiffs seek only an order preventing DoD from continuing to implement its policy suspending Clearinghouse review for wind-energy projects, together with compliance reports demonstrating adherence to that injunction. *See* ECF No. 14 at 37. That order would last only pending final judgment—if Defendants ultimately prevail on the merits, DoD's challenged policy would no longer be enjoined and it could resume its freeze.

By contrast, Plaintiffs' requested final judgment would afford materially broader relief, including: vacatur of the unlawful policy, declaratory relief, and orders requiring DoD to act within specific timelines for applications in various stages of the review process, and to act on the specific applications of the Developer plaintiffs. *See* ECF No. 36 at 79-81.

Defendants' authorities are distinguishable because they each involved preliminary relief that could not readily be undone after final judgment. *See Senate of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992); *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969); *Diversified Mortg. Invs. v. U.S. Life Ins. Co. of N.Y.*, 544 F.2d 571, 575 (2d Cir. 1976). Here, by contrast, if Defendants ultimately prevail, DoD could resume its freeze, and the injunction would not require any specific outcome in the interim. Nor does *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) support Defendants' position. There, the Tenth Circuit declined to decide whether the

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR
PRELIMINARY INJUNCTION**

preliminary injunction sought was mandatory because it held that the plaintiffs were entitled to a preliminary injunction even under the higher standard.[1]

Accordingly, Plaintiffs properly seek a standard prohibitory injunction that preserves the status quo pending adjudication on the merits.

## II.    Plaintiffs Are Likely to Succeed on the Merits

### A.    Plaintiffs Challenge Reviewable Agency Conduct.

Defendants attempt to avoid analysis of the preliminary injunction factors by reiterating their threshold jurisdictional arguments. DoD Br. at 27. Those arguments are incorrect for all the reasons discussed in Plaintiffs' Opposition to Defendants' Motion to Dismiss filed on July 13, 2026—in short, Plaintiffs challenge a specific DoD policy freezing its review process and DoD's refusal to perform specific statutorily required duties. *See* ECF No. 91.

### B.    Plaintiffs Are Likely to Succeed on Their 706(2) Claim.

Once Defendants' jurisdictional arguments are discarded, it becomes clear that DoD's freeze is arbitrary, capricious, contrary to law, and promulgated without observance of required procedures under 5 U.S.C. § 706(2) ("Section 706(2)").

#### 1.    *DoD did not provide a reasoned basis for its decision.*

The central defect in DoD's action is that DoD has never justified the policy Plaintiffs actually challenge: an across-the-board suspension of the Clearinghouse review process for wind-energy projects. Plaintiffs do not dispute that national-security threats evolve or that DoD may update its internal methodology. Section 183a exists precisely so DoD can evaluate those concerns through individualized review and, where necessary, through project-specific mitigation. But

---

[1] As in *Awad*, the strong likelihood of success and significant irreparable harm here mean that Plaintiffs' motion should be granted even to the extent that the higher mandatory injunction standard applies.

6

neither the contemporaneous record nor the Marks Declaration explains why those concerns required DoD to suspend the statutory review and mitigation process rather than address them through it.

The contemporaneous materials Defendants identify—the May 7 Memorandum and April 8 letter to ACP—were themselves issued months after the freeze was implemented in August 2025, and they invoke generalized concepts such as "national security," "modern military risks," and "interagency coordination." Those statements do not identify any project-specific concern, any failure of existing mitigation measures, any changed circumstance requiring a nationwide suspension, or any reason why DoD could not continue individualized review while purportedly updating its methodology.

Defendants cannot supply the missing rationale through the Marks Declaration because it is quintessential pos-hoc rationalization. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22–23 (2020). The contemporaneous record said nothing about the new justifications now emphasized in that declaration, including drone technology, Ukraine's "Operation Spiderweb," and recent unauthorized drone sightings. ECF No. 90-1 ¶¶ 17, 40, 73-79 ("Marks Decl."). Treating those new explanations as mere elaboration on "national security" and "military risks" would eviscerate the post-hoc rationalization rule and its core administrative-law values. *See Regents of the Univ. of Cal.*, 591 U.S. at 4. Indeed, courts in the Ninth Circuit have consistently held that such "supplemental" information cannot provide the basis for an agency decision. *See Twinco, Inc. v. U.S. Small Bus. Admin.*, No. CV-24-5061-BHS, 2026 WL 322876, at *4 (W.D. Wash. Feb. 6, 2026); *see also Alaska Urological Inst. v. U.S. Small Bus. Admin.*, 619 B.R. 689, 703 (D. Alaska 2020) (declining to consider materials the government characterized as "fuller explanation" where the record offered no explanation relevant to those issues); *Cmty. Legal Servs.*

7

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

*in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897, 916-17 (N.D. Cal. 2025) (rejecting post-hoc information where the agency's initial record failed to show a "minimal level of analysis" on those issues).

