# Exhibit A

*To Plaintiff's Reply Brief in Support of Motion for Stay or Preliminary Injunction*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST, *et al.* *Plaintiffs,* <br><br> v. <br><br><br><br><br><br><br><br> PETER B. HEGSETH, *et al.*, *Defendants.* | **Civil Action No. 3:26-cv-01092-IM** <br><br> **REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Pursuant to 28 U.S.C. § 1746(2), I, Howard D. Belote, declare as follows:

**Introduction**

1. I submit this reply declaration in support of Plaintiffs' motion for preliminary injunction and in response to the Declaration of Hon. Dale R. Marks, dated July 5, 2026, and filed in this action on July 6, 2026, as ECF No. 90-1 ("Marks Decl."). I have reviewed the Marks Declaration in its entirety.

2. Based on my firsthand role in developing the Clearinghouse, my direct involvement in implementing its statutory and regulatory framework, and sixteen years of continuous experience working within the Clearinghouse process on behalf of developers, I believe the Marks Declaration presents a materially incomplete and, in numerous respects, inaccurate account of the Clearinghouse's history, purpose, and operation. It misstates the statutory and regulatory framework governing the Clearinghouse; the purposes for which Congress established it; the manner in which the Clearinghouse has historically evaluated projects and resolved military

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

concerns through individualized review and negotiated mitigation; and what has actually occurred since DoD stopped advancing wind projects in August 2025.

3. I do not dispute that DoD may and should periodically reassess potential risks as technologies, missions, and operational requirements change. The Clearinghouse itself has continually adapted to changing missions, radar systems, and operational concerns throughout its history. To my knowledge, however, DoD had never before stopped executing mitigation agreements across the board while reevaluating its methodology, as it did beginning in August 2025.

4. Based on my experience and my review of the Marks Declaration in its entirety, I am aware of no project-specific analysis, operational experience, technological development, or other changed circumstance demonstrating that the Clearinghouse's longstanding process of individualized review and negotiated mitigation had become incapable of protecting military missions, or that it was necessary to indefinitely suspend that process for utility-scale wind projects nationwide rather than adapt it and continue applying it on an individualized and localized project basis, as Congress directed and the Clearinghouse has repeatedly done throughout its history.

5. I have personal knowledge of the facts stated herein and, if called to testify, could and would testify competently thereto.

## Professional Background and Qualifications

6. My professional background and qualifications are set forth in full in my declaration submitted in support of Plaintiffs' Motion for Preliminary Injunction ECF No. 36-13 and are incorporated here by reference. In brief: I am the Managing Partner and CEO of DARE Strategies LLC. Prior to founding DARE, I served for 24 years and 7 months in the United States Air Force, retiring as an Air Force colonel and F-16 pilot. My hours in the F-111 and F-16 provided

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

working knowledge of radar theory, and my wartime command experience in Tel Aviv in 2003 and Baghdad in 2004-5 gave me important experience in force protection, risk assessment, and real-time threat response.  After my base command tour at Nellis AFB, Nevada, I retired from active duty and served as the founding Executive Director of the Clearinghouse, an office within DoD, from July 2010 to June 2012. That is the same office Mr. Marks now oversees, and during my tenure I personally drafted the governing regulations that established the Clearinghouse's process. In the sixteen years since, I have worked continuously within that process on behalf of developer clients, negotiating more than 60 Memoranda of Understanding and siting memos between DoD and wind developers and supporting or advising on more than 115 projects.

7.    Like Mr. Marks, I have submitted prior declarations in litigation challenging other agency actions to stymie development of wind projects in the United States. Each of those courts to date has rejected Mr. Marks' similar claims of purportedly new and exigent national security threats from wind projects, even where, unlike here, accompanied by information designated as classified by Mr. Marks for the courts' in *camera* review. Mr. Marks' more detailed declaration in this case does not change my opinions.

8.    While I possess an active SECRET clearance, I do not have access to, and this declaration does not rely upon, any classified information. My opinions are based solely on the unclassified record, my firsthand knowledge of the Clearinghouse's creation and operation, and my experience working within the Clearinghouse process over the past sixteen years.

**<u>Response to the Marks Declaration</u>**

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

9.      Mr. Marks' factual representations do not hold up to scrutiny. Measured against the historical record, the sources he cites, publicly available data, and even other statements in his own declaration, his account fails in three principal respects:

(a) the statutory and regulatory framework governing the Clearinghouse, including its origins, purpose, statutory deadlines, historical workload, and processing timelines;

(b) the current threat justifications DoD offers for the pause, including the historical treatment of radar interference, drone threats, classified analysis, mitigation technologies, and the operational experience of allied nations; and

(c) DoD's conduct since August 2025, including the scope of the pause, the absence of project-specific explanations, and the departure from the Clearinghouse's longstanding practice of individualized review and negotiated mitigation.

I address each in turn below.

## I. The Statutory and Regulatory Framework Governing the Clearinghouse

**Issue 1: Mr. Marks' Claimed Role in Drafting the Clearinghouse's Founding Framework (Marks Decl. ¶ 16)**

10.     On the Clearinghouse's origins: Mr. Marks states that he "was also personally involved with drafting the original Clearinghouse framework (Public Law 111-383; 10 U.S.C. § 183a) 15 years ago." Marks Decl. ¶ 16. That is not consistent with my own knowledge. I was the Clearinghouse's first Executive Director, serving from its inception in July 2010 through June 2012, and I personally developed the governing regulations that established the Clearinghouse's process. I do not recall Mr. Marks having any role, comparable or otherwise, in that founding process, and his declaration identifies no specific contribution—no meeting, document, or drafting role.

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**Issue 2: The Origins of the Clearinghouse and the Asserted Midair Collision (Marks Decl. ¶¶ 17, 55)**

11.     Mr. Marks states that the Clearinghouse statute developed in response to "a midair collision" that purportedly resulted from "wind-farm interference" with a North American Aerospace Defense Command ("NORAD") radar and a "lack of interagency coordination." Marks Decl. ¶ 17; *see also id.* ¶ 55. Mr. Marks cites no source for this claim. I am not aware of, and do not recall, any midair collision serving as the impetus for the Clearinghouse. A midair collision of the kind Mr. Marks describes would have been a defining event for the office I was appointed to lead. I have reviewed the governing regulations I personally drafted and my own records from my tenure as founding Executive Director, and I have found no reference to any such collision in any of them. Throughout the subsequent years of the Clearinghouse's operation, including during the dozens of project-specific mitigation discussions in which I have participated, I have never heard a prior midair collision cited as the basis for DoD's concerns or as the historical justification for the creation of Radar Adverse-impact Mitigation ("RAM") process. Had such an event truly been the defining impetus for the Clearinghouse or its mitigation framework, I would have expected it to be referenced repeatedly during those discussions. It never was.

