# <u>Exhibit B</u>

*To Plaintiff's Reply Brief in Support of Motion for Stay or Preliminary Injunction*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST, *et al.* *Plaintiffs,* <br><br> v. <br><br><br><br><br><br><br><br><br> PETER B. HEGSETH, *et al.*, *Defendants.* | **Civil Action No. 3:26-cv-01092-IM** <br><br> **REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Pursuant to 28 U.S.C. § 1746(2), I, Geoffrey N. Blackman, declare as follows:

**Introduction**

1.    I submit this reply declaration in support of Plaintiffs' motion for a preliminary injunction and in response to the Declaration of Hon. Dale R. Marks, dated July 5, 2026, and filed in this action on July 6, 2026, as ECF No. 90-1 ("Marks Decl."). Drawing on my 31 years of experience as a radar subject matter expert and on my experience advising wind energy developers on the radar-related aspects of the Clearinghouse process, I address the respects in which the Marks Declaration overstates or mischaracterizes the technical relationship between wind turbines and radar systems, and the historical availability and effectiveness of radar mitigation measures. I have reviewed the Marks Declaration in its entirety.

**REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

2.    I have personal knowledge of the facts stated herein and, if called to testify, could and would testify competently thereto.

**<u>Professional Background and Qualifications</u>**

3.    My professional background and qualifications are set forth in full in my declaration submitted in support of Plaintiffs' Motion for Preliminary Injunction ECF No. 36-12 and are incorporated here by reference. In brief: I am the founder, owner, and principal consultant of Westslope Consulting, LLC, a firm that provides radar consulting and technical services to developers of land-based and offshore wind energy. I have 31 years of experience working with radar and associated tracking and display systems, including air traffic control radar, air defense radar, border security radar, high-frequency coastal radar, weather radar, over-the-horizon drug-interdiction radar, and test-range instrumentation radar. From 1995 to 2008, I provided systems engineering support to the Federal Aviation Administration ("FAA"), including work on the Air Route Surveillance Radar-4 (ARSR-4) and the Airport Surveillance Radar-11 (ASR-11) programs. Since founding Westslope Consulting in 2008, I have spent 18 years conducting mitigation studies, collaborating with the Department of Defense ("DoD") whenever possible to understand impacts and identify mitigation, and negotiating mitigation agreements with federal agencies, including leading the Radar Working Group under the first Cooperative Research and Development Agreement with U.S. Transportation Command, and serving as a technical advisor to a wind developer in negotiating the first Memorandum of Agreement between a wind developer and the Navy.

2

**REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

4.     This declaration does not rely on, and I do not have access to, classified information. My statements below are confined to the unclassified representations in Mr. Marks' declaration and reflect my own direct, technical experience.

## Response to the Marks Declaration

5.     The issues discussed below set forth my professional opinions regarding the principal technical assertions in the Marks Declaration. Those opinions are based on my experience studying, testing, and mitigating the effects of wind turbines on radar systems, and on my direct experience developing and evaluating radar mitigation measures over more than two decades.

**Issue 1: Mr. Marks' Claim That Emerging Drone Threats Required Abandoning the Clearinghouse's Longstanding Mitigation Framework (Marks Decl. ¶¶ 35–36, 39)**

6.     Mr. Marks' suggestion that current wind-turbine radar impact analysis and mitigation techniques cannot or do not address modern drones is inconsistent with my experience. In my experience, the Clearinghouse repeatedly and consistently adapts to changing technologies. I served as a technical advisor to Idaho National Laboratory for the 2008 JASON Report, *Wind Farms and Radar* (JSR-08-125), which followed DoD's own report to Congress on the subject two years earlier. Those two reports make clear that DoD understood the effects of wind turbines on radar systems for approximately twenty years. During that same period, mitigation techniques have been developed, tested, validated, and refined.

7.     The Department of Energy's Wind Turbine Radar Interference Mitigation ("WTRIM") initiative has continued to improve those mitigation techniques as radar technology, software, and operational requirements have evolved. The Clearinghouse has repeatedly adapted

3

**REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

to changing technologies and operational concerns over the past two decades. Nothing in Mr. Marks' declaration identifies any engineering analysis, field testing, operational experience, or other technical evidence demonstrating that the existing mitigation framework has become fundamentally incapable of adapting to, and addressing drone-related concerns, or why those concerns could no longer be evaluated and mitigated on a project-specific basis as they had been throughout the Clearinghouse's history.

