# Exhibit C

*To Plaintiff's Reply Brief in Support of Motion for Stay or Preliminary Injunction*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST, *et al.* | **Civil Action No. 3:26-cv-01092-IM** |
| *Plaintiffs*, | |
| v. | **REPLY DECLARATION OF EDWARD J. CHUPEIN, SENIOR ADVISOR TO DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| PETER B. HEGSETH, *et al*., | |
| *Defendants*. | |

Pursuant to 28 U.S.C. § 1746(2), I, Edward J. Chupein, declare as follows:

## Introduction

1.      This reply declaration responds to the Declaration of Hon. Dale R. Marks, dated July 5, 2026, and filed in this action on July 6, 2026, as ECF No. 90-1 ("Marks Decl."). Based on my direct involvement in the events that led to the creation of the Military Aviation and Installation Assurance Siting Clearinghouse ("Clearinghouse"), as well as my experience in the Air Force and subsequently as a consultant assisting developers in addressing and mitigating impacts on military airspace, including testing activities, training operations, and military readiness, I submit this declaration to correct specific inaccuracies in Mr. Marks' declaration. I have reviewed the Marks Declaration in its entirety, and I have personal knowledge of the facts set forth below; if called to testify, I could and would do so competently.

## Professional Background and Qualifications

**REPLY DECLARATION OF EDWARD J. CHUPEIN, SENIOR ADVISOR TO DARE STRATEGIES LLC,
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

2.    My background and qualifications are described fully in my declaration submitted in support of Plaintiffs' Motion for Preliminary Injunction ECF No. 36-14 and are incorporated here by reference. By way of summary, I am the sole proprietor of AVRO Polaris Consulting, LLC and a Senior Advisor to DARE Strategies LLC ("DARE Strategies"). I served for more than 27 years in the United States Air Force, retiring as an Air Force colonel. I subsequently served as Deputy Chief, Operational Training Infrastructure at Headquarters, United States Air Force, after previously serving as Chief, Airspace and Ranges Division. In 2008, as Chief, Airspace and Ranges, I supervised the Air Force's analysis and response to the Shepherds Flat Wind Farm project in Oregon, the first major wind project that led DoD to engage early in a project's development to ensure compatibility with military operations and training. That effort, conducted in coordination with United States Northern Command, the National Security Council, the National Economic Council, and the Federal Aviation Administration ("FAA"), led to the creation of the Air Force's first policy office dedicated to renewable-energy siting and helped develop the DoD-wide policy framework that ultimately resulted in Congress establishing the Siting Clearinghouse in 2011. Between 2011 and 2020, I participated as the senior Air Staff representative in several of the Clearinghouse's most significant Mitigation Response Team ("MRT") negotiations and remained responsible for overseeing many others. Since retiring from federal service in 2020, I have analyzed approximately 552 proposed wind energy projects, identifying potential impacts to military training, testing, and operations and developing mitigation strategies to address those impacts.

3.    I have not received access to and express no view regarding the content of any classified information referenced in Mr. Marks' declaration as he defines those terms in paragraphs 90–94. The statements below are based on my own firsthand experience.

2

**REPLY DECLARATION OF EDWARD J. CHUPEIN, SENIOR ADVISOR TO DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**<u>Response to the Marks Declaration</u>**

4.      The four issues discussed below illustrate several respects in which Mr. Marks' description of the Clearinghouse's origins and operation departs from my firsthand experience, which pre-dates the Clearinghouse itself and includes the work that led to its creation. The facts set forth herein contradict Mr. Marks' claimed role in drafting the Clearinghouse's founding framework, his account of the event he says led to its creation, his characterization of the Department of Homeland Security's ("DHS") historical participation in Clearinghouse mitigation discussions, and his characterization of the drone threat as absent from the Clearinghouse's analytical methodology.

