# Exhibit D

*To Plaintiff's Reply Brief in Support of Motion for Stay or Preliminary Injunction*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST; INTERWEST ENERGY ALLIANCE; CLEAN GRID ALLIANCE; ALLIANCE FOR CLEAN ENERGY NEW YORK, INC., *Plaintiffs,* | **Civil Action No. 3:26-cv-01092-IM** |
| v. | **REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| UNITED STATES DEPARTMENT OF DEFENSE; DALE MARKS, Assistant Secretary of Defense for Energy, Installations, and Environment, in his official capacity, *Defendants.* | |

Pursuant to 28 U.S.C. § 1746(2), I, Benjamin Doyle, declare as follows:

### Introduction

1.    I submit this declaration in reply to the Declaration of Hon. Dale R. Marks, dated July 5, 2026, and filed in this action on July 6, 2026, as ECF No. 90-1 ("Marks Decl."). Drawing on my direct experience advising clients through the Military Aviation and Installation Assurance Siting Clearinghouse ("Clearinghouse") process, I address several respects in which the Marks Declaration overstates or mischaracterizes the Clearinghouse's historical practices, its technical review methodology, and the current, on-the-ground status of mitigation-agreement processing. I have reviewed the Marks Declaration in full, and the facts set forth below are based on my personal knowledge. If called to testify, I could and would do so competently.

1

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## Professional Background and Qualifications

2.      I previously submitted a declaration in support of Plaintiffs' Motion for Preliminary Injunction ECF No. 36-15 describing my background and qualifications in detail, and I incorporate that declaration here by reference. To summarize: I am the President and Chief Executive Officer of Capitol Airspace Group ("CAG"), an aviation consulting firm that provides analytical, strategic, and advocacy services to airports, commercial developers, and communities relating to aeronautical studies conducted by the Federal Aviation Administration ("FAA") and the Department of Defense ("DoD"). Early in my career, I served as an Air Traffic Control Tower Chief in the United States Army.

3.      For over 25 years, I have assisted clients in technical and strategic planning associated with the aeronautical study of tall structures, including wind turbines, conducted by the FAA pursuant to 14 C.F.R. Part 77. These aeronautical studies include the consultation with and review by the Clearinghouse and its Mitigation Response Teams ("MRTs"). Over the past 27 years, CAG has become the top filer of FAA Form 7460-1 filings in the country, with more than 130,000 filings, and has completed 82 mitigation agreements through the Clearinghouse review process.

4.      This declaration does not rely on, and I have no access to, classified information. My statements below are confined to the unclassified representations in the Marks Declaration and reflect my own direct experience and that of my staff.

## Response to the Marks Declaration

5.      The eight issues below identify where Mr. Marks' declaration diverges from my institutional experience with the Clearinghouse: its historical practices regarding developer

2

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

complaints, classified review, case-by-case analysis, overall workload, and FAA coordination; the funding actually committed to drone-related study; the legal effect of FAA hazard determinations; and the current status of mitigation-agreement processing since August 2025.

**Issue 1: Mr. Marks' Claim That No Developer Complained of Delays Until Litigation Became Imminent (Marks Decl. ¶ 32)**

6.      Mr. Marks states that no developer requested a written extension or complained about prolonged mitigation discussions until litigation became imminent. Marks Decl. ¶ 32. That is incorrect. Developers and industry participants raised concerns regarding prolonged delays in writing well before this litigation was filed. My team at CAG expressed to the Clearinghouse and the MRT leads throughout 2025 and 2026, by email and phone, the extent of the delays and their effects on the projects. Mr. Marks' premise that industry only raised these concerns once litigation became imminent is therefore incorrect, and his portrayal of this litigation as a manufactured, rather than longstanding, grievance does not hold up.

**Issue 2: Mr. Marks' Claim That Classified Information Justified Suspending, Rather Than Continuing, the Clearinghouse Process (Marks Decl. ¶¶ 37–38, 61–64)**

7.      Mr. Marks states that the Clearinghouse's analytical methodology is classified and that disclosure would itself create national security vulnerabilities. Marks Decl. ¶¶ 37–38. Separately, Mr. Marks states that DoD's 2025 pause was informed by classified SECRET and TOP SECRET information that cannot be publicly disclosed. Marks Decl. ¶¶ 61–64. Proceeding on a classified basis is not new, and it has never previously required suspending the Clearinghouse process. The Clearinghouse has adjudicated projects involving classified information since its inception. In those cases, DoD communicated that it had a national security concern and requested additional dialogue or mitigation measures without disclosing the

3

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

underlying classified basis for the concern. Even without access to the underlying classified information, developers were able to work with DoD to address the concern through mutually acceptable mitigation measures. In my staff's experience, radar issues, impacts to test missions, and matters involving Relocatable Over-the-Horizon Radar ("ROTHR") have all involved classified information that was not shared publicly, without halting the Clearinghouse review process.

