Jon A. Mueller (*pro hac vice*)
JMueller@law.umaryland.edu
William Piermattei (*pro hac vice*)
WPiermattei@law.umaryland.edu
Environmental Law Clinic
University of Maryland Carey School of Law
500 W. Baltimore St., Baltimore MD 21201
Tel: 410-706-8157

Jesse A. Buss, OSB No. 122919
Willamette Law Group, PC
411 Fifth Street, Oregon City OR 97045-2224
Tel: 503-656-4884, jesse@WLGpnw.com

Thomas C. Buchele, OSB No. 081560
Earthrise Law Center, Lewis & Clark Law School
10101 S. Terwilliger Blvd., Portland OR 97219-7799
Tel: 503-768-6736, tbuchele@lclark.edu

*Attorneys for Amici Curiae Environmental Law Clinic Professors*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **RENEWABLE NORTHWEST**, *et al.*,<br><br>        *Plaintiffs,*<br><br>    v.<br><br>**PETER B. HEGSETH**, *et al.*<br><br>        *Defendants*. | No. 3:26-cv-1092-IM<br><br><br>**BRIEF OF *AMICI CURIAE*<br>ENVIRONMENTAL LAW CLINIC<br>PROFESSORS** |

**Table of Contents**

STATEMENT OF INTEREST OF AMICI CURIAE………………………………………….1

**I.   INTRODUCTION**………………………………………………………………………...2

**II.  Defendants Violated Laws Governing Land-Based Wind Turbine Assessment**…5

**III. Defendants Violated Regulatory Requirements in Reviewing Projects**………….8

**IV. Defendants' "National Security" Claims are Unsubstantiated Pretext to Stop Wind Project Development**……………………………………………………………...10

    A. APA Legal Standards for Review of Final Agency Actions……………………..11

    B. Defendants Violated all of the *State Farm* Factors……………………………….13

       1.  Defendants Relied on Factors Congress Did Not Intend……………………..13

       2.  Defendants Failed to Consider an Important Aspect of Their Policy Change, the Reliance Interests of Wind Project Developers…………………………..15

       3.  Defendants' Explanation as to the Failure to Adhere to Statutory and Regulatory Deadlines is Counterfactual and Not Supported by Any Record...16

       4.  Defendants' "National Security" Reasoning for Not Adhering to Their Statutory and Regulatory Responsibilities is an Implausible Pretext to Stop All Wind Energy Development………………………………………………..18

**V.  Defendants' Inaction and Disregard of Established Legal Processes Harm the Public Interest**………………………………………………………………………..23

**VI. CONCLUSION**………………………………………………………………………..28

## Table of Authorities

### Cases

*A.A.R.P. v. Trump*, 605 U.S. 91 (2025)……………………………………………………………..3

*Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359 (1998)………………………10

*Anthropic PBC v. Department of War*, 825 F. Supp. 3d 1101 (N.D. Cal. 2026)……………19

*Atchison, Topeka & Santa Fe Ry. v. Wichita Board of Trade*, 412 U.S. 800 (1973)………...11

*Bennett v. Spear*, 520 U.S. 154 (1997)…………………………………………………..12

*Citizens to Protect Overton Park v. Volpe*, 401 U.S. 402 (1971)………………………..10

*Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017)………………………………..12

*Colorado v. Trump*, 823 F. Supp. 3d 1251 (D. Colo. 2026)……………………………..19

*Connecticut v. U.S. Department of Interior*, 363 F. Supp. 3d 45 (D.D.C. 2019)……12, 23

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019)………………………………….10

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020)….10, 23

*Empire Leaseholder LLC v. Burgum*, No. 26-cv-00004 (D.D.C. Jan 15, 2026)………...18

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)………………………………15

*Environmental Defense Fund v. Gorsuch*, 713 F.2d 802 (D.C. Cir. 1983)……………...12

*Environmental Defense Fund v. Hardin*, 428 F.2d 1093 (1970)………………………...13

*FCC v. Fox*, 556 U.S. 502 (2009)…………………………………………………15, 16

*Illinois v. Noem*, 813 F. Supp. 3d 282 (D.R.I. 2025)……………………………………19

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2012)……………………………………..10

*Judulang v. Holder*, 565 U.S. 42 (2011)………………………………………………...15

*Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026)……………………………………...3

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)………………………………..11

*Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022)………………………….12, 13

*Marin Audubon Society v. FAA*, 121 F.4th 902 (D.C. Cir. 2024)………………………..10

*Massachusetts v. EPA*, 549 U.S. 497 (2007)……………………………………………….15

*Michigan v. EPA*, 576 U.S. 743 (2015)…………………………………………………….10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)…………………………………………………...13, 15, 16, 18

*National TPS Alliance v. Noem*, 166 F.4th 739 (2026)………………………………..18

*New York v. Trump,* 811 F. Supp. 3d 215 (D. Mass. 2025)……………………...12, 18, 20

*Organized Village of Kake v. U.S. Department of Agriculture*,
    795 F.3d 956 (9th Cir. 2015)…………………………………………………..15

*RENEW Northeast v. U.S. Dept. of Interior*, No. 25-cv-13961-DJC,
    2026 WL 1078282 (D. Mass. Apr. 21, 2026)………………………….20, 22-23

*Revolution Wind v. Burgum*, No. 1:25-cv-02999,
    2026 WL 113568 (D.D.C. Jan. 12, 2026)…………………………………18, 21

*R.I. State Council of Churches v. Rollins*, 808 F. Supp. 3d 370 (D.R.I. 2025)………….19

*Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019)…………………………………23

*Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987)…………………………………12

*Sunrise Wind LLC v. Burgum*, No. 1:26-cv-00028 (D.D.C. Feb. 2, 2026)………………18

*Sweet v. Devos*, 495 F. Supp. 3d 385 (N.D.Cal. 2020)…………………………………..19

*Tummino v. Hamburg,*, 936 F. Supp. 2d 162 (E.D.N.Y. 2013)…………………………23

*Vineyard Wind 1 LLC v. Dep't of the Interior*, No. 26-10156-BEM
    (D. Mass. Jan. 27, 2026)……………………………………………………………18

*Virginia Electric & Power Co. d/b/a Dominion Energy Virginia v. Dep't of the
    Interior*, No. 2:25-cv-830, 2026 WL 125783 (E.D. Va. Jan. 16, 2026)…………18

**Statutes**

10 U.S.C. § 183a………………………………………………………………*passim*

42 U.S.C. § 7410……………………………………………………………....27

49 U.S.C. § 44718……………………………………………………………5, 6

5 U.S.C. §§ 701–706………………………………………………………...*passim*

**Laws**

Pub. L. No. 111-383, § 358, 124 Stat. 4137 (2011)……………………………………….4

**Regulations**

30 C.F.R. § 585.150………………………………………………………………...20

32 C.F.R. Part 211………………………………………………………….5, 8, 9, 16

32 C.F.R. § 211.4………………………………………………………….......*passim*

32 C.F.R. § 211.6…………………………………………………………..*passim*

**Treatises**

Kenneth Culp Davis, *Administrative Law Treatise* (2nd ed. 1978)………………………11

Richard J. Pierce, Jr., *Administrative Law Treatise* (4th ed. 2002)………………………11

**STATEMENT OF INTEREST OF *AMICI CURIAE***

*Amici curiae*[1] are clinical law professors and scholars whose teaching, scholarship, and professional work focus on administrative law, energy regulation, environmental law, and permitting requirements, as well as training students as to the functions and procedural requirements of federal administrative law. Some *amici* have and continue to represent clients in

