# Exhibit A

Daniel Hutzenbiler, OSB No. 176050
**McKANNA BISHOP JOFFE L.L.P.**
1635 NW Johnson Street
Portland, Oregon 97209
(503) 226-6111
dhutzenbiler@mbjlaw.com

Richard F. Griffin*
**BREDHOFF & KAISER, P.L.L.C.**
805 Fifteenth Street NW, Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600
rgriffin@bredhoff.com

* *pro hac vice pending*

*Attorneys for Amici*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

|  |  |
|---|---|
| RENEWABLE NORTHWEST; ADVANCED POWER ALLIANCE; ALLIANCE FOR CLEAN ENERGY NEW YORK, INC.; CLEAN GRID ALLIANCE; GREEN ENERGY CONSUMERS ALLIANCE; INTERWEST-ENERGY ALLIANCE; MAINE RENEWABLE ENERGY ASSOCIATION; RENEW NORTHEAST; and SOUTHERN RENEWABLE ENERGY ASSOCIATION, | Case. No. 3:26-cv-01092-YY |
| Plaintiff, | **Brief Amicus Curiae of Climate Jobs Oregon (CJOR), Climate Jobs Colorado (CJC), Texas Climate Jobs Project (TXCP), Climate Jobs Illinois (CJIL), Climate Jobs Washington (CJWA), Michigan Climate Jobs (MICJ), Climate Jobs Massachusetts (CJMA), Maine Labor Climate Council (MLCC), Climate Jobs New York Education Fund (CJNY), Union Energy PA, and the Iron Workers District Council of the Mid-Atlantic States (IWDCMA) in Support of Plaintiffs' Motion for a Stay or Preliminary Injunction** |
| v. | |
| PETER B. HEGSETH, in his official capacity as Secretary of Defense; DALE R. MARKS, in his official capacity as Assistant Secretary of Defense for Energy, Installations, and Environment; U.S. DEPARTMENT OF DEFENSE; and DEPARTMENT OF DEFENSE MILITARY AVIATION AND INSTALLATION ASSURANCE SITTING CLEARINGHOUSE, | |
| Defendants. | |

**INTRODUCTION**

Plaintiffs' Motion for a Stay or Preliminary Injunction and Memorandum of Law in support persuasively demonstrates that Defendants' effective "freezing [of] their statutorily mandated review duties for wind energy projects" violated the Administrative Procedure Act ("APA") by, among other things, ignoring interests and impacts the APA required them to consider. Amici are coalitions of labor groups (hereinafter "coalition members") that have committed substantial resources through joint labor-management apprentice and training entities to training the skilled workforce needed to build and maintain windmills and turbines, as well as to construct the infrastructure necessary to support wind energy development. Amici submit this brief in support of Plaintiffs' Motion to bring to the Court's attention particular interests Defendants ignored in their ill-considered rush to stymie and/or eliminate wind energy development: the interests of coalition members, who have invested in training wind energy workers, and the interests of those trained workers, seeking sustainable employment to support themselves and their families, who have spent countless hours developing the necessary skills to perform the complicated, often dangerous work of constructing and maintaining wind energy projects. Defendants' freeze threatens those workers' hard-won livelihoods. It has already caused many of them to lose work in an industry where the promise of good jobs, at living wages with health care and retirement security, has become illusory because of ill-conceived and unlawfully executed arbitrary government action.

**INTERESTS OF AMICI**

Amici are coalitions whose coalition member organizations participate in training programs to provide workers with the skills necessary for work in the wind energy industry, who serve as those workers' collective bargaining representatives while performing such work, and

advocate in support of wind energy projects as part of an overall clean, renewable energy

strategy.

CJOR is a coalition of labor organizations—including the Oregon AFL-CIO, the Oregon Building and Construction Trades Council, and six local unions—working to ensure that the transition to a clean energy future in Oregon is one that centers working people and the communities they live in. Climate Jobs Oregon addresses the needs of working families by providing education, research, and public forums that promote renewable energy infrastructure and the workforce opportunities emerging within the clean energy economy.

