# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| RENEWABLE NORTHWEST; ADVANCED POWER ALLIANCE; ALLIANCE FOR CLEAN ENERGY NEW YORK, INC.; CLEAN GRID ALLIANCE; GREEN ENERGY CONSUMERS ALLIANCE; INTERWEST ENERGY ALLIANCE; MAINE RENEWABLE ENERGY ASSOCIATION; RENEW NORTHEAST; SOUTHERN RENEWABLE ENERGY ASSOCIATION; LAS CRESTAS WIND ENERGY, LLC; NOVA CLEAN ENERGY, LLC; APEX CLEAN ENERGY HOLDINGS, LLC; HORSE THIEF WIND PROJECT, LLC; NORTH HILLS WIND PROJECT, LLC; PRAIRIE PHOENIX WIND PROJECT, LLC; CRIDER VALLEY WIND ENERGY LLC; CANISTEO WIND ENERGY LLC; DEUEL HARVEST WIND ENERGY SOUTH LLC; HAMMERHEAD WIND ENERGY LLC; LAZBUDDIE WIND ENERGY II LLC; THRESHER WIND LLC; TOWNER WIND ENERGY II LLC; TRITON WIND ENERGY LLC; WHITETAIL WIND, LLC; RAMBLE WIND ENERGY LLC; MEADOW LAKE II WINDFARM, LLC; BLACKSTONE WIND FARM II, LLC; BIG RIVER WIND, LLC; and BLUE CANYON WINDPOWER V LLC, | Case No. 3:26-cv-01092-IM<br><br>**OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION** |

PAGE 1 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs,

v.

PETER B. HEGSETH, in his official capacity as Secretary of Defense; DALE R. MARKS, in his official capacity as Assistant Secretary of Defense for Energy, Installations, and Environment; U.S. DEPARTMENT OF DEFENSE; DEPARTMENT OF THE AIR FORCE; DEPARTMENT OF THE ARMY; DEPARTMENT OF THE NAVY; and DEPARTMENT OF DEFENSE MILITARY AVIATION AND INSTALLATION ASSURANCE SITING CLEARINGHOUSE,

Defendants.

**IMMERGUT, District Judge.**

In 2011, Congress enacted a comprehensive statutory scheme for the Department of Defense ("DoD") to assess whether proposed energy construction projects would have an "adverse impact on military operations and readiness." 10 U.S.C. § 183a(c). By statute, DoD must conduct a preliminary review of proposed energy project applications within 75 days. *Id.* § 183(c)(1). Based on this review, DoD either finds that a project "will have an adverse impact on military operations and readiness" or clears the project. *Id.* § 183(c)(2)(a). In the former case, DoD must "engage in discussions with the applicant to attempt to mitigate the adverse impact." 32 C.F.R. § 211.6(a)(3)(iii). If the applicant and DoD reach an agreement "on mitigation measures that remove the adverse impact," then DoD clears the project. *Id.* § 211.6(b)(1)(i).

Between 2011 and 2025, this statutory and regulatory framework governed DoD's review of applications for wind energy projects, just as it governed applications for all energy projects.

But beginning in August 2025, DoD incrementally stopped processing proposed wind energy projects, and on May 7, 2026, DoD's review of wind energy projects ground to a halt.

On May 31, 2026, plaintiff wind energy trade associations and environmental nonprofits filed this action against the Department of Defense and other DoD defendants, alleging that DoD's "review freeze" of wind energy projects violated the Administrative Procedure Act ("APA"). Complaint, ECF 1. Plaintiffs moved to stay or preliminarily enjoin DoD's freeze. Plaintiffs' Motion for Stay or Preliminary Injunction ("PI Motion"), ECF 14. Defendants moved to dismiss for lack of subject-matter jurisdiction. Defendants' Combined Motion to Dismiss and Response to Plaintiffs' PI Motion ("MTD & PI Response"), ECF 90. On August 4, 2026, this Court held a combined hearing on the motions. ECF 124. For the following reasons, Defendants' Motion to Dismiss is DENIED, and Plaintiffs' Motion for Stay or Preliminary Injunction is GRANTED.

## BACKGROUND

### A. Legal Background

In 2011, Congress passed a law requiring DoD to conduct a national security review of proposed energy construction projects. Ike Skelton National Defense Authorization Act for Fiscal Year 2011, Pub. L. No. 111-383, § 358, 124 Stat. 4137, 4198-4202 (2011) (codified as amended at 10 U.S.C. § 183a). DoD's review fits within a broader review of large-scale construction projects, which is conducted by the Federal Aviation Administration. For any proposed construction of a structure over 200 feet above ground level, which includes utility-scale wind turbines, developers must notify the FAA of the proposed construction. 49 U.S.C. § 44718(a); 14 C.F.R. §§ 1.2, 77.5(a), 77.9(a). The FAA then conducts an "aeronautical study" to determine whether the construction will have an "adverse impact on the safe and efficient use of

the navigable airspace." 49 U.S.C. § 44718(b). As part of this aeronautical study, DoD must determine whether the construction "would result in an unacceptable risk to the national security of the United States." *Id.* § 44718(b)(2)(b), (f). Upon completion of the aeronautical study, the FAA either makes a "Determination of Hazard to Air Navigation" or a "Determination of No Hazard to Air Navigation" ("DNH") regarding the project. *Id.* § 44718(b); 14 C.F.R. § 77.31.

A DNH "alone does not . . . give a 'green light' to proceeding with the project." *Backcountry Against Dumps v. FAA*, 77 F.4th 1260, 1265 (9th Cir. 2023). However, "other permits and practical hurdles for the construction of the project may hinge on the hazard/no hazard determination." *Id.*; *see also BFI Waste Sys. of N. Am., Inc. v. FAA*, 293 F.3d 527, 530 (D.C. Cir. 2002) ("The FAA lacks authority to prohibit a construction or alteration it believes to be hazardous to air navigation. Nonetheless, a hazard determination can hinder the project sponsor in acquiring insurance, securing financing or obtaining approval from state or local authorities." (citation and footnote omitted)). And because an aeronautical study is not complete until DoD conducts its national security review, an energy construction project cannot receive a DNH until DoD completes its national security review. 49 U.S.C. § 44718(f).

DoD's review is not a black box. Rather, Congress created a statutory framework that guides DoD's review of whether a construction project "would result in an unacceptable risk to the national security of the United States." 49 U.S.C. § 44718(f)(1). Congress explicitly defined an "unacceptable risk to the national security of the United States" in this context to mean:

> [t]he proposed construction . . . of a structure . . . that the Secretary of Defense can demonstrate would—
>
> (A) endanger safety in air commerce directly related to the activities of the Department of Defense;
>
> (B) interfere with the efficient use of the navigable airspace directly related to the activities of the Department of Defense; or

PAGE 4 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

(C) significantly impair or degrade the capability of the Department of Defense to conduct training, research, development, testing, and evaluation, and operations or to maintain military readiness.

10 U.S.C. § 183a(h)(11).

To coordinate DoD's review of energy project applications, Congress created the Military Aviation and Installation Assurance Siting Clearinghouse ("Clearinghouse"). *Id.* § 183a(a)–(b). A combination of statutes, regulations, and DoD's internal guidance documents governs the Clearinghouse's review of energy project applications as part of the FAA's aeronautical study.

After receiving an application from the Secretary of Transportation for an energy project, DoD must conduct a "preliminary review" of the application. 10 U.S.C. § 183a(c). By statute, DoD must complete this review within 75 days, *id.* § 183a(c)(1), and by regulation, that deadline is shortened to 30 days, 32 C.F.R. § 211.6(a)(3).[1] If DoD determines that the proposed project will have an "adverse impact on military operations and readiness,[2] the Clearinghouse shall issue to the applicant a notice of presumed risk." 10 U.S.C. § 183a(c)(2)(A). A notice of presumed risk

---

[1] Defendants argue that 32 C.F.R. § 211.6(a)(3) does not establish a 30-day deadline but rather that "the 30-day period is an interim regulatory milestone to ensure the Clearinghouse" has "adequate time to meet the statutory 75-day period." MTD & PI Response, ECF 90 at 47 n.18. Defendants' understanding contradicts the plain text of the regulation. Section 211.6(a)(3) requires the Clearinghouse to "take one of three actions" "[n]ot later than 30 days after receiving the application," and all three actions specify that the Clearinghouse "shall notify the Secretary of Transportation" of its preliminary review "determination." 32 C.F.R. § 211.6(a)(3)(i)–(iii). Although Defendants appeal to DoD's "longstanding interpretations and practices of the statutory and regulatory scheme," MTD & PI Response, ECF 90 at 48 n.18, such appeals are unavailing because the regulation is not "genuinely ambiguous." *Kisor v. Wilkie*, 588 U.S. 558, 574 (2019); *see id.* at 574–75 ("If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law.").

