Michael Giaquinto, OSB No. 246342
MORGAN LEWIS & BOCKIUS LLP
300 South Grand Ave., 22nd Floor
Los Angeles, CA 90071-3132
T: 213-612-7227
michael.giaquinto@morganlewis.com

Jennifer Trock (*pro hac vice*)
Douglas Hastings (*pro hac vice*)
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000
jennifer.trock@morganlewis.com
douglas.hastings@morganlewis.com

Ella Foley Gannon (*pro hac vice*)
600 Montgomery Street, Suite 2300
San Francisco, CA 94111-2725
T: 415-442-1000
ella.gannon@morganlewis.com

*Attorneys for Plaintiffs (except Las Crestas Wind Energy, LLC)*

Darin Sands, OSB No. 106624
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
T: +1 503-734-2480
dsands@bradleybernstein.com

Richard W. Smith (*pro hac vice*)
Kathleen Mueller (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
T: 202-736-8000
rwsmith@sidley.com
kmueller@sidley.com

*Attorneys for Plaintiff Las Crestas Wind Energy, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>PETER B. HEGSETH, *et al.*,<br><br>*Defendants.* | Case No.: 3:26-cv-01092-IM<br><br>**PLAINTIFFS' MOTION TO ENFORCE STAY**<br><br>***Oral Argument Requested*** |

## <u>LR 7-1(a) CERTIFICATION</u>

On October 19, 2026, certain counsel for Plaintiffs discussed the substance of this Motion with counsel for Defendants pursuant to L.R. 7-1 and were unable to reach a resolution. Plaintiffs respectfully request that oral argument be scheduled as soon as practicable following the conclusion of briefing. *See* L.R. 7-1(e)(1)-(2). Defendants neither join nor oppose Plaintiffs' request for oral argument but, in the event the Court opts to set oral argument, Defendants join in the request that oral argument be scheduled as soon as practicable.

## <u>INTRODUCTION</u>

Congress established a specific process under 10 U.S.C. § 183a ("Section 183a") for the Department of Defense ("DoD") to assess adverse impacts of proposed energy projects on military operations and readiness and identify feasible and affordable ways to mitigate these impacts while allowing development to proceed. 10 U.S.C. § 183a(c)(1)(A)-(B). On August 6, this Court stayed DoD's categorical suspension of that process for wind energy projects, ordering DoD to resume its review and provide regular status reports demonstrating its compliance. Dkt. 125 at 34-35. More than sixty days later, DoD's two status reports describe a new analysis, a new methodology,

and a new model mitigation agreement, but they do not show that DoD is actually advancing projects through the review process Congress prescribed.

To the contrary, the reports demonstrate that DoD is maintaining its review freeze through new mechanisms. DoD has not: executed any mitigation agreements for projects awaiting only DoD's countersignature, issued any draft agreements for projects that completed mitigation discussions and reached an understanding of project mitigation measures, or reported any completed MRT negotiations. Statutory and regulatory deadlines continue to go unmet. Instead, DoD has introduced sweeping new administrative requirements across wind projects without identifying the particular project-specific impacts on military operations and readiness that justify reopening completed mitigation negotiations. What DoD presents as the resumption of review is an altered framework that is, in effect, a different method of perpetuating the very delays this Court ordered it to end.

The clearest evidence that DoD has not restored the congressionally mandated review process is its treatment of projects in Category 1. These projects have already completed mitigation negotiations, have developer-executed mitigation agreements, and have been awaiting final DoD action for up to a year or more. Yet, rather than countersigning the fully-negotiated agreements or identifying any project-specific military readiness or operational concern preventing execution of these agreements, DoD has delayed these projects indefinitely through a dramatically expanded, 119-page model mitigation agreement imposing new sweeping boilerplate requirements unrelated to project-specific concerns, such as personnel vetting, supply chains, cybersecurity, grid security, and other matters.

