# Exhibit A

## *To Plaintiffs' Motion to Enforce Stay*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| RENEWABLE NORTHWEST, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>PETER B. HEGSETH, *et al.*,<br><br>*Defendants*. | Case No.: 3:26-cv-01092-IM<br><br>**JOINT DECLARATION OF HOWARD D. BELOTE, BENJAMIN DOYLE, GEOFFREY N. BLACKMAN, AND EDWARD CHUPEIN IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE STAY** |

Pursuant to 28 U.S.C. § 1746(2), we, Howard D. Belote, Benjamin Doyle, Geoffrey N. Blackman, and Edward Chupein, declare as follows:

**INTRODUCTION**

1. We submit this joint declaration in support of Plaintiffs' Motion to Enforce Stay following the Court's August 6, 2026, preliminary injunction (ECF No. 125). We address the new model mitigation agreement (the "Model Agreement") that the Department of Defense ("DoD") describes in its status reports filed September 10, 2026 (ECF No. 144) and October 5, 2026 (ECF No. 153), and that the Military Aviation and Installation Assurance Siting Clearinghouse ("Clearinghouse") has begun sending to developers.

2. Each of us has reviewed both status reports and a copy of the Model Agreement, which was provided to developers by DoD. A true and correct copy of the Model Agreement, as provided to us, is attached as Exhibit A. Citations to the "Model Agreement" in this declaration refer to the section and exhibit numbers of Exhibit A. Each of us has also reviewed the Declaration

of Hon. Dale R. Marks, ECF No. 90-1 ("Marks Decl."), and the Court's preliminary injunction order, ECF No. 125.

3. The facts stated in this declaration are based on our personal knowledge, our professional experience, and our review of the documents identified in paragraph 2. If called to testify, each of us could and would testify competently thereto. Statements made in the first-person plural reflect the shared professional experience and opinions of all four of us. Facts specific to a particular declarant's firm, clients, or projects, including client communications and project counts, are attributed in this declaration to that declarant or firm and are based on that declarant's personal knowledge. Statements attributed to one of us by name likewise reflect that individual's personal knowledge and experience.

## BACKGROUND OF THE DECLARANTS

### A. HOWARD D. BELOTE

4. I, Howard D. Belote, am the Managing Partner and CEO of DARE Strategies LLC ("DARE Strategies"). My background and qualifications are described in my declarations submitted in connection with Plaintiffs' Motion for Preliminary Injunction, ECF No. 36-13 ¶¶ 1–14; ECF No. 98-2 ¶¶ 6–8, which are incorporated by reference. In brief, after a 24-year career in the United States Air Force, I served as the founding Executive Director of the Clearinghouse from July 2010 to June 2012 and personally drafted the regulations that established its process. In the years since, I have worked continuously within that process on behalf of developers, including on more than 60 mitigation agreements and siting memoranda.

### B. BENJAMIN DOYLE

5. I, Benjamin Doyle, am the President and Chief Executive Officer of Capitol Airspace Group ("CAG"), an aviation consulting firm. My background and qualifications are described in my declaration submitted in support of Plaintiffs' Motion for Preliminary Injunction, ECF No. 36-15 ¶¶ 1–6, which is incorporated by reference. In brief, I began my career as an Air Traffic Control Tower Chief in the United States Army and have spent more than 25 years assisting

clients with FAA aeronautical studies of tall structures, including wind turbines, and the related Clearinghouse review. CAG is the largest filer of FAA Form 7460-1 notices in the country, with more than 130,000 filings, and has completed 82 mitigation agreements through the Clearinghouse process. *Id.* ¶¶ 3–4, 12.

**C. GEOFFREY N. BLACKMAN**

6. I, Geoffrey N. Blackman, am the founder, owner, and principal consultant of Westslope Consulting, LLC ("Westslope Consulting"). My background and qualifications are described in my declaration submitted in support of Plaintiffs' Motion for Preliminary Injunction, ECF No. 36-12 ¶¶ 1–18, which is incorporated by reference. In brief, I am a radar engineer with 31 years of experience working with radar and associated tracking and display systems, including 13 years providing systems engineering support to the FAA. I defined, flight tested, and implemented the first wind-turbine-interference-specific mitigation software changes in the FAA's ASR-11 radar, served as a technical advisor for the 2008 JASON report on wind farms and radar, and for the past 18 years have conducted mitigation studies and negotiated mitigation agreements with federal agencies on behalf of developers. *Id.* ¶¶ 4–9.

