# Exhibit B

## *To Plaintiffs' Motion to Enforce Stay*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**PORTLAND DIVISION**

RENEWABLE NORTHWEST, *et al.*,

Plaintiffs,

v.

PETER B. HEGSETH, *et al.*,

Defendants.

Case No. 3:26-cv-01092-IM

**DECLARATION OF TOM VINSON IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE STAY**

Pursuant to 28 U.S.C. § 1746, I, Tom Vinson, submit this declaration in support of Plaintiffs' Motion to Enforce Stay and declare as follows:

## I. BACKGROUND OF THE DECLARANT

1. I am the Vice President, Policy and Regulatory Affairs at the American Clean Power Association ("ACP"), a position I have held since August 2010, including time holding the same position in one of ACP's predecessor organizations. I have 19 years of experience in the clean energy industry, including land-based and offshore wind energy. I am over the age of majority and competent to make this declaration. I make it based on my personal knowledge and professional experience, on information that ACP members provided to me as described in paragraph 6, and on my review of Defendants' status reports and the model mitigation agreement described below.

2. As Vice President of Policy and Regulatory Affairs at ACP, I lead the association's engagement with federal agencies on siting, permitting, and related regulatory matters. I previously led work on tax and finance policy at one of ACP's predecessor organizations. In my current role, I assess how legislation, regulations, and federal policies affect the development, financing, construction, and operation of clean energy projects. I have worked on wind energy and military

compatibility issues for more than 18 years. My experience includes engagement with Congress and the Department of Defense ("DoD") on the statutory framework governing DoD's review of wind energy projects; collaboration with federal agencies on research and field testing of measures to mitigate potential wind turbine interference with military radar systems; and efforts to strengthen communication, understanding, and working relationships between the wind energy industry and the military.

3. I have authored a variety of documents describing the DoD review process and available mitigations. For example, the May 2018 white paper The Department of Defense and American Wind Power: Partners in Protecting National Security and Military Readiness, which summarizes the DoD review process and case studies demonstrating how project developers have negotiated with DoD to address their concerns with specific projects, and a January 2026 fact sheet titled "Wind Turbine and Radar Interactions and Solutions," which describes potential interference issues by radar type and available mitigation measures.

4. ACP is the leading voice of today's multi-technology clean energy industry, representing energy storage, wind, utility-scale solar, clean hydrogen, and transmission companies. ACP's members span the energy value chain, from domestic extraction of critical minerals, to production of midstream and downstream components, to energy infrastructure development, finance, management, and operations.

5. ACP is not a party to this litigation. Many ACP members that develop, own, or operate onshore wind projects are also members of one or more of the Plaintiff organizations, including Renewable Northwest, Alliance for Clean Energy New York, Clean Grid Alliance, Interwest Energy Alliance, the Advanced Power Alliance, and Renew Northeast.

6. I communicate regularly with ACP members about legal and regulatory issues affecting the development and operation of onshore wind projects. In preparing this declaration, I spoke with ACP members that are also members of Plaintiff organizations and that have onshore wind projects pending before DoD. Each described its project's status, its communications with DoD since the preliminary injunction, and the consequences it has experienced. Several also provided documents, including correspondence with DoD. The project examples below are based on what those members reported to me. Because the information is commercially sensitive, I identify each project by letter. Throughout this declaration, I identify where a statement rests on what members reported to me, on DoD's status reports, or on my own assessment of the practical consequences, which is based on my experience with DoD's review process and my work with ACP members on policies to support the development and financing of wind projects.

7. These examples are not a complete inventory of affected projects. They illustrate whether DoD has resumed substantive project-specific review since the August 6, 2026 preliminary injunction (ECF No. 125) (the "PI Order"), the consequences of DoD's new review approach for projects at different stages, and the continuing harms experienced by members of Plaintiff organizations—the same harms the Court found irreparable and that the stay was intended to stop.

## II. SUMMARY OF OBSERVATIONS

8. Based on my experience with DoD's review process, my review of DoD's status reports and the new model mitigation agreement DoD has begun distributing since the PI Order (the "Model Agreement")[1], and information provided by ACP members, my principal observations

[1] The Model Agreement is designated as Controlled Unclassified Information. Plaintiffs have conferred with counsel for Defendants as to the appropriate treatment of the Model Agreement in this litigation, who indicated that it should be filed under seal. Accordingly, Plaintiffs intend to file a separate motion requesting leave to file the Model Agreement under seal.

are as follows. First, DoD has resumed administrative activity without advancing the projects that require mitigation. DoD's reports describe internal assessments under a new methodology, contacts with developers, invitations to future meetings, and distribution of the Model Agreement, but they identify no mitigation agreement that DoD has countersigned and no project-specific draft agreement that DoD has issued. DoD reports clearing only four projects since the PI Order, out of approximately 90 awaiting preliminary review, and none of the four required mitigation. In my experience, finding that a project needs no mitigation is the most straightforward determination in DoD's review process, so those four clearances say little about whether DoD is completing the reviews that require negotiated mitigation. The members I spoke with are aware of only two Mitigation Response Team ("MRT") meetings since the PI Order. (Sections III, IV, and VII.)

9. Second, for the projects closest to completion, it appears DoD is restarting negotiations rather than finalizing them. Developers of projects awaiting DoD's countersignature (Category 1) had negotiated and executed mitigation agreements, and developers of projects awaiting a draft agreement (Category 2) had completed MRT review and reached agreement with the MRT on mitigation measures. What remained was for DoD to sign, or to prepare, an agreement reflecting terms already reached. DoD has instead begun distributing the Model Agreement to Category 1 projects, a new 119-page form, which it says will be followed by individualized agreements, with Category 2 projects addressed only after Category 1. (Sections IV through VI.)

10. Third, that new process adds substantial delay. Before it can be signed, the template requires project-specific information, new compliance programs, financing-party approvals, and further DoD review, and it adds obligations not clearly connected to the radar or airspace interference the mitigation process has addressed. In my experience, negotiating the template's material terms, which for the reasons in Section IX I expect most recipients will need to do, could

take a year or longer. Even a developer that accepted every term would still need months to complete the template and obtain DoD's execution, and neither estimate accounts for DoD's sequencing of agreements. (Paragraphs 23–26.)

11. Fourth, the Model Agreement threatens the financing on which these projects depend. In my experience, a utility-scale wind project can be financed only if it can show predictable electricity production, durable federal approvals, defined and quantifiable liabilities, and lenders' ability to protect their collateral. The template undermines each of those conditions through uncapped curtailment; unilateral and broad suspension, reopener, and termination rights for DoD; a permanent, uncapped release and indemnity; and restrictions on ownership changes, assignments, and lender security interests. These provisions do not merely increase the cost of financing. In my professional assessment, several of them would prevent lenders and investors from committing the capital needed to build many projects. (Section IX.) The Joint Declaration of Howard D. Belote, Benjamin Doyle, Geoffrey N. Blackman, and Edward Chupein (the "Consultants' Declaration"), filed with this declaration, addresses the technical and procedural departures from prior mitigation agreements; this declaration addresses their consequences for project development and financing.

12. Fifth, DoD's new process does not cure the harms the Court found irreparable; it prolongs and compounds them. Developers must either accept terms that may make their projects unfinanceable or undertake lengthy negotiations while their costs and risks continue to accumulate. In my assessment, the longer that continues, the greater the risk that projects that were ready to proceed will never be financed or built. (Sections IX and X.)

13. Since the PI Order, members of Plaintiff organizations have paused construction on a construction-ready project and lost a place on a utility's shortlist to purchase its output (Project

A); paid more than $1 million to post interconnection security that a financing partner would not fund without a countersigned agreement (Project C); lost turbine supply arrangements and been forced to rebid or reprice turbine orders at higher prices (Projects L and M); incurred millions of dollars in delay damages under a power purchase agreement that either party may now terminate (Project M); lost a prospective purchaser for a project's output (Project W); failed to be shortlisted in power purchase solicitations or been unable to sign an offtake agreement (Projects AA and BB); paused wind development at a site and turned to solar instead (Project V); received new notices of presumed risk that send projects that had completed, or been cleared through, DoD review back to the start of the process (Projects O and Y); and, in at least one case, terminated a project, in significant part because it could not obtain FAA Determinations of No Hazard ("DNHs") (Project Q). Members continue to carry land, interconnection, and equipment costs for projects they cannot advance, while deadlines tied to turbine procurement, offtake agreements, local permits, and federal tax credits draw closer.

## III. PROJECTS HAVE NOT ADVANCED SINCE THE PRELIMINARY INJUNCTION

14. In the PI Order, the Court found that Plaintiffs were likely to succeed on their claims that DoD's freeze on review of wind energy projects violates statutory and regulatory deadlines governing DoD's review of wind energy projects. ECF No. 125 at 26–30. The Court stayed DoD's review freeze nationwide, as to all wind energy project applications, pending final adjudication of Plaintiffs' claims on the merits. Id. at 34–35. The Court explained that, although the statutory and regulatory deadlines apply to projects in the earlier stages of review, "there is no basis in statute or in regulation for DoD to withhold action" for projects with an executed mitigation agreement awaiting DoD countersignature or projects that have completed the MRT process but not yet received a draft mitigation agreement. Id. at 36 n.13. To ensure compliance with the stay, the Court

ordered DoD to file status reports every 30 days "addressing whether review of wind energy projects has resumed" for projects at each of five stages of review, which DoD's status reports refer to as Categories 1 through 5. Id. at 35–36.

15. Despite the Court's clear orders, DoD has not resumed review. While it may have reported some administrative activity, none of this activity has resulted in any substantive movement through mitigation review. Two months after the PI Order, DoD's reports identify no executed mitigation agreement that DoD has countersigned and no project-specific draft agreement issued to a project that had completed the MRT process. ECF No. 153 at 2–3. As described in Section VII, the members I spoke with are aware of only two MRT meetings held as of the second status report, both with the Navy.

16. Because DoD has not resumed review, projects remain stalled at the first four stages the Court identified: (1) "projects with a mitigation agreement executed by the developer that are awaiting countersignature by DoD"; (2) "projects that have completed the MRT process but have not yet received a draft mitigation agreement from DoD"; (3) "projects that were in the middle of the MRT process"; and (4) "projects that have received a notice of presumed risk and are awaiting initial MRT meetings." ECF No. 125 at 35–36. Progress at the fifth stage, preliminary review, has been minimal. Of the approximately 90 projects awaiting preliminary review, DoD reports clearing only four, and those four required no mitigation agreement. ECF No. 153 at 4. Further, while some projects in Category 5 moved to Category 4 when the preliminary review identified 40 projects needing a notice of presumed risk, that merely means those projects join the backlog of around 60 prior projects in Category 4 awaiting scheduling of an initial MRT meeting.

17. In addition, since the PI Order DoD has begun issuing the Model Agreement, which is dated October 2026. As described in paragraphs 23–26 and Section IX, the template will further

delay these projects, and its terms, members report and I agree, would prevent many projects from being financed. Because these projects remain stalled, members continue to incur the carrying costs, higher financing costs, lost or delayed revenue, and risks to tax-credit value that the Court found irreparable. ECF No. 125 at 30.

