**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | | |
|---|---|---|
| RENEWABLE NORTHWEST, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:26-CV-01092 |
| | § | |
| PETER B. HEGSETH, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## FEDERAL DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE STAY

Plaintiffs' motion to enforce should be denied. The Department of War has returned to reviewing applications, as the Court's injunction required. And regardless, Plaintiffs' motion is an inappropriate attempt at the programmatic relief Plaintiffs previously disavowed, asking the Court to direct the extent and terms of necessary mitigation, and the timing and sequencing of Department review for every pending application. As Plaintiffs and their non-party declarant recognizes, activity is taking place in each of the five Categories. Plaintiffs' grievances go to the pace of since-resumed processing, but they have not shown that the temporary pause stayed by this Court is still in place. Should any particular developer be concerned with the pace of review for its application, that is a fact-specific grievance which requires a fact-specific remedy, not the wholesale programmatic relief Plaintiffs' motion seeks.

## I. BACKGROUND

On August 6, this Court issued a preliminary injunction against Federal Defendants that "stayed" any "freeze" on the DoW Military Aviation and Installation Assurance Siting

Clearinghouse's ("Clearinghouse") "review" of applications referred to it by the Federal Aviation Administration under 10 U.S.C. § 183a. *See* Dkt. No. 125 at 35. The Court also ordered DoW to submit status reports every 30 days "addressing whether review of wind energy projects has resumed for projects" under various stages of review, which Federal Defendants have been doing. *Id.* A few weeks ago, Plaintiffs[1] filed a "Response" to Federal Defendants' first status report suggesting that the temporary pause stayed by this Court is still in effect. Dkt. No. 147. The Court in turn scheduled a status conference and declined to issue any relief, including noting the relatively short period of time since the injunction. Dkt. No. 152. DoW's status reports and the additional information submitted with this response demonstrate the progress thus far and the review that has occurred for projects in each stage of the Clearinghouse review process.

## A. PROGRESS SINCE PRELIMINARY INJUNCTION ORDER

As set forth in more detail below and in Federal Defendants' prior status reports, Federal Defendants have accomplished the following since the Court's preliminary injunction:[2]

<u>Necessary Foundations for Continued Review</u>

- The Clearinghouse implemented certain inter-agency coordination procedures previously neglected but required by existing federal regulations. Dkt. No. 144 at 2.

- The Clearinghouse developed and implemented a new internal analytical methodology to assess pending projects in light of emergent risks. *Id.*

---

[1] For purposes of this brief, Federal Defendants use "Plaintiffs" for ease but refer only to the non-State plaintiffs, as it does not appear the State Plaintiffs joined this Motion nor the previous "response" to Federal Defendants' first status report.

[2] Where noted, some of these actions have been taken since the previous status report.

- In conjunction with the development of the revamped internal analytical methodology, the Clearinghouse developed a new model mitigation agreement for wind energy project applications. *Id.*

Processing at All Five Stages

- Category 1: At the time of the prior status report, the Clearinghouse had been actively applying the analytical methodology to all projects in this category, and had concluded with respect to all projects except one. Dkt. No. 153 at 2. Since then, the Clearinghouse has also analyzed the sole remaining project in this category. *See* Declaration of Dale R. Marks ¶ w (attached as Exhibit A). The Clearinghouse has determined that all projects in this category are mitigatable with additional mitigation measures. *Id.* On October 28, 2026, the Department and one wind project developer fully culminated the Clearinghouse review process with a signed and fully executed mitigation agreement.[3] *Id.* ¶ q. Thus, since the preliminary injunction, the Clearinghouse has shifted from a pause on processing-related activity to active assessment of projects in this Category.

- Category 2: At the time of the prior status report, the Clearinghouse had been actively applying its new analytical methodology to the projects in this category, and had completed analysis on "at least 10 of the 30 projects in this second category." Dkt. No. 153 at 2. Since then, the Clearinghouse has been able to complete its analysis for every project in this category. Exh. A ¶ x. This analysis, and these determinations, have all been made since the preliminary injunction order.

