**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | | |
|---|---|---|
| RENEWABLE NORTHWEST, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PETER B. HEGSETH, *et al.*,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:26-CV-01092 |

**SECOND DECLARATION OF HON DALE R. MARKS**

I, Dale R. Marks, declare as follows:

a. I previously provided a declaration in this litigation on July 5, 2026. At that time, I was performing the duties of the Deputy Undersecretary of War for Acquisition and Sustainment (DASW(A&S)). That position has subsequently been filled. I remain the Assistant Secretary of War for Energy, Installations, and Environment (ASW(EIE)), a position I have held since June 3, 2025.

b. My career spans nearly 25 years of uniformed military service and subsequent senior roles within the federal government, focusing on strategic planning, operational risk assessment, and national security. The information contained in this declaration is based entirely on my personal knowledge or information obtained through the performance of my professional duties.

c. In my confirmed role as ASW(EIE), I am responsible for all Department of War (DoW) matters relating to energy, installations, and the environment,

including operational and facility energy, installation maintenance, and environmental planning. In so doing, I provide budgetary, policy, and managerial control over the Department's extensive real property assets, which include 27 million acres of land and in excess of 500,000 buildings and structures located at over 800 installations.

d. As noted in my original declaration, I am the Secretary's delegated manager of the Military Aviation and Installation Assurances Clearinghouse (Clearinghouse). As such, I am familiar with the Clearinghouse processes for evaluating projects referred by the Federal Aviation Administration (FAA) and, where appropriate, negotiating and executing mitigation agreements (MAs) to address effects on military operations and national security. DoW's role in making national security determinations differs based on which agency the DoW is supporting. *Importantly, the DoW is not an approval authority for projects* submitted to the Department of Transportation (DOT), acting through the FAA, or the Department of the Interior (DOI).

e. I have reviewed the plaintiffs' motion to enforce the stay, and the declarations attached thereto. *See* Dkt. No. 154, 154-1, and 154-2. The following statements are based on knowledge obtained in furtherance of executing my professional responsibilities.

**Preliminary Injunction & Plaintiffs' Motion to Enforce Requests Related to Compliance Reporting Requirements**

f. On August 6, 2026, the Court directed DoW to provide status updates every 30 days addressing whether review of wind energy projects has resumed at each stage

of the review process based on five defined categories[1] [Category 1- Awaiting MA Countersignature; Category 2- Awaiting Draft MAs; Category 3- Mitigation Response Team (MRT) Continuation; Category 4- MRT Scheduling; and Category 5- Preliminary Review (PR)] established in the plaintiffs' pleadings. On October 20, 2026, the plaintiffs filed a motion seeking enforcement of the court's August 6 preliminary injunction and requested an order requiring DoW to take the following deadline-driven, project-specific actions across the aforementioned five categories of projects:

(1) **Category 1 (Awaiting MA Countersignature):** Within 30 days, countersign pending mitigation agreements and transmit determinations to FAA, or provide a detailed explanation of remaining project-specific concerns, necessary steps, responsible officials, and timeline.

(2) **Category 2 (Awaiting Draft MAs):** Within 30 days, issue a project-specific draft agreement or provide an equivalent detailed explanation for further review.

(3) **Category 3 (MRT Continuation):** Begin substantive reengagement within 15 days and establish milestones and completion timelines within 30 days.

(4) **Category 4 (MRT Scheduling):** Begin actual MRT discussions within 30 days for projects already issued a Notice of Presumed Risk (NPR), identify

---

[1] "(1) projects with a mitigation agreements executed by the developer that are awaiting countersignature; (2) projects that have completed the mitigation response team (MRT) process; (3) projects that were in the middle of the MRT process; (4) projects that have received a notice of presumed risk and are awaiting initial MRT meetings; and (5) projects that are awaiting completion of a preliminary review and issuance of a notice of presumed risk determination or non-objection transmittals to the FAA." *Renewable Nw. v. Hegseth,* No. 3:26-cv-01092-IM, Opinion & Order at 35–36 (D. Or. Aug. 6, 2026), ECF No. 125.

project-specific concerns, or explain any required antecedent step, and schedule MRT discussions.