Even if the Court considered the Marks Declaration, it still would not justify DoD's action. The declaration generally asserts that there have been recent operational developments, evolving military technologies, and changing threats. *See* Marks Decl. ¶¶ 17, 40, 73-79. But it never explains why those developments required DoD to suspend the project-specific review process Congress prescribed, much less identify any studies or analysis that would allow the Court to evaluate whether a nationwide suspension was warranted. Ex. C (Chupein Decl. ¶¶ 13, 15).[2] At most, the declaration asserts that there are additional considerations for the Clearinghouse to assess during its review. It does not provide a plausible basis for eschewing the statutorily mandated process altogether. *See* Ex. B ¶ 15; Ex. D ¶ 8.

The specific examples Marks offers only underscore the lack of connection between the problems identified and the solution implemented. Marks points to drone incursions near Edwards Air Force Base in California. But those incursions were detected and tracked by DoD notwithstanding thousands of wind turbines in the area. *See* Ex. A ¶ 25; Ex. B ¶ 10. Marks does not contend that those turbines interfered with detection of or response to the drone incursion, identify any technical analysis showing that existing mitigation failed, compare detection capability at Edwards to installations without nearby turbines, or explain why that incident

---

[2] The Marks Declaration also contains numerous statements about DoD's freeze and its review process in general that are inaccurate or fail to provide critical context, including its description of the Clearinghouse's origins, historical DHS participation, adaptation of the Clearinghouse to new information, and the current status of review of wind-energy projects. *See, e.g.*, Ex. A ¶¶ 2, 22-23, 47-49, 60-64; Ex. D ¶¶ 13-20; Ex. B (Blackman Decl. ¶¶ 26-27); Ex. C ¶¶ 5-8, 13-15.

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR
PRELIMINARY INJUNCTION**

required freezing wind-energy reviews across the board rather than continuing project-specific review.

Marks also invokes heightened drone risks more generally to support the policy. Plaintiffs do not dispute that drones present evolving national-security concerns. But a generalized increase in drone risk does not explain why DoD had to suspend the statutory review process for proposed wind-energy projects. DoD has not identified any issue related to detection of drones or the mitigation of possible radar interference from wind turbines that could not be addressed through individualized review. The Clearinghouse has historically addressed evolving threats (including drone threats), new compatibility concerns, and classified information through project-specific review and mitigation, not categorical suspension. Ex. D ¶¶ 7-12; Ex. C ¶¶ 9-15; Ex. A ¶¶ 24-26. And there is no evidence of any operational failure of existing mitigation measures, any drone-specific wind-turbine research underway that could require a freeze, or any technical basis for abandoning project-specific review. Ex. B ¶¶ 6-17, 23-24.

Similarly, Operation Spiderweb does not supply the missing explanation. As Marks describes it, that operation involved drones covertly transported inside Russia by truck and launched near Russian air bases. Marks Decl. ¶¶ 43-48. That scenario does not show that wind turbines impaired drone detection or that existing wind-turbine mitigation measures failed. Nor does it explain why DoD could not evaluate any comparable domestic concern through the Clearinghouse's project-specific process, which considers location, radar line-of-sight, overlapping sensor coverage, available mitigation, and the particular military assets potentially affected. Ex. A ¶¶ 36-39; Ex. B ¶¶ 16, 23-24. Indeed, DoD continued holding mitigation meetings and sending mitigation agreements to developers after Operation Spiderweb. Ukraine also continued to expand its wind-energy development notwithstanding those evolving threats. Those

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

facts undermine any claim that the event required an immediate categorical halt to wind-energy development.  Ex. A ¶¶ 30, 36.

Taken together, Marks' examples suggest at most that DoD has certain risks to evaluate. They do not identify any category of risk that cannot be evaluated through the individualized review and mitigation process Congress established—indeed, if DoD concludes that a particular project presents an "unacceptable risk to national security," Section 183a already provides the mechanism for making that determination.  What Marks never explains is why DoD had to suspend the statutory process for all wind-energy projects rather than use the process to evaluate those risks. Moreover, DoD's own contemporaneous statements and conduct undermine the rationale that Marks now provides.  When asked at a March 4, 2026, hearing before the House Armed Services Readiness Subcommittee whether he intended to change the Clearinghouse process, Marks responded that "the intent is to change the process to speed it up."  Ex. A ¶ 56.  Weeks later, DoD moved in the opposite direction, cancelling scheduled Mitigation Response Team meetings and expanding its ongoing freeze to all steps of the process.

Marks also invokes unspecified SECRET and TOP SECRET information as support for DoD's position. *See* Marks Decl. ¶¶ 11, 61, 64.  But Defendants have not submitted any classified materials for in camera review or under seal and cannot ask the Court to credit evidence that is not before it. That omission is particularly notable because, in prior litigation involving similar facts, the government did submit classified materials for in camera review. After independently reviewing those classified submissions, each court nevertheless concluded that the government had failed to justify the challenged agency action and granted preliminary relief.  ECF No. 1-6 at 40:10-46:8, Transcript from *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999 (D.D.C. Jan. 12, 2026); ECF No. 1-8 at 57:12-64:7, Transcript from *Sunrise Wind, LLC v. Burgum*, No. 1:26-

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

cv-00028 (D.D.C. Feb. 2, 2026); ECF No. 1-7 at 48:11-57:6, Transcript from *Vineyard Wind 1, LLC v. U.S. Dep't of the Interior*, No. 26-10156 (D. Mass. Jan. 27, 2026); ECF No. 1-5 at 48:16-53:1, Transcript from *Va. Elec. & Power Co. v. U.S. Dep't of the Interior*, No. 2:25-cv-830 (E.D. Va. Jan. 16, 2026).