12.     Mr. Marks' suggestion that RAM techniques originated as a response to concerns about midair collisions is inconsistent with both its history and its operation. RAM has historically supported NORAD's homeland-defense mission—not civilian air traffic control or the avoidance of midair collisions. NORAD's mission is national air defense, and every NORAD Mitigation Response Team ("MRT") in which I have participated has focused on preserving homeland surveillance and defense capabilities, not preventing aircraft collisions. That understanding is confirmed by the origins of the RAM process itself. During my tenure as installation commander

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

at Nellis Air Force Base and the Nevada Test and Training Range, and later while I was in the process of becoming the Clearinghouse's first Executive Director, General Gene Renuart, then Commander of NORAD, requested assistance in addressing operational impacts to a NORAD radar. That first use of RAM, described more fully below, predated the creation of the Clearinghouse and was directed exclusively at preserving operational radar capabilities, not addressing aviation safety or collision risks.

13.     Mr. Marks states that, "[p]rior to the fall of 2025, the Department evaluated FAA applications through the lens of flight safety, training impacts within or adjacent to military training areas, and low-level routes." Marks Decl. ¶ 41. That description is incomplete. The Clearinghouse has never been limited to those aspects of the military mission. Rather, 10 U.S.C. § 183a directs DoD to assess the likely scope, duration, and level of any adverse impact on "military operations and readiness." Throughout my sixteen years working with the Clearinghouse, that mandate has encompassed a broad range of operational concerns beyond flight safety and training. In fact, NORAD has since at least August 7, 2019—the earliest date I can substantiate—shared "Areas of Concern" with wind industry representatives and consultants. These areas of concern had nothing to do with "flight safety, training impacts within or adjacent to military training areas, and low-level routes," as Mr. Marks contends. They were solely focused on NORAD's ability to conduct homeland surveillance and defense—specifically on operational requirements levied on NORAD by the Chairman, Joint Chiefs of Staff ("CJCS").

14.     The history of RAM further confirms this point. Directly contrary to Mr. Marks' account, the first use of RAM predated the creation of the Clearinghouse and arose from a concrete operational challenge—not from flight safety or training concerns—and not from any broader strategic reassessment of wind development. As I was in the process of becoming the

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Clearinghouse's first Executive Director, NORAD Commander General Renuart asked then-Deputy Under Secretary of Defense (Installations and Environment) Dorothy Robyn to help preserve the surveillance capabilities of a long-range radar near Fossil, Oregon that was affected by the Shepherds Flat Wind Farm along the Columbia River. Rather than suspending or delaying the project, DoD, NORAD, and Headquarters Air Force's Operations Directorate worked with technical experts to develop a plug-in processor and software modifications that mitigated the radar interference while allowing the project to proceed. When I later established the MRT process, I used that successful effort as the model for addressing NORAD-related issues. Over the sixteen years that followed, every NORAD MRT in which I participated reflected the same fundamental approach: identify the specific operational concern, develop project-specific mitigation where necessary, preserve homeland defense and surveillance capabilities, and enable compatible energy development.

**Issue 3: The Clearinghouse's Statutory Purpose and Renewable-Energy Objective (Marks Decl. ¶¶ 17–18)**

15.    Mr. Marks' declaration also omits the original statutory purpose of the Clearinghouse. The 2011 National Defense Authorization Act, Public Law 111-383, § 358(a), stated as an express objective that "[i]t shall be an objective of the Department of Defense to ensure that the robust development of renewable energy sources and the increased resiliency of the commercial electrical grid may move forward in the United States, while minimizing or mitigating any adverse impacts on military operations and readiness." Only in a separate provision, § 358(e)(2), did the statute first reference an "unacceptable risk to the national security of the United States"—language whose definition I personally helped develop, together with the definition of "unacceptable risk" that now appears in 32 C.F.R. Part 211 and DoDI 4180.02.

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

16.     Although the statutory language has changed over time, Congress has not changed that intent, nor has DoD ever removed the renewable-energy objective from its own implementing regulation. To this day, 32 C.F.R. § 211.4 provides that "[i]t is an objective of the Department of Defense to ensure that the robust development of renewable energy sources and the increased resiliency of the commercial electrical grid may move forward in the United States, while minimizing or mitigating any adverse impacts on military operations and readiness." That regulation remains in effect. In my opinion, Mr. Marks' description of the Clearinghouse as existing solely to prevent unacceptable national-security risk is incomplete. DoD's own governing regulation continues to recognize that the Clearinghouse's mission is both to protect military readiness and to facilitate compatible renewable energy development through minimization and mitigation of project-specific impacts.

**Issue 4: The Statutory or Regulatory Timeframes Governing Clearinghouse Review (Marks Decl. ¶¶ 24–25)**

17.     Mr. Marks' declaration emphasizes the absence of an express statutory deadline for certain individual steps in the Clearinghouse process while giving comparatively little attention to the statutory and regulatory timeframes governing the process as a whole. That does not reflect how the Clearinghouse operated during the first fifteen years I worked with it. In my experience, I never observed the absence of a separate deadline for a particular step being treated as a basis for allowing projects to remain indefinitely unresolved. The Clearinghouse understood its responsibility to move projects through successive stages of review, mitigation, and final determination without unnecessary delay. Although Congress adjusted portions of the process over time, extending the preliminary review period from 60 to 75 days, I never understood those changes to alter that fundamental expectation. In practice, the Clearinghouse continued working

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

toward a final project-specific resolution rather than allowing projects to remain indefinitely pending. To my knowledge, Mr. Marks' declaration and ordered freeze is the first instance of the Clearinghouse declining to complete reviews for an entire class of energy projects for months on end.