**Issue 2: Mr. Marks' Claim That Existing Radar Mitigation Measures Are Inadequate to Address Modern Threats (Marks Decl. ¶¶ 36, 56–60)**

8. Mr. Marks' declaration does not identify a technical deficiency in the radar mitigation measures developed and validated over the past two decades, and in my professional opinion it is highly unlikely that one exists.

9. Mitigation measures that I have personally been involved in developing or testing, and mitigation measures that I have implemented, trained others how to implement, or negotiated, including radar tracking and display system improvements; optimization techniques, which North American Aerospace Defense Command (NORAD) refers to as Radar Adverse-impact Mitigation ("RAM"), which vary by radar system; and the use of other nearby radar sites to augment detection, remain effective today.

10. Nothing about the drone threats Mr. Marks describes changes how these mitigations work. While Mr. Marks states that DoD "lacks confidence that [the MRT's mitigation] measures are responsive to the actual risks presented," his declaration focuses on only one type of mitigation: RAM. He does not address other mitigation measures and how those work together as a system.  To the extent Mr. Marks' declaration relies on examples of drone incursions,

4

**REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

including drone incursions near installations such as Edwards Air Force Base ("AFB"), Mr. Marks cites no technical analysis showing that nearby wind turbines impaired detection or response in those incidents, or that any previously validated mitigation measure ceased functioning as designed.

**Issue 3: Mr. Marks' Claim That the Clearinghouse's Radar-Related Analytical Methodology Has Not Materially Changed in Fifteen Years (Marks Decl. ¶ 39)**

11.    Mr. Marks' characterization of a static, fifteen-year-old methodology does not match my direct experience. DoD's radar-mitigation approach has continually adapted to the technical characteristics of each radar system it addresses. For example, DOD developed a distinct analytical methodology and mitigation approach specifically for wind projects near Relocatable Over-the-Horizon Radar (ROTHR) installations, designed to detect aircraft and vessels approaching the U.S. from a great distance. Further, the FAA, DoD, and the Department of Homeland Security developed and implemented the Stationary Doppler Target Suppressor (SDTS) algorithm in the Common Air Surveillance Radar (CARSR) software, which is adjusted as part of RAM and has been funded over the last several years by way of voluntary contribution in DoD mitigation agreements. Per the WTRIM Working Group, *Annual Progress Update for 2025*, the SDTS successfully met detection requirements. The FAA has since developed a circuit-card upgrade for the ARSR-4 that incorporates the SDTS and other functionality to improve its performance in the presence of turbines, thereby helping mitigate the impact of proposed and existing wind projects. Before DoD suspended the Clearinghouse process, DoD had already begun requesting voluntary contributions from developers to fund upgrades to ARSR-4 radar systems and to implement infill phased-array radar systems, initially to mitigate impacts to ASR-11 radar sites. These efforts reflected the Clearinghouse's longstanding practice of addressing

5

**REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

evolving technical concerns through project-specific mitigation rather than suspending project review. This infill technology is part of the work being conducted by the WTRIM initiative.  Per the WTRIM Working Group, *Annual Progress Update for 2025*, "two vendors are under contract to deploy their infill radar at Travis AFB." A methodology that is tailored, system by system, to the radar actually at issue is not a static methodology, and Mr. Marks' declaration does not identify any specific basis in which this system-by-system approach has failed to keep pace with evolving threats.

**Issue 4: Mr. Marks' Characterization of the Range of Mitigation Approaches Historically Available to DoD (Marks Decl. ¶¶ 56-60)**

12.    Mr. Marks' declaration discusses a single mitigation option—RAM—and questions its continued viability, but even assuming that his conclusion on RAM's limitations were correct (which it is not), evaluating the effectiveness of RAM in isolation does not reflect the range of mitigation approaches DoD has actually developed and employed. Based on my 15 years negotiating mitigation agreements through the Clearinghouse, the available toolkit for proposed projects includes, among other measures: reducing the height of, relocating, or removing turbines within a project; leveraging overlapping coverage from adjacent radar sites; voluntary developer contributions to fund RAM, circuit-card upgrades to the ARSR-4, or an infill phased array radar; and turbine curtailment during national security events or severe weather. Mr. Marks' declaration does not indicate that DoD evaluated any of these established alternatives, or explain why they would no longer be effective. His singular focus on RAM to support his declared lack of confidence in DoD's mitigation options is misleading, at best.