**Issue 1: Mr. Marks' Claimed Role in Establishing the Clearinghouse Framework (Marks Decl. ¶ 16)**

5.      Mr. Marks states that he "was also personally involved with drafting the original Clearinghouse framework (Public Law 111-383; 10 U.S.C. § 183a) 15 years ago." Marks Decl. ¶ 16. That claimed role does not match my own knowledge of the events leading to the establishment of the Clearinghouse. In 2008, as Chief, Airspace and Ranges Division, Operations Directorate, Headquarters, United States Air Force, I supervised the Air Force's analysis and response to the Shepherds Flat Wind Farm project in Oregon. The Shepherds Flat Wind Farm project was the first proposed wind-energy development to highlight the potential impacts of wind turbines on military operational and training compatibility. The effort to analyze and address these impacts, which I led in collaboration with United States Northern Command ("NORTHCOM") leadership, included an initial engagement between General Gene Renuart, then Commander of the North American Aerospace Defense Command ("NORAD") and NORTHCOM, myself, and senior staff from the National Security Council, the National Economic Council, and the FAA. The outcome of this

3

Case 3:26-cv-01092-IM   Document 98-4   Filed 07/20/26   Page 5 of 9

effort resulted in a template for a DoD-wide policy for analyzing, and where needed, mitigating wind-energy project potential impacts on operational and training compatibility and laid the groundwork for the legislation that established the Clearinghouse in 2011. Given my direct involvement in these efforts, I would have expected to know who played a meaningful role in developing the original Clearinghouse framework. I do not recall hearing Mr. Marks' name in connection with these efforts, let alone being aware of any participation by Mr. Marks. His declaration identifies no specific meeting, document, drafting responsibility, or other contribution that would allow his claim to be evaluated.

### Issue 2: Mr. Marks' Account of the Incident That Prompted the Clearinghouse's Creation (Marks Decl. ¶¶ 17, 55)

6.      Mr. Marks states that the Clearinghouse statute was developed in response to a vulnerability that "resulted in a midair collision," and claims wind-farm interference with a NORAD radar and a lack of interagency coordination were the "root causes." Marks Decl. ¶ 17; *see also id.* ¶ 55 ("the incident that led to the creation of the Clearinghouse in 2011"). Mr. Marks does not identify the incident to which he refers. I am not aware of any midair collision that led to the Clearinghouse's creation. No such collision, civilian or military, was discussed during my 2008 engagement with the National Security Council, the National Economic Council, and the FAA regarding the Shepherds Flat Wind Farm project, described above, or in any other meeting in which I participated regarding wind-energy development's impacts on military operations. Moreover, I am not aware of any report from 2001–2011 in the National Transportation Safety Board ("NTSB") aviation database that identifies a midair collision resulting in any way from wind farm interference with a NORAD radar. Indeed, none of these reports mention wind farms or turbines at all.

4

**REPLY DECLARATION OF EDWARD J. CHUPEIN, SENIOR ADVISOR TO DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

7.      To the best of my knowledge, the earliest instances of DoD concern regarding impacts of wind energy development on air-traffic-control and air-safety issues related to whether proposed wind turbines could adversely affect terminal-area operations at Travis Air Force Base, California; Cannon Air Force Base, New Mexico; and Fort Sill, Oklahoma. These matters were handled by the Air Force Flight Standards Agency ("AFFSA") and the U.S. Army Aeronautical Services Agency ("USAASA"). Concerns regarding Travis Air Force Base led to, and were addressed by, the Wind Turbine Radar Interference Mitigation ("WTRIM") initiative. Concerns about impacts to Cannon Air Force Base and Fort Sill were successfully resolved through analyses showing that the proposed wind projects would not reduce radar performance below the FAA's acceptable threshold. During these reviews, there were no discussions about a midair collision. Nor did any subsequent interagency meeting I attended related to wind energy development impacts on airspace in the years that followed include any discussion of a midair collision.

**Issue 3: DHS's Historical Participation in Clearinghouse Mitigation Discussions (Marks Decl. ¶¶ 29–31)**

8.      Mr. Marks states that the Clearinghouse "historically did not consistently invite" DHS to participate in mitigation discussions, notwithstanding statutory language he describes as requiring DHS participation. Marks Decl. ¶¶ 29–31. That characterization does not reflect my experience. DHS maintained a longstanding presence in this process through the Long-Range Radar Joint Program Office ("LRR JPO") and the interagency WTRIM working group. The purpose of these organizations is to facilitate interagency coordination between DoD, DHS, FAA, the Department of Energy ("DOE") and other federal agencies on radar matters related to wind energy development. Through participation in these organizations, DHS was involved both in the development of the Clearinghouse process, and in the Clearinghouse process itself.