8.      Based on my experience, Congress anticipated that the Clearinghouse would continue making individualized national security determinations even when those determinations involved classified information. Title 10, United States Code, Section 183a expressly permits the Secretary of Defense's report accompanying a finding of unacceptable risk to include a classified annex. 10 U.S.C. § 183a(e)(2)(A). In my experience, that provision is consistent with the way the Clearinghouse has historically operated: analysis supported by classified information has been incorporated into project-specific reviews rather than treated as a reason to suspend those reviews altogether. Throughout my experience with the Clearinghouse, DoD has successfully evaluated classified information, negotiated appropriate mitigation measures, and completed project-specific reviews without disclosing classified information to project developers. For these reasons, I do not believe the existence of classified information or classified analytical methodologies required DoD to suspend the Clearinghouse's individualized review process nationwide or indefinitely, rather than continue the project-specific and timely approach the Clearinghouse has historically employed.

**Issue 3: Mr. Marks' Claim That a Static, Fifteen-Year-Old Methodology Had Become Obsolete (Marks Decl. ¶ 39)**

4

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

9.      Mr. Marks states that the Clearinghouse's analytical methodology has not materially changed for approximately fifteen years, suggesting that longstanding assumptions are now inadequate. Marks Decl. ¶ 39. That premise and conclusion are both inaccurate. In my experience, the Clearinghouse has always stressed specific, case-by-case review given the variance among both military missions and project characteristics. At the beginning of every MRT, DoD names the specific national security concern that needs to be addressed for that project (unless the specific concern is classified, in which case DoD would notify the developer that a concern exists and describe the project modifications or mitigations that DoD envisions will be necessary to resolve that risk). At those meetings, the MRT leads have described DoD's assessment of all potential impacts on testing, training, and operations. The existing methodology provides the Clearinghouse with a process to identify specific impacts from a project, to investigate and implement solutions, and where necessary, to oppose a particular project and provide an account to Congress as to why the Department deems the risk of the project to be unacceptable. There has never been a one-size-fits-all methodology, so there is no single, static methodology that could have suddenly become obsolete. Mr. Marks' account of a fixed, one-size-fits-all methodology that abruptly failed misrepresents the Clearinghouse's actual process and the flexibility inherent in that process.

**Issue 4: DoD's response to the asserted drone-related threat departs from the Clearinghouse's longstanding methodology for addressing emerging compatibility issues (Marks Decl. ¶¶ 47–48)**

10.     Mr. Marks' declaration cites drone-related threats to energy infrastructure and other critical facilities as a basis for reconsidering the Clearinghouse's historical methodology. Marks Decl. ¶¶ 47–48. I take no position on whether drones present a threat to military

5

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

operations. My point is narrower: DoD has not used the Clearinghouse budget or process to study any interaction between wind turbines and drone detection and defense systems, and that omission undermines any suggestion that DoD's own actions reflect a belief that wind turbines contribute to the drone threat.

11.    The Clearinghouse, which reports up to the Assistant Secretary for Energy, Installations, and Environment, is in Mr. Marks' chain of command. Thus, Mr. Marks has the authority to direct certain funding decisions related to the Clearinghouse's lines of effort, including to fund studies evaluating emerging risks that are within the Clearinghouse's purview. Mr. Marks' declaration references other DoD components as having assessed the risks he was concerned about, but he does not appear to have used the tools most readily available to him— the Clearinghouse's budget and its existing expertise—to evaluate these concerns, despite the Clearinghouse being the most knowledgeable DoD office on wind turbine-related radar interference and associated risks.

12.    In 2021, the Clearinghouse's annual budget was increased from approximately $1.5 million to roughly $8.0 million to support study of wind-turbine compatibility with military missions, including emerging threats and their impacts. DoD is continuing to use that funding to study compatibility issues involving military operations in the maritime environment, including ship operations, offshore training and exercises, and the wide range of systems that support those activities. This is consistent with how DoD has historically used the Clearinghouse process to evaluate new compatibility concerns, whether classified or unclassified.

13.    As of July 8, 2026, DoD had directed none of that funding, or any other Clearinghouse funding, to study potential interactions between wind turbines and drone-

6

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

detection or counter-drone systems. Clearinghouse studies are funded annually, and resources may be reprogrammed as priorities change. If DoD believes additional study of drone-related risks associated with wind-turbine siting is necessary, it has the funding to develop a better understanding of any impacts and evaluate potential mitigation measures and has not initiated any study.