---

[1] *Amici curiae* include the following environmental law clinic professors:

Thomas C. Buchele
Professor of Law, Lewis & Clark Law School
Earthrise Law Center
Portland, Oregon

Deborah A. Sivas
Luke W. Cole Professor of Environmental Law, Stanford Law School
Co-Director, Environmental Law Clinic
Director, Environmental and Natural Resources Law & Policy Program
Stanford, California

Todd D. Ommen
Professor of Law, Elisabeth Haub School of Law
Managing Attorney, Pace Environmental Litigation Clinic, Inc.
White Plains, New York

Kevin Lynch
Professor of Law, University of Denver Sturm College of Law
Environmental Law Clinic
Denver, Colorado

Kim Diana Connolly
Professor of Law, University at Buffalo School of Law
Director, Environmental Advocacy Clinic
Director, Environmental Law Program
State University of New York
Buffalo, New York

Jon A. Mueller, Director
William Piermattei
Environmental Law Clinic
University of Maryland Carey School of Law
Baltimore, Maryland

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                                    1

related federal administrative proceedings. *Amici* possess substantial expertise concerning the Administrative Procedure Act ("APA"), the lawful exercise of delegated executive authority, and federal statutory and regulatory frameworks.

*Amici* submit this brief to assist the Court in evaluating the administrative law principles implicated by Plaintiffs' claims as well as the public's interest in developing renewable energy, reducing air pollution including reducing greenhouse gas emissions, reducing consumer electricity prices, and building an efficient electricity grid for the 21st Century. *Amici* share a substantial professional and academic interest in ensuring that federal agencies exercise delegated authority consistent with statutory mandates, reasoned decision-making requirements, and the procedural constraints imposed by the APA. This is particularly true where agency action is based on unexplained concerns of "national security" rather than expert judgment and reasoned decision-making pursuant to governing statutes and regulations. The failure to follow established rules is even more concerning given the wealth of evidence supporting an inference that the vague assertions of national security are a pretext to stifle an industry that the current administration dislikes.

## I.     <u>INTRODUCTION</u>

This case concerns the Department of Defense and "Defense Components" (collectively "Defendants") exhibiting a pattern and practice of stopping further wind energy development by ignoring their statutory and regulatory responsibilities without reasoned explanation, notice-and-comment rulemaking, or public transparency. According to Plaintiffs' Amended Complaint, no project has moved forward in nearly a year, regardless of where wind energy projects are sited. Whether a proposed project is 500 feet or 500 miles from a military installation, all projects are

frozen because of alleged "deficiencies" in Defendants' current risk assessment process due to "modern-day national security threats." Defendants' Motion to Dismiss at 1 (ECF 90).[2]

Nowhere in the record before this Court is there any explanation of the risk assessment "deficiencies" that are being "reassessed" due to "modern-day" security threats. First, Congress created Defendants' process to review wind projects from 2011 to 2025, *i.e.*, "modern-day." Second, there is no explanation in the record why wind projects are not being evaluated with those alleged "modern-day" security concerns in mind or a reasoned justification given to project developers explaining nearly year-long delays while Defendants' alleged reassessment moves forward. Third, there is nothing in the record explaining what these "deficiencies" with the current assessment process may be given that the process effectively permitted tens of thousands of wind turbines from 2011 to 2025. These holes in the record — along with Defendants' ignoring their legal and regulatory responsibilities without any supporting rationale, factual findings, or public hearings — violate the law, Defendants' regulations, and the APA.

Defendants claim that their unexplained national security concerns and alleged, unexplained assessment deficiencies take precedence over their legal and regulatory duties because the governing law provides Defendants "one discrete goal of paramount importance: to evaluate proposed energy and infrastructure projects and ensure they do not present an unacceptable risk to the national security of the United States." ECF 90 at 11. But the law and Defendants' regulations specifically identify the "paramount importance" of the legal regime

---

[2] Courts have struck down this administration's attempts to use "national security" as justification to avoid legal requirements. *See, e.g., A.A.R.P. v. Trump*, 605 U.S. 91, 95–96 (2025) (per curiam) (national security concerns justifying summary deportation violates due process required by immigration law); *Learning Resources, Inc. v. Trump,* 607 U.S. 229 (2026) (statute governing presidential power to address "unusual and extraordinary threat" to national security does not include power to impose tariffs).

governing their actions is "to ensure that the robust development of renewable energy sources and increased resiliency of the commercial electrical grid may move forward…." Pub. L. No. 111-383, § 358, 124 Stat. 4137, 4198 (2011) ("It shall be an objective of the Department of Defense to ensure that the robust development of renewable energy sources and the increased resiliency of the commercial electrical grid may move forward in the United States, while minimizing or mitigating any adverse impacts on military operations and readiness."); *see also* 32 C.F.R. § 211.4 (2023). The only reasonable interpretation of the enabling statute and Defendants' own regulations is that the "robust development of renewable energy sources" is of "paramount importance" and "minimizing or mitigating any adverse impacts" to military preparedness are secondary considerations to achieve the primary goal. This fundamental flaw in Defendants' new interpretation of their responsibilities assessing wind energy projects infects and undermines their subsequent unexplained and unsupported rationale to *stop* (rather than "ensure") the robust development of wind energy projects.

By withholding signatures, transmittals of determinations, and negotiated mitigation plans to project applicants and the Federal Aviation Administration ("FAA"), Defendants have ground wind energy development to a halt uniformly, without individualized assessment. The unexplained freeze of statutorily mandated work is the very definition of arbitrary, and in violation of law. Defendants have provided no cogent explanation for their actions, no opportunity for notice-and-comment rulemaking, no limiting principles governing the duration for their unlawful delays, no timetable for adhering to all of their statutory responsibilities, nor meaningful interaction with project developers.

Defendants' failure to adhere to their statutory and regulatory responsibilities will cost Plaintiffs, their employees, contractors, and the American public dearly: millions in

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                    4

unrecompensed investment, cancelled contracts, job losses, higher energy prices, decreased air quality, decreased electrical grid resiliency and worsening climate change. Land-based wind can help ensure the nation will meet rising electricity usage affordably, decrease reliance on volatile, polluting fossil fuels, and allow states to comply with their Clean Air Act obligations while meeting their statutory greenhouse gas ("GHG") reduction goals. FAA issuance of final Determinations of "No Hazard" depends upon completion of Defendants' review process and transmitting its findings and mitigation agreements back to FAA. *See* 49 U.S.C. § 44718; 10 U.S.C. § 183a; 32 C.F.R. Part 211. The United States has over 1,380 wind farms with more than 77,000 wind turbines generating 464,000 GWh of energy, approximately 10% of U.S. energy generation, without compromising "national security."[3] Allegedly, some new, undescribed, unsupported, and unmanifested national security threat requires all wind energy project development to stop. This defies credulity.