CJC is a union-led organization—with members including the Colorado AFL-CIO, the Colorado Building and Construction Trades Council, and eleven local unions—dedicated to creating an environmentally sustainable and resilient economy powered by strong union jobs. CLC is committed to advancing racial and economic justice while building a future where every Coloradan can thrive.

TXCJ, launched in July 2021, is a coalition of labor unions from across Texas united to fight climate change and reverse income inequality in the country's energy capital. The coalition advocates for long-term solutions to these intertwined crises by pushing state and local lawmakers to tap the state's massive renewable energy potential and create millions of new family-sustaining union jobs.

CJIL is a coalition of labor organizations advocating for a pro-worker, pro-climate agenda in Illinois. CJIL is united around a shared goal of combating climate change while reversing income inequality, with a mission to advocate for a clean energy economy at the scale climate science demands, create good union jobs, and support more equitable communities. The coalition represents hundreds of thousands of Illinois working men and women who are the best trained and skilled to build Illinois' new clean-energy economy from the ground up.

CJWA is a broad and growing coalition of unions—including the Washington State Labor Council, AFL-CIO, the Washington State Building and Construction Trades Council, and eleven other local unions, district councils, and state affiliates—across Washington organizing for a worker-centered clean energy economy.

MICJ is a coalition of labor unions across Michigan dedicated to building a worker-centered clean energy future by advancing good union careers, educating our communities on climate policy, and promoting science-based solutions that ensure economic and environmental justice for all working families. MICJ's vision and mission is to make Michigan a leader in clean energy generation with good-paying union careers, creating strong and vibrant communities, and ensuring our children have safe and healthy spaces to learn and thrive.

CJMA, a tax-exempt 501(c)(3) organization, is a coalition of local labor unions and related economic justice non-profit organizations that collectively represent tens of

thousands of workers employed in Massachusetts. CJMA works to advance policy that supports clean energy projects and the workers who build, operate, and maintain them.

MLCC, a fiscally sponsored tax-exempt 501(c)(3) organization, is a coalition of 20 public and private sector unions committed to fighting the twin crises of climate change and economic inequality. MLCC aims to create good Maine jobs, reduce carbon emissions and economic inequality, and provide a seat at the table for workers and unions in this process.

CJNY, a tax-exempt 501(c)(3) organization, is a coalition of labor unions representing 2.6 million New York working men and women. CJNY is committed to building a clean energy economy at the scale climate science demands, creating good jobs, and supporting equitable communities and a more resilient New York.

Union Energy PA is a Pennsylvania coalition of unions whose mission is to ensure that the transition to a clean energy economy creates high-quality, unionized jobs that provide fair wages, comprehensive benefits, and safe working conditions. Union Energy PA is committed to protecting the environment while fostering economic growth and stability for workers and communities.

IWMADC is a regional labor organization supporting Iron Workers local unions across Washington D.C., Maryland, Virginia, Delaware, and West Virginia. Headquartered in Fredericksburg, Virginia, it represents union ironworkers engaged in structural, ornamental, and reinforcing ironwork, including ironworkers performing work on both onshore and offshore wind energy projects.

## ARGUMENT

**The Amici Coalition Members Have Substantial Investments in Training Workers for the Wind Energy Industry and They, and the Workers They Have Trained Who Are Gainfully Employed in the Industry, Have Important Reliance Interests That Have Been Ignored by Defendants.**

1. **The Administrative Procedure Act Requires That, When Considering Regulatory Change, Agencies Must Address Adverse Effects on the Livelihood of Workers and Investments in Training Workers.**

Agency action which "makes worthless substantial past investment incurred in reliance upon the prior rule" is arbitrary and capricious. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 220 (1988) (Scalia, J., concurring). Agencies must consider the reliance interests of regulatory beneficiaries when changing rules, *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 30–31 (2020), including the reliance interests of workers "whose careers and livelihoods were upended" by the agency's change of course. *Thakur v.*