[2] "The term 'adverse impact on military operations and readiness' means any adverse impact upon military operations and readiness, including flight operations, research, development, testing, and evaluation, and training, that is demonstrable and is likely to impair or degrade the ability of the armed forces to perform their warfighting missions." 10 U.S.C. § 183a(h)(1).

PAGE 5 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

"describes the concerns identified by [DoD] in the preliminary review and requests a discussion of possible mitigation actions." *Id.* Alternatively, if the Clearinghouse determines that the proposed project will *not* have an "adverse impact on military operations and readiness"—or only a "sufficiently attenuated" impact that "does not require mitigation"—then DoD's review is complete, and the Clearinghouse notifies the FAA of its determination. 32 C.F.R. § 211.6(a)(3).

For projects that receive a notice of presumed risk, DoD regulations outline the mitigation process. The Clearinghouse must "offer to discuss mitigation with the applicant to reduce the adverse impact" and "[d]esignate one or more DoD Components to engage in [such] discussions." *Id.* § 211.6(a)(3)(iii)(A)–(B). The Clearinghouse must invite the FAA Administrator and the Secretary of Homeland Security to be part of the mitigation response team ("MRT") and may also invite other federal agencies to be part of the team. *Id.* § 211.6(b). The MRT must consider various mitigation actions, such as "[m]odifications to radars or other items of military equipment," and determine if they are "feasible and affordable actions" that will mitigate adverse impacts of projects on military operations and readiness. *Id.* § 211.9(a). Also, the project applicant "should" consider mitigation actions that it can take, such as "[m]odification of the proposed structure, operating characteristics, or the equipment in the proposed project." *Id.* § 211.9(b). By regulation, mitigation discussions may not extend more than 90 days, unless the applicant and the MRT agree to an extension of a "specific period of time." *Id.* § 211.6(b)(1).

If the mitigation discussions result in an agreement between the applicant and the MRT with respect to mitigation measures, then the MRT provides the applicant a draft "agreement" and notifies the Clearinghouse of the agreement. *Id.* § 211.6(b)(1)(ii); DoD Instruction 4180.02 at 3.2(c)(8)(c), DoD Military Aviation and Installation Assurance Siting Clearinghouse (effective

PAGE 6 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

June 15, 2023) ("DoDI 4180.02"). Once the project applicant signs and returns the agreement to the Clearinghouse, DoD provides a countersignature and notifies the FAA of its determination that the project would not result in an "unacceptable risk to the national security of the United States." DoDI 4180.02 at 3.2(d)(2); 49 U.S.C. § 44718(f)(1). The FAA can then complete its aeronautical study and, if warranted, issue a Determination of No Hazard. 49 U.S.C. § 44718(b)(2).

### B. Factual Background

Before August 2025, DoD evaluated wind energy project applications in accordance with the above statutes and regulations and adhered to a predictable timeline for its review. The first Executive Director of the Clearinghouse explains the general timeline as follows: From the time a developer notifies the FAA of its large-scale construction project, DoD would take on average two to three months to either issue a notice of presumed risk or inform the FAA that DoD has no national security concerns. Declaration of Howard D. Belote ("Belote Decl."), ECF 36-13 ¶¶ 5, 21(e). If DoD issued a notice of presumed risk, it would take about one to two months for DoD to convene an MRT and two to three months for MRT discussions. *Id.* ¶ 21(d)–(e). After the conclusion of MRT discussions, it would take on average three to four months for DoD to prepare a draft agreement and transmit it to the project applicant. *Id.* ¶ 21(b). After the developer signed the agreement, it would take about two months for the developer to receive the countersigned agreement from DoD and for DoD to transmit its findings to the FAA. *Id.* § 21(a). To recap, DoD's review process from the issuance of a notice of presumed risk through to final execution of a countersignature by DoD generally took nine to fourteen months.[3] *Id.* ¶ 21.

---

[3] According to the current DoD official in charge of the Clearinghouse, between 2012 and 2025, the review process from FAA project notification to execution of the mitigation agreement took on average 491 days. Declaration of Honorable Dale R. Marks ECF 90-1 ¶ 27. The founding

PAGE 7 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

However, beginning in August 2025, DoD stopped reviewing proposed wind energy projects. The incremental stoppage started in August when DoD stopped countersigning mitigation agreements that had already completed the MRT process and were only awaiting DoD signature. Declaration of Geoffrey N. Blackman ("Blackman Decl."), ECF 36-12 ¶ 27(a); Belote Decl., ECF 36-13 ¶ 24(a); Declaration of Benjamin Doyle ("Doyle Decl."), ECF 36-15 ¶ 14(a). Next, in December 2025, the Clearinghouse stopped providing developers that had completed the MRT process with draft agreements even though the developers and MRT had previously reached agreement on mitigation measures. Blackman Decl., ECF 36-12 ¶ 27(b); Belote Decl., ECF 36-13 ¶ 24(b); Doyle Decl., ECF 36-15 ¶ 14(b). Then in April 2026, DoD cancelled further negotiations with all wind energy applicants that were undergoing MRT discussions. Blackman Decl., ECF 36-12 ¶ 27(c); Belote Decl., ECF 36-13 § 24(c); Doyle Decl., ECF 36-15 ¶ 14(d).

On May 7, 2026, DoD's incremental slowdown reached a standstill when DoD issued interim guidance to reassess its internal review process for energy projects "causing impactful doppler interference." Interim Guidance Regarding Compliance with Established Military Aviation and Installation Assurance Siting Clearinghouse Procedures ("May 7 Memorandum"), ECF 36-3 at 4. Among energy projects that undergo DoD review, which include "oil and gas infrastructure, energy storage facilities, power plants," etc., *id.* at 3, only wind turbines cause impactful doppler interference. PI Motion, ECF 14 at 26–27. For energy projects that "do not create an impactful doppler effect," the memo clarified that they would "continue to be promptly

---

Executive Director of the Clearinghouse notes that "aggregate averages can be highly misleading if they include extraordinary outlier projects." Reply Declaration of Howard D. Belote ("Belote Reply Decl."), ECF 98-2 ¶ 20. Regardless, when adding Plaintiffs' own estimated two to three months from FAA project notification to issuance of a notice of presumed risk to Plaintiffs' nine-to-fourteen-month estimate, the parties' estimated historical review timelines are not too far apart.

PAGE 8 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

processed." May 7 Memorandum, ECF 36-3 at 3. DoD justified its freeze on energy projects "causing impactful doppler interference" by citing "the advancement of adversarial capabilities and the evolving global threat-picture." *Id.* at 3. DoD did not elaborate on these "adversarial capabilities" or the "evolving global threat-picture." Nonetheless, DoD concluded that "further interagency coordination . . . is required to ensure a comprehensive national security review is conducted in a manner sufficient to address modern advancements in consideration of their scope, duration, and level of risk recent[ly] presented to DoW[4] operations and readiness." *Id.*

Although the May 7 Memorandum did not provide further explanation, Defendants in this litigation provide the declaration of the current DoD official in charge of the Clearinghouse, Assistant Secretary of Defense Dale R. Marks, to elaborate on the issues raised in the memo. Declaration of Honorable Dale R. Marks ("Marks Decl."), ECF 90-1. As Assistant Secretary Marks chronicles in detail, a "dramatic change in drone-based adversarial capability [has] emerg[ed] over the past 24 months." *Id.* ¶ 48. Assistant Secretary Marks describes how recent drone warfare in Ukraine and Iran reveals that "no target is out of reach, regardless of geographic distance," and that "a smaller nation or rogue actor does not need to achieve air or naval superiority to inflict severe damage on [a] larger power." *Id.* ¶¶ 42–45. In other words, "hobbyist drones costing hundreds of dollars can destroy a $300 million strategic bomber." *Id.* ¶¶ 46.