These new requirements have no relation to the radar interference and drone-related concerns DoD has repeatedly invoked to justify its original suspension, nor are they project-

specific. DoD is proposing to impose these new requirements across all wind projects, without either identifying which (if any) particular adverse impacts to military operations or readiness warrant their application to individual projects or explaining why the mitigation measures already agreed upon for these projects are inadequate. At the same time, DoD has identified no comparable new framework being imposed on other energy projects it reviews, nor offered any explanation why categorical cybersecurity, personnel and supply-chain requirements are necessary for wind energy projects but not for gas-fired or nuclear projects, or any other energy-related activities subject to Clearinghouse review. That approach is not the resumption of project-specific review—it is simply a different method of freezing wind development in the United States.

The same failure to comply with this Court's order is evident in projects at earlier stages of review, where DoD has not complied with express statutory and regulatory deadlines. DoD's regulations require completion of preliminary review within 30 days, 32 C.F.R. §211.6(a)(3), and Congress separately requires preliminary review within 75 days, 10 U.S.C. §183a(c)(1). Yet more than 60 days after this Court's injunction, as of the second status report, DoD still had not issued preliminary determinations for 46 of the 90 projects in Category 5, many of which had been awaiting review well before the Court's order. Rather than demonstrating compliance with these obligations, DoD reports undertaking additional analysis under its new methodology and contacting some developers—but identifies no completed mitigation negotiations, no newly issued draft mitigation agreements, and no executed mitigation agreements. As this Court has already made clear, compliance with its injunction "requires compliance with all regulatory and statutory deadlines." Dkt. 152. DoD's reported preliminary activity cannot substitute for completing the actions that Congress and DoD's own regulations require.

Plaintiffs do not question DoD's authority—or its obligation—to assess genuine impacts to military readiness and operations. Congress established Section 183a for precisely that purpose. DoD may identify project-specific risks, conduct further review when justified, and in doing so must, "identify any feasible and affordable actions that could be taken" by DoD, the developers, or others to mitigate any adverse impacts and minimize risks to national security "while allowing the energy project . . . proceed with development." 10 U.S.C. § 183a(c)(1)(B). DoD is required to exercise its authority through the process Congress prescribed. DoD cannot comply with either its statutory mandate or the court's order merely by replacing that suspension with generally applicable procedures that have the same exact function: halting review of all wind energy projects.

Further relief is urgent because DoD's continued delay is exacerbating precisely the irreparable harm identified in the Court's stay ruling: lost financing opportunities, mounting carrying costs, and jeopardized contracts and tax benefits. Many of these harms, such as a lost power purchase agreement or interconnection window, cannot simply be restored once they are lost. As a result of these compounding issues, some projects have already been cancelled or dramatically altered, thereby incurring massive sunk costs. And each day that delays continue increases the risk that additional developers will be forced to terminate their projects.

Plaintiffs therefore respectfully request that the Court require DoD to take concrete action within specified deadlines to restore the review process Congress mandated and this Court ordered resumed. Plaintiffs also ask the Court to issue additional instructions on what DoD must do to comply with its order—including that it must immediately recommence the substantive project-specific review required by Congress and cannot evade that process through categorical new requirements that prevent projects from reaching the next legally required step.

## LEGAL STANDARD

Courts retain authority to enforce their injunctions and when subsequent facts warrant, to make the relief sufficiently specific to be effective. *A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002) (recognizing authority to modify a preliminary injunction in light of new facts); *see also System Federation No. 91 v. Wright*, 364 U.S. 642, 647–48 (1961) (district courts have "wide discretion" to modify an injunction); *Armstrong v. Brown*, 768 F.3d 975, 979 (9th Cir. 2014) (approving additional monitoring and dispute resolution procedures in an injunction after noncompliance). A party may not avoid enforcement by complying with a myopic reading of what an injunction requires. "[V]iolation of the spirit of the injunction" is enough to warrant further enforcement. *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935 (9th Cir. 2014); *see also City & Cnty. of San Francisco v. Trump,* No. 25-CV-01350-WHO, 2025 WL 2426858, at *4 (N.D. Cal. Aug. 22, 2025) ("[T]he Government cannot avoid liability down the line by hewing to the narrow letter of the injunction.").