**D. EDWARD CHUPEIN**

7. I, Edward Chupein, am the sole proprietor of AVRO Polaris Consulting, LLC and a Senior Advisor to DARE Strategies. My background and qualifications are described in my declaration submitted in support of Plaintiffs' Motion for Preliminary Injunction, ECF No. 36-14, which is incorporated by reference. In brief, I served more than 27 years in the United States Air Force, retiring as a colonel, and later served as Deputy Chief, Operational Training Infrastructure, and before that as Chief, Airspace and Ranges Division, at Headquarters, United States Air Force. In 2008, I led the Air Force's response to the Shepherds Flat Wind Farm in Oregon, the project that prompted DoD to begin engaging with developers early to ensure compatibility with military operations. That work helped shape the DoD policy framework that led Congress to establish the Clearinghouse in 2011. From 2011 to 2020, I was the senior Air Staff representative in several of

the Clearinghouse's most significant Mitigation Response Team ("MRT") negotiations and oversaw many others. Since retiring from federal service in 2020, I have analyzed approximately 552 proposed wind energy projects for potential impacts to military training, testing, and operations and developed strategies to mitigate them.

8. Our individual experience includes the mitigation agreements and wind-project reviews described above. We do not offer a combined total because the projects and agreements on which we have worked may overlap.

**SUMMARY OF OPINIONS**

9. Based on our experience with the Clearinghouse process and our review of the Model Agreement, we have reached the following conclusions:

10. Contrary to DoD's stated rationale for suspending project reviews and developing a new mitigation framework, the Model Agreement does not materially address the radar-interference, particularly Radar Adverse-impact Management ("RAM") and drone-detection concerns DoD has asserted create unacceptable vulnerabilities in detecting drones and other low-observable threats. Instead, the Model Agreement largely retains the radar-related mitigation measures used in prior agreements, including curtailment, lighting restrictions, and financial contributions. It does not identify any new measure to address the asserted limitations of RAM or improve drone detection. Its principal changes impose extensive new requirements concerning foreign ownership, cybersecurity, confidentiality, and continuing oversight of project operations—none of which directly addresses either military readiness and operations (as required by Section 183a) or the radar vulnerabilities DoD invoked to justify halting the Clearinghouse process.

11. The Model Agreement fundamentally departs from the agreements historically used to resolve military concerns and allow wind projects to proceed. Prior mitigation agreements typically consisted of approximately 15 to 20 pages and established project-specific measures addressing identified impacts on military operations and readiness, consistent with DoD's statutory mandate. The Model Agreement exceeds 110 pages and imposes extensive new contractual

obligations unrelated to actual mitigation measures while at the same time substantially expanding DoD's authority to unilaterally terminate agreements, reopen negotiations, and request suspension or curtailment of operations. Its curtailment provisions, which were previously intended to require developers to curtail operations to accommodate specific operations of limited duration (e.g. use of particular airspace or address a particular weather pattern), do not contain express limits on frequency or duration, and its termination provisions extend to circumstances unrelated to the military impacts previously addressed through the Clearinghouse process.

12. The Model Agreement also removes important protections contained in prior agreements and creates new obstacles to project completion and operation. It omits DoD's prior commitment not to object to certain FAA extensions and refilings within agreed project parameters, potentially requiring renewed DoD review even when a project remains within previously approved scope. It also introduces extensive ownership, cybersecurity, personnel-security, reporting, and confidentiality requirements, along with a blanket prohibition on aircraft detection lighting systems ("ALDS") that could conflict with existing state or local permitting requirements. These new provisions create additional grounds for review, disagreement, and possible termination even when a developer continues to satisfy the mitigation measures negotiated to protect military operations.

13. Applying the Model Agreement to projects that have already completed substantive DoD review would replace the final steps of a substantially completed process with extensive new requirements unrelated to the actual mitigation measures previously identified and negotiated that could add months of delay, and potentially more than a year if disputed provisions must be negotiated. Category 1 developers have already negotiated and executed mitigation agreements and are awaiting only DoD's countersignature. Category 2 developers have completed their MRT reviews and are awaiting draft agreements. Requiring these developers to use the Model Agreement would necessitate extensive new documentation, verification, coordination, and review, while potentially reopening matters already resolved. Based on our experience, populating the template alone would ordinarily take several weeks, and completing the necessary reviews and

obtaining DoD's execution could take months even if developers accepted every term. Negotiating disputed provisions could take substantially longer. Even relatively narrow disputes have required three months or more to resolve, while negotiations involving multiple provisions have extended beyond a year. Thus, projects that had already completed most or all of the substantive Clearinghouse process would face substantial additional delays instead of receiving the agreements needed to move forward.

14. The delays extend well beyond projects awaiting mitigation agreements. Our clients' experiences demonstrate that projects in Categories 3 and 4 continue to face incomplete MRT reviews, repeated requests for extensions without any indication of next-steps and timelines to complete the review process, and limited substantive engagement toward resolving identified military concerns. Other projects remain awaiting preliminary review, including filings pending for more than a year despite the ordinary 30-day review period (and DoD's statutory and regulatory deadlines). The Model Agreement does nothing to resolve these delays.