## IV. DoD'S STATUS REPORTS CONFIRM PROJECTS ARE NOT MOVING FORWARD

18. I have reviewed Defendants' status reports filed on September 10, 2026 (ECF No. 144) and October 5, 2026 (ECF No. 153). What ACP members report to me is consistent with those filings. The filings, however, describe activity; they do not show that any project requiring mitigation has moved closer to completing review.

19. Category 1: DoD's first status report described approximately 60 projects that either had an executed mitigation agreement awaiting DoD's countersignature or had completed the MRT process and were awaiting a draft agreement. It identified no countersignatures and no draft agreements for any of them. ECF No. 144 at 2–3. Instead, DoD reported that it was assessing those projects under a new "analytical methodology" that it "continues to refine," and that, depending on the results, it would issue a notice of unacceptable risk, reopen negotiations, or circulate a new model mitigation agreement. Id. DoD reported that one project had received the new Model Agreement. Id. Counsel for Defendants later confirmed that the project is not affiliated with any Plaintiff. ECF No. 147 at 2 n.2.

20. DoD's October 5 report, like its first, identifies no executed agreement that DoD has countersigned. DoD reports that it has applied its new methodology to all but one of the approximately 30 projects awaiting countersignature, that it "believes that most of the projects therein present threats that are mitigatable, with limited additional mitigation measures," and that it is "in the process of providing each of the Category 1 projects a copy of the new model mitigation

agreement." ECF No. 153 at 2. DoD describes the Model Agreement as "terms [developers] may consider while the Department begins the process of providing them with individualized mitigation agreements crafted for each project." Id. In other words, for projects whose developers completed mitigation negotiations with the potentially affected military service, signed agreements drafted by DoD reflecting those negotiations, and sent them back to DoD for signature, DoD now proposes to replace those agreements with new ones, after a further round of negotiation, on terms that are not yet final. Based on what members have reported to me, several of those projects belong to ACP members that are also members of Plaintiff organizations.

21. DoD's report describes the template as a way to "accelerate any negotiations," ECF No. 153 at 2, but does not explain why this interim step is necessary for projects whose terms were already negotiated. By DoD's own account, it has already applied its new methodology to all but one of them and concluded that most present threats that can be mitigated with limited additional measures. Yet DoD has not identified when it will provide the project-specific agreements needed to complete the process. The template cannot fill that gap. It cannot be signed as provided: it contains none of the project-specific information an executed mitigation agreement requires, and DoD has stated that it will be followed by "individualized mitigation agreements crafted for each project." ECF No. 153 at 2.

22. As of DoD's October 5 status report, I am not aware of any project of an ACP member that is also a member of a Plaintiff organization that has received an individualized mitigation agreement to review and sign. Based on my review of the Model Agreement and on what members have told me, I do not expect recipients to be able to sign the Model Agreement as DoD has proposed it. As I explain in Section IX, members are concerned, and I agree based on my experience, that several of its provisions would prevent a project from obtaining financing, because

they affect the project's expected output, the finality of its federal clearance, and lenders' ability to take a security interest in the project.

23. In practice, the template does not complete negotiations for these projects; it restarts them. Based on my experience, the delay it adds has three components, which are cumulative: (a) the time required to negotiate material terms, which I expect most recipients will need to do; (b) the administrative and approval work required of every developer, even one that accepts every term; and (c) the time attributable to DoD's own drafting, review, countersignature, and sequencing of agreements.

24. Time to negotiate material terms. Negotiating the template's terms would add the most time. In my experience, even when DoD was actively working with developers, resolving a single disputed term took three months or more, and resolving several issues took more than a year. The template introduces a large number of terms that, to my knowledge, have never appeared in a mitigation agreement, many of which will require the consent of lenders and investors. For many projects, negotiating those terms could take a year or longer. That time is in addition to the work described in paragraph 25 and to the time these projects have already waited.

25. Work required even if the developer accepts the template. Based on my experience and what members have reported, even a developer willing to accept every term of the template as written could not simply sign it. The developer and DoD would first have to assemble and agree on the project-specific information the template requires: ownership disclosures and, where applicable, CFIUS documentation; project data and a project area map; the FAA aeronautical study numbers and precise coordinates and heights for each turbine; the amount of the voluntary contribution; and points of contact. Model Agreement Exs. 1–4, 6. For projects that have been waiting a year or more, much of that information would also need to be reverified. The developer

would have to put in place the new personnel-screening, cybersecurity, and supply-chain programs based on standards from the North American Electric Reliability Corporation (NERC) that do not even go into effect until mid-2028, enter into the separate non-disclosure agreement, and obtain internal and financing-party approvals. Id. § 6; Ex. 9. In my experience, that work alone would take at least several weeks. A developer that meets the template's foreign-ownership conditions would also have to file with CFIUS and obtain a letter concluding CFIUS action before DoD would execute the agreement. Id. § 4.5.1. This component measures only the developer-side work needed to put the template, as written, into final form.

26. DoD review, countersignature, and sequencing. DoD's own steps would add further time that developers cannot control. In my experience, before August 2025, when DoD was actively working to finalize agreements, DoD's countersignature alone took approximately two months. That historical figure reflects a period when DoD was actively finalizing agreements; since August 2025, DoD has not countersigned a single agreement. DoD has also not identified when it will issue individualized agreements for Category 1 projects, and it has stated that it will turn to Category 2 projects only after completing those for Category 1. ECF No. 153 at 2–3. I cannot estimate this component, because DoD has not provided a timeline. Taken together, where material terms must be negotiated, the added time could be a year or longer. Even unconditional acceptance of the template would add months, given the developer-side work described in paragraph 25, any required CFIUS process, and DoD's countersignature. Neither estimate includes the additional delay from DoD's sequencing of Category 1 and Category 2 agreements. Every month that process takes extends the harms the stay was intended to stop.

27. Category 2: The approximately 30 projects that had completed the MRT process but had not received a draft agreement are in a similar position, with an additional layer of delay.

Their developers completed mitigation discussions with the affected military services and reached agreement on the measures needed to address each project's impacts. All that remained was for DoD to put the agreed terms into a draft agreement for signature. Instead, DoD reports that it has completed its new analysis for only "at least 10" of these projects, that it expects to send them the Model Agreement, and that it will turn to individualized agreements for these projects only after it "completes the drafting and dissemination of individualized mitigation agreements for the Category 1 projects." ECF No. 153 at 2–3. DoD reports no project-specific draft agreement issued to any project in this category. These developers therefore face each component of delay described in paragraphs 23–26, and they cannot begin the last of them until DoD finishes the Category 1 agreements on a timeline it has not identified. To the extent the agreement DoD sends these projects mirrors the Model Agreement, the financing problems described in Section IX will also apply.

28. Categories 3 and 4: The reports show similarly little movement for projects in MRT review. In September, DoD reported that for approximately 110 projects in the MRT process, "developer re-engagements have yet to begin." ECF No. 144 at 3. By October 5, DoD reported applying its new methodology to "more than 5" of those projects, and to one of the approximately 50 projects awaiting an initial MRT meeting. ECF No. 153 at 3. DoD reports that the Air Force contacted 92 projects in Categories 3 and 4, and that NORAD invited 22 Category 4 projects to begin MRT negotiations, but it does not report any MRT meeting held or any mitigation discussion concluded. Id. at 3–4. These are contacts and invitations, not completed mitigation negotiations or project clearances, and the report does not establish that those steps met applicable review deadlines. DoD has also issued interim guidance directing that the principles of its new Model Agreement be used in MRT discussions. Id. at 3. DoD has not made that guidance public or

provided it to ACP or, to my knowledge, to any of the members I spoke with. Neither ACP nor those members know what the guidance says or how the MRTs are applying it. Developers in MRT review have no way to evaluate, plan around, or respond to standards they have not seen, and to the extent the guidance carries the Model Agreement's terms into MRT discussions, the financing problems described in Section IX will affect those negotiations as well. Members' experience in MRT review is described in Section VII.

29. DoD also has not reported whether it is meeting the statutory and regulatory deadlines. DoD's October 5 report acknowledges that at an October 1, 2026, status conference, the Court stated that it expected DoD to report on its compliance with those deadlines, but states that collecting that information for the report "has proven infeasible." ECF No. 153 at 2 n.1. DoD states that it will begin reporting the number of projects beyond applicable deadlines in its next status report. Id. Accordingly, the reported contacts and internal assessments cannot yet be evaluated against the governing deadlines using DoD's own reporting.

30. In short, the status reports identify no project at stages (1) through (4) that has completed review by the DoD Military Aviation and Installation Assurance Siting Clearinghouse ("Clearinghouse") through a countersigned mitigation agreement or a non-objection transmittal to the FAA, and I am aware of no project of an ACP member that is also a member of a Plaintiff organization that has done so. The only clearances are the four Category 5 projects described in paragraph 16. In my experience, determining that a project presents no presumed risk is ordinarily the simplest call in the review process; it requires no MRT discussions, no negotiation of mitigation measures, and no agreement. Those clearances say nothing about whether DoD is completing review of the projects that require mitigation.

## V. EXECUTED MITIGATION AGREEMENTS AWAITING DoD COUNTERSIGNATURE

31. For projects at this stage, as a result of MRT negotiations, the relevant DoD components, in coordination with the Clearinghouse, determined that with agreed mitigation measures the project would not pose an unacceptable risk to national security. The Clearinghouse then presented a DoD-drafted mitigation agreement to the developer for signature, and the developer signed it and sent it back. Since the PI Order, no ACP member that is also a member of a Plaintiff organization has received a countersigned agreement. When the Court entered the PI Order, it found that DoD had not countersigned any mitigation agreement for a wind energy project since August 2025. ECF No. 125 at 29. As of DoD's October 5 status report, that remains true. For some of these developers, the wait for DoD's signature now exceeds a year. As the Court noted, there is "no basis in statute or in regulation for DoD to withhold action" on these projects. ECF No. 125 at 36 n.13.

32. **Project A**. Project A is a 103 MW onshore wind project in Wasco County, Oregon, representing approximately $300 million in planned investment. The project has completed all major development milestones, including full site control, full permitting, an executed utility interconnection agreement, and advanced engineering. The developer executed its mitigation agreement in July 2025. The agreement has been awaiting DoD countersignature for 15 months, including more than 70 days since the PI Order. On October 5, 2026, instead of countersigning the agreement the developer had executed, the Clearinghouse sent the project DoD's new model mitigation agreement. The new terms depart significantly from the agreement the developer negotiated with DoD and may render the project unfinanceable.

33. The developer began construction in July 2026 but has had to pause construction, because the FAA will not issue DNHs until DoD executes the mitigation agreement. While

construction is paused, the developer is incurring approximately $400,000 per year to keep the project ready to restart. Because of the delay in obtaining DNHs, the project was also withdrawn from a regional utility's shortlist to purchase its output. The delay also puts the project's federal tax credits at risk. To qualify, the project must complete construction by July 2030. Once DoD executes the mitigation agreement, the FAA typically needs another four to six months to issue DNHs, and the project will then need 18 to 24 months to complete construction. Every month of further delay shrinks the remaining construction window and increases the risk to an approximately $300 million investment.