- Categories 3 and 4: At the time of the prior status report, the Clearinghouse had been actively applying its analytical methodology to the projects in these categories, and had reported that it had completed analysis on "more than five" applications in Category 3, and one project in Category 4. Dkt. No. 153 at 3. Since then, the Clearinghouse has been able to complete its analysis for 20 more projects in Category 3. Exh. A ¶ x. Moreover, for Category 3 projects, "[s]ince the second compliance report, DoW has made contact with approximately 80 developers" of the approximately 110 in this Category. *Id.* The Air Force-led Mitigation Response Teams ("MRT") have been seeking 90-day extensions, having secured roughly 19, and continue to seek extensions from the remaining developers. *Id.* And for Category 4 projects (a list which more developers joined after receiving notices of presumed risk, 42 extensions have been granted. *Id.* ¶ z. This analysis and outreach, which had paused at the time of the preliminary injunction order, has all occurred since.

[3] The name of this project and developer has already been disclosed to Plaintiffs.

- Category 5: At the time of the prior status report, the Clearinghouse had determined that at least 40 projects in this category were to be issued notices of presumed risk, and the Department had been in the process of notifying those developers. Dkt. No. 153 at 4. The Clearinghouse had also determined that 4 projects did not warrant a notice of presumed risk; those determinations concluded the Clearinghouse review altogether at that point, without any mitigation demands, and those projects are now with the FAA. *Id.* Since then, the Clearinghouse has cleared an additional 7 projects, finding no presumed risk; those projects, too, are now with the FAA. Exh. A ¶ aa. Also since the prior status report, 8 additional projects have received notices of presumed risk. *Id.* Additionally, 52 wind development projects have been determined not to present a national security risk, and 15 more projects are awaiting confirmation from the Air Force that they do not pose a risk to national security. *Id.* The Department has issued an internal directive to close these projects, advancing them to the FAA. *Id.* At the time of the preliminary injunction order, the Clearinghouse had not been making determinations as to presumed risk; it has now resolved over half of the projects that were in this Category.

### B. INFORMATION SHARING

DoW has also endeavored to share information, when appropriate, throughout this process. Counsel for Federal Defendants has discussed Plaintiffs' concerns with Plaintiffs' counsel when sought, and has provided Plaintiffs' counsel with the information Plaintiffs have requested in meet and confers since the preliminary injunction order. This includes the new draft model mitigation agreement, as well as a list of all currently pending projects, organized by project category.[4] In their Motion, Plaintiffs attempt to weaponize that information, shared in the spirit of goodwill, to introduce irrelevant matters such as their grievances with the model mitigation agreement terms, as discussed *infra* Part III.B.

---

[4] With respect to this list of all currently pending projects, Plaintiffs' present Motion argues the list of all currently pending projects is "[i]naccurate" and "inconsistent," as certain projects are purportedly missing or in the wrong category. Dkt. No. 154 at 12–13. To the extent there are minor discrepancies, the list was not intended nor represented to be a certified statement. It was prepared and provided in a good-faith effort at collaboration and information sharing. The Department would welcome Plaintiffs providing a copy of their list identifying projects they believe are absent from the Clearinghouse's list so that DoW may reconcile any differences.