(5) **Category 5 (PR):** Complete outstanding preliminary reviews and take required resulting action promptly, subject to the specified deadline framework. Plaintiffs' Motion to Enforce Stay at 15–16, *Renewable Nw. v. Hegseth*, No. 3:26-cv-01092-IM (D. Or. Oct. 20, 2026), ECF No. 154.

g. As a foundational matter to the categorical progress made during this, and prior, compliance reporting cycles as described below (beginning at para. u), the new model MA terms that the plaintiffs complain about are grounded in the Clearinghouse's original mission as amplified by recent policy and regulatory activity to protect the national electric grid and bulk energy supply across the whole of government. Energy proposal review across the full spectrum of proposals necessitated revising all of the Clearinghouse MA templates, irrespective of specific generation technology. In short, the model MA is not unique to wind, nor intended to encumber wind development projects.

h. Importantly, when DoW reviews a project in the FAA's Obstruction Evaluation/Airport Airspace Analysis (OE/AAA) system, it evaluates projects through two lenses: FAA's Part 77 (14 C.F.R.) and DoW's Part 211 (32 C.F.R.). Critically, Part 77 only addresses airspace obstruction issues and does not define airspace as Class B, C, D, E, special-use airspace, or a fixed geographic airspace boundary. Instead, it defines obstruction-evaluation surfaces and height standards used to assess whether an object may affect navigable airspace or aviation facilities resulting in a safety of flight risk. The only inclusion of military airspace is for the

imaginary surfaces located at military airports— including inner horizontal, conical, outer horizontal, primary, clear-zone, approach-clearance, and transitional surfaces (14 C.F.R. § 77.21). Part 77 review does not create, chart, or provide stand-alone obstruction-protection criteria for military special-use airspace, low-level training, ranges, or other DoW missions. These concerns are addressed through the 32 C.F.R. Part 211's Mission Compatibility Evaluation (MCE) processes through which DoW satisfies the Department's statutory obligations with respect to military operations and national security, including those related to its homeland defense mission.

i. Since the inception of the Clearinghouse in 2011, homeland defense has been a component of DoW's national security review obligations, which include the "***prevention of threats and aggression directed toward the United States*** and its territories" (Pub. L. No. 111-383, § 358(f)(2)(E)) (emphasis added). This obligation flows into DoDI 4180.02, *DoD Military Aviation and Installation Assurance Siting Clearinghouse*. DoDI 4180.02, para. 2.6 establishes the responsibilities of Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs (now Assistant Secretary of War for Homeland Defense and Americas' Security Affairs) with respect to homeland defense reviews of projects presented to the Clearinghouse by either the FAA or DOI. The term "homeland defense activity" means an activity undertaken for the military protection of the territory or domestic population of the United States, or of infrastructure or other assets of the United States determined by the Secretary of War as being critical to

national security, from a ***threat or aggression against the United States*** (emphasis added) (32 U.S.C. § 901(1)).

j. Significantly, the last portion of this definition echoes the mission to deter "threats" and "aggression" against the United States original to DoW's Clearinghouse function (Pub. L. No. 111-383, § 358(f)(2)(E)); a mission which takes on increased importance given Executive Order (EO) 14421, *Declaring a National Emergency to Secure the United States Bulk-Power System*, (Exec. Order No. 14,421, 91 Fed. Reg. 55,995 (Aug. 31, 2026)) and DoW's role in providing technical, operational, force-protection, installation-energy, radar/airspace, cyber, supply-chain, and mission-assurance considerations to the Department of Energy (DOE), especially as it promulgates the required rulemaking due in late December of this year.