Finally, Defendants' lack of a reasoned basis cannot be excused by their assertion that deference is "supercharged" on matters involving military judgment. DoD Br. at 35. The deference on military matters that cases like *Winter v. NRDC* have recognized is deference to the "professional judgment of military authorities concerning the relative importance of a particular military interest," 555 U.S. 7, 24 (2008), and that is not what Plaintiffs dispute here. DoD's action is arbitrary because it did not assess and explain why it could not achieve military objectives with project-specific mitigations; it failed to examine the impacts of its freeze on wind-energy development; it ignored the reliance interests of wind developers, and it directed the violation of statutory and regulatory deadlines. Deference to military judgment is not a blank check to violate the APA.

### 2. *DoD failed to consider statutorily required factors and ignored wind developers' reliance interests.*

DoD's suspension of all review is also arbitrary and capricious because of what DoD failed to consider when adopting the policy. First, it failed to consider "an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983): the impacts of its freeze on wind-energy development. Defendants minimize those issues as "dollars and cents" concerns pertinent only to wind developers, DoD Br. at 36, but DoD is *required* by both statute and its own regulations to ensure that "robust development of renewable energy sources and the increased resiliency of the commercial electrical grid may move forward." Pub. L. No. 111-383, 124 Stat. 4137 (2011); *see also* 32 C.F.R. § 211.4. Defendants cannot rely

11

on DoD's April 8 letter to ACP to demonstrate compliance with this requirement. That letter at best acknowledged that DoD had a *duty* to consider the development of energy sources. But the letter did not say that DoD had considered the impact on wind-energy development before its current freeze, much less explain how its analysis affected its conclusion.

DoD also failed to give any consideration to wind developers' reasonable reliance on DoD's pre-2025 policy of expeditiously executing its review duties. Those reliance interests are concrete and substantial—developers structured financing, procurement, permitting, and construction decisions around the Clearinghouse's established review process. Ex. A ¶ 52. Yet, DoD hardly attempts to argue that it considered those reliance interests, pointing only to the statement in its April 8 letter that it has a general duty to consider "developing energy sources." DoD Br. at 36. That is not sufficient to render DoD's action non-arbitrary under Section 706(2). An agency that changes its policy not only must determine specifically what reliance interests exist, but also must "determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 32. There is no evidence that DoD, for example, considered courses of action other than its across-the-board freeze and assessed whether those would have a lesser impact on wind developers' reliance interests. *Cf. id.* (emphasizing alternatives an agency could have considered if it had considered reliance interests). If it had, it could have examined the well-established ways that doppler interference can be addressed through existing mitigation options without the need to halt wind-energy review nationwide.

### 3. *DoD's freeze is unlawful because it prohibits compliance with statutory and regulatory deadlines.*

DoD's freeze is also "not in accordance with [the] law" under Section 706(2) because compliance with statutory and regulatory deadlines is impossible when a freeze is in effect.

12

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

Defendants' rehashed argument that compliance with deadlines can only be raised in a 706(1) claim rather than a 706(2) claim, DoD Br. at 37, is again mistaken.  It is well recognized that a final agency action is unlawful under Section 706(2) if the consequence of that action is that the agency *will* violate deadlines.  *See, e.g., New York v. Trump*, 811 F. Supp. 3d 215 (D. Mass. 2025); *RENEW Ne. v. U.S. Dep't of Interior*, No. 25-cv-13961, 2026 WL 1078282 (D. Mass. Apr. 21, 2026).

DoD concedes as much when it acknowledges that its action would be contrary to law if "the May 7 Memorandum directed DoD to refrain from taking [required statutory steps]."  DoD Br. at 38.  But DoD *did* refrain from taking steps required by Section 183a when it implemented its freeze in August 2025, extended it to all steps of its review process in its April 13, 2026 communication to DoD personnel, and then kept it in place through the May 7 Memorandum.

Defendants try to portray the May 7 Memorandum as directing a broad resumption of its review duties.  DoD Br. at 37.  But, although the memo directs "prompt[] process[ing]" of *some* energy projects, that provision is explicitly limited to only those projects that "do not create an impactful doppler effect."  ECF No. 1-1 at 2.  Wind projects are the only energy project type that creates impactful doppler effects, so the May 7 Memorandum actually instructs the *continuation of the freeze* for wind-energy projects.  The memorandum's directive about performing preliminary review for all projects within seventy-five days does appear to apply to wind-energy projects, *see id.*, but that is only one step in the process.