**Issue 5: Clearinghouse Processing Timelines (Marks Decl. ¶¶ 27, 81)**

18.    Mr. Marks states that, between 2012 and 2025, DoD processing averaged 491 days from FAA notification to execution of a mitigation agreement. Marks Decl. ¶ 27. He further states that, when he assumed his current position in June 2025, "projects pending action" averaged 673 days "from initiation to completion," including 512 days between establishment of the MRT and circulation of the first draft mitigation agreement. *Id.* ¶¶ 32, 81. Those figures cannot be meaningfully evaluated because Mr. Marks does not identify the projects included in the dataset, the period over which they were measured, the methodology used to calculate the averages, or whether atypical projects were excluded. I am aware of no publicly available dataset from which those figures can be verified.

19.    My experience over sixteen years of continuous practice before the Clearinghouse, involving more than 60 completed mitigation agreements and siting memos, is materially different. Excluding the temporary delays caused by the simultaneous retirement of NORAD's two radar analysts in 2023 and the 2024 transfer of NORAD MRT oversight away from the Air Force Secretariat, the timelines I have consistently observed are substantially shorter: approximately seven to eleven months (210–330 days) from a Notice of Presumed Risk to final DoD execution; approximately one to three months (30–90 days) from convening the MRT to reaching an informal mitigation agreement; and approximately three to four months (90–120 days) from that agreement to circulation of a final mitigation agreement for signature. Those are the timelines on which

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

developers, counsel, and DoD personnel routinely operated throughout the Clearinghouse's history.

20.    Moreover, aggregate averages can be highly misleading if they include extraordinary outlier projects. A small number of projects of that nature can substantially inflate an average while saying little about the timelines developers ordinarily experienced.

21.    In any event, even Mr. Marks' figures do not support the conclusion that DoD's current actions are consistent with historical practice. Longer processing times are not the same as an indefinite cessation of processing. To my knowledge, DoD had never before stopped executing mitigation agreements across the board while reevaluating its methodology, as it did beginning in August 2025. To the contrary, the Department of Energy's WINDExchange program reports that the Clearinghouse reviewed approximately 10,000 energy projects between 2010 and the present, with only *one project* ultimately receiving an unacceptable-risk determination after mitigation efforts proved unsuccessful. That project involved a proposed wind facility located in Somerset County, Maryland, in direct line-of-sight and such close proximity to the Navy's Advanced Dynamic Aircraft Measurement System at Naval Air Station Patuxent River that the parties were ultimately unable to identify an acceptable mitigation solution. That history demonstrates that the Clearinghouse has consistently addressed even difficult operational issues through project-specific review and negotiated mitigation—not by suspending the process altogether for all wind projects.

**Issue 6: DHS Participation in Clearinghouse Review (Marks Decl. ¶¶ 29–31)**

22.    Mr. Marks' declaration suggests that the Clearinghouse historically failed to involve the Department of Homeland Security ("DHS") in addressing radar-interference issues, notwithstanding statutory language regarding DHS participation. That does not reflect the process I experienced. Throughout my sixteen years working with the Clearinghouse, DHS was a regular

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

participant in addressing radar-interference issues through the Long Range Radar Joint Program Office and the interagency Wind Turbine Radar Interference Mitigation ("WTRIM") working group. Those organizations existed specifically to facilitate ongoing interagency coordination among DoD, DHS, the FAA, and other federal entities on the technical issues presented by wind projects. In my experience, the Clearinghouse did not need to issue a separate, project-specific invitation to DHS each time a Notice of Presumed Risk was issued or a MRT was convened because DHS was already participating through those established interagency mechanisms.

23.    More broadly, the Clearinghouse's longstanding practice was to address new or difficult technical issues through collaboration—not by suspending project review. When novel issues arose, DoD worked with DHS, other federal agencies, developers, and outside technical experts to evaluate the issue, develop project-specific mitigation, and continue moving projects toward resolution. That collaborative, interagency process was a defining feature of the Clearinghouse throughout my tenure and the years that followed. Publicly available WTRIM annual reports, including the 2024 report, continue to identify DHS as an active participant, and the 2016 federal interagency WTRIM strategy likewise reflects DHS's integral role from the outset. In my opinion, that history is difficult to reconcile with any suggestion that DHS's participation represents a new feature of the process or explains the current nationwide suspension of project-specific review.

## II. The Current Threat Justifications DoD Has Offered for the Pause

### Issue 7: The History of Wind Turbine Radar Impacts (Marks Decl. ¶¶ 35–36, 39)

24.    Mr. Marks suggests that DoD must reassess existing mitigation agreements because they were negotiated under outdated assumptions that do not account for modern threats. Wind turbine radar impacts, however, are not a new or newly discovered phenomenon. They have been

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

studied and understood for well over a decade and, by my count, for approximately twenty years. DoD's own report to Congress addressing wind farms and radar dates to 2006, and a MITRE/JASON report specifically studying wind farms and radar interference, including potential mitigation options, followed in 2008. Mitigation options have been evaluated and accepted since at least 2012–2013, when DoD field-tested mitigation measures and reported the results in a 2014 paper, with additional options tested and validated in the years since, and still more in development as discussed in the WTRIM annual progress reports and a WTRIM report to Congress dated February 2024. Even accepting for the sake of argument that the threat of a drone attack on the homeland has increased as drone technology has advanced, DoD maintains an updated array of countermeasures to address those evolving threats. And to the extent that any emerging drone threat scenario relates to wind turbine-related radar impacts, DoD already possesses mitigation tools designed to address it. Nothing in Mr. Marks' declaration explains why mitigation measures that DoD successfully relied upon for years suddenly became inadequate or why they could no longer be evaluated on a project-specific basis. While Mr. Marks references the application of DoD's threat assessment processes and offices (Joint Risk Analysis Methodology ("JRAM") and the Defense Threat Reduction Agency ("DTRA")) that would evaluate the new threat scenario against the Clearinghouse's mitigation capabilities, conspicuously absent from Mr. Marks' declaration—in unclassified or classified format—is an explanation of how those DoD components reviewed the potential risk at hand and what findings and determinations resulted from those processes. Absent that information, it is not possible to confirm the credibility of Mr. Marks' justification for his suspension of mitigation agreements.