**Issue 5: The Existing Technical Research Does Not Identify a Technical Basis for Suspending the Clearinghouse Process (Marks Decl. ¶¶ 49–60)**

6

**REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

13.    The existing technical research does not identify a drone-related risk to wind-turbine radar mitigation that would justify suspending the Clearinghouse process nationwide. The WTRIM Working Group, *Annual Progress Update for 2025,* which I referenced previously, documents more than twenty ongoing research efforts funded by DoD, the Department of Energy, the FAA, and the National Oceanic and Atmospheric Administration that address subjects ranging from radar-clutter mitigation to next-generation radar systems. Those research efforts reflect the longstanding approach of continually improving radar performance and refining mitigation techniques as technology evolves. I regularly review published research related to radar systems, and am not aware of, and the published research does not identify, any new research initiative concluding that evolving drone threats have rendered existing wind-turbine mitigation measures inadequate or that the Clearinghouse's longstanding project-specific review process should be abandoned. Nor do those materials identify drone detection as a wind-turbine research priority. Nothing in the unclassified technical record with which I am familiar identifies a technical basis for suspending execution of mitigation agreements nationwide rather than continuing the Clearinghouse's longstanding practice of evaluating projects individually and developing project-specific mitigation measures where appropriate. Tellingly, Mr. Marks does not offer to provide the Court any information (classified or unclassified) purportedly showing otherwise.

14.    I have also reviewed the Department of Energy's December 2024 Report to Congress on wind turbine/radar research, development, testing, and evaluation. The report is consistent with ongoing efforts to refine radar performance and mitigation techniques as technology evolves. The report does not identify an operational failure of existing mitigation measures or recommend suspending the Clearinghouse's individualized review process. Nor does

7

**REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL
CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

the report identify drone detection specifically as a research priority connected to wind-turbine interference.

15.     I am not aware of any technical analysis in the unclassified record concluding that evolving drone threats rendered the existing mitigation framework inadequate or justified an indefinite, nationwide suspension of mitigation-agreement processing. Because Mr. Marks did not provide that type of analysis, in classified or unclassified format, the credibility of his determination is unsubstantiated.

**Issue 6: Mr. Marks' Lack of an Explanation for Wind Energy Projects with No Impacts to Radar (Marks Decl. ¶¶ 49–55)**

16.     Mr. Marks' declaration does not explain why wind energy projects that have no impact on radar systems should be subject to an indefinite, nationwide suspension.  A turbine sited entirely outside a radar's line of sight cannot generate a radar return, appear on an operator's display, or contribute clutter that could even conceivably interfere with detection of any target, drone or otherwise. Indeed, a number of projects at issue in this litigation are not in the vicinity of a radar and as such could not give rise to the impacts discussed in Mr. Marks' declaration. His declaration does not explain why such projects with no radar impact should be subject to the indefinite pause.

**Issue 7: Mr. Marks' Declaration Does Not Address Common Air Route Surveillance Radar or the Full Range of Available Mitigation Options (Marks Decl. ¶¶ 50, 56)**

17.     Mr. Marks' declaration addresses only a subset of the radar systems and mitigation measures relevant to the projects affected by the current suspension. Based on my experience negotiating mitigation agreements through the Clearinghouse, Mr. Marks' declaration does not

8

**REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

reflect the full range of radar systems, engineering approaches, and mitigation options that DoD has historically relied upon in evaluating wind projects.

18.    His declaration identifies only Airport Surveillance Radars ("ASR"), specifically the ASR-8 and ASR-11, Marks Decl. ¶¶ 50, 56, but does not separately address the Common Air Route Surveillance Radar ("CARSR"), even though CARSR mitigation is at issue in nearly all of the projects implicated in this litigation. In my professional opinion, the established mitigation measures used for CARSR and the relevant ASR radar systems remain effective.