5

**REPLY DECLARATION OF EDWARD J. CHUPEIN, SENIOR ADVISOR TO DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**Issue 4: The Historical Treatment of Drone Threats in the Clearinghouse's Analytical Methodology (Marks Decl. ¶¶ 40–42)**

9.      Mr. Marks suggests that emerging drone threats represent a fundamentally new consideration absent from the Clearinghouse's historical analytical methodology. Marks Decl. ¶¶ 40–42. That characterization does not reflect my experience. While asymmetrical drone warfare has accelerated in connection with the conflicts in Ukraine and Iran, drones, other unmanned aircraft systems, and balloons have long been a concern for NORAD/NORTHCOM and for the test-and-evaluation functions across the military services. These organizations have long had visibility into wind-energy projects referred to DoD through the FAA's Obstruction Evaluation/Airport Airspace Analysis ("OEAAA") process. Similarly, DoD has long recognized the challenges posed by low-observable and small-radar-cross-section technologies, as well as the need to develop technologies capable of addressing those challenges.

10.     Throughout my government service, numerous DoD organizations at the Service, Joint, combatant command, and interagency levels were responsible for analyzing emerging threats—including unmanned aircraft systems—and developing doctrine, operational concepts, and technical solutions to address them. Organizations such as NORTHCOM, the Air Force Research Laboratory, Joint Staff elements, and Service analytical organizations routinely evaluated evolving threats and worked with other federal agencies and industry to improve detection and mitigation capabilities.

11.     That effort has long been supplemented by Federally Funded Research and Development Centers ("FFRDCs"), University Affiliated Research Centers ("UARCs"), and major defense contractors, which conduct research and development on behalf of DoD relating to counter-UAS capabilities, radar performance, and multi-domain awareness. The existence of these

6

**REPLY DECLARATION OF EDWARD J. CHUPEIN, SENIOR ADVISOR TO DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

longstanding programs reflects that emerging drone threats have been recognized and actively studied across the Department for many years.

12.    Against that backdrop, I do not agree with Mr. Marks' suggestion that drone threats represent a wholly new consideration absent from the Clearinghouse's historical analytical methodology or stakeholder review process. That suggestion is inconsistent with my experience and with the longstanding institutional focus within DoD on detecting, assessing, and mitigating emerging aerial threats.

**<u>Conclusion</u>**

13.    Based on my direct, personal involvement in the discussions and meetings that led to the Clearinghouse's creation, and my continued engagement with radar-interference and airspace-policy issues in the many years since, it is my opinion that Mr. Marks' declaration is inaccurate in each of the respects addressed above: his claimed role in drafting the Clearinghouse's founding framework, his account of what led to the Clearinghouse's creation, his characterization of DHS's historical participation in Clearinghouse mitigation discussions, and his characterization of the drone threat as somehow absent from the Clearinghouse's analytical methodology. Nothing in my experience indicates that the Department's longstanding process of project-specific review and mitigation became incapable of addressing emerging threats. Throughout my career, emerging operational challenges were addressed by applying the Department's existing analytical processes and developing new technical solutions as needed. I have seen nothing in Mr. Marks' declaration explaining why those longstanding processes suddenly became inadequate here.

14.    Moreover, it is my opinion that Mr. Marks' recounting of the threat assessment processes that he says the Department has undertaken over the past 10 months lacks substantial detail both as to the inputs and assumptions used in the relevant analyses and as to the actual

7

**REPLY DECLARATION OF EDWARD J. CHUPEIN, SENIOR ADVISOR TO DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

findings and determinations produced and verified through those analyses. Without those details, Mr. Marks' blanket suspension of mitigation agreements for wind energy projects nationwide is unsupported. On each of these points, my account is based on firsthand, contemporaneous involvement in the events Mr. Marks purports to describe.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on 7/20/2026.

/s/ *Edward J. Chupein*
Edward J. Chupein
Sole Proprietor, AVRO Polaris Consulting, LLC,
and Senior Advisor, DARE Strategies LLC

8

**REPLY DECLARATION OF EDWARD J. CHUPEIN, SENIOR ADVISOR TO DARE STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**