14.    Throughout my experience, when the Clearinghouse identifies a new compatibility concern affecting military missions, it studies the issue, develops and evaluates mitigation measures, and incorporates those findings into the project-review process while continuing project-specific reviews. To my knowledge, DoD has not taken those steps with respect to the asserted interaction between wind turbines and drone-related threats. That departure from the Clearinghouse's longstanding practice undermines Mr. Marks' suggestion that the asserted drone-related threat required suspending wind-project reviews nationwide. An agency that viewed this risk as sufficiently urgent to suspend wind-project review nationwide has not devoted any portion of its dedicated energy compatibility budget to studying the interaction it now cites as justification for that action. Put simply, Mr. Marks' decision not to use the Clearinghouse's budget and expertise to review his concerns is difficult to reconcile with Mr. Marks' assertion that DoD has reviewed and validated the alleged drone-related risk and justified his decision to affect an immediate nationwide pause.

**Issue 5: Mr. Marks' Claim of a 400-Percent Increase in Clearinghouse Workload Since 2020 (Marks Decl. ¶ 25)**

15.    Mr. Marks states that "from 2020 forward, the number of mitigation agreements executed per year increased by 400% or more." Marks Decl. ¶ 25. Based on my experience, that

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

statistic does not accurately reflect the Clearinghouse's overall workload. CAG is familiar with the Clearinghouse's 2025 public briefing deck, which the Clearinghouse uses in public briefings and webinars. The Clearinghouse reviews wind turbines, solar panels, transmission towers and utility poles in the FAA process. The increase in reviews for the Clearinghouse has been almost entirely in the non-wind categories that do not present the doppler impacts that Mr. Marks claims represent the threat regarding drone defense. That deck reports that the number of wind-energy project applications received through the FAA remained relatively stable during the relevant period, increasing from 589 in calendar year ("CY") 2020 to 598 in CY2024—less than a two-percent increase. Indeed, CY2021, the year immediately following the baseline Mr. Marks identifies, reflects the lowest application volume in the twelve-year dataset.

16.     The same public materials report that, between 2014 and 2024, the Clearinghouse reviewed 53,259 energy projects, found an identified adverse risk in only 551 projects, and required signed mitigation agreements for only 182 projects. In my experience, those figures do not reflect the type of dramatic increase in workload described by Mr. Marks. While his statistic concerns the number of mitigation agreements executed in particular years, executed agreements are not a reliable measure of the Clearinghouse's overall workload because they represent only the small subset of projects that ultimately require mitigation.

17.     The Clearinghouse's own public data regarding application volume and identified adverse-risk determinations do not demonstrate the type of workload increase that, in my opinion, would explain or justify the nationwide suspension of wind-project reviews. Nor does Mr. Marks explain why any increase in workload would justify suspending only utility-scale wind projects

8

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

while continuing to process other categories of energy infrastructure. In my experience, that selective approach is inconsistent with the explanation he offers.

**Issue 6:  Mr. Marks' Claim That an FAA Screening Algorithm — Not Human Review — Determines Whether DoD Reviews a Wind Project (Marks Decl. ¶¶ 19–20)**

18.    Mr. Marks' declaration states that the FAA refers a project to DoD only when its screening algorithm identifies a potential impact. Marks Decl. ¶¶ 19–20. This claim reflects a common misconception. DoD receives and reviews every wind energy project that is filed with the FAA. The three military departments have established internal routing rules that allow them to automatically indicate they have no equities in particular projects. The Clearinghouse, however, does not automatically screen out wind energy projects. Every wind energy project filed with the FAA is referred to the Clearinghouse for review and requires an active response from the Clearinghouse.

**Issue 7: Mr. Marks Incorrectly Justifies the Nationwide Suspension as Necessary to Address Future National Security Risks Before DoD Executes Mitigation Agreements (Marks Decl. ¶¶ 65–68)**

19.    Mr. Marks states that FAA Determinations of No Hazard ("DNHs") effectively persist in perpetuity, making it paramount that DoD "get its advisory assessment right the first time." *Marks Decl.* ¶¶ 65–68. He explains that, for this reason, DoD "strategically initiated a temporary pause in signing further mitigation agreements until the Department had the opportunity to evaluate the Clearinghouse's internal, analytical methodology for assessing national security risks in light of the dramatic threat paradigm shift." That rationale rests on an incorrect understanding of the legal effect of a DNH and overlooks a central feature of the framework governing the Clearinghouse process. FAA Determinations of No Hazard do not remain in effect indefinitely. They expire after 18 months under 14 C.F.R. § 77.33(b), and any

9

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

extension under 14 C.F.R. § 77.35(c) is limited in duration, and requires renewed FAA and DoD review.