## II.    Defendants Violated Laws Governing Land-Based Wind Turbine Assessment.

In 2011, Congress passed the Ike Skelton National Defense Authorization Act that established the Military Aviation and Installation Assurance Siting Clearinghouse (hereinafter "Clearinghouse"). The Clearinghouse is a Department of Defense unit led by the Assistant Secretary of Defense for Energy, Installations and Environment that governs and coordinates Defendants' review of wind turbine projects. Congress has revised the enabling statute multiple times since 2011, the latest in December 2025. *See* 10 U.S.C. § 183a. The Clearinghouse is designed to coordinate Defendants' review of applications for energy projects filed with the FAA

---

[3] U.S. Energy Information Administration, *Electric Power Monthly*, February 2026, https://www.eia.gov/todayinenergy/detail.php?id=67367; https://cleanview.co/power-projects/operating/wind-farms/us (with map); https://energy.usgs.gov/uswtdb/ (US Geological Survey Wind Turbine database).

pursuant to 49 U.S.C. § 44718. *Id.* § 183a(b)(1). The statutory framework governing land-based

wind development projects has a set pattern and practice to address any potential impacts wind

turbines can have on navigable airspace, military readiness, and national security. *See* ECF 65-1

at ¶¶ 68 – 102 for full description of the legal structure. Below are highlights important to the

APA legal analysis:

- The FAA analyzes land-based wind project impact on navigable air space. In doing so,
  FAA asks Defendants to address whether specific project applications will impact
  military readiness and operations. 49 U.S.C. § 44718.

- No later than 75 days after receiving the FAA's transmittal, Defendants *shall* conduct a
  review to determine if there is a potential adverse impact or risk to military preparedness.
  10 U.S.C. § 183a(c)(1)-(5). If the review finds a potential adverse impact, Defendants
  "shall" identify feasible mitigation measures "to minimize risks to national security *while*
  *allowing the energy project… to proceed with development*." *Id.* at § 183a(c)(1)
  (emphasis supplied).

- If the Clearinghouse finds no adverse impact, the Clearinghouse must notify the FAA in
  writing within five business days. *Id*. § 183a(c)(8).

- If Defendants identify a potential risk that requires mitigation, they must issue a notice
  "that describes the concerns identified" and meet with the project applicant to develop a
  mitigation plan. *Id*. § 183a(c)(2)(A). Those discussions must be completed within 90 days
  unless both parties consent to an extension. 32 C.F.R. § 211.6(b)(1).

- Once the parties agree to a mitigation plan, Defendants "shall notify the Clearinghouse of
  the agreement." *Id*. § 211.6(b)(1)(ii).

- Before the Clearinghouse can find a project risk "unacceptable," it must give "full consideration to mitigation actions," and then, within 30 days, must prepare a report to Congress describing the basis of its "unacceptable risk" finding, including explanation of the operational impact, mitigation options considered and why those mitigation options are not feasible. 10 U.S.C. § 183a(e)(1)(A) and (2)(A).

- The integrated review process with other agencies must "ensure timely notification and consideration of energy projects." *Id*. § 183a(c)(5).

- For "comprehensive review," Defendants shall "identify distinct geographic areas" where projects could impact military operations, provide notice and comment, make final designation that includes maps of the area, and identify feasible mitigation measures for future projects. *Id*. § 183a(d)(2)(B).

Defendants have ignored the above statutory regulatory responsibilities and thereby halted applicants' projects. *See* ECF 65-1 at ¶¶ 139-141, 151-172.  The above-described process is a project-specific and geographic-specific analysis. By their own admission, Defendants have ceased making individualized assessments pursuant to the above statutory scheme while they reassess their methodology for making decisions "which will fully play out in due course," whatever that means. ECF 90 at 29. Tellingly, pursuant to Defendants' May 7 Memorandum, the Clearinghouse was to resume preliminary review of energy project applications within the 75-day time frame and "*issue notices of presumed risk."* ECF 90 at 29-30 (emphasis supplied). By Defendants' own admission they are not reinstituting the entirety of their review process, but only moving forward project-specific review that results in "presumed risk." *See* 32 C.F.R. § 211.6(a)(3)(i)-(iii) (Clearinghouse can take one of three actions, no adverse impact, adverse impact not requiring mitigation, and may have adverse impact requiring mitigation). Defendants

offer no supporting facts as to any "deficiencies" of their current project review system, no timeline for completion ("in due course"), and no rulemaking as to anything they have done over the past year. Defendants have also failed to make any geographic-specific determinations, findings or explanations of concerns or deficiencies in the current statutory and regulatory assessment process that they refuse to implement. *See* 10 U.S.C. § 183a(d).

Defendants have denied that their shirking of legal responsibility has legal consequences: "ongoing review of its methodology does not impose any direct legal consequences with respect to any application, which all remain in pending status and will be reviewed in due course." ECF 90 at 31. Of course Defendants' final decision to withhold statutorily obligated project-specific decisions (keeping all applications in "pending status") have legal consequences as Plaintiffs have described in detail. *See* ECF 65-1 at ¶¶ 175-197. Those legal consequences will remain indefinitely. As such, Defendants' conduct is not in accordance with the law governing Defendants' review and violates the APA. *See* 5 U.S.C. § 706(1) ("compel agency action unlawfully withheld or unreasonably delayed"); *id*. § 706(2)(A), (D) (set aside agency actions not in accordance with law or failing to adhere to legal procedures).

### III.    Defendants Violated Regulatory Requirements in Reviewing Projects.

Effective January 6, 2014, Defendants created rules governing a formal review process to determine if wind projects pose a risk to military operations and readiness. *See* 32 C.F.R. § 211. These regulations were designed to "*ensure that the robust development of renewable energy sources and the increased resiliency of the commercial electrical grid may move forward in the United States*, while minimizing or mitigating any adverse impacts on military operations and readiness." *Id*. at § 211.4(a) (emphasis supplied). Defendants must conduct reviews in accordance with 32 C.F.R. § 211, and "[n]o other process shall be used." *Id*. at § 211.4(b).

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                    8

Pursuant to § 211 regulations, once the Clearinghouse receives a project application it "shall": (1) send application to "DoD Components" that may have an interest; (2) DoD Components then have 20 days to comment on the application; (3) and within 30 days of receiving the application, the Clearinghouse "shall" make one of three findings (no adverse impact, adverse impact but no mitigation required, or may have an adverse impact). 32 C.F.R. § 211.6(a)(3). If the Clearinghouse determines a project will not have an adverse impact, it must communicate that finding to the DOT within five business days by statute. 10 U.S.C. 183a(c)(8). If the Clearinghouse determines a project may have an adverse impact requiring mitigation, the Clearinghouse "shall immediately": (1) notify the applicant project developer; (2) offer to discuss mitigation measures; (3) designate one or more DoD Components to engage in mitigation discussions; and (4) notify the DOT and Homeland Security. *Id.* at § 211.6(a)(3)(iii)(A-D). Defendants have failed to follow this process. ECF 65-1 at ¶¶ 139, 151-157 (August 2025 stopped countersigning agreements Defendants drafted); 140, 158-162 (December 2025 stopped drafting mitigation agreements memorializing verbal agreements with project applicants); 163 – 166 (projects awaiting mitigation discussions); 167-170 (projects awaiting preliminary review).