*Trump*, 787 F.Supp.3d 955, 974 (N.D. Cal. 2025), *aff'd in part and rev'd in part on other grounds*, 176 F.4th 1187 (9th Cir. May 26, 2026). *See also Am. Fed'n of State Cnty. & Mun. Emps., AFL-CIO v. OMB*, 807 F.Supp.3d 1004, 1037 (N.D. Cal. 2025) (recognizing reliance interests of federal employees subject to Reductions in Force); *Am. Ass'n of Univ. Professors v. Trump*, 815 F.Supp.3d 907, 972 (N.D. Cal. 2025) (recognizing reliance interests for university professors who hired graduate students and undertook other laboratory research preparation work in anticipation of federal grants that were terminated); *Woonasquatucket River Watershed Council v. USDA*, 778 F.Supp.3d 440, 471 (D.R.I. 2025) (requiring agency to consider "staff laid off" and "projects halted" as reliance interests).

Entities which have expended money, time, and resources on training materials and programs also have reliance interests that must be considered. *San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F.Supp.3d 716, 752–54 (N.D. Cal. 2025) (recognizing reliance interests for school districts who created training materials and programs based on grant conditions that were later changed).

2. **Amici's Coalition Members, Through Jointly Administered Apprenticeship and Training Programs, Have Trained Workers Who Have Obtained Transformative Jobs in the Wind Energy Industry, with Good Wages and Benefits, Frequently Working Under the Terms of Project Labor Agreements.**

Here, the people who relied on the agencies' prior policies and practices—and whose interests were not considered in Defendants' freeze—include those workers who sought and

obtained work on wind energy projects, and the coalition members whose apprenticeship and training programs prepared those workers with the necessary skills to perform that work.[1]

Wind projects require large and highly coordinated workforces throughout each phase of their manufacture, construction, and maintenance. Workers are involved in site preparation, excavation, concrete and foundation work, steel fabrication and erection, electrical installation, crane operations, transportation logistics, transmission construction, substation work, turbine inspection, assembly, installation, commissioning, operations, and long-term maintenance. *See generally* Hamilton and Liming, *Careers in Wind Energy*, U.S. Bureau of Labor Statistics (2010), https://www.bls.gov/green/wind_energy/wind_energy.pdf.

### A. Coalition members train workers through joint apprenticeship and training committees.

Most of the jobs involved in the segments of the wind industry described above require substantial skill to perform. *Id.* at 14–17 (discussing, *inter alia*, skills of electricians, construction equipment operators, crane operators, and wind turbine service technicians working on wind projects). In order to acquire these skills, many workers participate in registered apprenticeship and training programs, which combine in-class learning with on-the-job training. These programs, frequently lasting three to five years before the apprentice acquires sufficient training and skills to graduate to journeyperson status, are approved by the federal Department of Labor Office of Apprenticeship or the relevant recognized State Apprenticeship Agency. *See* About Us, https://www.apprenticeship.gov/about-us/apprenticeship-system (last visited July 31, 2026). "Reduced to its essence, registered apprenticeship is a structured training program where

---

[1] This brief is accompanied by three declarations providing supporting factual information concerning the activities of coalition members in Oregon, Colorado, and Illinois—Declarations of Anthony Levenda (Exhibit B), Nate Bernstein (Exhibit C), and Joseph Mullen Duffy (Exhibit D).

workers work for lower wages for a set period, in exchange for instruction on-the-job and in classroom settings where they are provided broad-based training in all aspects of their craft." Belman, *Registered Apprenticeship in Construction: Built to Last?* Institute for Construction Economic Research, June 2020, https://iceres.org/wp-content/uploads/2022/07/Registered-Apprenticeship-in-Construction-Built-to-Last.pdf at p. 3.