This newly emerging threat from drones allegedly "informed the strategic steps DoW has taken since mid-August of 2025" with respect to wind energy projects. *Id.* ¶ 40. As Assistant Secretary Marks explains, wind turbines "obstruct radar signals" because "spinning turbine blades rotate fast enough to generate a false signal due to their Doppler effect." *Id.* ¶ 49. In

---

[4] The Department of Defense is also referred to as the Department of War, abbreviated as DoW. This Court refers to the agency as the Department of Defense because that is its official name designated by statute. *See* 10 U.S.C. § 111.

PAGE 9 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

particular, wind turbines generate a "strong" radar signal, which may "'blind'" radars to objects that generate lower signals, such as drones. *Id.* ¶ 53. Thus, "[t]he national security concern is that any low-[signal] drone or missile flying through this 'blinded' sector could be entirely filtered from radar view." *Id.* ¶ 58. Given this national security concern, DoD conducted a "programmatic review of the Clearinghouse," which led DoD to conclude that it "should proceed carefully before executing further mitigation agreements." *Id.* ¶ 95. DoD executed its last mitigation agreement on August 18, 2025, "pending the outcome of the internal, analytical methodology review." *Id.* ¶ 96.

### C. Procedural History

On May 31, 2026, plaintiff nonprofit trade associations and environmental organizations[5] filed this lawsuit against Secretary of Defense Hegseth, Assistant Secretary of Defense Marks, DoD, and the Clearinghouse. Complaint, ECF 1. Plaintiffs brought two APA claims, alleging (1) DoD's review freeze is unlawful final agency action under 5 U.S.C. § 706(2), *id.* ¶¶ 206–51; and (2) DoD's failure to meet statutory and regulatory deadlines is unlawful withholding—or unreasonable delay—of required agency action under § 706(1), *id.* ¶¶ 252–65. Plaintiffs requested vacatur of DoD's policy of freezing its review of proposed wind energy projects, as well as other declaratory and injunctive relief to compel DoD to resume its review of wind energy projects. *Id.* at 70–72.

On June 22, 2026, Plaintiffs filed an amended complaint, which brought the same two APA claims contained in the original complaint. First Amended Complaint ("FAC"), ECF 36

---

[5] The plaintiff trade associations and environmental organizations include Renewable Northwest, Advanced Power Alliance, Alliance for Clean Energy New York, Inc., Clean Grid Alliance, Green Energy Consumers Alliance, Interwest Energy Alliance, Maine Renewable Energy Association, RENEW Northeast, and Southern Renewable Energy Association.

PAGE 10 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

¶¶ 231–91. The First Amended Complaint is materially the same as the prior Complaint, except with respect to the parties and the relief requested. *See generally* FAC Redline, ECF 36-1. Twenty wind energy project developers[6] joined the lawsuit as Plaintiffs, and Plaintiffs added the Department of the Air Force, the Department of the Army, and the Department of the Navy as Defendants. FAC, ECF 36 at 2. Plaintiffs also requested injunctive relief for DoD to resume its review of the wind developer plaintiffs' specific projects. FAC, ECF 36 at 80–81; *see id.* ¶¶ 32– 51 (listing projects).

Before this Court are Plaintiffs' Motion for Stay or Preliminary Injunction, ECF 14, and Defendants' Motion to Dismiss, ECF 90. In their motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), Defendants argue that Plaintiffs (1) bring claims that must be channeled to the court of appeals, (2) make a broad programmatic attack on DoD's review process rather than an attack on discrete agency action, (3) do not challenge final agency action, and (4) that select Plaintiffs lack Article III standing. In their motion to stay or preliminarily enjoin  DoD's freeze, Plaintiffs argue that they are likely to succeed on both of their APA claims and satisfy the remaining factors to warrant a stay or preliminary injunction. For the following reasons, Defendants' Motion to Dismiss is DENIED, and Plaintiffs' Motion for Stay or Preliminary Injunction is GRANTED.

## DISCUSSION

---

[6] The 20 developers are "Las Crestas Wind Energy, LLC; Apex Clean Energy Holdings, LLC; Nova Clean Energy, LLC; North Hills Wind Project, LLC; Prairie Phoenix Wind Project, LLC; Deuel Harvest Wind Energy South LLC; Lazbuddie Wind Energy II LLC; Thresher Wind LLC; Towner Wind Energy II LLC; Triton Wind Energy LLC; Whitetail Wind, LLC; Meadow Lake II Windfarm, LLC; Blackstone Wind Farm II, LLC; Big River Wind, LLC; Horse Thief Wind Project, LLC; Crider Valley Wind Energy LLC; Canisteo Wind Energy LLC; Hammerhead Wind Energy LLC; Ramble Wind Energy LLC; and Blue Canyon Windpower V, LLC." FAC, ECF 36 at 2–3.

### A. Motion to Dismiss

"Federal courts are courts of limited jurisdiction," and "[t]hey possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "A rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). For a "'factual' attack on jurisdiction," the defendant "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.* For a factual challenge, "[t]he plaintiff bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met." *Id.*

Defendants do not explicitly state whether they bring a facial or factual challenge under Rule 12(b)(1), but they do not contest Plaintiffs' characterization that Defendants bring a facial challenge. *See* Plaintiffs' Opposition to Defendants' Motion to Dismiss ("MTD Response"), ECF 91 at 10. This Court agrees with Plaintiffs that Defendants bring a facial attack on this Court's jurisdiction because Defendants do not contest the truth of allegations in the course of making their jurisdictional arguments. Defendants cite Assistant Secretary Marks's declaration within their argument that Plaintiffs fail to challenge final agency action, but they do not cite the declaration to contest any factual allegations that Plaintiffs raise in their First Amended Complaint. Also, in opposition to Plaintiffs' Motion for Stay or Preliminary Injunction,

PAGE 12 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

Defendants dispute whether DoD has resumed preliminary review of wind energy projects, as discussed below in resolving the PI Motion. But Defendants do not rely on this factual dispute in any of their arguments in their Motion to Dismiss. Plaintiffs therefore bring a facial attack.

### 1. Jurisdiction Channeling

Defendants argue that a jurisdiction-channeling provision of the Federal Aviation Act, 49 U.S.C. § 46110(a),[7] requires Plaintiffs to bring their claims in the first instance in the court of appeals. MTD & PI Response, ECF 90 at 21–24. Defendants analogize Section 46110(a) to other statutes that channel jurisdiction to the court of appeals. *See id.*[8] But as Plaintiffs point out, Defendants entirely omit discussion of Ninth Circuit case law that has already established the boundaries of the jurisdiction-channeling provision specifically at issue in this case. MTD Response, ECF 91 at 11–12 (citing *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250 (9th Cir. 2008); *Latif v. Holder*, 686 F.3d 1122, 1127 (9th Cir. 2012)). Under binding circuit precedent, Section 46110(a) does not strip this Court's original jurisdiction, and there is no need to resort to Defendants' reasoning by analogy.

The Ninth Circuit's decision in *Ibrahim* illustrates the limits of Section 46110(a). There, the plaintiff Ibrahim brought an APA claim against numerous federal agencies, including the

---

[7] 49 U.S.C. § 46110(a) provides, in relevant part, that "a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the Transportation Security Administration with respect to security duties and powers designated to be carried out by the Administrator of the Transportation Security Administration or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator of the Federal Aviation Administration) in whole or in part under this part . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business."

[8] For example, Defendants rely on *California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908 (9th Cir. 1989)'s discussion of jurisdiction stripping in the context of appellate review of Federal Energy Regulatory Commission ("FERC") licensing decisions. *Id.* at 909.