## ARGUMENT

### I. DoD Has Not Restarted the Project-Specific Review This Court Ordered Resumed.

DoD's second status report reflects the development of templates and preliminary analysis, but not restoration of the process that Congress required. For each category, DoD must take the next legally prescribed action, within applicable deadlines, based on an individualized assessment of the project.[1]

[1] The categories in this Court's order were: (1) projects with a mitigation agreement executed by the developer that are awaiting countersignature by DoD; (2) projects that have completed the MRT process but have not yet received a draft mitigation agreement from DoD; (3) projects that were in the middle of the MRT process; (4) projects that have received a notice of presumed risk and are awaiting initial MRT meetings; and (5) projects that are awaiting completion of a preliminary review and issuance of a notice of presumed risk determination or non-objection transmittals to the FAA. Dkt. 125 at 30.

**A. Categories 1 and 2: DoD Is Reopening Completed Mitigation Work Through Broad New Requirements Without Identifying Project-Specific Reasons.**

DoD's continuation of its freeze is particularly blatant for projects in Categories 1 and 2. Section 183a requires review of the likely scope, duration and level of risk of a project's impact on military operations and readiness and identification of feasible, affordable mitigation to allow the project to move forward. 10 U.S.C. § 183a(c)(1)(A)-(B). The relevant "adverse impact" must be demonstratable and likely to impair or degraded the armed forces' ability to perform their warfighting missions. *Id.* at 183a(h)(1). DoD's regulations likewise require its components to use the prescribed FAA-related review process: "No other process shall be used by a DoD component." 32 C.F.R. § 211.4(b) For Category 1, DoD acknowledges that it has executed no mitigation agreements and reports only that it has "applied its new analytical methodology" to the projects. Dkt 153 at 2. DoD similarly reports that it has not issued any draft agreements for projects in Category 2 and notes that it has not even "concluded" its new "analysis" for the majority of these projects. *Id.* at 2-3.

More significantly, DoD has disseminated a new "model mitigation agreement" that contains extensive substantive and procedural requirements that threaten to delay completion of projects already near the end of review. The model mitigation agreement itself does not constitute project-specific review for any particular project; it is a new framework DoD proposes to apply across wind-projects, including those Category 1 projects for which developers have already negotiated and signed mitigation agreements. The template agreement is 119 pages long including its attachments, a substantial expansion from the 15-20 page agreement that DoD previously used. And, critically, it imposes a host of new requirements that are unrelated to the concerns that DoD mentioned in its previous correspondence to developers and in its briefs submitted to this Court. DoD repeatedly told this Court that additional review was needed because wind turbines could

potentially interfere with military radar, including the ability to detect drones. *See, e.g.*, Dkt. 91-1 ("The national security concern is that any low-RCS drone or missile flying through [a wind turbine's] 'blinded' sector could be entirely filtered from radar view."); Dkt. 91 (describing "a threat paradigm shift taking place that arguably exceeds 9/11," involving "the use of unmanned aircraft systems (UASs, i.e., drones)"). Yet, the template leaves operative radar-interference provisions largely unchanged and identifies no materially new technical measures addressing the drone-detection vulnerability DoD invoked. Ex. A, Declaration of Howard Belote, Benjamin Doyle, Geoffrey Blackman, and Edward Chupein ("Belote et al. Decl.") ¶¶ 16-24.

Instead, the model agreement adds a myriad of entirely distinct new requirements covering topics ranging from personnel issues to supply chain concerns to grid reliability to cybersecurity. Among other things, new model mitigation agreement requires developers to: (1) implement a Personnel Risk Assessment and vetting program; (2) establish a strict security perimeter protocol; (3) implement a cybersecurity protocol designed to block traffic associated with specific countries and entities; (4) establish a Supply Chain Risk Management program that attempts to address security risks presented by vendors; (5) provide detailed ownership disclosure information; and (6) provide broad indemnifications to the U.S. Government. The agreement would also give DoD the ability to unilaterally terminate or renegotiate an existing mitigation agreement based on vague criteria and broad authority to issue curtailment orders shutting down wind turbine operation.

DoD has not explained why these new provisions are necessary across wind projects without the same requirements being identified for other energy projects subject to Clearinghouse review. Cybersecurity, personnel and supply chain concerns are not self-evidently unique to wind facilities nor are they unique to the projects that require mitigation agreements compared to projects that may be mitigated without an agreement (e.g. by removing a turbine from the site plan

to avoid a military training route) or that do not require mitigation at all as a result of the preliminary review. DoD's addition of these new requirements solely for certain wind projects but not gas-fired generating facilities or electrical transmission projects underscores the absence of any articulated, project-specific military impact justifying a wholesale new framework.