15. Distributing a new agreement template does not itself advance projects through the Clearinghouse process. Meaningful progress requires DoD to complete the project-specific reviews, mitigation discussions, draft agreements, and countersignatures necessary at each stage. Without those concrete actions, projects will remain stalled despite having already spent months or years in the Clearinghouse process.

## I. THE MODEL AGREEMENT DOES NOT ADDRESS THE RADAR AND DRONE CONCERNS DoD HAS RELIED ON

16. Throughout this litigation, DoD has purported to justify its review freeze by asserting that wind turbines interfere with military radar and may impair the detection of drones and other low-observable threats. Mr. Marks identified "radar interference and self-imposed, partial blindness as a mitigation measure" as "the driving national security concern." Marks Decl. ¶ 98. That concern centers on RAM a technique DoD developed to reduce interference from wind turbines by adjusting how radar processes returns from affected areas. Although intended to

preserve radar surveillance capabilities in the presence of wind turbines, those adjustments can also reduce the radar's ability to detect other objects in the affected areas. Mr. Marks asserted that RAM measures used in prior mitigation agreements "partially blind these radars," potentially allowing low-radar-cross-section drones or missiles to pass through affected sectors without detection. *Id.* ¶ 58; *see id.* ¶ 33. Much of his declaration addresses drone threats, including incursions over military installations, Operation Spiderweb, and the conflicts in Ukraine and the Middle East. *Id.* ¶¶ 43–48, 53–60, 72–79. DoD's first status report expressly linked its new analytical methodology to these concerns, describing it as a methodology for "reviewing wind project risks, including those described in the Marks Declaration." ECF No. 144 at 2.

17. Yet the Model Agreement does not meaningfully address the radar and drone-detection problems described in Mr. Mark's declaration. It does not mention drones, unmanned aircraft, counter-drone capabilities, or Doppler effects. Its operative mitigation measures, set out in Exhibit 4, consist of a voluntary financial contribution (without additional explanation as to what is the contribution will be used to curtail), curtailment under Exhibit 5, night-vision-compatible lighting, and a prohibition on ADLS. Model Agreement Ex. 4 ¶¶ E4.1.1–E4.1.3. These are the same general categories of measures DoD employed in mitigation agreements before August 2025. Rather, the Model Agreement imposes an entirely new contractual framework without identifying any material new technical measure that would resolve the concerns DoD offered to justify halting the Clearinghouse process.

18. DoD developed RAM beginning with the Shepherds Flat project in Oregon in 2008 to preserve the radar surveillance capabilities of the North American Aerospace Defense Command ("NORAD") while allowing wind projects to proceed. ECF No. 98-2 ¶¶ 12–14. RAM was thus part of the mitigation framework DoD itself developed, approved, and relied upon for years. DoD has given no explanation of why or whether that framework now creates unacceptable detection risks. If it did, the appropriate technical response would be to evaluate and, where necessary, modify the mitigation measures addressing radar interference. The Model Agreement

does not do that. Instead, it leaves the underlying technical measures substantially unchanged while introducing extensive new obligations that do not remedy the asserted radar vulnerability.

19. Mr. Blackman states that, based on his experience as a radar engineer, the detection concerns Mr. Marks described are the type of issue that can be addressed through technical measures. Depending on the radar and project, those measures could include adjustments to RAM settings and the radar sectors affected, overlapping or infill radar coverage, radar hardware or software upgrades, or changes to turbine heights or locations. These are among the types of measures Mr. Blackman has studied, negotiated, and implemented in addressing wind-turbine interference. ECF No. 36-12 ¶ 22. Not every such measure would necessarily appear in a mitigation agreement itself; some could be implemented by DoD separately. But neither the Model Agreement nor the measures it identifies explains whether or how DoD will address the drone-detection vulnerability Mr. Marks described, if such vulnerability exists. The Model Agreement's curtailment provisions can eliminate turbine-generated interference by requiring turbines to cease operating, but curtailment was already part of prior agreements and does not provide a new technical means of detecting drones while turbines remain operational. In Mr. Blackman's professional opinion, the Model Agreement therefore does not materially address the radar-detection deficiencies DoD has invoked to justify the freeze, nor does it explain why developers that had already completed technical review must revisit their negotiated agreements to address those concerns. Although the ability of any particular radar to detect small drones depends on its design, the target characteristics, and operating conditions, the Model Agreement does not identify any new measure, beyond addressing turbine-related interference, that would improve a radar's baseline ability to detect such targets.

20. Section 4 imposes extensive ownership disclosures, advance-notice requirements, and, in certain circumstances, filing obligations with the Committee on Foreign Investment in the United States ("CFIUS"), while allowing DoD to terminate the agreement based on specified CFIUS outcomes. Model Agreement §§ 4.2–4.9. It invokes a February 2025 national security presidential memorandum concerning foreign investment and Executive Order 14420 addressing

the bulk-power system. *Id.* § 4.1. Prior Clearinghouse mitigation agreements contained only a limited "Review of Business Entities" provision. The Model Agreement replaces that approach with detailed reporting requirements and additional grounds for termination. *Id.* §§ 2.2.2.3, 4.5.2.2. DoD already participates in the established CFIUS process for reviewing covered foreign investments presenting national security concerns. The Model Agreement adds a separate layer of contractual restrictions and potential termination rights without identifying how those requirements would mitigate the radar-interference or drone-detection risks asserted in this litigation.