34. **Project B**. Project B is a large onshore wind project in the central United States. It represents a planned capital investment of more than $1 billion. The developer executed its mitigation agreement and has been awaiting DoD countersignature for 10 months, including more than 70 days since the PI Order. Since the PI Order, the developer, its consultant, and its FAA contact have contacted the Clearinghouse and NORAD on at least four occasions. None of those inquiries has received a response. The only communication the developer has received from DoD since the PI Order came on October 5, 2026. That day, instead of countersigning the agreement the developer had executed, the Clearinghouse sent the developer DoD's new model mitigation agreement. The template is generic, not specific to the project, and the transmittal email said nothing beyond "Please see attached." Without DoD's non-objection, the FAA has not issued DNHs for the project's turbines. Until the mitigation agreement is executed and DNHs are issued, the developer cannot sign power purchase agreements that require it to post financial security. It also cannot sign a turbine supply contract.

35. DoD's refusal to act is putting substantial investment at risk. Because of the project's size, the wind turbines will be spread across approximately 100,000 acres, and the

developer is currently paying approximately $1.2 million per year in land carrying costs. Key wind leases begin to expire in early 2027 unless the project has a fixed path forward, and every month of delay extends the project schedule and adds carrying cost. In 2025, the developer executed an interconnection agreement with the utility and posted $13.5 million in security to accelerate construction of the point of interconnection. The utility has already drawn on that security to procure equipment and begin constructing a dead-end structure. It will continue drawing on the security to complete the remaining interconnection work, which is targeted for completion in February 2028. If the developer is forced to cancel the project because of DoD's refusal to countersign the mitigation agreement, it will lose the security the utility has spent. If the delay continues, the project may have to undergo an interconnection re-study, which would add cost and time, or it may be forced to stop development. Cancellation would also deprive the host counties of approximately $10 million per year in additional tax revenue for the counties and school districts, undermining a significant source of funding for local public services in communities with already-declining tax bases.

36. **Project C**. Project C is a 162 MW onshore wind project in Onondaga County, New York. It has been in development for more than four years. The developer has committed more than $9 million to its development, approximately $1 million of that since June 2026. The developer executed its mitigation agreement in August 2025. The agreement has been awaiting DoD countersignature for 14 months, including more than 70 days since the PI Order.

37. The missing countersignature is now blocking the project's financing. NYISO requires interconnection security that steps up as a project advances. Project C's interconnection security is projected to increase from approximately $5 million to more than $21 million by the end of October. Because the approximately $5 million NYISO already holds will not be released

right away, the developer expects that, by the end of the year, it will have committed more than $26 million to the project's interconnection, between NYISO and the interconnecting utility. In April 2026, the developer entered into a letter of intent with a development partner to finance continued development and to post the stepped-up security. Without a countersigned agreement, the partner has not been confident enough to fund those obligations. To avoid cancelling the project, the developer entered into a separate arrangement to post the interconnection security, at an added cost to the project of more than $1 million. That arrangement lasts only until the interconnection agreement is executed, which is estimated to be in six months, at which time the project may have to find an alternate source of security for over $21 million of interconnection funds.

38. Between now and that execution, the developer also projects spending approximately $2 million more to move the project into the permitting queue and keep it on schedule as well as nearly $2 million more on equipment. Falling off schedule would significantly jeopardize the project's anticipated tax credits, raising its capital costs and the cost of renewable energy to New York consumers, if the project can be completed at all. If the developer does not receive the agreement countersigned on the financeable terms previously agreed, it is uncertain whether the project can proceed.

39. **Project D**. Project D is a 67 MW onshore wind project in Grant County, Wisconsin. The developer executed its mitigation agreement in December 2025. The agreement has been awaiting DoD countersignature for 10 months, including more than 70 days since the PI Order. On October 5, 2026, instead of countersigning the agreement the developer had executed, the Clearinghouse sent it DoD's new model mitigation agreement. The template is generic, not specific to the project, and the transmittal email said nothing beyond "Please see attached."

40. After the PI Order, the developer contacted NORAD on August 20, 2026. On August 25, NORAD responded that it was developing implementation guidance. The developer followed up on September 11. On September 15, NORAD responded that a final determination had not been made. The mitigation agreement is now the controlling factor in the project's schedule. To bring the project online by the end of 2028, the developer must order its turbines, which have an approximately 12-month lead time, by about May 1, 2027. That timing lets the turbines arrive in May 2028 and be erected during the low-wind summer months. If the agreement and DNHs are not in hand by then, the project's online date will be delayed by a full year. The developer has paid $17,006.50 in landowner lease payments since August 2026 and projects to spend $30,090 more through May 1, 2027. A one-year delay would add approximately $50,659.76 in lease payments from May 2, 2027 through May 1, 2028.

41. **Project E**. Project E is a 1.2 GW onshore wind project in Meade, Seward, and Gray Counties, Kansas. The developer executed its mitigation agreement in September 2025. The agreement has been awaiting DoD countersignature for 13 months, including more than 70 days since the PI Order. On October 5, 2026, instead of countersigning the agreement the developer had executed, the Clearinghouse sent the developer DoD's new model mitigation agreement.

42. The developer has spent more than $36.5 million in development costs, all of which are at risk if the project cannot proceed. The developer must secure all required DNHs by February 1, 2027 to proceed with engineering, procurement, construction, and financing to hold the project schedule.

43. **Project F**. Project F is a 1,500 MW onshore wind project in Finney, Haskell, and Gray Counties, Kansas. The developer executed its mitigation agreement in December 2025. The agreement has been awaiting DoD countersignature for 10 months, including more than 70 days

since the PI Order. On October 5, 2026, instead of countersigning the agreement the developer had executed, the Clearinghouse sent the developer DoD's new model mitigation agreement. For each year that the project is delayed, the project would incur tens of millions of dollars in increased construction costs, including costs associated with additional development, new studies, and lease renewals. The developer has spent more than $5.4 million in development costs, including $1.2 million since August, all of which are at risk if the project cannot proceed.

44. **Project G**. Project G is a 300 MW onshore wind project near Friona, Texas. The developer executed its mitigation agreement in September 2025. The agreement has been awaiting DoD countersignature for 13 months, including more than 70 days since the PI Order. On October 5, 2026, instead of countersigning the agreement the developer had executed, the Clearinghouse sent the developer DoD's new model mitigation agreement.

45. The developer has spent more than $10.5 million in development costs on the project, all of which are at risk if it cannot proceed. Without a countersigned agreement and DNHs, the developer cannot procure turbines or finance the project. As a result, the project's timeline is slipping, which puts its land control, its interconnection position, and its commercial agreements at risk. The developer needs all required DNHs by November 1, 2026 to hold its current engineering, procurement, construction, and financing schedules. Its power purchase agreement requires it to have received all DNHs by December 31, 2026.

46. **Project H**. Project H is a 500 MW onshore wind project in Kiowa County, Colorado. The developer executed its mitigation agreement in August 2025. The agreement has been awaiting DoD countersignature for 14 months, including more than 70 days since the PI Order. On October 5, 2026, instead of countersigning the agreement the developer had executed, the Clearinghouse sent the developer DoD's new model mitigation agreement. The template is

generic, not specific to the project, and the transmittal email said nothing beyond "Please see attached."

47. The developer has invested substantial resources in the project, relying on a timely and predictable federal permitting process. Those investments include land acquisition, environmental and wildlife studies, engineering and technical analysis, local permitting, and consulting and professional services. If the developer is forced to cancel the project because of DoD's inaction, those costs would be an irrecoverable loss. Without a countersigned agreement and DNHs, the developer cannot procure turbines on the project's schedule. The project's Kiowa County permit lapses unless construction begins by March 14, 2029, and construction cannot begin without DNHs. Renewal or re-permitting is not guaranteed. It would require substantial additional spending and would expose the project to changed regulatory requirements or new local opposition. The developer's executed offtake agreement is also at risk, because the project cannot move forward under the agreement without a countersigned mitigation agreement and DNHs. Based on its purchase price alone, that agreement represents a potential loss of more than $20 million, apart from development costs.

48. **Project I**. Project I is a 250 MW onshore wind project near Brandt, South Dakota. The developer executed its mitigation agreement in August 2025. The agreement has been awaiting DoD countersignature for 14 months, including more than 70 days since the PI Order. On October 5, 2026, instead of countersigning the agreement the developer had executed, the Clearinghouse sent the developer DoD's new model mitigation agreement.

49. Because of the timing of the transmission upgrades required for this project, the mitigation agreement will become the controlling factor in the project's schedule in May 2028. By that point, the developer must order turbines to meet its goal of bringing the project online by the

end of 2029; turbine delivery takes approximately 12 months. The developer cannot place the turbine order until both the mitigation agreement and the FAA Determinations of No Hazard are in place. If both approvals are not in place by May 2028, the developer will miss the window to complete the project in 2029, and the project's completion will slip by a full year. Meanwhile, the developer continues to make lease payments to landowners for a project it cannot yet build. It has paid $69,105 since August 2026 and projects an additional $154,831 in payments through May 1, 2027, and $209,758 from May 2, 2027, through May 1, 2028.

50. **Project J**. Project J is an 800 MW onshore wind project in San Miguel and Torrance Counties, New Mexico, representing approximately $4.5 billion in planned investment. On April 19, 2023, the developer and DoD executed a mitigation agreement covering a large wind project area that includes Project J. On August 9, 2023, they amended it to reflect an adjustment to the final turbine layout, as the agreement contemplated. Some of the turbine locations covered by the agreement have since been built and are now operating. On June 5, 2025, the developer submitted new turbine filings to the FAA that are consistent with the mitigation agreement. They require the same kind of simple amendment as the August 2023 amendment: substituting certain turbine locations, within a fixed geographic boundary set out in the agreement's exhibits, with the new filing locations. The developer has provided the materials needed to support that amendment and has asked DoD on numerous occasions to tender it. It has been waiting for the amendment since June 2025, including more than 70 days since the PI Order. Since the PI Order, the developer has contacted the Clearinghouse twice. DoD's only response has been that it is reviewing the Court's decision and developing implementation guidance.

51. Without DoD's non-objection, the FAA has not issued DNHs for the new turbine locations. As a result, the developer will have to make significant capital investments in the project

without a reasonable expectation of receiving DNHs before construction financing. Building without DNHs would be expected to significantly raise the project's costs, including insurance and financing costs. To date, the developer has spent more than $17 million in development costs, approximately $6 million of it since the PI Order. It has also issued more than $150 million in letters of credit to advance the project, and it must commit an additional $35 million in turbine procurement reservations by the end of 2026. If the developer is forced to cancel Project J because of DoD's failure to act, it will lose approximately $17 million in unrecoverable development costs, including land lease payments, interconnection deposits, permitting and study costs, and equipment reservation payments.

52. **Project K**. Project K is a 378 MW onshore wind project in Washington, with expected capital costs of approximately $900 million. The developer has already executed a mitigation agreement with DoD for the project and is awaiting only a draft amendment that would update the list of FAA aeronautical study numbers for the project's turbines. The amendment has been pending since December 2025, including more than 70 days since the PI Order. The developer has not received the amendment, the model agreement, or a project-specific agreement.

53. The continuing delay is putting substantial investment at risk and increasing the cost of keeping the project viable. Because the developer cannot provide its prospective offtaker with certainty about the project's construction start or commercial operation date, it has been unable to make progress toward a power purchase agreement. Nor can it secure turbine delivery on the project's required schedule without paying a substantial deposit to reserve a manufacturing slot, putting those funds at risk if the project cannot proceed.