## II. THERE IS NO OCCASION TO ENFORCE THE INJUNCTION

Plaintiffs have not carried their burden to demonstrate there is occasion for an enforcement action. Ninth Circuit precedent instructs that a party may seek to enforce an injunction by showing that the injunction explicitly forbids the challenged conduct. *Clark v. Coye*, 60 F.3d 600, 644 (9th Cir. 1995). The moving party has the burden of showing by clear and convincing evidence that the enjoined party violated a "specific and definite order of the court." *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999). "(A)ll ambiguities are resolved in favor of the person (or entity) subject to the injunction." *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985). Here, the Court enjoined the temporary pause, and the facts before the Court demonstrate that DoW is reviewing the pending applications consistent with the plain terms of the injunction order. Not only have Plaintiffs not disputed the veracity of either of the first two status reports, but Plaintiffs' declarant confirms their accuracy. *See* Dkt. No. 154-2 at 9 (hereinafter the "Vinson Declaration") ("I have reviewed Defendants' status reports filed on September 10, 2026 . . . [w]hat [my] members report to me is consistent with those filings."). The Vinson Declaration admits that "[t]he filings" (which he acknowledges are accurate) do "describe activity." *Id.* And as discussed at the October 1, 2026 status conference, Plaintiffs conflate their disputes—which are at core issues with *how* review has resumed—with disputes about *whether* review has resumed. For instance, the Vinson Declaration argues the Department is "restarting negotiations rather than finalizing them." *Id.* But the latter and the former are merely different stages of the very processing Plaintiffs themselves admit is happening. Because those prior negotiations occurred under a former, outdated risk assessment process, it is only natural for the Clearinghouse to reassess;

that reassessment is no less processing than starting from where a project had previously left off.

In each Category, there has been concrete progress. For projects in Category 1, the analytical review has been completed, the review has indicated the threats are mitigatable, and the Department is in the process of assessing whether projects in this category will require new mitigation agreements or if pre-existing mitigation agreements adequately address security risks. Exh. A ¶ w. The Department intends to "act with dispatch" in moving the projects in this category. *Id.* And while Plaintiffs assert Federal Defendants have "identifie[d] no completed mitigation negotiations, no newly issued draft mitigation agreements, and no executed mitigation agreements" (Dkt. No. 154 at 4), that claim is not true as the Department has concluded mitigation discussions and executed a mitigation agreement with one developer as of this filing. Exh. A ¶ q. Projects in Category 2 have seen similar progress, albeit without the fully executed mitigation agreement. *Id.* ¶ x. The Clearinghouse has also re-engaged in mitigation discussions with developers per Categories 3 and 4, as Plaintiffs' Vinson Declaration acknowledges. *See* Dkt. No. 152-2 at 5 (acknowledging, inter alia, "contacts with developers" and "invitations to figure meetings"). Indeed, DoW issued internal guidance to Clearinghouse personnel specifically "to ensure adherence to the processes established in Section 183a of title 10, United States Code (U.S.C.), the Clearinghouse statute, and the corresponding regulations set forth in Code of Federal Regulations (C.F.R.) Part 211"—i.e., to ensure that processing resumes. *See Interim Guidance Regarding Compliance with Established Military Aviation and Installation Assurance Siting Clearinghouse Procedures*, DEPARTMENT OF WAR (Sept. 29, 2026) (attached as Exhibit B). That memorandum "merely reiterates the

Department's current expectations," including in "ensur[ing] the prompt scheduling of MRTs." *Id.* at 2. And in Category 5, while preliminary review is not complete for every project, it is complete for over half. Exh. A ¶ aa. Indeed, 8 additional wind projects have been issued a notice of presumed risk, 7 more have been found to not warrant a notice of presumed risk, and have been fully cleared from the Clearinghouse process and are now with the FAA. *Id.* And more than 50 remaining wind projects have been determined to not warrant a notice of presumed risk and have designated for closure. *Id.*

Despite Plaintiffs' careful efforts to frame this motion as an "enforcement" of the relief the Court ordered, it is not so. Federal Defendants are in compliance with the injunction as review is no longer paused. Plaintiffs here attempt to fundamentally alter the nature of the injunction by backdooring components of undoubtedly mandatory relief, seeking not to enforce, but to modify the injunction.[5] They seek to tack on an inordinate number of requirements—most of which are not even prohibitory in nature—that were never in the Court's injunction order nor the relief Plaintiffs sought. That, by definition, is a modification, including a transition from prohibitory to mandatory relief.