k. The EO's central finding is that foreign supply of certain bulk-power-system electric equipment presents an "unusual and extraordinary threat" to U.S. national security, foreign policy, and the economy because certain foreign actors are increasingly creating and exploiting vulnerabilities in the system, which may allow for malicious cyber activities (e.g., digital backdoors that would permit remote foreign access and potential disruption of the bulk-power system). The order therefore declares a national emergency under the International Emergency Economic Powers Act and the National Emergencies Act.

l. Specifically, EO 14421 requires the Secretary of Energy in coordination with the Director of the Office of Management and Budget and in consultation with the Secretary of War, the Secretary of Commerce, the Secretary of Homeland Security,

the Director of National Intelligence, and the heads of other executive departments and agencies, as appropriate, to undertake on several actions, including:

(1) Identifying high-risk bulk-power-system electric equipment associated with Covered Foreign Entities;

(2) Making determinations to prohibit certain post–August 26, 2026, transactions involving foreign-produced bulk-power-system electric equipment;

(3) Taking appropriate implementation measures to prohibit qualifying transactions, order cessation or replacement, issue licenses, establish prequalification procedures, and impose mitigation or conditions on certain existing equipment, including establishing conditions on continued use, maintenance, monitoring, isolation, disconnection, replacement, or removal of certain preexisting foreign equipment;

(4) Developing and submitting recommended Federal Acquisition Regulation (FAR) revisions within 180 days (i.e., by February 22, 2027) to ensure Federal energy-infrastructure procurements adequately consider national-security risks and prioritize U.S.-manufactured energy infrastructure;

(5) Consistent with the National Emergencies Act and International Emergency Economic Powers Act reporting requirements, submitting recurring and final reports to Congress on the declared national emergency;

(6) Developing and submitting recommendations to the President on ways to identify, inventory, isolate, monitor, or replace the identified high-risk equipment, taking account of overall bulk-power-system risk; and

(7) Publishing rules or regulations within 120 days (i.e., by December 24, 2026), as needed, to implement the EO as described above.

m. Importantly, EO 14421 was not issued in isolation, nor was it the first federal undertaking of a similar nature that impacted DoW's existing Clearinghouse mitigation templates. For example, five days before DoW initiated its temporary and strategic pause with respect to executing further MAs, the Department of Commerce (DOC) launched a section 232 (Trade Expansion Act of 1962) national-security investigation to under 19 U.S.C. § 1862 and the National Security Industrial Base Regulations regarding imported wind turbines (90 Fed. Reg. 41,380 (Aug. 25, 2025). DOC's investigation found that imports of wind turbines and their components and subcomponents are being imported under circumstances that threaten to impair U.S. national security, as further articulated in presidential Proclamation 11074 entitled "Adjusting Imports of Wind Turbines and their Parts and Components into the United States" (91 Fed. Reg. 68,001, 68,003 (Oct. 28, 2026)).

n. Issued on October 22, 2026, the proclamation adopts Commerce's section 232 findings regarding grid reliability, cybersecurity and remote-access, as well as radar and airspace concerns related to wind energy. In particular, the investigation determined that wind-energy products—especially foreign-produced, networked inverters—can create exploitable vulnerabilities (e.g., risks that a malicious actor

could obtain remote access to turbine generation systems and disrupt or sabotage power operations). As a result, the proclamation directs the Secretary of Commerce and U.S. Trade Representative to pursue or continue trade negotiations, report to the President within 180 days, and monitor imports for possible further action. *Id*.

o. Given this context and generational threat paradigm threat described in my July 5, 2026, declaration, it was imperative for DoW to substantially revise its MA templates to address the emerging national security concerns rooted the Clearinghouse's mission to prevent "threats and aggression directed toward the United States and its territories." However, as described in my earlier declaration and DoW's first two compliance reports, doing so required a scientifically rigorous and national security-centered framework; a structured review and update to DoW's internal, analytical methodologies; and the development of a new MA template, the provisions of which are to be universally applied across all bulk energy supply technologies.