The May 7 Memorandum also tacitly directs DoD *not* to complete the preliminary review within the thirty-day timeline in DoD's regulations.  Defendants suggest that the thirty-day deadline is merely to "timely begin[] its evaluat[ion] [of] all comments and recommendations received," but that is patently inconsistent with DoD's regulations.  DoD Br. at 37-38 n.18.  The

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

regulations do not merely require DoD to "begin" within thirty days; they provide that DoD *shall* take one of three actions within thirty days: "(1) determine that the project will not have an adverse impact on military operations and readiness, in which case it shall notify the Secretary of Transportation of such determination, (2) determine that the proposed project will have an adverse impact on military operations and readiness but that the adverse impact involved is sufficiently attenuated that it does not require mitigation…. [in which case] it shall notify the Secretary of Transportation of such determination, or (3) determine that the proposed project may have an adverse impact on miliary operations and readiness…. [And] notify the applicant [and the Secretary of Transportation] of the determination of the Clearinghouse and offer to discuss mitigation with the applicant to reduce the adverse impact." 32 C.F.R. § 211.6(a)(3).[3] The May 7 Memorandum does not direct DoD to take those actions within thirty days, and there is no evidence that DoD is doing so.

To the contrary, processing of wind developers' applications remains stalled at all stages. *See* Ex. D ¶¶ 18-20; Ex. A ¶¶ 60-64. Indeed, a May 12, 2026 letter signed by fifty-five Members of Congress independently confirmed the nationwide scope of the freeze, reporting that nearly 200 projects remained stalled at every stage of the Clearinghouse process. Ex. A ¶¶ 47, 54.

### 4.    *DoD changed its regulations without notice-and-comment rulemaking.*

DoD's freeze is independently unlawful because it effectively amends the regulations governing the Clearinghouse process without complying with the notice-and-comment process under Section 553 of the APA. Defendants' response that an agency "delay" cannot be a legislative

---

[3] DoD suggests that completing those steps within thirty days would be "operationally impracticable," DoD Br. at 37–38 n.18, but if that is its view, it must amend the regulations that it promulgated with a notice-and-comment rule rather than doing so *sub silentio* through an inconsistent policy. *See* Section II.B.4, *infra*.

14

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

rule requiring notice-and-comment, DoD Br. at 38, misses the point—Plaintiffs do not contend that DoD needed to use notice-and-comment because it has delayed. The issue is that DoD cannot effectively amend its regulations by directing DoD components to disregard the deadlines in the regulations, such as the thirty-day deadline for preliminary review and the requirement to complete MRT discussions within ninety days absent a written agreement with the developer to extend it. *See* 32 C.F.R. § 211.6. Nor is the freeze, as DoD contends, merely an "internal methodology." DoD Br. at 38. It has real-world binding impacts for wind developers by replacing the regulatory review process on which developers have long relied with an indefinite, extra-regulatory process applicable only to wind projects.

Defendants' reliance on the military-function exception in 5 U.S.C. § 553(a)(1) is misplaced. That exception is narrowly construed. *See Indep. Guard Ass'n of Nev., Local No. 1 v. O'Leary*, 57 F.3d 766, 769-71 (9th Cir. 1995). Moreover, the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). Defendants promulgated the Clearinghouse regulations in Section 211.6 through notice-and-comment without invoking the military-function exception, *see* 78 Fed. Reg. 73088 (Dec. 5, 2013), so the same procedure is required to revoke and replace them.

### 5.    *DoD was motivated by impermissible bias.*

Finally, Plaintiffs are likely to succeed on the merits because DoD's stated rationale for the freeze is not its genuine rationale and reflects consideration of impermissible policy objectives. The question of whether DoD has stated the actual reason for the policy is not a "mud fight" that Plaintiffs are "forbidden" from raising. DoD Br. at 39. It is arbitrary and capricious for an agency to base its decision on factors Congress did not intend it to consider including ulterior political

15

motivations. *See State Farm*, 463 U.S. at 43. Accordingly, courts have an obligation to consider the factors which drive an agency's decision. Here, Congress directed DoD to conduct project-specific assessments of military readiness and identify feasible mitigation measures that permit the continued development of energy projects, including renewable energy. 10 U.S.C. § 183a. Congress did not authorize DoD to halt review of an entire class of projects because of a generalized policy objective to stop wind-energy development.

Abundant publicly available (and judicially noticeable) evidence in government records shows that the Administration has an overarching objective of halting wind-energy development. It can be seen in both direct statements by President Trump and in other administrative actions to halt wind-energy development. Defendants' suggestion that those statements are inapplicable here because they were about "offshore wind projects," DoD Br. at 39, is demonstrably incorrect. While some of the administration's prior actions specifically target offshore projects, the orders challenged in *New York v. Trump* and *RENEW Northeast* involved both offshore and onshore wind development, *New York v. Trump*, 811 F. Supp 3d at 215; *RENEW Ne.*, 2026 WL 1078282, at *4, and the President has expressly stated an intent to halt *all* wind development, and even specifically disparaged *onshore* projects. *See* ECF No. 14 at 20.

Nothing DoD said or did when it implemented the freeze suggests otherwise. Before this litigation, ACP, affected developers, and fifty-five Members of Congress repeatedly asked DoD to identify the legal and factual basis for abandoning the Clearinghouse's longstanding review process, yet DoD declined to do so. Ex. A ¶ 67. That absence of any contemporaneous explanation is consistent with an action that was driven by extraneous biases rather than reasoned consideration of statutorily prescribed factors.