**Issue 8: The Historical Performance of Existing Mitigation Measures (Marks Decl. ¶¶ 36, 56–60)**

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

25.     Even accepting for the sake of argument Mr. Marks' assertion that new threats, such as drones, are emerging, nothing in Mr. Marks' declaration explains why mitigation measures that DoD successfully relied upon for years suddenly became inadequate to address the drone threats he alludes to. Moreover, none of the drone incursions discussed in his declaration involved wind turbines. Indeed, at least one of the scenarios proves the opposite of the theory that Mr. Marks posits: several of the incursions he cites occurred at Edwards Air Force Base in California, where, as the declaration acknowledged, DoD detected and tracked those incursions notwithstanding the presence of thousands of turbines in the surrounding region. Mr. Marks identifies no evidence that nearby wind turbines impaired DoD's ability to detect or respond to those drones, no comparison showing that detection capability at Edwards is materially worse than at installations without nearby wind turbines, and no analysis demonstrating that previously accepted mitigation measures are no longer effective. In my opinion, the examples he cites do not support the conclusion that existing or proposed wind projects require a fundamentally different approach than what DoD has successfully employed for years.

**Issue 9: The Clearinghouse's Historical Use of Classified Information (Marks Decl. ¶¶ 37–38)**

26.     The Clearinghouse has relied on classified analyses since its inception and has developed mitigation measures with developers without risking spillage of that information. To the extent that Mr. Marks' statement that the need to protect sources and methods prevents the Department from working with developers to find real-world mitigation solutions to risks derived from classified intelligence or analysis, that is inconsistent with Congress' directive in 10 U.S.C. § 183a and long-standing Clearinghouse practice. In those cases, where a DoD component needs to address a risk identified through classified information, DoD has simply informed developers

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

that a concern exists and identified the mitigation required, without disclosing the underlying classified basis, and developers have routinely been able to implement those measures. As described above, the history of RAM in NORAD MRTs from 2019 onward has relied upon classified CJCS surveillance requirements without ever defining those requirements; industry representatives have always implemented those requirements. The use of classified information has therefore never prevented the Clearinghouse from conducting project-specific reviews or negotiating mitigation agreements. Nor has the government offered to provide classified information for the Court's *in camera* review in this case. Mr. Marks' declaration offers no explanation why classified information now requires abandoning that longstanding process rather than continuing to apply it on a project-by-project basis.

**Issue 10: Changes to the Clearinghouse's Analytical Methodology Over Time (Marks Decl. ¶ 39)**

27.    Mr. Marks' declaration states that the Clearinghouse's analytical methodology had not materially changed for approximately fifteen years. That is incorrect. The Clearinghouse's analytical methodologies have continually evolved as new missions, technologies, and operational concerns have emerged. Relocatable Over-the-Horizon Radar ("ROTHR") provides a clear example. Because ROTHR presented technical issues fundamentally different from those associated with air-traffic-control or NORAD radar systems, the Clearinghouse did not attempt to force the problem into its existing analytical framework. Instead, it developed an entirely new analytical methodology and corresponding mitigation approaches tailored specifically to proposed wind projects near ROTHR installations. As the Clearinghouse's founding Executive Director, I personally traveled to the Massachusetts Institute of Technology's Lincoln Laboratory—the Federally Funded Research and Development Center established to design the Nation's air defense

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

network and one of DoD's premier radar research institutions—to initiate the technical effort that ultimately produced the analytical methodology and mitigation measures accepted by the Department of the Navy and the United States Southern Command. That experience exemplifies how the Clearinghouse has historically responded to new technical challenges: by developing new analytical methodologies and project-specific mitigation measures while continuing to review and process projects—not by suspending the process until a comprehensive reassessment could be completed.

### Issue 11: Mitigation Approaches Historically Used by DoD (Marks Decl. ¶ 39)

28.    Mr. Marks' declaration discusses only a single mitigation option and questions its viability in light of the drone threat he describes. That does not reflect the range of mitigation measures available to address wind turbine radar impacts. DoD has developed, tested, and employed multiple mitigation approaches, and the appropriate mitigation has always depended on the particular radar system, military mission, and characteristics of the proposed project. Mr. Marks references DoD's JRAM and DTRA risk evaluation processes but, among other missing details, he does not indicate whether DoD evaluated any mitigation options as part of the analysis, whether any remain effective, or why they were rejected. For example, risk management is a key component of the JRAM framework, and a reasonably thorough analysis of emerging drone risks to exploit wind turbine-related risks under that framework would require evaluation of current and feasible mitigation measures and capabilities. Without addressing those issues, his declaration does not establish that project-specific mitigation is no longer a viable means of protecting military missions.

### Issue 12: The International Experience Cited by Mr. Marks (Marks Decl. ¶¶ 40, 42, 48)

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

29.     Drone threats are not new, and although they have evolved, other countries have generally responded by deploying additional radar systems, counter-UAS technologies, and other mitigation measures while continuing to permit wind development, rather than by suspending project-specific mitigation. Mr. Marks' declaration does not discuss whether any of the wind projects at issue—which are usually sited in remote or rural areas rather than near likely drone targets, as reflected in the U.S. Wind Turbine Database maintained by the U.S. Geological Survey and Lawrence Berkeley National Laboratory (the same database on which Mr. Marks himself relied)—are located near facilities that would plausibly be attractive targets for a drone attack. Again, if DoD conducted a threat assessment to evaluate the ability of new adversary drone technologies to exploit wind turbine-related radar impacts, that threat assessment would only be complete if it considered the relative placement of the project at issue and the potential target facility.

30.     Nor does Mr. Marks identify any operational experience from allied countries—including those operating substantial wind fleets in the North Sea and Baltic Sea—showing that existing wind mitigation measures have failed, that wind turbines have materially impaired military responses to drone attacks, or that evolving drone threats require abandoning project-specific review in favor of an indefinite, nationwide suspension. His declaration identifies no allied military that has concluded such a suspension is necessary, and reports in the European press indicate precisely the opposite. Rather than suspend wind development, NATO allies are using offshore wind platforms to improve their coastal surveillance and defense: the British are upgrading their radar network, while Belgium and Poland are reportedly having developers install additional sensor packages on offshore substations.

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

31. The available real-world experience for onshore wind likewise points the other way. Ukraine, which has defended against sustained drone and missile attacks on its energy infrastructure since February 2022, has continued to expand wind generation throughout the war and has publicly explained that distributed generation, including wind, strengthens national resilience because it is harder to disable and more rapidly restored than large, centralized power plants. Ukraine added more than 400 megawatts of new wind capacity in the first half of 2026 alone, with a project pipeline exceeding 10 gigawatts. Yet Mr. Marks' declaration does not identify any evidence that Ukraine has concluded wind turbines create an unacceptable military vulnerability, that existing mitigation measures are inadequate, or that project-specific review should be abandoned. Instead, Ukraine has continued expanding wind generation while adapting its defenses to evolving drone and missile threats, including from its hostile next-door neighbor, Russia (geography that the United States does not face).