19.    The only mitigation measure Mr. Marks' declaration identifies is RAM, Marks Decl. p. 14, ¶ 39—the voluntary contribution developers make for projects that impact radar. That is not, however, the only mitigation option available: developers have also relied on overlapping coverage from nearby radar installations by reducing the height of or removing turbines that interfere with these radar sites as discussed in paragraph 12 of my declaration, RAM optimization updates to the CARSR's SDTS algorithm (available only for CARSR, not ASR), and curtailment to mitigate wind-farm interference.

**Issue 8: Additional Technical Considerations Confirm That Radar Systems Remain Capable of Reliable Detection Notwithstanding Nearby Wind Turbines (Marks Decl. ¶¶ 36, 49–55, 56–60, 97–98)**

20.    Mr. Marks' declaration relies on developments in Ukraine and other recent conflicts, Marks Decl. ¶¶ 43–48, to suggest that wind turbines present a new or unmanageable radar-detection challenge. However, comparisons with Ukraine and these other recent conflicts do not reflect the technical reality of U.S. air-defense architecture. Unlike Ukraine, which has of necessity relied on a more improvised and distributed set of detection assets, the United States maintains a substantially more capable, layered, and redundant network of radar and other sensor

9

**REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

systems. Based on my 31 years working with air-defense, air-traffic-control, and border-security radar systems, I do not believe that redundancy and sophistication are meaningfully undermined by the presence of wind turbines mitigated using the established techniques described throughout this declaration.

21.    Nor does the Interim Guidance's reference to a "significant Doppler effect," as characterized in Mr. Marks' declaration, Marks Decl. ¶ 98, identify a new or previously unrecognized technical phenomenon. Rotating turbine blades do produce Doppler-shifted radar returns, but that effect has been well understood for approximately two decades. It is the precise physical effect that the wind-turbine-interference-specific mitigation software I helped design, flight-test, and implement for the FAA's ASR-11 system in the mid-2000s was built to address. Describing that long-mitigated phenomenon as though it were a newly identified basis for an indefinite, nationwide suspension does not reflect the current state of radar-mitigation technology.

**Issue 9: The Technical Materials Accompanying Mr. Marks' Declaration Are Inconsistent with Standard Radar-Engineering Practice (Marks Decl. ¶¶ 52–55, 58, 92)**

22.    As a radar engineer, I have reviewed the technical materials that accompany Mr. Marks' declaration, and in my professional opinion, they do not resemble the technical work product that ordinarily results from a DoD radar-mitigation analysis. One chart, for example, is captioned "Signal to Notice (SNR) Comparison." Marks Decl. ¶ 52. That is not a standard or recognized term in radar engineering; the accepted terminology—used throughout my 31 years in this field, including by DoD radar engineers—is "Signal-to-Noise Ratio."

23.    More broadly, the materials embedded in Mr. Marks' declaration consist primarily of simplified, conceptual graphics, generalized diagrams, and explanatory analogies, rather than

10

**REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

actual engineering analyses, radar cross-section studies, operational modeling, validation reports, or field-test results I would expect to see supporting a technical conclusion of this significance. In my professional experience conducting and reviewing radar-mitigation studies over more than two decades, materials of that kind are not a substitute for the rigorous technical analysis that has historically supported DoD mitigation determinations. For example, the graphics in the Marks declaration are not attributed to any particular wind project. And because Mr. Marks provides only those conceptual graphics to explain and justify his decision-making, while omitting actual analysis, there is an insufficient basis to conclude that the underlying analysis is credible or that Marks' determination was based on actual engineering analysis or modeling.

**Conclusion**

24.    Based on my decades of experience studying, testing, and mitigating the effects of wind turbines on radar systems, it is my professional opinion that the technical conclusions in Mr. Marks' declaration do not accurately reflect the current state of radar engineering, the historical development of radar mitigation techniques, or my experience with the Clearinghouse's longstanding approach to evaluating and mitigating radar impacts.

25.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

11

**REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Executed on 07/20/2026.

Geoffrey N. Blackman
Founder and Principal Consultant, Westslope
Consulting, LLC

12

**REPLY DECLARATION OF GEOFFREY BLACKMAN, FOUNDER AND PRINCIPAL
CONSULTANT OF WESTSLOPE CONSULTING, LLC, IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**