20.    The possibility of evolving military missions, technologies, and national security threats is not a flaw in the Clearinghouse process—it is a condition the process is specifically designed to accommodate. The regulatory and contractual framework incorporates multiple mechanisms to respond to those changes over time. Under the Clearinghouse's standard mitigation agreements, project owners must, upon request by NORAD, immediately curtail turbine operations for a discrete, temporary, and stated national security or defense purpose in accordance with established communication protocols, though, to my knowledge, this has not occurred in practice. The agreements also permit either party to request amendments, with the parties consulting regarding proposed changes as military requirements and operational needs evolve. These contractual protections operate alongside the regulatory safeguards described above. Collectively, these safeguards ensure that DoD retains multiple mechanisms to respond to new operational and national security concerns throughout a project's operational life. In my experience, this framework has enabled the Clearinghouse to continue conducting project-specific reviews while adapting its analyses and mitigation measures as military requirements, technologies, and threats changed. Mr. Marks identifies no reason why that framework became inadequate here.

**Issue 8: Mr. Marks' Characterization of DoD's Actions Since August 2025 as a Temporary Pause (Marks Decl. ¶¶ 70–80, 95–100)**

21.    Mr. Marks describes DoD's actions since August 2025 as a temporary pause and states that DoD did not completely shut down the Clearinghouse. Marks Decl. ¶¶ 70–80, 85, 97.

10

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

My own firsthand knowledge, drawn from CAG's current client projects, shows that the disruption has instead expanded to affect every stage of the process for wind projects:

a. **MRT Negotiations**. As of mid-April 2026, the Air Force, Navy, and the North American Aerospace Defense Command informed CAG that all MRT negotiations and engagement, including previously scheduled meetings, had been canceled until further notice, without explanation. CAG is aware of eleven projects for its clients affected by this suspension.

b. **Transmittal of Draft Agreements**. DoD has not sent a draft mitigation agreement to any project sponsor that completed an MRT since December 2025. CAG is aware of nineteen such projects: one has been awaiting an agreement for more than 24 months; two for 12 to 24 months; six for 6 to 12 months; and ten for 4 to 6 months.

c. **Countersignature Delays.** DoD has not produced a countersigned mitigation agreement, including amendments, for any project since August 2025, even where DoD had already agreed on mitigation terms and the developer had returned a signed agreement. CAG is aware of fifteen projects for its clients in this category: four have awaited DoD signatures for more than 270 days; two for more than 180 days; five for more than 120 days; two for more than 90 days; and two for less than 90 days. The shorter durations are lower due to the stoppage of negotiation and transmittal. The projects have not even progressed to the countersignature phase.

Mr. Marks' characterization of these actions as a temporary pause does not capture the true impact on the wind industry. Marks Decl. ¶¶ 85, 97. That remains true notwithstanding the May 7, 2026 Interim Guidance that Mr. Marks describes as having restarted the Clearinghouse process, id. ¶¶

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

95–98: CAG's clients continue to report no executed mitigation agreements, no new draft agreements, and no new MRTs.

22.    Additionally, many of the Clearinghouse actions, such as informal reviews, compatibility letters and notices of presumed risk have always been executed by either the Clearinghouse executive director or deputy director.

23.    In this stated restart of the process, the Clearinghouse is required to obtain Mr. Marks' signature for every Clearinghouse letter and memo, which he had yet to provide for any of the described documents as of July 17, 2026.  Mr. Marks' declaration states that approximately 1,000 structures have received findings of no concern since May 2026. Id. ¶¶ 98–100. To my knowledge, none of those determinations involved utility-scale wind projects. In my experience, these delays do not appear tied to any project-specific concern but instead reflect a new, general position by DoD to delay or avoid reviewing wind projects. None of what Mr. Marks describes as a temporary pause is borne out by CAG's current client experience, which shows a suspension that has persisted, without exception, across every stage of the wind project mitigation-agreement process for nearly a year.

### Conclusion

24.    Based on my 27 years of experience advising clients on military aviation and energy siting matters, including nearly 15 years working with the Clearinghouse since its inception, Mr. Marks' declaration does not accurately describe either the Clearinghouse's longstanding practices or the way the process has actually operated since August 2025. In my experience, the Clearinghouse has historically addressed classified information, evolving threats,

12

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

project-specific risks, and emerging compatibility concerns through individualized technical review, targeted study, and negotiated mitigation—not by suspending project-specific reviews nationwide. Likewise, CAG's current experience does not support Mr. Marks' characterization of the suspension as a temporary pause or his assertion that meaningful processing of utility-scale wind projects has resumed. Instead, it reflects a continuing, across-the-board suspension affecting every material stage of the Clearinghouse process for wind projects. Mr. Marks' declaration identifies and substantiates no critical flaw in the ability of the Clearinghouse's existing process to simultaneously safeguard national security and allow wind energy projects to move forward, let alone that could support a categorical and indefinite shutdown of that process.

25.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on 7/20/2026.

Benjamin Doyle
President and Chief Executive Officer, Capitol
Airspace Group

13

**REPLY DECLARATION OF BENJAMIN DOYLE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF CAPITOL AIRSPACE GROUP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**