Congress has delegated a very specific role to Defendants (which they have ignored) and Defendants, through notice-and-comment rulemaking, have developed specific regulations (also ignored) that are specifically concerned with "national security," yet Defendants have not explained why they have deviated from the statutory and regulatory requirements. Essentially, Defendants have stopped assessing and discussing national security concerns related to wind projects due to national security concerns. This makes no sense, is not in accordance with law, and is arbitrary and capricious. 5 U.S.C. § 706(1) and (2).

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                    9

IV.    **Defendants "National Security" Claims are Unsubstantiated Pretext to Stop Wind Project Development.**

The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" adopted "without observance of procedure required by law;" or taken "in excess of statutory jurisdiction…." 5 U.S.C. § 706(2)(A), (C), (D). These requirements reflect Congress's insistence that agencies exercise delegated authority through reasoned, statute-bound decision-making grounded in statutory criteria and record evidence. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020); *Michigan v. EPA*, 576 U.S. 743, 750 (2015); *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998); *Marin Audubon Society v. FAA*, 121 F.4th 902, 912, 915 (D.C. Cir. 2024). There is no evidence in the record before this Court that there was a reasoned, statute-bound decision to stop Defendants' statutorily required work. *See In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2012) (Opinion by now Justice Kavanaugh) (agency cannot disregard statutory responsibilities). In *Aiken,* the D.C. Circuit upheld a mandamus action when the Nuclear Regulatory Commission "shut down its review and consideration of the Department of Energy's license application" in violation of federal law, noting that "[i]t is no overstatement to say that our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law..." *Id*. at 258, 267.

It is hornbook law that government agencies must have a lawful basis for their actions, decisions must be reasoned and supported by evidence, and agencies may not act on whims without considering relevant factors.  5 U.S.C. § 706(2); *Citizens to Protect Overton Park v. Volpe*, 401 U.S. 402 (1971); *Dep't of Commerce v. New York*, 588 U.S. 752 (2019); *Regents*, 591 U.S. 1 (2020).  However, that is exactly what Defendants have been doing.  Rather than giving

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                                    10

Defendants' unlimited discretion by uttering the words "national security," administrative law, based on the rule of law, cabins discretion to only those circumstances "when *individualizing* is needed." Kenneth Culp Davis, *Administrative Law Treatise* (2ⁿᵈ Ed. 1978) § 2:13 at 115 (emphasis supplied). Here, Defendants have ignored the statutory and regulatory framework requiring individual assessment of wind energy projects and replaced it with unbounded discretion to block all wind energy projects through the incantation of "national security."

Generally, administrative law, in furtherance of the rule of law: (1) requires reasoned "explanation for departure from precedent" as well as "guiding rules and standards"; (2) forbids unnecessary discretionary power; (3) requires open and transparent standards, findings, and reasons for decisions; and (4) requires checking, structuring and confining discretionary power. *Id.* at 117. At a bare minimum, "an agency must engage in 'reasoned decisionmaking,' defined to include an explanation of how the agency proceeded from its findings to the action it has taken." Richard J. Pierce, Jr., *Administrative Law Treatise* (4ᵗʰ ed. 2002) § 11.4 at 808. An important principle of administrative law is an "unexplained departure from the agency's prior policies and precedents" violates the arbitrary and capricious standard. *Id.* § 8.5 at 547 *citing Atchison, Topeka & Santa Fe Ry. v. Wichita Board of Trade,* 412 U.S. 800, 808 (1973).

### A.  APA Legal Standards for Review of Final Agency Actions.

The APA (5 U.S.C. §§ 701–706) governs judicial review of final administrative actions. In determining whether an agency action is consistent with enabling legislation, that review is to be conducted *de novo* with courts making independent assessments as to the "best reading" of the laws governing agency action and whether final agency actions comport with congressional delegation of authority. *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369, 395 (2024) ("the role of the reviewing court under the APA is, as always, to independently interpret the statute and

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                    11

effectuate the will of Congress subject to constitutional limits."). Defendants have ignored their specific statutory requirements and deadlines and make no factual findings and offer no explanation for this work stoppage beyond "complexity," the need to coordinate with other agencies, and the need for "updated information." ECF 36-3 at 2, 4, "Interim Guidance Regarding Compliance with Established Military Aviation and Installation Assurance Siting Clearinghouse Procedures" ("Interim Guidance").

Defendants' decision to halt all work required by statute and regulation is also a final agency action. A final agency action is one that is the consummation of a decision-making process that either determines rights and obligations or has legal consequences. *See Bennett v. Spear,* 520 U.S. 154, 177-78 (1997); *New York v. Trump,* 811 F. Supp. 3d 215, 232-33 (D. Mass. 2025), *Louisiana v. Biden,* 622 F. Supp. 3d 267, 291-292 (W.D. La 2022). Here, Defendants' decision to stop the regulatory process for an unspecified length of time, refusal to engage in statutorily required assessment, reporting, mitigation discussions, mitigation agreements and ultimate sign-off on projects is a final decision. *New York v. Trump,* 811 F. Supp. 3d at 242-43 (suspension of off-shore wind projects a final decision that violates the APA); *Louisiana v. Biden,* 622 F. Supp. 3d at 292-93 (pause on offering oil and gas leases a final agency action), *Environmental Defense Fund v. Gorsuch,* 713 F.2d 802, 813 (D.C. Cir. 1983) (suspension of permitting process is equivalent to suspension of regulations and "promulgation of a regulation" that failed to go through notice and comment); *Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017) (decision to stay final rule pending reconsideration is a final agency action); *Connecticut v. U.S. Department of Interior,* 363 F. Supp. 3d 45, 60 (D.D.C. 2019) (refusal to sign off on tribal procedures final agency action). "[A]n agency cannot preclude judicial review by casting its decision in the form of inaction." *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987)

(*quoting Environmental Defense Fund v. Hardin,* 428 F.2d 1093, 1099 (D.C. Cir. 1970)). A wealth of cases have established that decisions to stay statutorily mandated work, particularly indefinite stays as in this case, are final agency actions. *See Louisiana v. Biden,* 622 F. Supp. 3d at 292-93 (collected cases establishing pause/stay of agency duties is final agency action).

### B. Defendants Violated all of the *State Farm* Factors.

In *State Farm,* the Supreme Court determined that an agency action would be found arbitrary and capricious if the agency: (1) relied on factors Congress did not intend; or (2) failed to consider an important aspect of the problem; or (3) the explanation of the agency differs from the evidence in the record; or (4) is the product of implausible reasoning that is not the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983). Defendants have violated all four of the *State Farm* factors.

### 1. Defendants Relied on Factors Congress Did Not Intend.

Congress created the Clearinghouse to coordinate, facilitate, and complete project reviews in a timely fashion, *i.e.,* within 75 days. Defendants must notify the FAA of "no adverse impact" findings within five business days or engage project applicants and stakeholders to discuss and agree on mitigation measures within 90 days. *See* 10 U.S.C. § 183a(c)(8); 32 C.F.R. § 211.6(b)(1). A separate procedure for "comprehensive review" is a geographic-specific review of areas that present unique national security concerns and could affect multiple projects. *See* 10 U.S.C. § 183a(d). The statute is clear: Defendants, through the Clearinghouse, are to make *project-specific* determinations as to potential adverse risks and mitigate those risks when necessary, or *geographic-specific* assessments of potential adverse risks and provide notice of those areas to developers and the public. Defendants have done neither, regardless of a project's proximity to a military installation, all projects have been treated the same: halted.