In the unionized construction sector, where Amici's coalition members operate, the apprenticeship and training programs are governed by joint labor-management committees and are financed by hourly contributions mandated in collective bargaining agreements.

> In the contemporary construction industry, the largest number of registered apprentices are enrolled in joint programs, meaning those sponsored by employers and labor organizations working together through joint labor-management committees . . . Training through registered apprenticeship programs sponsored by a Joint Apprenticeship Training Committees (JATCs) provides comprehensive classroom and on-the-job training to apprentices over a 3-to-5-year period, depending on the locale and the trade. It is supported by an assessment on the working hours of the craft workers covered by the collective agreement; Building Trades apprentices do not pay directly for their training. Rather, they earn as they learn, complete their program without college debt, and have earnings that compare favorably to many new college graduates. Since 1937, the US apprenticeship model has been successful in moving construction apprentices into lifetime careers and providing the skilled labor force needed by employers. It has also been effective in adapting to technological innovation, to changing employer needs, and to the evolution of the labor force.

*Id.* at 5 (footnotes omitted).

Through jointly trusteed apprenticeship and training programs to which they are a party, Amici's constituent members have invested millions of dollars training workers with the skills necessary to work on wind projects.[2] For example, in Oregon, CJOR coalition member Iron

---

[2] The descriptions of investments in training that follow are provided as examples and represent a small fraction of the entire training effort of the Amici's coalition members. Virtually every local union that is a coalition member of the various Amici and that is a building and construction trades union has a jointly administered apprenticeship and training program. The cited examples are but the tip of the skilled craft training iceberg.

PAGE 6 – BRIEF AMICUS CURIAE IN SUPPORT OF
PLAINTIFFS' MOTION FOR A STAY OR PRELIMINARY INJUNCTION

Workers Local 29's Joint Apprenticeship and Training Committee receives $1.12 per hour worked under Local 29's collective bargaining agreements to fund apprentice and journeyperson training. Levenda Decl. at ¶ 11. The Local has approximately 1200 working members and 250 apprentices, and approximately 90% of its members have come through the apprenticeship program. *Id.* at ¶ 11–12. In both the second year (green energy training) and fourth year (onshore wind turbine and offshore wind turbine) of their apprenticeship, Local 29 apprentices receive wind energy specific training. *Id.* at ¶ 11.

Similarly, CJOR coalition member Local 701 of the International Union of Operating Engineers ("IUOE"), through its participation in the Oregon Southwest Washington IUOE Local 701 and Associated General Contractors Joint Apprenticeship and Training Committee, conducts journeyperson upgrading training to teach crane operators how to operate the exceptionally large cranes typically utilized in windmill construction. *Id.* at ¶ 19. Moreover, Local 701 has access, through its affiliation with IUOE, to their state-of-the-art ITEC national training center, https://www.iuoe.org/training/, where Local 701 members get trained on the latest and most sophisticated construction heavy equipment. Levenda Decl. at ¶ 15. The contributions required for training under Local 701's collective bargaining agreements are $0.90 per hour to the Local 701 Training Trust and $0.15 per hour to the International's Training Trust to support the Local's and International's training efforts. *Id.* at ¶ 14–15.

In addition, CJOR coalition member IBEW Local 48 represents about 6,000 union electricians across NW Oregon and SW Washington. In conjunction with its signatory contractors, Local 48 has developed the NECA-IBEW Electrical Training Center ("NIETC")) that has been training skilled tradespeople for the region since 1929. The program is funded by

contractually obligated contributions from approximately 200 contractors, and presently has about 800 apprentices. *Id.* at ¶ 13.

In Colorado, CJC coalition member IBEW Local 111 participates in the Denver Joint Electrical and Apprenticeship Committee, a training center that offers its members courses that teach skills relevant to work in onshore wind projects, such as Wind Turbine Rescue. Bernstein Decl. at ¶ 10. Additionally, IBEW Local 111 members are trained at the IBEW International Union's Mountain State Line Constructors Joint Apprenticeship and Training Committee training center, where they learn to work on transmission line projects which connect wind energy projects to the grid. *Id.* at ¶ 11.