PAGE 13 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

Transportation Security Administration ("TSA"), seeking an injunction to remove her name from the federal government's No-Fly List. *Ibrahim*, 538 F.3d at 1253–54. The district court concluded that 49 U.S.C. § 46110 stripped it of jurisdiction over Ibrahim's APA claim, but the Ninth Circuit reversed. The Ninth Circuit held that the statute only applies to orders of agencies specifically "named" in Section 46100. *Id.* at 1255; *see* 49 U.S.C. § 46110(a) (channeling review of orders "*issued by* the Secretary of Transportation . . . or the Administrator of the Federal Aviation Administration" (emphasis added)). It was undisputed that the agency that "compiles the list of names ultimately placed on the No-Fly List" was the Terrorist Screening Center ("TSC"), an agency within the Federal Bureau of Investigation ("FBI"), not the TSA or the FAA. *Id.* at 1255. Therefore, because "putting Ibrahim's name on the No-Fly List was an 'order' of an agency *not* named in section 46110," the Ninth Circuit held that "the district court retain[ed] jurisdiction to review that agency's order under the APA." *Id.* (emphasis in original).

*Ibrahim* dictates that this Court has jurisdiction over Plaintiffs' APA claims. Plaintiffs challenge an action of the Department of Defense, which—like TSC—is not part of TSA or the FAA. Thus, "section 46110 doesn't apply to that agency's actions." *Id.* at 1256.

Defendants resist this straightforward conclusion by attempting to distinguish *Ibrahim* on its facts. Defendants argue that in *Ibrahim*, "the FBI's No-Fly List determination was a standalone determination," whereas here, DoD's "review exists wholly within, and only because of, FAA's process for making hazard determination." Defendants' Reply in Support of Motion to Dismiss for Lack of Subject-Matter Jurisdiction ("MTD Reply"), ECF 97 at 10–11. The problem for Defendants, however, is that the Ninth Circuit did not characterize its holding in so limited a manner. The Ninth Circuit's rule statement was clear; "the district court retains jurisdiction to

review" "an 'order' of an agency *not* named in section 46110." *Ibrahim*, 538 F.3d at 1255. As it must, this Court declines Defendants' invitation to artificially narrow Ninth Circuit precedent.

If there was any reason for doubt after *Ibrahim*, the Ninth Circuit's subsequent decision in *Latif* closes the door on Defendants' jurisdiction-channeling argument. In *Latif*, the plaintiffs brought a procedural due process claim under the APA, challenging "the adequacy of the redress procedures available to challenge their apparent inclusion on the [No-Fly] List." 686 F.3d at 1126. The Ninth Circuit explained that the plaintiffs' "procedural challenge requires judicial review of orders issued both by TSA, which is named in § 46110, and by TSC, which is not." 686 F.3d at 1126, 1128. Nonetheless, the Ninth Circuit held that Section 46110 did not strip the district court of jurisdiction because "relief must come from TSC," and the court "would not be able to provide relief . . . by directing *TSA* to conduct further proceedings." *Id.* at 1129 (emphasis in original). The same can be said here, that "relief must come from" DoD and that this Court "would not be able to provide relief . . . by directing [the FAA] to conduct further proceedings." *Id.* In sum, Section 46110 does not apply to Plaintiffs' APA claims, which challenge DoD's review freeze and not any action of the FAA.

### 2. Agency Action

Defendants also argue that rather than challenging discrete agency action as required under the APA, Plaintiffs launch a broad programmatic attack on DoD's Clearinghouse review process. MTD & PI Response, ECF 90 at 24–28. Defendants are incorrect.

"It is axiomatic that Plaintiffs must identify 'agency action' to obtain review under the APA." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1010 (9th Cir. 2021). "The APA defines 'agency action' broadly to 'include the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'" *S.F.*

PAGE 15 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

*Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 575–76 (9th Cir. 2019) (brackets omitted) (quoting 5 U.S.C. § 551(13)). "This definition 'is meant to cover comprehensively every manner in which an agency may exercise its power.'" *Id.* at 576 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)). At the same time, a plaintiff must challenge "some *particular* agency action that causes it harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (internal quotation marks omitted). "This limitation on judicial review precludes 'broad programmatic attacks,' whether couched as a challenge to an agency's action or 'failure to act.'" *Whitewater Draw Nat. Res. Conservation Dist.*, 5 F.4th at 1010–11 (brackets omitted) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64–65 2004)).

Here, Plaintiffs challenge a particular agency action "with broad application": DoD's stoppage of reviewing all wind energy projects. *Id* at 1012 n.7. The "broad application" of DoD's review freeze does not transform Plaintiffs' attack on a particular agency action into a broad programmatic attack on an agency's operations. *Id.* As Plaintiffs allege in their First Amended Complaint, "DoD's policy of indefinitely freezing its review process is contrary to law because it directs DoD to violate statutory and regulatory obligations." FAC, ECF 36 ¶ 266. Assistant Secretary Marks confirms this review freeze, noting that DOD "executed the last mitigation agreement on August 18, 2025" and that DOD has "refrained from executing further agreements and drafting new ones" since "around December [2025]." Marks Decl., ECF 90-1 ¶ 96.

The discrete agency action challenged here contrasts with the broad programmatic attacks in the cases that Defendants discuss. In *Lujan v. National Wildlife Federation,* the plaintiff environmental organization challenged "the entirety" of the Bureau of Land Management's ("BLM") "so-called 'land withdrawal review program.'" 497 U.S. at 890. As the Supreme Court explained, the term "land withdrawal review program" "d[id] not refer to a single BLM order or

PAGE 16 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

regulation, or even to a completed universe of particular BLM orders and regulations." *Id.*

Instead, it refers to "the continuing (and thus constantly changing) operations of the BLM in

reviewing [land] withdrawal revocation applications and the classifications of public lands and

developing land use plans." *Id.* Even though the plaintiff alleged that "violation of the law is

rampant within this program," the plaintiff could not bring its challenge under the APA, which

requires an "attack against some particular 'agency action' that causes it harm." *Id.* at 891.

In stark opposition, Plaintiffs in this case do not challenge "the entirety" of DoD's

Clearinghouse program, claiming that "violation of the law is rampant within" DoD's program of

reviewing energy projects. *Id.* at 890–91. Instead, Plaintiffs challenge "a single" DoD policy of

not reviewing wind energy projects, or at the very least "a completed universe of particular"

DoD policies of not reviewing wind energy projects. *Id.* at 890; *see Barrick Goldstrike Mines

Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000) (recognizing that final agency action, let

alone agency action, "may result from a series of agency pronouncements rather than a single

edict" (internal quotation marks omitted)). Unlike in *Lujan*, Plaintiffs here do not "seek

*wholesale* improvement of this program by court decree." 497 U.S. at 891 (emphasis in original).

Rather, they seek to vacate the review freeze, a "particular 'agency action' that causes [them]

harm." *Id.*

Defendants' reliance on the Ninth Circuit's decision in *Whitewater* similarly misses the

mark. In *Whitewater*, the plaintiffs were "organizations and individuals who seek to reduce

immigration into the United States because it causes population growth, which in turn, they

claim, has a detrimental effect on the environment." 5 F.4th at 1003. Rather than challenging a

particular agency action, the plaintiffs alleged that the Department of Homeland Security's

("DHS") implementation of the following seven categories of immigration policy violated

environmental laws: "employment-based immigration," "family-based immigration," "long-term nonimmigrant visas," "parole," "temporary protective status," "refugees," and "asylum." *Id.* at 1010. The Ninth Circuit held that the plaintiffs' APA challenge was "[in]distinguishable from the broad programmatic attack at issue in [*Lujan*]." *Id.* at 1012. As in *Lujan*, "the challenged 'programs' merely refer to continuing operations of DHS in regulating various types of immigration." *Id.* (citing *Lujan*, 497 U.S. at 891). In short, Plaintiffs' challenge here resembles nothing like a broad programmatic attack on DoD's Clearinghouse operations. Rather, Plaintiffs challenge a particular agency action "with broad application." *Whitewater*, 5 F.4th at 1012 n.7.

### 3. Final Agency Action

Defendants next argue that Plaintiffs have not identified final agency action as required to bring their first APA claim under 5 U.S.C. § 706(2). MTD & PI Response, ECF 90 at 28–31; *see* FAC, ECF 36 ¶¶ 231–76 (Count I). The Supreme Court has established a "two-part test for determining whether agency action is 'final.'" *Waterkeeper All. v. U.S. EPA*, 140 F.4th 1193, 1207 (9th Cir. 2025). "'First, the action must mark the consummation of the agency's decisionmaking process,' and 'must not be of a merely tentative or interlocutory nature.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). "Second, 'the action must be one by which rights or obligations have been determined, *or* from which legal consequences will flow.'" *Id.* (emphasis added) (quoting *Bennett*, 520 U.S. at 178). Courts "'focus on the practical and legal effects of the agency action,' not on labels,' and finality is 'interpreted in a pragmatic and flexible manner.'" *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023) (quoting *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006)).