Adopting many of these new provisions is not feasible for developers for numerous reasons. Some of them, such as the personnel reporting requirements and cybersecurity provisions, present logistical and technical problems. Ex. A, Belote et. Al Decl. ¶ 33. Others, such as the requirement that developers not install an ADLS lighting system, run counter to state laws and permit conditions for many projects. *Id.* ¶ 35. And the model agreement's broad provisions for unilateral termination, renegotiation, and curtailment of operations have the potential to render projects non-viable by creating too much uncertainty for developers to obtain necessary financing or insurance. *Id.* ¶¶ 25-31.

Developers cannot simply accept and execute the new agreement in place of the agreements they already negotiated; they must populate project-specific terms and, where they cannot accept the new provisions, reopen negotiations that were previously completed. Previous negotiations involving a single disputed term have taken approximately three and a half months, those involving negotiations of ownership and assignments terms required six and a half months, and curtailment terms required fourteen months. *Id.* ¶ 41. These negotiations occurred while DoD was actively working towards completion of the process. *Id.* The new 119-page template presents numerous additional subjects for negotiation, which threatens substantial new delays that may exceed a year or more for projects that had already reached the final steps of review, including resolution of the concerns of potentially affected military components. *Id.* ¶¶ 25-37. And even if and when

developers could accept the terms, they would still need to complete project-specific schedules and further review before DoD will consider countersignature. *Id.* ¶ 42.

That ongoing state of limbo for developers has the same functional impact as DoD's review freeze it has imposed since August 2025, which this court ordered it to stop. The imposition of a new model mitigation agreement does not demonstrate that DoD has resumed the review Congress required. Here, the proposed new provisions appear to apply across an entire categories of projects, while DoD has not identified the distinct project-specific concerns that necessitate reopening these agreements or explained why existing mitigation is insufficient. Nor has DoD shown how applying its new methodology moves these projects toward the final action they were awaiting. The new model agreement is evidence not of restored individualized review but a broadly applicable replacement process that threatens to perpetuate the categorical delay this Court enjoined.

**B. Categories 3 and 4: Preliminary Contacts and Requests for More Time Are Not Substitutes for Meaningful Mitigation Review.**

The second status report likewise fails to demonstrate that the substantive mitigation process has resumed for Categories 3 and 4. DoD identifies some outreach and invitations to negotiate. Plaintiffs acknowledge these activities; the deficiency is that the report does not show meaningful progress toward resolving identified risks and completing prescribed review steps.

For Category 3, DoD has identified no project that has completed Mitigation Response Team ("MRT") discussions. Instead, DoD reports that it has "begun" to apply its "new analytical methodology," purportedly analyzing "more than 5" of the 110 projects under that category. Dkt. 153 at 3. DoD also reports that it has "initiated or re-initiated contact" with developers for 92 projects. *Id.* But the Developer Plaintiffs and Organizational Plaintiffs' members have – at most – received repeated requests for extensions without any indication of next-steps and timelines to

complete the review process, and limited substantive engagement toward resolving identified When developers have responded and asked for a status update on MRT discussions or even for an explanation for why an additional 90 days was required, DoD has typically not responded or provided any additional substantive information. Ex. A, Belote et al. Decl. ¶ 14, 46. As of the time of the second status report, Plaintiffs are aware of only two MRT meetings that have been held, both with the Navy. Plaintiffs are not aware of any meetings with the Air Force or NORAD. Ex. D, Declaration of Tom Vison ("Vinson Decl.") ¶ 15, 99.

DoD therefore continues to violate its regulatory requirement to complete MRT discussions in 90 days absent a mutually agreed extension in writing, as required by 32 C.F.R. § 211.6(b)(1). DoD's regulation supplies a framework for real progress, not indefinite analysis or delays through requests for extensions without explanation or indication of when the process will be concluded or the relevant milestones. DoD regulations expressly limit mitigation discussions to 90 days unless the parties mutually agree in writing to an extension for a specific period. 32 C.F.R. §211.6(b)(1)-(2). So, while voluntary, written extensions may be appropriate in some instances, DoD should be required to conduct substantive discussions and seek a meaningful agreed extension based on substantive concerns only when necessary, rather than as a matter of universal policy to buy more time without any substantive progress or a plan to move forward.