21. Section 6 requires developers to comply with three North American Electric Reliability Corporation ("NERC") Critical Infrastructure Protection standards applicable to higher-impact grid assets, even though the Model Agreement identifies the project as a "Low Impact" asset. Model Agreement § 6.1. Exhibit 7, which reproduces those standards, accounts for approximately half of the Model Agreement's pages. Although Section 6 is labeled "Voluntary," its operative provisions require the owner to adopt specified measures. *Id.* Some requirements apply when a project is within "geographically sensitive proximity" to DoD installations, restricted airspace, or radar infrastructure, but the Model Agreement does not define that term. *Id.* § 6.1.2. These requirements impose substantial new compliance obligations without explaining how they would correct the radar-detection vulnerabilities DoD has identified.

22. Exhibit 9 imposes an entirely new non-disclosure agreement restricting access to curtailment information, including by limiting disclosure to U.S. citizens and restricting communications with foreign parent companies and foreign-owned contractors absent government approval. Model Agreement Ex. 9 ¶¶ E9.1.13, E9.4.1, E9.4.3. It also prohibits the owner and its representatives from requesting classified information relating to the project, without an express exception for appropriately cleared personnel. *Id.* ¶ E9.2.1. Prior agreements contained only limited confidentiality provisions concerning curtailment. These restrictions could complicate communications with project personnel and contractors, without providing any new means of mitigating radar interference or improving drone detection.

23. These provisions represent a fundamental departure from the historical purpose and operation of Clearinghouse mitigation agreements. In our collective experience, those agreements were negotiated to resolve identified, project-specific impacts on military operations, including radar interference and obstructions to military training activities. The Model Agreement instead imposes extensive new requirements governing ownership, cybersecurity, confidentiality, financial liability, and continuing project operations. None of us has previously encountered a Clearinghouse mitigation agreement imposing obligations of comparable breadth, complexity, and commercial consequence. More importantly, DoD has not explained how these new obligations address the particular radar and drone-detection concerns it identified as the basis for suspending project reviews.

24. The Model Agreement's length illustrates the magnitude of this departure. Before August 2025, the mitigation agreements on which we worked typically ran approximately 15 to 20 pages. The Model Agreement, including its exhibits, exceeds 110 pages. Despite that dramatic expansion, it does not identify a material new technical measure addressing the radar-interference and drone-detection concerns on which DoD has relied. The additional requirements substantially increase developers' obligations without resolving the asserted deficiencies in the prior mitigation framework.

## III. MATERIAL DEPARTURES FROM PRIOR CLEARINGHOUSE AGREEMENTS

### A. DoD's Broad Termination Authority

25. The Model Agreement allows DoD to terminate the agreement at its discretion in a range of circumstances. These include alleged noncompliance with the ownership, cybersecurity, or confidentiality provisions; a CFIUS outcome DoD considers unsatisfactory; and any change in federal, state, or local law, or in any NERC standard, that adversely affects "National Defense Imperatives and Priorities" where the parties do not agree on an amendment within 60 days. Model Agreement §§ 2.2.2, 4.5.2.2.3, 13.1.3; *id.* Ex. 9 ¶ E9.7.3. In some cases, termination may be "immediate." *Id.* Ex. 9 ¶ E9.7.3. DoD may also terminate if the project stops producing energy for

90 consecutive days without prior notice to DoD. *Id.* § 2.2.2.2. The same provision allows DoD to terminate upon the occurrence of a force majeure event, which the Model Agreement defines to include floods, fires, "unusually severe weather," epidemics, and even "acts of the Government." *Id.*; *id.* Ex. 8 ¶ E8.29. A hurricane that damaged the project could thus end the agreement at DoD's option. By contrast, termination under the standard mitigation agreement used before August 2025 required the more customary and commercially reasonable "mutual consent of the parties" language. The Model Agreement retains mutual termination (*id.* § 2.2.3) but adds several new grounds for unilateral termination by DoD – including minor administrative triggers that have no material effect or substantive impact on mitigation measures. Apart from mutual consent, prior agreements terminated only on defined, objective events: retirement of the affected military radar, or the project ceasing operations or being decommissioned. Termination would also end DoD's commitment not to object to the project before other federal, state, and local regulators. *Id.* § 8.2. In our experience, these additional termination provisions differ substantially from the more limited termination events in prior Clearinghouse agreements and expose developers to new risks outside of their control.