54. Meanwhile, the developer continues to incur significant costs to preserve the project. Its interconnection milestones cannot be suspended indefinitely, leaving it exposed to the

costs of interconnection upgrades. It also pays approximately $200,000 annually in development-term rent, which increases each year, rather than converting its leases to their extended term and beginning construction. At least one transmission easement expires in less than two years. To preserve that easement, the developer would have to renegotiate with the landowner at greater cost or pay the full easement cost as though construction had begun.

55. The developer has also purchased the project's main power transformers to safe-harbor the project for tax-credit purposes. It has already incurred $158,000 in change-order costs for transformer storage and maintenance, and those costs are expected to grow. The developer must make its investment decision by February 2027. If it cannot proceed at that point, the project can no longer begin operating in 2028, and its safe-harbor status extends only through 2029. The developer has already spent approximately $20 million in development costs, all of which is at risk if the project cannot proceed.

56. **Project L.** Project L is a 183 MW onshore wind project located in Howard County, Iowa. After the MRT review process concluded and the parties agreed on mitigation measures, the Clearinghouse provided the developer with a mitigation agreement for signature. The developer executed the agreement and returned it to the Clearinghouse for countersignature in August 2025. Nearly 14 months later, the agreement remains unsigned by DoD, including more than 70 days after the PI Order.

57. Since the PI Order, DoD's continued failure to countersign the mitigation agreement has caused the project to lose its turbine supply arrangement. The developer has been forced to rebid its turbine order, with new bids coming in at prices higher than anticipated. Without an executed agreement, the developer also cannot lock in turbine or construction pricing, jeopardizing its power purchase agreement because it cannot provide the offtaker with the price

certainty necessary to move forward. Changing turbine suppliers also requires the developer to select a different turbine model and revise the turbine array spacing, necessitating a redesign of the project layout and renewed development studies.

58. These delays also threaten the project's interconnection rights. The project's interconnection agreement requires it to achieve commercial operation by June 2028. As DoD's delay pushes the project schedule further back, the developer expects to seek a waiver of that deadline from FERC. Although the developer is working to secure MISO's agreement not to oppose the request, there is no guarantee that FERC will grant a waiver. If FERC denies the request, the project could lose its interconnection rights, potentially jeopardizing its viability.

59. **Project M**. Project M is a 300 MW onshore wind project in Limestone and McLennan Counties, Texas, representing approximately $500 million in planned investment. The developer executed its mitigation agreement in December 2025. The agreement has been awaiting DoD countersignature for 10 months, including more than 70 days since the PI Order. On August 6, 2026, the day of the PI Order, the developer emailed its NORAD contact asking for a status update. When it received no response, it followed up on August 19 and again on September 25. On September 25, NORAD replied only that the project's status remained unchanged. On October 5, 2026, instead of countersigning the agreement the developer had executed, the Clearinghouse sent it DoD's new model mitigation agreement, with no explanation in the transmittal email.

60. DoD's failure to act has delayed the project by approximately one year and now threatens its power purchase agreement (PPA). Because the developer could not predict when it would receive a countersigned mitigation agreement and DNHs, it could not confidently make the next milestone payment required under its turbine supply agreement. That agreement subsequently expired, leaving the developer without its secured turbine supply. Turbines may no longer be

available on the project's revised schedule, and the previously negotiated prices for turbines and construction work have increased.

61. The delay has also triggered millions of dollars in delay damages under the project's PPA. As of September 27, 2026, either party may terminate the agreement. The next key PPA deadline is March 28, 2027, the project's scheduled construction start date. Missing that deadline would require the developer to post additional security. The approximately one-year delay has also forced the developer to incur an additional year of landowner lease payments, property taxes, and other carrying costs that it had not anticipated.

62. Since the PI Order, the developer has incurred nearly $2.5 million in additional costs. If the project is cancelled, the developer stands to lose approximately $54 million in development expenditures to date and could face approximately $60.5 million in PPA damages. The consequences would also extend to the surrounding community: local landowners would lose approximately $150 million in lease payments, and the host counties would forgo approximately $100 million in property tax revenue over the project's lifetime.

63. **Project FF**. Project FF is a 165 MW onshore wind project in Macon County, IL, representing approximately $430M in planned investment. The developer executed its mitigation agreement in December 2026, and the agreement has now been pending DoD countersignature for 10 months, including 70 days since the PI Order. Without DoD's non-objection, the FAA has not issued a DNH, and the developer cannot issue full notice to proceed to its turbine supplier. Since the PI Order, the developer has seen increases in EPC and turbine costs and will continue to incur wages and land payments.

64. If the developer is forced to cancel Project FF because of DoD's refusal to countersign the mitigation agreement, it will lose approximately $24M in unrecoverable

development costs, including land lease payments, wages, interconnection deposits, and permitting and study costs. Those costs have grown by approximately $400K since Plaintiffs moved for a preliminary injunction, because the developer has continued to make lease and option payments and pay project specific wages while it waits for DoD to act.

65. **Project GG.** Project GG is a 441 MW onshore wind project in Coconino County, Arizona, representing approximately $900 million in planned investment. On August 26, 2026, the developer filed requests to extend the project's DNHs. On September 24, 2026, FAA indicated that it had no concerns with the extension requests and that the project would not need a new mitigation agreement, but that it was awaiting DoD response. The developer has received no indication that DoD has acted on the requests. The extensions have not been executed. The project has now been waiting nearly two months since it filed, and more than three weeks since DoD stated that it had no concerns.

66. The delay puts substantial revenue at risk. The developer estimates that it will lose approximately $90 million in revenue if approval of the extensions slips past the end of 2026. It faces the same loss if the extensions are denied and it must refile with the FAA. The developer has invested approximately $22.5 million in the project to date.

67. **Project HH.** Project HH is a 252 MW onshore wind project in New Mexico. The developer and DoD executed a mitigation agreement for the project, but minor adjustments to certain turbine locations required an amendment. The developer signed the amendment and submitted it to DoD for countersignature in September 2025. More than 13 months later, DoD has still not countersigned the amendment, including more than 70 days since the PI Order.

68. DoD's failure to act has prevented the project from maintaining its planned construction schedule and has increased the project's costs and risks. As the delay continued, the

developer was forced to seek extensions of milestone dates under the project's power purchase agreement (PPA), leaving approximately $20 million in PPA security deposits at risk. Uncertainty has also prevented the developer from making a long-term transmission commitment on its original timeline. Instead, the developer has had to submit successive transmission service requests to preserve the project's transmission access. Since the PI Order alone, it has paid an approximately $120,000 cash study deposit and posted an approximately $3.2 million letter of credit to maintain its current transmission study.

69. The developer has invested approximately $43 million in the project to date. If DoD's continued refusal to act prevents the project from meeting its contractual and development milestones and ultimately results in termination, up to approximately $43 million in invested capital would be at risk.

## VI. PROJECTS WITH INFORMAL AGREEMENTS AWAITING A MITIGATION AGREEMENT

70. For projects at this stage, the developer completed mitigation and deconfliction discussions with the MRT and reached informal agreement with the MRT on the mitigation measures needed to address the project's impacts. Unlike Category 1 projects, these projects had not yet received an agreement for signature. Like the projects in Section V, these projects had completed the substantive work of mitigation negotiations; what remained was for DoD to reduce the agreed measures to a draft agreement, which generally should not take long since the agreement terms are largely the same from agreement to agreement depending on the issues being mitigated.

71. **Project N**. Project N is a 512 MW onshore wind project in Klickitat County, Washington. The developer reached agreement with the MRT on mitigation measures in April 2026. The project was awaiting a draft mitigation agreement when DoD halted processing in April 2026, and it has now waited more than five months for a draft agreement, including more than 70

days since the PI Order. Since the PI Order, the developer has twice asked the Clearinghouse for next steps and a schedule to complete the process. On August 19, 2026, the developer told the Clearinghouse it was ready to resume immediately and asked for next steps. On August 25, DoD responded that it was reviewing the Court's decision and developing implementation guidance. The developer followed up on September 23. On September 24, DoD responded that it had no change to report and that the Clearinghouse was still defining its new process.

72. Because of DoD's refusal to act, the developer may be unable to finance the project on the timeline contemplated by its financing arrangements. For each year the project is delayed, it would incur tens of millions of dollars in increased construction costs, excluding costs associated with additional development, new studies, and lease renewals. Moreover, the project has entered into land agreements with finite terms that, if renewed under new timelines and terms, would cost the project in excess of $500,000 per year and likely result in higher payment obligations due to the passage of time.

73. **Project O**. Project O is a 290 MW onshore wind project near Greenwood, New York. The project has been awaiting an updated draft mitigation agreement for 13 months, including more than 70 days since the PI Order. Since the PI Order, the developer contacted the Clearinghouse on August 21 and September 11, 2026. The only response it received was that no decision had been made. Then, on September 26, rather than providing a draft agreement, the Clearinghouse issued the project a new notice of presumed risk and asked whether the developer was willing to enter into mitigation discussions. On October 16, 2026, the developer responded noting that the project had already completed the MRT process and was awaiting a draft mitigation agreement. It has received no response.

74. The project is at risk of failing to meet the interconnection milestones established in its interconnection agreement and is at risk of failing to meet its offtake contract obligations with NYSERDA. If these milestones are not met, the developer would be required to obtain a new queue position, which risks delaying the project by years. For each year of delay, the project incurs tens of millions of dollars in increased construction costs, exclusive of any costs associated with redevelopment, new studies, or lease renewals.

75. **Project P**. Project P is a 1,500 MW onshore wind project near Hugoton, Kansas. The project has been awaiting a draft mitigation agreement for 8 months, including more than 70 days since the PI Order. The developer has spent more than $14.9 million in development costs, all of which are at risk if the project cannot proceed.

76. **Project Q**. Project Q is a 500 MW onshore wind project in Illinois. The developer reached informal agreement with the MRT on April 6, 2026. Despite the PI Order, it has not received a draft mitigation agreement, and it has now waited more than 190 days since reaching that agreement. Since the PI Order, the developer has had to keep making financial commitments and faced significant capital investment decisions. Ultimately, the project's inability to acquire or plan to acquire DNHs was a significant factor in the decision to terminate the project.

77. **Project R**. Project R is a utility-scale onshore wind project in the Northeast, representing approximately $170 million in planned investment. The project had already received DNHs when, in 2025, the developer proposed modifications to its turbine layout and submitted them to the Air Force for review. In August 2025, after several months of consultation, the Air Force accepted the proposed modifications in writing. In September 2025, the developer accepted in writing all terms required for the mitigation agreement. The developer has been waiting for the Air Force to provide a draft mitigation agreement ever since. The Air Force told the developer in

November 2025 and again in March 2026 that an agreement had been drafted. The developer requested the draft agreement in writing seven times between December 2025 and May 2026, but the Air Force did not provide it.

78. Immediately after the PI Order, the developer asked the Air Force to finalize and provide the mitigation agreement and to give an expected delivery date. When it received no response, it followed up, asking for the current status of the agreement, whether any remaining items required action by the developer, and the remaining steps and timeline for finalization. The Air Force did not provide a project-specific status or timeline. It said only that it was working with the Clearinghouse on the "way forward." In early October 2026, instead of providing the agreement, the Air Force told the developer there was a "need to resume" the MRT process and that it would provide an overview of the way forward. It has not provided that overview. It also did not identify any new mitigation issue, set a timeline, or explain why a process that produced agreed terms more than a year ago must begin again. As of October 15, 2026, the developer has not received a mitigation agreement.