The singular case Plaintiffs offer in analogy to support their request to "enforce" is unpersuasive. *See* Dkt. No. 154 at 15 (citing *New York v. Trump*, 777 F. Supp. 3d 112, 120 (D.R.I. 2025), *aff'd*, 171 F.4th 1 (1st Cir. 2026)). In *New York*, the court enjoined FEMA from

---

[5] Indeed, multiple cases Plaintiffs cite in their "Legal Standard" pertain, by Plaintiffs' own characterization, to *modification* of an injunction, not enforcement. The standard for modification is distinct from the standard to enforce, placing upon the movant "the burden of establishing that a significant change in facts or law warrants revision." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000). Plaintiffs do not even attempt to meet this standard and, in any event, have not identified any pertinent changes in facts or law.

applying a categorical freeze on the award and obligation of certain FEMA funds. 777 F. Supp. 3d at 115. The agency then implemented a memorandum providing for a "manual review process" whereby its staff manually reviewed all grant payment requests before disbursing payment to recipients. *Id.* at 117. The court determined that the facts in that case suggest the new justification was "covertly" an end-around that "strives to effectuate . . . [what] the Court enjoined in its preliminary injunction." In *New York*, subsequent actions to the injunction included a "hold" directive on "all Department grant disbursements." *Id.* at 118.

Here, unlike the district court' reading of the facts in *New York*, there is no evidence that the Department, on the heels of this Court's order, proffered a different directive to achieve a similar pause on wind review. Instead, Federal Defendants took various steps to resume review, consistent with this Court's order, as outlined above and in previous status reports. As mentioned above, the Department even issued internal guidance specifically to ensure processing resumes under the law, consistent with this Court's order. *See* Exh. B.

Plaintiffs' disputes at heart go to dissatisfaction with pace and execution, i.e., "how" review has resumed, rather than, as was issue in *New York*, "if" it has resumed. Federal Defendants here have shown movement on projects across the spectrum, and have internally directed personnel "to ensure adherence to" the applicable laws and regulations. Exh. B. And in any event, the court in *New York* responded in that case by prohibiting the subsequent "manual review process"—prescribing *prohibitory* relief against a *new* directive. That is nothing like the laundry list of affirmative, mandatory relief that Plaintiffs seek here. Simply, *New York* is inapposite.

Federal Defendants maintain that the Department is adhering to the Court's injunction because the policy enjoined by the Court is no longer in effect and the facts before the Court demonstrate that review is occurring, albeit not at the pace Plaintiffs desire. Federal Defendants also strongly urge that any shortcomings in adhering to existing statutory or regulatory deadlines is not itself a violation of the injunction or the spirit of the injunction. The very point of a preliminary injunction is to maintain the status quo, *see Camenisch*, 451 U.S. at 395, which this Court interpreted as "the state of affairs that existed before the review freeze." Dkt. No. 125 at 24. It would be untenable to interpret compliance with the preliminary injunction as returning to an idyllic state of affairs that had never existed. *See*, *e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("[A]n agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."); *Thrivent Fin. for Lutherans & Thrivent Inv. Mgmt. Inc. v. Sec. & Exch. Comm'n*, 183 F.4th 777, 784 (D.C. Cir. 2026) ("Agencies have broad discretion in ordering priorities on their regulatory agenda and husbanding scarce agency resources."). This sort of compliance, never having been achieved, is particularly infeasible here given the practical limitations as discussed *infra* Part IV.B.

## III. PLAINTIFFS ARE INAPPROPRIATELY SEEKING PROGRAMMATIC RELIEF

As explained above, there is no need to enforce the injunction. But even if that were not the case, Plaintiffs' requested remedy goes too far. Plaintiffs seek broad, programmatic relief beyond the scope of the injunction. Plaintiffs' requests are inappropriate for a multitude of reasons. Plaintiffs' demands for relief violate seminal Supreme Court authority on the unavailability of such requests, as they seek across-the-board relief across hundreds of

applications based on a handful of examples. Plaintiffs ask the Court to effectively run the Clearinghouse by directing the manner DoW must allocate its limited resources and even direct the nature of DoW's desired mitigation agreements.