p. Significantly, the first application of the new MA was not for a wind energy project at all. The earliest draft provisions, addressing Committee on Foreign Investment in the United States (CFIUS) and national security concerns stemming from insider threat as well as cyber and supply chain security, was for Department of the Air Force (DAF) negotiations with a transmission line project. A similar variant was developed for Department of the Army's (Army's) use with solar technology projects near Fort Huachuca. As a matter of policy and in compliance with statutory obligations

regarding national security, DoW will incorporate the new model provisions into all MA templates regardless of underlying technology.

q. However, the Department recognizes templated MAs are a tool to be used in project-specific MRT discussions that result in agreements unique to specific projects. The new model template is just that, as individual developers will receive their own draft mitigation agreements which will be personalized based on the results of the Clearinghouse's analytical assessment of that project's risks. DoW demonstrated this use and flexibility in negotiating the first fully executed wind agreement under the new model. The resulting 253-page MA with a large, sophisticated entity (i.e., having wind energy generating capacity approaching 2.4 gigawatts across several states) retained almost all of the new terms, with the exception of various provisions in Section 6 and the related Exhibit 7. While this developer's project is classified as low-impact, it was willing to voluntarily agree to some of the North American Electric Reliability Corporation – Critical Infrastructure Protection (NERC CIP) medium-impact standards. Where it did not, the parties were able to agree to substituted provisions using other standards such as those of National Institute of Standards and Technology (NIST) for example. These alternative provisions and approaches were mutually determined to be adequate to address the developer's needs and the Department's current national security concerns that precipitated the need for the new model MA template. Moreover, contrary to the plaintiffs' claims, this agreement was expeditiously negotiated and executed—45 duty days from the exchange of the first draft until the last signature was obtained. This example suggests the dire predictions forecast in the Vinson declaration are unlikely to come to pass. Regardless, if a term is particularly

problematic for a particular developer, the Department remains motivated to engage as necessary to meet both parties' objectives, rather than simply find that the project presents an unacceptable risk.

**Operational and Resource Constraints, Workload Scale, and Obstruction Evaluation/ Airport Airspace Analysis (OE/AAA) System Latency Limitations**

r. Critically, all of DoW's evaluation and negotiation efforts must be advanced by highly contractor dependent teams of professionals at the DoW, Service, and Component levels. None of these teams are sized to manage the dramatic influx of applications received in recent years during a period simultaneously characterized by downward pressures on resourcing (manning, funding, and contractor support). As noted in my prior declaration, over the 13-year period (2012-2025), it took DoW, on average, 491 days from the point of OE/AAA project notification to full execution of mitigation agreements. From 2020 onward, the number of mitigation agreements executed per year increased by 400% or more (Decl. of Dale R, Marks ¶ 25, *Renewable Nw. v. Hegseth*, No. 3:26-cv-01092-IM (D. Or. July 6, 2026), ECF No. 90). As stated in para. 27 of this declaration, Clearinghouse records indicate that the DoW has signed 185 wind energy mitigation agreements since 2012 (*Id.*) In an average year, the DoW would execute 13 mitigation agreements, but more recently, this number has hovered around 30 (*Id.*) However, there are currently approximately 400 wind energy projects in categories one through five, and staffing levels remain largely unchanged.

s. DoW's Clearinghouse has two federal employees and four contractors trained to operate the FAA's OE/AAA system and to provide dedicated support to the MCE

process, including both the formal and informal reviews, and now, litigation support. While three contractor positions supported the MCE process prior to 2024, since that time, the Clearinghouse had a protracted vacancy of one of its two civilian employee billets, which was not filled until just a few months ago.

t. The two components responsible for virtually all wind energy project reviews are the DAF and the North American Aerospace Defense Command (NORAD). Similar to the Clearinghouse, DAF has two federal employees and three contractors supporting its review processes, while NORAD has a staff of four civilian employees for whom § 183a responsibilities are but one of their professional duties. Moreover, by law, contractors cannot perform inherently governmental functions—meaning they cannot sign MAs, formally adjudicate "unresolved adverse impacts," or execute official determinations. Consequently, these actions for the approximately 400 projects in the queue rest solely with the 8 federal civilian employees amongst DoW and the most heavily impacted components. These operational and resource constraints are further compounded by workload scale and OE/AAA system latency issues.