16

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

Courts have repeatedly recognized that agency action is arbitrary and capricious when it is driven by ulterior political motivations rather than the agency's proffered explanation. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019); *see also Woods Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859 (10th Cir. 1994) (setting aside agency action where the stated reason was a pretext for an ulterior motive); *State v. U.S. Dep't of Interior*, 363 F. Supp. 3d 45, 63-65 (D.D.C. 2019) (holding plaintiffs plausibly alleged political influence that rendered agency action arbitrary and capricious); *Tummino v. Hamburg*, 936 F. Supp. 2d 162, 183-86 (E.D.N.Y. 2013) (finding agency action arbitrary and capricious where political interference produced implausible justifications). Indeed, courts have enjoined other recent efforts by the administration to halt wind energy development in part because they recognized that the government's national security justifications "may have been pretextual." Revolution Wind Transcript, ECF No. 1-6 at 44:10-14 (noting that the government had "criticized offshore wind projects for a variety of reasons unrelated to national security").

Defendants base their defense in part on *Department of Commerce*, but that case undermines their position. *See* 588 U.S. at 780-85. While Defendants quote the Court's observation that agency actions are not invalidated "solely because [they] might have been influenced by political considerations," they omit its holding: that the agency's explanation in that case was unlawful because it was "contrived," not genuine. *Id.* at 784. The APA requires agencies to provide "genuine justifications," and "[a]ccepting contrived reasons would defeat the purpose of the enterprise." *Id.* at 785. Plaintiffs are likely to prevail on their claim that Defendants' justification for the policy is contrived, because it is "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

Defendants' reliance on *American Federation of Government Employees, AFL-CIO v. Trump*, 178 F.4th 456 (9th Cir. 2026), is likewise misplaced. *AFGE* rejected a challenge premised on alleged retaliatory animus where the challenged executive action itself rested on facially legitimate national security justifications. It did not involve a *State Farm* claim alleging that an agency relied on factors Congress did not authorize it to consider. Nor did it suggest that merely invoking "national security" shields agency action from ordinary APA review. Similarly, *Trump v. Hawaii* does not suggest that basing agency decisions on extrinsic animus is acceptable; it simply held that a particular presidential proclamation was not spurred by religious animus. 585 U.S. 667, 706 (2018).

### C.      Plaintiffs Are Likely to Succeed on Their 706(1) Claim.

Defendants attempt to recast Plaintiffs' claim as one involving only agency delay. But Plaintiffs do not challenge a slower pace of agency review; they challenge Defendants' wholesale refusal to perform mandatory duties imposed by statute and regulation. Section 706(1) authorizes courts to compel agency action that has been either "unlawfully withheld" or "unreasonably delayed." 5 U.S.C. § 706(1). This case squarely presents an action "unlawfully withheld," which renders DoD's action per se unlawful under Section 706(1). But even under the more flexible factors of the "unreasonable delay" standard, DoD's actions are not reasonable given the statutory context and the lack of basis or concrete timeline DoD has provided.

#### 1.      *DoD has unlawfully withheld statutorily required agency actions.*

Defendants admit that DoD began "re-evaluating" its methodology in August 2025 and "has not executed any mitigation agreements during this re-evaluation." DoD Br. at 6. They further represent that DoD is still "striving to develop an analytically sound methodology." *Id*. at 29. Those admissions establish that DoD has suspended its mandatory review activities while

18

conducting an open-ended reassessment of its own internal procedures. The consequences are equally undisputed: DoD has imposed a freeze of the Clearinghouse process, under which projects that have completed mitigation discussions remain without draft agreements, developers who have already executed mitigation agreements remain without DoD's countersignature, and projects throughout the review pipeline cannot advance because DoD has ceased performing the next required agency action. Ex. D ¶ 21.

DoD's actions are categorically different than mere "delay." *Al Otro Lado v. Executive Office for Immigration Review,* 138 F.4th 1102 (9th Cir. 2025) is instructive. In that case, the Ninth Circuit held that an agency unlawfully withholds action when it engages in a "wholesale refusal" to perform a mandatory duty. *Id.* at 1122. That is precisely the case here—defendants are not processing projects more slowly or otherwise advancing applications toward completion. They have suspended the statutorily required agency actions necessary for projects to proceed while offering only the *possibility* that they may resume those duties at some undefined point in the future.

The Marks Declaration confirms that the problem is not ordinary processing delay. Marks points to evolving threats, changing technologies, interagency coordination, and revising methodology. But those are continuing conditions inherent in the Clearinghouse's mission, not temporary impediments with a defined endpoint. The Clearinghouse has always addressed changing military risks, classified information, and emerging technologies through individualized review and mitigation. *See* Ex. A ¶¶ 3-4, 21-31; Ex. D ¶¶ 7-9; Ex. B ¶¶ 7-8; Ex. C ¶¶ 9, 13-15. If those conditions justify suspending mandatory duties now, DoD could invoke them to justify suspension indefinitely.