32. Ukraine's experience is also instructive because it reflects the most extensive real-world operational experience with modern drone warfare. Publicly available analyses of Ukraine's counter-drone operations describe an integrated air-defense architecture that employs multiple complementary detection and tracking capabilities rather than relying exclusively on radar.

33. Those analyses do not identify interference from wind turbines as a material limitation on Ukraine's ability to detect or respond to drone threats, notwithstanding the country's continued expansion of wind generation during the conflict. To the contrary, Ukraine's experience suggests that modern counter-drone defense depends on a layered approach employing multiple complementary technologies rather than on radar alone.

34. It is also important to recognize that the United States' air defense architecture differs fundamentally from Ukraine's. The United States employs a far more capable, layered, and

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

redundant network of radar systems, sensors, and other air-defense assets. For that reason, developments in Ukraine do not, by themselves, demonstrate that longstanding mitigation measures for U.S. wind projects have become inadequate.

35.    Mr. Marks relies extensively on developments in Ukraine and other recent conflicts to explain why DoD believes the national security environment has fundamentally changed. Yet he identifies no country that has determined evolving drone threats require abandoning project-specific review and negotiated mitigation for land-based wind projects. Based on my experience and review of the publicly available information, I am aware of no country that has concluded that land-based wind development presents such an inherent national security risk that it has categorically suspended nationwide review of those projects. Instead, countries confronting significant national security challenges have continued to evaluate land-based wind projects on a project-specific basis, sometimes restricting or excluding development of proposed projects in particular sensitive military areas, rather than imposing a nationwide suspension of project review. That has been the general approach even in countries, including Sweden, Finland, Japan, and Taiwan, facing acute security concerns due to proximity to adversarial neighbors.

**Issue 13: Operation Spiderweb and the Israel-Iran Conflict (Marks Decl. ¶¶ 43–48)**

36.    In my opinion, Operation Spiderweb does not support the conclusions Mr. Marks draws from it. Most fundamentally, DoD's own conduct contradicts any suggestion that Operation Spiderweb required an immediate halt to the Clearinghouse's ordinary mitigation process: DoD continued holding mitigation meetings and continued sending mitigation agreements to developers after June 2025. Nor does the operation itself bear any apparent relationship to the asserted problem of wind-turbine radar interference. As Mr. Marks describes it, the attack involved drones covertly transported into Russia inside shipping containers carried by trucks and launched from locations

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

within the country. That scenario does not suggest that wind turbines impaired detection, and Mr. Marks offers no explanation of how commercial vehicles could enter the United States, bypass port-of-entry and law-enforcement controls, travel to concealed launch sites and exploit wind-turbine interference in the manner his declaration implies. Operation Spiderweb may support enhanced intelligence, border security, counter-UAS capabilities, and law-enforcement measures; it does not support suspending wind development nationwide or abandoning the Clearinghouse's longstanding practice of wind project-specific mitigation.

37.    Operation Spiderweb also did not introduce DoD to a new category of threat. DoD had already been confronting offensive drone attacks for years, including the January 2024 attack in Jordan that killed three U.S. service members and injured more than 40 others. By December 2024, DoD had formally adopted a department-wide strategy for countering unmanned systems. Operation Spiderweb may have illustrated the evolving tactics of drone warfare, but Mr. Marks does not explain why it rendered the Clearinghouse's existing project-specific mitigation process inadequate—particularly when DoD continued using that process after the operation occurred.

38.    The later events discussed in Mr. Marks' declaration also do not change my opinion. The incidents in the Strait of Hormuz occurred after DoD had already begun its strategic review, and the renewed conflict involving Israel, the United States, and Iran did not begin until February 28, 2026—nearly six months after DoD stopped executing mitigation agreements in August 2025. Because those events occurred well after the August 2025 policy change, they do not help explain why DoD concluded at that time that it needed to suspend its longstanding process of project-specific review and negotiated mitigation for utility-scale wind projects.

39.    More importantly, Mr. Marks does not identify any evidence that air-defense challenges arising from those conflicts were caused or materially affected by radar interference

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

from wind turbines, and I am aware of no such evidence. To the contrary, publicly available analyses of drone and counter-drone operations in both the Russia-Ukraine and Israel-Iran conflicts emphasize layered, integrated air-defense systems employing multiple complementary detection and response capabilities. Those analyses do not identify wind turbines as a material limitation on air defense or suggest that any evolving drone threats require suspending project-specific review or negotiated mitigation for wind projects.

**Issue 14: Public Technical Research Regarding Wind and Radar (Marks Decl. ¶¶ 47–48)**

40.    I have reviewed WTRIM's 2024 Annual Progress Update, which summarizes DoD's and other agencies' wind turbine/radar research, development, testing, and evaluation efforts. The report describes more than twenty ongoing research projects funded by DoD, the Department of Energy, the FAA, and NOAA addressing subjects ranging from radar-clutter mitigation to next-generation radar systems. The report does not identify any new research initiative or technical effort focused on the interaction between wind turbines and drone detection that would explain the abrupt suspension of mitigation-agreement execution beginning in August 2025. Nor, to my knowledge, has DoD identified any such new analysis as the basis for abandoning the Clearinghouse's longstanding practice of project-specific mitigation, and Mr. Marks' declaration does not identify the presence of any such analysis.

**Issue 15: Radar Line-of-Sight and Wind Turbine Effects (Marks Decl. ¶¶ 49–55)**

41.    Mr. Marks' declaration substantially overstates the operational effects of wind turbines on radar performance. Existing U.S. radar systems face inherent challenges detecting small drones regardless of whether wind turbines are present, and the radars at issue are not rendered "blind." Marks Decl. ¶ 52–53. To the contrary, I have seen video from the Danish aerospace and defense firm Terma in which their radar tracks a fighter formation flying through

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

an offshore wind farm below the spinning turbine blade tips. Mr. Marks does not distinguish between the limitations inherent in radar technology generally and any incremental effects attributable to wind turbines. More fundamentally, the declaration does not explain why DoD has suspended processing for all wind projects, including turbines sited entirely outside a radar's line of sight ("RLOS"). Because such turbines cannot be seen by the radar, they do not generate radar returns, appear on an operator's display, or create clutter that could even theoretically interfere with drone detection. If the technical concerns described in Mr. Marks' declaration are in fact the basis for DoD's actions, there is no apparent reason why projects incapable of producing those effects would be subject to the same indefinite, nationwide suspension. Mr. Marks offers no technical explanation for that result.