Defendants claim that wind energy projects are subject to further interagency coordination "to ensure a comprehensive national security review is conducted in a manner sufficient to address modern advancements in consideration of their scope, duration, and level of risk recent (sic) presented to DoW operations and readiness." ECF 36-3 at 3. This change in policy "is required" due to "potential threats to critical infrastructure and the homeland based on the advancement of adversarial capabilities and the evolving global threat picture." *Id*. Unexplained is how global threats impact every project application including those that do not pose any adverse impact to military preparedness.

Congress intended individualized review of each application and any unique concerns the application presents to military preparedness with tight timelines to complete such reviews and engagement with applicants to mitigate any potential risks specifically identified. Defendants have not utilized statutory "comprehensive review" to designate *specific* geographic areas of concern, explain those *specific* concerns and open them to notice and comment. *See* 10 U.S.C. § 183a(d); 83 FR 39080-01 (August 8, 2018) (Providing notice of two specific geographic areas of concern to potential project developers).

Congress did not intend Defendants to grind wind energy development to a halt based on generalized, vague "national security" concerns, but the exact opposite: to facilitate the national security analysis to "accelerate the development of planning tools necessary to determine the acceptability to the Department of Defense" of land-based wind energy projects. 10 U.S.C. § 183a(b)(1). That is the purpose of creating the Clearinghouse, to facilitate the identification of project and/or geographic-specific "feasible and affordable" mitigation measures that address national security concerns "while allowing the energy project … to proceed with development." 10 U.S.C. § 183a(c)(1)(B). Since Congress did not intend Defendants to halt project-specific and

geographic-specific work based on generalized, unexplained, nation-wide, industry-wide "national security" concerns and address alleged (but not supported) "deficiencies" in their assessment, Defendants have considered matters Congress has not intended and *made those vague unintended considerations trump* statutorily mandated individual project and geographic area considerations. *State Farm,* 463 U.S. at 43("an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider…."); *Massachusetts v. EPA*, 549 U.S. 497, 532–35 (2007) (holding EPA's denial of the rulemaking petition was arbitrary and capricious because the agency rested its decision on policy considerations rather than the factors Congress specified); *Judulang v. Holder*, 565 U.S. 42, 55–56 (2011) (agency action arbitrary and capricious where agency based its policy on factors beyond the governing statute).

## 2. Defendants Failed to Consider an Important Aspect of Their Policy Change, the Reliance Interests of Wind Project Developers.

When an agency changes its policy, it must provide a reasoned explanation for the change that includes an acknowledgement of the policy change. *See FCC v. Fox,* 556 U.S. 502, 514-15 (2009). An agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id*. at 415. In addition, an agency "must" provide a more detailed justification when "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy *has engendered serious reliance interests that must be taken into account*." *Id*. (emphasis supplied); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016); *Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956, 968–69 (9th Cir. 2015) (en banc) (agency acted arbitrarily by reversing prior policy without reasoned explanation).

Here, as Plaintiffs have demonstrated, their industry has significant reliance interests on a timely adherence to the policies and procedures outlined in the Clearinghouse statute, Defendants' regulations, and Defendants' policy to ensure "the robust development of renewable energy sources …." 32 C.F.R. § 211.4(a). Moreover, Defendants represented to Plaintiffs that it "shall" conduct its review pursuant to the regulations in 32 C.F.R. § 211 and "(n)o other process shall be used by a DoD Component." *Id.* at § 211.4(b). These representations generated significant reliance interests and large investments. Defendants' failure to: (1) recognize the change in their policies and procedures; (2) provide a reasoned explanation for the change; and (3) address significant reliance interests on Defendants' adherence to orderly processing of applications through the Clearinghouse according to statutory and regulatory requirements are all important aspects that must be considered and addressed under the APA. *State Farm,* 463 U.S. at 43 (Agency acts arbitrarily and capriciously when it "entirely failed to consider an important aspect of the problem"); *Fox,* 556 U.S. at 515-16 (agency must provide detailed justification when it changes policies that engendered significant reliance interests and take those reliance interests into account). Defendants have failed to explain their policy change or address Plaintiffs' reliance interests. *See* ECF 65-1 at ¶ 171 – 174 (Defendants' refusal to engage with applicants, explain delays).

### 3. Defendants' Explanation as to the Failure to Adhere to Statutory and Regulatory Deadlines is Counterfactual and Not Supported by Any Record.

Defendants claim that the Interim Guidance memo "is not a policy or regulatory change in how the Department meets its statutory obligation to inform the Secretary of Transportation … a proposed project presents an unacceptable risk to the national security of the United States…" ECF 36-3 at ¶2. Defendants assert that, "effective immediately," the Clearinghouse will adhere to *some* of its statutorily required responsibilities and deadlines (e.g., conduct reviews within 75

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                    16

days pursuant to 10 U.S.C. 183a(c)(1)). *Id.* at ¶9(b)(1).  Inexplicably, it ignores its own regulations requiring this review to be completed in 30 days. 32 C.F.R. § 211.6(a)(3).

Tellingly, Defendants claim in the Interim Guidance that they have not changed their policy or regulations when a "proposed project presents an unacceptable risk" to national security. But that assertion only addresses one scenario: when the Clearinghouse finds (1) a project may have an adverse impact on military operations; (2) the Clearinghouse Mitigation Response Team and the applicant cannot come to an agreement as to feasible mitigation that minimizes risks to national security; and (3) after giving full consideration to mitigation actions, Defendants find the project "would result in unacceptable risk to national security." *See* 10 U.S.C. § 183a(e). The record reflects that meetings with applicants to discuss mitigation options are not moving forward. ECF 65-1 at ¶¶ 163-166. Not addressed at all are instances where the Clearinghouse finds no adverse impact or an adverse impact that does not require mitigation. *See* 32 C.F.R. § 211.6(a)(3) (describing the three actions the Clearinghouse can take on an application). Nor does the Interim Guidance address instances where the parties come to agreement on mitigation measures. *See id.* at § 211.6(b) (mitigation discussions "shall not extend more than 90 days," mitigation agreements to be transmitted to FAA for application modification if the project changes). None of that work has been conducted or completed within statutory or regulatory requirements nor is it addressed in the Interim Guidance.

Indeed, the fact that the Interim Guidance memo focuses on the most extreme outcome ("unacceptable risk") and ignores policies and procedures concerning findings that could move wind projects forward (no risk, risk but no mitigation necessary, or agreed mitigation measures to address identified risks) indicates Defendants are making blanket determinations that all land-based wind energy projects pose an unacceptable national security threat similar to their blanket

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                          17

determinations that off-shore wind projects allegedly pose a national security threat, all of which have been enjoined or overturned.[4] Nor have Defendants reported to Congress that any project presents an unacceptable risk, the basis for such a finding, or mitigation options considered, or provided an explanation why those mitigation measures were not feasible or sufficient as required by statute. 10 U.S.C. § 183a(e)(2)(A). Defendants' scant record does not support their claims that they have not changed their policy or procedures.