Finally, in Illinois:

IUOE Local 150 has invested more than $97 million to date in training facilities, instructors, land, equipment, simulators, classrooms, laboratories, and certification programs that prepare workers to perform complex construction work, including utility-scale energy projects. This investment helps Local 150 operate the William E. Dugan Training Center, which includes approximately 342,000 square feet of facilities, an indoor training area, nearly 200 pieces of heavy equipment, approximately 30 classrooms, a construction-material testing laboratory, a welding facility, an equipment-simulator laboratory, and an auditorium. The training facility allows members of Local 150 to receive realistic hands-on instruction relevant to wind work under controlled conditions.

Duffy Decl. at ¶ 12.

**B. Trained workers working on wind energy projects under collective bargaining agreements, including Project Labor Agreements, have good jobs with excellent pay, health care coverage, and employer contributions to their retirement security.**

The wind energy projects on which these unionized, trained, skilled craftspeople work are performed under the terms of collective bargaining agreements between the involved union(s) and the relevant employer(s). Frequently, the type of collective bargaining agreement negotiated to cover a large wind energy job is a project labor agreement ("PLA"). PLAs are comprehensive

labor-management collective bargaining agreements covering all the work to be done on large construction projects. *See generally Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993). [3]

Working under collective bargaining agreements, including PLAs, assures that those performing wind energy work have good jobs, are paid prevailing wages, and are provided health care coverage and pension benefits. Wind energy projects constructed pursuant to collective bargaining agreements thus support high-quality, middle-class jobs for electricians, laborers, ironworkers, operating engineers, heavy-equipment operators, truck drivers, crane operators, mechanics, welders, rail workers, and numerous other skilled trades. Many of these jobs are in largely rural areas, like Eastern Oregon and Central Illinois, where utility-scale wind energy projects represent one of the most significant sources of employment and economic activity.

For example, in Oregon, wind energy projects previously constructed where workers' terms and conditions of employment were set by collective bargaining agreements include Wheat Field Wind Power Project in Gilliam County, Golden Hills Wind Farm in Sherman County,

---

[3] "PLAs are generally negotiated by the entity that controls contracting for the project and a council of labor organizations that represent all the trades that will be employed on the project. Through PLAs, the parties set standard work rules, establish various forums for communication and coordination, and prevent work stoppages with no-strike, no-lockout provisions, and speedy dispute-resolution mechanisms. They also set standard pay and benefit rates for each trade and address labor supply issues through provisions that commit the signatory unions to use their job referral procedures to ensure a steady supply of highly skilled workers. Both union and nonunion workers can register for referrals, and typically any contractor – union or nonunion – may bid for work on a covered project, as long as they agree to abide by the agreement and thereby to be held to the same standards." Comments Of North America's Building Trades Unions On The Bureau Of Ocean Energy Management's Proposed Sale Notice: Atlantic Lease Sale 8 For Commercial Leasing For Wind Power On The Outer Continental Shelf In The New York Bight, at 2 (Aug. 13, 2021), https://www.regulations.gov/comment/BOEM-2021-0033-0074. State and local governments have recognized that PLAs have significant value for government-sponsored projects: their project-long no-strike, no-lockout clauses are a safeguard against the disruption that stems from labor disputes, and they ensure that the work is performed with a high quality, well-trained workforce.

Vanscycle II Wind Repower Project in Umatilla County, , and Wheatridge East Wind Project in Morrow and Umatilla Counties. Levenda Decl. at ¶ 22–23.