DoD's stoppage of reviewing wind energy projects satisfies both prongs of the *Bennett* test. First, the review freeze marks the consummation of the agency's decisionmaking process. In

Assistant Secretary Marks's own words, DoD made the "decision" to "refrain[] from executing further agreements and drafting new ones . . . pending the outcome of [DoD's] internal, analytical methodology review and its impact on identifying sufficiently effective mitigation measures." Marks Decl., ECF 90-1 ¶ 96. DoD is not merely in the process of weighing whether to halt review of wind energy projects. It has already made its decision, and since August 2025, DoD has not executed a mitigation agreement for a wind energy project, even for projects that had already completed the MRT process and were only awaiting countersignature. *Id.*; Blackman Decl., ECF 36-12 ¶ 27(a); Belote Decl., ECF 36-13 ¶ 24(a); Doyle Decl., ECF 36-15 ¶ 14(a). "The mere possibility that an agency might reconsider" its decision "does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *cf. Waterkeeper All.*, 140 F.4th at 1207 ("Were it otherwise, an agency could argue that any periodic obligation is not final, and hence not reviewable, simply by pointing to the fact that the agency will need to do something similar again in the future. Such a result cannot be correct.").

Second, the review freeze is a decision "from which legal consequences will flow." *Bennett*, 520 U.S. at 178. The parties primarily dispute whether any of Plaintiffs' "rights or obligations have been determined" based on the review freeze, but that is not the only way to satisfy *Bennett*'s second prong. *Id.*; *see* MTD & PI Response, ECF 90 at 30–31; MTD Response, ECF 91 at 18–20. As *Bennett* itself made clear, the challenged agency action need only be one "from which legal consequences will flow." *Bennett*, 520 U.S. at 178. "Courts have consistently interpreted *Bennett* to provide several avenues for meeting the second finality requirement." *Or. Nat. Desert*, 465 F.3d at 986. One such avenue for Plaintiffs is to demonstrate that DoD's review freeze "imposes obligations on the agency," even if it does not "impose[] obligations on Plaintiffs." *Sierra Club v. Trump*, 929 F.3d 670, 698 n.23 (9th Cir. 2019).

PAGE 19 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

Here, DoD's freeze "imposes obligations on the agency" by requiring DoD not to review any wind energy project applications pending DoD's internal reassessment of its national security review process. *Id.* Defendants argue that DoD's "ongoing review of its methodology does not impose any direct legal consequences with respect to any application." MTD & PI Response, ECF 90 at 31. But even if the review freeze does not impose direct legal consequences on *Plaintiffs'* rights or obligations, it certainly imposes direct legal consequences on DoD's Clearinghouse program, "[b]y suspending the Clearinghouse review process and preventing DoD from notifying the FAA of its national security determinations." MTD Response, ECF 91 at 18. Moreover, while the challenged action "need not alter the legal regime to which the involved federal agency is subject," here Plaintiffs claim—and as discussed below, this Court finds—that the review freeze *does* alter the legal regime by violating multiple statutory and regulatory deadlines. *Or. Nat. Desert*, 465 F.3d at 987. Finally, where, as here, an agency fails to act in the "face of a purported obligation," the agency's conduct can constitute "final agency action, satisfying *Bennett*'s second prong." *See Waterkeeper All.*, 140 F.4th at 1208. DoD's review freeze thus satisfies both prongs of *Bennett* and constitutes final agency action.[9]

### 4. Article III Standing

---

[9] Defendants also argue that "this case is at heart a challenge to agency inaction," and therefore, "Section 706(1), and not Section 706(2), is the applicable vehicle for Plaintiffs' claims." MTD & PI Response, ECF 90 at 31. But as Plaintiffs correctly point out, "'Sections 706(1) and 706(2) are not mutually exclusive,' and courts routinely permit both claims to proceed together." MTD Response, ECF 91 at 20–21 (quoting *New York v. Trump*, 811 F. Supp. 3d 215, 243 (D. Mass. 2025)) (collecting cases). More broadly, under the APA, "'agency action' is defined to include a 'failure to act,'" *Plaskett v. Wormuth*, 18 F.4th 1072, 1081 (9th Cir. 2021), so there is no reason why a "failure to act" could not constitute final agency action when the "failure to act" satisfies the *Bennett* test. *See All. to Save Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 9–10 (D.D.C. 2007) (collecting cases in which courts have permitted Section 706(2) claims challenging failures to act to proceed, "notwithstanding the fact that the agency 'did' nothing").

PAGE 20 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

Lastly, Defendants argue that the plaintiff wind energy trade associations lack standing. MTD & PI Response, ECF 90 at 32–33. "Under Article III of the Constitution, a plaintiff needs a 'personal stake' in the case." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). At this stage of the litigation, "[i]f at least one plaintiff has standing, the suit may proceed." *Id.* To establish associational standing, a plaintiff must demonstrate that (1) "its members would otherwise have standing to sue in their own right'" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1143 (9th Cir. 2024) (quoting *Cent. Sierra Env't Res. Ctr. v. Stanislaus Nat'l Forest*, 30 F.4th 929, 937 (9th Cir. 2022) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977))).

Defendants only challenge Plaintiffs' ability to satisfy the third requirement for associational standing.[10] Citing their prior argument that Plaintiffs make an impermissible broad

---

[10] Although Defendants do not challenge whether Plaintiffs have demonstrated that at least one plaintiff has satisfied the first two requirements for associational standing, this Court has "an independent obligation to consider standing . . . because it is an Article III jurisdictional requirement." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F. 4th 664, 680 (9th Cir. 2023) (en banc). Here, the plaintiff trade associations satisfy the first two requirements. As to the first requirement, the trade associations include member renewable energy companies that build wind turbines. *See, e.g.*, FAC, ECF 36 ¶¶ 24, 28–29, 31. These member companies have suffered financial harm due to DoD's review freeze, and "[m]onetary costs are of course an injury [in fact]." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025) (quoting *United States v. Texas*, 599 U.S. 670, 676 (2023)); *see* PI Motion, ECF 14 at 38 (chronicling "approximately $2.0 billion in economic harm across affected projects"). And because the member wind energy companies are the "object of the action (or forgone action) at issue" in this case, there is "little question" that causation and redressability are met. *Diamond Alt. Energy*, 606 U.S. at 112 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). As to the second requirement for associational standing, the plaintiff wind energy trade associations and environmental nonprofits seek to protect the development of wind energy projects, which is certainly "germane to the organization[s'] purpose[s]." *Stavrianoudakis*, 108 F.4th at 1143 (internal quotation marks omitted); *see, e.g.*, FAC, ECF 36 ¶¶ 24, 28–29, 31.

PAGE 21 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

programmatic attack, Defendants argue that Plaintiffs' claims "require the participation of the [individual] project developers." MTD & PI Response, ECF 90 at 32. But this Court already rejected above Defendants' initial premise that Plaintiffs bring a broad programmatic attack.

Regardless, Plaintiffs request only a range of "injunctive and declaratory relief," which "do not require individualized proof," and therefore, the third requirement is satisfied. *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001); *see* FAC, ECF 36 at 79–81. Plaintiffs do not challenge "whether any particular application presents a national security risk" but rather whether "DoD's categorical refusal to allow wind-energy projects from proceeding through the Clearinghouse review process" violates the APA. MTD Response, ECF 91 at 26. Defendants do not dispute that the review freeze is "categorical" with respect to wind energy projects. Indeed, Assistant Secretary Marks states that DoD initiated its review freeze to allow DoD "to evaluate the Clearinghouse's internal, analytical methodology for assessing national security risks." Marks Decl., ECF 90-1 ¶ 68. No aspect of Plaintiffs' APA claims requires wading into the particularities of why a specific wind energy project application is frozen. For similar reasons, the relief requested does not require individualized proof. In Plaintiffs' words, they do not ask this Court to review "whether any particular application presents a national security risk." MTD Response, ECF 91 at 26. Instead, Plaintiffs seek relief "requiring the Clearinghouse to resume the review process" for all wind energy projects. *Id.* This "categorical" relief does not require any project-specific inquiry. *Id.* Therefore, Plaintiffs demonstrate that the trade associations have associational standing.