For category 4, DoD reports only that it has "applied its new analytical methodology" to one project and that NORAD "contacted 22 projects in Category 4 and invited them to begin MRT negotiations." Dkt. 153 at 4. Invitations may be a useful step, but the status report does not establish that substantive MRTs have been assembled or that discussions have begun for these projects or that DoD has communicated the actual concerns to be addressed. *See id.*

### C. Category 5: DoD Continues to Fail to Comply with Deadlines Established for Preliminary Review.

DoD continues to violate statutory and regulatory deadlines for the remaining projects in Category 5. The regulations require the specified preliminary action within 30 days of the relevant triggering event, and §183a(c)(1) requires the Clearinghouse to conduct preliminary review within 75 days after a proper application from the Secretary of Transportation.

Yet, in its first report, DoD said it had issued a notice of presumed risk for 40 of 90 projects awaiting preliminary review. Its second report identifies four additional projects for which it concluded no notice of presumed risk was warranted and closed review. Dkt. 153 at 4. While DoD has closed review for 4 projects, this represents only a tiny fraction of the projects in the overall process and represents a set of projects that should already have been cleared because they present no issues requiring mitigation.

DoD reports no preliminary determination for nearly half—46 of 90—projects awaiting review. *Id.* More than sixty days have passed since the Court stayed DoD's freeze, and many of these projects were pending well before that order. DoD's continuing failure to complete these determinations is especially difficult to reconcile with the Court's express reminder that its stay requires compliance with all applicable statutory and regulatory deadlines. Dkt 152.

### D. DoD's Project Classifications Appear Inaccurate, Obscuring Whether Review Is Advancing.

Finally, DoD's reported category assignments also appear inconsistent with the records that certain developers have reported to American Clean Power ("ACP"), whose members include many of the Plaintiffs here. In Category 1, ACP is tracking at least three projects that are not in DoD's list anywhere and two projects that DoD lists as Category 2. Ex. B., Vinson Decl. ¶ 109. In Category 2, ACP is tracking at least five projects that are not on DoD's list at all, at least 15

projects that DoD identifies as Category 3, and four projects that DoD identifies as Category 4. *Id.* In Category 3, ACP is tracking at least four projects that are not on DoD's list at all, at least one project that DoD lists as Category 2, and two projects DoD has as Category 4. *Id.* With respect to Category 4, ACP is tracking at least two projects that are not on DoD's list, at least seven projects that DoD lists as Category 3, and one that DoD lists as Category 5. *Id.* Finally, with respect to Category 5, ACP is tracking at least five projects that are not on DoD's list, one project that DoD lists as Category 3, and one that DoD lists as Category 4. *Id.*

Accurate classifications matter because the Court's status-reporting requirement is intended to show whether projects are advancing. Given these discrepancies, the Court should require DoD to provide an updated project-level list, and developers should be provided an opportunity to identify and correct documented errors.

## II. DoD's Continuing Delays Are Causing Irreparable Harm and Threaten the Loss of Additional Projects.

As Plaintiffs demonstrated in seeking preliminary relief, withholding DoD review obstructs financing, increases carrying and construction costs, jeopardizes procurement and labor commitments, threatens power-purchase deadlines and eligibility for critical tax benefits, and impairs projects' ability to earn renewable energy credits. This Court already found serious, unrecoverable economic injury from the freeze because sovereign immunity forecloses recovery of the relevant monetary loses. Dkt. 125 at 30. DoD's ongoing open-ended review compounds the same injuries notwithstanding the Court's stay.

For example, developers have reported to Plaintiffs that they are already experiencing the following specific issues as a result of DoD's continued freeze:

- Significant ongoing payments for land, lease, and interconnection carrying costs;

- Payments for interconnection security that a financing partner would no longer fund without a countersigned agreement;
- delay damages under a power purchase agreement;
- lost turbine supply arrangements;
- lost power offtake opportunities
- risk to tax-credit value
- forced pauses or termination of wind development.