26. Mr. Belote states that, during his service as the Clearinghouse's founding Executive Director and in accordance with both the language and intent of Section 183a, agreements were intended to document agreed mitigation measures and provide a stable basis for continued coordination between DoD and developers. The new form introduces additional circumstances in which DoD may seek changes or end the arrangement that are well outside of the intended scope.

**B. DoD's Broad Renegotiation Authority and Right to Request Suspension**

27. The Model Agreement allows DoD to declare a "Material Change in Circumstances," "as determined in the sole discretion of the Department," and to require the developer to renegotiate the mitigation measures "and any other relevant terms" for at least 90 days. Model Agreement § 3.1. Under prior agreements, any modification required the agreement of both parties. During that period, DoD reserves the right to request that the project suspend

operations, with no limit on duration. *Id.* § 3.3. Any conditions CFIUS imposes automatically amend the agreement. *Id.* § 4.5.3. DoD must give written notice describing the event and proposing adjustments, but only "[t]o the maximum extent possible and within given national security as well as classification constraints." *Id.* § 3.2. And the Model Agreement does not say what happens if, after 90 days, the developer does not agree to DoD's proposed changes, including whether any suspension of operations would continue.

### C. Loss of DoD's Commitment Not to Object to FAA Extensions and Refilings

28. Wind projects routinely need to extend their FAA determinations or refile with the FAA, for example when turbine models or locations change during development. ECF No. 36-13 ¶ 22. Existing mitigation agreements prohibit DoD from objecting to a developer's request to extend its FAA Determination of No Hazard as long as the project area and turbines remain within the parameters of the agreement. That commitment allowed a project to get through construction delays and design changes without reopening the agreement, and it is the principal regulatory benefit a developer receives in exchange for agreeing to mitigation.

29. Section 8 of the Model Agreement does not carry forward that commitment. Model Agreement §§ 8.1–8.3. Instead, the Model Agreement automatically terminates if construction does not commence within the period prescribed by FAA regulations. *Id.* § 2.2.1.1. Any change requiring a new FAA filing also requires a formal amendment of the mitigation agreement, potentially reopening a lengthy DoD review process even when the project remains within previously agreed parameters. *Id.* § 9.1. The Model Agreement further weakens DoD's remaining commitment not to object before other regulators by conditioning it on the owner's continuing "material compliance" with an extensive array of new obligations and disclosure requirements, while expressly preserving DoD's ability to object to transactions before CFIUS. *Id.* §§ 8.2, 4.5.3, 5.4. Together with the new termination and renegotiation provisions, these changes make the duration and scope of DoD's non-objection commitment less predictable than under prior agreements.

**D. Curtailment Authority Broad Enough to Halt a Project Indefinitely**

30. The Model Agreement requires the project owner to "immediately curtail wind turbine operations" whenever the Military Department or NORAD requests it for "National Defense Imperatives and Priorities." Model Agreement Ex. 5 ¶ E5.3. That term is defined to include the protection of virtually all military operations, installations, and readiness activities. *Id.* Ex. 8 ¶ E8.43. Advance notice "may not always be possible." *Id.* Ex. 5 ¶ E5.5. The Model Agreement places no limit on how often or how long DoD may curtail the project. It provides no compensation, places all resulting wear and tear on the owner, and bars the owner from challenging "the Curtailment itself." *Id.* ¶¶ E5.2–E5.3. Although the Model Agreement's definitions still refer to a "curtailment soft cap" and "Banked Hours," no operative provision sets a cap. *Id.* Ex. 8 ¶¶ E8.2, E8.7.

31. The curtailment provisions in agreements before August 2025 were far narrower. Prior agreements generally limited curtailment to defined national security emergencies or severe weather and expressly excluded routine changes in military missions. In our experience, DoD rarely, if ever, invoked those provisions. The Model Agreement fundamentally changes that arrangement. It replaces narrowly defined emergency authority with an extraordinarily broad definition of "National Defense Imperatives and Priorities" encompassing virtually any military operation, installation, readiness activity, or perceived threat. Model Agreement Ex. 8 ¶ E8.43. DoD could invoke this authority to require immediate curtailment of a project for an indefinite period, without compensation, meaningful limits on frequency or duration, or any right to challenge the curtailment itself. The same broadly defined priorities can also serve as grounds for reopening negotiations over the entire agreement. *Id.* § 3.1. A project that has fully complied with its mitigation obligations could therefore be required under the Model Agreement to cease generating electricity for an indefinite period at DoD's request, even though the parties had already negotiated measures to address the project's military impacts. This authority makes the timing and duration of project operations less predictable than under prior agreements. The Model Agreement

compounds these problems by restricting disclosure of curtailment requests and imposing a new non-disclosure agreement that limits access to curtailment information, including by foreign-owned entities. *Id.* Ex. 5 ¶ E5.4; *id.* Ex. 9 ¶ E9.4.1. These restrictions could complicate the operational communications necessary to implement and coordinate curtailment.