79. The developer has invested approximately $2.1 million in the project. About $750,000 of that was invested after the Air Force's August 2025 written acceptance, in reliance on the expectation that the agreed mitigation framework would be documented in the promised agreement. DoD's continuing failure to finalize that agreement has put that capital at risk. The uncertainty also affected a key development decision. Because the developer could not be confident whether and when the project could proceed with the agreed turbine configuration, it did not enter the then-current interconnection queue. As a result, the developer expects the project's interconnection and commercial operation to be delayed by approximately two years. That delay lengthens the development period, requiring additional land-control payments, permitting,

engineering, consultant, and personnel costs. It also extends the time the developer must carry its invested capital before the project generates any revenue, and it exposes the project to two additional years of potential cost escalation for turbines, electrical equipment, and construction. At a $170 million total investment, each 1 percent increase in project cost would amount to approximately $1.7 million. These harms continue to grow with each month DoD fails to act on an agreement it accepted more than a year ago.

80. **Project S**. Project S is a 277 MW onshore wind project in the Midwest, representing approximately $830 million in planned investment. The developer completed MRT discussions in April 2026, but it has not received a draft mitigation agreement. Since shortly after the PI Order, the developer's airspace consultant has asked DoD weekly for a status update on the project. DoD has not provided any substantive responses or provided the developer with a draft mitigation agreement.

81. The developer expects its local permits to be approved in December 2026, which would allow the project to move into engineering and procurement if DNHs had been issued. Because of the uncertainty over DNHs, the developer is limiting its spending on the project and will have to delay commitments to subcontractors. That means it will miss the opportunity to lock in current pricing, and it estimates that construction costs could increase by as much as $54 million. If the project is cancelled because of DoD's refusal to act, the developer would lose approximately $20 million in unrecoverable development costs, about $5 million of which it has incurred since this summer.

82. **Project T**. Project T is the repowering of an existing 300 MW onshore wind project in Texas. The developer completed its initial MRT discussions but has not received a draft mitigation agreement. In April 2026, NORAD advised the developer that all mitigation agreements

were on hold with no timeline. The project has now waited more than six months, including more than 70 days since the PI Order. Since the PI Order, the developer contacted the Clearinghouse by email on August 12, 2026, and by phone on September 8, and called and emailed its NORAD contact through mid-September. None of those inquiries has received a response, and the developer has not received the model agreement or a project-specific agreement.

83. The mitigation agreement is now on the project's critical path, meaning that it controls the overall project schedule. Until the agreement is executed, the project cannot move forward with key activities, and any further delay will push back subsequent milestones and the project's completion. The ongoing delay threatens the project's schedule. Under the current timeline, the agreement may not be executed until July 2027, delaying the anticipated start of construction until September 2028 and jeopardizing the developer's ability to meet the December 2029 in-service deadline.

84. The delay also threatens the project's economics by pushing back turbine delivery. Equipment delivered after December 31, 2027, will not qualify for the Advanced Manufacturing Credit, which the developer estimates would otherwise provide a benefit of approximately $200,000 per turbine, or roughly $24 million across the project. In addition, the developer has already spent approximately $1 million on development, including engineering and study costs, all of which is at risk if the project cannot proceed.

85. **Project U**. Project U is a utility-scale onshore wind project with a signed mitigation agreement. It has been waiting almost a year for DoD to review its request to simply renew DNHs for turbine locations that have not been moved.

86. These delays have stalled the project's progress, and the project has continued to suffer harm since the PI Order. The developer continues to pay lease, easement, and other

development costs while it awaits feedback from the government. The developer estimates that if the delay pushes the project's commercial operation date back by two to three years, it would incur losses of roughly $100 million to more than $200 million. Those losses include lost production tax credit value, escalation in construction and equipment costs, higher costs to secure power purchase agreements and financing in a market crowded with projects racing to meet tax credit deadlines, and additional lease and development costs.

87. **Project V** and **Project W** are sister projects being developed by the same developer in southwest Kansas.

88. Project V is a proposed onshore wind project of up to 500 MW located in Ford, Hodgeman, and Gray Counties, Kansas. The developer waited more than three and a half months for DoD to schedule an initial MRT meeting, which finally took place on December 11, 2025. More than ten months later, the developer has been unable to secure a follow-up meeting. Without further MRT discussions, the project cannot advance to mitigation agreement drafting or a final determination.

89. Project W is a proposed onshore wind project of up to 500 MW located in Finney, Gray, Hodgeman, and Ford Counties, Kansas. In March 2026, the developer confirmed to DoD that the draft mitigation agreement was acceptable. More than seven months later, DoD has still not provided an executable agreement. DoD's legal review has stalled without explanation, and neither NORAD nor the Clearinghouse has taken the steps necessary to transmit the agreement for signature. As a result, the project remains unable to obtain the agreement needed to complete the review process.

90. DoD's continued delays have caused substantial harm to both projects, with mounting commercial consequences even after the PI Order. For Project V, uncertainty about

whether and when the project could complete MRT review led the developer to make the commercial decision in September 2026, approximately one month after the PI Order, to pause wind development and pursue solar development at the site instead. As a result, the wind project is unlikely to proceed before the tax credits available to it expire in 2030, which may jeopardize its long-term viability. In addition, the site's solar resource is substantially weaker than its wind resource, so a solar facility would produce energy at a higher cost per megawatt-hour. Because a project's costs are ultimately reflected in the price charged to its offtaker, the developer must find a purchaser willing to pay that higher price before the project can proceed. A higher price makes it substantially more difficult to secure such a purchaser.

91. Project W remains under development, but within the past two weeks, its prospective purchaser withdrew, in part because of the uncertainty created by DoD's continued delay. The developer must now find a replacement buyer, and its options are limited. Because of the price difference between the project's location on the grid and the regional trading hub, a standard financial power purchase agreement is not economically viable, and prospective buyers are unwilling to assume the associated price risk. The developer therefore needs a buyer with a substantial electricity load that can be served directly by the project. If it cannot find such a buyer, the project will not proceed. Continued uncertainty about DoD's review also puts the developer in a weaker negotiating position, making it likely that any replacement buyer will demand less favorable terms.

92. **Project HH.** Project HH is a 230 MW onshore wind project in Lincoln County, Nebraska, representing approximately $500M in planned investment. The developer requested a mitigation agreement for execution on 22nd 2025, and the agreement has now been pending DoD finalization for over 300 days, including 70 days since the PI Order. Since the PI Order, the

developer has contacted the Clearinghouse 4 times and has been told only that the agreement remains under review. Without DoD's non-objection, the FAA has not issued a DNH, and the developer cannot obtain construction permits, proceed with investment in equipment or construction. Since the PI Order, the risk associated with the project has increased because its generator interconnection agreement will expire before the project is able to be completed and operationalized.

93. If the developer is forced to cancel Project HH because of DoD's refusal to deliver and execute the mitigation agreement, it will lose approximately $4M in unrecoverable development costs, including lease payments and engineering and design expenses. In addition, the developer will be required to pay up to $8.9M in penalty payments and forfeited study deposits due to withdrawal of the interconnection request.

94. Those costs have grown by approximately $300K since Plaintiffs moved for a preliminary injunction because the developer has continued to progress the engineering, permitting and design work to meet obligations under the project's Generator Interconnection Agreement.

95. **Project II.** Project II is a 200 MW onshore wind project in Pottawattamie County, Iowa, representing approximately $450M in planned investment. The Clearinghouse issued an email MRT on Sept. 4th, 2025, and the developer returned minor comments to its mitigation agreement on or about October 19th, 2025, while also requesting an executable mitigation agreement. The requested agreement has now been pending delivery from the DoD for 365 days, including 70 days since the PI Order. Since the PI Order, the developer has received no response. Without DoD's non-objection, the FAA has not issued a DNH, and the developer cannot issue full notice to proceed to its turbine supplier or proceed with other development activities.

96. On October 5th, 2026, instead of providing an execution ready agreement to the developer, the Clearinghouse sent the developer DoD's new model mitigation agreement. The new agreement lacked project specific information provided in the earlier draft, does not reflect the measures the developer and the MRT agreed to and contains the terms described in Section IX. DoD has thus responded to an agreement awaiting only its signature by proposing a new agreement the developer believes it could not finance.

97. If the developer is forced to cancel Project II because of DoD's refusal to deliver and execute the mitigation agreement, it will lose approximately $6.3M in unrecoverable development costs, including lease payments and engineering and design expenses. In addition, the developer will be required to pay up to $7.2M in penalty payments and forfeited study deposits due to withdrawal of the interconnection request.

98. Those costs have grown by approximately $3M since Plaintiffs moved for a preliminary injunction because the developer has continued to progress the project's interconnection studies and engineering, permitting and design work.

## VII. PROJECTS STALLED IN MRT REVIEW

99. Members with projects in MRT review report that, as of DoD's October 5 status report, they were aware of only two MRT meetings held since the PI Order, both with the Navy. That figure reflects what members reported to me; it is not a complete accounting of DoD's activity. When the Court entered the PI Order, it found that DoD had not engaged in mitigation discussions with any wind project applicant since at least April 2026. ECF No. 125 at 29. Since then, that has changed very little. To my knowledge, no MRT meetings have been held with the Air Force or the North American Aerospace Defense Command ("NORAD"), which together are potentially implicated by most of the approximately 328 projects DoD has identified. Only two

have been held with the Navy based on information ACP has collected from developers. The category counts described in Section IV reflect the number of projects DoD reported in each category at the time of the PI Order; the total number of projects under review has since increased, see ECF No. 153 at 2 n.1 ("more than 300 projects under review"), and projects have moved between categories, id. at 3–4. DoD's October 5 status report states that the Air Force and NORAD have "contacted" developers to "initiate or re-engage in MRT discussions." ECF No. 153 at 3–4. In the experience of the members I spoke with, those communications have said only that someone will contact the developer later to schedule a meeting, without proposing a date or time. For the members I spoke with, these contacts had not yet resulted in confirmed dates and times or completed substantive MRT meetings. Members also report that recent Air Force communications have asked developers to agree to extend the 90-day MRT discussion period, representing that milestones would follow once the extension was agreed, but that no milestones or meetings have followed. In at least one case, the 90-day period had begun more than two years earlier.

100. **Project X.** Project X is a 192 MW onshore wind project in Illinois. The project received an NPR in February 2026 and is in MRT review. On August 18, 2026, the developer asked DoD to re-engage in MRT discussions. The Clearinghouse responded with a form reply stating that it was aware of the injunction and was developing implementation guidance. DoD has not followed up since. It has not proposed an MRT meeting, given a timeline for resuming MRT discussions, or otherwise contacted the developer about the project.

101. Because DoD has not resumed MRT review, the developer has put the project on hold. While it waits, it continues to pay approximately $200,000 per year in lease payments to maintain site control. The project faces a major interconnection deadline in March 2027. If the

project misses that deadline, it may be cancelled, and the developer would lose approximately $4.8 million in unrecoverable development costs.