### A. PLAINTIFFS NOW SEEK TO COMPEL ACTION, NOT JUST RESUME REVIEW

Plaintiffs' request for relief in support of their preliminary injunction motion asked the Court to "preliminary enjoin DoD's review freeze," including status reports every 30 days. Dkt. No. 14 at 12; *see id.* at 46 (asking the Court to "preliminary enjoin DoD from continuing to apply its unlawful review freeze and related policies and practices"). Indeed, at the preliminary injunction hearing, Plaintiffs doubled down. *See* Dkt. No. 149-1 at 58:4-16 (Transcript of Preliminary Injunction Hearing) ("[W]e're asking for a prohibitory injunction . . . [w]e are not asking for any particular action to be taken by the Government . . . this order will just take away the policy that stopped them from doing what they're supposed to be doing.").

Plaintiffs now have changed their tune and ask the Court to compel DoW action. *See* Dkt. No. 154 at 16–18. That is a mandatory injunction, as it orders a party to take action. *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996). In contrast to a mandatory injunction, a prohibitory injunction "merely orders the defendant to refrain from doing [certain] acts." 42 Am. Jur. 2d Injunctions § 5 (2017); *see Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) (explaining that a prohibitory injunction "prohibits a party from taking action"). The litany of relief that Plaintiffs seek here violate multiple legal doctrines.

**1. <u>Plaintiffs' requested relief violates preliminary injunction principles.</u>**

Plaintiffs have been consistent that they sought only to enjoin the pause on review—and for good reason, as the legal support for a mandatory preliminary injunction is tenuous at best on the facts of this case. *See*, *e.g.*, *Senate of State of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992) (explaining that "judgment on the merits in the guise of preliminary relief" is "highly inappropriate"); *Diversified Mortg. Inv'rs v. U.S. Life Ins. Co. of N.Y.*, 544 F.2d 571, 576 (2d Cir. 1976) (stating that a preliminary injunction "should not grant relief properly awarded only in a final judgment"); *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969) (per curiam) ("[A] preliminary injunction should not work to give a party essentially the full relief he seeks on the merits."). And it is axiomatic that a preliminary injunction's purpose "is merely to preserve the relative positions of the parties until" a determination on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Here, a mandatory preliminary injunction would violate these principles, as Plaintiffs are effectively asking the Court to take affirmative action that would indeed moot out their claims by providing their developers full relief. *See*, *e.g.*, Dkt. No. 154 at 16 (demanding, for example, "countersign[ature] and execut[ion]" of outdated draft mitigation agreements). For these reasons, when given the opportunity, Plaintiffs painstakingly disavowed any notion that they seek mandamus relief, and only seek "for a prohibitory injunction . . . that will take away the policy[.]" Dkt. No. 149-1 at 58:4-16. That appears to no longer be the case.

**2. <u>Plaintiffs' requested relief violates APA principles.</u>**

Plaintiffs' requested relief is also inconsistent with the Court's remedial authority under the Administrative Procedure Act (APA), as the actions and timelines they demand of DoW

are not "discrete" nor "final." Controlling precedent makes clear that Plaintiffs may not levy "'broad programmatic attack[s],' whether couched as a challenge to an agency's action or 'failure to act.'" *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1010 (9th Cir. 2021) (alteration in original) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64–65 (2004) ("*SUWA*")). In *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990), the Supreme Court explained that efforts to compel affirmative relief must be made on a "case-by-case approach." Here, there is nothing case-by-case about what Plaintiffs seek; rather, they seek relief for hundreds of applications, including those by developers not members to this case, and with no regard for the particular facts surrounding that application. *See* Dkt. No. 154 at 16–18 (asking to compel completion by a date certain of every project within each of the five categories). Plaintiffs do not seek to compel any "agency action," but rather an assortment of actions such as MRT discussions and draft-sharing, none of which constitute "agency action" as understood in the APA context, and in any case, each action, even if compellable, be evaluated on their own record. Nor are the actions they seek to compel "final" for APA purposes, as the Clearinghouse's ultimate risk determination is itself advisory, of no legal effect, and therefore not final agency action. *See* 49 U.S.C. § 44718(b)(3). Thus, Plaintiffs' requests to compel action on various stages on the way to that ultimate determination is also not final agency action as is required for mandatory relief.