**Third Compliance Reporting Period (October 5-November 4, 2026) Data**

u. On August 6, 2026, the Court directed the Department of War to provide status updates according to the five categories described above every 30 days. During a status conference on October 1, 2026, the Court directed the Department to include in the status update its compliance with statutory and regulatory deadlines. What follows is the Clearinghouse compliance data for the period from October 5, 2026, through November 4, 2026.

v. As noted in the October 5, 2026, status update, and applicable to all of the categories, I issued interim guidance on September 29, 2026, "Interim Guidance Regarding Compliance with Established Military Aviation and Installation Assurance Siting Clearinghouse Procedures" regarding projects to be reviewed by the Clearinghouse. The guidance "reiterates the Department's current expectations of the [Clearinghouse], the Services, and Department of War (DoW) Components with respect to projects issued a Notice of Presumed Risk (NPR) pursuant to 32 C.F.R. § 211.6(a)(3)(iii)(A)." (attached as Exhibit A). The interim guidance unequivocally states, "[t]he Services and Components will ensure the prompt scheduling of MRTs. For any projects for which a NPR has been issued and that have not already been contacted to schedule an initial meeting, the Service or the DoW Component leading the MRT discussions will contact the applicant **no later than 1200 on 30 September 2026**." (emphasis in the original). Additionally, the interim guidance directs, "[p]rior to attending any meetings, the Services and Components leading the MRT will discuss the operational risks identified during the pre-MRT, internal, analytical evaluation of the project with NORAD's J322 Radar Analysis Branch. In addition to discussing the mission specific impact data and ensuring mitigation decisions are technically effective, operationally feasible, and defensible, the MRT will address the standard mitigation agreement topics described below. Importantly, several of these topics are in furtherance of Executive Order 14421, *Declaring a National Emergency to Secure the United States Bulk-Power System*, dated August 26, 2026, and the forthcoming implementation standards."

w. **Category 1 (Awaiting MA Counter Signature):** Since the October 5, 2026, status update, the Department of War has undertaken the following activities in furtherance of

its review of Category 1 wind energy projects (i.e., those projects with a mitigation agreement executed by the developer that are awaiting countersignature):

(1) As noted in the prior update, the Department applied its new analytical methodology to all the projects in this category save one. That project's review is complete, and now all projects in this category have been evaluated pursuant to the new analytical methodology.

(2) The results indicated that all projects in this category pose risks to national security that require mitigation measures. Many of those mitigation measures were reflected in the MAs previously signed by the developers but not countersigned, and thus not executed, by the Department. In consideration of project developers' reliance interests, and the potential sufficiency of the mitigation measures in the previously-signed MAs, the Department is assessing whether, for only this category, it may be appropriate to countersign the original MAs for any of the projects in this category.

(3) Whether through countersignature of pre-existing MAs or issuance of new draft agreements, the Department intends to act with dispatch with respect to the approximately 33 projects remaining in Category 1.

x. **Category 2 (Awaiting Draft MAs):** Since the October 5, 2026, status update, the Department of War has undertaken the following activities in furtherance of its review of Category 2 wind energy projects (i.e., those projects that had completed the MRT process but had not yet received a draft mitigation agreement from DoW):

(1) As with the projects in the category above, the Department has completed the analytical methodology evaluation of all of the approximately 28 projects in this category.