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

Marks also demonstrates that DoD is not actively working to move pending projects toward completion. Marks emphasizes that DoD has conducted "53 internal and external meetings, including 20 engagements with Congress and key federal partners," along with numerous other consultations. Marks Decl. ¶ 94. Yet nowhere does he state that DoD—after having been non-responsive to extensive developer outreaches—has now resumed engaging with the developers whose participation is indispensable to the statutory mitigation process. Ex. D ¶¶ 18-19; Ex. A ¶¶ 63-64. The statutory and regulatory frameworks contemplate an interactive process in which the MRT works with developers to identify and negotiate project-specific mitigation measures, and Marks himself acknowledges that DoD must still develop guidance regarding mitigation measures "that can be discussed with developers" before "resuming developer discussions." Marks Decl. ¶¶ 31, 33, 86, 100. Even after months of internal deliberations, Marks identifies no present effort to advance the projects. Indeed, although DoD claims to have resumed processing, the Clearinghouse now requires Mr. Marks' personal signature on every Clearinghouse letter and memorandum, yet, as of July 17, 2026, he had not signed a single one. Ex. D ¶ 23.

More fundamentally, Defendants' explanation has no logical endpoint. Marks repeatedly acknowledges that military threats, technologies, and mitigation strategies will continue to evolve. Marks Decl. ¶¶ 18, 38, 39, 48, 66, 100. Those are enduring features of the national security environment, not temporary conditions capable of resolution by a date certain. If the evolving nature of national security threats justified suspending mandatory statutory duties today, it would justify suspending them tomorrow, next year, and indefinitely thereafter. Because those conditions will continue to exist indefinitely, Defendants' theory is inherently a refusal to act. *Tang v. Chertoff*, 493 F. Supp. 2d 148, 150 (D. Mass. 2007) ("The duty to act is no duty at all if the deadline is eternity.").

20

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

Nor does it matter that DoD professes an intent to resume processing applications "as expeditiously as possible." DoD Br. at 29. Nearly every agency accused of unlawfully withholding action could make the same representation. The relevant question under *Al Otro Lado* is not whether the agency hopes to act someday, but whether it is presently carrying out the mandatory duties Congress assigned to it. *See* 138 F.4th at 1121-23. Here, DoD admits that it has ceased executing mitigation agreements and suspended mitigation discussions while it reevaluates its methodology. DoD Br. at 6, 29. That is precisely the type of wholesale suspension of mandatory agency action that *Al Otro Lado* distinguished from ordinary processing delay. *See* 138 F.4th at 1121-23.

The statutory and regulatory framework and the Clearinghouse's historical practices all reinforce that conclusion. Congress required DoD to complete preliminary review within seventy-five days, 10 U.S.C. § 183a, and DoD adopted additional mandatory procedural deadlines governing the remainder of the review process, including completion of initial reviews within thirty days and mitigation discussions within ninety days absent a written extension agreed to by the applicant. 32 C.F.R. § 211.6. And Declarants with decades of firsthand Clearinghouse experience explain that, even where no statute or regulation imposed a specific deadline, the Clearinghouse consistently continued processing projects through individualized review and negotiated mitigation rather than suspending review of an entire class of projects while reconsidering its internal methodology. Ex. A ¶¶ 17-21. Because nothing in the governing statute or regulations authorizes DoD to freeze the execution negotiated mitigation agreements, indefinitely suspend mitigation discussions, or halt those required review activities altogether, DoD is unlawfully withholding those mandatory actions.

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

### 2.    *Alternatively, DoD has unreasonably delayed required actions.*

Even if the Court characterizes Defendants' conduct as delay rather than withholding, Plaintiffs are still likely to succeed because that delay is unreasonable under the six-factor test articulated in *Telecommunications Research and Action Center v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984), known as the "*TRAC* factors." The first, and most important, *TRAC* factor asks whether the agency's action is governed by a "rule of reason." *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 813-14 (9th Cir. 2015). Defendants identify no such rule here. There is no announced completion date, no objective criteria for concluding the reassessment, and no timetable by which projects will resume moving through the review process. Indeed, courts evaluating similar indefinite agency holds have found the absence of any meaningful endpoint or criteria for lifting the hold weighs heavily in favor of finding unreasonable delay. *Doe v. Trump*, No. 1:25-cv-13946-JEK, 2026 WL 1170971, at *6 (D. Mass. Apr. 30, 2026). Congress likewise established deadlines designed to ensure prompt review of wind-energy projects, and DoD adopted additional regulatory deadlines reflecting its own judgment regarding reasonable processing times, both of which inform the second *TRAC* factor. *Pesticide Action Network*, 798 F.3d at 813. Finally, the indefinite suspension has already delayed financing, interconnection, construction, commercial operation, and eligibility for time-sensitive tax incentives, while Defendants' asserted reassessment does not explain why mandatory statutory duties must cease altogether during that effort. Accordingly, whether viewed as agency action unlawfully withheld or, alternatively, as agency action unreasonably delayed, Plaintiffs are likely to succeed under Section 706(1).