**Issue 16: Public Reports on Wind Turbine/Radar Research (Marks Decl. ¶¶ 56–60)**

42.    I have also reviewed the Department of Energy's February 2024 Report to Congress and the 2025 interagency report on wind turbine/radar research, development, testing, and evaluation. Those reports describe ongoing efforts to improve radar performance and the compatibility of wind facilities with defense missions—efforts that are consistent with the Clearinghouse's longstanding practice of refining its analytical methods and mitigation measures as technology evolves. Neither report, however, identifies any operational failure of existing mitigation measures, any conclusion that project-specific mitigation had become ineffective, or any recommendation that DoD suspend its longstanding process of individualized review and negotiated mitigation.

43.    Nor does the 2025 interagency report identify drone detection or unmanned aerial vehicles as a research priority in connection with wind-turbine interference. I am aware of no technical analysis concluding that evolving drone threats rendered the Clearinghouse's

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

longstanding review process inadequate or justified an indefinite, nationwide suspension of mitigation-agreement execution. Mr. Marks identifies no such analysis (classified or unclassified) in his declaration.

**Issue 17: The Technical Materials Referenced in the Marks Declaration (Marks Decl. ¶¶ 49–64, 89–94)**

44.     Mr. Marks states that DoD's decision to suspend the Clearinghouse's longstanding process for utility-scale wind projects was informed by classified analyses, including JRAM and the DTRA Mission Assurance process. Marks Decl. ¶¶ 61, 89–94. I do not question that these are the processes DoD would ordinarily use to assess emerging threats and adversary capabilities. What Mr. Marks does not provide, however, is any meaningful description—classified or unclassified—of the conclusions those analyses reached or how they support the decision to indefinitely suspend the Clearinghouse's established process of project-specific review and negotiated mitigation.

45.     The unclassified materials accompanying Mr. Marks' declaration also do not resemble the technical products that ordinarily result from those processes. One chart is captioned "Signal to Notice (SNR) Comparison," rather than "Signal-to-Noise Ratio," the standard radar-engineering terminology used by DoD radar engineers and the Clearinghouse's technical personnel. Marks Decl. ¶ 52. Other exhibits consist primarily of simplified conceptual graphics, generalized diagrams, and explanatory analogies rather than the engineering analyses, radar cross-section studies, operational modeling, validation reports, or field-test results that historically informed Clearinghouse determinations. Marks Decl. ¶¶ 52–55, 58, 92. Several of the graphics also appear to have been prepared specifically to illustrate the arguments made in this declaration rather than reflecting contemporaneous technical analyses generated during DoD's decision-

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

making process. To my knowledge, these graphics have not previously been published or otherwise disclosed by DoD.

46.    I do not have access to the classified analyses Mr. Marks references, nor do I purport to authenticate the origin of the exhibits attached to his declaration. But during my sixteen years working with the Clearinghouse, national security determinations have been based on validated engineering analyses and classified operational assessments—not explanatory presentation materials prepared for litigation. While there is no relevant evidence to support the assertions, if DoD's decision was supported by the rigorous engineering and intelligence analyses Mr. Marks describes, the declaration does not explain, even at a high level, what those analyses concluded or why they led DoD to depart from the Clearinghouse's longstanding process. Instead, the public record relies primarily on illustrative graphics that are not themselves technical analyses.

### III. DoD's Conduct Since August 2025

**Issue 18: The Scope and Duration of DoD's Pause (Marks Decl. ¶¶ 85, 96–97)**

47.    On DoD's conduct since August 2025: Mr. Marks' account of recent events is no more reliable than his account of the Clearinghouse's history. He characterizes DoD's actions as a narrow, "temporary and strategic" "pause in the execution of additional mitigation agreements," during which "most aspects of the process continued business as usual." Marks Decl. ¶¶ 85, 97. He further states that DoD executed its last mitigation agreement on August 18, 2025. *Id.* ¶ 96. That date is the one specific, objectively verifiable fact in this portion of his declaration, and it is consistent with my own records. The broader narrative is not. Everything else in his characterization—that the pause was narrow, temporary, and confined to mitigation agreement execution—is contradicted by what I have personally observed while representing developers before the Clearinghouse. Based on my firsthand involvement with DARE Strategies' current

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

client projects, what began as a halt in executing mitigation agreements progressively expanded to disrupt virtually every stage of the Clearinghouse process. Far from continuing "business as usual" as Mr. Marks claims, DoD's actions have increasingly prevented the ordinary processing of utility-scale wind projects, irrespective of their individualized locations or circumstances. My clients' experience is not an outlier: a bipartisan group of 55 Members of Congress wrote to Secretary Hegseth and Mr. Marks on May 12, 2026, reporting that nearly 200 projects were then stalled across every stage of the Clearinghouse pipeline—at least 35 awaiting only DoD's countersignature and at least 30 awaiting a draft agreement after successful mitigation talks— numbers that track closely with what I have observed among my own clients.[1]

**Issue 19: Project-Specific Explanations for the Pause (Marks Decl. ¶¶ 21, 28–31, 33– 35)**

48.     The pattern of DoD's actions that I have personally observed is irreconcilable with Mr. Marks' characterization that DoD paused only the "execution" of mitigation agreements while other phases of the Clearinghouse process "continued business as usual." Marks Decl. ¶¶ 85, 97, 99. As described above, what began as a halt in countersigning mitigation agreements in August 2025 progressively expanded to encompass the transmission of draft agreements, the conduct of MRT negotiations, and ultimately the processing of projects throughout the Clearinghouse pipeline. By April 2026, the disruption had spread to every meaningful stage of the process for the projects with which I am familiar. This was not a temporary pause in a single procedural step. It was a progressively expanding shutdown of the Clearinghouse's ordinary process for utility-scale

---

[1] Letter from Members of Congress to Pete Hegseth, Sec'y of Def. (May 12, 2026), https://magaziner.house.gov/sites/evo-subsites/magaziner.house.gov/files/evo-media-document/quill-letter-l36575-dod-delays-in-mitigation-agreements-for-wind-energy-projects-version-2-05-12-2026-06-09-pm-1-compressed.pdf

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

wind projects. Mr. Marks offers the Court a far narrower description, but neither his declaration nor my firsthand experience provides any basis for that characterization.