### 4. Defendants' "National Security" Reasoning for Not Adhering to Their Statutory and Regulatory Responsibilities is an Implausible Pretext to Stop All Wind Energy Development.

Defendants' change of policy from ensuring wind projects move forward while mitigating adverse effects to stopping wind energy projects because of unexplained national security concerns is "the product of implausible reasoning that is not the product of agency expertise" and thus arbitrary and capricious. *State Farm*, 463 U.S. at 43. When the record does not explain the rationale for agency action/inaction, extra-record review is appropriate when the rationale seems contrived. *Dep't of Commerce*, 588 U.S. at 785 (court "cannot ignore the disconnect between the decision made and the explanation given" and accept contrived reasons for agency action). Because the record of Defendants' inaction is scant to non-existent, ostensibly supported by the Interim Guidance memo, additional, contemporaneous actions and statements by the current administration are warranted. *National TPS Alliance v. Noem,* 166 F.4th 739 (2026) (extra-record

---

[4] *See* ECF 65-1 at ¶4; *New York v. Trump,* 811 F. Supp. 3d 215 (D. Mass. 2025), appeal dismissed, No. 26-1174 (1st Cir. June 15, 2026); *Revolution Wind v. Burgum,* No. 1:25-cv-02999, 2026 WL 113568  (D. D.C. Jan. 12, 2026); *Empire Leaseholder LLC v. Burgum,* No. 26-cv-00004, Oral Ruling/Minute Order (D.D.C. Jan. 15, 2026); *Virginia Electric & Power Co. d/b/a Dominion Energy Virginia v. Dep't of the Interior,* No. 2:25-cv-830, 2026 WL 125783 (E.D. Va. Jan. 16, 2026); *Vineyard Wind 1 LLC v. Dep't of the Interior,* No. 26- 10156-BEM, ECF 71 (Staying Stop Work Order) (D. Mass. Jan. 27, 2026); *Sunrise Wind LLC v. Burgum,* No. 1:26-cv-00028, Oral Ruling/Minute Order (D. D.C. Feb 2, 2026).

racial animus considered when rationale for Venezuela's Temporary Protected Status revoked); *Anthropic PBC v. Department of War,* 825 F. Supp. 3d 1101, 1133 (N.D.Cal. 2026) ("contradictory positions, the procedural defects, and the rushed process following a public declaration of the foreordained conclusion" that Plaintiff was a supply chain risk to national security was arbitrary and capricious); *Sweet v. Devos,* 495 F. Supp. 3d 835 (N.D.Cal. 2020) (Defendant explanation of delay in deciding student loan relief pretextual, extra record evidence considered); *Colorado v. Trump,* 823 F. Supp. 3d 1251, 1276-77 (D. Colo. 2026) (Reasons given for USDA decision modifying Colorado pilot project and threatening removal of federal benefits were pretextual, extra-record evidence considered to show arbitrary and capricious punishment as motive); *R.I. State Council of Churches v. Rollins*, 808 F. Supp. 3d 370, 384 (D.R.I. 2025) (rejecting USDA's rationale for refusing to issue SNAP benefits during government shutdown as "pretextual" and "incongruent with what the record reveals about the agency's priorities and decisionmaking process"); *Illinois v. Noem,* 813 F. Supp. 3d 282, 303-04 (D. R. I. 2025) (FEMA claims it did not consider "sanctuary designation policy considerations" in reallocating grant funding belied by extra-record statements and circumstances).

Below is a timeline of actions, statements, and policies the current administration has pursued to stop all wind energy development and provides the actual rationale for stopping statutorily required work: an animus to wind energy development. *See also,* ECF 65-1 at ¶¶ 208-230 (Detailing wind energy litigation finding administration arbitrarily hindered wind energy development).

**January 20, 2025**: President Donald Trump ordered the withdrawal of the entire Outer Continental Shelf from offshore wind leasing and the halt of offshore wind permitting ("the

Wind Memo").[5] *New York v. Trump*, 811 F. Supp. 3d at 243 (Wind Memo arbitrary and capricious and unlawful under the APA).

**February 26, 2025,** the President emphasized that Cabinet officials must comply with the no-windmills directive with "no exceptions."[6]

**July 2025**, Responding to Executive Order 14315, Department of Interior ("DOI") requires 68 different actions related to wind and solar energy development approval/permitting to have three different Under Secretary approvals and heightened agency review for all actions and decisions related to wind and solar facilities.[7] When challenged, a court found the heightened review standards to be arbitrary, capricious and contrary to law. *RENEW Northeast v. U.S Dept. of Interior*, No. 25-cv-13961-DJC, 2026 WL 1078282, at *5, *22 (D. Mass. Apr. 21, 2026).

**August 5, 2025,** DOI withdrew millions of acres of federal waters that were available to wind development, ending the offering of wind energy leases.[8]

---

[5] Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, THE WHITE HOUSE (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/temporary-withdrawal-of-all-areas-on-the-outer-continental-shelf-from-offshore-wind-leasing-and-review-of-the-federal-governments-leasing-and-permitting-practices-for-wind-projects/.

[6] Remarks Prior to a Cabinet Meeting and an Exchange with Reporters, Gov't Publ'g Off. (Feb. 26, 2025), https://www.govinfo.gov/content/pkg/DCPD-202500304/pdf/DCPD-202500304.pdf.

[7] Exec. Order No. 14315; U.S. DEP'T OF THE INTERIOR, OFF. OF THE SEC'Y, DEPARTMENTAL REVIEW PROCEDURES FOR DECISIONS, ACTIONS, CONSULTATIONS, AND OTHER UNDERTAKINGS RELATED TO WIND AND SOLAR ENERGY FACILITIES (Jul. 15, 2025), https://www.doi.gov/media/document/departmental-review-procedures-decisions-actions-consultations-and-other.

[8] Recission of Renewable Energy Leasing Schedule, 90 Fed. Reg. 37386-01 (August 5, 2025); 30 C.F.R. 585.150 (September 4, 2025).

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                    20

**August 20, 2025,** President Trump declared on Truth Social that "[w]e will not approve wind or farmer destroying Solar," making explicit that federal approvals would be withheld.[9]

**August 26, 2025,** the President reiterated that directive directly to agency leadership, stating that "[w]e're not allowing any windmills to go up . . . And windmills, we're just not going to allow them."[10] This statement is a specific direction to multiple agencies with distinct statutory mandates to act in concert to shut down wind energy development rather than exercise independent, statute-specific judgment.

**December 22, 2025,** citing undefined national security concerns, DOI paused construction activities for five offshore wind projects.[11] Those federal stop-work orders have been enjoined allowing all five projects to continue construction or operation.[12]

**January 9, 2026**, President Trump met with oil and gas executives and openly acknowledged his administration is blocking wind project approvals, stating: "I can proudly say

---

[9] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 20, 2025, 9:51 AM), *see* https://www.cnbc.com/2025/08/20/trump-says-us-will-not-approve-solar-or-wind-power-projects.html.

[10] ROLL CALL, Remarks: Donald Trump Leads a Cabinet Meeting at the White House – August 26, 2025, at 6:48.