Workers represented by coalition member unions have spoken about the transformative opportunities provided by work on wind projects. Tiffany Wilkins, who is represented by IUOE Local 701, spoke with pride about being able to point to wind turbines in her community and say "'I helped build that. I was on that project. And my brothers and sisters here were on it with me.' It's the kind of opportunities we need more." Ivan Maldonado, represented by LIUNA Local 737, said "Joining a union and learning a trade changes lives. I see it in younger workers everyday." Alex Baumhardt, *New labor coalition hopes to spur job growth to meet Oregon's clean energy targets*, Oregon Capital Chronicle, Jan. 21, 2026, https://oregoncapitalchronicle.com/2026/01/21/new-labor-coalition-hopes-to-spur-job-growth-to-meet-oregons-clean-energy-targets/. Levenda Decl. at ¶ 26.

In Illinois, all utility scale wind projects CJIL's members have worked on have been covered by project labor agreements. Duffy Decl. at ¶ 21. For workers, a PLA helps ensure that temporary construction employment provides meaningful career opportunities rather than merely short-term jobs without benefits or recognized training. For the community, PLAs can help convert a major energy investment into local wages, apprenticeship access, safer construction, predictable project delivery, and a skilled workforce available for future infrastructure needs. *Id.*

Thus, utility-scale wind energy projects are not only a critical piece of the nation's clean energy future. They are also a significant source of employment for trained, skilled, union craftspeople, they encourage the workforce development of the next generation of such workers,

and they provide the type of jobs with good wages and benefits that afford those workers economic opportunity to provide better lives for themselves and their families.

**3. Defendants' "Pause" Has Resulted in Trained Workers Losing Work and Squandered Amici's Investments in Training Programs.**

Plaintiffs have supported their preliminary injunction motion with evidence of the adverse impact Defendants' failure to act has had on the wind energy industry. On the conservative end, the declaration from Charles River Associates Vice President Kurt G. Strunk (ECF 14-28, Ex. AA), at paragraph 16, estimates that 106 projects are affected spanning 21 states and representing approximately 29.6 GW of potentially delayed land-based wind capacity. At paragraph 18 in his declaration, he estimates the overall employment impact: affected projects are associated with approximately 29,127 direct construction jobs and 82,120 indirect and induced construction jobs. In Texas alone,[4] he estimates that there are 41 projects affected, entailing 11,870 direct construction jobs and 36,941 indirect and induced conduction jobs. *Id.* at 8, Table 1.

A significant number of these affected projects employ or would employ workers represented by constituent members of the Amici. For example, in Oregon, Defendants' inaction threatens the viability of the Big River Wind Project and puts 4,700 jobs in jeopardy.[5]The

---

[4] According to a report from the Texas Comptroller of Public Accounts, in 2023, wind represented 28.6 percent of Texas energy generation, second to natural gas (41.8 percent), and there were 239 wind-related projects in Texas and more than 15,300 wind turbines, the most of any state.
https://comptroller.texas.gov/economy/economic-data/energy/2023/wind-snap.php.
[5] "The freeze is also derailing Oregon's clean energy progress. Under a 2021 law, electricity providers built their compliance plans around new wind projects like the Big River Wind Project – plans now upended by the freeze, forcing costly rewrites and delaying the state's clean energy targets, along with putting more than 4,700 jobs at risk." *Oregon is co-leading the lawsuit filed in the U.S. District Court for the District of Oregon*, Oregon Dep't of Justice (July 16, 2026), https://www.doj.state.or.us/media-home/news-media-releases/ag-rayfield-intervenes-to-protect-onshore-wind-energy-projects/.

Rattlesnake Road Repower project is also potentially at risk, as well as the Biglow Canyon Wind Farm Repower—work for two years starting mid-September—Heppner Wind Project, Saddle Butte Energy Facility, and Big Horn Wind Farm Repower. IUOE Local 701 alone expected to place approximately 255-275 operating engineers on these projects. Levenda Decl. at ¶ 25. In Colorado, multiple wind projects, including the 500-megawatt Towner Wind Energy II Project in Kiowa County, are being held up by the wind freeze. Bernstein Decl. ¶ 12.