### B. Motion for Preliminary Injunction

Plaintiffs move for a preliminary injunction or stay of DoD's review freeze under the APA, *see* 5 U.S.C. § 705, which are both governed by the familiar *Winter* factors for a

PAGE 22 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

preliminary injunction. *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1015 (9th Cir. 2025); *see Winter v. Nat'l Res. Def. Council*, 55 U.S. 7, 20 (2008). Plaintiffs must therefore demonstrate that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Nw. Ass'n of Indep. Schs. v. Labrador*, 166 F.4th 1148, 1156 (9th Cir. 2026). "Likelihood of success on the merits is a threshold inquiry and is the most important factor." *Id.* (internal quotation marks omitted).

As an initial matter, the parties dispute whether Plaintiffs seek a mandatory injunction or a prohibitory injunction. "'A mandatory injunction orders a responsible party to take action,' while 'a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits.'" *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060–61 (9th Cir. 2014) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009)). "The difference is legally significant because mandatory injunctions are 'particularly disfavored,' and place a higher burden on the plaintiff to show 'the facts and law *clearly* favor the moving party.'" *Fellowship of Christian Athletes*, 82 F. 4th at 684 (9th Cir. 2023) (en banc) (emphasis in original) (first quoting *Marlyn Nutraceuticals*, 571 F.3d at 879; and then quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)). In this context, "the status quo is 'the legally relevant relationship between the parties before the controversy arose.'" *Id.* (quoting *Ariz. Dream*, 757 F.3d at 1061). A controversy arises not "at the time of the lawsuit" but rather when a party "affirmatively change[s]" the "longstanding relationship between the parties." *Id.* at 685.

Here, Plaintiffs request a prohibitory injunction because they seek to preserve the legal regime that governed DoD's review of wind energy projects before the review freeze. Before the

PAGE 23 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

review freeze and since the Clearinghouse's creation in 2011, "Plaintiffs were subject to a legal regime" in which Defendants reviewed their wind energy project applications. *Ariz. Dream*, 757 F.3d at 1061. *Id.* DoD's review freeze "affirmatively changed" this "longstanding relationship between the parties," and thus, the status quo is the state of affairs that existed *before* the review freeze. *Fellowship of Christian Athletes*, 82 F. 4th at 685. Plaintiffs now request a stay of the review freeze "to restore that status quo," and therefore, "the relief sought is properly viewed a prohibitory injunction." *Id.*; *see Ariz. Dream*, 757 F.3d at 1061 ("[L]ike other injunctions that prohibit enforcement of a new law or policy, Plaintiffs' requested injunction is prohibitory.").

### 1. Likelihood of Success

The APA authorizes reviewing courts to "hold unlawful and set aside agency actions if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' and 'without observance of procedure required by law.'" *Backcountry Against Dumps*, 77 F.4th at 1267 (quoting 5 U.S.C. § 706(2)(A), (D)). The APA also directs courts to "compel agency action unlawfully withheld or unreasonably delayed." *Chairez v. Mayorkas*, 168 F.4th 1227, 1231 (9th Cir. 2026) (quoting 5 U.S.C. § 706(1)). Plaintiffs bring claims under both Section 706(2) and Section 706(1). FAC, ECF 36 ¶¶ 231–76 (706(2) claim), 277–91 (706(1) claim). This Court finds that Plaintiffs have demonstrated a likelihood of success for both their claims based on the same underlying rationale: DoD's review freeze violates statutory and regulatory deadlines governing DoD's review of wind energy projects. Thus, the freeze both "unlawfully withheld" agency action and was "not in accordance with law." 5 U.S.C. §§ 706(1), (2)(A).

### a. Section 706(2) Claim

In Count I of the First Amended Complaint, Plaintiffs claim that "DoD's freeze of its review of wind energy projects must be set aside under Section 706(2)." FAC, ECF 36 ¶ 233.

PAGE 24 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs argue that (1) "DoD provided only vague and implausible justifications for its freeze, failed to consider important factors, and ignored stakeholders' reliance interests," PI Motion, ECF 14 at 25–29; (2) "DoD's freeze was based on the Government's hostility to wind energy," *id.* a 29–30; (3) "DoD's freeze violates statutory and regulatory deadlines," *id.* at 30–32; and (4) "DoD failed to follow the required notice-and-comment rulemaking process," *id.* at 32–33. Because Plaintiffs are likely to succeed on their Section 706(2) claim based on their third argument, this Court does not reach Plaintiffs' other arguments at this stage of the litigation.[11]

Even assuming that DoD's review freeze was "reasonable and reasonably explained," and thus not arbitrary and capricious, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), the freeze is still "not in accordance with law," 5 U.S.C. § 706(2)(A), because it violates statutory and regulatory deadlines that govern the review process. Congress established a statutory scheme for DoD to assess national security concerns arising from energy projects, and DoD promulgated regulations that are also binding on the agency. DoD cannot pick and choose which parts of this legal regime to follow. It must adhere to the entire regime, which includes the various statutory and regulatory deadlines governing the review process from start to finish.

---

[11] At the hearing on this motion, Plaintiffs agreed that this Court need not reach their other likelihood-of-success arguments. Minutes of Proceedings, ECF 154. For completeness, this Court notes that Defendants offer the following responses to Plaintiffs' other arguments. As to (1), Defendants argue that DoD's review freeze survives "the APA's deferential arbitrary-and-capricious standard," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 426 (2021), especially when taking into account the "'unusually deferential' standard of APA review applicable" in a case like this that touches on national security concerns. MTD & PI Response, ECF 90 at 44 (quoting *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989)). As to (2), Defendants respond that Plaintiffs' reliance on "statements by President Trump and actions by other agencies in offshore wind projects" fails because the review freeze, "on its face, has 'a legitimate grounding in national security concerns, quite apart from any' sign of animus." *Id.* at 49 (quoting *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 178 F.4th 456, 467 (9th Cir. 2026)). As to (4), Defendants argue that the review freeze falls under the "military function" exception under the APA. *Id.* at 49.

DoD's review freeze violates deadlines for the Clearinghouse's preliminary review. After the Secretary of Transportation notifies DoD of an energy project application, DoD must conduct a "preliminary review" of the application within 75 days by statute, and within 30 days by regulation. 10 U.S.C. § 183a(c)(1); 32 C.F.R. § 211.6(a)(3); *see supra* n.1. In Plaintiffs' PI Motion filed on June 11, 2026, Plaintiffs stated that they "are currently unaware of any projects for which DoD has completed preliminary review since it issued the May 7 Memorandum." PI Motion, ECF 14 at 31. Therefore, it appears that Defendants failed to meet their 30-day deadline to complete preliminary review. However, in their subsequent briefing, the parties equivocate regarding whether DoD has resumed its preliminary review of wind energy projects. *See* MTD & PI Response, ECF 90 at 17 ("DoW issued the May 7 Memorandum clarifying that the Clearinghouse should proceed with the preliminary review of energy project applications, including issuing notices of presumed risk."); Plaintiffs' Reply in Support of Motion for Stay or Preliminary Injunction ("PI Reply"), ECF 98 at 20 ("The memorandum's directive about performing preliminary review for all projects within seventy-five days *does* appear to apply to wind-energy projects . . . ." (emphasis added)). At the August 4, 2026 hearing, this Court asked the parties to clarify whether DoD has resumed Clearinghouse preliminary review of wind energy projects in accordance with its 75-day statutory and 30-day regulatory deadlines.