Ex. B, Vinson Decl. ¶¶ 119-40.

Many of these harms are permanent and cannot be recovered even when DoD's freeze is ultimately lifted. If developers lose a power purchase agreement, let an interconnection position expire, forfeit a turbine reservation, or lose financing partner, they may not be able to fix these issues in the future. *Id.* at 142. And these issues compound each other: for example, a missed construction window could affect a turbine reservation that in turn renders a developer ineligible for critical tax credits.

For some projects, these compounding issues can be fatal to the project's viability. Plaintiffs are aware of one Category 2 project that was already forced to terminate as a result of its inability to obtain a DNH, notwithstanding that it had undergone MRT discussions and reached an informal agreement with DoD. *Id.* ¶ *75.* Another project was forced to terminate its plans for wind development and instead install solar panels that are less efficient at that location, resulting in significant financial losses for the developer and more expensive energy generation. *Id.* ¶ 89. If DoD's ongoing freeze continues—particularly if the process is stalled for a year or more as a result of DoD's new model mitigation agreement—it could force many other projects to make these same decisions, resulting in hundreds of millions of dollars in sunk costs.

### III. This Court Should Impose Specific Compliance Requirements to Make Its Stay Effective.

Courts routinely update stays or injunctions to mandate more specific instructions when a defendant's conduct demonstrates that it not sufficiently complying with the Court's original order. *A&M Recs., Inc.*, 284 F.3d at 1098; *Armstrong*, 768 F.3d 975, 979. As particularly relevant here, the District of Rhode Island recently found further enforcement action necessary when FEMA had continued "implementing a categorical freeze" of certain funding in violation of the court's preliminary injunction order. *New York v. Trump*, 777 F. Supp. 3d 112, 120 (D.R.I. 2025) *aff'd* 171 F.4th 1 (1st Cir. 2026). Much like DoD here, FEMA argued that it was not continuing to freeze funding because its adoption of a "manual review process" was simply an "internal control" that was different from the funding freeze the court had enjoined. *Id.* at 116. The court disagreed, concluding that FEMA had "essentially adopted a review scheme" that "strives to effectuate" the enjoined freeze, and therefore ordered FEMA to immediately cease that new process and take additional steps to effectuate the court's prior order. *Id.* at 120.

Such action is needed here to ensure that DoD complies with both the letter and intent of this Court's stay of "DoD's review freeze." Dkt. 125 at 34. DoD has not merely delayed completion of a handful of difficult projects; it has introduced a broad new methodology *and* model mitigation agreement while leaving entire stages of the required process functionally stalled. This Court has been clear that compliance with the preliminary injunction "requires compliance with all regulatory and statutory deadlines," Dkt. 152, and observed that "there is no basis in statute or in regulation for DoD to withhold action for projects at stages (1) and (2) of the review process." Dkt. 125 at 36 n. 13. The Court has also recognized approximately $2.0 billion in already-incurred economic harm across affected projects. *Id.* at 30. In light of both the continuing violations and

DoD's inability to provide deadline-specific compliance information, meaningful enforcement measures—not merely another generalized report of internal activity—are necessary.

Plaintiffs therefore ask for the carefully bounded additional measures below. Plaintiffs do not ask DoD to make a specific finding, dictate particular project-specific mitigations, or substitute judicial judgment for DoD's on the merits of a military readiness or national security concern. Instead, Plaintiffs ask this Court to require timely performance of legally required procedural steps and project-specific explanations where DoD contends additional project-specific review is needed. Because general assurances and status reports have not restored the process, more specific deadlines and continuing judicial oversight are necessary to give the existing stay practical effect.