**E. New Indemnification Language**

32. Sections 12.1–12.2 of the Model Agreement contain a release and indemnification provision broadly covering claims and losses associated with specified military activities near the project. We have not encountered comparable language in the Clearinghouse mitigation agreements on which we worked.

**F. Reporting and Compliance Obligations**

33. The Model Agreement also imposes an extensive and unprecedented set of ongoing reporting, monitoring, personnel-security, and compliance obligations, with potential termination of the mitigation agreement for even technical noncompliance (e.g. a late notice). Among other things, the owner must notify DoD at least 30 days before any transfer giving a new party a 5 percent or greater interest, and at least 180 days before any change affecting foreign ownership or control (Model Agreement § 4.3.3); report confirmed cyber incidents to DoD and NERC within four hours (*id.* § 6.1.2.4); report insider threats, suspected sabotage, and unauthorized access attempts (*id.* § 6.2); conduct personnel risk assessments and continuously escort any unvetted foreign-national technician (*id.* §§ 6.1.1.1, 6.1.1.4); certify its operations-center contact annually (*id.* § 11.3); and report incidents involving protected information within 24 hours (*id.* Ex. 9 ¶ E9.6.1). These requirements would force developers to establish and maintain substantial new compliance systems, incur continuing personnel and administrative costs, and monitor a wide range of activities that have no demonstrated connection to the radar interference or drone-detection concerns underlying DoD's review process. More importantly, they create numerous additional grounds for disputes over compliance that could jeopardize the entire mitigation agreement, even where a project continues to satisfy every measure negotiated to protect military

operations. Rather than resolving identified military conflicts and allowing projects to proceed, the Model Agreement subjects developers to continuing oversight and the risk of losing their agreements for matters unrelated to the impacts the Clearinghouse process was established to address.

**G. Voluntary Contribution Due Before the Project Is Built**

34. Under prior mitigation agreements we worked on, developer contributions for radar mitigation became due when a project commenced operations. Mr. Belote reports that the first mitigation agreement negotiated during his tenure as Executive Director recognized that many projects are never constructed and, therefore, never result in the anticipated mission impacts. Departing from more than a decade of established practice, the Model Agreement instead requires payment upon execution of the agreement, even if the project is never built. This change introduces a significant new financial obligation and will require developers and DoD to negotiate both the timing and justification for mitigation payments.

**H. Prohibition on Aircraft Detection Lighting Systems**

35. The Model Agreement prohibits developers from installing ADLS. Model Agreement Ex. 4 ¶ E4.1.3.2. These systems are required by some state laws and local permit conditions, generally where their use has been approved by the FAA. DoD has previously sought restrictions on ADLS for particular projects, including those near intercontinental ballistic missile facilities, where DoD identified a military concern (e.g. a project-specific mitigation measure). The Model Agreement imposes the prohibition on every project, without regard to its location, military impacts, or applicable permitting requirements. Where a state law or local permit requires ADLS, this blanket restriction could create a conflict between the DoD mitigation agreement and the project's permitting requirements that would need to be resolved before the project could proceed. Nothing in the Model Agreement explains why such a sweeping prohibition is necessary for projects that present no identified ADLS-related military concern. DoD's transmittal email states that the Model Agreement "should be tailored to specific circumstances of the matter," but

neither that email nor DoD's status reports identifies which provisions will be modified, for which projects, or under what standards. Developers are therefore being asked to evaluate and potentially accept requirements that may be incompatible with their existing permits, without knowing whether DoD will ultimately insist on those requirements or how long obtaining an exception would take. This leaves developers without a clear process for resolving potential conflicts with existing permits and completing agreements for projects that have already spent months or years addressing military impacts.

**I. Ownership-Transfer and Assignment Provisions**

36. The Model Agreement adds detailed notice and approval procedures for changes in ownership and assignment. Section 4.3.3 addresses transfers of interests of 5 percent or more, and Section 5 addresses assignments, including mortgages. Such procedures were not part of the standard agreements with which we have worked and may require additional coordination with DoD when project ownership changes.

**J. Additional Agreement Provisions**

37. Section 13.5 addresses conflicts between the agreement and its exhibits, and other provisions prescribe procedures for ongoing administration. These differ from the form and procedures of agreements we previously negotiated. We do not offer a legal interpretation of how a court would apply them.

## II. THE MODEL AGREEMENT WILL FURTHER DELAY PROJECTS THAT HAD ALREADY COMPLETED DoD REVIEW

38. DoD is sending the Model Agreement first to the projects that were closest to completing the Clearinghouse process. DoD's October 5 status report states that it is providing the Model Agreement to the approximately 30 projects whose developers had executed mitigation agreements awaiting only DoD's countersignature, and that it expects to provide it to the approximately 30 projects that had completed the MRT process but had not received a draft agreement. ECF No. 153 at 2–3.