102. **Project Y**. Project Y is a 200 MW onshore wind project in Benton County, Indiana. The developer has secured 99 percent of the project's land. Key local and state permitting processes are underway, the interconnection study process is nearing completion, and major due diligence studies are complete. The developer is targeting a commercial transaction in the fourth quarter of 2027 and commercial operation as early as the fourth quarter of 2029. In October 2024, the FAA issued DNHs for the project's turbines through the OE/AAA process, indicating that DoD had cleared the project. The developer later refiled within the same project area, modifying some individual turbine locations. In my experience, when a developer refiles within an area DoD has already cleared and makes only modest changes to turbine locations, DoD has typically cleared the refiled turbines consistent with its prior determination. Instead, in September 2026, after the PI Order, DoD issued a new notice of presumed risk citing perceived impacts to NORAD radar operations at Grissom Air Reserve Base. The notice does not explain the basis for this new finding beyond general national security concerns, and it does not identify what changed since DoD cleared the project in 2024. As a result, a project DoD cleared two years ago must now start the DoD review process over. That process includes MRT discussions, which DoD is not currently conducting with NORAD, and any resulting mitigation agreement. DoD has not offered or scheduled an MRT meeting since issuing the notice.

103. The developer has approximately $15 million in sunk costs and financial commitments in the project, all of which are at risk. Since the PI Order alone, it has spent $367,149 to keep the project moving. That spending covers land leases, transmission easements, and title and survey work; engineering and design; legal work for permitting and land; micrositing and

meteorological tower monitoring; environmental site assessments and wetland delineations; development and procurement of the main power transformer and circuit breakers; airspace support; and community sponsorships and local liaison work. Until DoD conducts an MRT review of the new notice, the developer cannot resolve it or obtain new DNHs, and the project cannot move forward.

104. **Project Z**. Project Z is a 180 MW onshore wind project near Bloomington, Illinois. The Air Force asked the developer to agree to extend the MRT discussion period, but it proposed no timeline or path forward. On July 28, 2026, the developer responded by asking the Air Force for a proposed meeting schedule and a plan for the next 90 days. The Air Force has not responded with a meeting schedule, a plan, or any other path forward, and it has not scheduled an MRT meeting since the PI Order.

105. Because DoD has not resumed MRT review, Project Z cannot advance to mitigation agreement drafting or a final determination. Each year of delay would increase the project's construction costs by tens of millions of dollars. That figure does not include the cost of additional development work, new studies, and lease renewals. If the developer is forced to cancel the project, the project's development costs would constitute a substantial financial loss.

106. **Project AA**. Project AA is a 400 MW onshore wind project in Grant and Hidalgo Counties, New Mexico. The project received a notice of presumed risk on February 26, 2026. It concluded MRT discussions with NORAD in April 2026, but it still must complete MRT discussions with the Air Force. The developer has been waiting for the Air Force to convene those discussions. It has received no communication proposing an MRT meeting or a schedule for one.

107. After the PI Order, the Air Force asked the developer to agree to extend the MRT discussion period. The developer asked for a proposed meeting schedule and the expected length

of the extension, but the Air Force did not provide either. At the end of August, the developer received only a brief note stating that the Air Force was working with the Clearinghouse on a path forward. It has received no update since. Because mitigation discussions have not concluded, the developer has not received a draft mitigation agreement.

108. The developer has spent more than $6.0 million in unrecoverable development costs, including land lease payments, permitting, environmental and engineering studies, interconnection work, and internal labor. Those costs have grown by approximately $145,000 since this summer. That increase is smaller than it otherwise would be only because the developer has deliberately deferred major workstreams until DoD's review is resolved; in effect, the delay has halted the project's progress. In the second half of 2026, the developer competed in three solicitations for power purchase agreements. It has not been shortlisted in any of them, which it attributes to the uncertainty created by DoD's and the FAA's non-response. The developer has also pushed its turbine reservation payment to next year. That shift affects the project's target commercial operation date and its economics, and it may affect the availability of turbines that comply with federal foreign-entity-of-concern restrictions. Meanwhile, the developer continues to pay pre-operation rent on its state land lease. Its next key deadline is in March 2027, when it must begin early procurement of long-lead high-voltage components. If the project cannot begin procurement by March 2027, the project's commercial operation date will slip, and it will have to procure that equipment later, likely at higher prices. Because the developer cannot responsibly commit to that equipment while DoD's review remains unresolved, DoD's delay makes it increasingly unlikely that the developer can meet the March 2027 deadline.

109. ACP tracks the review status of member projects based on information that developers provide to ACP, and ACP has compared that information against DoD's project lists.

That comparison shows discrepancies between ACP's project tracking and DoD's lists. Some projects that ACP is tracking do not appear on DoD's lists at all, and others appear in a different category than the information developers have provided to ACP would indicate. To the extent a project that has already accepted DoD's final mitigation proposal remains classified as undergoing MRT review, DoD's reported category totals overstate the number of projects requiring substantive mitigation negotiations and understate the number awaiting only preparation or execution of an agreement. Specifically:

a. In Category 1, ACP is tracking at least three projects that are not in DoD's list anywhere and two projects that DoD lists as Category 2.

b. In Category 2, ACP is tracking at least five projects that are not on DoD's list at all, at least 15 projects that DoD identifies as Category 3, and four projects that DoD identifies as Category 4.

c. In Category 3, ACP is tracking at least four projects that are not on DoD's list at all, at least one project that DoD lists as Category 2, and two projects DoD has as Category 4.

d. In Category 4, ACP is tracking at least two projects that are not on DoD's list, at least seven projects that DoD lists as Category 3, and one that DoD lists as Category 5.

e. In Category 5, ACP is tracking at least five projects that are not on DoD's list, one project that DoD lists as Category 3, and one that DoD lists as Category 4.

## VIII. PROJECTS AWAITING PRELIMINARY REVIEW

110. DoD reported that approximately 90 projects were awaiting preliminary review at the time of the injunction. Its October 5 report states that notices of presumed risk had been

identified for at least 40 projects, that 25 draft notices were awaiting final input from the military services regarding the specific risks, and that four projects were cleared without a presumed-risk finding and returned to the FAA. ECF No. 153 at 4. Four clearances out of approximately 90 projects is minimal progress, even at this stage of review. These steps do not establish that the remaining preliminary reviews have been completed or that DoD has met applicable deadlines. Members report filings that have been pending well beyond the 30-day preliminary review period, some for more than a year, without any determination.

111. **Project BB**. Project BB is a 486 MW onshore wind project in Colorado. The developer filed the project's turbines with the FAA in April 2026. DoD's 30-day preliminary review period therefore expired in May 2026, but DoD has issued no determination. On August 17, 2026, after the PI Order, the developer asked the Clearinghouse to re-engage on the project. The Clearinghouse has not responded.

112. Because of the uncertainty about whether and when the project will receive DNHs, the developer has been unable to sign an offtake agreement that it has been negotiating for more than a year. Without an offtake agreement, the project cannot be financed. If it cannot proceed, the developer stands to lose approximately $5.03 million in sunk development costs, approximately $975,000 of which it has spent since filing with the FAA in April 2026.

113. **Project CC**. Project CC is a 200 MW onshore wind project in the Midwest, representing approximately $600 million in planned investment. The developer filed the project with the FAA in April 2026, and the project has been awaiting DoD's preliminary review well beyond the 30-day review period. Since shortly after the PI Order, the developer's airspace consultant has asked DoD weekly for a status update on the project, but DoD has provided no

substantive updates, has not scheduled an MRT meeting, and has not indicated that it intends to schedule a meeting. It has issued no determination on the project.

114. The developer faces a key decision in December 2026. If DoD has not meaningfully resumed review by then, the developer expects to revert to an earlier, less efficient turbine layout that still has valid DNHs. That change would require substantial rework of the engineering completed to date and amendments to permits the county has already issued. The developer estimates that the rework alone would cost approximately $2 million, and that the less efficient layout would add approximately $10 million in project costs, including longer roads and additional cabling. If the project is cancelled, the developer would lose approximately $15 million in unrecoverable development costs, about $5 million of which it has incurred since this summer.

115. **Project DD**. Project DD is a 300 MW, 123-turbine repowering of an existing wind project in Ida County, Iowa, representing approximately $450 million in planned investment. The developer submitted the project to the FAA on April 8, 2026. The FAA public comment period closed with no comments received, but according to the FAA, the DNHs remain pending DoD review and approval. DoD's 30-day preliminary review period expired in May 2026, more than five months ago, and DoD has issued no determination.

116. Under the local ordinance, the developer cannot proceed with local permitting or the repowering until it has DNHs and FAA approval of an aircraft detection lighting system. The developer must execute a turbine supply agreement and a balance-of-plant agreement by November 2026. Without DNHs, it cannot commit to those agreements, and if it does not execute them by then, the project will be delayed from 2027 to 2028 or later. If the project is cancelled because of DoD's failure to act, the developer would lose approximately $1.2 million in development costs, including studies and permitting.

117. **Project EE**. Project EE is a 1,000 MW onshore wind project in Lea County, New Mexico, representing approximately $2.37 billion in planned investment. The developer submitted the project to the FAA in March 2026. DoD's 30-day preliminary review period expired in April 2026, but DoD has issued no determination. The developer has received no communication from DoD about the project since its submission.

118. DoD's delay is holding up the project's commercial progress. The developer is in bilateral negotiations with a single offtaker and expected to execute an agreement in the second half of 2026. Because of the uncertainty created by DoD's and the FAA's non-response, the parties have not yet entered exclusivity or executed a term sheet. The developer has also pushed its turbine reservation payment to next year. That shift affects the project's target commercial operation date and its economics, and it may affect the availability of turbines that comply with federal foreign-entity-of-concern restrictions. Meanwhile, the developer continues to pay pre-operation rent on its state land lease. The developer has spent more than $7 million on development to date, including land lease payments, permitting, environmental and engineering studies, interconnection work, and internal labor. It expects to spend approximately $3.6 million more in the second half of 2026, all of which would be at risk if the project cannot proceed. The project's next key deadline is in December 2026, when the developer must begin early procurement of long-lead high-voltage components. The developer expects that if it cannot begin that procurement on time, the project's commercial operation date will slip, resulting in loss of tax credits, and the equipment will likely cost more.

## IX. NEW MODEL AGREEMENT TERMS CREATE ADDITIONAL NEGOTIATION AND FINANCING OBSTACLES

119. As DoD's October 5 status report confirms, the Clearinghouse has begun transmitting the Model Agreement since the PI Order. ECF No. 153 at 2. I have reviewed a copy

of the Model Agreement provided by a member. The Model Agreement is a proposed form: DoD describes it as "terms [developers] may consider" while DoD prepares individualized agreements, and DoD has not said when it will issue or execute those agreements. Id. The discussion below describes what the template would require if DoD carries these terms into the individualized agreements. The Model Agreement runs 119 pages, including exhibits, compared with the 15 to 20 pages typical of the more than 140 prior agreements that were fully executed.

120. The template is not a revised version of the prior form. Prior mitigation agreements were narrow, negotiated bargains: each resolved a specific conflict between a project and military radar or airspace, and in exchange DoD agreed not to object to the project. Neither party could unilaterally change that bargain. The template departs from that model in two ways. First, it adds obligations, including ownership and CFIUS conditions, cybersecurity and supply-chain programs, a separate non-disclosure agreement, a permanent release and indemnity, and a federal choice-of-law clause, many of which, in my experience, did not appear in prior mitigation agreements and are not clearly connected to the specific adverse impact a mitigation agreement exists to resolve. Second, it functions as an open-ended instrument under which DoD may reopen the terms, request suspension of operations, or terminate the agreement largely on its own determination. What a developer receives is, in effect, a revocable consent. In my experience, lenders and investors do not finance a project whose mitigation agreement, and with it the basis for DoD's non-objection to the project, can be withdrawn in that way.