### B. PLAINTIFFS' DISPUTES ABOUT THE MITIGATION AGREEMENT ARE IRRELEVANT

Within their Motion, Plaintiffs dedicate multiple pages to gripe about the terms contained in the new model mitigation agreement template. *See* Dkt. No. 54 at 7–10. The

Vinson Declaration also dedicates substantial attention to attacking the template. *See* Dkt. No. 154-2 ¶¶ 119–140.

Principally, disagreement with any of the terms in the model mitigation agreement template is wholly irrelevant to the question presented in Plaintiffs' motion—specifically, whether the temporary pause that Plaintiffs challenged, and this Court preliminarily enjoined, remains in effect. Plaintiffs believe that requirements on "topics ranging from personnel issues to supply chain concerns to grid reliability to cybersecurity" are unnecessary and too burdensome.[6] Dkt. No. 154 at 8. But substantive disagreement with mitigation measures is not relevant to the question of whether the Clearinghouse is complying with, in Plaintiffs' own terms, "the resumption of project-specific review." Dkt. No. 154 at 4. Instead, Plaintiffs are asking the Court to let *them* decide what mitigation measures DoW should be requiring under its authorities, and implicitly suggesting that the Court could take up the pen and instruct the Clearinghouse to offer and omit certain terms. This is wholly improper and there is no support for the proposition that Plaintiffs may compel, through the Court, their policy preferences on DoW writ large. *SUWA*, 542 U.S. at 64 (holding that even where appropriate for a court to direct an agency to act, it may not "direct[] how it shall act"); *see*, *e.g.*, *Du v. Gonzales*, No. CV0700151MMMCTX, 2008 WL 11336158, at *6 n.20 (C.D. Cal. Feb. 19, 2008) ("[U]nder

---

[6] Plaintiffs also allege that the requirements of the model mitigation agreement are absent "for other energy projects subject to Clearinghouse review." Dkt. No. 154 at 8. As dispelled by the Honorable Marks, this assertion is untrue, as this agreement, and the mitigation measures provided therein, have also been utilized with respect to transmission line and solar technology projects. Exh. A ¶ p. "Significantly, the first application of the new MA was not in the context of a wind project at all," but rather utilized by the Air Force when negotiating with the Committee on Foreign Investment in the United States (CFIUS) in the context of national security concerns with a transmission line project. *Id.*

the APA, a court does not have jurisdiction to order that an agency act in a particular way[.]"). Moreover, implicit within these grievances is Plaintiffs' apparent belief that they are *entitled* to a mitigation agreement of their liking (and, ultimately, entitled to a finding of no unacceptable risk). Nothing in the statute suggests that the parties must come to an agreement; and if none is reached, the Clearinghouse may issue a finding of unacceptable risk, which in any event is no more than a non-binding recommendation to the FAA. *See* 49 U.S.C. § 44718(b)(3).

Plaintiffs are also disputing terms in only a *model* mitigation agreement. As explained by the Honorable Marks: "The new model template is just that, as individual developers will receive their own draft mitigation agreements which will be personalized based on the results of the Clearinghouse's analytical assessment of that project's risks." Exh. A ¶ q. So, Plaintiffs are voicing displeasure with contractual terms that are not before them. Not only so, but the Department has never represented, nor does it suggest now, that the terms of a particular draft mitigation agreement are offered on a take-it-or-leave-it basis. Quite to the contrary; while the initial draft mitigation agreement may reflect the Department's preferred, ideal language, "if a term is particularly problematic for a particular developer, the Department remains motivated to engage as necessary to meet both parties' objectives, rather than simply find that the project presents an unacceptable risk." *Id.* And finally, specific for Category 1 projects, they may not receive a new mitigation agreement at all as the Department weighs whether countersignature of pre-existing mitigation agreements is appropriate. *Id.* ¶ w.