(2) As noted in the October 5, 2026, status update, the Department intends to draft bespoke, individualized MAs for the projects in this category after tending to the administrative needs of the Category 1 projects.

y. **Category 3 (MRT Continuation):** Since the October 5, 2026, status update, the Department of War has undertaken the following activities in furtherance of its review of Category 3 wind energy projects (i.e., those projects that were in the middle of the MRT process):

(1) In the October 5, 2026, status update, DoW reported that there were approximately 110 projects in Category 3. Since the second compliance report, DoW has made contact with approximately 80 developers.

(2) In addition to completing the remaining two-thirds of Category 2 projects from last cycle, DoW has completed the analytical methodology evaluation of approximately 20 additional projects in Category 3 this reporting period over what was reported in October.

(3) As noted in the plaintiffs' declarations, MRT representatives have sought 90-day extensions, securing about 19 of them, and they continue to seek them from the remaining developers in this category as well as the other categories. For those projects not currently covered by a valid extension, DoW has exceeded the 90-day regulatory timeline.

z. **Category 4 (MRT Scheduling):** Since the October 5, 2026, status update, the Department of War has undertaken the following activities in furtherance of its review of Category 4 wind energy projects (i.e., those projects that had received notice of presumed risk and were awaiting initial MRT meetings):

(1) During this compliance reporting cycle, 8 developers have moved into this category after receiving NPRs, while the MRTs secured 42 extensions for Category 4 projects.

(2) The Department has yet to apply its new analytical methodology to the projects in this category, beyond the one evaluated last cycle. As such, the Department has not provided developers in this category with copies of the new model MA template and has not provided any developers with individualized draft MAs this reporting cycle.

(3) Since the October 5, 2026, status update, developers in this category have been contacted, asked to consent to extensions, and/or have been contacted regarding the scheduling of MRT discussions. Other than the 42 projects for which the developers have consented to an extension, all have exceeded the 90-day regulatory timeline.

aa. **Category 5 (Preliminary Review):** Since the October 5, 2026, status update, the Department of War has undertaken the following activities in furtherance of its review of Category 5 wind energy projects (i.e., those projects that were awaiting completion of a preliminary review and issuance of presumed risk determinations or non-objection transmittals to the FAA):

(1) Since the October 5, 2026, status update, the Department has issued 8 NPRs as described above and has received 17 new wind energy projects during this reporting cycle. Forty-five projects are currently under active review.

(2) Additionally, the Department's preliminary review has identified 52 wind projects that do not warrant an NPR, and the Components are in the final stages of reviewing approximately fifteen additional projects that appear as they too will not require an NPR.

(3) While these wind development projects will create doppler effects, the siting proposals for these projects do not generate radar interference impacting DoW equities, and no other DoW impacts were identified during the preliminary review. Thus, the internal, methodological evaluation DoW applies to projects receiving an NPR is not necessary. These projects will be closed out with the FAA without progressing through Categories 4 through 1. All but six of these projects have exceeded the statutory 75-day review period.

(4) I have directed the Clearinghouse staff to continue closing these projects, thereby advancing them to the FAA for further processing pursuant to 49 U.S.C. § 44718.

(5) This reporting cycle, DoW completed 7 similarly situated projects; they are now with the FAA for further processing pursuant to 49 U.S.C. § 44718. Of the 7 projects DoW closed, one was evaluated and closed out during the 75-day statutory timeline directed by § 183a.

bb. The Services must balance various operational and personnel demands against their obligations to the MRTs. Similarly, NORAD has seen a dramatic increase of threat activity in its area of responsibility, notably involving unmanned aerial systems.

Nevertheless, the Department is fully committed to progressing through its review of Clearinghouse projects and to meeting this Court's expectations.

I certify under penalty of perjury that the statements above are true and accurate.

MARKS.DALE.
R.1080786405

Digitally signed by
MARKS.DALE.R.1080786405
Date: 2026.11.03 20:41:48
-05'00'

Dale R. Marks
Assistant Secretary of War
for Energy, Installations, and Environment

Executed Nov. 3, 2026, in Arlington, VA.