### III.    Plaintiffs Have Demonstrated Irreparable Harm.

Plaintiffs have demonstrated irreparable harm. DoD's freeze has brought the development of utility-scale wind-energy projects to a standstill by preventing completion of the federal review

22

process necessary to obtain FAA DNHs.  Without DNHs, projects cannot reliably close financing, maintain permits, preserve PPAs, satisfy interconnection milestones, procure long-lead equipment, proceed to construction, or preserve eligibility for time-sensitive federal tax credits.  *See, e.g.,* ECF Nos. 14 at 28-33; 14-3 at 18, 22; 14-11 at 12-16; 14-5 at 13; 14-6 at 11; 14-21 at 20; 14-22 at 23; 14-24 at 21; 14-25 at 19; 14-26 at 19.  Because those opportunities cannot be recreated after final judgment and sovereign immunity precludes recovery of damages from the federal government, Plaintiffs have established irreparable harm.  And these harms extend beyond the wind developers to electric utilities, states, consumers, and organizations such as GECA.  ECF No. 14 at 33-34.

Defendants' assertion that irreparable harm exists only where agency action threatens "the very existence" of a business is incorrect.  The Ninth Circuit recognizes irreparable harm where government action fundamentally disrupts business operations, even if the business continues to exist.  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058-59 (9th Cir. 2009); *see also Easterday Dairy, LLC v. Fall Line Cap., LLC*, No. 2:22-CV-01000-HL, 2022 WL 17104572, at *14 (D. Or. Nov. 22, 2022) (finding irreparable harm where plaintiffs' business depended on obtaining a permit).

And the Ninth Circuit has repeatedly held that economic harms are irreparable where, as here, monetary relief is unavailable against the federal government.  *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025), *cert. denied*, No. 25-364, 2026 WL 1871300 (U.S. June 30, 2026); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).  Additionally, the injury here is not strictly monetary.  The unrecoverable investments described in Plaintiffs' declarations are evidence of a much broader disruption to ongoing project development—not the injury itself.

23

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

Defendants' refusal to complete the mitigation process has brought project development to a standstill. Projects cannot obtain financing, reach financial close, obtain or maintain local permits, preserve PPAs, procure long-lead equipment, satisfy interconnection milestones, or preserve eligibility for time-sensitive federal tax incentives. ECF Nos. 14-3; 14-11; 14-13; 14-22. Those are precisely the operational harms recognized in *Washington v. U.S. Department of Transportation*, where the court found irreparable injury because the challenged federal action disrupted project implementation, budgeting, staffing, and project delivery, not merely because it imposed financial costs. 792 F. Supp. 3d 1147, 1188-91 (W.D. Wash. 2025). The same is true here—projects have remained stalled awaiting draft mitigation agreements or DoD's countersignature on already-negotiated agreements for many months, causing financing windows, procurement schedules, and construction timelines to continue slipping. Ex. D ¶ 21.

The hundreds of millions of dollars already invested demonstrate that these projects are moving through complex, sequential development processes that cannot simply be paused and restarted after judgment. Every day of continued unlawful agency inaction threatens financing windows, procurement opportunities, contractual commitments, permitting approvals, interconnection rights, tax-credit eligibility, and commercial operation deadlines. Those lost opportunities cannot later be restored through money damages or a merits judgment.

## IV.    The Balance of Equities and Public Interest Favor Preliminary Relief.

The balance of equities and the public interest strongly favor preliminary relief because Plaintiffs seek only to preserve the statutory process Congress established—not to dictate its outcome. Defendants repeatedly invoke national security, but Plaintiffs do not ask this Court to second-guess DoD's military judgments, require approval of any wind-energy project, or dictate

24

the substance of any national security determination. Plaintiffs ask only that DoD resume performing the review Congress assigned it under Section 183a.

Congress itself struck the balance between national security and renewable energy development. Section 183a requires DoD to evaluate project-specific national security risks, identify feasible mitigation measures possible, and provide its determinations to the FAA. If evolving threats warrant more rigorous review, additional mitigation measures, or findings of unacceptable risk to national security, DoD remains free to reach those project-specific conclusions through the process Congress prescribed. Indeed, the Clearinghouse already possesses project-specific tools to address evolving national-security concerns without suspending review altogether. Existing mitigation agreements authorize DoD to require temporary curtailment of turbine operations whenever necessary to protect military missions and permit the parties to modify mitigation requirements as military missions, technologies, and threats evolve. Those safeguards demonstrate that the Clearinghouse's individualized review process was specifically designed to accommodate changing national-security conditions through project-specific mitigation rather than by freezing wind-energy projects nationwide. Ex. D ¶ 20; Ex. A ¶¶ 20-21.

DoD's own experience confirms the same point. Since 2010, the Clearinghouse has reviewed approximately 10,000 energy projects, with only one ultimately receiving an unacceptable-risk determination. Ex. A ¶ 21. And so does the experience of other nations—rather than suspending wind-project review, allied nations have continued permitting wind development while adapting their defenses through measures such as radar upgrades and additional sensor deployments. *Id*. ¶ 30.

To be sure, courts afford substantial deference to military and national security judgments. But that deference does not permit an agency to disregard statutory requirements or evade judicial

25

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

review through generalized assertions of national security. As the court explained in *Kirwa v. U.S. Department of Defense*, "while courts should exercise caution when adjudicating claims involving matters of military affairs and national security, that caution does not give DOD carte blanche authority to act in contravention of ... applicable statutes." 285 F. Supp. 3d 257, 266-70 (D.D.C. 2018). APA review requires more than "trust us" assertions of national security. *Id.* at 270.