49.    That shutdown is particularly difficult to reconcile with the Clearinghouse framework Congress established. Historically, when DoD identified a new or evolving national-security concern, it addressed that concern through the Clearinghouse's project-specific review process—including Notices of Presumed Risk, MRT negotiations, and tailored mitigation measures—the very process Mr. Marks describes throughout his declaration. Marks Decl. ¶¶ 21–23, 28–31, 33–35. Yet Mr. Marks never explains why those established mechanisms could not have been used here if a genuine, newly identified national-security concern had arisen. Instead, the projects I have worked on received no project-specific explanation, no identified technical deficiency, no revised mitigation proposal, and no indication that existing mitigation measures had become inadequate. Rather than engaging in the individualized evaluation Congress required and the Clearinghouse historically performed, DoD simply stopped moving projects forward.

**Issue 20: The Timing of Developer Concerns Relative to This Litigation (Marks Decl. ¶¶ 26, 32)**

50.    Mr. Marks also asserts that "no developer has ever contacted the Clearinghouse to allege the Department failed to render a preliminary review within 30 days," and that developers did not seek written extensions or complain about delays "until litigation seemed imminent." Marks Decl. ¶¶ 26, 32. That characterization is misleading. Well before this litigation was filed, and before litigation was even under consideration, ACP wrote directly to Mr. Marks on March 9, 2026, requesting that DoD explain "the basis for the apparent departure from [its] prior longstanding practice of promptly concluding agreements and transmitting findings to the FAA" and, if DoD did not intend to execute pending mitigation agreements, to identify "the legal and

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

factual basis for that position." That letter expressly challenged the very delays and departure from longstanding Clearinghouse practice that Mr. Marks now suggests no one raised.

51.     Nor was ACP's letter an isolated concern.  My clients and I repeatedly sought updates from Clearinghouse personnel regarding pending projects, attempted to determine why previously negotiated agreements were no longer moving forward, and continued to engage in good faith in the expectation that the Clearinghouse would resume its longstanding practice of project-specific review. The problem was not a lack of communication from developers; it was the absence of meaningful responses or project-specific explanations from DoD.

52.     My clients make long-term business decisions—including financing, procurement, construction scheduling, and commercial contracting—in reliance on a fair, transparent, and reasonably predictable Clearinghouse process. Before the events described above, I could generally advise clients when to expect DoD action because, although individual projects varied, the process continued to move toward resolution. That is no longer true. Mr. Marks therefore misinterprets the industry's conduct. Developers did not remain silent because they accepted indefinite delay; they engaged repeatedly with DoD in an effort to move projects forward and, when it became clear that the Clearinghouse had abandoned its longstanding practices without explanation, ACP formally raised those concerns directly with Mr. Marks months before this lawsuit was filed.

**Issue 21: Industry and Congressional Correspondence Regarding the Pause**

53.     Mr. Marks' declaration portrays DoD's actions as the product of a careful, good-faith effort to address newly emerging national-security concerns. It omits, however, the extensive record of industry and congressional inquiries that preceded this litigation—many directed to Mr. Marks personally—and DoD's failure to provide any meaningful explanation at the time. As

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

described above, ACP wrote directly to Mr. Marks on March 9, 2026, requesting the legal and factual basis for DoD's apparent departure from its longstanding practice of promptly executing mitigation agreements and transmitting determinations to the FAA. DoD's April 8, 2026, response, signed by Mr. Marks' deputy, Robert E. Thompson, did not identify any project-specific deficiency, any newly discovered technical concern, or any basis for distinguishing pending projects from the thousands previously processed by the Clearinghouse. Nor did it provide any timeline for resuming action. Instead, it stated only that DoD was "taking steps to ensure the Department's formal review of proposed projects is sufficient to address modern military risks" and made passing reference to a government shutdown that lasted approximately six weeks and had ended months earlier.

54.    The following day, April 9, 2026, DoD began sending substantially identical form letters to individual developers, including my clients, repeating the same generalized language while again providing no project-specific explanation and no indication of when processing would resume. Then, on May 12, 2026—less than two months before Mr. Marks signed his declaration—55 Members of Congress from both parties wrote directly to Secretary Hegseth and Mr. Marks stating that the Clearinghouse had "effectively ceased functioning" and describing the Department's actions as "an unexplained and significant departure from longstanding practice."

55.    Mr. Marks' declaration does not acknowledge any of these communications. By the time he signed it, DoD had been repeatedly asked—by the industry, by affected developers, and by Members of Congress—to explain why it had abandoned the Clearinghouse's longstanding, project-specific review process. Yet none of the contemporaneous responses identified the factual and technical rationale set out in this declaration. Instead, DoD offered only generalized references to "modern military risks" while continuing to withhold project-specific explanations, suspend

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

processing nationwide, and decline to explain why the existing mitigation framework had suddenly become inadequate. Mr. Marks supplied his declaration only after this litigation was filed and for purposes of defending against it.

56.    In response to a question from Ranking Member Garamendi during the March 4, 2026, hearing before the House Armed Services Readiness Subcommittee regarding delays in DoD's review of wind projects and whether he intended to change the Clearinghouse process, Mr. Marks testified: "Sir, the intent is to change the process to speed it up . . . [with respect to NORAD] we've asked for input on how to make that better." That testimony is difficult to reconcile with DoD's actions only weeks later. Rather than implementing changes to expedite the process, DoD expanded its freeze by cancelling scheduled MRT meetings, refusing to execute negotiated mitigation agreements, and ceasing to transmit to the FAA determinations for wind turbines that DoD's preliminary review had already concluded posed no presumed risk because they were outside radar line of sight, outside low-level military airspace, and beyond the established buffer around intercontinental ballistic missile launch and control facilities.

**Issue 22: The Nature of the 53 Meetings Referenced in the Marks Declaration (Marks Decl. ¶¶ 84–88)**

57.    Mr. Marks' declaration states that DoD conducted approximately 53 meetings while developing its revised methodology. As I understand it, many of those meetings were briefings for Members of Congress, congressional staff, and other stakeholders (but not developers) responding to a widespread concern over DoD's suspension of the Clearinghouse process—not technical working sessions with the wind industry or the independent experts who have historically collaborated with DoD to develop project-specific mitigation measures. Nor did those meetings produce meaningful public information regarding the technical basis for DoD's actions or when the Clearinghouse would resume normal operations.