[11] See *e.g.*, U.S. Dep't of the Interior, Bureau of Ocean Energy MGMT., Director's Order (Dec. 22, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Empire%20Wind%20Suspension%20Letter.pdf?VersionId=vZMM8IpvlVC lZgsRXYmlw6uOV3E3klKr; Maxine Joselow & Lisa Friedman, *Trump halts 5 Wind Farms Off the East Coast*, N.Y. Times, Dec. 23, 2025, at A1.

[12] *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL, 2026 WL 113568 (D.D.C. Jan. 12, 2026).

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                    21

. . . that we have not approved one windmill since I've been in office. And we're going to keep it that way. . . . And I've told my people, we will not approve windmills."[13]

**March 23, 2026,** the Trump administration announced it would pay a wind energy developer $1 Billion to abandon its wind energy project.[14]

**March 24, 2026** President Trump, speaking to Secretary of Interior Doug Burgum at a White House event noted: "I can proudly say, Doug, that we have not approved one windmill since I've been in office. And we're going to keep it that way."[15]

**April 8, 2026**, Defendants respond to American Clean Power Association inquiries concerning the lack of progress (and statutorily mandated decisions) on renewable energy projects, noting that "evolving risks," "modern military risks," and "comprehensive review" development were the reasons for this indefinite delay. *See* ECF 64-1 at ¶174 and ECF 36-5.

**April 21, 2026**, *RENEW* district court issued a sweeping preliminary injunction enjoining renewable energy permitting restrictions that are unsupported by governing statutes or reasoned agency decision-making. *RENEW Northeast*, 2026 WL 1078282, *1, *31-32.

**May 7, 2026**, Defendants' "Interim Guidance" memorandum claims it "is not a policy or regulatory change in how the Department meets its statutory obligation to inform the Secretary of Transportation … a proposed project presents an unacceptable risk to the national security of

---

[13] TRANSCRIPT: President Trump Meets with Oil and Gas Executives at the White House, Senate Democrats (Jan. 9, 2026), https://www.democrats.senate.gov/newsroom/trump-transcripts/transcript-president-trump-meets-with-oil-and-gas-executives-at-the-white-house-10926.

[14] Evan Halper & Jake Spring, *Trump Administration to pay $1 billion to stop two East Coast wind farms*, Wash. Post, Mar. 23, 2026, https://www.washingtonpost.com/climate-environment/2026/03/23/trump-east-coast-wind-farms-pay-france/.

[15] *Trump Takes Aim at Windmills Despite Increasing Energy Costs*, Georgia Public Broadcasting, Mar. 24, 2026.

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                    22

the United States…" *yet does not address the clear change in policy of withholding approval of projects that do not pose unacceptable risk to national security, withholding signatures on mitigation agreements, and failure to conduct mitigation meetings.*

Courts have repeatedly recognized that agency action becomes unlawful where agencies preserve the outward form of administrative process while structuring that process to deliver politically predetermined results. *See Dep't of Commerce*, 588 U.S. at 784 (rejecting "contrived" agency rationale masking the agency's actual reasoning); *Regents*, 591 U.S. at 21-22 (2020); *Tummino v. Hamburg*, 936 F. Supp. 2d 162, 183-86 (E.D.N.Y. 2013); *Saget v. Trump*, 375 F. Supp. 3d 280, 359–60 (E.D.N.Y. 2019); *Connecticut*, 363 F. Supp. 3d at 63–65; *RENEW Northeast*, 2026 WL 1078282 at *24-25.

Here, Defendants have not acknowledged their departure from long-standing legislative and regulatory processes and timelines, failed to explain why they have ignored those required processes and timelines, and have structured their processes to deliver pre-determined results announced by the President: stop all wind energy projects. Defendants have executed this policy under the pretext of "national security," in the hope that courts will not look past this thin veneer.

## V. Defendants' Inaction and Disregard of Established Legal Processes Harm the Public Interest.

On January 20, 2025, The White House declared a "national energy emergency" because "(t)he energy and critical minerals ("energy") identification, leasing, development, production, transportation, refining, and generation capacity of the United States are all far too inadequate to meet our Nation's needs."[16] The U.S. Department of Energy ("DOE") states "wind energy

---

[16] *Declaring a National Energy Emergency*, The White House, Jan. 20, 2025, https://www.whitehouse.gov/presidential-actions/2025/01/declaring-a-national-energy-emergency/.

projects provide many economic benefits including direct and indirect employment, land lease payments, local tax revenue, and lower electricity rates-plus other financial incentives."[17] Further, the DOE has also noted that "wind power is a domestic resource that enables U.S. economic growth."[18]

The growth of the wind energy sector and its contribution to U.S. energy independence has been stunning, particularly since Congress created the Clearinghouse in 2011. According to the U.S. Geological Survey (USGS) Wind Turbine Database, there are currently more than 77,000 wind turbines operating in 45 states, none of them interfering with national security.[19] According to an American Clean Power study, the 155+ wind projects currently frozen by Defendants' violation of their statutory and regulatory responsibilities put $84 billion in capital investment at risk. The projects would support over 240,000 jobs, including manufacturers, construction workers, and technicians in hundreds of local economies across the country. For consumers, an effective halt on new wind projects will cost U.S. households $3 billion by 2030 and nearly $13 billion by 2035, with commercial and industrial customers absorbing an additional $21 billion in costs by 2035.[20]

---

[17] *Economics*, Wind Exchange, U.S. Dep't of Energy, https://www.energy.gov/cmei/systems/windexchange/economics.

[18] *Advantages and Challenges of Wind Energy*, U.S. Dep't of Energy, https://www.energy.gov/cmei/systems/advantages-and-challenges-wind-energy.

[19] https://energy.usgs.gov/uswtdb/

[20] American Clean Power Association, *How the Department of Defense Block on Wind Projects Impacts the Grid*, https://cleanpower.org/wp-content/uploads/2026/07/ACP_DoD_BlockonWindImpact_2026Analysis.pdf.

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                24

The NERA Economic Consulting for the Corporate Energy Buyers Association (CEBA) conducted a macroeconomic study finding that blocking renewable energy's economic development could cost the United States over $100 billion in cumulative electricity and natural gas costs between 2027 and 2033.[21] Furthermore, when new solar and "wind resources are constrained, average U.S. electricity prices are higher by as much as $2.3/MWh (6%) from 2027-2033."[22]

Stopping wind production, and therefore relying more on fossil fuel energy, also harms public health. A 2021 Harvard University study estimated that air pollution attributable to fossil fuel combustion causes approximately 8.7 million premature deaths each year—nearly one in every five deaths worldwide.[23]  This data reflects an overwhelming body of scientific and medical evidence demonstrating that fossil fuel combustion poses a significant threat to public health. In the U.S., the health burdens of air pollution from oil and gas development lifecycles (not including coal) are 40 to 50,000 premature deaths from $PM_{2.5}$ exposure, 35 to 40,000

---

[21] Ryan Kennedy, *Constraining U.S. Wind and Solar Development Could Trigger $121 Billion in Unnecessary Energy Costs*, PV Magazine USA, Jun. 20, 2026, https://pv-magazine-usa.com/2026/06/20/constraining-u-s-wind-and-solar-deployment-could-trigger-121-billion-in-unnecessary-energy-costs/.