In Illinois, the Midwest Region Laborers report that Next Era actually started a wind project this spring in Knox County that was stopped. Duffy Decl. at ¶¶ 13, 17–18. Workers were on site for about three weeks before the job was halted, performing preliminary road work, including putting access roads into the farm fields. Due to the freeze, they not only stopped, but they actually ripped out the roads that they had started building.  Gavin Waidelich, *Wind energy project halts in Knox County, school tax revenue option closes*, Our Quad Cities (updated May 13, 2026), https://www.ourquadcities.com/news/local-news/wind-energy-project-halts-in-knox-county-school-tax-revenue-option-closes/. In addition, public reporting in June 2026 identified a number of Illinois projects, expected by CJIL coalition members to employ workers they represent, as delayed, cancelled, or at risk, including an Apex Clean Energy project in Peoria, Stark, and Putnam Counties (approximately 900 MW and as many as 250 turbines) and an EDPR project in Tazewell County (approximately 205 MW and as many as 89 turbines). https://ipmnewsroom.org/trump-administration-blocks-wind-farm-development-in-illinois-and-across-the-nation/

The construction of wind energy projects has a ripple effect that results in numerous related jobs manufacturing wind energy project components, running transmission lines from the projects to the grid, and providing supporting infrastructure. So too, there is a substantial ripple

PAGE 12 – BRIEF AMICUS CURIAE IN SUPPORT OF
PLAINTIFFS' MOTION FOR A STAY OR PRELIMINARY INJUNCTION

effect to the loss of good jobs on wind energy projects. Those jobs are not available for apprentices to train on, meaning that the pipeline of the next generation of skilled craftspeople is cut off. The example of IBEW Local 48 in Oregon illustrates this problem. Currently, the construction picture for electricians in Oregon is difficult—the Local has approximately 6,000 members and more than 1100 are out of work, including hundreds of apprentices. Levenda Decl. at ¶ 29. Because apprenticeship programs depend so heavily on on-the-job training, the absence of work on wind energy projects means not only the loss of income for the skilled Local 48-represented electricians who would otherwise be earning a good living on those jobs, but also the loss of training opportunities for apprentices, who, unable to progress in their chosen trade, will leave the industry. *Id*.

Expensive training efforts squandered, good jobs lost, prospects for future wind employment put on hold or eliminated—the APA required Defendants to weigh these workplace consequences when considering whether to change its existing policies and procedures to freeze wind energy development. Defendants' failure to comply with that obligation is an additional basis for granting Plaintiffs' Motion.

## CONCLUSION

There is no indication that Defendants considered the adverse impact their freeze would have on the legions of workers who spent considerable time and effort to acquire the complex array of skills necessary to work in the wind energy industry, nor is there any indication of any consideration of those workers' loss of the highly paid jobs with excellent benefits the industry provided. Defendants also ignored the reliance interests of those institutions that, like Amici's coalition members, participate in joint labor-management apprenticeship and training programs that expend considerable resources training workers to acquire the skills necessary to perform

PAGE 13 – BRIEF AMICUS CURIAE IN SUPPORT OF
PLAINTIFFS' MOTION FOR A STAY OR PRELIMINARY INJUNCTION

work on wind energy projects. This failure to consider these important reliance interests supports

Plaintiffs' persuasive arguments that Defendants' conduct contravened the APA's requirements.

This Court should grant Plaintiffs' Motion for a Stay or Preliminary Injunction.

Dated: July 31, 2026                    Respectfully submitted,


*/s/ Daniel Hutzenbiler*
Daniel Hutzenbiler, OSB No. 176050
McKanna Bishop Joffe L.L.P.
1635 NW Johnson Street
Portland, Oregon 97209
(503) 226-6111
dhutzenbiler@mbjlaw.com

Richard F. Griffin, Jr.*
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Steet NW, Suite 1000
Washington, D.C. 20005
(202) 842-2600
rgriffin@bredhoff.com

**pro hac vice motion pending*

*Attorneys for Amici*