Plaintiffs represented that among their wind energy company members, which sponsor the "vast majority of wind energy projects" nationwide, Plaintiffs are unaware of any member project that has resumed DoD preliminary review. Minutes of Proceedings, ECF 124. Defendants have provided no contrary evidence in the record, and at the hearing, Defendants did not point to a single example of a wind energy project application currently undergoing preliminary review. Nonetheless, Defendants represented that it is their understanding that preliminary review has

PAGE 26 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

resumed for wind energy projects in purported accordance with the May 7 Memorandum. Defendants' representation cannot be squared with the fact that July 21, 2026—75 days after May 7, 2026, the date preliminary review allegedly resumed—has come and gone, and yet DoD has not completed its preliminary review for *even one* of plaintiff member's wind energy projects. At this stage of the litigation, Plaintiffs have demonstrated that DoD has not resumed its preliminary review of wind energy projects, or at the very least, DoD has not conducted its preliminary review in accordance with the 75-day statutory deadline. 10 U.S.C. § 183a(c)(1).

In any event, Defendants do not dispute that they have violated the 90-day deadline set by regulation for the completion of mitigation discussions. Following DoD's issuance of a notice of presumed risk, DoD must assemble an MRT to "engage in discussions with the applicant to attempt to mitigate the adverse impact." 32 C.F.R. § 211.6(a)(3)(iii)(B). By regulation, such mitigation discussions "shall not extend more than 90 days beyond the initial notification to the applicant" of a notice of presumed risk. *Id.* § 211.6(b)(1). This 90-day deadline can be extended only if the MRT and the applicant "agree, in writing, to an extension of a specific period of time." *Id.* Defendants do not dispute that since April of this year, mitigation discussions have not taken place. Blackman Decl., ECF 36-12 ¶ 27(c); Belote Decl., ECF 36-13 § 24(c); Doyle Decl., ECF 36-15 ¶ 14(d). That means Defendants have not complied with the 90-day deadline to complete mitigation discussions, given that 90 days after April 30, 2026, is July 29, 2026.

While Defendants do not dispute that they have violated the 90-day deadline, they insist that "[a]s a practical matter, mitigation discussions almost always exceeded 90 days, and historically ha[ve] averaged 512 days between mitigation response team establishment and the first draft of the mitigation agreement." MTD & PI Response, ECF 90 at 15 n.4. But practical constraints cannot justify an agency's failure to comply with federal law. *See Util. Air Reg. Grp.*

*v. EPA*, 573 U.S. 302, 327 (2014) ("An agency confronting resource constraints may change its own conduct, but it cannot change the law."). Moreover, "a prior violation of statutory authority does not excuse subsequent violations, nor does it affect the Congressionally-enacted scope of agency authority." *Nat'l TPS All.*, 150 F.4th at 1021–22. And practically speaking, it makes sense that prior to the freeze, wind energy developers did not feel the need to file suit to remedy deadline violations because DoD still provided a "transparent and predictable timeline." Belote Decl., ECF 36-13 ¶¶ 21, 29. But in light of DoD's review freeze that started a year ago and still has no end in sight, the wind developers would naturally look to the same deadlines for relief. Because DoD's actions did not meet these statutory and regulatory deadlines, they were "not in accordance with law" in violation of the APA. 5 U.S.C. § 706(2)(A).

### b. Section 706(1) Claim

In Count II of the First Amended Complaint, Plaintiffs claim that "DoD has unlawfully withheld required action by refusing to move its review process forward," or in the alternative, "DoD is unreasonably delaying its review process. FAC, ECF 36 ¶¶ 282, 287. For the same reasons that this Court finds that Plaintiffs are likely to succeed on their Section 706(2) claim, this Court also finds that Plaintiffs are likely to succeed on their Section 706(1). Namely, DoD withheld its review of wind energy projects in violation of statutory and regulatory deadlines.

Under 5 U.S.C. § 706(1), a reviewing court can compel agency action "only if there is 'a specific, unequivocal command' placed on the agency to take a 'discrete agency action,' and the agency has failed to take that action." *Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1075 (9th Cir. 2016) (quoting *Norton*, 542 U.S. at 63–64). In other words, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64 (emphasis in original). For example, "when an

agency is compelled by law"—"which includes, of course, agency regulations that have the force of law"—"to act within a certain time period, . . . a court can compel the agency to act." *Id.* at 65.

That is precisely the situation in this case. Once more, 32 C.F.R. § 211.6(b)(1) places "a specific, unequivocal command" on DoD to complete mitigation discussions within 90 days. *Vietnam Veterans*, 811 F.3d at 1075 (quoting *Norton*, 542 U.S. at 63). Since at least April of this year, DoD has not engaged in mitigation discussions with any wind project applicants, and since August of last year, DoD has not countersigned any mitigation agreements for wind energy projects that have already completed mitigation discussions. Therefore, DoD has "failed to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64 (emphasis in original).

The parties contest whether DoD's review freeze constitutes unlawful withholding or unreasonable delay, the latter of which requires application of the so-called *TRAC* factors. PI Motion, ECF 14 at 34–35; MTD & PI Response, ECF 90 at 38–40; *see, e.g.*, *Vaz v. Neal*, 33 F.4th 1131, 1137 (9th Cir. 2022) (quoting *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) ("*TRAC*")). But the Ninth Circuit's decision in *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166 (9th Cir. 2002), establishes that DoD's review freeze is unlawful withholding and should not be analyzed as unreasonable delay using the *TRAC* factors.

In *Badgley*, plaintiff environmental groups and certain individuals challenged defendant United States Fish and Wildlife Service's ("the Service") failure to comply with a twelve-month deadline under the Endangered Species Act ("ESA"). *Id.* at 1169–70. The Ninth Circuit held that the agencies' "failure to comply with the twelve-month deadline is not in accordance with the ESA, the governing law," in violation of the APA. *Id.* at 1177. In so ruling, the court rejected application of the *TRAC* factors to determine whether there was an unreasonable delay. *Id.* at 1177 n.11. In the Ninth Circuit's words, "Congress has specifically provided a deadline for

performance by the Service, so no balancing of factors is required *or permitted*." *Id.* (emphasis added); *see also South Carolina v. United States*, 907 F.3d 742, 755 (4th Cir. 2018) (holding that the Department of Energy's failure to meet a two-year statutory deadline "constituted an unlawfully withheld agency action within the meaning of § 706(1)"). The same is true here because both statute and regulation "specifically provide[] a deadline for performance." *Badgley*, 903 F.3d at 1177 n. 11.

In conclusion, Plaintiffs have shown they are likely to prevail on both their APA claims.

### 2. Irreparable Harm

Plaintiffs have also demonstrated irreparable harm will likely result in the absence of a stay of DoD's review freeze based on "substantial and continuing [economic] losses for wind-project developers, including Plaintiffs' members." PI Motion, ECF 14 at 38. "Economic harm is not normally considered irreparable," but the Ninth Circuit has held that "economic harm is irreparable when monetary damages are unavailable." *Washington v. Trump*, 145 F.4th 1013, 1036 (9th Cir. 2025). In this case, money damages are unavailable because Plaintiffs bring APA claims against defendant "federal officials and federal agencies." *Id.*; *see Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) ("The APA's waiver of sovereign immunity does not apply . . . to claims seeking 'money damages.'" (quoting 5 U.S.C. § 702)). Thus, Plaintiffs' mounting economic harm during DoD's review freeze constitutes irreparable harm. *See* PI Motion, ECF 14 at 38 (estimating that "the current delays have already caused approximately $2.0 billion in economic harm across affected projects through increased carrying costs, higher financing costs, delayed or lost project revenues, and the potential loss of tax-credit value"); *see id.* at 38–42.

### 3. Balance of Equities and Public Interest

Plaintiffs have also shown that the balance of equities and public interest weigh in their favor. "When the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). On the one hand, "[t]he public interest is served by compliance with the APA." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)). And more broadly, "it would not be equitable or in the public's interest to allow the Government to violate the requirements of federal law." *Pacito v. Trump*, 169 F.4th 895, 938 (9th Cir. 2026) (brackets and ellipses omitted) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). On the other hand, "the government's interest in ensuring the nation's security is 'an urgent objective of the highest order.'" *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 178 F.4th 456, 468 (9th Cir. 2026) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010)). "Of course, military interests do not always trump other considerations," but courts must "'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'" *Winter*, 555 U.S. 7 at 24, 26 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)).