Plaintiffs respectfully request an order requiring DoD to take the following actions for each wind energy project for which DoD is required to exercise its authority through the legally prescribed process:

- **Category 1**: Within 30 days, either: (1) countersign and execute the developer-signed mitigation agreement and transmit its determination to the FAA; or (2) issue a detailed statement by an authorized DoD official identifying, for that project: (i) each unresolved, demonstrable adverse impact on military operations and readiness preventing execution; (ii) why the mitigation already negotiated and accepted by the developer does not adequately address these concerns; (iii) the specific additional information, review, or mitigation, if any, that remains necessary; (iv) the official or officials who will complete any additional steps; and (v) the anticipated timeline for completing them.
- **Category 2:** Within 30 days, either (1) transmit a project-specific draft mitigation agreement reflecting the results of concluded MRT discussions; or (2) provide a

detailed statement identifying (i) the specific adverse impact on military operations and readiness that prevents issuance, (ii) why previously negotiated mitigation is insufficient, (iii) what substantive review remains, (iv) why that review is necessary, (v) who will complete it, and (vi) the anticipated timeline for completing that review. A general statement that DoD is reanalyzing the project under a new methodology will not satisfy this obligation.

- **Category 3**: Within 15 days, commence substantive reengagement with the developer for each project and seek any necessary extensions to comply with the 90-day requirement in 32 C.F.R. §211.6(b)(1). Then, within 30 days from the court's order, identify a process, meaningful milestones, and timeline to complete the MRT process for each project.
- **Category 4**: Within 30 days, commence actual MRT discussion for each project ready for that step, communicating the specific concerns and proposed mitigation issues to be addressed for that project, or identifying the particular legally required antecedent step that remains and a timeline for completing. Merely inviting a developer to begin discussions will not satisfy the order.
- **Category 5**: Complete each outstanding preliminary review and take the resulting required action as expeditiously as possible, and in no event later than the latter of 15 days or the expiration of 30 days after receipt of the project from the FAA for review.

To prevent the same delays from recurring under another label, Plaintiffs also respectfully request that the Court specify that compliance with its stay requires the following:

- DoD must comply with all applicable statutory and regulatory deadlines.

- DoD must conduct individualized review addressing the risk, proposed mitigation, and next required statutory or regulatory step for each project under 10 U.S.C. § 183a and 32 C.F.R. Part 211.
- Development or refinement of new methodologies, creation of templates, or other non-project specific analysis does not constitute resumption of the project-specific review process mandated by 10 U.S.C. § 183a.
- DoD may not categorically suspend, restart, or defer completion of otherwise advanced review steps merely because it has adopted a new template agreement or analytical methodology. Any additional review or mitigation required before further action must be tied to identified concerns affecting the particular project and accompanied by an explanation of why negotiated measures are insufficient.
- DoD's requests for extensions of MRT discussions are not themselves progress toward completion, and any regulatory extensions must be mutually agreed in writing for a specific period. *See* 32 C.F.R. §211.6(b)(1).
- DoD must maintain accurate project-category records and provide an opportunity for developers to provide feedback regarding any errors in those records.
- DoD must include in each court-ordered status report, for each of the five project categories, the number of projects that have advanced to the next stage since the preceding report, the number remaining at that stage, and an explanation of any continuing delays in completing actions required by applicable statutes or regulations.

Dated: October 20, 2026

Respectfully submitted,

*s/ Michael Giaquinto*
Michael Giaquinto, OSB No. 246342
MORGAN, LEWIS & BOCKIUS LLP
300 South Grand Ave., 22nd Floor
Los Angeles, CA 90071-3132
T: 213-612-7227
michael.giaquinto@morganlewis.com

Jennifer Trock (*pro hac vice*)
Douglas Hastings (*pro hac vice*)
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000
jennifer.trock@morganlewis.com
douglas.hastings@morganlewis.com

Ella Foley Gannon (*pro hac vice*)
600 Montgomery Street
Suite 2300
San Francisco, CA 94111-2725
T: 415-442-1000
ella.gannon@morganlewis.com

*Attorneys for Plaintiffs (except Las Crestas Wind Energy, LLC)*

Darin Sands, OSB No. 106624
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
T: +1 503-734-2480
dsands@bradleybernstein.com

Richard W. Smith (*pro hac vice*)
Kathleen Mueller (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
T: 202-736-8000
rwsmith@sidley.com
kmueller@sidley.com

*Attorneys for Plaintiff Las Crestas Wind Energy, LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on October 20, 2026, a copy of the foregoing was uploaded to the Court's CM/ECF system, which will effectuate service on all registered counsel in this case.

*s/ Michael Giaquinto*

Michael Giaquinto