39. Many of those developers have already waited up to a year or more for DoD to countersign an agreement or to issue a draft reflecting mitigation measures they had already agreed on with the MRT. DoD reports that it has applied its new analytical methodology to all but one Category 1 project and believes most of those projects present mitigable threats requiring only limited additional mitigation measures. *Id.* at 2. Yet DoD reports no countersigned Category 1 agreement, no project-specific reason why any previously negotiated agreement cannot be completed, and no timetable for completing those agreements. Instead of receiving those agreements, developers now face a new agreement that departs substantially from what they negotiated, and that DoD intends to follow with "individualized mitigation agreements crafted for each project," without saying when. *Id.* For projects awaiting a draft agreement, that process will not begin until DoD "completes the drafting and dissemination of individualized mitigation agreements for the Category 1 projects." *Id.* at 2–3.

40. Because of the extensive and material departures from the prior model mitigation agreement described above, we anticipate that developers would need to negotiate changes to move forward with such a mitigation agreement. That process would result in further lengthy delays.

41. In our experience, negotiating changes to a mitigation agreement with DoD is a lengthy and burdensome process, even when only a single term is disputed. Any change must be reviewed by the affected Military Department, its counsel, the Clearinghouse, and DoD's Office of General Counsel, and then approved by the officials authorized to execute the agreement. Even relatively narrow disputes over individual provisions have required three months or more to resolve, while negotiations involving multiple provisions have extended well beyond a year. Critically, these delays occurred when the Clearinghouse and military representatives were actively working with developers to resolve outstanding issues and finalize agreements. They therefore reflect a functioning review process under substantially more favorable circumstances than those that have prevailed since August 2025, when DoD effectively halted the advancement of projects. The following examples illustrate these timelines:

a. In Mr. Belote's experience, even amendments that only updated turbine locations within previously agreed parameters averaged three to four months when they required senior-executive signature. ECF No. 36-13 ¶ 22(d).

b. In one CAG negotiation from 2021 to 2023, the developer sought changes to the curtailment provisions. These covered how curtailment was defined, the distinction between severe-weather and training curtailment, and how curtailment hours accrued and were banked. Resolving those issues took 14 months, in part because the changes required the consent of the project's investors.

c. In a 2020–2021 CAG negotiation, the developer's counsel and CAG sought changes to the advance-notice requirements, business-entity review, assignment and CFIUS provisions, treatment of existing mortgages, and other terms. Resolving those issues and receiving a revised draft took six and a half months.

d. In late 2020, during a CAG negotiation, a developer sought to replace a requirement that turbines be "locked" during curtailment with a requirement that the blades be "feathered," and to address how wear and tear would be allocated. That single issue took three and a half months to resolve and produce a revised draft.

e. One DARE Strategies negotiation to minimize training impacts in military airspace near White Sands Missile Range, New Mexico, took 28 months to resolve—from an initial meeting at the affected Air Force base in December 2017 to final execution of the mitigation agreement in April 2020.

f. A mitigation agreement signed by a DARE Strategies client involved a unique over-the-horizon radar with a detection range of more than 1,000 miles and took seven years and five months to conclude. From receipt of the first draft of the agreement in March 2015 to its execution in August 2022, the client steadfastly supported the Clearinghouse process while the Massachusetts Institute of Technology's Lincoln Laboratory developed a sophisticated model of electromagnetic interference. Although this case is

an outlier, it demonstrates the value of good-faith negotiations in which DoD clearly identifies mission impacts and potential mitigation measures.

42. Given the numerous potential issues that would be negotiated as part of the model mitigation agreement, the timeline to negotiate them all would likely be significantly longer than some of the negotiations on the single issues described above—likely well over a year. The total time to execution would be even longer because even after the terms of an agreement were negotiated, the template still would need to be populated with new project-specific information by the developer, and internal and any necessary third-party reviews and approvals would then add further time before the agreement is ready for DoD's execution. Those steps would then need to be followed by DoD's own review and countersignature, which historically took approximately two months. *See infra* ¶ 28.

**IV. STATUS OF OUR CLIENTS' PROJECTS**

43. Our firms advise developers with projects in Categories 1 and 2. These projects had completed substantial portions of Clearinghouse review before DoD halted their advancement. Category 1 projects awaited DoD execution of negotiated agreements; Category 2 projects awaited draft agreements following MRT discussions. Based on CAG's review of its client matters, CAG has 16 Category 1 projects, 12 of which have received the new template, and 38 Category 2 projects, three of which have received the template.

44. Rather than completing those outstanding steps, DoD's Model Agreement threatens to undo much of the work already performed. Based on our review and experience, applying the Model Agreement to Category 1 and 2 projects would require developers to revisit previously negotiated terms, assemble and verify extensive new project-specific information, obtain additional internal and any necessary third-party approvals, and submit materials for further DoD review. Developers that cannot accept the Model Agreement's substantially different provisions would face potentially prolonged renegotiations. Even developers willing to accept every term would need to complete additional work, which will vary by project, before an agreement could

be ready for DoD's execution, followed by DoD's own review and countersignature. In practical terms, DoD would be replacing the final steps of a substantially completed process with a new and substantially more burdensome process of uncertain duration. For projects that have already waited more than a year for DoD to act, this would compound the existing delays rather than provide a meaningful path to completion.

45. Our firms also advise developers with projects in Categories 3 and 4. Based on CAG's review of its client matters, CAG has 15 Category 3 projects, 13 of which have had at least one MRT meeting but have not completed MRT review, and 51 Category 4 projects. Some other projects await initiation or resumption of that process. These counts reflect CAG's client matters, not the total DoD backlog.

46. DoD's communications with our clients in MRT review since the preliminary injunction have largely consisted of requests for additional time rather than substantive efforts to resolve outstanding issues. During September and October 2026, several CAG clients received emails from the Air Force seeking extensions of MRT discussions. For example, on September 22, 2026, the Air Force's Deputy Director for Encroachment Risk Management requested that a CAG client agree to extend MRT discussions by 90 days, until December 21, 2026. The email represented that, once the extension was agreed upon, the Air Force project manager could provide milestones for mitigation. The developer agreed. Yet the Air Force has provided no milestones, scheduled no meeting, and undertaken no further substantive communication with the developer beyond confirming the extension. The regulatory 90-day mitigation discussion period under 32 C.F.R. § 211.6(b)(1) (2025) began for this project when DoD issued its notice of presumed risk on August 19, 2024—more than two years ago. In our experience, requesting another extension without identifying concrete next steps or engaging in mitigation discussions does nothing to resolve the project's outstanding issues. It simply prolongs an already extraordinary delay.

47. Our firms also represent clients whose projects remain stalled at the earliest stage of the Clearinghouse process, awaiting preliminary review well beyond the 30-day regulatory period. CAG has 39 such filings. The other declarants also advise clients with filings awaiting

preliminary review. Some have been pending for more than a year. Among CAG's pending filings, one was submitted in July 2025 and two in September 2025; none has received a preliminary determination. Based on CAG's analysis, the July 2025 project should be found to have no impact on military operations. These projects have not reached the stage of negotiating mitigation measures or resolving disputed military concerns. They remain stalled because DoD has not completed the threshold review necessary to determine whether any such concerns exist.

48. For each of these pending filings, the next step in the Clearinghouse process is straightforward: the Clearinghouse must complete its preliminary review and either determine that the project presents no adverse impact on military operations or issue a notice of presumed risk referring the project for MRT review. Based on our analysis, some pending projects should receive no-impact determinations, while others require notices of presumed risk and the commencement of substantive MRT discussions. DoD's failure to make either determination leaves both groups unable to advance. Taken together, our clients' experiences across all five categories demonstrate a continuing failure to move projects through the Clearinghouse process: agreements awaiting signature remain unsigned; completed MRT reviews have not produced draft agreements; projects requiring mitigation discussions receive extensions instead of substantive engagement; projects awaiting preliminary review remain without determinations. The Model Agreement does not resolve these failures. For projects closest to completion, it threatens to impose substantial new requirements and reopen work that had already been completed. In our opinion, unless DoD resumes the concrete review, negotiation, and execution steps required at each stage, projects will continue to face additional delays in the Clearinghouse process.

## CONCLUSION

49. In our opinion, the Model Agreement does not address the radar-interference and drone-detection concerns DoD has identified as the basis for suspending project reviews. Instead, it replaces the established mitigation framework with extensive new requirements, substantially expands DoD's authority over project operations, and removes important protections contained in

prior agreements. For projects that have already completed substantive review, including those awaiting only DoD's countersignature, imposing the Model Agreement would effectively reopen a substantially completed process, adding months of further review and potentially more than a year of negotiations over disputed provisions. Meanwhile, projects at earlier stages continue to face stalled reviews, repeated extensions, and a lack of substantive progress. Based on our collective experience, the Model Agreement does not provide a meaningful path to completing these reviews. Rather than advancing projects toward resolution, it risks prolonging the delays that have already prevented them from moving forward.

Each of us declares under penalty of perjury that the foregoing is true and correct.

Executed on October 19, 2026.

/s/ *Howard D. Belote*
Howard D. Belote
Managing Partner and CEO, DARE Strategies LLC

Executed on October 19, 2026.

/s/
Benjamin Doyle
President and CEO, Capitol Airspace Group

Executed on October 19, 2026.

/s/
Geoffrey N. Blackman
Founder and Principal Consultant, Westslope Consulting, LLC

Executed on October 19, 2026.

/s/ *Edward J. Chupein*
Edward Chupein
Sole Proprietor, AVRO Polaris Consulting, LLC