121. Regardless of the legal authority DoD asserts for these provisions, their practical consequences for project development and financing are substantial. Each new obligation is something a developer and its financing parties must evaluate, negotiate, and approve before the agreement can be signed, and each adds time to a process the stay was meant to restart. Several

also create financing obstacles that, in my assessment, would prevent many projects from being financed on the template's terms.

122. Based on my professional experience and my communications with ACP members, utility-scale onshore wind projects are typically financed through some combination of construction and term debt, tax equity investment or the sale of tax credits under 26 U.S.C. § 6418, and long-term PPAs. Lenders and investors size their commitments on the project's projected energy production and revenue over the project's expected operating life, as verified by an independent engineer. Before they will fund, financing parties also typically require that (a) the project hold all material federal approvals on terms that cannot be revoked or materially changed at a counterparty's discretion; (b) the project's liabilities be defined and quantifiable; (c) the lenders be able to take a security interest in every material project contract and, after a default, step in or transfer the project without losing those contracts; and (d) the financing parties be able to review the project's material contracts and the risks they create. In my experience, these requirements are not merely preferences that affect the interest rate a lender charges; they determine whether financing can close at all. If a project cannot establish a reasonably predictable revenue stream, demonstrate that its essential approvals will remain effective and will not unduly burden project operations, or give lenders enforceable rights in its assets and contracts, the developer may be unable to obtain the construction financing necessary to build it. The paragraphs that follow explain, for each major provision, the new obligation, the financing risk it creates, and the consequence for the project.

123. Curtailment. The template requires the project owner to "immediately curtail wind turbine operations" whenever the Military Department or NORAD requests it for "National Defense Imperatives and Priorities." Model Agreement Ex. 5 ¶ E5.3. Unlike the prior mitigation

agreements, which limit curtailment to defined national security emergencies or severe weather, and which in industry's experience DoD rarely, if ever, invoked, the new requirement is so broad that it covers the protection of virtually all military operations, installations, and readiness activities—emergency or not. Id. Ex. 8 ¶ E8.43. The template states that advance notice "may not always be possible." Id. Ex. 5 ¶ E5.5. The breadth of this authority creates significant risk for investors, because a project could be ordered to stop producing at any time, without advance notice, as often as DoD chooses, and with no compensation. That risk does not depend on how often DoD actually invokes the authority. It arises from the authority itself. In my experience, lenders and tax equity investors underwrite a project based on what its contracts permit, not on what a counterparty is expected to do, and they size their commitments against conservative, downside cases. Because financing parties cannot quantify, price, or insure against this risk, it would be extremely difficult, if not impossible, to get them comfortable with the project's financial assumptions. At a minimum, the risk would be priced into a higher cost of capital; more likely, lenders and investors would decline to finance the project at all. Because the production tax credit under 26 U.S.C. § 45Y is earned for each kilowatt-hour produced and sold, uncapped curtailment also makes the project's tax credits unpredictable to tax equity investors and credit purchasers. And curtailment on demand may leave the project unable to meet its delivery obligations under its PPA, exposing it to damages for energy it was prohibited from producing, and potentially creating challenges for grid operators who will have to procure replacement power with potentially no warning.

124. Suspension, reopener, and termination at DoD's discretion. Beyond curtailment, DoD "reserves the right to request the Project Owner suspend operations of the Project," with no limit on duration. Model Agreement § 3.3. DoD may also declare a "Material Change in Circumstances," "as determined in the sole discretion of the Department," and require the owner

to renegotiate the mitigation measures "and any other relevant terms" for at least 90 days. Id. § 3.1. If any change in federal, state, or local law, including rules and regulations, or in any NERC standard, materially affects the parties' rights or obligations, the parties do not agree on an amendment within 60 days, and the change adversely impacts "National Defense Imperatives and Priorities," DoD may terminate the agreement on 10 days' written notice. Id. §§ 2.2.2.6, 13.1, 13.1.3. In other words, DoD could change its own regulations and use that as a basis for terminating an agreement. DoD may also terminate for alleged noncompliance with the template's ownership, cybersecurity, or confidentiality provisions, in some cases "immediate[ly]." Id. §§ 2.2.2.3–2.2.2.5; Ex. 9 ¶ E9.7.3. DoD may even terminate upon the occurrence of a force majeure event, which the template defines to include floods, fires, and "unusually severe weather." Id. § 2.2.2.2; Ex. 8 ¶ E8.29. A tornado that damaged a project could thus end its agreement at DoD's option. By contrast, prior agreements could be terminated only by mutual consent or upon defined, objective events, such as retirement of the affected radar or decommissioning of the project. And the template does not say what happens if the parties have not agreed on new terms when the 90-day renegotiation period ends, including whether a suspension of operations would continue.

125. These provisions create fundamental uncertainty about whether the basis for a project's federal clearance will remain in place. DoD does not issue or revoke FAA determinations; the FAA does so under its own authority. But DoD's non-objection to the FAA is predicated on the mitigation agreement. If DoD suspends, reopens, or terminates the agreement, the basis for that non-objection is placed in doubt, and with it the project's ability to obtain, extend, or rely on the FAA determinations it needs. Under the template, that risk continues even after the project has been financed, built, and placed in operation. A project could face a DoD request to suspend operations for an unlimited period, losing all revenue while its debt service continues, face

renegotiation of its mitigation terms after financing has closed, or lose its agreement because of circumstances beyond its control, such as a change in law or a severe storm. The template places no meaningful limits on these risks and gives lenders no notice or opportunity to cure. In my experience, financing parties commit hundreds of millions of dollars to a wind project over periods of 10 to 15 years or more, and they do so only when they can rely on the project's material approvals remaining in effect for that period. Lenders and investors cannot underwrite risks of this kind, and in my experience most will not finance a project subject to them. The practical result is that a template DoD presents as the path forward under the stay would leave many of these projects unable to obtain the financing they need to be built.

126. Advance notice and CFIUS review for ownership changes. The template requires the owner to notify DoD at least 30 days before any transfer that gives a new party a 5% or greater equity or voting interest, and at least 180 days before any change that could affect its status as a foreign person. Model Agreement § 4.3.3. A change resulting in foreign ownership or control requires a CFIUS filing at least 180 days in advance. Id. § 4.5.2.1. If CFIUS does not clear the transaction, DoD may terminate the agreement in its "sole discretion," and any CFIUS conditions automatically amend the agreement. Id. §§ 4.5.2.2.3, 4.5.3. Owners that meet the foreign-ownership conditions in Section 4.5.1 must also obtain CFIUS clearance before DoD will execute the agreement. Id. § 4.5.1.

127. These restrictions threaten several routine sources of project capital. Tax equity investments, for example, often require an investor to acquire an equity interest in a project company in exchange for providing capital needed to develop or construct the project. Sponsor equity sales likewise may be necessary to bring in new investors or refinance an existing investment. The template's advance-notice requirements, up to 180 days for any change that could

affect foreign-person status, together with uncertain CFIUS outcomes that DoD may treat as grounds for termination, could delay or derail these transactions, even when the ownership change is necessary to secure financing. Id. §§ 4.3.3, 4.5.2.2.3. Notice periods of that length are incompatible with the timelines on which many investments are negotiated and closed, particularly when the transaction's outcome could include termination of the project's mitigation agreement or the imposition of new conditions.

128. The template creates an additional obstacle for lenders. It treats a mortgage of the project as an assignment and requires any assignee to expressly and unconditionally assume all of the owner's obligations under the agreement, with the assumption delivered to DoD 30 days in advance; any assignment that does not comply is "null and void ab initio." Id. §§ 5.1–5.2. This means a lender seeking a security interest in the project could be required to assume the owner's contractual obligations, including the uncapped indemnity described below, rather than simply hold collateral to secure repayment. If the owner defaults, a lender's foreclosure or exercise of remedies could also trigger transfer requirements that jeopardize the agreement or require the lender to assume obligations it never agreed to undertake. The template does not include the customary protections that allow lenders to take the project as collateral without assuming the owner's obligations or to step in and protect or operate the project if the owner defaults, or that allow owners to transfer interests among affiliated companies or to new upstream owners without jeopardizing the mitigation agreement. The consequences of a procedural misstep are severe. A missed assumption deadline would not by itself void the underlying loan, tax equity investment, or foreclosure, but it could render the assignment of the mitigation agreement void from the outset, leaving the lender, investor, or purchaser holding a project without the agreement on which DoD's non-objection rests. A missed ownership notice under the provisions described above could also

give DoD grounds to terminate the agreement. Id. §§ 2.2.2.3, 4.9. In my experience, lenders will not close financing unless they can obtain and enforce a security interest in the project's material contracts and, after a default, foreclose or step in without losing them. These restrictions put each of those rights in doubt and can prevent financing from closing.

129. Taken together, these provisions undermine lenders' ability to protect their collateral and recover their investment, and turn the ordinary transactions through which wind projects are financed, refinanced, and transferred into potential grounds for losing the project's federal clearance. In my experience, lenders and investors will not commit capital on those terms.

130. Permanent, uncapped indemnity. The owner must "permanently release[], indemnif[y], and hold[] harmless" the United States from all claims and losses "arising as a result of" military activities near the project, including low-altitude and supersonic flight, live-fire exercises, and ordnance deployment. *Id.* §§ 12.1–12.2. The indemnity expressly covers direct, indirect, and consequential damages, including physical damage to the project, loss of revenue, grid instability, and electrical service interruptions. *Id.* § 12.2. It has no cap and no exceptions. No comparable provision appeared in prior mitigation agreements.

131. This provision imposes two distinct burdens. First, the release requires the owner to give up its own claims against the United States for losses arising from the listed military activities. If low-altitude flight operations or ordnance deployment during a training exercise damaged project equipment, the owner would bear the entire loss, including lost revenue, with no recourse against the government. Second, the indemnity requires the owner to cover claims that others bring against the United States arising from those activities. If military activity near the project caused grid instability or an electrical service interruption, and utilities, customers, or other third parties sought damages from the government, the provision would require the project owner

to indemnify the government, with no limit on the amount. In both cases, the owner assumes the financial risk of activities it does not control and cannot predict. In my experience, financing parties require a project's liabilities to be defined and quantifiable, because they size debt and equity based on the cash flow left after the project's obligations are met. An unlimited, permanent liability for the government's own conduct cannot be quantified, and a single large claim could consume the cash flow on which repayment depends. Members have reported to me that their insurers have indicated they will not cover this exposure, so it cannot be shifted to an insurer either. And because the template treats a mortgage as an assignment, a lender taking a security interest in the project could itself be required to assume this obligation. In my experience, lenders and investors will not finance a project that carries an uninsurable, uncapped liability of this kind.

132. Confidentiality and citizenship restrictions. Under the template's provisions, the owner may not disclose any curtailment request, or any curtailment that results, without the government's prior consent. Although consent to disclose to a business entity with which a non-disclosure agreement is in place "will not be unreasonably withheld," the owner must still obtain consent before each such disclosure, and the template sets no time within which consent must be given. *Id.* Ex. 5 ¶ E5.4. Access to curtailment data is limited to U.S.-citizen representatives with a verified need to know. *Id.* Ex. 9 ¶¶ E9.1.13, E9.4.1. The owner may not share that information with "foreign parent companies, foreign partners, foreign subcontractors, or foreign-controlled entities, including third-party operations and maintenance (O&M) contractors," without the government's express written authorization. *Id.* ¶ E9.4.3. These restrictions collide with the information flows on which project financing depends. In my experience, loan agreements and tax equity agreements typically require the project owner to report production regularly, explain material shortfalls, and promptly disclose events that could affect the project's output or its ability

to service debt. Lenders and their independent engineers monitor production against the projections on which the debt was sized, and tax equity investors track the output that generates the production tax credits they have paid for. A curtailment the owner cannot disclose leaves an unexplained production shortfall. That could put the owner in breach of its reporting covenants, or force it to choose between violating the template and violating its financing agreements. The same problem arises under a PPA. To excuse a delivery shortfall, an owner typically must give the offtaker notice and explain the cause, and if it cannot do so, it may owe damages for energy it was prohibited from producing. Before closing, financing parties also need to evaluate curtailment risk as part of their diligence, but under the template they could not see the information needed to do so without government consent. The citizenship restriction compounds these problems. Many lenders, tax equity investors, and project sponsors have non-U.S. parents, affiliates, or personnel, and many O&M contractors and turbine manufacturers are foreign-owned. Where a project has a foreign parent or a foreign-owned O&M contractor, the template could prevent the owner from sharing curtailment information with the very parties that finance and operate the project, and with the personnel needed to carry out a curtailment, absent separate government approval. In my experience, financing parties will not commit capital to a project whose owner may be contractually barred from telling them why it is not producing.

133. Cybersecurity and supply-chain obligations. Although the template acknowledges that the project is a “Low Impact” asset under NERC standards, it requires the owner to implement measures equivalent to NERC CIP-004, CIP-005, and CIP-013, which address personnel and training requirements, electronic security perimeters and remote access, and supply-chain risk management, respectively. Model Agreement § 6.1. Notably, NERC does not require compliance with these standards until July 1, 2028. These requirements entail ongoing obligations to establish

and maintain cybersecurity procedures, control and monitor access to systems, manage personnel and vendor risks, and document compliance. The template makes noncompliance grounds for termination of the mitigation agreement. Id. § 2.2.2.4.

134. These requirements create additional costs and operational burdens that may be difficult to quantify before financing and that continue throughout the project's life. More importantly, they expose the project to the risk of losing its mitigation agreement, and potentially its ability to operate, if the owner fails to meet any applicable requirement. Much of that compliance depends on third parties the owner does not control. Turbine manufacturers and O&M contractors, many of them foreign-owned, perform much of the work on a wind project under agreements typically negotiated long before construction, and those agreements do not contain these requirements. If a vendor declines to provide required software information, submit its technicians to screening, or accept new reporting obligations, the owner, not the vendor, bears the risk of termination. These risks arise even though cybersecurity and supply-chain risks in the electric power industry are already subject to federal regulatory oversight, including through FERC-approved NERC reliability standards. By imposing additional contractual requirements without clearly defining their scope or limiting the consequences of noncompliance, the template makes the security of a material project approval depend on the conduct of third parties and on standards that cannot be measured in advance. In my experience, lenders and investors are unwilling to finance a project on that basis, or will do so only on terms that substantially increase its cost.

135. The selective application of these new requirements further undermines DoD's justification for imposing them on projects already undergoing review. DoD's Model Agreement introduces extensive provisions addressing CFIUS, foreign ownership, cybersecurity, supply-

chain security, personnel screening, and other matters that are not specific to radar interference. Based on my experience with the DoD review process and my review of DoD's status reports, I am not aware of comparable requirements being imposed on other energy infrastructure or uniformly across wind projects. In particular, DoD reports clearing four wind projects after determining that they presented no presumed risk to military operations, without requiring mitigation agreements containing these provisions. DoD has not explained in its status reports why these broader concerns justify reopening completed reviews and renegotiating existing mitigation agreements, particularly where the new requirements have not been tied to an identified, project-specific interference risk. I do not suggest that these requirements should be extended to the four cleared projects or to any other projects. Rather, DoD should explain why these additional requirements are necessary for projects that have already completed technical reviews and negotiated measures addressing the military interference risks identified during those reviews. Without such an explanation, the selective imposition of these new requirements reinforces my concern that they create additional obstacles and delay rather than resolve the interference issues the review process is intended to address.

136. Loss of DoD's commitment not to object to FAA extensions. Prior agreements barred DoD from objecting to a developer's request to extend its FAA Determination of No Hazard so long as the project remained within the agreement's parameters. That commitment is the principal regulatory benefit a developer receives in exchange for agreeing to mitigation, and it allowed projects to absorb construction delays and design changes without reopening the agreement. The template omits it. Model Agreement §§ 8.1–8.3. Instead, the agreement terminates automatically if construction does not begin within the period set by FAA regulations, and any change requiring a new FAA filing requires a formal amendment. Id. §§ 2.2.1.1, 9.1. DoD's

remaining commitment not to object before other regulators is conditioned on the owner's continuing "material compliance" with the template's many new obligations. Id. § 8.2. These changes strike at a core financing requirement. In my experience, lenders and tax equity investors typically require, as a condition of closing and throughout construction, that the project hold valid FAA determinations for every turbine and that those determinations not be subject to revocation or lapse outside the owner's control. Developers routinely change turbine models or adjust locations between financing and construction, often because of supply-chain availability, and construction schedules routinely slip for reasons beyond the developer's control. Under prior agreements, those ordinary events did not put DoD's non-objection at risk. Under the template, a construction delay could terminate the mitigation agreement outright. Termination would not itself revoke an existing FAA determination, which the FAA issues and extends under its own authority. But it would remove the basis for DoD's non-objection, so that any extension request or new FAA filing would again be subject to DoD review and potential objection. And under the template, a turbine model or location change that requires a new FAA filing, as such changes commonly do, would require a formal amendment that DoD may grant or withhold on no set timeline. In my experience, financing parties will not lend against a project whose mitigation agreement, and with it the basis for DoD's non-objection, could terminate mid-construction or be reopened by a design change made to keep the project on schedule. Their exposure would depend on DoD's willingness to act, and members report that DoD has not executed amendments to their mitigation agreements since August 2025.

137. The problem is especially acute now. Members report that many projects that have waited more than a year for DoD action are at or near the 18-month expiration of their FAA determinations. A developer whose FAA determination is expiring must seek an extension or a

new determination from the FAA. Under the template, the same delay could also terminate the mitigation agreement automatically, leaving the developer without DoD's commitment not to object at the very point it needs one. Rather than ending the harm the stay was meant to prevent, the template would compound it by turning the delay these projects have already experienced into grounds for losing the agreements they need to be financed and built.

138. Exhibits control, and state law does not apply. If the body of the template and an exhibit conflict, the exhibit controls. Model Agreement § 13.5. That reverses the usual order. In most commercial agreements, the main body sets the parties' core rights and limits, and exhibits and schedules supply technical or administrative detail. Here, the exhibits contain some of the template's most consequential terms: the curtailment provisions, the broad definition of "National Defense Imperatives and Priorities," the cybersecurity standards, and the new non-disclosure agreement. As a result, any protection a developer negotiates in the body of the agreement, such as a limit on curtailment or a narrower termination right, could be overridden by broader language in an exhibit. To obtain a protection it can rely on, a developer would have to renegotiate each exhibit that might conflict with it, adding time and complexity to an already lengthy process. In my experience, financing parties and their counsel must be able to say with confidence what a material contract requires. A structure in which the fine print can override the negotiated terms makes that difficult.

139. The template also provides that "United States Federal law" alone governs its interpretation. Id. § 13.2. The other contracts on which a project's financing depends, including its loan agreements, tax equity agreements, PPAs, and security documents, are typically governed by state law, under which questions about interpretation, assignment, security interests, and lenders' remedies are well settled. The template does not identify what body of federal law would answer

those same questions for the mitigation agreement. Financing parties would therefore face uncertainty about how the agreement would be interpreted and enforced, and how it would interact with the rest of the project's contracts, if a dispute arose. That uncertainty adds to the cost and difficulty of financing.

140. For these reasons, the template does not offer a near-term path to completing review for projects that had already finished, or nearly finished, the mitigation process. It leaves developers with two unacceptable alternatives: accept terms that, in my assessment, would make many projects commercially unfinanceable, or negotiate for what could be a year or longer, as described in paragraphs 23–26, while those projects continue to deteriorate.

## X. CONTINUING PROJECT-SPECIFIC HARM AND NEED FOR TIMELY ACTION

141. In granting the stay, the Court found that DoD's review freeze was causing wind-project developers "substantial and continuing" economic losses, including "increased carrying costs, higher financing costs, delayed or lost project revenues, and the potential loss of tax-credit value," and that because money damages are unavailable, this "mounting economic harm" is irreparable. ECF No. 125 at 30. Each of those harms has continued since the PI Order. As the examples above show, since the PI Order members of Plaintiff organizations have continued paying land, lease, and interconnection carrying costs on projects they cannot advance (for example, Projects A, B, D, I, K, and X); paid to arrange interconnection security that a financing partner would not fund without a countersigned agreement (Project C); incurred delay damages under a power purchase agreement (Project M); lost turbine supply arrangements (Projects L and M) and offtake opportunities (Projects A, W, AA, and BB); seen tax-credit value put at risk (Projects A and T); and paused or terminated wind development (Projects Q and V).

142. For these projects, delay is not merely a deferred expense. Based on my experience and what members report, wind projects are developed against a sequence of interlocking deadlines: interconnection milestones and security postings, turbine supply reservations and procurement commitments, PPA milestones and commercial-operation dates, financing commitments with expiration dates, local permits, FAA determinations that lapse after 18 months and can only be extended an additional 18 months with the concurrence of DoD, and the timing requirements of federal tax credits. Those deadlines do not move when DoD review is delayed. A missed deadline can trigger forfeited deposits, damages, renegotiation on worse terms, or loss of the contract altogether, and each loss makes the next deadline harder to meet. If enough of them are missed, a project that could have been built is cancelled.

143. These harms compound over time. In my experience, a developer may be able to absorb an additional month of carrying costs, but it cannot necessarily recover a lost power purchase agreement, an expired interconnection position, a forfeited turbine reservation, or financing that is no longer available. Once those opportunities are lost, the project may no longer be economically viable even if DoD eventually completes its review. Restarting mitigation negotiations therefore does not merely postpone construction; in my assessment, it increases the risk that projects that were otherwise ready to proceed will never be built.

144. Members have identified DoD's pending review or determination as an obstacle to advancing the projects described above.

## CONCLUSION

145. Based on my experience, my review of DoD's status reports and the Model Agreement, and the information reported to me by ACP members, DoD's actions since the PI Order have not resolved the obstacles preventing these projects from advancing. Projects that had

completed or substantially completed mitigation review remain stalled, and the new Model Agreement adds both further delay and contractual terms that threaten their ability to obtain financing. Meanwhile, the resulting costs, missed milestones, and uncertainty continue to accumulate and threaten the viability of projects that were otherwise ready to be financed and built.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 18, 2026



/s/Tom Vinson