To the extent any developers receive terms they believe would unduly frustrate their project, they should engage with the Clearinghouse to negotiate an amenable solution, as the Department is committed to doing. *Id.* ¶ q. While Plaintiffs contend, based on the Vinson

Declaration, that negotiations would threaten "delays that may exceed a year or more," Dkt. No. 154 at 9, the Honorable Marks submits that "the dire predictions forecast in the Vinson declaration are unlikely to come to pass," Exh. A ¶ q. As proof of concept, recently the Department fully executed a mitigation agreement with one wind energy developer. *Id.* Where the sides disagreed, they were able to reach "alternative provisions and approaches [] mutually found to be adequate to address the developer's needs and the Department's current national security concerns that precipitated the need for the new model MA template." *Id.* Those negotiations took place over merely 45 duty days (around 65 total days), start to finish.[7] *Id.*

Ultimately, the level of rigor and meticulousness of the Clearinghouse's review process is wholly irrelevant to the salient issue here of whether that review process is occurring. Plaintiffs' motion is an attempt, under the guise of a need to enforce the preliminary injunction, to lasso the Court into matters comfortably outside its province.

## IV. IN ANY EVENT, PLAINTIFFS' REQUESTED RELIEF GOES TOO FAR

As explained above there is no need to enforce the injunction and Plaintiffs' motion is nothing more than attempt at the programmatic relief they previously disavowed. But even if some form of relief were appropriate, Plaintiffs' requests are inappropriate for several other reasons.

### A. RELIEF SOUGHT IS UNSUPPORTED BY STATUTE/REGULATION

Not only should the Court decline Plaintiff's request for programmatic relief for the reasons previously discussed, *supra* Part II.A, but much of what Plaintiffs seek is unmoored to

[7] Of course, to the extent negotiations in any particular case are prolonged, the length of such discussions may be attributable at least in part to the specific developer. This is yet another example of why Plaintiffs' request for programmatic relief is inappropriate.

the law. It is true that this Court found that there is a 30-day deadline to complete preliminary review. Dkt. No. 125 at 26. And it also found there is a 90-day deadline to complete mitigation discussions. *Id.* at 27. But the requirements of the regulatory scheme end there; there are, for instance, no deadlines for a draft agreement to be provided to a developer (projects in Category 2, as conceptualized in this litigation), nor any deadlines for the Department to sign/countersign such agreements (projects in Category 1, as conceptualized in this litigation). Of the gauntlet of "specific requirements" Plaintiffs submit to help "ensure" compliance, many of their proposed dates are simply preferences that they desire, unrequired and absent from any statute or regulation. *See*, *e.g.*, Dkt. No. 154 at 16–17 (demanding, for instance, 30 days for Category 1 countersignature and 30 days for Category 2 project-specific draft agreement transmission). Relatedly, Plaintiffs ask the Court to forbid the Department from categorically re-visiting certain review steps in light of the updated security risk assessment protocols. Dkt. No. 154 at 18. Indeed, any demand by Plaintiffs that is unsupported by a statutory or regulatory deadline would be inherently fact-specific and would need to be brought, and assessed, on a project- and case-specific basis. *See Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (adopting the so-called *TRAC* factors as set forth in *Telecommunications Rsch. & Action Ctr. v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984), to determine whether to compel an agency action)). Thus, instead of seeking to enforce statutory or regulatory deadlines, Plaintiffs are asking the Court to forbid the Clearinghouse from processing if that processing is in a manner that Plaintiffs disfavor.

### B. RELIEF SOUGHT IS UNSUPPORTED BY PRACTICAL CONSIDERATIONS

Much of Plaintiffs' requested relief also ignores some of Plaintiffs' own facts and is contrary to historical timelines for Clearinghouse review. This is yet another example of how Plaintiffs are asking the Court to programmatically impose their policy preferences on the Clearinghouse process. Indeed, Plaintiffs' factual declarant is not even a member of the Plaintiff organizations, let alone a project developer. *See* Dkt. No. 154-2 ¶ 5 ("ACP is not a party to this litigation.").

Plaintiffs make no effort to explain how their timelines comport with the reality on the ground. Take the two concrete deadlines as interpreted by this Court: 30 days for preliminary review and 90 days for MRT discussions. *See* Dkt. No. 125 at 5, 27. The Clearinghouse has historically needed much longer for both these steps—indeed, preliminary review historically took more than 75 days, and it took an average of 512 days from the start of the mitigation process to the first draft mitigation agreement. Dkt. No. 90-1 ¶ 32. For Plaintiffs' requested relief across the five Categories, none of the timeframes they propose comport with historical pre-pause realities. *See* Dkt. No. 154 at 16–17. For instance, by their own declarant, "DoD's countersignature alone took approximately two months" pre-pause, Dkt. No. 154-2 ¶ 26, yet they now demand 30 days, Dkt. No. 154 at 16. Likewise, they admit that resolving multiple disputed mitigation terms historically "took more than a year," Dkt. No. 154-2 ¶ 26, yet they now ask the Court to order draft mitigation agreements, with agreed-upon terms, to be provided within 30 days, Dkt. No. 154 at 16. Relatedly, for Category 3 projects, Plaintiffs demand DoW "commence substantive reengagement with the developer for each project" within 15 days, *id.* at 17, despite that there are more than 100 projects in this Category.

Not only are these Plaintiff-devised timelines sweeping, unprecedented, and largely unworkable, Plaintiffs indeed seek to apply them for *all* the projects, irrespective of project-specific circumstances and even despite that most developers are not parties to this case and have not sought such relief. These demands are also particularly untenable considering the projects had backlogged during the pendency of the pause, in the time prior to this Court's preliminary injunction order. As explained by the Honorable Marks, the Clearinghouse has limited resources and must balance various operational and personnel demands against their obligations. Exh. A ¶¶ r–t (explaining the Department has navigated, in recent years, "a period simultaneously characterized by downward pressures on resourcing (manning, funding, and contractor support," while facing a "dramatic influx of applications received"). Indeed, staffing at the Clearinghouse and specific components in charge of wind energy review has long been sparse and recently faced "a protracted vacancy." *Id.* ¶ s; *see also id.* ¶¶ r–t. The Department must be afforded latitude to best determine how to navigate within these operational constraints. *See*, *e.g.*, *Massachusetts*, 549 U.S. at 527 ("[A]n agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."); *Thrivent*, 183 F.4th at 784 ("Agencies have broad discretion in ordering priorities on their regulatory agenda and husbanding scarce agency resources."). Indeed, particularly comprehensive projects may necessitate longer review processes; to compel action with respect to any project is a fact-specific inquiry which must be analyzed, if at all, under the *TRAC* factors and on a project-specific basis. *See Indep. Mining Co*, 105 F.3d at 507. The relief demanded by Plaintiffs for Categories 1 through 5, and in their remaining bullet points on page 18 of their motion, should be rejected.

## V. CONCLUSION

Plaintiffs' Motion largely regurgitates the same issues Plaintiffs raised in their "Response" to Federal Defendants' first status report. The relief Plaintiffs request is improper, including for multiple reasons with respect to certain items Plaintiffs demand. The record presently before the Court shows that DoW has returned to reviewing applications, as the injunction required—even if slower than Plaintiffs' hopes. The Court should deny Plaintiffs' motion, which is replete with inappropriate and unsupported demands.

Dated: November 3, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

*/s/ Shawn D. Ren*
Shawn D. Ren, Trial Attorney
Texas Bar No. 24132873
U.S. Department of Justice
Energy & Natural Resources Division
999 18th St., N Terrace, Suite 600
Denver, CO 80202
Tel: (202) 598-3141
Fax: (303) 844-1350
E-mail: shawn.ren2@usdoj.gov

*Attorney for Federal Defendants*