The equities therefore favor Plaintiffs. Defendants identify no cognizable harm from complying with the statutory framework Congress enacted. An injunction would not prevent DoD from evaluating national security risks, requesting additional information, negotiating mitigation measures, or making a finding of unacceptable risk. It would require only that DoD perform those functions through the process Congress mandated. By contrast, every day the freeze remains in place continues to delay projects nationwide, undermining commercial certainty, jeopardizing financing and contractual commitments, and frustrating the orderly development process Congress intended. *See Invenergy Renewables, LLC v. United States*, 422 F. Supp. 3d 1255, 1291 (Ct. Int'l Trade 2019).

While the public has a strong interest in national security, it also has a compelling interest in ensuring that federal agencies comply with congressional mandates. Requiring Defendants to resume the individualized review process established by Section 183a protects both interests simultaneously: it preserves DoD's authority to make expert national security determinations while ensuring that those determinations are made through the statutory process Congress required. It would also be consistent with Congress's mandate for DoD to "ensure" "the robust development of renewable energy sources." Pub. L. No. 111–383, 124 Stat. 4137 (2011).

The public also has a strong interest in the continued development of wind-energy projects. As shown in Plaintiffs' motion, these projects contribute to grid reliability, stabilize consumer

26

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR
PRELIMINARY INJUNCTION**

electricity prices, and help meet growing electricity demands. *See, e.g.*, ECF No. 14-29 at 10. Wind projects also operate without any direct carbon emissions or generation of virtually any solid or hazardous waste and, therefore, serve the public's interest in a healthy environment. *RENEW Ne.*, 2026 WL 1078282, at *31.

Along with those benefits for energy security and the environment, the public interest is also served by the economic benefits of wind-energy projects. These include billions of dollars in private capital investment that supports local contractors, suppliers, and infrastructure, ECF No. 1-14 at 5-6, billions of dollars annually in property tax revenues, and the creation of hundreds of thousands of jobs, including thousands of manufacturing jobs. *See* ECF No. 14 at 36.

DoD's freeze places these important projects on hold indefinitely and threatens to permanently erase the positive impacts they could have on energy and the economy. Staying or preliminarily enjoining the freeze, however, allows these benefits to continue.

## CONCLUSION

The Court should grant Plaintiffs' motion and stay or preliminarily enjoin DoD from continuing to apply its unlawful review freeze and related policies and practices. To ensure DoD is resuming its ordinary (and required) review process, the Court should order DoD to provide status reports every thirty days summarizing each of the actions it has taken to review wind-energy projects, including the steps taken to address (1) projects with a mitigation agreement executed by the developer that are awaiting countersignature by DoD; (2) projects that have completed the MRT process but have not yet received a draft mitigation agreement from DoD; (3) projects that were in the middle of the MRT process; (4) projects that have received an NPR and are awaiting initial MRT meetings; and (5) projects that are awaiting completion of a preliminary review and issuance of an NPR determination or non-objection transmittals to the FAA.

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

Dated:  July 20, 2026

Respectfully submitted,

*s/        Michael Giaquinto*
Michael Giaquinto, OSB No. 246342
MORGAN, LEWIS & BOCKIUS LLP
300 South Grand Ave., 22nd Floor
Los Angeles, CA  90071-3132
T: 213-612-7227
michael.giaquinto@morganlewis.com

Jennifer Trock (*pro hac vice*)
Douglas Hastings (*pro hac vice*)
1111 Pennsylvania Ave., NW
Washington, D.C.  20004
T: 202-739-3000
jennifer.trock@morganlewis.com
douglas.hastings@morganlewis.com

Ella Foley Gannon (*pro hac vice*)
600 Montgomery Street
Suite 2300
San Francisco, CA  94111-2725
T: 415-442-1000
ella.gannon@morganlewis.com

*Attorneys for Plaintiffs (except for Las Crestas Wind Energy LLC)*

Darin Sands, OSB No. 106624
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR  97209
T: +1 503-734-2480
dsands@bradleybernstein.com

Richard W. Smith (*pro hac vice*)
Kathleen Mueller (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C.  20005
T: 202-736-8000

28

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

rwsmith@sidley.com
kmueller@sidley.com

*Attorneys for Plaintiff Las Crestas Wind Energy, LLC*

29

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

## <u>LOCAL RULE 7-2 (b) CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable 14,000-word limitation as noted in the Court's order on July 6, 2026 (*see* ECF No. 89), when combined with Plaintiffs' opposition to Defendants' motion to dismiss, because it contains 7,997 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature blocks, exhibits and any certificates of counsel.

.

<div align="center" style="margin-left:50%">

/s/ Michael B. Giaquinto

*Attorney for Plaintiffs (except Las Crestas Wind Energy LLC)*

</div>

<div align="right">30</div>

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on July 20, 2026, a copy of the foregoing was uploaded to the Court's CM/ECF system, which will effectuate service on all registered counsel in this case.


<u>s/ Michael B. Giaquinto</u>

Michael B. Giaquinto

31

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**