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

58.    The chronology of DoD's own conduct further undermines the suggestion that a comprehensive methodological review required an immediate halt to the Clearinghouse process. NORAD continued scheduling MRT meetings and conducting mitigation discussions through early April 2026. My own records include a routine project email from a NORAD point of contact dated February 12, 2026, and an MRT discussion held on April 9, 2026. Only one week later, on April 16, 2026, that same official advised that he was "unable to discuss these pending mitigation agreements or any pending MRTs" and that NORAD was "unable to share" its list of affected radars "at this time." The abrupt transition from ordinary project-specific engagement to complete silence was never accompanied by any project-specific technical explanation.

**Issue 23: The Process Improvements Described in the Marks Declaration (Marks Decl. ¶¶ 99–100)**

59.    Mr. Marks' declaration states that DoD developed new mitigation templates, revised communications, updated training, and other process improvements during this period. Even accepting for the sake of argument those assertions as true, they do not explain why the nationwide suspension described above persisted throughout that work or why it continues today. If those efforts were intended to improve the Clearinghouse process, one would reasonably expect them to result in the resumption of project-specific review, the circulation of updated mitigation agreements, or the reopening of MRT negotiations. Based on my firsthand experience, none of those things have occurred. None of my clients has received any of the purported new mitigation templates, revised communications, or other process improvements Mr. Marks describes. Instead, the practical effect has remained unchanged: pending projects continue to be stalled, negotiated mitigation agreements remain unexecuted, discussions regarding draft agreements have not resumed, and the individualized review process Congress established remains effectively suspended.

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**Issue 24: The Effect of the May 7, 2026 Interim Guidance on Wind Projects (Marks Decl. ¶¶ 97-98)**

60.     Mr. Marks' declaration characterizes the May 7, 2026, Interim Guidance as having "restarted" the Clearinghouse process. That characterization is difficult to reconcile with the memorandum itself. The Interim Guidance expressly singles out wind projects because of their supposed potential for "significant Doppler effects" and directs additional review before those projects may proceed. Thus the memorandum did not restore the ordinary Clearinghouse process for utility-scale wind development. That reality is entirely consistent with what my clients and other developers have experienced throughout the preceding nine months: no executed mitigation agreements, no new draft mitigation agreements, no resumed MRT negotiations, and no meaningful project-specific progress.

61.     Mr. Marks also states that the MRT slowdown lasted only sixteen business days and ended on May 7, 2026. As of the date of this declaration, however, MRT negotiations, draft-agreement transmittal, and mitigation-agreement execution remain suspended for the DARE Strategies projects identified above, exactly as they were before issuance of the Interim Guidance. The practical reality for utility-scale wind projects did not change on May 7.

62.     Mr. Marks further states that approximately 1,000 structures have received findings of no concern since May 2026 and offers that figure as evidence that the Clearinghouse has resumed normal operations. That statistic is misleading in the context of this case. Mr. Marks does not state that any of those structures were utility-scale wind turbines, and to the best of my knowledge, none were. Indeed, the Interim Guidance itself makes clear that wind projects remain subject to additional review because of their claimed potential for "significant Doppler effects" irrespective of where the project is located. Thus, the cited figure demonstrates only that DoD has

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

processed categories of projects unaffected by the wind-specific restrictions. It does not show that the Clearinghouse resumed processing the very category of projects whose suspension is at issue in this litigation.

**Issue 25: The Practical Application of the Interim Guidance to Wind Projects (Marks Decl. ¶¶ 99–102)**

63.     Mr. Marks' declaration characterizes the Interim Guidance as a technology-neutral policy that was not intended to single out wind energy. The text and operation of the May 7, 2026, memorandum do not support that characterization. The memorandum expressly exempts oil and gas energy projects and any other projects that do not present a purportedly "impactful" Doppler effect from the additional review it imposes. To my knowledge, utility-scale wind energy is the only category of energy infrastructure that DoD has identified as presenting such a Doppler effect. As a practical matter, therefore, the additional review applies only to wind projects.

64.     That conclusion is confirmed by DoD's own implementation. Since issuance of the Interim Guidance, the Clearinghouse continued its freeze on clearance of wind turbines that do not trigger the need for mitigation discussions because they are outside radar line of sight and military airspace, the execution of mitigation agreements, the transmission of draft agreements, and MRT negotiations for utility-scale wind projects. Thus, regardless of how the memorandum is framed, it operates as a wind-specific policy. Calling it technology-neutral does not change its practical effect.

**<u>Conclusion</u>**

65.     As the Clearinghouse's founding Executive Director, one of the principal authors of its implementing regulations, and someone who has worked continuously within the Clearinghouse process for the past sixteen years, I am aware of no prior instance in which DoD

Page 31
**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

suspended the execution of mitigation agreements, the circulation of draft mitigation agreements, and MRT negotiations across the board for an open-ended period without providing project-specific explanations. The Clearinghouse that Congress created and that I helped implement has always operated through individualized technical review. New concerns were evaluated one project at a time, mitigation was tailored to the facts of each project, and where mitigation proved insufficient, that determination was likewise made on a project-specific basis.

66.    In my opinion, based on my firsthand knowledge of the Clearinghouse's creation, operation, and evolution, the actions DoD has taken since August 2025 are unprecedented. They are not consistent with the statutory framework Congress established, the regulations I helped draft, or the way the Clearinghouse has operated for more than sixteen years. In my opinion, Mr. Marks materially mischaracterizes the Clearinghouse's history, governing framework, the significance of the national-security developments on which he relies, and the practical effect of DoD's actions since August 2025.

67.    Finally, the explanation contained in Mr. Marks' declaration was not offered contemporaneously to the industry or to Congress despite repeated requests. Before this litigation was filed, ACP sought the legal and factual basis for DoD's departure from longstanding Clearinghouse practice; affected developers repeatedly sought project-specific explanations; and 55 Members of Congress requested that DoD explain why the Clearinghouse had effectively ceased functioning. Yet DoD responded only with generalized references to "modern military risks," without identifying any project-specific deficiency, any failure of the existing mitigation framework, or any reason why the individualized review process Congress established had to be abandoned. Those contemporaneous events are consistent with my own experience and inconsistent with the account presented in Mr. Marks' declaration.

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

68.    I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge and belief.

Executed on July 20, 2026.

Howard D. Belote
Managing Partner and CEO, DARE Strategies LLC

**REPLY DECLARATION OF HOWARD D. BELOTE, MANAGING PARTNER AND CEO OF DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**