[22] Suganda Tuladhar, Bharat Ramkrishnan and Juliette Min, *The Cost of Constraining New Solar and Wind*, CEBA 6, Jun. 11, 2026, https://ceba.org/wp-content/uploads/2026/06/FINAL-The-Cost-of-Constraining-New-Solar-and-Wind-June-2026.pdf.

[23] Karn Vohra et al., *Global Mortality from Outdoor Fine Particle Pollution Generated by Fossil Fuel Combustion: Results from GEOS-Chem*, 195 Env't Rsch. 110754 (2021); Ctr. for Climate, Health & the Glob. Env't, Harvard T.H. Chan Sch. of Pub. Health, *Fossil Fuel Air Pollution Responsible for 1 in 5 Deaths Worldwide*, https://hsph.harvard.edu/environmental-health/news/fossil-fuel-air-pollution-responsible-for-1-in-5-deaths-worldwide/.

premature deaths from $NO_2$ exposure, 10,000 preterm birth incidences, 200,000 childhood asthma cases, and 1,600 cancer cases due to hazardous air pollutants.[24]

As one of the largest sources of fine particulate matter ($PM_{2.5}$), nitrogen oxides, sulfur dioxide, and other hazardous air pollutants, fossil fuel combustion has been linked to increased rates of asthma, respiratory disease, cardiovascular disease, certain cancers, adverse birth outcomes, cognitive impairments, and premature death.[25] These harms are borne disproportionately by children, older adults, low-income communities, and communities of color, who are more likely to live near highways, industrial facilities, power plants, and other major sources of fossil fuel emissions.[26]

Moreover, halting wind energy development harms many states, utilities, and grid operators who have structured long-term energy planning and Clean Air Act compliance strategies around the anticipated deployment of renewable energy resources. These expectations are reflected in EPA-approved State Implementation Plans (SIPs), utility integrated resource plans, and state renewable portfolio standards (RPS), which collectively assume continued growth in wind, solar, and other low or zero-emitting generation as a central pathway for achieving and maintaining the Clean Air Act's National Ambient Air Quality Standards

---

[24] Karn Vohra et al., *The health burden and racial-ethnic disparities of air pollution from the major oil and gas lifecycle stages in the United States*, Science Advances, Aug. 22, 2025.

[25] Health Impacts of Poor Air Quality, Nat'l Acad. of Med., May 28, 2025, https://nam.edu/product/air-quality-climate-health-hazard/.

[26] U.S. Envtl. Prot. Agency, *Climate Change and Social Vulnerability in the United States: A Focus on Six Impacts*, 21–31 (Sep. 2021); Ctr. for Climate, Health & the Glob. Env't, Harvard T.H. Chan Sch. of Pub. Health, *Equity*, https://hsph.harvard.edu/research/climate-health-c-change/climate-kids-and-health/equity/.

(NAAQS).[27] Integrated resource planning requires utilities to evaluate the full range of supply-side and demand-side resources, including renewable generation, energy efficiency, and conventional fossil fuel resources, to ensure reliable and least-cost electricity service.[28]

Renewable portfolio standards, adopted in thirty states, Washington, D.C., and two territories, further require electric utilities to procure specified percentages of electricity from renewable sources by set deadlines, thereby creating binding procurement obligations that drive long-term generation and emissions planning.[29] Defendants' actions impermissibly impede renewable energy development, thus thwarting the will of the people in 30 states by making those renewable energy goals unreachable. Simultaneously, extending reliance on fossil fuel generation increases the risk that states will be unable to attain or maintain Clean Air Act NAAQS thereby triggering Clean Air Act consequences. States must develop State Implementation Plans (SIPs) to control certain criteria pollutants emitted by fossil fuels. 42 U.S.C. § 7410.[30] One of the ways states plan to reduce these criteria pollutants to maintain air quality under the NAAQS program is to increase renewable energy deployment.[31] Increased

---

[27] 42 U.S.C. § 7410 (Clean Air Act provision requiring states to develop plans to implement, maintain, and enforce the NAAQS).

[28] 16 U.S.C. § 2602(19) (defining integrated resource planning as a utility planning process that evaluates supply-side and demand-side resources to meet electricity demand at least cost while ensuring reliability).

[29] Nat'l Conf. of State Legislatures, *State Renewable Portfolio Standards and Goals* (Aug. 13, 2021), https://www.ncsl.org/energy/state-renewable-portfolio-standards-and-goals.

[30] 42 U.S.C. § 7410(c)(1), (k)(5) (discussing EPA's duty to promulgate federal implementation plans and revise SIPs where necessary to ensure attainment and compliance).

[31] *See, e.g.,* 88 Fed. Reg. 58178, 58193 (Aug. 25, 2023) (Maryland SIP relies on renewable portfolio standard to reduce long-term regional haze); Rhode Island Regional Haze State Implementation Plan Revision for the Second Implementation Period (2018-2028), March 7, 2025 at 99-100, available at: https://dem.ri.gov/sites/g/files/xkgbur861/files/2025-

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                    27

failures to achieve NAAQS under the Clean Air Act will also exacerbate the harm to public health noted above.

## VI.    CONCLUSION

Defendants' refusal to adhere to their own regulations and do the work Congress demands (ensure the development of wind energy while mitigating any adverse impacts) violates the APA and harms not just Plaintiffs but all U.S. citizens through higher electricity rates and worsening air quality, with dire public health consequences. Multiple courts have found the administration's attempts to block wind energy development to be illegal. This Court has ample evidence to join them as Defendants provide no factual record supporting this drastic shift in policy and practice. Congress, through the Clearinghouse statute, expected wind projects to move forward. Defendants' (in)actions have, in effect, found that all wind energy projects present "unacceptable risk," but Congress saw such determinations as outliers requiring specific explanations of why any individual project cannot move forward. Defendants' actions are, therefore, completely incongruous with their enabling statute. Worse still, the record before this Court shows Defendants, and more broadly the administration, are willing to undermine the rule of law, justifying their flouting of the law and their own regulations with bare, unfounded claims of "national security" they believe allow them to do as they please. A national security free pass cannot be the basis for sound administrative law. If it is allowed, such a national security exception will swallow the rule of law.

---

04/RI%20Regional%20Haze%20SIP%20for%20the%20Second%20Implementation%20Period %20%282018%20-%202028%29_0.pdf; Partial Approval and Partial Disapproval of Air Quality Implementation Plans; Hawaii; Regional Haze State Implementation Plan for the Second Implementation Period, 91 Fed. Reg. 7204, 7216 (Feb. 17, 2026) (relies on 100% renewable portfolio standard for long-term regional haze plan).

BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW PROFESSORS                    28

Respectfully submitted this 29th day of July 2026.

   */s/ Jesse A. Buss*
Jesse A. Buss, OSB No. 122919
WILLAMETTE LAW GROUP, PC
411 Fifth Street, Oregon City OR 97045-2224
ph: 503-656-4884, fax: 503-608-4100
jesse@WLGpnw.com

Thomas C. Buchele, OSB No. 081560
EARTHRISE LAW CENTER
tbuchele@lclark.edu

Jon A. Mueller (*pro hac vice*)
JMueller@law.umaryland.edu
William Piermattei (*pro hac vice*)
WPiermattei@law.umaryland.edu
Environmental Law Clinic, University of Maryland
Carey School of Law