As an initial matter, because compliance with the APA and federal law is in the public interest, these equitable factors weigh in favor of granting injunctive relief. *Azar*, 911 F.3d at 581; *Pacito*, 169 F.4th at 938. The more salient question here is whether "given that national security interests are of 'the highest order,'" MTD & PI Response, EF 90 at 54, Defendants' purported national security interests in suspending Clearinghouse review of all wind energy projects outweighs the equitable factors favoring Plaintiffs. This Court concludes that because Plaintiffs only ask that DoD resume its national security review process in accordance with an existing statutory and regulatory scheme that allows DoD to continue weighing any national security considerations, the balance of equities and public interest remain on Plaintiffs' side.

PAGE 31 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

Critically, Plaintiffs do not ask this Court to assess "whether any particular application presents a national security risk," and Plaintiffs admit that even if they prevail, "DoD will continue to evaluate individual projects under the statutory process." MTD Response, ECF 91 at 26. Rather, Plaintiffs "seek only to require DoD to resume the very review and mitigation process Congress established to protect such [national security] interests." PI Motion, ECF 14 at 44. Indeed, Congress established a comprehensive statutory scheme governing DoD's national security review process, and DoD regulations layer additional requirements on the process. Congress did not give DoD free rein to review energy projects in whatever way DoD deems fit. Instead, as chronicled in detail above, Congress specified the process, from DoD's 75-day preliminary review to its mandatory 90-day mitigation discussions. *See supra* Legal Background. Congress also delineated the substance of DoD's review, requiring DoD to determine whether the energy project presents an "unacceptable risk to the national security of the United States," a term which Congress defined. To satisfy the statutory definition, the Secretary of Defense must "demonstrate," as relevant here, that the construction would "significantly impair or degrade the capability of the Department of Defense to conduct training, research, development, testing, and evaluation, and operations or to maintain military readiness." 10 U.S.C. § 183a(h)(11).

Therefore, contrary to Defendants' assertion, this case does not resemble *Winter*. MTD & PI Response, ECF 90 at 53–54. In *Winter*, the Supreme Court found that "the balance of equities and consideration of the overall public interest . . . tip[ped] strongly in favor of the Navy." 555 U.S. at 26. But the equitable considerations on each side of the scale looked very different in *Winter*. On the plaintiffs' side, "the most serious possible injury would be harm to an unknown number of the marine mammals that they study and observe." *Id.* On the Navy's side, "forcing the Navy to deploy an inadequately trained antisubmarine force jeopardizes the safety of the

PAGE 32 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

fleet." *Id.* In contrast to *Winter*, here Plaintiffs do not pit their purely private interests against the national security interests of Defendants. National security interests are on both sides of the scale because Plaintiffs merely wish to reinstate DoD's review process, through which DoD can decide whether any project presents "unacceptable risk to the national security of the United States."

Of course, national security interests are also on Defendants' side of the scale, but these interests do not outweigh the above interests on Plaintiffs' side. Defendants argue that "it is against the public interest to force the Clearinghouse to quickly cobble together a methodology, or rely on a prior one, that potentially fails to adequately consider emergent national security risks." MTD & PI Response, ECF 90 at 53–54. But once again, DoD ignores that it is *Congress* that established the "methodology" that DoD believes "potentially fails to adequately consider emergent national security risks." Congress has already weighed the national security interests on both sides and determined that its detailed statutory scheme best protects national security. For that reason, it is not for the DoD, or this Court for that matter, to override the careful choices of the people's elected representatives. If DoD wishes to alter the statutory scheme, it can ask Congress to do so. Until then, DoD "has no power to 'tailor' legislation to [its] policy goals by rewriting unambiguous statutory terms." *Util. Air*, 573 U.S. at 325. DoD is also free to alter the regulations governing its review process as long as they are within the "statutory boundaries of [Congress's] delegations." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 404 (2024). The bottom line is that "the public has an interest in ensuring that the statutes enacted by their representatives are not imperiled by executive fiat," which ultimately weighs in favor of staying DoD's indefinite review freeze. *E. Bay Sanctuary*, 993 F.3d at 679 (internal quotations omitted).

**4.  Scope of Relief**

Finally, this Court considers the proper scope of preliminary relief. *See Nat'l TPS All.*, 150 F.4th at 1027 ("Preliminary relief 'must be narrowly tailored to remedy the specific harm shown.'" (quoting *E. Bay Sanctuary*, 934 F.3d at 1029)). "Section 705 of the APA grants courts the power to issue all 'necessary and appropriate process' tailored to the circumstances of a particular case to 'preserve status or rights.'" *Immgr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025) (quoting 5 U.S.C. § 705). The Ninth Circuit has extended the complete-relief principle articulated in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), "to address the proper scope of APA relief." *Nat'l TPS All.*, 150 F.4th at 1027–28. Therefore, the relevant question in crafting a stay under Section 705 of the APA "is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* at 1028 (emphasis in original) (quoting *Immigr. Defs.*, 145 F.4th at 995–96). "There is no rule, however, that nonparties must remain unaffected by the court's order." *Id.* Courts must consider whether limiting the scope of relief is a "workable solution" under a statute as not to create "a judicially created patchwork." *Id.*

Here, this Court concludes that staying DoD's review freeze as to all wind energy project applications is the only "workable solution" under 10 U.S.C. § 183a as not to create "a judicially created patchwork" of statutory and regulatory deadlines. *Id.* The Ninth Circuit's reasoning in *National TPS Alliance* is instructive. There, the plaintiffs challenged "a single act" of the Secretary of Homeland Security that terminated lawful immigration status for "over 600,000 Venezuelan citizens living in the United States." *Id.* at 1007, 1028. Although the plaintiff organization's members included only 84,000 of the over 600,000 individuals affected, the Ninth Circuit found that "[p]ostponing the rule for just some individuals would require rewriting the statute itself." *Id.* at 1028–29. This was because the statute "does not allow for partial

PAGE 34 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

determinations," i.e. granting status "when it comes to California residents, but not for Pennsylvania residents." *Id.* at 1029. Therefore, the Ninth Circuit granted nationwide relief. *Id.*

The same chain of logic applies to the frozen wind energy project applications in this case. Here, plaintiffs challenge DoD's "single act" of categorically freezing review of wind energy projects and "do not challenge the [national security] determination for any particular" wind energy project. *Id.* at 1028. Requiring DoD to only comply with its statutory and regulatory obligations for plaintiff wind developers' and plaintiff trade association members' wind energy projects "would require rewriting the statute" and regulations governing deadlines. *Id.* at 1029. Thus, to prevent the creation of a "judicially created patchwork," this Court likewise concludes that a nationwide stay of DoD's review freeze is the proper preliminary remedy.[12] *Id.* at 1028.

## CONCLUSION

For the above reasons, this Court DENIES Defendants' Motion to Dismiss, ECF 90, and GRANTS Plaintiffs' Motion for Stay or Preliminary Injunction, ECF 14. DoD's review freeze is STAYED pending final adjudication of Plaintiffs' two APA claims on the merits. To ensure compliance with the stay, this Court ORDERS DoD to provide status reports every 30 days addressing whether review of wind energy projects has resumed for projects at each stage of the review process: (1) projects with a mitigation agreement executed by the developer that are awaiting countersignature by DoD; (2) projects that have completed the MRT process but have not yet received a draft mitigation agreement from DoD; (3) projects that were in the middle of the MRT process; (4) projects that have received a notice of presumed risk and are awaiting

---

[12] Defendants do not offer any response to Plaintiffs' requested scope of preliminary relief.

PAGE 35 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

initial MRT meetings; and (5) projects that are awaiting completion of a preliminary review and

issuance of a notice of presumed risk determination or non-objection transmittals to the FAA.[13]


**IT IS SO ORDERED.**


DATED this 6th day of August, 2026.


/s/ Karin J. Immergut<br>
Karin J. Immergut<br>
United States District Judge

---

[13] This Court notes that although the statutory and regulatory deadlines discussed above apply only to projects in stages (3)–(5), once mitigation discussions successfully conclude, the MRT "shall notify the Clearinghouse of the agreement." 32 C.F.R. § 211.6(b)(1)(ii). And there is no basis in statute or in regulation for DoD to withhold action for projects at stages (1) and (2) of the review process. Thus, staying the freeze for projects at these two stages is also warranted.

PAGE 36 – OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION